**Nos. 26-1374, 26-1375**

In The
# United States Court of Appeals for the Fourth Circuit

**PERDUE FARMS, INC.,**

*Plaintiff-Appellant,*

*v.*

**KEITH E. SONDERLING, in his official capacity as Acting U.S. Secretary of Labor, et al.**
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of North Carolina
Nos. 24-cv-00477, 24-cv-00594 (Hon. Louise W. Flanagan)

**JOINT APPENDIX**

**VOLUME 2 of 3 | JA36-JA538**

(*Counsel listed on inside cover*)

Brett A. Shumate
*Assistant Attorney General*
Daniel Aguilar
David L. Peters
*Attorneys, Appellate Staff*
*Civil Division*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 598-6735
david.l.peters@usdoj.gov

*Counsel for Government*
*Defendants*

Thad M. Guyer
T M GUYER & FRIENDS, PC
Government Accountability
Project
116 Mistletoe Street
Medford, OR 97501
(206) 941-2869
thad@guyerayers.com

*Counsel for Rudy Howell and*
*Craig Watts*

Gary W. Jackson
Attorney at Law
555 South Mangum Street
Suite 100
Durham, NC 27701
(919) 298-2722
gjackson@ncadvocates.com

*Counsel for Rudy Howell and*
*Craig Watts*

Megan Barbero
Courtney L. Dixon
Elizabeth M. Wilson
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4540
mbarbero@venable.com

*Counsel for Perdue Farms, Inc.*

# TABLE OF CONTENTS[*]

| Docket, ECF No. | Description | Page No. |
|---|---|---|
| **Volume 1** | | |
| 5:24-cv-00477, 73<br>5:24-cv-00594, 67 | Order granting defendants' motions for summary judgment and to dismiss (Mar. 9, 2026) | JA1 |
| 5:24-cv-00477, 74 | Judgment (Mar. 9, 2026) | JA34 |
| 5:24-cv-00594, 68 | Judgment (Mar. 9, 2026) | JA35 |
| **Volume 2 (Watts)** | | |
| 5:24-cv-00477, N/A | District Court Docket Report | JA36 |
| 5:24-cv-00477, 6 | Complaint for declaratory and injunctive relief (Aug. 23, 2024) | JA48 |
| 5:24-cv-00477, 6-1 | Declaration of Roger A. Colaizzi in Support of Plaintiff Perdue Farms Inc.'s Complaint for Declaratory and Injunctive Relief and list of attached exhibits | JA75 |
| 5:24-cv-00477, 6-2 | Exhibit 1 to complaint: Notice of Whistleblower Complaint | JA77 |
| 5:24-cv-00477, 6-3 | Exhibit 2 to complaint: OSHA Findings | JA92 |
| 5:24-cv-00477, 6-4 | Exhibit 3 to complaint: ALJ Decision and Order dated Jan. 6, 2017 | JA97 |
| 5:24-cv-00477, 6-5 | Exhibit 4 to complaint:, Administrative Review Board Decision dated Mar. 5, 2019 | JA110 |
| 5:24-cv-00477, 6-6 | Exhibit 5 to complaint: Dept of Labor's Motion for Voluntary Remand | JA117 |
| 5:24-cv-00477, 6-7 | Exhibit 6 to complaint: Order Granting Motion for Remand | JA129 |
| 5:24-cv-00477, 6-8 | Exhibit 7 to complaint: FDA Amicus Brief | JA131 |
| 5:24-cv-00477, 6-9 | Exhibit 8 to complaint: Administrative Review Board Decision dated May 28, 2020 | JA181 |
| 5:24-cv-00477, 6-10 | Exhibit 9 to complaint: Supplemental Whistleblower Complaint | JA188 |
| 5:24-cv-00477, 6-11 | Exhibit 10 to complaint: ALJ Decision and Order dated Oct. 21, 2022 | JA214 |
| 5:24-cv-00477, 6-12 | Exhibit 11 to complaint: Respondent's Application for Subpoenas | JA233 |
| 5:24-cv-00477, 6-13 | Exhibit 12 to complaint: Order Quashing Subpoenas | JA389 |
| 5:24-cv-00477, 6-14 | Exhibit 13 to complaint: Respondent's Motion to Certify Interlocutory Appeal or to Reconsider | JA396 |
| 5:24-cv-00477, 6-15 | Exhibit 14 to complaint: Order Denying Motion to Certify Interlocutory Appeal or to Reconsider | JA411 |

---

[*] To avoid unnecessary duplication, this joint appendix includes exhibits the first time they appear in the record and omits duplicate exhibits refiled later in the record or that appear in both cases.

1

| | | |
|---|---|---|
| 5:24-cv-00477, 6-16 | Exhibit 15 to complaint: Respondent's Letter Requesting Conference and Stay | JA424 |
| 5:24-cv-00477, 6-17 | Exhibit 16 to complaint: Complainant's Response to Request for Conference and Stay | JA427 |
| 5:24-cv-00477, 6-18 | Exhibit 17 to complaint: Order Denying Conference and Stay | JA432 |
| 5:24-cv-00477, 6-19 | Exhibit 18 to complaint: Respondent's Motion to Dismiss | JA440 |
| 5:24-cv-00477, 6-20 | Exhibit 19 to complaint: Complainant's Opposition to Motion to Dismiss | JA466 |
| 5:24-cv-00477, 6-21 | Exhibit 20 to complaint: Order Denying Motion to Dismiss | JA472 |
| 5:24-cv-00477, 25 | Watts's Answer to Complaint (Dec. 4, 2024) | JA480 |
| 5:24-cv-00477, 50 | Perdue's Statement of Undisputed Material Facts (Feb. 19, 2025) | JA499 |
| 5:24-cv-00477, 51 | Appendix to Perdue's Statement of Undisputed Facts (Table of Contents) | JA508 |
| 5:24-cv-00477, 51-22 | Exhibit 22 to Appendix to Perdue's Statement of Undisputed Facts: Declaration of Roger A. Colaizzi | JA511 |
| 5:24-cv-00477, 56 | Government's Response to Perdue's Statement of Material Facts (Mar. 12, 2025) | JA515 |
| 5:24-cv-00477, 57-1 | Watts's Response to Perdue's Statement of Material Facts (Mar. 12, 2025) | JA524 |
| 5:24-cv-00477, 75 | Notice of Appeal (Apr. 1, 2026) | JA536 |
| **Volume 3 (Howell)** | | |
| 24-cv-00594, N/A | District Court Docket Report | JA539 |
| 5:24-cv-00594, 1 | Complaint for declaratory and injunctive relief (Oct. 18, 2024) | JA550 |
| 5:24-cv-00594, 1-1 | Declaration of Robert A. Colaizzi and list of exhibits | JA577 |
| 5:24-cv-00594, 1-2 | Exhibit 1 to complaint: Notice of Whistleblower Complaint | JA579 |
| 5:24-cv-00594, 1-4 | Exhibit 3 to complaint: OSHA letter dated Jan. 27, 2022 | JA599 |
| 5:24-cv-00594, 1-5 | Exhibit 4 to complaint: OSHA Findings | JA602 |
| 5:24-cv-00594, 1-6 | Exhibit 5 to complaint: Howell OSHA Objections and Restated Complaint | JA607 |
| 5:24-cv-00594, 1-7 | Exhibit 6 to complaint: ALJ Decision and Order dated Dec. 14, 2022 | JA633 |
| 5:24-cv-00594, 1-8 | Exhibit 7 to complaint: ALJ Scheduling Order dated Sep. 25, 2024 | JA644 |
| 5:24-cv-00594, 35 | Perdue's Statement of Undisputed Material Facts (Mar. 17, 2025) | JA650 |
| 5:24-cv-00594, 36 | Appendix to Perdue's Statement of Facts (list of exhibits) | JA660 |

2

| | | |
|---|---|---|
| 5:24-cv-00594, 36-18 | Exhibit 18 to Perdue's Statement of Facts: ALJ Order Granting Joint Motion to Stay | JA663 |
| 5:24-cv-00594, 36-19 | Exhibit 19 to Perdue's Statement of Facts: Declaration of Roger A. Colaizzi | JA667 |
| 5:24-cv-00594, 37-2 | Howell's Statement of Undisputed Facts (Mar. 17, 2025) | JA672 |
| 5:24-cv-00594, 43 | Government Defendants' Response to Perdue's Statement of Material Facts (Apr. 7, 2025) | JA686 |
| 5:24-cv-00594, 44-1 | Howell's Response to Perdue's Statement of Material Facts (Apr. 7, 2025) | JA698 |
| 5:24-cv-00594, 48 | Perdue's Response to Howell's Statement of Undisputed Facts (Apr. 28, 2025) | JA716 |
| 5:24-cv-00594, 69 | Notice of appeal (Apr. 1, 2026) | JA737 |

3

APPEAL,CLOSED,MEDIATION

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:24-cv-00477-FL

Perdue Farms Inc. v. Su et al
Assigned to: District Judge Louise Wood Flanagan
related Case: 5:24-cv-00594-FL
Case in other court: USCA, 25-01105
                 USCA, 26-01374
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 08/20/2024
Date Terminated: 03/09/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Perdue Farms Inc.**                    represented by    **Margaret Santen**
Ogletree Deakins
201 South College Street
Ste 2300
Charlotte, NC 28244
704-342-2588
Email: Margaret.Santen@ogletree.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin M Koger**
Venable LLP
Litigation
600 Massachusetts Avenue, NW
Washington DC, DC 20001
202-344-4162
Email: kmkoger@venable.com
*ATTORNEY TO BE NOTICED*

**Mitchell Mirviss**
Venable LLP
750 East Pratt Street, 9th Floor
Baltimore, MD 21202
410-244-7412
Fax: 410-244-7742
Email: mymirviss@venable.com
*ATTORNEY TO BE NOTICED*

**Roger A. Colaizzi**
Venable LLP
600 Massachusetts Ave.
Washington, DC 20001
202-344-8051
Fax: 202-344-8300
Email: racolaizzi@venable.com

JA036

*ATTORNEY TO BE NOTICED*

**Vanessa N. Garrido**
Ogletree, Deakins, Nash, Smoak & Stewart,
P.C.
8529 Six Forks Road
Forum IV, Suite 600
Raleigh, NC 27615
919-789-3194
Fax: 919-783-9412
Email: vanessa.garrido@ogletree.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Lori Chavez-DeRemer**
*in her official capacity as Secretary of the*
*United States Department of Labor*

represented by **Brittany Bruns**
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-531-1325
Email: brittany.s.bruns@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew James Rising-DO NOT USE -**
**DOJ ACCOUNT**
DOJ-Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Ste 11406
Washington, DC 20005
202-514-0265
Email: andrew.j.rising@usdoj.gov
*TERMINATED: 02/13/2026*

**Defendant**

**PAMELA KULTGEN**
*in her official capacity as an Administrative*
*Law Judge of the United States Department*
*of Labor*

represented by **Brittany Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew James Rising-DO NOT USE -**
**DOJ ACCOUNT**
(See above for address)
*TERMINATED: 02/13/2026*

**Defendant**

**United States Department of Labor**

represented by **Brittany Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA037

**Andrew James Rising-DO NOT USE -
DOJ ACCOUNT**
(See above for address)
*TERMINATED: 02/13/2026*

**Defendant**

**THE OFFICE OF ADMINISTRATIVE
LAW JUDGES OF THE UNITED
STATES DEPARTMENT OF LABOR**

represented by **Brittany Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew James Rising-DO NOT USE -
DOJ ACCOUNT**
(See above for address)
*TERMINATED: 02/13/2026*

**Defendant**

**CRAIG WATTS**

represented by **Stephani Ayers**
T.M. Guyer and Ayers & Friends, PC
Pob 1061
Medford, OR 97501
813-382-7865
Email:
stephani@whistleblowerdefenders.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth Connell**
Government Accountability Project
1612 K St., NW
Suite 808
Washington, DC 20006
202-449-6040
Email: elisabeth.connell@gmail.com
*TERMINATED: 09/30/2025*

**Gary W. Jackson**
Gary W. Jackson, Attorney at Law
555 S. Mangum Street, Suite 100
North Carolina
Durham, NC 27701
704-650-9655
Email: gjackson@ncadvocates.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2024 | 1 | COMPLAINT *COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF* against All Defendants ( Filing fee $ 405 receipt number ANCEDC-7739864.), filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet, # 3 Proposed Summons, # 4 Proposed Summons, # 5 Proposed Summons, # 6 Proposed Summons, # 7 Proposed Summons) (Garrido, Vanessa) (Entered: 08/20/2024) |

JA038

| 08/20/2024 | 2 | Notice of Appearance filed by Vanessa N. Garrido on behalf of Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 08/20/2024) |
|---|---|---|
| 08/20/2024 | 3 | Financial Disclosure Statement by Perdue Farms Inc. (Garrido, Vanessa) (Entered: 08/20/2024) |
| 08/20/2024 | 4 | MOTION for Preliminary Injunction *PLAINTIFF PERDUE FARMS INC.S MOTION FOR PRELIMINARY INJUNCTION* filed by Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 08/20/2024) |
| 08/20/2024 | 5 | Memorandum in Support regarding 4 MOTION for Preliminary Injunction *PLAINTIFF PERDUE FARMS INC.S MOTION FOR PRELIMINARY INJUNCTION* filed by Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 08/20/2024) |
| 08/22/2024 | | NOTICE OF DEFICIENCY regarding 1 Complaint. Counsel is directed to refile because the exhibits/attachments (pages 28 - 432) should be filed as separate pdfs attached to the main documents and each exhibit should have a description. See Section V.E.1(d) of the CM/ECF Policies and Procedures Manual. (Rudd, D.) (Entered: 08/22/2024) |
| 08/22/2024 | | Notice to Counsel regarding: [1-3] Proposed Summons, [1-4] Proposed Summons, [1-5] Proposed Summons, [1-6] Proposed Summons, [1-7] Proposed Summons, 2 Notice of Appearance. Counsel is reminded that the filing user must lock or flatten the PDF document. Failure to flatten documents may result in the clerks office issuing a notice of deficiency. Counsel should "flatten" (*the proposed summonses, notice of appearance*) prior to attaching it in accordance with Section IV.B of the CM/ECF Policies and Procedures Manual. No further action is needed. (Rudd, D.) Modified on 8/22/2024 to include the notice of appearance. (Rudd, D.) (Entered: 08/22/2024) |
| 08/22/2024 | | Notice to Counsel regarding: [1-3] Proposed Summons, [1-4] Proposed Summons, [1-5] Proposed Summons, [1-6] Proposed Summons, [1-7] Proposed Summons. When the defendant is a government agency or employee, summonses are required for the agency or employee, the U.S. Attorney General, and the U.S. Attorney Civil Process Clerk. Counsel should file a proposed summons for the U.S. Attorney Civil Process Clerk and the U.S. Attorney General using the event "Notice-Other". (Rudd, D.) (Entered: 08/22/2024) |
| 08/23/2024 | 6 | **COMPLAINT *COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF*** against All Defendants ( Filing fee $ 405 receipt number ANCEDC-7739864.), filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit Declaration of Roger A. Colaizzi, # 2 Exhibit Notice of Whistleblower Complaint (February 23, 2015), # 3 Exhibit OSHA Findings (February 2, 2016), # 4 Exhibit ALJ Decision and Order (January 6, 2017), # 5 Exhibit ARB Decision (March 5, 2019), # 6 Exhibit Dept. of Labor's Motion for Voluntary Remand (September 24, 2019), # 7 Exhibit Order Granting Motion for Remand (January 7, 2020), # 8 Exhibit FDA Amicus Brief (March 11, 2020), # 9 Exhibit ARB Decision (May 28, 2020), # 10 Exhibit Supplemental Whistleblower Complaint (April 25,2022), # 11 Exhibit ALJ Decision and Order (October 21, 2022), # 12 Exhibit Respondent's Application for Subpoenas (March 11, 2024), # 13 Exhibit Order Quashing Subpoenas (March 15, 2024), # 14 Exhibit Respondent's Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024), # 15 Exhibit Order Denying Motion to Certify Interlocutory Appeal (April 24, 2024), # 16 Exhibit Respondent's Letter Requesting Conference (July 19, 2024), # 17 Exhibit Complainant's Response to Request for Conference (July 19, 2024), # 18 Exhibit Order Denying Conference Call (July 23, 2024), # 19 Exhibit Respondent's Motion to Dismiss (July 29, 2024), # 20 Exhibit Complainant's Opposition to Motion to Dismiss (July 30, 2024), # 21 Exhibit Order Denying Motion to Dismiss (August 8, 2024)) (Garrido, Vanessa) (Entered: 08/23/2024) |
| 08/23/2024 | 7 | Notice filed by Perdue Farms Inc. *Summons in a Civil Action*. (Garrido, Vanessa) (Entered: 08/23/2024) |

JA039

| 08/23/2024 | 8 | Notice filed by Perdue Farms Inc. *Summons in a Civil Action*. (Garrido, Vanessa) (Entered: 08/23/2024) |
|---|---|---|
| 08/30/2024 | 9 | Summonses Issued as to PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor, CRAIG WATTS, U.S. Attorney and U.S. Attorney General. *(\*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.\*)* (Sellers, N.) (Entered: 08/30/2024) |
| 08/30/2024 | | Case Selected for Mediation - A printable list of certified mediators for the Eastern District of North Carolina and the Selection of Mediator form are available on the court's Website, http://www.nced.uscourts.gov/attorney/mediators.aspx. Please serve this list on all parties. (Sellers, N.) (Entered: 08/30/2024) |
| 10/15/2024 | 10 | Affidavit of Service *Affidavit of Service of Process* filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit Su Proof of Delivery, # 2 Exhibit ALJ Proof of Delivery, # 3 Exhibit DOL Proof of Delivery, # 4 Exhibit OALJ Proof of Delivery, # 5 Exhibit USAG Proof of Delivery, # 6 Exhibit US CPC Proof of Delay of Delivery, # 7 Exhibit US AG Proof of Delivery of Other Process, # 8 Exhibit US CPC Proof of Delivery of Other Process, # 9 Exhibit US CPC Proof of Delivery) (Garrido, Vanessa) (Entered: 10/15/2024) |
| 10/17/2024 | 11 | Notice filed by Perdue Farms Inc. *Summons in a Civil Action*. (Garrido, Vanessa) (Entered: 10/17/2024) |
| 10/23/2024 | 12 | Summons Issued as to United States Attorney for the Eastern District of North Carolina. *(\*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.\*)* (Stouch, L.) (Entered: 10/23/2024) |
| 11/01/2024 | 13 | Affidavit of Service filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit CPC Proof of Delivery) (Garrido, Vanessa) (Entered: 11/01/2024) |
| 11/06/2024 | 14 | Notice of Appearance filed by Margaret Santen on behalf of Perdue Farms Inc.. (Santen, Margaret) (Entered: 11/06/2024) |
| 11/06/2024 | 15 | Notice of Appearance filed by Andrew James Rising on behalf of Julie Su, PAMELA KULTGEN, United States Department of Labor, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR. (Rising, Andrew) (Entered: 11/06/2024) |
| 11/06/2024 | 16 | Joint MOTION for Extension of Time *Joint Motion for Entry of a Stipulated Briefing Schedule on Plaintiffs Motion for Preliminary Injunction* filed by Perdue Farms Inc.. (Attachments: # 1 Text of Proposed Order) (Garrido, Vanessa) (Entered: 11/06/2024) |
| 11/07/2024 | | Motion Submitted to District Judge Terrence W. Boyle regarding 16 Joint MOTION for Extension of Time *Joint Motion for Entry of a Stipulated Briefing Schedule on Plaintiffs Motion for Preliminary Injunction*. (Rudd, D.) (Entered: 11/07/2024) |
| 11/07/2024 | 17 | Notice of Appearance filed by Kristin M Koger on behalf of Perdue Farms Inc.. (Koger, Kristin) (Entered: 11/07/2024) |
| 11/07/2024 | 18 | RESPONSE in Opposition regarding 4 MOTION for Preliminary Injunction *PLAINTIFF PERDUE FARMS INC.S MOTION FOR PRELIMINARY INJUNCTION* filed by Julie Su, PAMELA KULTGEN, United States Department of Labor, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR. (Rising, Andrew) (Entered: 11/07/2024) |
| 11/07/2024 | 19 | ORDER granting 16 Motion for Extension of Time. The government defendant's shall file their response no later than November 7, 2024. Plaintiff shall file its response no later than |

JA040

| | | |
|---|---|---|
| | | December 5, 2024. Signed by District Judge Terrence W. Boyle on 11/7/2024. (Rudd, D.) (Entered: 11/07/2024) |
| 11/18/2024 | | Set Hearing: Motion Hearing set for 12/19/2024 at 03:00 PM in Raleigh - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 11/18/2024) |
| 11/19/2024 | 20 | Joint MOTION for Extension of Time to File Answer filed by Perdue Farms Inc.. (Attachments: # 1 Text of Proposed Order) (Garrido, Vanessa) (Entered: 11/19/2024) |
| 12/03/2024 | 21 | Notice of Special Appearance for non-district by Mitchell Mirviss on behalf of Perdue Farms Inc.. (Mirviss, Mitchell) (Entered: 12/03/2024) |
| 12/03/2024 | 22 | Notice of Special Appearance for non-district by Elisabeth Connell on behalf of CRAIG WATTS. (Connell, Elisabeth) (Entered: 12/03/2024) |
| 12/03/2024 | 23 | Notice of Special Appearance for non-district by Elisabeth Connell on behalf of CRAIG WATTS. (Connell, Elisabeth) (Entered: 12/03/2024) |
| 12/04/2024 | 24 | Consent MOTION Consent Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at December 19, 2024 Hearing filed by Perdue Farms Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at December 19, 2024 Hearing) (Koger, Kristin) (Entered: 12/04/2024) |
| 12/04/2024 | 25 | **ANSWER** to 6 Complaint by CRAIG WATTS. (Connell, Elisabeth) (Entered: 12/04/2024) |
| 12/05/2024 | | Reset Hearing: Motion Hearing reset for **12/23/2024 at 02:00 PM in Raleigh** - 7th Floor - Courtroom 2 before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 12/05/2024) |
| 12/05/2024 | 26 | RESPONSE regarding 4 MOTION for Preliminary Injunction *PLAINTIFF PERDUE FARMS INC.S MOTION FOR PRELIMINARY INJUNCTION*, 5 Memorandum in Support filed by CRAIG WATTS. (Connell, Elisabeth) (Entered: 12/05/2024) |
| 12/05/2024 | 27 | REPLY to Response to Motion regarding 4 MOTION for Preliminary Injunction *PLAINTIFF PERDUE FARMS INC.S MOTION FOR PRELIMINARY INJUNCTION* filed by Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 12/05/2024) |
| 12/09/2024 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 20 Joint MOTION for Extension of Time to File Answer. (Mann, Stephanie) (Entered: 12/09/2024) |
| 12/09/2024 | | Motion Submitted to District Judge Terrence W. Boyle regarding 24 Consent MOTION Consent Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at December 19, 2024 Hearing. (Mann, Stephanie) (Entered: 12/09/2024) |
| 12/10/2024 | | TEXT ORDER granting Defendant Craig Watts' Motion for Extension of Time 20 . This defendant's Answer 25 is deemed timely filed. Signed by Peter A. Moore, Jr., Clerk of Court on 12/10/2024. (Hockaday, A.) (Entered: 12/10/2024) |
| 12/10/2024 | 28 | ORDER granting 24 Motion to Appear Remotely. Signed by District Judge Terrence W. Boyle on 12/10/2024. (McNally, Kimberly) (Entered: 12/10/2024) |
| 12/13/2024 | 29 | MOTION Joint Motion to Reset PI Hearing for Entry of Stipulated Briefing Schedule filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 12/13/2024) |
| 12/13/2024 | 30 | MOTION Plaintiff Perdue Farms, Inc.'s Motion to Strike or Disregard Defendant Craig Watts' Untimely and Unauthorized Filing regarding 26 Response filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 12/13/2024) |
| 12/13/2024 | 31 | Memorandum in Support regarding 30 MOTION Plaintiff Perdue Farms, Inc.'s Motion to Strike or Disregard Defendant Craig Watts' Untimely and Unauthorized Filing regarding 26 Response filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 12/13/2024) |

JA041

| 12/16/2024 | 32 | RESPONSE in Opposition regarding 30 MOTION Plaintiff Perdue Farms, Inc.'s Motion to Strike or Disregard Defendant Craig Watts' Untimely and Unauthorized Filing regarding 26 Response filed by CRAIG WATTS. (Connell, Elisabeth) (Entered: 12/16/2024) |
|---|---|---|
| 12/19/2024 | 33 | ORDER Resetting Hearing and ADOPTING Briefing Schedule Deadlines for Dispositive Motions: Motion Hearing reset for 1/17/2025 at 11:00 AM in Greenville - Courtroom before District Judge Terrence W. Boyle. Signed by District Judge Terrence W. Boyle on 12/16/2024. (Stouch, L.) (Entered: 12/19/2024) |
| 12/23/2024 | 34 | Notice of Special Appearance for non-district by Roger A. Colaizzi on behalf of Perdue Farms Inc.. (Colaizzi, Roger) (Entered: 12/23/2024) |
| 12/30/2024 | 35 | REPLY to Response to Motion regarding 30 MOTION Plaintiff Perdue Farms, Inc.'s Motion to Strike or Disregard Defendant Craig Watts' Untimely and Unauthorized Filing regarding 26 Response filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 12/30/2024) |
| 01/02/2025 | 36 | Consent MOTION Consent Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing filed by Perdue Farms Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing) (Koger, Kristin) (Entered: 01/02/2025) |
| 01/08/2025 | | Motion Submitted to District Judge Terrence W. Boyle regarding 36 Consent MOTION Consent Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing. (Stouch, L.) (Entered: 01/08/2025) |
| 01/09/2025 | 37 | ORDER granting 36 Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025. Signed by District Judge Terrence W. Boyle on 1/8/2025. Counsel will be emailed the videoconference information. (Stouch, L.) (Entered: 01/09/2025) |
| 01/09/2025 | 38 | Consent MOTION for Leave to Appear Remotely at Jan. 17, 2025 Hearing filed by CRAIG WATTS. (Attachments: # 1 Exhibit Dec. 18, 2024 Scheduling Order, # 2 Text of Proposed Order) (Connell, Elisabeth) (Entered: 01/09/2025) |
| 01/15/2025 | | Motion Submitted to District Judge Terrence W. Boyle regarding 38 Consent MOTION for Leave to Appear Remotely at Jan. 17, 2025 Hearing. (Stouch, L.) (Entered: 01/15/2025) |
| 01/16/2025 | 39 | ORDER granting 38 Motion for Leave to Appear by Video Teleconference. Signed by District Judge Terrence W. Boyle on 1/15/2025. Counsel will be emailed the videoconference information. (Stouch, L.) (Entered: 01/16/2025) |
| 01/16/2025 | 40 | Notice of Appearance filed by Gary W. Jackson on behalf of CRAIG WATTS. (Jackson, Gary) (Entered: 01/16/2025) |
| 01/17/2025 | 41 | Minute Entry for proceedings held in Greenville, NC before District Judge Terrence W. Boyle: Motion Hearing held on 1/17/2025. All parties present and ready to proceed. Oral arguments held. Written order to follow. (Court Reporter Jenny Carroll, Official Court Reporter) (Stouch, L.) (Entered: 01/24/2025) |
| 01/17/2025 | 42 | **Disregard - Duplicate entry.** Minute Entry for proceedings held in Greenville, NC before District Judge Terrence W. Boyle: Motion Hearing held on 1/17/2025. All parties present and ready to proceed. Oral argument held. Written order to follow. (Court Reporter Jenny Carroll, Official Court Reporter) (Stouch, L.) Modified on 1/27/2025 (Stouch, L.). (Entered: 01/24/2025) |
| 01/29/2025 | 43 | **ORDER denying 30 Motion to Strike or Disregard Defendant Craig Watts' Untimely and Unauthorized Filing and denying 4 Motion for Preliminary Injunction. Signed by District Judge Terrence W. Boyle on 1/28/2025.** (Stouch, L.) Modified on 8/20/2025 (Collins, S.). (Entered: 01/29/2025) |

| 01/31/2025 | 44 | Notice of Interlocutory Appeal filed by Perdue Farms Inc. as to 43 Order on Motion for Miscellaneous Relief, Order on Motion for Preliminary Injunction. Filing fee, receipt number ANCEDC-7965057. (Santen, Margaret) (Entered: 01/31/2025) |
| 02/03/2025 | 45 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 44 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 02/03/2025) |
| 02/04/2025 | 46 | US Court of Appeals Case Number 25-1105 (Anisha Walker, Case Manager) as to 44 Notice of Interlocutory Appeal filed by Perdue Farms Inc. (Foell, S.) (Entered: 02/04/2025) |
| 02/04/2025 | 47 | ORDER of US Court of Appeals consolidating cases 25-1105-L and 25-1106 (5:24-CV-594-BO). (Foell, S.) (Entered: 02/04/2025) |
| 02/19/2025 | 48 | MOTION for Summary Judgment filed by Perdue Farms Inc.. (Santen, Margaret) (Entered: 02/19/2025) |
| 02/19/2025 | 49 | Memorandum in Support regarding 48 MOTION for Summary Judgment filed by Perdue Farms Inc.. (Santen, Margaret) (Entered: 02/19/2025) |
| 02/19/2025 | 50 | Statement of Material Facts regarding 48 MOTION for Summary Judgment filed by Perdue Farms Inc.. (Santen, Margaret) (Entered: 02/19/2025) |
| 02/19/2025 | 51 | Appendix to the Statement of Facts regarding 48 MOTION for Summary Judgment filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit Ex. 1 - Notice of Whistleblower Complaint (February 23, 2015), # 2 Exhibit Ex. 2 - Perdues Opposition to Dept. of Labors Motion for Voluntary Remand (October 4, 2019), # 3 Exhibit Ex. 3 - OSHA Findings, Report of Investigation and Complaint, docketed Feb. 12, 2016, # 4 Exhibit Ex. 4 - ALJ Decision and Order (January 6, 2017), # 5 Exhibit Ex. 5 - ARB Decision (March 5, 2019), # 6 Exhibit Ex. 6 - Dept. of Labors Motion for Voluntary Remand (September 24, 2019), # 7 Exhibit Ex. 7 - Order Granting Motion for Remand (January 7, 2020), # 8 Exhibit Ex. 8 - FDA Amicus Brief (March 11, 2020), # 9 Exhibit Ex. 9 - ARB Decision (May 28, 2020), # 10 Exhibit Ex. 10 - Supplemental Whistleblower Complaint (April 25, 2022), # 11 Exhibit Ex. 11 - ALJ Decision and Order (October 21, 2022), # 12 Exhibit Ex. 12 - Perdues Application for Subpoenas (March 11, 2024), # 13 Exhibit Ex. 13 - Order Quashing Subpoenas (March 15, 2024), # 14 Exhibit Ex. 14 - Perdues Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024), # 15 Exhibit Ex. 15 - Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024), # 16 Exhibit Ex. 16 - Perdues Letter Requesting Conference (July 19, 2024), # 17 Exhibit Ex. 17 - Watts Response to Request for Conference (July 19, 2024), # 18 Exhibit Ex. 18 - Order Denying Conference Call (July 23, 2024), # 19 Exhibit Ex. 19 - Perdues Motion to Dismiss (July 29, 2024), # 20 Exhibit Ex. 20 - Watts Opposition to Motion to Dismiss (July 30, 2024), # 21 Exhibit Ex. 21 - Order Denying Motion to Dismiss (August 8, 2024), # 22 Exhibit Ex. 22 - Declaration of Roger A. Colaizzi) (Santen, Margaret) (Entered: 02/19/2025) |
| 02/27/2025 | 52 | OFFICIAL TRANSCRIPT for dates of 01/17/2025, before Judge Terrence W. Boyle, regarding 44 Notice of Interlocutory Appeal Court Reporter Jenny Carroll, jenny_carroll@nced.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 3/23/2025. Redacted Transcript Deadline set for 4/2/2025. Release of Transcript Restriction set for 5/31/2025. (Carroll, Jennifer) (Entered: 02/27/2025) |
| 02/27/2025 | | NOTICE of Filing of Official Transcript 52 Appeal Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter. After filing the Notice |

| | | |
|---|---|---|
| | | of Intent to Request Redaction, a party must submit to the court reporter, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Carroll, Jennifer) (Entered: 02/27/2025) |
| 03/12/2025 | 53 | Notice of Special Appearance for non-district by Stephani Ayers on behalf of CRAIG WATTS. (Ayers, Stephani) (Entered: 03/12/2025) |
| 03/12/2025 | 54 | MOTION to Dismiss *or, in the alternative, for summary judgment,* filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor. (Attachments: # 1 Text of Proposed Order) (Rising, Andrew) (Entered: 03/12/2025) |
| 03/12/2025 | 55 | Memorandum in Support regarding 54 MOTION to Dismiss *or, in the alternative, for summary judgment, and in Opposition to Plaintiff's Motion for Summary Judgment* filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor. (Rising, Andrew) (Entered: 03/12/2025) |
| 03/12/2025 | 56 | Statement of Material Facts regarding 54 MOTION to Dismiss *or, in the alternative, for summary judgment, Response to Plaintiff's Statement of Material Facts* filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor. (Rising, Andrew) (Entered: 03/12/2025) |
| 03/12/2025 | 57 | Memorandum in Opposition regarding 49 Memorandum in Support, 48 MOTION for Summary Judgment *and Cross-Motion for summary Judgment* filed by CRAIG WATTS. (Attachments: # 1 State of Facts, # 2 Proposed Order, # 3 Cross Motion judgment) (Ayers, Stephani) Modified on 8/20/2025 to raise motion flag and revise docket text. (Collins, S). (Entered: 03/12/2025) |
| 04/02/2025 | 58 | RESPONSE/REPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' DISPOSITIVE MOTIONS, AND IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT regarding 54 MOTION to Dismiss *or, in the alternative, for summary judgment,*, 57 Memorandum in Opposition, 48 MOTION for Summary Judgment filed by Perdue Farms Inc. (Koger, Kristin) Modified on 8/20/2025 (Collins, S). (Entered: 04/02/2025) |
| 04/16/2025 | 59 | REPLY to Response to Motion regarding 54 MOTION to Dismiss *or, in the alternative, for summary judgment,* filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor, CRAIG WATTS. (Rising, Andrew) (Entered: 04/16/2025) |
| 04/17/2025 | | REMINDER TO COUNSEL. Pursuant to Judge Boyle's Practice Preferences located on the court's website, counsel shall provide a courtesy copy of all documents over 20 pages, single-sided, by mailing or delivering to the clerk's office in Raleigh. (Stouch, L.) (Entered: 04/17/2025) |
| 04/21/2025 | | Motion Submitted to District Judge Terrence W. Boyle regarding 54 MOTION to Dismiss *or, in the alternative, for summary judgment,*, 48 MOTION for Summary Judgment along with all briefing. (Stouch, L.) (Entered: 04/21/2025) |
| 04/22/2025 | 60 | ORDER of US Court of Appeals granting motion to voluntarily dismiss 44 Notice of Interlocutory Appeal filed by Perdue Farms Inc. (Foell, S.) (Entered: 04/22/2025) |
| 04/22/2025 | 61 | MANDATE of US Court of Appeals as to 44 Notice of Interlocutory Appeal filed by Perdue Farms Inc.. (Foell, S.) (Entered: 04/22/2025) |

JA044

| 08/01/2025 | | **Set Hearing: Motion Hearing set for 8/26/2025 at 11:30 AM in Elizabeth City - Courtroom before District Judge Terrence W. Boyle.** (Stouch, L.) (Entered: 08/01/2025) |
|---|---|---|
| 08/05/2025 | 62 | Notice filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor regarding 54 MOTION to Dismiss *or, in the alternative, for summary judgment, Notice of Supplemental Authority*. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Rising, Andrew) (Entered: 08/05/2025) |
| 08/18/2025 | 63 | MOTION to Continue *August 26, 2025 Motions Hearing* filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor. (Rising, Andrew) (Entered: 08/18/2025) |
| 08/19/2025 | 64 | **TEXT ORDER REASSIGNING CASE. At the direction of the Court and for the continued efficient administration of justice, this case is reassigned to United States District Judge Louise W. Flanagan for all further proceedings. United States District Judge Terrence W. Boyle is no longer assigned to this case. All future filings should reflect the revised case number of 5:24-cv-477-FL.** Signed by Peter A. Moore, Jr., Clerk of Court on 8/19/2025. (Stouch, L.) (Entered: 08/19/2025) |
| 08/19/2025 | | Notice to Counsel - **The hearing scheduled for 8/26/2025 at 11:20 am in Elizabeth City before United States District Judge Boyle is cancelled.** (Stouch, L.) (Entered: 08/19/2025) |
| 08/20/2025 | 65 | TEXT ORDER REASSIGNING CASE. At the direction of the Court, this Case is reassigned to Chief Judge Richard E. Myers II for all further proceedings. District Judge Louise Wood Flanagan is no longer assigned to case. All future filings shall reflect the revised case number of 5:24-CV-477-M.Signed by Peter A. Moore, Jr., Clerk of Court on 8/20/2025. (Moore, P.) (Entered: 08/20/2025) |
| 08/20/2025 | 66 | **TEXT ORDER. Order (65) entered in error, this Case remains assigned to District Judge Louise Wood Flanagan for all further proceedings. Chief Judge Richard E. Myers, II is not assigned to case. All future filings shall reflect the revised case number of 5:24-CV-477-FL.Signed by Peter A. Moore, Jr., Clerk of Court on 8/20/2025.** (Moore, P.) Modified on 8/20/2025 (Collins, S). (Entered: 08/20/2025) |
| 08/20/2025 | | Motions No Longer Submitted to District Judge Terrence W. Boyle: regarding 63 MOTION to Continue *August 26, 2025 Motions Hearing*, 54 MOTION to Dismiss *or, in the alternative, for summary judgment,*, 48 MOTION for Summary Judgment . (Collins, S) (Entered: 08/20/2025) |
| 08/20/2025 | | Motions Submitted to District Judge Louise Wood Flanagan regarding 63 MOTION to Continue *August 26, 2025 Motions Hearing*, 54 MOTION to Dismiss *or, in the alternative, for summary judgment,*, 57 MOTION for Summary Judgment, 48 MOTION for Summary Judgment . (Collins, S) (Entered: 08/20/2025) |
| 09/08/2025 | 67 | Notice of Supplemental Authority filed by Perdue Farms Inc. regarding 57 MOTION for Summary Judgment, 54 MOTION to Dismiss *or, in the alternative, for summary judgment,*, 48 MOTION for Summary Judgment *Notice of Supplemental Authorities*. (Attachments: # 1 Exhibit A - Sun Valley Orchards, LLC v. DOL, ___ F.4th ___, 2025 WL 2112927 (3d Cir. Jul. 29, 2025) # 2 Exhibit B - Wulferic, LLC v. FDA, ___ F. Supp. 3d ___, 2025 WL 2200923 (N.D. Tex. Aug. 1, 2025),, # 3 Exhibit C - Space Exploration Technologies Corp. v. NLRB, ___ F.4th ___, 2025 WL 2396748 (5th Cir. Aug. 19, 2025) (SpaceX)) (Koger, Kristin) Modified on 9/9/2025 to label exhibits. (Collins, S). (Entered: 09/08/2025) |

| 09/22/2025 | 68 | RESPONSE regarding 67 Notice - other,, filed by PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor. (Rising, Andrew) (Entered: 09/22/2025) |
| --- | --- | --- |
| 09/29/2025 | 69 | MOTION to Withdraw as Attorney *Elisabeth R. Connell* filed by CRAIG WATTS. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order) (Connell, Elisabeth) (Entered: 09/29/2025) |
| 09/30/2025 | | Notice to Counsel regarding: 69 Motion to Withdraw as Attorney. Counsel provided an incomplete signature block. Counsel does not have to refile but should refer to Section IV.D of the CM/ECF Policy Manual for signature block requirements on future pleadings. Further, counsel is directed to update contact information in CM/ECF by choosing "Utilities" and selecting "Maintain Your Account." Contact the clerk's office if additional assistance is required. (Collins, S) (Entered: 09/30/2025) |
| 09/30/2025 | 70 | **ORDER granting 69 Motion to Withdraw as Attorney. Attorney Elisabeth Connell terminated. Signed by District Judge Louise Wood Flanagan on 9/30/2025.** (Collins, S) (Entered: 09/30/2025) |
| 10/29/2025 | 71 | Notice filed by Perdue Farms Inc. regarding 67 Notice - other,, 68 Response, 62 Notice - other, *Omnibus Notice of Supplemental Authority and Reply/Response to the Department of Labor's Supplemental Memos.* (Attachments: # 1 Exhibit 1 - Comcast Corp. v. DOL, 2025 WL 2712424 (E.D. Va. Sept. 23, 2025)) (Koger, Kristin) (Entered: 10/29/2025) |
| 02/13/2026 | 72 | Notice of Substitution of Counsel filed by Brittany Bruns on behalf of PAMELA KULTGEN, Julie Su, THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR, United States Department of Labor substituting for Andrew J. Rising. (Bruns, Brittany) (Entered: 02/13/2026) |
| 03/09/2026 | 73 | **ORDER denying 48 Motion for Summary Judgment; granting 54 Motion to Dismiss; granting 57 Motion for Summary Judgment. The clerk is DIRECTED to close these cases. Signed by District Judge Louise Wood Flanagan on 3/9/2026.** (Collins, S) (Entered: 03/09/2026) |
| 03/09/2026 | 74 | **JUDGMENT - Signed by Peter A. Moore, Jr., Clerk of Court on 3/9/2026.** (Collins, S) (Entered: 03/09/2026) |
| 04/01/2026 | 75 | Notice of Appeal filed by Perdue Farms Inc.. Filing fee, receipt number ANCEDC-8550561. (Garrido, Vanessa) (Entered: 04/01/2026) |
| 04/01/2026 | 76 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 75 Notice of Appeal. (Foell, S.) (Entered: 04/01/2026) |
| 04/02/2026 | 77 | US Court of Appeals Case Number 26-1374 (A. Walker, Case Manager) as to 75 Notice of Appeal filed by Perdue Farms Inc.. (Foell, S.) (Entered: 04/02/2026) |
| 04/02/2026 | 78 | ORDER of US Court of Appeals as to 75 Notice of Appeal filed by Perdue Farms Inc.. The court consolidates Case No. 26-1374(L) and Case No. 26-1375 (5:24-CV-594-FL) (Foell, S.) (Entered: 04/02/2026) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 05/13/2026 10:00:47 | | | |
| **PACER Login:** | emacksey98 | **Client Code:** | |

| Description: | Docket Report | Search Criteria: | 5:24-cv-00477-FL |
|---|---|---|---|
| Billable Pages: | 10 | Cost: | 1.00 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| **PERDUE FARMS INC.,**<br>31149 Ocean City Road<br>Salisbury, Maryland 21804<br><br>       Plaintiff,<br><br>v.<br><br>**JULIE SU**, in her official capacity as Acting Secretary of the United States Department of Labor,<br><br>**PAMELA KULTGEN**, in her official capacity as an Administrative Law Judge of the United States Department of Labor,<br><br>**UNITED STATES DEPARTMENT OF LABOR**,<br><br>**THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR**,<br><br>*and*<br><br>**CRAIG WATTS,**<br><br>      Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Perdue Farms Inc. ("Perdue"), by its undersigned attorneys, alleges and states as follows:

**INTRODUCTION**

1. Perdue brings this action for declaratory relief under 28 U.S.C. §§ 2201-02, to enjoin Defendants from conducting unconstitutional administrative proceedings against Perdue currently pending in the U.S. Department of Labor ("DOL")'s Office of Administrative Law

1

Judges ("OALJ"), *Watts v. Perdue Farms Inc.*, Dkt, No. 2016-FDA-0003 (the "Administrative Proceedings"). These proceedings are unconstitutional for multiple reasons, including, *inter alia*, deprivation of Perdue's constitutional right to a jury trial guaranteed by the Seventh Amendment as recently affirmed by the Supreme Court in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) ("*Jarkesy II*").

2.      The Administrative Proceedings involve claims against Perdue for compensatory damages and other relief under the employee-protection (whistleblower) provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d ("FSMA") currently pending before DOL Administrative Law Judge ("ALJ") Pamela Kultgen. An evidentiary hearing on the merits is scheduled to commence on April 14, 2025 to be tried by ALJ Kultgen without a jury and without the discovery and evidentiary protections available in an Article III court, subject to review by an appellate board and potential further determination by Acting Secretary of Labor Julie Su. The purpose of this action is to prevent DOL, its OALJ, Secretary Su, and ALJ Kultgen from continuing this unconstitutional proceeding against Perdue.

3.      The underlying facts concern a dispute between Perdue and one of its independent contractors, Craig Watts, who owns and operates C&A Farms in Fairmont, North Carolina. Watts raised chickens for Perdue as an independent contractor under a written contract between the parties. On February 23, 2015, Watts filed a complaint against Perdue with DOL's Occupational Safety and Health Administration ("OSHA"), alleging retaliation by Perdue in violation of the FSMA. *See* Declaration of Roger A. Colaizzi, Ex. 1, Notice of Whistleblower Complaint (Feb. 23, 2015) ("Watts Complaint").[1] Perdue vigorously denies his claims, which Watts brought following years of complaints about compensation for growers in the industry and a video showing that Watts

---

[1] All Exhibits referenced in this Complaint are exhibits to the Colaizzi Declaration.

2

raised Perdue chicks in deplorable condition. After Perdue learned of the terrible manner in which Watts raised the chicks, it took remedial action to ensure that Watts would take proper care of the chicks entrusted to him. Watts alleges that the remedial action taken by Perdue constitutes retaliation prohibited by FSMA's whistleblower protections. *See id.* ¶ 57.

4.     Perdue is not asking this Court to litigate the merits of Watts' accusations. Instead, Perdue brings five constitutional challenges to the Administrative Proceedings.

5.     *First*, in *Jarkesy II*, the Supreme Court held that trying legal claims administratively violates the Seventh Amendment constitutional right to a jury trial. *See Jarkesy II*, 144 S. Ct. at 2127-28. Here, Watts' claims are legal in nature, seeking damages for emotional distress, lost profits, and backpay, and are close analogues to common-law wrongful-discharge actions for breach of contract and tort. The pending Administrative Proceedings deny Perdue its constitutional right to a jury trial.

6.     *Second*, separate from the Seventh Amendment right to a jury trial, Watts' claims implicate private rights (*e.g.*, the contractual relationship between Watts and Perdue and Perdue's right to property placed in direct issue by Watts' claims for damages), that must be adjudicated in an Article III court. Adjudicating those rights in an Article I tribunal violates Article III and the separation of powers vesting the judicial power exclusively in the judicial branch.

7.     *Third*, the FSMA statutory scheme accords Watts, a private litigant, power to kick out his claims to this Article III court and elect a jury trial, but without providing any intelligible standard to curb or even guide his discretion. Watts may even do so after an adverse ruling by the ALJ. By delegating unfettered legislative power to an individual litigant to decide whether his claims should be tried before an Article I ALJ or an Article III court with the right to a jury trial and full due-process protections unavailable in the OALJ, FSMA violates the nondelegation

<div align="center">3</div>

doctrine of the constitutional separation of powers. *See Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022) ("*Jarkesy I*"), *aff'd and remanded*, 144 S. Ct. 2117 (2024).

8.    *Fourth*, OALJ's ALJs are unconstitutionally shielded from presidential oversight mandated by the Take Care Clause, U.S. Const. art. II, sec. 2, because they are doubly insulated from the presidential removal power: they can be removed *only* for cause and *only* by the Merit Systems Protection Board ("MSPB"), whose members can be removed *only* for cause by the President. In *Jarkesy I*, the Fifth Circuit held that such double insulation is unconstitutional. *See Jarkesy I*, 34 F.4th at 463-65.

9.    *Fifth*, the OALJ proceedings violate due process because they lack basic procedural protections, such as the right to subpoena third parties for testimony and mandatory application of the Federal Rules of Evidence.

10.    ALJ Kultgen has refused to consider any of these constitutional concerns regarding the administrative process, ruling that it exceeds her statutory authority as an ALJ; her ruling means that the issues cannot be considered by any court until years from now, when the case finally reaches the Fourth Circuit following multiple levels of internal DOL adjudication. Her ruling that she lacks power even to consider whether she has constitutional power to adjudicate the claims before her abdicates her fundamental duty to apply the laws and Constitution of the United States, pursuant to her oath of office. It vividly demonstrates why the claims do not belong in an Article I tribunal.

11.    The *Jarkesy* decisions and another recent Supreme Court ruling, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), have brought these concerns to a head. *Axon* held that parallel challenges to the constitutional authority of SEC and FTC ALJs are entitled to immediate "here-and-now" adjudication and, where appropriate, injunctive relief from an Article III district court.

4

*Id.* at 195. Under *Axon*, the district court may take swift action to prevent "here-and-now" injury by averting unconstitutional administrative enforcement proceedings without waiting for completion of the administrative process and limited judicial review by a circuit court of appeals.

12.     Perdue sits in the same precarious shoes as did the respective plaintiffs in *Axon*—facing an imminent unconstitutional administrative adjudication of claims against it that belong in an Article III court. And its constitutional deprivations plainly echo those brought in *Jarkesy*. To prevent the acute harm from being required to endure administrative proceedings that are facially and irreparably unconstitutional, this Court should preliminarily and permanently enjoin the proceedings, declare further proceedings unlawful, instruct the ALJ to dismiss the case, and grant such other relief as this Court deems necessary or proper.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the United States Constitution as applied to a federal statute, FSMA, and seeks relief against officers of the United States. *Axon* expressly held that district courts have federal-question jurisdiction under § 1331 to review analogous claims that an agency's enforcement structure violates the Constitution. 598 U.S. at 195. No provision in FSMA or any "other law takes that power away." *Id.* at 211 (Thomas, J., concurring).

14.     This Court has the authority to grant injunctive and declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and its inherent equitable powers.

15.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B). The individual Defendants are acting in their official capacity as officers of an agency of the United States, and the federal agencies exercise authority in this District. A substantial part of the events or omissions giving rise to Perdue's claims occurred within this District. Watts' farm is located in Fairmont,

5

North Carolina, within this District, and most of the pertinent facts and events at issue in the administrative action took place there. ALJ Kultgen has scheduled the evidentiary hearing on the merits of Watts' claims to be held in Fayetteville, North Carolina, located within this District.

## PARTIES

16.     Plaintiff Perdue is a privately held Maryland corporation with its principal place of business in Salisbury, Maryland. Perdue is an integrated poultry producer engaged in business throughout the United States. It maintains multiple facilities in North Carolina and contracts with independent chicken growers in North Carolina and in other states.

17.     Defendant Julie Su is the Acting Secretary of Labor. She is statutorily responsible for investigating and adjudicating complaints filed pursuant to the FSMA. She is sued in her official capacity.

18.     Defendant Pamela Kultgen is the ALJ presiding over *Watts v. Perdue Farms Inc.*, No. 2016-FDA-0003 pending before the DOL's OALJ. She is sued in her official capacity.

19.     DOL is an agency of the federal government that, among other things, is statutorily tasked with investigating and adjudicating complaints filed pursuant to the FSMA. 21 U.S.C. § 399d(b).

20.     OALJ is responsible for adjudicating complaints filed pursuant to the FSMA.

21.     Defendant Craig Watts is an individual who resides in North Carolina. Watts owns and operates C&A Farms in Fairmont, North Carolina, and he raised chickens for Perdue as an independent contractor under a written contract.

6

## BACKGROUND

### I.    Watt's Agreement with Perdue.

22.    Perdue is an integrated poultry producer engaged in business throughout the United States. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model). Within this integrated operation, Perdue owns hatcheries and breeding flocks. It delivers its chicks to independent contract growers, such as Watts. Independent growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *See id*.

23.    Watts is a farmer who raised chicks for Perdue under a standard independent-contractor agreement (the "Agreement"), in accordance with applicable Federal law and United States Department of Agriculture ("USDA") regulations. *See id*. at 684-85; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement imposed upon Watts, *inter alia,* extensive requirements to protect the well-being of the poultry.

24.    Watts' Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. The Agreement provided that Perdue would consign chicks and provide feed, fuel, medications, vaccinations, and other supplies to Watts. In exchange, Watts agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. Typically, chicks would be raised by contractor farmers for several weeks before removal.

25.    For years, Watts complained about the amount and system of compensation to which he agreed to accept in his independent contract with Perdue. Eventually, dissatisfied by a lack of improvement, Watts implemented a punitive scheme. Working with a cinematography group and at least one third-party activist group, in May 2014, Watts invited to his farm a film crew from a private third-party organization to film a group of live chicks that were recently placed

7

on his farm by Perdue when in good health. *See* Colaizzi Decl. Ex. 1, Watts Compl. ¶¶ 29, 30. According to Watts' complaint in the Administrative Proceedings, several weeks later, the private third-party organization returned to his poultry farm to film more footage of the flock, which was then nearing the end of its growth cycle. *See id.* ¶ 30. He alleges that the chickens were in deplorable condition. The third-party then allegedly edited the footage into a short video and released it on its website. *See id.* at ¶ 31.

26.     The video was not provided to Perdue by Watts or the third-party, nor was it submitted to a government agency, nor to any state attorney general. Instead, Perdue learned of the video from a news article published in *The New York Times* or from other third-party sources. The video revealed that Watts had failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks. For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive. Even Watts' initial complaint filed with OSHA described the chickens in his care as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id.* ¶ 38. But Watts went even further. Armed with this footage showing his own poor treatment of the chicks in his care, Watts proclaimed in the video that the condition of his chickens showed they were not "humanely raised," as Perdue had indicated on product labels and in advertising for one of its consumer brands that was unrelated to the brand of chickens raised by Watts for Perdue.

27.     The posted video further revealed that, not only had Watts disregarded the welfare of the chickens under his care, but that he also had violated the "biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks. Upon viewing the video, Perdue immediately sent its Poultry Welfare auditors to Watts' poultry farm to ascertain the condition of

8

the flock. Perdue also consulted a report from the non-profit Center for Food Integrity's Animal Care Review Panel (the "Panel"), which reviewed the private third-party's video and provided an assessment as to possible animal-welfare violations. In the Panel's report, three separate and independent experts concluded that Watts' complaints about the conditions in his chicken houses were his responsibility.

28.    Relying largely on the Panel's report, Perdue concluded that Watts needed to complete supplemental biosecurity and animal welfare training prior to the placement of a new flock with him, in order to prevent further poultry welfare and biosecurity violations. By a letter dated December 29, 2014, Perdue informed Watts of its decision.

## II.    Administrative Proceedings.

29.    Enacted in 2011, the FSMA provides whistleblower protections for "employees" of entities who are engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food that is subject to the Food, Drug, and Cosmetic Act ("FDCA").

30.    On February 23, 2015, Watts filed a whistleblower complaint in OSHA against Perdue alleging violations of the employee protection provisions of FSMA through purported employment retaliation by Perdue against his involvement in the third-party animal rights group's video. Watts argued that Perdue's labeling of chicken as "humanely raised" was misleading because he did not raise them humanely on his farm. According to Watts, following his participation in the video that documented the purported mislabeling, Watts was subjected to adverse employment actions, including increased scrutiny of Watts' operations, additional training prior to the placement of Perdue's next flock with Watts, a delay in the placement of his flock, and implementation of a Performance Improvement Program.

9

31.    The complaint sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,[" plus "all other relief available at law and equity…." Colaizzi Decl. Ex. 1, Watts Compl. ¶¶ 58, 61.

32.    An OSHA regional investigator reviewed Watts' complaint and, on February 8, 2016, found it "to have no merit" because Watts was not an employee of Perdue. *See* Colaizzi Decl. Ex. 2, OSHA Findings. The investigator found that, under the test established in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), and a moderately different "right-to-control" test— both of which DOL uses to determine employee status under whistleblower statutes—Watts was not Perdue's employee. *Id.* at 2-3.

33.    Watts appealed to the OALJ. Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims that Perdue fails to raise chickens humanely as advertised arise under the Poultry Product Inspections Act ("PPIA"), 21 U.S.C. § 451 et seq., a statute enforced by the USDA, and do not fall under the FSMA (generally enforced by the U.S. Food and Drug Administration (the "FDA"), and also by DOL regarding its employee protections). On January 6, 2017, DOL ALJ Dana Rosen agreed and dismissed Watts' complaint for lack of subject-matter jurisdiction.  *See* Colaizzi Decl. Ex. 3, OALJ Dec. and Order.

34.    Watts then appealed to DOL's Administrative Review Board (the "ARB"), an internal appellate board. On March 5, 2019, the ARB affirmed ALJ Rosen's decision. *See* Colaizzi Decl. Ex. 4, ARB Dec.

35.    Watts appealed to the United States Court of Appeals for the Fourth Circuit. Before briefing began, DOL counsel moved for voluntary remand to the ARB for the limited purpose of permitting the FDA to file an amicus brief. *See* Colaizzi Decl. Ex. 5, DOL Mot. for Voluntary

10

Remand (Sept. 24, 2019). Without opinion, the Fourth Circuit granted the request and remanded the action back to the ARB. *See* Colaizzi Decl. Ex. 6, Order Granting Mot. for Remand (Jan. 7, 2020).

36.    On remand, FDA submitted an amicus brief that principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including issues concerning conditions under which the poultry was raised. *See* Colaizzi Decl. Ex. 7, FDA Amicus Br. 5-12 (Mar. 11, 2020). At the very end of its brief, the FDA asserted that, because "animal food is food," and because Perdue supplied Watts with animal food, this was an "independent" point that "may be relevant to the [ARB's] evaluation" of subject matter jurisdiction under the FSMA. *Id.* at 23. Perdue did not dispute that chicken feed constituted "food" under the FDCA but pointed out that none of Watts' claims concerned chicken feed supplied by Perdue.

37.    The ARB did not address FDA's principal argument and instead, on May 28, 2020, remanded the action back to the OALJ based upon the FDA's tail-end suggestion, ruling that, because Perdue "supplied the poultry animal feed for poultry on Watts' farm[,] ... Perdue is an entity who manufactures, process [sic], transports, or distributes 'food' within the meaning of the [FSMA] and thus is a covered entity." Colaizzi Decl. Ex. 8, ARB Dec. 6.

38.    On remand before the OALJ, on January 29, 2021, Perdue again moved to dismiss, raising arguments that had not yet been addressed by the OALJ or the ARB, including the fact that FSMA did not apply because none of Watts' specific claims involved chicken feed.  That motion remained pending through April 21, 2022, when the case was reassigned to ALJ Kultgen.

39.    Watts then filed a supplemental complaint on April 25, 2022, which elaborated upon his allegations against Perdue but which still did not assert any issue with the chicken feed supplied by Perdue. *See* Colaizzi Decl. Ex. 9, Supplemental Whistleblower Compl. Most

11

important, Watts substantially expanded his requested relief to include (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion; and (e) "all other relief available at law and equity." *Id.* ¶¶ 80, 81, 82, 85.

40.     ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022, ruling, *inter alia*, that the lack of any allegation about chicken feed was immaterial because she agreed with FDA's arguments that FDA, not USDA, had jurisdiction over how poultry are raised on farms. Discovery has ensued thereafter. *See* Colaizzi Decl. Ex. 10, OALJ Dec. and Order at 10-11.

41.     On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, among other things, the video evidence forming the heart of Watts' claims.  *See* Colaizzi Decl. Ex. 11, Resp.'s Application for Subpoenas.  Just four days later, on March 15, 2024, the ALJ quashed Perdue's subpoena requests, ruling that the OALJ lacks statutory authority to issue subpoenas, based upon an ARB decision issued just two weeks earlier, *Fagan v. Dep't of the Navy*, ARB No. 2023-0006, 2024 WL 1091871 (Feb. 28, 2024), and finding no further authority in the FSMA to issue subpoenas. *See* Colaizzi Decl. Ex. 12, Order Quashing Subpoenas. This order effectively denied Perdue even the most basic discovery about the preparation and production of the most pivotal aspect of Watts' claims. Perdue moved for reconsideration or, in the alternative,

12

for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery constituted a denial of due process given the importance of the issue to the case. *See* Colaizzi Decl. Ex. 13, Resp.'s Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024). On April 24, 2024, ALJ Kultgen denied this motion as well. *See* Colaizzi Decl. Ex. 14, Order Denying Mot. to Certify Interlocutory Appeal.

42.    The Supreme Court issued *Jarkesy II* on June 27, 2024. On July 19, 2024, Perdue promptly submitted a letter to the ALJ apprising her of the decision and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and also to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. The letter asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *See* Colaizzi Decl. Ex. 15, Resp.'s Letter Requesting Conference. Watts opposed the requests. *See* Colaizzi Decl. Ex. 16, Compl.'s Resp. to Request for Conference (July 19, 2024). Despite the extraordinary circumstances, on July 23, 2024 the ALJ denied the request for a conference call and a stay of discovery, ruling that ALJs "lack the power and authority to decide constitutional questions" and thus "cannot and will not grant any motion to dismiss on constitutional grounds." *See* Colaizzi Decl. Ex. 17, Order Denying Conference Call at 2. The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), for the principle that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.'" *Id*. It failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Even though the order denied Perdue's motion before the motion was ever filed, it allowed Perdue to file its motions to preserve Perdue's positions for appellate consideration. *Id.*

13

43. In a footnote, the ALJ suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

44. On July 29, 2024, Perdue moved to dismiss for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II*. *See* Colaizzi Decl. Ex. 18, Resp.'s Mot. to Dismiss. The next day, Watts opposed the motions, reiterating that the OALJ could not consider constitutional challenges but making no specific arguments about whether *Jarkesy I or II* applied. *See* Colaizzi Decl. Ex. 19, Compl.'s Opp. to Mot. to Dismiss (July 30, 2024). He opposed any voluntary removal to federal court. *Id.* at 3.

45. On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, ruling that she lacked authority to decide constitutional questions and could not grant the requested relief. *See* Colaizzi Decl. Ex. 20, Order Denying Mot. to Dismiss. She did, however, agree to amend the scheduling order and reschedule the hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

46. Discovery is now set to close on January 17, 2025. A multi-day merits hearing is scheduled to commence on April 14, 2025 in Fayetteville, North Carolina. *Id.*

### III. <u>The Unconstitutionality of the OALJ Proceedings against Perdue.</u>

47. The OALJ proceedings against Perdue are unconstitutional under *Jarkesy I* and *II*. Even though the OALJ is well aware of the constitutional bars, it has declined to act upon them—indeed, it has declined even to consider them—because, it says, administrative agencies are powerless to consider their lack of constitutional power to enforce the laws they administer.

48. The ALJ's refusal to consider whether her proceeding is unconstitutional vividly shows why Article I courts are not proper tribunals to adjudicate claims that sound in law and

14

JA061

involve private rights. This refusal violates her oath of office, forsaking the solemn duty to follow and apply the Constitution, which, pursuant to 5 U.S.C. § 3331, all officers of the United States except the President must swear.

49.    The ALJ proceedings thus are unconstitutional and violate Perdue's rights.

50.    The first reason that the ongoing proceedings are unconstitutional is that the proceedings violate Perdue's Seventh Amendment right to a jury trial. "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency[.]" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989). *Jarkesy II* holds that claims like Watts' claims against Perdue, which seek emotional-distress, lost profits, backpay, and other compensatory damages and penalties that sound in law, not equity, amount to a suit at common law and entitle Perdue to the protections of the Seventh Amendment. *See Jarkesy II,* 144 S. Ct. at 2128-31.  OALJ proceedings do not allow for a jury trial. Allowing the claims to be tried by an ALJ without a jury would thus violate Perdue's constitutional rights and should be enjoined.

51.    The second reason the Administrative Proceedings are unconstitutional is that they violate Article III and thus violate the separation of powers. Article III provides that the judicial power of the United States is vested "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1. Also pursuant to Article III, this judicial power "extend[s] to all Cases, in Law and Equity, arising under … the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. Congress may not grant judicial power "on entities outside Article III." *Stern v. Marshall*, 564 U.S. 462, 484 (2011). Because lawsuits seeking money damages "implicate the core private right to property[,]" they must be brought in

15

an Article III judicial forum and cannot be heard by an Article I administrative tribunal. *See Axon*, 598 U.S. at 204 (Thomas, J., concurring).

52.    The third reason that the ongoing proceedings are unconstitutional is that the ALJ is insulated from the President's supervision by two levels of for-cause removal protection. The Secretary of Labor may remove ALJ Kultgen "only for good cause established and determined by the Merit Systems Protection Board ["MSPB"] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). MSPB members similarly may be removed by the President only for cause, *i.e.*, they "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). This double layer of for-cause removal violates Article II of the Constitution, which grants the power to execute federal law to the President "alone." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). Under Article II, the President must have adequate "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 514-15 (2010). One layer of insulation from Presidential plenary power is acceptable, but two layers are not. *Id.* at 515; *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). Thus, the double layer of removal protection currently afforded to ALJs in the OALJ does not grant the President removal authority required by Article II and precludes further litigation under that scheme.

53.    Perdue has been injured by the lack of proper oversight over the OALJ. Presiding over a proceeding that is allegedly illegal without stopping to assess and address its illegality in the face of binding Supreme Court precedent is itself illegal and an abandonment of the ALJ's constitutional duty. In refusing even to consider the constitutionality of the proceedings, ALJ Kultgen has acted illegally and in derogation of her oath of office. Perdue therefore is directly

16

JA063

affected by a lack of proper oversight and ability to remove her due to her conduct as the presiding officer over the claims against Perdue.

54.    The fourth reason that the ongoing proceedings are unconstitutional is that they exceed legislative authority under Article I by violating separation of powers and the nondelegation doctrine. Here, FSMA accords private parties such as Watts unfettered discretion whether to proceed in an Article I court or whether to kickout his claims to an Article III tribunal by bringing them in a U.S. district court. Indeed, FSMA accords Watts this unilateral kickout power twice, first if OSHA does not reach a final decision on his claims within 210 days of the filing of his complaint, and again within 90 days after the Secretary of Labor renders her final decision in the matter. 21 U.S.C. § 399d(b)(4)(A). Because the federal proceedings are *de novo*, *id.*, this second kickout right gives Watts, but not Perdue, the unfettered right to treat the lengthy administrative process (*i.e.*, the ALJ hearing, ARB review, and final DOL decision) as if they never happened. Once removed to federal court, either party may demand a trial by jury. *Id.* Under the nondelegation doctrine, Congress may not delegate its legislative power to a non-legislative party to determine whether a matter belongs in an Article I or Article III court without providing an "intelligible principle" to guide the exercise of that power. *See Jarkesy I*, 34 F.4th at 459, 462-63. Here, the FSMA provides no such "intelligible principle" and instead allows *a private litigant*, Watts, the unilateral and plenary power to decide whether his claims will be heard in an Article III court, with full due-process protections, and subject to trial by jury, without affording any such authority to his adversary party, Perdue.

55.    The fifth and final reason that the ongoing proceedings are unconstitutional is that they violate due process. Perdue lacks the right to subpoena third parties for testimony and documents, depriving it of the basic right to discover facts concerning the key evidence in the case.

17

*See Souch v. Califano*, 599 F.2d 577, 580 (4th Cir. 1979) (holding that an ALJ's failure to issue a subpoena for testimony and documents underlying key adverse evidence violates claimant's due process rights). OALJ's ALJs "have broad discretion to limit discovery in order to expedite the hearing." 29 C.F.R. § 1987.107(b). Neither the Federal Rules of Evidence nor any other "[f]ormal rules of evidence" may be applied by the ALJ at the merits hearing. 29 C.F.R. § 1987.107(d). The ALJ has not been confirmed by the U.S. Senate as meeting the high standards expected from an Article III judge to exercise judicial power and preside over a trial. She has ruled that she lacks authority and will not consider fundamental constitutional questions concerning subject-matter jurisdiction, in stark contrast to an Article III court's inherent judicial authority to determine whether actions by Article I officers violate the Constitution. *See Marbury v. Madison*, 5 U.S. 137, 176-78 (1803). As *Marbury* aptly put it, "[t]his is of the very essence of judicial duty." *Id.* at 178.

56.    Each of those violations of fundamental fairness is compounded by DOL's right under its own regulations to join the proceedings at any time and effectively serve as both litigant/prosecutor and adjudicator/ultimate decision-maker in a single matter. Under 29 C.F.R. § 1987.108(a)(1), the Assistant Secretary for OSHA has plenary discretion to "participate at any time at any stage of the proceeding" as either a party or as an amicus curiae, including the right to petition for review of an ALJ decision or an ALJ's approval or disapproval of any settlement between the parties. Depending on the stage of the proceedings, a settlement between the parties must be approved by OSHA, the ALJ, or the ARB, respectively. 29 C.F.R. § 1987.111(a), (b), & (d). Finally, for good cause or under "special circumstances not contemplated" in the regulations (which are undefined and thus unbounded), both the ALJ and the ARB may waive any rule or regulation governing their respective proceeding. 29 C.F.R. § 1987.115.

18

57.    Perdue's private adversary, Watts, has unfettered discretion and absolute control over which tribunal will hear his claims. No comparable right extends to Perdue. Adding insult to injury, if he loses in the DOL, Watts has the further right to refile his claims in federal district court for *de novo* proceedings, until 90 days after the Secretary's final ruling, giving him (but not Perdue) an outrageous advantage of testing the Article I waters and then removing the claims to federal court should he ultimately decide that he might fare better if given a second chance by litigating in a different forum.

58.    The Supreme Court has made it perfectly clear that the deprivation of a constitutional right constitutes an irreparable injury, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and that the time to review and resolve such constitutional violations is now. *Axon*, 598 U.S. at 191. *Axon* holds that federal district courts should rule on constitutional challenges to agency enforcement proceedings to prevent "here-and-now" injuries that "cannot be undone" through appellate review, and thus must be ruled upon as they arise. *Id.* Under *Axon*, the proceedings should be enjoined, as appellate review following a final decision by the Secretary cannot remedy the constitutional violations, nor can the unconstitutional nature of the proceedings be severed to redress the injury without affecting the adjudication.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATION OF SEVENTH AMENDMENT
**Against All Defendants**

59.    Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

60.    The Seventh Amendment entitles parties to a jury trial of claims that are "'legal in nature.'" *Jarkesy II*, 144 S. Ct. at 2128 ((citation omitted).

19

61. Watts' claims against Perdue are legal in nature because they are akin to an 18th century common-law claim for breach of action or a personal-injury tort claim for damages, and because he seeks compensatory damages, including damages for emotional distress, lost profits, and backpay, and penalties under FSMA for attorney's fees and costs. *See id.* at 2129 (describing "money damages" as a "prototypical common law remedy").

62. The value in controversy exceeds twenty dollars.

63. Watts' claims against Perdue seeking a personal award of money damages do not fall within the narrow "public rights" exception to the Seventh Amendment's right to a jury trial. *See id*. at 2131-34.

64. ALJ Kultgen's adjudication of Watts' claims violates Perdue's Seventh Amendment right to a trial by jury and constitutes an ongoing irreparable "here-and-now" harm to Perdue.

## <u>COUNT II</u>

### VIOLATION OF ARTICLE III
**Against All Defendants**

65. Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

66. Because Watts is seeking compensatory damages and penalties, and further seeks to adjudicate the parties' private contract rights, Perdue's private rights are at stake in the Administrative Proceedings.

67. Claims involving private rights cannot be removed from the jurisdiction of the Article III courts. The types of claims Watts is asserting and the relief Watts seeks implicate the judicial power, which Article III of the Constitution vests exclusively in the federal courts. By adjudicating the claims before an Article I ALJ and subsequent administrative review and decision,

20

Watts' election to proceed in the OALJ usurps what the Constitution leaves to the exclusive jurisdiction of Article III courts.

68.     Watts' claims do not implicate administrative expertise or efficiency. They do not require administrative adjudication, nor are they uniquely suited to administrative adjudication, as similar "actions are commonly considered by federal courts or without the federal government's involvement." *Jarkesy I*, 34 F.4th at 459.

69.     Accordingly, ALJ Kultgen's and DOL's continued administrative adjudication of Watts' claims violates Article III of the Constitution and constitutes an ongoing irreparable harm to Perdue.

<u>**COUNT III**</u>

**VIOLATION OF PRESIDENT'S REMOVAL AUTHORITY UNDER ARTICLE II**
**Against All Defendants**

70.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

71.     Article II of the Constitution provides that the President must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and vests the President with the sole "authority to remove those who assist him." *Free Enter. Fund*, 561 U.S. at 513-14.

72.     DOL ALJs are "inferior officers" within the executive branch of the United States subject to the President's removal authority.

73.     The Secretary of Labor may remove ALJ Kultgen "only for good cause established and determined by the [MSPB]." 5 U.S.C. § 7521(a).

74.     MSPB members, in turn, may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

75.     Accordingly, even though she is exercising executive authority, two levels of for-cause removal protections insulate ALJ Kultgen from presidential control, which violates Article II of the Constitution and irreparably harms Perdue.

76.     This violation of Article II is not severable or mitigable. Per *Axon*, it inflicts an actionable "here-and-now" injury. The ALJ's ruling (and, apparently, official OALJ policy) that she lacks authority to consider whether the Administrative Proceedings against Perdue are unconstitutional, violates her oath of office and is illegal conduct warranting Presidential oversight.

77.     Perdue is thus entitled to relief "to ensure that the [legal] standards to which [Perdue is] subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.

## COUNT IV

### VIOLATION OF NONDELEGATION DOCTRINE
### AND SEPARATION OF POWERS UNDER ARTICLE I
### Against All Defendants

78.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

79.     Under the separation of powers required by the Constitution, Congress may delegate legislative authority to an administrative agency only if it provides an "intelligible principle" by which that agency can exercise that power. *See Jarkesy I*, 34 F.4th at 459, 462-63.

80.     The FSMA provides no such "intelligible principle." Once 210 days have lapsed since Watts filed his initial complaint, under FSMA, Congress grants to Watts—not even an administrative agency—unfettered discretion to adjudicate his FSMA claims in either an administrative proceeding before the OALJ with up to two further levels of DOL administrative

22

review, or in federal court with a mutual option to elect a trial by jury. That right re-vests for 90 additional days after the Secretary of Labor issues her final decision, when Watts may move his claims to an Article III federal court for *de novo* adjudication—giving him, but not Perdue, the unfettered right to a do-over should he receive an adverse result in the Administrative Proceedings. Despite vesting legislative power in a private party to select between an Article I and an Article III tribunal, Congress failed to provide any standard, guidance, or intelligible principle on how that party should exercise its discretion.

81.    Congress has exceeded its Article I authority by delegating to a third party, in this case a private party (Watts), the power to choose (twice, at separate junctures) whether to keep an action before the DOL or to move it to an Article III court.

82.    Congress's delegation of authority to a private party, unconstrained by an intelligible principle, to decide whether to subject his private dispute with Perdue to administrative adjudication, violates Article I of the Constitution, the separation of powers required by the Constitution, and the nondelegation doctrine limiting congressional authority.

83.    The FSMA statutory scheme constitutes a more egregious violation of the nondelegation doctrine than did the securities laws at issue in *Jarkesy I* and *II*. There, the third party was a different government agency, the SEC. Here, Watts is an adverse private-party litigant, who has been vested with unfettered, plenary discretion, without any controlling limit or principle, to deny Perdue its statutory option under the FSMA and constitutional rights under the Seventh Amendment to have a jury hear and decide its case. In exercising this unfettered power, Watts has a 100% personal financial interest in securing the maximum possible judgment without any accountability to anyone or any guiding intelligible standard to limit his exercise of that authority.

23

84. The FSMA's violation of the separation of powers and the nondelegation doctrine thus violates the Constitution and constitutes an ongoing irreparable harm to Perdue.

## COUNT V

**VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE**
**Against All Defendants**

85. Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

86. The purported lack of statutory power to issue third-party subpoenas facially violates Perdue's due-process rights under the Fifth Amendment and materially impairs Perdue's ability to defend itself in the OALJ proceeding. This harm is especially acute as applied in this case, where Perdue needs third-party subpoenas to investigate the key evidence in the case—the video footage filmed on Watts' farm that constitutes the heart of Watts' retaliation claims against Perdue. Under DOL regulations, the ALJ has broad discretion to limit discovery in order to expedite the merits hearing.

87. The acute harm from a lack of basic discovery of documents and testimony about key evidence in the case could be compounded by the inapplicability of the Federal Rules of Evidence, creating substantial uncertainty as to what evidentiary rules will govern the Administrative Proceedings.

88. If the action had been brought in an Article III court, as is constitutionally required, Perdue would be granted subpoena power and full discovery rights, and would be granted the full constitutional protections afforded by Article III courts.

89. Due process is denied when an ALJ relies upon certain evidence as the basis for their decision yet denies a request to subpoena documents or testimony directly related to that evidence and potentially undermines it. *See Souch v. Califano*, 599 F.2d 577 (4th Cir. 1979).

24

90.     Due process is further denied by the statutory scheme in FSMA, which accords an adverse private party, Watts, unfettered discretion to control whether Purdue can adjudicate its defenses in an Article III court and try them before a jury. FSMA even provides Watts—but not Perdue—the right to redo the case in an Article III federal court should he lose in the DOL.

91.     Because FSMA authorizes Watts, a private third-party adverse actor, to choose whether Perdue is afforded the protections of an Article III court; whether Perdue is given the opportunity to defend itself in front of a neutral Article III judge who meets constitutional requirements; whether to erase an adverse result in the DOL by moving his claims to federal court for *de novo* review; and whether or not Perdue can access its Seventh Amendment right to a jury trial, the ongoing Administrative Proceedings violate Perdue's due-process rights by implicating fundamental questions of fairness.

92.     FSMA also accords DOL a right to participate at any time and then become both prosecutor and adjudicator, including the rights to petition for review of ALJ orders and to approve or disapprove of settlements between the parties. The statutory scheme thus violates Perdue's due-process rights to a fair and impartial adjudicator by allowing DOL to participate in dual roles.

93.     The ALJ's ruling that she lacks any authority to consider constitutional challenges to her authority further violates Perdue's due-process rights, as it deprives Perdue of an adjudicator who can fulfill "the very essence of judicial duty." *Marbury*, 5 U.S. at 178. Requiring a litigant to endure years of illegal, unconstitutional litigation because the tribunal declares that it lacks power to halt its own extra-jurisdictional proceedings is fundamentally unfair and thus violates due process.

94.     This one-sided, fundamentally unfair scheme is inherent in the underlying proceedings and thus constitutes an ongoing irreparable harm to Perdue and should be enjoined.

25

## **PRAYER FOR RELIEF**

For these reasons, Perdue respectfully requests that this Court:

1. Preliminarily and permanently enjoin Defendants from continuing the pending ALJ proceedings against Perdue;

2. Declare that the Administrative Proceedings against Perdue are unlawful and that Defendants may not proceed with such proceedings;

3. Award such other and further relief as this Court may deem just and proper, including but not limited to reasonable attorney's fees and costs.

Dated: August 20, 2024                    Respectfully submitted,


                            _____/s/ Margaret Santen_____
                            Margaret Santen
                            N.C. Bar No. 52927
                            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                            201 South College Street, Suite 2300
                            Charlotte, NC 28244
                            704-405-3119
                            maggie.santen@ogletree.com


                            _____/s/ Vanessa N. Garrido_____
                            Vanessa N. Garrido
                            N.C. Bar No. 53470
                            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                            8529 Six Forks Road, Suite 600
                            Raleigh, NC 27615
                            919-789-3194
                            vanessa.garrido@ogletree.com

                            *Local Civil Rule 83.1(d) Attorneys for Plaintiff*

                            Roger A. Colaizzi (notice of special appearance to
                            be filed)
                            Kristin M. Koger (notice of special appearance to
                            be filed)
                            Venable LLP
                            600 Massachusetts Ave., N.W.
                            Washington, DC 20001

26

202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (notice of special appearance to
be filed)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

27

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>    Plaintiff,<br><br>v.<br><br>**JULIE SU**, in her official capacity as Acting Secretary of the U.S. Department of Labor, et al.,<br><br>    Defendants. | **DECLARATION OF ROGER A. COLAIZZI IN SUPPORT OF PLAINTIFF PERDUE FARMS INC.'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

I, Roger A. Colaizzi, declare as follows:

1.  I am an attorney at Venable LLP.  I offer this Declaration in support of Plaintiff Perdue Farms Inc.'s Complaint for Declaratory and Injunctive Relief.

2.  Attached hereto are true and correct copies of the following exhibits:

| Ex. No. | Description |
|---|---|
| 1 | Notice of Whistleblower Complaint (February 23, 2015) |
| 2 | OSHA Findings (February 8, 2016) |
| 3 | ALJ Decision and Order (January 6, 2017) |
| 4 | ARB Decision (March 5, 2019) |
| 5 | Dept. of Labor's Motion for Voluntary Remand (September 24, 2019) |
| 6 | Order Granting Motion for Remand (January 7, 2020) |
| 7 | FDA Amicus Brief (March 11, 2020) |
| 8 | ARB Decision (May 28, 2020) |
| 9 | Supplemental Whistleblower Complaint (April 25, 2022) |

| Ex. No. | Description |
|---|---|
| 10 | ALJ Decision and Order (October 21, 2022) |
| 11 | Respondent's Application for Subpoenas (March 11, 2024) |
| 12 | Order Quashing Subpoenas (March 15, 2024) |
| 13 | Respondent's Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024) |
| 14 | Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024) |
| 15 | Respondent's Letter Requesting Conference (July 19, 2024) |
| 16 | Complainant's Response to Request for Conference (July 19, 2024) |
| 17 | Order Denying Conference Call (July 23, 2024) |
| 18 | Respondent's Motion to Dismiss (July 29, 2024) |
| 19 | Complainant's Opposition to Motion to Dismiss (July 30, 2024) |
| 20 | Order Denying Motion to Dismiss (August 8, 2024) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of August 2024 in Washington, DC.

*/s/ Roger A. Colaizzi*
Roger A. Colaizzi

2

# Exhibit 1

UNITED STATES DEPARTMENT OF LABOR
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

*In the Matter of*

| | |
|---|---|
| **CRAIG WATTS,** ) | |
| ) | |
| *Complainant,* ) | |
| ) | |
| *v.* ) | Case No. |
| ) | |
| **PERDUE FARMS, INC.,** ) | |
| ) | |
| *Respondent.* ) | |

### NOTICE OF WHISTLEBLOWER COMPLAINT

Complainant Craig Watts, through his counsel, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

### I.    INTRODUCTION

1.    This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d, by Complainant, Mr. Craig Watts, against Perdue Farms, Incorporated (hereafter "Respondent"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent in December 2014, and January 2015, in retaliation for activity protected under 21 U.S.C. § 399d.

### II.    JURISDICTION

2.    This Complaint having been timely filed within 180 days of the adverse actions complained of, OSHA has jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below.

1

JA078

### III.   PARTIES

3.      Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where he raises chickens for Respondent under a written contract between the parties. Under this contract, Respondent delivers flocks of chicks to Complainant, who houses and tends to each flock in accordance with standards set by Respondent.  Complainant feeds, waters, and cares for those flocks using feed, medications, and other supplies provided by Respondent.

4.      Respondent retains title of each flock at all times, and an agent of Respondent typically visits Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately six weeks.

5.      At the end of flock's growth cycle, Respondent compensates Complainant for his services in accordance with a payment schedule.

6.      The foregoing facts demonstrate that Complainant is an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

7.      At the end of their growth cycle, Respondent's agents pick up the flocks for transport to slaughter and processing facilities owned and operated by Respondent.  Respondent transports chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

8.      At these facilities, Respondent slaughters, processes and packages chickens and turkeys for sale to consumers.  Respondent is one of the largest producers of poultry products in the United States, and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

9.      Respondent also imports, exports, receives and stores grains and other raw agricultural commodities, which Respondent processes for use in animal feed and pet food.

2

10. The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

## IV. FACTUAL ALLEGATIONS

### A. Complainant's Job, Duties, and Performance

11. Complainant began raising chickens for Respondent in 1992. In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms, but was asked to sign a new contract with Respondent in 1999, and has been raising chickens for Respondent continuously since then. Complainant currently raises approximately 720,000 chickens per year for Respondent.

12. Complainant is required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent. These standards impose numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles, and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

13. An employee of Respondent regularly visits Complainant's farm to ensure that Complainant is maintaining his facilities and tending to flocks in accordance with Respondent's standards. Typically, these visits occur approximately once per week during the flocks' growth cycles. Complainant is known by Ms. Price, Respondent's Growout Supervisor for the region surrounding Complainant's farm, to be one of Respondent's most successful and conscientious farmers.

3

14.     At the end of their growth cycles, Respondent rates flocks in what is referred to as Respondent's "tournament system." Complainant's compensation for each cycle is based in part upon these ratings. Under this system, farmers' performance is measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group. Complainant's flocks consistently receive high ratings, and Complainant has been rated the top producer in his group numerous times.

15.     Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

### B.     Background Facts Relevant to Protected Activity

16.     Several years ago, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant. In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry. The commercial depicted Perdue's Chairman walking through what he purports to be a Perdue chicken farm while extolling the virtues of Perdue's humane treatment of chickens and Perdue "doing the right thing." Perdue's Chairman noted in the commercial that consumers are much more interested in knowing how chickens are raised and treated. Perdue's "Humanely Raised" label was intentionally designed by Perdue to solicit more business from these consumers.

17.     Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised. Perdue alone sets the guidelines for Watts and their other chicken farmers

4

to follow that dictate what the chickens are fed, in what space the flock is to be contained, and what brand and type of equipment Complainant is to use.

18.    For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches, sores and increased risk of infection. Following Respondent's specifications, the chicken houses contain around 30,000 chickens packed into a tight space with barely any room to move.

19.    Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy. For example, many birds arrive at Complainant's farm carrying infections, and die of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink. Many others have leg deformities, impairing their ability to move about freely and comfortably. Following Perdue's specifications, which require the chickens to be raised to grow unnaturally large and fast, the birds in Complainant's facility rapidly grow heavy and lethargic, so that within weeks after placement they spend the vast majority of their time lying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts. The high growth rate makes it difficult for the flock to breathe and walk.

20.    In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was not truthful. As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom are wholly unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified.

5

JA082

21.    The conditions described above in paragraphs 17-20 were the result of Respondent's practices and other factors within Respondent's control.

22.    For example, Respondent controls the size of the flocks placed on Complainant's farm, which Respondent adjusts to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density. Respondent crowds too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other.  The flock density of flocks placed by Respondent on Complainant's farm has, at times, even exceeded the National Chicken Council's animal welfare guidelines.

23.    A few years ago, Respondent stopped using antibiotics in its North Carolina hatcheries.  Respondent has not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

24.    In recent years, Complainant has observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities. Respondent is not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

25.    Respondent's breeding of chickens has resulted in birds that gain weight too rapidly and that have a high rate of leg deformities.  Within weeks after placement, these birds grow heavy and lethargic, and spend most of their time laying around on their litter, causing the birds to develop sores and large patches of red, irritated flesh on their breasts.

26.    Several years ago, Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers

6

JA083

from opening windows to allow access to sunlight and fresh air. This lack of sunlight and fresh air has impaired the birds' quality of life, causing overheating, increased stress and reduced levels of activity.

27.     Respondent prohibits Complainant from administering any antibiotics or other medications to sick birds, and Respondent has refused to administer medication when Complainant has sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

### C.     Protected Activity

28.     Complainant objected to Respondent's use of the phrase "Humanely Raised" on its labeling and to its practices and conduct described in paragraphs 22-27 above, which Complainant believed compromised the birds' welfare and increased their risk of becoming contaminated with and developing infections from salmonella, e-coli, and other harmful bacteria, in turn threatening the health of consumers.

29.     In furtherance of an effort to oppose those practices and Respondent's use of the phrase "Humanely Raised" on its labeling, Complainant invited Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF"), to visit his farm and shoot audiovisual footage of the chickens in his four chicken houses. CIWF campaigns on a global level to end cruel factory farming practices, often relying on undercover investigations.  In the US, chicken factory farms are notoriously inaccessible to anyone outside of the industry, yet they account for ninety-five percent of all factory-farmed animals (or nearly 9 billion animals). Director Garces reported during this investigation into Perdue that it was the first time she had been invited to observe by such a contract farmer.

7

30.    On or about May 22, 2014, CIWF Director Garces and videographer Raegan Hodge visited Complainant's farm and began videotaping the flock, which had recently been placed. Both individuals returned several weeks later to film more footage of the flock, which was then nearing the end of its growth cycle.

31.    CIWF condensed the footage it had filmed into a short video, which Complainant agreed to allow CIWF to publish at a later date. Complainant expected that Respondent would view the video, and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt an investigation or other action by government officials. This video and interview with Complainant remains a key piece of advocacy material publicly available and maintained on CIWF's website, "Why one Perdue factory famer speaks out" <http://action.ciwf.com/ea-action/action?ea.client.id=1872&ea.campaign.id=32809&ea.tracking.id=homepage&_ga=1.7779 3172.1269961080.1424111353> (See Attachment A). In his interview, Complainant explains he is disclosing his complaints because the Perdue chicken is not "as advertised"; because the consumers are being "hoodwinked"; and because the chickens are not "happy" or "healthy."

32.    Late at night on December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm. The column criticizes the apparent poor health of the birds, and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds is inappropriate. An excerpt of thevideo produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, publicly available here:

8

http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html (See Attachment B).

33.    This video depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities.

34.    The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

35.    The article notes that Respondent was contacted for comment before the article's publication, and many users of Twitter sent links to the video to Respondent following its publication. Forbes, The Huffington Post, Wired, and the Washington Post, among others, also reported on Complainant's interview and the video.

## V.    ADVERSE ACTIONS

36.    On December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm. These inspections continued, occurring almost daily until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

9

37.    On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received, via hand delivery, a two page letter from Respondent. The letter stated that Respondent was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Complainant's farm.

38.    The December 29, 2014 letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

39.    Complainant was informed that he would not receive another flock placement until he completed a training session concerning proper animal welfare and biosecurity practices.

40.    A training session was planned for January 8, 2014. Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

41.    As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2014, approximately 9 days after he would have typically received a new flock.

42.    Complainant lost approximately $4,500 in earnings due to Respondent's delayed flock placement.

43.    Respondent has continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily since January 15, 2015.

## VI.    NEXUS/CONTRIBUTING FACTOR

10

44. As noted above, Respondent was aware of the video footage taken by CIWF at the time of its publication, having been reached for comment by columnist Nicholas Kristoff, and having received messages including links to the video from users of Twitter.

45. Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, just hours after the video's publication.

46. The letter placing Complainant under a Performance Improvement Plan was issued by Respondent just over three weeks later, on December 29, 2014.

47. In the letter placing Complainant under a Performance Improvement Plan, Respondent attributes its decision to audit Complainant's farm and place Complainant under a Performance Improvement Plan to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent … with Perdue standards" particularly concerning.

48. In the letter, Respondent suggests that it did not find any problematic conditions during its recent inspections of Complainant's farm, and describes the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

49. In fact, the flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

50. As noted above, prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation, and in fact considered Complainant to be one of its top producers.

11

51. The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's decision to place him under a Performance Improvement Plan and subject his farm to increased scrutiny, and that Respondent would not have taken those actions regardless of Complainant's protected activity.

## VII. CLAIM FOR RELIEF

52. Complainant engaged in protected activity under the Food Safety Modernization Act's employee protection provision when he facilitated the production and publication of video footage depicting the condition of birds placed on his farm by Respondent and criticizing Respondent's practices. As noted above, Complainant believed that the condition of the birds raised on his farm was the result of Respondent's practices and conduct described in paragraphs 22-27 that compromised the welfare of the animals and increased their risk of becoming contaminated with or developing infections from salmonella, e-coli, and other harmful bacteria, threatening the health of consumers. Additionally, as noted above, the Respondent's use of the phrase "Humanely Raised" was misleading in light of the condition of the birds raised on Complainant's farm.

53. Complainant also caused to be provided information that he reasonably believed to be a violation of the Food, Drug and Cosmetic Act to the federal government. As a result of the conditions exposed by Complainant and CIWF in early December 2014, Senators Feinstein and Booker began taking action to have the USDA stop this misleading practice. This resulted in a letter dated January 7, 2105 where the Senators wrote to USDA Secretary Vilsack demanding intervention into this ongoing practice of mislabeling poultry as "humanely raised." The Senators noted:

12

We write today to express our serious concern that the Food Safety and Inspection Service (FSIS) is approving false and misleading labels with animal welfare claims for meat and poultry products, such as "humanely raised" or "cage free." ... As you are aware, it is a violation of the Federal Meat Inspection Act and Poultry Products Inspection Act to label a product in a manner that is misleading or false.... It is our view that claims like "humanely raised" should only be approved by FSIS, or verified through the Process Verified Program, when there is evidence that animal welfare standards set by an independent third party, and which significantly exceed standard industry practice, are being met.

54.     The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and Cosmetic Act, food is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4). 56.     Respondent had knowledge of Complainant's protected activity, and Complainant's protected activity was a contributing factor in Respondent's decisions to place Complainant under a Performance Improvement Plan and to subject Complainant's farm to increased scrutiny. Respondent would not have taken those adverse actions regardless of Complainant's protected activity.

57.     The foregoing facts demonstrate that Respondent violated the Food Safety Modernization Act's employee protection provision when it placed Complainant under a Performance Improvement Plan and subjected his farm to increased scrutiny.

## VII.    PRAYER FOR RELIEF

58.     Complainant seeks compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by Respondent, and for wages paid to his employee

13

JA090

as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

59.     Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

60.     Complainant seeks an order prohibiting Respondent from continuing to subject his facility to retaliatory increased inspections.

61.     Complainant seeks reasonable costs and attorney's fees, together with all other relief available at law and equity, including the costs of any expert witness fees.

Respectfully submitted,

Jeffery S. Gulley
Food & Public Health Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-457-0034 ext. 127
Fax. 202-457-0059
Email: JeffG@whistleblower.org

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

14

# Exhibit 2

JA092

**U.S. Department of Labor**

Occupational Safety and Health Administration
Atlanta Regional Office
Sam Nunn Federal Center
61 Forsyth Street, SW Room 6T50
Atlanta, Georgia 30303
(678) 237-0400
(678) 237-0447 FAX



February 8, 2016

Sarah L. Nash
Government Accountability Project
1612 K Street, NW – Suite 100
Washington, DC 20006

Re:     Perdue Farms, Inc. / Watts / Case No. 4-3750-15-036

Dear Ms. Nash:

This is to advise you that we have completed our investigation of the above-referenced complaint filed by your client, Craig Watts, (Complainant) against Perdue Farms (Respondent) on February 19, 2015 under the whistleblower provisions of Section 402 of the FDA Food Safety Modernization Act (FSMA), 21 U.S.C. §1012. In brief, your client alleged that Respondent placed him under increased scrutiny, increased inspections, and delayed a delivery of new poultry in retaliation for participating in the video recording and publishing of video depicting the conditions under which poultry were raised for Respondent.

Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through her agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region IV, issues the following findings:

### Secretary's Findings

Complainant, a farmer, raised live chickens for Respondent, the nation's third largest chicken producer. Respondent owns the live chicks and delivers them to Complainant for caretaking; after approximately eight weeks, Complainant returns the chickens to Respondent for slaughter.

On February 19, 2015, Complainant filed a complaint with the Secretary of Labor alleging Respondent violated the whistleblower protection provision of FSMA by retaliating against him after he invited a film crew from an organization that campaigns to end "all cruel factory farming practices", to video the conditions of chickens in his chicken houses. After a news article was published on December 3, 2014, Respondent sent employees to inspect Complainant's farm. These inspections continued almost daily until the flock was raised and removed on December 22, 2014. On December 29, 2014, Respondent notified Complainant it was implementing a Performance Improvement Plan

**OSHA** Occupational Safety and Health Administration

JA093

for poultry welfare and biosecurity at Complainant's farm. Complainant was also required to complete a training session concerning proper animal welfare and biosecurity practices, before another flock was delivered. The new flock was delivered on January 15, 2015, approximately 9 days after they would normally have been delivered. As this complaint was filed within 180 days of the alleged adverse action, it is deemed timely.

Respondent is covered by the FSMA whistleblower provisions because they are an entity engaged in the manufacture, processing, packing, transportation, distribution, reception, holding, or importation of food that can be subject to the Food, Drug, and Cosmetic Act ("FD&C"), within 21 U.S.C. §399d(a).

Respondent contracts with over 2,000 farms/farmers, including Complainant, to raise live chickens for slaughter and consumption. Under the contract, Respondent delivers flocks of chickens to Complainant, who houses and cares for the flocks using feed, medication and supplies provided by Respondent. Title of each flock is retained by Respondent. Once Complainant raises the flock, Respondent transports the flock to slaughter and processing facilities that it owns in over a dozen states. At these facilities, Respondent slaughters, processes, and packages chickens and turkeys for sale to consumers.

Complainant contends that he is Respondent's employee. FSMA does not define the term "employee"; however, the Supreme Court has concluded that "when Congress has used the term 'employee' without defining it...Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."

The Administrative Review Board ("ARB") has adopted both the *Darden* and right-to-control tests to determine employee status under whistleblower statutes.

The gravamen of the right-to-control test is control. If Respondent "exercises control over the terms, conditions or privileges" of Complainant's employment, then Respondent is Complainant's employer, for purposes of FSMA. A Poultry Producer Agreement (the "Agreement") governs the relationship between Complainant and Respondent. Either party could terminate the Agreement with ninety days' notice. Respondent did not limit Complainant's right or ability to pursue other work or hold other jobs, although Complainant can only raise flocks from one chicken producer at a time because raising flocks from different chicken producers increases the risk of cross-contamination between flocks. It is completely up to Complainant to decide whether to hire employees to assist him. During the period at issue, Complainant employed a full-time assistant to work with Respondent's flock. Complainant set his and his assistant's schedules and devised his own strategy to raise the chickens. Complainant received no employee benefits, such as vacation time, sick leave, pension benefits, health insurance, or workers' compensation benefits, from Respondent. Respondent paid Complainant per flock and did not withhold taxes from these payments, for which Complainant receives a Tax Form 1099 at the end of each year. Thus, under the right-to-control test, Complainant is not Respondent's employee.

Similarly, under the *Darden* test, Complainant is not Respondent's employee. In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among other things relevant to this inquiry are the skill required; the source of instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the fired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Based on the foregoing reasons, Complainant is not an "employee" within the meaning of 21 U.S.C. §399d(a). Therefore, OSHA does not have jurisdiction to investigate his Complaint. Consequently, this complaint is dismissed.

Respondent and Complainant have 30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge (ALJ). If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with:

> Chief Administrative Law Judge
> USDOL-Office of Administrative Law Judges
> 800 K Street NW, Suite 400
> Washington, D.C. 20001-8002
> Telephone: (202) 693-7300
> Fax: (202) 693-7365

With copies to:

> Todd J. Horn
> Venable LLP
> 750 E. Pratt Street – Suite 900
> Baltimore, MD 21202

And

> Kurt A. Petermeyer, Regional Administrator
> U.S. Department of Labor – OSHA
> Sam Nunn Atlanta Federal Center
> 61 Forsyth Street, SW, Room 6T50
> Atlanta, GA 30303

In addition, please be advised that the U.S. Department of Labor does not represent any party in the hearing; rather, each party presents his or her own case. The hearing is an adversarial proceeding before an Administrative Law Judge (ALJ) in which the parties

are allowed an opportunity to present their evidence for the record. The ALJ who conducts the hearing will issue a decision based on the evidence and arguments, presented by the parties. Review of the ALJ's decision may be sought from the Administrative Review Board, to which the Secretary of Labor has delegated responsibility for issuing final agency decisions under the FSMA. A copy of this letter has been sent to the Chief Administrative Law Judge along with a copy of your complaint. The rules and procedures for the handling of FSMA cases can be found in 21 U.S.C. §1012, and may be obtained at www.whistleblowers.gov.

Sincerely,

Matthew E. Robinson
Regional Supervisory Investigator

# Exhibit 3

Case 5:24-cv-00477-BO-RJ    Document 6-4    Filed 08/23/24    Page 1 of 13

JA097

**U.S. Department of Labor**

Office of Administrative Law Judges
11870 Merchants Walk - Suite 204
Newport News, VA 23606

(757) 591-5140
(757) 591-5150 (FAX)



**Issue Date: 06 January 2017**

Case No.:    2016-FDA-00003

*In the Matter of:*

CRAIG WATTS,
    *Complainant,*

    *v.*

PERDUE FARMS, INC.,
    *Respondent.*

## DECISION AND ORDER GRANTING RESPONDENT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

This matter arises from a complaint filed under the employee protection provisions of the Food Safety and Modernization Act ("FSMA"), 21 U.S.C. § 399d (2011), which amended the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.* (1938), and is governed by the implementing regulations found in the Code of Federal Regulations, Title 29, Part 1987.

### Summary

Mr. Craig Watts ("Complainant") is the owner of C&A Farms in Fairmont, North Carolina. *See* Complainant Craig Watts' Opposition to Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction and response at 5 (hereinafter *Complainant's Resp.*). Complainant alleges he had an independent contractor relationship with Perdue Farms, Inc., ("Respondent") in which he would "grow out" chickens until their removal and processing by Respondent.[1] *See* Respondent Perdue Farms, Inc., Motion to Dismiss for Lack of Subject Matter Jurisdiction at 4 (hereinafter *Respondent's Motion to Dismiss*). In 2014, Complainant alleged that consumers were being misled by the Respondent on the farming practices and health of chickens that were raised for Respondent in violation of the Food Safety Modernization Act and the Food, Drug, and Cosmetics Act. *Complainant's Resp.* at 6. In response to this allegation, Complainant alleges Respondent took actions in retaliation against Complainant which violated the employee

---

[1] Mr. Watts' relationship with Perdue Farms, Inc. in their contractual agreement allegedly allowed him to raise chickens that Perdue delivered for a number of weeks until they would be removed from his farm and harvested by Perdue. Complainant alleges that during this "grow out" period, he noticed discrepancies between the quality of chickens being raised and the claims made by Respondent. The court cites to *Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-85 (E.D.N.C. 1985); *Respondent's Motion. to Dismiss* at 4-5; *Complainant's Resp.* at 5-7 (providing background regarding the relationship between Respondent and Complainant and the chicken raising operation).

JA098

protection provisions of the Food Safety Modernization Act. 21 U.S.C. 399d. Complainant filed this claim alleging that Respondent violated Section 399d by retaliating against him for exposing above alleged violations. *Complainant's Resp.* at 7. Based on the law discussed below, this court finds it does not have subject matter jurisdiction over Complainant's claims, cannot hear the claim, and cannot weigh the merits of the claim. The court grants Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

## Procedural History

On February 19, 2015, Complainant filed a whistleblower retaliation complaint with the United States Department of Labor, Occupational Safety and Health Administration (OSHA), alleging violations of the employee protection provisions of the Food Safety Modernization Act. *Complainant's Resp.* at 7. On February 8, 2016, OSHA issued a finding and determination that Perdue was covered by FSMA provisions but that Complainant was not an employee under the FSMA. *Id.* at 8. On March 18, 2016, Complainant filed his Request for Hearing and Objections to Order challenging OSHA's decision and requested a hearing before an Administrative Law Judge pursuant to 29 C.F.R. Part 1987.106(a). *See* Request for Hearing and Objections to Order. The case was assigned to the Honorable Dana Rosen on March 31, 2016. *See* Notice of Assignment. Shortly thereafter, the Parties made a joint request to stay discovery pending the resolution of Respondent's planned Motion To Dismiss on jurisdictional grounds. *See* Joint Request to Stay Discovery Pending Resolution of Motion to Dismiss and for a Scheduling Conference. On April 26, 2016, an Order granting the joint request was issued. *See* Order Granting Joint Request to Stay Discovery Pending Resolution of Motion to Dismiss. A requested extension of time for the Complainant's reply brief was granted on July 1, 2016. See Order Granting Extension of Time to Respond to Respondent's Motion to Dismiss. On July 22, 2016, U.S. Poultry and Egg Association filed a Motion in Support for Leave to File an Amicus Brief in Support of Respondent Perdue Farms' Motion to Dismiss for Lack of Subject Matter Jurisdiction. This motion was granted on August 4, 2016. *See* Order Granting Leave to File an Amicus Brief in Support of Respondent Perdue Farms' Motion to Dismiss for Lack of Subject Matter Jurisdiction. The Parties filed briefs, all were considered, and applicable case law, statutes and regulations were applied to the claim at hand.

## Jurisdiction

Respondent asserts a jurisdictional challenge and claims that the United States Department of Labor and therefore the Office of Administrative Law Judges lack subject matter jurisdiction over the Complainant's claims. *Respondent's Motion to Dismiss* at 7-9. Respondent argues that the United States Department of Agriculture, not the United States Food and Drug Administration, is the statutory body empowered to hear and to enforce claims arising under the Poultry Products Inspection Act ("PPIA"). *See* 21 U.S.C. § 467f; *Respondent's Motion to Dismiss* at 7.

Complainant argues that the statutory provision exempting poultry and poultry products from the provisions of the FDCA also removes on-farm poultry products from the jurisdiction and whistleblower provisions found within the FSMA. 21 U.S.C. § 467f (stating that "[p]oultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act [21 USCS §§ 301 *et seq.*] to the extent of the application or extension thereto of the

- 2 -

provisions of this Act [21 USCS §§ 451 *et seq.*], except that the provisions of this Act [21 USCS §§ 451 et seq.] shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act [21 USCS §§ 301 *et seq.*] prior to enactment of the Wholesome Poultry Products Act [enacted Aug. 18, 1968].") This would then remove poultry from the regulatory jurisdiction of the FDCA and make 21 U.S.C. § 399d, the employee protection provision granting Occupational Safety and Health Administration ("OSHA") power to review FSMA whistleblower claims, inapplicable to poultry and poultry products that are exempted from the FDCA by the PPIA. For the reasons stated below, this court finds that it does not have subject matter jurisdiction to adjudicate Complainant's claim.

<u>**Applicable Law**</u>

The Rules of Practice and Procedure for Administrative Hearings before the Office of Administrative Law Judges, found in 29 C.F.R. Part 18, provide the standard to be applied on a Motion for Dispositive Action. *See* 29 C.F.R. 18.70. A party may make a motion to dismiss "part or all of the matter for reasons recognized under controlling law, such as *lack of subject matter jurisdiction*, failure to state a claim upon which relief can be granted, or untimeliness." *Id.* at (a). If there is a situation not covered by "these rules, or a governing statute, regulation, or executive order" the Federal Rules of Civil Procedure apply. *See* 29 C.F.R. § 18.10; *see also Ahluwalia v. ABB, Inc.*, 2007-SOX-44, *1, *2 (ARB Sept. 24, 2007) (for application of pre-2015 amendment 29 C.F.R. § 18.1, which mirrors the language found in 18.10). An administrative law judge must dismiss the matter once they make a determination that subject matter jurisdiction is lacking. 29 C.F.R. § 18.70(a).

Subject matter jurisdiction "refers to a tribunal's power to hear a case." *Snyder v. Bechtel Int'l Oil, Gas, & Chem.*, ALJ Case No. 2015-CPS-00004 (2015) (quoting *Morrison v. Nat'l Australian Bank*, 561 U.S. 267 (2010)). "The Department of Labor's subject matter is invoked 'when the parties are properly before it, the proceeding is of a kind or class which the court is authorized to adjudicate, and the claim set forth in the paper writing invoking the court's action is obviously not frivolous.'" *Snyder*, 2015-CPS-00004 at 10 (quoting *Sasse v. U.S. Dept. of Justice*, ARB No. 99-053, ALJ No. 1998-CAA-007, slip op. at 3 (ARB Aug. 31, 2000)). Under the analogous Federal Rule of Civil Procedure 12(b)(1) and controlling law as incorporated by 29 C.F.R. 18.70(a), the Complainant bears the burden of proof in asserting that the court's jurisdiction is proper. *Ahluwalia*, 2007-SOX-44 at 2; *see also* 29 C.F.R. 18.70(a).

<u>**Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction**</u>

Respondent argues that the U.S. Department of Labor, Office Of Administrative Law Judges, lacks authority to hear the Complainant's claim. Respondent makes two different, but interlinked, challenges to the authority of this court to review the Complainant's FSMA whistleblower claim. First, Respondent alleges that OSHA's conclusion that they retained jurisdiction over Complainant's FSMA whistleblower claim was in error because "poultry raising practices" are expressly exempt from the FDA's regulatory authority by the exemption provision found within the PPIA and instead under the purview of the United States Department of Agriculture ("USDA"). See *Respondent's Mtn. to Dismiss* at 7; *see, e.g.*, 21 U.S.C. § 467f. Second, Respondent asserts that Complainant's claim should be dismissed on the independent legal ground that the FDA does not have authority to regulate the on-farm activities which are

- 3 -

central to the complaint and that the USDA and their Food Safety Inspection Service ("FSIS") retains authority over on-farm activities. *Id.*

### Complainant's Response to Respondent's Motion to Dismiss

In Complainant's Opposition and response to Respondent's Motion to Dismiss, Complainant argues that the United States Department of Labor has jurisdiction over cases filed pursuant to the employee protection provision of the Food Safety Modernization Act. (FSMA) Complainant argues that there is subject matter jurisdiction because Respondent is "a company engaged 'the manufacture, processing, packing, transporting, distribution, reception, holding or importation of food.' " Complainant argues that the U. S. Department of Labor's jurisdiction is proper because the FDCA prohibits companies from selling " 'food' that has been 'adulterated" . . . or 'food' that has been 'misbranded. ' " *Complainant's Resp.* at 13; 21 U.S.C. §§ 331(c), 342(a)(4), 343(a). Complainant argues that previous cases have interpreted the term "food" broadly and include regulation of livestock which is to be slaughtered and adulteration of livestock through misadministration of livestock drugs. *Complainant's Resp.* at 13; *see also United States v. Rhody Dairy*, 812 F. Supp. 2d. 1239 (W.D. Wash. 2011); *United States v. Tuente Livestock*, 888 F. Supp. 1416 (D. Ohio 1995). Complainant further asserts that the FDA and USDA exercise concurrent jurisdiction over meat and poultry products "beyond the point when such products leave a USDA inspected establishment." *Complainant's Resp.* at 14. Complainant also asserts that even if the FDA lacks jurisdiction over Complainant's disclosures because of the PPIA, the U. S. Department of Labor still retains jurisdiction to review the Complainant's FSMA whistleblower claim. *Id.* at 15.

### Statutory Authority Analysis

The FSMA, signed into law on January 4, 2011, was passed as a reform of United States food safety laws and amended portions of the FDCA in an attempt to modernize food safety regulations promulgated by the FDA. Food Safety Modernization Act, 111 P.L. 353, 124 Stat. 3885 (2011). The FSMA provides that "[n]othing in this Act, or an amendment made by this act, shall be construed to – alter or limit the authority of the Secretary of Agriculture under the laws administered by such Secretary, including – (B) the Poultry Products Inspection Act...." 21 U.S.C. § 2251. The FSMA also added employee protection provisions to the preexisting FDCA which protect employees from retaliation by certain classes of employer upon good faith reporting of an alleged violation of the provisions of the FDCA. 21 U.S.C. § 399d. The employee protection provisions found within the FSMA specify that a party may report retaliation by filing a complaint with the Secretary of Labor within 180 days of the violation. 21 Id. § (d)(b). The FDCA covers a large portion of the food production and distribution system within the United States, but certain classes of "food" are regulated by other agencies, such as poultry and meat which are primarily regulated under the jurisdiction of the USDA.[2] *See generally* Federal Meat

---

[2] Note: "Food" itself is a contested term in this action. The FDCA in 21 U.S.C. § 321 defines "food" as (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article. Complainant avers that "food" includes live animals such as cows and swine, so by association poultry are included. *Complainant's Resp.* at 13 (citing *Rhody Dairy,* 821 F. Supp. at 1239; *Tuente Livestock,* 888 F. Supp. at 1424). Respondent asserts that "food" does not include live poultry. *Respondent's Mtn. to Dismiss* at 15-16. As it is not necessary to make a determination on the contention that chickens are food because of the clear preemption of the PPIA, for the purposes of resolving the question of subject matter jurisdiction, this court does not make a finding on the matter.

- 4 -

JA101

Inspection Act, 21 U.S.C. §§ 601-695; Renée Johnson, Cong. Research Serv., The Federal Food Safety System: A Primer, at 1, 2-8 (Jan. 17, 2014), http://fas.org/sgp/crs/misc/RS22600.pdf. While the FDA retains control over adulteration of most food through the FDCA, there are limits. *See, e.g.,* 21 U.S.C. § 350(c)(a) (holding that the Secretary of Health and Human Services may compel access to and copy all records related to adulterated articles of food with an exception for farms and restaurants). The PPIA contains an express provision exempting "poultry and poultry products" from the provisions of the FDCA but not derogating any authority conferred by the FDCA prior to the enactment of the Wholesome Poultry Products Act in 1968. *See* 21 U.S.C. § 467f.

The PPIA was enacted in 1968 to protect the public from "unwholesome, adulterated, or misbranded" poultry[3] products. *See* Poultry Products Inspection Act, 21 U.S.C. §§ 451-472 (1957). The PPIA gave authority to the Secretary of Agriculture to enforce the provisions of the Act, which regulate, but are not limited to, slaughter, labelling, and recordkeeping provisions of poultry production. *Id.* § 467(d). This included granting the USDA and FSIS authority to conduct *ante mortem* and *post mortem* of poultry in official establishments. *Id.* § 455. The PPIA provides its own provision for persons arbitrating disputed violations and permits persons an "opportunity to present [their] views orally or in writing with regard" to further proceedings. *Id.* § 462. Section 467f exempts the PPIA from the provisions of the FDCA to the "extent of the application or extension thereto of the provisions of [the PPIA]" except for authority derogated to the FDCA before the enactment of the Wholesome Poultry Products Act in 1968. *Id.* § 467f. Additionally, the USDA uses the authority of the PPIA to run a label approval system which certifies certain animal claims and qualities. *See generally* 9 C.F.R. § 381.129; *Prior Label Approval System: Generic Label Approval,* 78 Fed. Reg. 66,826 (Nov. 13, 2013). In certain scenarios, the FDA and USDA's jurisdiction may overlap. See CPG 565.100, FDA Jurisdiction Over Meat and Poultry Products, FOOD & DRUG ADMIN. (Nov. 29, 2011) (stating that it is FDA policy to inform USDA FSIS when an apparent violation has occurred involving a meat or poultry product that has left a USDA inspected establishment and that the FDA will not normally initiate action unless the USDA does not wish to handle it).

## Findings of Fact and Conclusions of Law

This court begins its analysis with Respondent's argument that the court lacks subject matter jurisdiction to hear Complainant's claim. Respondent argues that under the PPIA, the U. S. Department of Agriculture (USDA) is the federal agency with authority to regulate alleged adulteration and misbranding of poultry products from on-farm conditions similar to those alleged by Complainant. Respondent argues that the U. S. Department of Labor does not have authority.

Complainant filed his claim pursuant to the employee protection provisions of the FSMA, which allows a party who reported their reasonable belief of an act or omission which would constitute a violation of the FDCA and:

> [W]ho believes that he or she has been discharged or otherwise discriminated against by any person in violation of subsection (a) may, not later than 180 days after the date on

---

[3] Within the PPIA, "poultry" are defined as "any domesticated bird, whether live or dead." 21 U.S.C. 453(e).

- 5 -

which such violation occurs, file (or have any person file on his or her behalf) a complaint with the Secretary of Labor (referred to in this section as the "Secretary") alleging such discharge or discrimination and identifying the person responsible for such act. Upon receipt of such a complaint, the Secretary shall notify, in writing, the person named in the complaint of the filing of the complaint, of the allegations contained in the complaint, of the substance of evidence supporting the complaint, and of the opportunities that will be afforded to such person under paragraph (2).

21 U.S.C. 399d(b).

Complainant alleges that after he reported what he reasonably believed to be a violation of the FDCA, the U. S. Department of Labor has the statutory authority to hear his claim. *Complainant's Resp.* at 3-4. Conversely, Respondent argues that the U. S. Department of Labor does not have statutory authority to hear this claim. Respondent calls jurisdiction into question by questioning the statutory interplay between the provisions of the FSMA and the operation of the PPIA. *Respondent's Motion to Dismiss* at 7. The Respondent argues that PPIA excludes the rearing of poultry and poultry products from the FDCA and by implication, the employee protection provisions of FSMA. Respondent argues that, therefore, the U. S. Department of Labor has no subject matter jurisdiction to adjudicate Complainant's claim.

Complainant asserts that he has been raising chickens on his farm for 23 years, 22 of which have been for the Respondent. *Complainant's Resp.* at 5. Complainant states that under a contractual obligation, Complainant receives chicks from Respondent and raises them until they are retrieved by Respondent for slaughter and processing. *Id.* Based on the Parties' pleadings, it appears that Complainant and Respondent are reasonably classified as being involved in the raising of poultry, with Respondent additionally involved in the labelling, processing, and shipping of poultry products. *Complainant's Response* at 5-7; *Respondent's Motion to Dismiss* at 1-2, 4-7.

Complainant argues that even if the PPIA is the exclusive regulatory source for remedying claims involving adulterated or misbranded poultry products, the U. S. Department of Labor retains subject matter jurisdiction over his whistleblower claim because he made a non-frivolous allegation that he believed the Respondent was violating the FSMA. *Complainant's Resp.* at 4. In support of this argument, Complainant cites *Sylvester v. Paraxel Int'l*, ARB No. 07-123 (ARB 2011) and *Johnson v. Wellpoint Companies, Inc.*, ARB No. 11-035 (ARB 2013). [4] *Complainant's Resp.* at 4. In *Sylvester*, the Complainant appealed an ALJ's decision to dismiss her Sarbanes-Oxley Act ("SOX") whistleblower claim. The Respondent challenged the jurisdiction of the U. S. Department of Labor stating that the allegations failed to meet the prescribed subject matter jurisdiction granted by Congress. *Id.* The Administrative Law Judge determined that the U.S. Department of Labor lacked subject matter jurisdiction because the Complainant failed to articulate a definitive and specific violation of law covered by SOX § 806 or other violations. *Sylvester*, ARB No. 11-035, at 7. The Administrative Review Board reversed, holding that in that case, the ALJ had subject matter jurisdiction to hear the case by an explicit grant of authority from the Secretary of Labor under 18 U.S.C. §1514(A)(b). *Id.* at 11.

---

[4] *Johnson v. Wellpoint* is not relevant to the case here. *Johnson* does not address subject matter jurisdiction.

- 6 -

In the case here, unlike in *Sylvester*, the specific grant of authority for the U. S. Department of Labor to review FSMA whistleblower cases in 21 U.S.C. § 399d only applies to violations of the FDCA and FSMA (21 U.S.C. § 301 *et seq.*). The express language of the PPIA, signed into law in 2011, removes the authority from the U. S. Department of Labor by stating that "[p]oultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act [21 USCS §§ 301 *et seq.*] to the extent of the application or extension thereto of the provisions of this Act...." 21 U.S.C. § 467f. As the PPIA was signed in 2011, it cannot fall into the prior conveyance of authority given to the FDCA before 1968. *Id.* An alternative reading would render § 467f internally inconsistent when read against the rest of the statute, including 21 U.S.C. § 2251. *See generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (stating that "[o]ur first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent."); 156 Cong. Rec. H8861-01 (2010) (discussing implication and implementation of FSMA).

Supporting that Congress intended the USDA to retain jurisdiction over certain poultry claims with the PPIA, the exemption clause of the Federal Meat Inspection Act ("FMIA") has been interpreted to work in a similar manner. The exemption provision of the FMIA provides that "[n]otwithstanding any other provisions of law, including section 1002(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 392(a)), the provisions of this Act [21 USCS §§ 601 et seq.] shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act [21 USCS §§ 301 et seq.] prior to enactment of the Wholesome Meat Act [enacted Dec. 15, 1967]." *See* 21 U.S.C. § 679. In a compliance policy guide promulgated by the Food and Drug Administration, the agency notes that:

> With respect to adulteration and misbranding, Section 902(b) of the Federal Food, Drug, and Cosmetic Act states that meat and meat products are exempt to the extent they are covered by the Meat Inspection Act. This had been construed since 1938 as meaning that USDA has exclusive jurisdiction up to the time a meat or meat product leaves a USDA inspected plant... POLICY: FDA will inform USDA Food Safety and Inspection Service (FSIS) when an apparent violation is encountered involving a meat or poultry product that has left a USDA inspected establishment.

CPG Sec. 565.100, FDA Jurisdiction Over Meat and Poultry Products, FOOD & DRUG ADMIN. (last updated Mar. 2005).

This policy, while predating the FSMA and only explicitly addressing the FMIA, supports that the FDA does recognize that certain meat or poultry production activities are under USDA jurisdiction up to the point they leave the farm or processor by virtue of specific statutory authority. While there are limited exceptions to this policy, such as the ability to exercise jurisdiction over meat and poultry products in interstate commerce when appropriate or when the USDA chooses not to become involved, the policy supports that the exemption clause found in the FMIA does affect the control of the FDCA over meat and livestock regulation. *Id.* In Complainant's case, the allegations made involve a violation of the FDCA for on-farm and processor activities. *See Complainant's Resp.* at 6 (discussing the alleged "cramped and infectious conditions in Perdue poultry houses" and that consumers were allegedly being fed

- 7 -

misinformation about their food in violation of the FDCA and FSMA). These alleged activities took place on the Complainant's farm and at the Perdue processing facility. *Respondent's Mtn. to Dismiss* at 4. These locations are regulated by the USDA. *See* Packers and Stockyard Act, 1921 § 1, 7 U.S.C. § 181 (1921); 21 U.S.C. §§ 451-472. At the time Complainant made his allegations, the chickens were not products that had left a "USDA inspected establishment." *Complainant's Resp.* at 5-6. As the FSMA makes explicit provisions for the adulteration and mislabeling of poultry, the Complainant's utilization of the employee protection provision does not allege violation under the FDCA, but under the PPIA. *See* 21 U.S.C. §§ 453, 458-459. Further, as this incident is alleged to have occurred on the farm and at the processor, this violation did not occur at a time where concurrent jurisdiction exists. *See* CPG Sec. 565.100, FDA Jurisdiction Over Meat and Poultry Products.

The FSMA, as a 2011 amendment to the FDCA, removed almost all authority for poultry and poultry claims from the FDCA except in cases where the authority was conferred "prior to enactment of the Wholesome Poultry Products Act [enacted Aug. 18, 1968]." 21 U.S.C. § 467f. As the employee protection provisions of the FSMA were enacted in 2011, this authority was not conferred to the FDCA under the plain reading of the statute. 21 U.S.C. § 399d. In light of the Congressional intent in passing the PPIA, the statutory preemption clause found in PPIA (21 U.S.C. 467f) which removes most of the regulatory structure protecting poultry and poultry products from the FDCA, and that the alleged claim falls in line with the prohibited conduct of the PPIA, this court finds that it lacks subject matter jurisdiction to review Complainant's claims. Complainant's claim alleges not a violation of the FDCA, but an alleged violation of the PPIA. Additionally, even if concurrent regulatory jurisdiction between the FDA and USDA is proper in certain circumstances, Complainant's alleged violations of the FDCA occurred on the farm and at the processor, both places protected and regulated under the PPIA. *Complainant's Resp.* at 6.

## Conclusion

Based on the case law, Congressional intent, and the statutes, the U. S. Department of Labor does not have jurisdiction to hear this FDA claim, submitted to OSHA. The proper forum for consideration of this claim is through the U. S. Department of Agriculture under the PPIA.

As Complainant's claim for alleged retaliatory discrimination under 399d does not allege an action under the FDCA due to the statutory preemption of the PPIA, there is no jurisdiction under the employee protection provisions of the FSMA. The FSMA, as a 2011 amendment to the FDCA, is not within the regulatory authority of the FDCA retained before the enactment of the Wholesome Poultry Products Act. 21 U.S.C. 467f. Additionally, while Complainant argues that at some point in the poultry raising process both the FDCA and USDA may exercise concurrent jurisdiction over poultry and poultry products, the violations alleged by Complainant are directly addressed by the PPIA and took place before leaving a USDA inspected establishment. *Complainant's Resp.* at 6.

For these reasons, the court finds it has no authority to hear this case. The court finds it has no subject matter jurisdiction over Complainant's claims. The court is not statutorily authorized to hear allegations of disputes arising under the PPIA. The employee protection provisions of the FSMA, which it is empowered to adjudicate, do not cover the poultry raising allegations made by the Complainant. *Snyder*, 2015-CPS-00004 at 10.

- 8 -

The court has no authority to address the merits or weigh the credibility of Complainant's claim.

Accordingly, the court cannot hear the Complainant's claim, grants Respondent's Motion To Dismiss, and dismisses Complainant's Complaint for lack of subject matter jurisdiction pursuant to 29 C.F.R. 18.70(a).

<div align="center">

**ORDER**

</div>

It is hereby **ORDERED** that:

The Respondent Perdue Farms' Motion to Dismiss the Complainant's Claim for lack of subject matter jurisdiction is **GRANTED.**

<div align="center">

**SO ORDERED.**

</div>



Digitally signed by Dana A. Rosen
DN: CN=Dana A. Rosen,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Newport News, S=VA, C=US
Location: Newport News VA

<div align="center">

DANA ROSEN
Administrative Law Judge

</div>

DR/TR/mjw
Newport News, VA

**NOTICE OF APPEAL RIGHTS**: To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") within fourteen (14) days of the date of issuance of the administrative law judge's decision. The Board's address is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington DC 20210, for traditional paper filing. Alternatively, the Board offers an Electronic File and Service Request (EFSR) system. The EFSR for electronic filing (eFile) permits the submission of forms and documents to the Board through the Internet instead of using postal mail and fax. The EFSR portal allows parties to file new appeals electronically, receive electronic service of Board issuances, file briefs and motions electronically, and check the status of existing appeals via a web-based interface accessible 24 hours every day. No paper copies need be filed.

An e-Filer must register as a user, by filing an online registration form. To register, the e-Filer must have a valid e-mail address. The Board must validate the e-Filer before he or she may file any e-Filed document. After the Board has accepted an e-Filing, it is handled just as it would be had it been filed in a more traditional manner. e-Filers will also have access to electronic service (eService), which is simply a way to receive documents, issued by the Board, through the Internet instead of mailing paper notices/documents.

Information regarding registration for access to the EFSR system, as well as a step by step user guide and FAQs can be found at: https://dol-appeals.entellitrak.com. If you have any questions or comments, please contact: Boards-EFSR-Help@dol.gov

Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-filing; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. *See* 29 C.F.R. § 1987.110(a). Your Petition must specifically identify the findings, conclusions or orders to which you object. You may be found to have waived any objections you do not raise specifically. *See* 29 C.F.R. § 1987.110(a).

At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. You must also serve the Assistant Secretary, Occupational Safety and Health Administration and, in cases in which the Assistant Secretary is a party, on the Associate Solicitor for Occupational Safety and Health. *See* 29 C.F.R. § 1987.110(a).

If filing paper copies, you must file an original and four copies of the petition for review with the Board, together with one copy of this decision. In addition, within 30 calendar days of filing the petition for review you must file with the Board an original and four copies of a supporting legal brief of points and authorities, not to exceed thirty double-spaced typed pages, and you may file an appendix (one copy only) consisting of relevant excerpts of the record of the proceedings from which the appeal is taken, upon which you rely in support of your petition for review. If you e-File your petition and opening brief, only one copy need be uploaded.

Any response in opposition to a petition for review must be filed with the Board within 30 calendar days from the date of filing of the petitioning party's supporting legal brief of points and authorities. The response in opposition to the petition for review must include an original and four copies of the responding party's legal brief of points and authorities in opposition to the petition, not to exceed thirty double-spaced typed pages, and may include an appendix (one copy only) consisting of relevant excerpts of the record of the proceedings from which appeal has been taken, upon which the responding party relies. If you e-File your responsive brief, only one copy need be uploaded.

Upon receipt of a legal brief filed in opposition to a petition for review, the petitioning party may file a reply brief (original and four copies), not to exceed ten double-spaced typed pages, within such time period as may be ordered by the Board. If you e-File your reply brief, only one copy need be uploaded.

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. §§ 1987.109(e) and 1987.110(b). Even if a Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days of the date the Petition is filed notifying the parties that it has accepted the case for review. *See* 29 C.F.R. § 1987.110(b).

- 10 -

# SERVICE SHEET

Case Name:  WATTS_CRAIG_v_PERDUE_FARMS_INC_

Case Number: **2016FDA00003**

Document Title: **DECISION AND ORDER GRANTING RESPONDENT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

I hereby certify that a copy of the above-referenced document was sent to the following this 6th day of January, 2017:



Digitally signed by Malinda J. Wright
DN: CN=Malinda J. wright, OU=Legal
Assistant, O=US DOL Office of
Administrative Law Judges, L=Newport
News, S=VA, C=US
Location: Newport News VA

**Malinda J. Wright**
Legal Assistant

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
    *{Hard Copy - Regular Mail}*

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
    *{Hard Copy - Regular Mail}*

Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
    *{Hard Copy - Regular Mail}*

Regional Solicitor
U. S. Department of Labor
Sam Nunn Federal Center
Room 7T10
61 Forsyth Street, S.W.
ATLANTA GA 30303
    *{Hard Copy - Regular Mail}*

Administrative Review Board
U. S. Dept. of Labor
Suite S-5220, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
    *{Hard Copy - Regular Mail}*

Craig Watts
5354 Butler Road
FAIRMONT NC 28340
    *{Hard Copy - Regular Mail}*

Workers Compensation
Perdue Farms, Inc.
31149 Old Ocean City Road
SALISBURY MD 21804-1806
    *{Hard Copy - Regular Mail}*

JA108

**SERVICE SHEET** continued (2016FDA00003 Case Decision)    Page: 2

Sarah L Nash, Esq
Government Accountability Project
1612 K Street, NW
Suite 1100
WASHINGTON DC 20006
        *{Hard Copy - Regular Mail}*

Todd J Horn, Esq
Venable, LLP
750 E. Pratt Street
Suite 900
BALTIMORE MD 21202
        *{Hard Copy - Regular Mail}*

Stephen R Freeland, Esq
Venable, LLP
575 Seventh Street, N.W.
WASHINGTON DC 20004
        *{Hard Copy - Regular Mail}*

J. Larry Stine, Esq
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, NE
Suite 400
ATLANTA GA 30326
        *{Hard Copy - Regular Mail}*

Raymond Perez, Esq
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, N.E.
Suite 400
ATLANTA GA 30326
        *{Hard Copy - Regular Mail}*

# Exhibit 4

Case 5:24-cv-00477-BO-RJ    Document 6-5    Filed 08/23/24    Page 1 of 7

JA110

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

CRAIG WATTS,                                    ARB CASE NO.  2017-0017

           COMPLAINANT,        ALJ CASE NO.  2016-FDA-00003

    v.                                          DATE:

                                        MAR – 5 2019

PERDUE FARMS, INC.,

           RESPONDENT.

BEFORE:  THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant:*
    **Thad M. Guyer, Esq.;** *T.M. Guyer & Friends, PC*; Medford, Oregon; **Karen Gray, Esq.;** *Government Accountability Project, Inc.*; Washington, District of Columbia

*For the Respondent:*
    **Todd J. Horn, Esq.;** and **Michael J. Wilson, Esq.;** *Venable LLP*; Baltimore, Maryland; **John F. Cooney, Esq.;** and **Stephen R. Freeland, Esq.;** *Venable LLP*, Washington, District of Columbia

*For the U.S. Poultry & Egg Association & National Chicken Council as Amicus Curiae:*
    **J. Larry Stine, Esq.;** *Wimberly, Lawson, Steckel, Schneider & Stine, PC*; Atlanta, Georgia

Before:  William T. Barto, *Chief Administrative Appeals Judge*; James A. Haynes and Daniel T. Gresh, *Administrative Appeals Judges*

## FINAL DECISION AND ORDER

    This case arises under the employee protection provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA),[1] as amended by Section 402 of the Food Safety and Modernization Act

---
[1]    21 U.S.C. § 301 et seq. (1938).

2

of 2011 (FSMA),[2] and its implementing regulations at 29 C.F.R. § 1987 (2018). Section 402 of the FSMA protects an employee who has engaged in protected activity pertaining to a violation or alleged violation of the FFDCA, or any order, rule, regulation, standard, or ban under the FFDCA, from retaliation. Craig Watts, the owner of C&A Farms, filed a complaint with the Department of Labor's Occupational Safety and Health Administration (OSHA) alleging that Perdue Farms, Inc. (Perdue) retaliated against him for engaging in FSMA-related protected activities. OSHA dismissed the complaint, and Watts asked for a hearing before an Administrative Law Judge (ALJ). Upon motion by Respondent, the ALJ also dismissed the complaint. For the reasons stated below, we affirm.

## BACKGROUND

Craig Watts contracted with Perdue Farms, Inc., to raise chickens in North Carolina which he received from Perdue as chicks.[3] After a period of several weeks, Perdue would then collect them for processing.[4] In 2014, Watts made allegations that Perdue had misinformed consumers about the practices farmers used in raising its chickens and the health of its chickens in violation of the FSMA and the FFDCA.[5] On February 19, 2015, Watts filed a whistleblower complaint alleging that Perdue retaliated against him for making such allegations in violation of the employee protection provisions of the FSMA.[6]

On February 8, 2016, OSHA determined that, while Perdue was covered under the FSMA, Watts was not a covered employee of Perdue under the FSMA.[7] Watts requested a hearing before an ALJ. Before the ALJ, Perdue filed a motion to dismiss for lack of subject matter jurisdiction. The ALJ granted Perdue's motion to dismiss pursuant to 29 C.F.R. § 18.70(a), concluding that she lacked jurisdiction to hear Watts's claim.[8] Specifically, the ALJ reasoned that the raising of chickens is part of the poultry products industry, which is exempt from the FFDCA pursuant to the Poultry Products Inspection Act (PPIA), 21 U.S.C. § 467f (1979), and is therefore also exempt from the FSMA amendments adding the employee

---

[2]    21 U.S.C. § 399d (2016).

[3]    Decision and Order Granting Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction (D. & O.) at 1, 6.

[4]    *Id.*

[5]    *Id.* at 1.

[6]    *Id.* at 1-2.

[7]    *Id.* at 2.

[8]    20 C.F.R. § 18.70 encompasses the bases for dismissal announced in Rule 12(b) of the Federal Rules of Civil Procedure. We note that judges and parties often use the term "subject matter jurisdiction" for what might more properly be denoted as a pleadings- or merits-based determination. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006).

3

protection provisions to the FFDCA. Watts appealed this decision to the Administrative Review Board (ARB or Board).

## JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated authority to the Board to act on appeals from decisions by ALJs in cases brought under the FSMA and to issue final agency decisions in those matters for the Department of Labor (DOL).[9] In cases arising under the FSMA, "[t]he ARB will review the factual determinations of the ALJ under the substantial evidence standard." 20 C.F.R. § 1987.110(b). The ARB reviews an ALJ's conclusions of law de novo.[10]

## DISCUSSION

### A. Statutory and Regulatory Background

We must determine whether the ALJ erred in her conclusion of law that the U.S. Department of Labor does not have jurisdiction to adjudicate this complaint. The statutory framework is complex, involving four distinct statutes, and requires some explanation to fully understand the context of this case.

The FFDCA authorizes the Food and Drug Administration (FDA) to regulate the safety of food in interstate commerce. 21 U.S.C. § 301 et seq. Chapter 9 of the FFDCA regulates food safety from the time it is imported, manufactured, or processed until it is packaged and distributed for public consumption. *Id.*

On January 4, 2011, Congress enacted the FSMA to amend the FFDCA and add employee protections.[11] Section 402 of the FSMA, 21 U.S.C. § 399d(a), provides that the following:

> (a) In general
>
> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of *food* may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the

---

[9]     Secretary's Order No. 2-2012 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 77 Fed. Reg. 69,378 (Nov. 16, 2012); 29 C.F.R. § 1987.110(a).

[10]    *Brousil v. BNSF Railway Co.*, ARB Nos. 16-025, 16-031, ALJ No. 2014-FRS-163, slip op. at 3 (ARB July 9, 2018).

[11]    Pub. L. 111-353, 124 Stat. 3885 (Jan. 4, 2011).

JA113

4

employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)

> (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter; . . .

21 U.S.C. § 399d(a) (emphasis added). "Food" is the operative word that conveys the whistleblower provision's coverage. "Food" is defined in the FFDCA as:

> The term "food" means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

21 U.S.C. § 321(f). Similarly, the FSMA's implementing regulations restate the definition without substantive change:

> *Food* means articles used for food or drink for man or other animals, chewing gum, and articles used for components of any such article.

29 C.F.R. § 1987.101(h).

While "food" is a broad category of articles and things, Congress has chosen to limit the FFDCA's coverage of food. It enacted the PPIA to protect the public from "unwholesome, adulterated, or misbranded" poultry products. 21 U.S.C. § 451 (1968). The PPIA generally exempts poultry and poultry products from the FFDCA:

> Poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.] to the extent of the application or extension thereto of the provisions of this chapter, except that the provisions of this chapter shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act prior to August 18, 1968. . . .

21 U.S.C. § 467f(a); *see also* 21 U.S.C. §§ 350c(d)(2), 381(m)(3)(B) (limiting poultry from the respective FFDCA obligations and duties). Furthermore, Section 403 of the FSMA, 21 U.S.C. § 2251, specifically addresses the relationship between the two Acts:

> Nothing in [the FSMA], or an amendment made by this Act, shall be construed to—
>
> . . .

5

> (4) alter or limit the authority of the Secretary of Agriculture
> under the laws administered by such Secretary, including---
>
> ...
>
> (B) the Poultry Products Inspection Act...

21 U.S.C. § 2251. Accordingly, the FFDCA's definition of "food" may be broad, but the PPIA and FSMA unequivocally establish that "poultry" is not "food" for the purposes of the FFDCA. There is no overlap of coverage in this particular regard, and the ALJ was correct as a matter of law to conclude that she had no authority to adjudicate a complaint arising under a statute, i.e., the PPIA, that is not administered by the Department of Labor.

### B. Watts's Further Argument

Watts also argues that even if the PPIA excludes "poultry" from coverage under the FFDCA, the DOL is still a proper forum for his complaint because Watts had a reasonable belief that he and his employer were covered under the FFDCA and the FSMA. The FSMA's implementing regulations provide that the FSMA protects an employee who has done the following:

> Provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the [FFDCA] or any order, rule, regulation, standard, or ban under the [FFDCA];

29 C.F.R. § 1987.102(b)(1). Watts cites *Saporito v. Publix Super Markets, Inc.*, ARB No. 10-073, ALJ No. 2010-CPS-001 (ARB Mar. 28, 2012), for support. In *Saporito*, a panel of the Board held that it was error to dismiss a complaint of retaliation under the Consumer Product Safety Improvement Act (CPSIA), 15 U.S.C. § 2087 (2008), because the ALJ erroneously concluded that the actions complained of involved categories of products excluded from the coverage of the CPSIA. The Board noted that the employee protection provision of the CPSIA was not limited to acts or omissions that violated the CPSIA, but also extended to violations of "any Act regulated by the [Consumer Products Safety] Commission, or any order, rule, regulation, standard, or ban under such Acts." The Board identified two such Acts that the Commission also regulated that may have been implicated by the actions Saporito complained of, and concluded that "[t]his factor alone is a sufficient basis to reverse and remand this matter to the ALJ." *Saporito*, ARB No. 10-073, slip op. at 5. In subsequent dicta, the Board noted that the ALJ had also erroneously failed to consider the effect of Saporito's potentially mistaken belief that the actions at issue were violations of the CPSIA. The Board observed that "[t]he CPSIA's plain language allows the complainant to be wrong as long as he held a reasonable belief of a violation of the Act or other act enforced by the Commission." *Saporito*, ARB No. 10-073, slip op. at 6.

### C. Analysis

Case 5:24-cv-00477-BO-RJ    Document 6-5    Filed 08/23/24    Page 6 of 7

6

Watts' reliance upon *Saporito* is misplaced for several reasons. As a threshold matter, the statutory framework in *Saporito* is distinguishable from that in the instant case. Whereas the CPSIA extended whistleblower protection to allegations of violations of any legislative act the Consumer Product Safety Commission regulated, in this matter the FFDCA and the FSMA extend such protection only to allegations of violations of the FFDCA. *See* 21 U.S.C. § 399d(a). And while the ALJ in *Saporito* erred by ignoring statutory language that resulted in a constrained reading of the reach of the Act's coverage at issue in that case, in this case Watts would have the Board expand the reach of the FFDCA and the FSMA to an entity neither Act covers on the basis of Complainant's mistake of law. By doing so, Watts conflates the standard of analysis for determining whether protected activity is established based on a complainant's "reasonable belief" with the different analysis for determining whether a respondent's activities are covered under the FSMA. A complainant's reasonable but mistaken belief that a FFDCA violation has occurred may render certain of his whistleblowing activities as protected under the Act. But an employee's reasonable albeit mistaken belief that poultry is regulated under the FFDCA and the FSMA cannot operate to extend coverage of those Acts over an entity whose activities the Acts do not otherwise regulate. Complainant's reasonable mistake of law may expand the protections that his whistleblowing activities receive, but it cannot extend the coverage of an Act beyond that which Congress expressly provided for in the statutory text.

In conclusion, Watts has failed to show that the ALJ erred in dismissing his complaint. *Cf. Nortell v. North Central College*, ARB No. 16-071, ALJ No. 2016-SOX-013, slip op. at 4-5 (ARB Feb. 12, 2018); *Fleszar v. Am. Med. Ass'n*, ARB Nos. 07-091, 08-061, ALJ Nos. 2007-SOX-030, 2008-SOX-016, slip op. at 4 (ARB Mar. 31, 2009). For the reasons stated above, we hold that the ALJ's decision was correct in law and fact. Accordingly, we **AFFIRM** the ALJ's dismissal of this complaint.

**SO ORDERED.**

# Exhibit 5

Case 5:24-cv-00477-BO-RJ    Document 6-6    Filed 08/23/24    Page 1 of 12

JA117

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

| | |
|---|---|
| CRAIG WATTS, <br><br>     Petitioner, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR; ACTING SECRETARY PATRICK PIZZELLA; PERDUE FARMS, INC., <br><br>     Respondents. | Case No. 19-1487 |

## ACTING SECRETARY OF LABOR'S MOTION FOR VOLUNTARY REMAND

Pursuant to Federal Rule of Appellate Procedure 27, the Acting Secretary of Labor ("Secretary"), United States Department of Labor ("DOL"), through counsel, hereby moves this Court for a voluntary remand of this case to the DOL's Administrative Review Board ("ARB" or "the Board") for further administrative proceedings. Counsel for the DOL have recently been apprised that the U.S. Food and Drug Administration ("FDA") has significant concerns with the ARB's decision at issue in this appeal. Accordingly, and for the reasons set forth below, the DOL respectfully requests that this Court remand the matter to the ARB for further proceedings to allow the FDA the opportunity to participate as amicus curiae in this case, to enable the private litigants to respond to the FDA's views,

and to allow the Board to reconsider its decision in light of those supplemental briefs.

Counsel for the Secretary has conferred with counsel for Petitioner Craig Watts ("Watts") and counsel for Respondent Perdue Farms, Inc. ("Perdue"). Counsel for the Petitioner consents to this request for a voluntary remand. Counsel for Perdue has advised that Perdue opposes DOL's motion for a voluntary remand and intends to file an opposition to this motion.[1]

**Background**

A.    Statutory and Regulatory Background

Since 1938, the Federal Food, Drug, and Cosmetic Act ("FFDCA") has authorized the FDA to regulate the safety of food in interstate commerce. *See* 21 U.S.C. 301 *et seq*. On January 4, 2011, Congress enacted the FDA Food Safety Modernization Act ("FSMA"), which, inter alia, added a whistleblower protection provision to the FFDCA. *See* Pub. L. No. 111-353, § 402, 124 Stat. 3885, 3968 (2011); 21 U.S.C. 399d. The FSMA whistleblower provision protects employees of entities that are "engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of *food*." 21 U.S.C. 399d(a) (emphasis added). Although the FDA is vested with general enforcement authority

---

[1] By separate motion, the DOL is also requesting that this Court hold the briefing schedule in this case in abeyance pending this Court's determination of the instant motion for voluntary remand.

- 2 -

over the FFDCA, the DOL is tasked with investigating and adjudicating FSMA whistleblower cases.  *See* 21 U.S.C. 399d(b).

An employee who believes that he or she has been subjected to retaliation for engaging in protected activity under the FSMA may thus file a complaint with the Secretary of Labor.  *See* 21 U.S.C. 399d(b)(1).  The Secretary has delegated responsibility for receiving and investigating whistleblower complaints under the FSMA to the Assistant Secretary for Occupational Safety and Health.  *See* Sec'y of Labor's Order No. 1-2012 (Jan. 18, 2012), 77 Fed. Reg. 3912, 2012 WL 194561 (Jan. 25, 2012); 29 C.F.R. 1987.103(b), .104(a).  Following an investigation, OSHA issues a determination either dismissing the complaint or finding retaliation and ordering appropriate relief.  *See* 29 C.F.R. 1987.105(a).

Either the complainant or the respondent may file objections to OSHA's determination within 30 days and request a de novo hearing before a DOL Administrative Law Judge ("ALJ").  *See* 29 C.F.R. 1987.106(a).  The ALJ may hold a hearing in the case or decide the case on dispositive motions, if appropriate. The ALJ's decision is subject to discretionary review by the DOL's Administrative Review Board.  *See* 29 C.F.R. 1987.110.

If a petition for review is filed and the ARB accepts review, the ARB issues the final decision of the Secretary of Labor under the FSMA.  *See* 21 U.S.C. 399d(b)(3),(5); 29 C.F.R. 1987.112(a); Sec'y of Labor's Order No. 01-2019 (Feb.

JA120

15, 2019), 84 Fed. Reg. 13,072, 2019 WL 1453417 (April 3, 2019).  The ARB's

decision is reviewable in the court of appeals for the circuit in which the violation

allegedly occurred or in which the complainant resided on the date of the alleged

violation.  *See* 21 U.S.C. 399d(b)(5)(A).  Judicial review of the ARB's final

decision is governed by the Administrative Procedure Act ("APA"), 5 U.S.C.

706(2).  *See* 21 U.S.C. 399d(b)(5)(A).

B.    Procedural History

In 2015, Petitioner Watts filed a whistleblower complaint with OSHA.  *See*

ECF Doc. No. 26, DOL Administrative Record ("AR") 004-017.  Watts, the owner

of a farm that contracts with Respondent Perdue to raise chickens, alleged that

Perdue had retaliated against him in violation of the FSMA for making allegations

that Perdue had misinformed customers about certain farming practices used in

raising the chickens and the health of its chickens.  *Id*.  In February 2016, OSHA

issued findings and dismissed the complaint.  *Id.* at AR 001-21.

Watts appealed OSHA's findings to an ALJ, and Perdue filed a motion to

dismiss for lack of subject matter jurisdiction.  *See* AR 022-066, 086-217.  On

January 6, 2017, the ALJ granted Perdue's motion, concluding that DOL lacked

jurisdiction to adjudicate the complaint because poultry is regulated by the U.S.

Department of Agriculture ("USDA") under the Poultry Products Inspection Act

- 4 -

("PPIA"), not by the FDA under the FFDCA.  *See* AR 307-319.  Watts appealed the ALJ's decision to the Board.  *Id.* at 320-326.

On March 5, 2019, the ARB affirmed the ALJ's decision, concluding that the term "food" in the FFDCA does not include poultry.  *See* AR 426-434; *Watts v. Perdue Farms, Inc.*, ARB Case No. 2017-0017, 2019 WL 3293923 (ARB Mar. 5, 2019).  On May 3, 2019, Watts appealed the ARB's decision to this Court.  *See* ECF Doc. No. 3-1.

After the ARB's decision was appealed to this Court, but prior to briefing, the FDA's Office of Chief Counsel informed counsel for the DOL that the FDA has significant legal and policy concerns with the ARB's decision.  The FDA has expressed that the ARB's decision may undermine its enforcement authority under the FFDCA, thereby potentially threatening the safety of the U.S. food supply.

### Argument

A.    Standard for Voluntary Remand of Agency Action

As this Court has expressly recognized, "When a court reviews an agency action, the agency is entitled to seek remand without confessing error, to reconsider its previous position."  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 215 (4th Cir. 2009) (internal quotation marks and citations omitted).  In appropriate circumstances, the voluntary remand of an agency action for reconsideration is warranted because "[a]n agency must be allowed to assess the

- 5 -

wisdom of its policy on a continuing basis." *Id.* (internal quotation marks and citations omitted). It is well-established that administrative agencies have "inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980); *see Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416 (6th Cir. 2004); *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001).

Courts commonly grant a government agency's motion for voluntary remand because it allows the agency to review and correct its own potential errors, if any, without necessitating the expenditure of judicial resources or the resources of private litigants in reviewing an administrative record that may be incorrect or incomplete. *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 641 (4th Cir. 2018); *Mineta*, 375 F.3d at 416-17; *SKF USA*, 254 F.3d at 1028-30; *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) (explaining that courts "commonly grant such motions [for voluntary remand], preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete").

As the D.C. Circuit recently explained, an agency need *not* "confess error or impropriety in order to obtain a voluntary remand," but the agency "ordinarily does

- 6 -

at least need to profess intention to reconsider, re-review, or modify the original agency decision that is the subject of the legal challenge." *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 387 (D.C. Cir. 2017); *see also Mineta*, 375 F.3d at 417 (stating that "voluntary remand is appropriate even without a change in the law or new evidence"); *SKF USA*, 254 F.3d at 1029 (same). An agency's request for a voluntary remand "may be refused if the agency's request is frivolous or in bad faith." *SKF USA*, 254 F.3d at 1029. If the concern expressed by the agency is "substantial and legitimate," however, then a voluntary remand is typically appropriate. *Id*.

Courts possess the inherent authority and discretion to grant agency requests for voluntary remand in such appropriate circumstances. *See, e.g., Limnia*, 857 F.3d at 381 (explaining that a "district court has broad discretion to decide whether and when to grant an agency's request for a voluntary remand"); *Loma Linda Univ. v. Schweiker*, 705 F.2d 1123, 1127 (9th Cir. 1983) ("A reviewing court has inherent power to remand a matter to the administrative agency."). Indeed, the APA itself empowers federal courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. 705.

- 7 -

B.      Voluntary Remand is Warranted Here So That the ARB Can Reconsider Its Decision in Light of Views Expressed by the FDA and the Private Parties' Responses to Such Arguments.

Here, the DOL's Administrative Review Board issued a decision interpreting the term "food" in the FFDCA based on the administrative record and briefs submitted by private litigants.  Upon appeal of the decision to this Court, the FDA became aware of the ARB's decision and expressed to the DOL's counsel significant concerns with the ARB's conclusions and analysis.  As explained above, although the DOL is statutorily tasked with administering the FSMA whistleblower provision, the FDA is the federal agency vested with general enforcement authority over the broader statute in which the whistleblower provision is codified.  Accordingly, the FDA has advised that the ARB's interpretation of the term "food" in this whistleblower case could have substantial implications for the FDA's ability to regulate the U.S. food supply under that broader statute.  Significantly, the FDA has indicated to the DOL's counsel that certain critical facts in the record and legal arguments relevant to the issue on appeal were not adequately argued before the ARB by the private litigants in this case.  The FDA requests the opportunity to provide its views to the ARB so that

- 8 -

the agency can reevaluate whether its prior decision is correct in light of certain important information not previously brought to the ARB's attention.[2]

The Secretary of Labor therefore moves this Court for a voluntary remand of this case to the ARB so that the ARB may reconsider the challenged agency decision on review. If remand is granted, the ARB would invite the FDA to file an amicus brief in the administrative proceeding and would allow the private litigants the opportunity to respond to the FDA's arguments. The ARB would consider such supplemental briefing and issue a decision as expeditiously as possible.

Given that the FDA has expressed significant and legitimate concerns regarding the ARB's decision, the Secretary of Labor hereby requests the opportunity for the administrative agency to reconsider its prior decision in this matter. This voluntary remand request is made in good faith and based on substantial inter-agency consultation and review. Remanding this case to the ARB will also serve the interests of judicial economy and comity by allowing the agency to reconsider its decision without further expenditure of judicial and litigant resources in the court of appeals.

---

[2] Notably, the ARB itself has not communicated with the FDA regarding this matter; all such contact with the FDA has been handled exclusively by the DOL's Office of the Solicitor. The ARB does not have any specific knowledge as to the substance of the FDA's concerns, but has agreed to accept a voluntary remand of this matter in order to allow the FDA to formally present its views to the Board and to permit the other parties to respond to such views on the record. Accordingly, the ARB's reconsideration of this matter upon remand would be based on the administrative record and any briefs filed before that forum.

- 9 -

## Conclusion

For the foregoing reasons, the Secretary respectfully requests that this Court remand this matter to the ARB for further proceedings.

Respectfully submitted,

KATE S. O'SCANNLAIN
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

MEGAN E. GUENTHER
Counsel for Whistleblower Programs

s/ Mary E. McDonald
MARY E. MCDONALD
Senior Attorney

U.S. Department of Labor
Office of the Solicitor
Suite N-2716
200 Constitution Avenue, N.W.
Washington, D.C. 20210
(202) 693-5693
mcdonald.mary@dol.gov

- 10 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of September, 2019, I electronically filed the foregoing Acting Secretary of Labor's Motion for Voluntary Remand with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

> s/ Mary E. McDonald
> MARY E. MCDONALD
> Senior Attorney
> U.S. Department of Labor
> Office of the Solicitor
> Suite N-2716
> 200 Constitution Avenue, N.W.
> Washington, DC 20210
> (202) 693-5693
> mcdonald.mary@dol.gov

- 11 -

# Exhibit 6

Case 5:24-cv-00477-BO-RJ    Document 6-7    Filed 08/23/24    Page 1 of 2

JA129

FILED: January 7, 2020

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1487
(LABR-1:2017-0017)

CRAIG WATTS,

      Petitioner,

    v.

UNITED STATES DEPARTMENT OF LABOR; SECRETARY EUGENE
SCALIA; PERDUE FARMS INC.,

      Respondents.

O R D E R

Respondent United States Department of Labor ("Department") has filed a motion to remand this case to the Department's Administrative Review Board for further administrative proceedings. The U.S. Poultry & Egg Association and the National Chicken Council have filed a motion for leave to file an amicus brief in opposition to the Department's motion to remand. We grant the motion for leave to file an amicus brief and grant the Department's motion to remand the case for further proceedings.

Entered at the direction of the panel: Judge Niemeyer, Judge King, and Judge Harris.

For the Court

/s/ Patricia S. Connor, Clerk

# Exhibit 7

**BEFORE THE UNITED STATES DEPARTMENT OF LABOR
ADMINISTRATIVE REVIEW BOARD**

CRAIG WATTS,

        Complainant,

v.

PERDUE FARMS, INC.,

        Respondent.

ARB Case No.:   2017-0017
ALJ Case No.:   2016-FDA-00003

---

**AMICUS UNITED STATES FOOD AND DRUG ADMINISTRATION'S
BRIEF OF POINTS AND AUTHORITIES**

**FOR FURTHER CONSIDERATION OF FINAL DECISION AND ORDER
DATED MARCH 5, 2019**

---

Michael D. Helbing, Esq.
Associate Chief Counsel for Enforcement
Tel: (240) 402-6165
Email: Michael.Helbing@fda.hhs.gov

Carolyn V. Jasperse, Esq.
Associate Chief Counsel
Tel: (301) 796-8567
Email: Carie.Jasperse@fda.hhs.gov

Nicole L. Pepperl, Esq.
Associate Chief Counsel
Tel: (240) 402-1879
Email: Nicole.Pepperl@fda.hhs.gov

Office of the General Counsel
Food and Drug Administration
United States Department of Health and Human Services
10903 New Hampshire Avenue
Silver Spring, MD 20993
*Attorneys for Amicus, United States Food and Drug Administration*

i

## TABLE OF CONTENTS

Interest of Amicus FDA ................................................................ 1

Introduction................................................................................... 3

Summary of the Argument ........................................................... 5

Argument ...................................................................................... 6

    I.    Live Animals Intended for Use as Food Are
        Regulated under the FFDCA ................................... 7

    II.   Live Poultry Is Not Exempt from FFDCA
        Regulation ............................................................... 12

        A. The PPIA Does Not Extend USDA
           Jurisdiction to Live Animals on the Farm .......... 13

        B. History of the Federal Meat Inspection Act
           and the PPIA ....................................................... 17

    III.  Animal Food is Food ............................................... 23

    IV.  Conclusion ............................................................. 25

ii

JA133

TABLE OF AUTHORITIES

**Federal Cases**

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017) ................................................13, 14, 15

*United States v. Cassaro, Inc.*,
443 F.2d 153 (1st Cir. 1971).................................................9

*United States v. Diamond State Poultry Co.*,
125 F. Supp. 617 (D. Del. 1954)............................................23

*United States v. Kocmond*,
200 F.2d 370 (7th Cir. 1952) ...............................................23

*United States v. O.F. Bayer & Co.*,
188 F.2d 555 (2d Cir. 1951)................................................9

*United States v. Rhody Dairy, L.L.C.*,
812 F. Supp. 2d 1239 (W.D. Wash. 2011)................................8

*United States v. Scenic View Dairy, L.L.C*,
2011 WL 3879490 (W.D. Mich. Sept. 1, 2011) ......................8, 12

*United States v. Tomahara Enterprises Ltd.*,
Food Drug Cosm. L. Rep. (CCH) ¶ 38,217Y, 1983 WL 960719
(N.D.N.Y. 1983) (attached as Attachment 1 to this memorandum).......9, 10

*United States v. Tuente Livestock*,
888 F. Supp. 1416 (S.D. Ohio 1995) ......................................9

**Statutes**

7 U.S.C. § 391 .......................................................20

21 U.S.C. § 321........................................................passim

21 U.S.C. § 342........................................................1, 11

21 U.S.C. § 350d.......................................................12

21 U.S.C. § 393........................................................1

21 U.S.C. § 399d.......................................................passim

21 U.S.C. §§ 451-472.................................................13, 15

iii

21 U.S.C. § 453 ................................................................................ 6, 14

21 U.S.C. § 455 ........................................................................... 10, 13, 14

21 U.S.C. § 456 ................................................................................. 13, 14

21 U.S.C. § 467a ..................................................................................... 15

21 U.S.C. § 467f .............................................................................. passim

21 U.S.C. § 601 ...................................................................................... 11

21 U.S.C. §§ 601-626 ............................................................................. 22

Act of February 7, 1928, c. 30, 45 Stat. 59 ........................................... 20

FDA Food Safety Modernization Act, Pub. L. No. 111-353,
124 Stat. 3885 (2011) ............................................................................. 1

Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717,
52 Stat. 1040 (1938) .............................................................................. 18

Poultry Products Inspection Act, Pub. L. No. 85-172, 71 Stat. 441
(1957) ..................................................................................................... 19

Wholesome Meat Act, Pub. L. No. 90-201, 81 Stat. 584 (1967) ........... 21

Wholesome Poultry Products Act, Pub. L. No. 90-492, 82 Stat. 791
(1968) ..................................................................................................... 21

## Regulations

9 C.F.R. § 381.70 .................................................................................. 14

21 C.F.R. § 1.226 .................................................................................. 12

21 C.F.R. § 1.227 ............................................................................... 8, 12

21 C.F.R. § 1.276 .................................................................................... 8

21 C.F.R. § 1.328 .................................................................................... 8

21 C.F.R. § 1.377 .................................................................................... 8

21 C.F.R. § 507.3 .................................................................................. 24

29 C.F.R. § 1987.101 ............................................................................ 24

**Rules of Procedure**

FED. R. APP. P. 29(a)(2) ...........................................................2

**Federal Register Notices**

Foreign Supplier Verification Programs for Importers of Food for Humans and Animals, 80 Fed. Reg. 74,226 (Nov. 27, 2015)................. 8

Reorganization Plan No. IV of 1940, 5 Fed. Reg. 2421, 54 Stat. 1234 (June 4, 1940).................................................................... 18

**Other Authorities**

Department of Labor, Investigator's Desk Aid to the FDA Food Safety Modernization Act (FSMA) Whistleblower Protection Provision (Aug. 2018), https://www.osha.gov/sites/default/files/FSMADeskAid.pdf ................ 24

FDA, Animal Products FDA Regulates (Nov. 2017), https://www.fda.gov/animal-veterinary/resources-you/ animal-products-fda-regulates ................................................. 8

FDA, Center for Veterinary Medicine, Compliance Program Guidance Manual 7371.006, Illegal Residues In Meat, Poultry, Seafood, and Other Animal Derived Foods (Aug. 2005), https://www.fda.gov/media/74810/download........................................ 8

FDA, Center for Veterinary Medicine, Compliance Policy Guide 615.200, Proper Drug Use and Residue Avoidance by Non-Veterinarians (July 1993), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-615200-proper-drug-use-and-residue-avoidance-non-veterinarians..................... 8

FDA, Compliance Policy Guide Sec. 565.100, FDA Jurisdiction Over Meat and Poultry Products (Nov. 2005), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-565100-fda-jurisdiction-over-meat-and-poultry-products................................................... 11

FDA, Investigations Operations Manual (2020), https://www.fda.gov/media/113432/download....................................... 8

FDA, Questions and Answers Regarding Food Facility Registration (Seventh Edition): Guidance for Industry (Aug. 2018), https://www.fda.gov/media/85043/download ........................................... 12

FDA, Warning Letter from Cheryl A. Bigham, Program Division Director, FDA Office of Human and Animal Food, to Dolezal Dairy (Aug. 29, 2018), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dolezal-dairy-558107-08292018 ............................................................. 9

FDA, Warning Letter from Cheryl A. Bigham, Program Division Director, FDA Office of Human and Animal Food, to Kevin Klug (Aug. 28, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/kevin-klug-588725-08282019 .............................................................. 8

FDA, Warning Letter from Evelyn Bonnin, Program Division Director, FDA Office of Human and Animal Food, to Jelliffe Dairy Farm (Nov. 19, 2018), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/jelliffe-dairy-farm-566246-11192018 ...................................................... 9

Hearings before the Committee on Agriculture and Forestry, 85th Cong., on S. 313, S. 645, and S. 1128 (Comm. Print 1957) (statement of Hermon I. Miller, Director, Poultry Division, Agricultural Marketing Service, USDA) .................................................. 19

H.R. Rep. No. 85-465 (1957) ................................................................. 19, 20

H.R. Rep. No. 90-653 (1967) .................................................................. 22

H.R. Rep. No. 90-1333 (1968) ............................................................... 22

Letter from Frank Yiannas, Deputy Commissioner for Food Policy and Response, FDA, and Mindy Brashears, Deputy Under Secretary for Food Safety, USDA, to Jeff M. Witte, Secretary, New Mexico Department of Agriculture (Oct. 22, 2019) (attached as Attachment 2 to this memorandum) .......................................................................... 11

vi

National Research Council Committee on Public Health Risk Assessment of Poultry Inspection Programs, *Poultry Inspection in the United States: History and Current Procedures*, in POULTRY INSPECTION: THE BASIS FOR A RISK-ASSESSMENT APPROACH (1987), https://www.ncbi.nlm.nih.gov/books/NBK218008/ ............................... 20

PETER BARTON HUTT ET AL., FOOD AND DRUG LAW (4th ed. 2014) ....... 10

S. Rep. No. 85-195 (1957) .................................................................... 19

S. Rep. No. 90-799 (1967) .................................................................... 22

S. Rep. No. 90-1449 (1968) .................................................................. 22

## INTEREST OF AMICUS FDA

The United States Food and Drug Administration (FDA) is the federal agency entrusted to "protect the public health by ensuring that . . . foods are safe." 21 U.S.C. § 393(b)(2)(A). As part of its broader regulatory and oversight mission, FDA administers and enforces provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA).

FDA's interest in this case is in the definition of "food" under the FFDCA; specifically, FDA is interested in ensuring that live poultry intended for use as food is "food" within the meaning of the FFDCA. As part of its regulatory authority, FDA has long regulated live animals intended for use as food *as* food under the FFDCA. *See* 21 U.S.C. § 321(f). For example, to protect the public from potential harm associated with unsafe drug residues, FDA issues warning letters and seeks injunctions when edible tissues of food-producing animals contain unsafe levels of animal drug residues, causing that food to be adulterated. *See* 21 U.S.C. § 342(a)(2)(C)(ii). Thus, FDA's ability to protect the food supply depends on the scope of the FFDCA extending to live animals intended for use as food.

The instant case implicates FFDCA's definition of food as part of an employee protection case initiated under a provision added to the FFDCA by the FDA Food Safety Modernization Act. Pub. L. No. 111-353, § 402, 124 Stat. 3885, 3968 (2011) (codified at 21 U.S.C. § 399d). This provision covers employees of

1

entities "engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food." 21 U.S.C. § 399d(a). Although FDA does not enforce the employee protection provision, it is part of the FFDCA and, thus, involves the question of whether live poultry on a farm falls under the FFDCA's food definition and may be regulated as such under the FFDCA. FDA respectfully submits this amicus brief to aid the Department of Labor Administrative Review Board's application of the law insofar as it involves the definition of food under the FFDCA and to promote a consistent application of the statutory definition that is in harmony with FDA's mission to ensure that food is safe.[1]

As an agency of the United States, FDA files this amicus brief pursuant to FED. R. APP. P. 29(a)(2) and the Administrative Review Board's February 12, 2020, "Order Inviting Supplemental Briefing."

---

[1] FDA takes no position on the final outcome of this matter or other issues relevant to its resolution, including, but not limited to, whether Mr. Watts was an employee of Perdue Farms or whether Mr. Watts reasonably believed he was alleging a violation of the FFDCA. *See* 21 U.S.C. § 399d(a).

2

INTRODUCTION

This dispute involves the whistleblower provision of the FDA Food Safety Modernization Act (FSMA), which is incorporated into the Federal Food, Drug, and Cosmetic Act (FFDCA) at 21 U.S.C. § 399d.  Respondent Perdue Farms, Inc. (Perdue) and its amici contend that Perdue is not subject to this provision because the Poultry Products Inspection Act (PPIA), not the FFDCA, applies.  Specifically, they contend that live animals intended for use as food are regulated under the PPIA, rather than as food under the FFDCA.  Within arguments made previously before this Board, Perdue incorrectly implied that FDA agreed that live food animals were exempt from regulation under the FFDCA and also included incomplete quotations of the PPIA, omitting critical language dispositive of this matter.  Perdue's reading is inconsistent with the statutory history of the FFDCA and its relation to the PPIA.  Its interpretation runs afoul of the statutory language, legislative history, and decades of practice and should thus be rejected.

Petitioner Craig Watts initiated this matter before the Occupational Safety and Health Administration alleging that Perdue violated the employee protection provisions enacted under FSMA and incorporated into the FFDCA.  In his complaint, Mr. Watts stated that he raised chickens for Perdue pursuant to a contract.  Notice of Whistleblower Complaint (Feb. 23, 2015) at 2.  Mr. Watts claims that he uses "feed, medications, and other supplies provided by Respondent

3

[Perdue]." *Id.* Perdue acknowledged that "Perdue will consign chicks and provide feed, fuel, medications, vaccinations, and other supplies to Watts." Respondent Perdue Farms, Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction (May 31, 2016) at 5. Mr. Watts alleged that he was an employee of Perdue. Notice of Whistleblower Complaint (Feb. 23, 2015) at 2. Mr. Watts further alleged that Perdue violated the whistleblower protection provisions by taking adverse actions against him in response to his efforts to oppose the use of the phrase "Humanely Raised" on labeling for poultry sold by Perdue. Notice of Whistleblower Complaint (Feb. 23, 2015) at 7-12.

Because the whistleblower provision at issue in this case is incorporated into the FFDCA, the parties' arguments before the Board included analysis of whether the live poultry raised by Mr. Watts and intended for use as food was "food" under the FFDCA. Resolution of this question is significant to the instant dispute because it is relevant to determining whether Perdue was subject to the requirements of the whistleblower provision at all. The question is also important to FDA, as the federal agency primarily responsible for implementing the FFDCA, because it could affect the scope of the agency's jurisdiction and thus its ability to promote a safe food supply.

Arguments from Perdue and amici that suggest that on-farm live poultry is not food for purposes of applying the FFDCA whistleblower provision ignore that

4

JA142

a matter must fall within the "application or extension" of the PPIA to be exempt from the FFDCA. 21 U.S.C. § 467f(a). The FFDCA's jurisdiction extends to live poultry intended for use as food because the PPIA inspection provisions do not extend USDA jurisdiction to live poultry prior to its arrival at an "official establishment" (*i.e.*, a slaughter and processing facility). Thus, the exemption to the FFDCA's requirements contained in the PPIA, likewise, does not extend to live poultry on farms.

## SUMMARY OF THE ARGUMENT

Although the relationship between the jurisdictions of FDA and the United States Department of Agriculture (USDA) is complex, the law is clear that live animals intended for use as food, including poultry, fall within the FFDCA definition of "food" and that FDA has authority under the FFDCA to regulate live animals on the farm when those animals are intended for use as food.

FDA has consistently regulated as food live animals intended for use as food. This is based on the plain language of the statute, judicial opinions, and legislative history. FDA's interpretation has been conveyed in numerous FDA regulations, guidance documents, and enforcement and advisory actions, as well as in joint documents authored with USDA. FDA's authority to regulate live animals, including poultry, as food is essential to the agency's ability to fulfill its mission to promote United States food safety and to the joint efforts of FDA and USDA to

5

ensure seamless protection of meat and poultry from farm to table. This authority is important to the public health because there are significant food safety provisions related to drug residue regulation in edible animal tissue found under the FFDCA that do not exist under other federal statutes.

The Poultry Products Inspection Act (PPIA) exempts live poultry from the FFDCA *only to the extent that the PPIA applies*. The PPIA applies to poultry and poultry products in an "official establishment" that is regulated by USDA. "Official establishment" is defined in the PPIA as "any establishment as determined by the Secretary at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained under the authority of [the PPIA]." 21 U.S.C. § 453(p). It does not apply to live poultry prior to its arrival at such an "official establishment," and it does not exclude poultry from the FFDCA's definition of food. For these reasons, live poultry on the farm is properly regulated by FDA as food under the FFDCA.

Further, the animal feed that Perdue provided to Petitioner Watts is also food within the meaning of the FFDCA and, thus, may provide an additional basis for determining whether Perdue is a covered entity under the whistleblower provision.

<div align="center">ARGUMENT</div>

Under the FFDCA, live animals intended for use as food are food. Although the United States Department of Agriculture (USDA) has exclusive jurisdiction

<div align="center">6</div>

over certain parts of the production process of poultry and poultry products under the PPIA, that jurisdiction does not begin until the animals arrive at an "official establishment" (*i.e.*, a slaughter and processing facility). Thus, live food-producing animals on the farm are regulated as food under the FFDCA. Moreover, there is no question that animal feed is "food" within the meaning of the FFDCA.

## I. Live Animals Intended for Use as Food Are Regulated under the FFDCA

Pursuant to the plain language of statutory text and its broad mission to ensure that foods are safe, FDA has long regulated live food-producing animals, including live poultry, as food, and courts and legal authorities have routinely upheld FDA's authority in this area.

Under the FFDCA, food is defined as "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article." 21 U.S.C. § 321(f). FDA has consistently interpreted this broad definition to include live animals intended for use as food and has used this authority to ensure that drug administration to food-producing animals does not endanger human health. FDA's interpretation has been broadly disseminated

7

through regulation,[2] in FDA publications,[3] and in enforcement and advisory

actions.[4]

---

[2] *See* 21 C.F.R. §§ 1.377 ("Food has the meaning given in section 201(f) of the act (21 U.S.C. 321(f)).  Examples of food include . . . live food animals."); 1.227 ("Examples of food include . . . live food animals"), 1.276(b)(5)(ii) ("Examples of food include . . . live food animals."), 1.328 ("Examples of food include . . . live food animals.").

[3] *See*, *e.g.*, FDA, Investigations Operations Manual (2020), at 2-16, § 2.7.1.3.2, https://www.fda.gov/media/113432/download ("Examples of food include . . . live food animals."); FDA, Animal Products FDA Regulates (Nov. 2017), https://www.fda.gov/animal-veterinary/resources-you/animal-products-fda-regulates ("For regulatory purposes, live animals are considered unprocessed food."); Foreign Supplier Verification Programs for Importers of Food for Humans and Animals, 80 Fed. Reg. 74,226, 74,257 (Nov. 27, 2015) ("[L]ive animals, such as poultry and cattle, are not subject to the USDA requirements under the [Federal Meat Inspection Act] or PPIA at the time of importation.  Indeed, FDA has exercised authority and responsibility over the importation of live food animals."); FDA, Center for Veterinary Medicine, Compliance Program Guidance Manual 7371.006, Illegal Residues In Meat, Poultry, Seafood, and Other Animal Derived Foods (Aug. 2005), at 5, https://www.fda.gov/media/74810/download ("[L]ive animals raised for food are 'food' under the Act."); FDA, Center for Veterinary Medicine, Compliance Policy Guide 615.200, Proper Drug Use and Residue Avoidance by Non-Veterinarians (July 1993), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-615200-proper-drug-use-and-residue-avoidance-non-veterinarians ("FDA regards live animals raised for food as 'food' under the Act.").

[4] *See United States v. Scenic View Dairy, L.L.C*, 2011 WL 3879490, at *2 n.2 (W.D. Mich. Sept. 1, 2011) ("Animals intended for slaughter have been held to constitute food within the meaning of the [Federal Food, Drug, and Cosmetic] Act"); *United States v. Rhody Dairy, L.L.C.*, 812 F. Supp. 2d 1239, 1242 (W.D. Wash. 2011) (granting injunction against dairy farm that sold cattle for food after noting that a required element of the statutory violation is that "the product at issue is food"); Warning Letter from Cheryl A. Bigham, Program Division Director, FDA Office of Human and Animal Food, to Kevin Klug (Aug. 28, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/kevin-klug-588725-08282019 (advising dairy operation that cow intended for slaughter was adulterated because of unsafe animal

8

Recognizing that the purpose of the FFDCA is to protect food safety, courts have upheld FDA's interpretation to encompass live animals intended for use as food. *United States v. Tuente Livestock*, 888 F. Supp. 1416, 1426 (S.D. Ohio 1995) (holding that "Hogs are food"); *United States v. Tomahara Enterprises Ltd.*, Food Drug Cosm. L. Rep. (CCH) ¶ 38,217Y, 1983 WL 960719 (N.D.N.Y. 1983) (live calves intended for use as food are food) (attached as Attachment 1 to this memorandum). Although live food animals are not ready for immediate consumption, courts have explained that components of food are food under the statutory definition, even when they are still in an unprocessed or inedible form. 21 U.S.C. § 321(f)(3); *United States v. Cassaro, Inc.*, 443 F.2d 153, 155-56 (1st Cir. 1971) (flour is food under the FFDCA); *United States v. O.F. Bayer & Co.*, 188 F.2d 555, 557 (2d Cir. 1951) (green coffee beans are food).

Although USDA has exclusive jurisdiction under the PPIA over certain aspects of poultry and poultry products once they enter an "official establishment"

---

drug residues); Warning Letter from Evelyn Bonnin, Program Division Director, FDA Office of Human and Animal Food, to Jelliffe Dairy Farm (Nov. 19, 2018), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/jelliffe-dairy-farm-566246-11192018 (same); Warning Letter from Cheryl A. Bigham, Program Division Director, FDA Office of Human and Animal Food, to Dolezal Dairy (Aug. 29, 2018), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dolezal-dairy-558107-08292018 (same).

9

that processes poultry and poultry products, *see* 21 U.S.C. § 455, USDA's jurisdiction under the PPIA does not extend to live animals on a farm.

The relationship between FDA and USDA's jurisdiction under these statutes is complex, but much of it is well established.[5] One legal textbook summarizes the relationship between FDA and USDA jurisdiction:

> FDA has exclusive regulatory jurisdiction over live animals intended to be used for food. *United States v. Tomahara Enterprises, Ltd.*, Food Drug Cosm. L. Rep. (CCH) ¶ 38,217 (N.D.N.Y. 1983). USDA has exclusive jurisdiction over the slaughter of food animals and over the subsequent processing of meat and poultry, except that USDA and FDA have joint jurisdiction over the use of food additives in meat and poultry. After processing, USDA and FDA have joint jurisdiction over the distribution of meat and poultry up to the retail establishment where it is sold. FDA has exclusive jurisdiction over retail food establishments.

PETER BARTON HUTT ET AL., FOOD AND DRUG LAW 318 (4th ed. 2014).

Because of the interrelatedness of FDA and USDA jurisdiction, FDA works closely with USDA to ensure seamless protection of meat and poultry from farm to table. For example, in response to recent testing showing that cattle intended for use as food had been chemically contaminated by groundwater, FDA and USDA officials jointly wrote to the Secretary of the New Mexico Department of Agriculture to address the situation. In that joint letter, FDA and USDA explained

---

[5] This discussion of live animals and USDA authority is limited to the PPIA and the Federal Meat Inspection Act (which covers certain species, such as cattle, sheep, swine, and goats) because these statutes affect FDA's jurisdiction under the FFDCA.

that "FDA has regulatory authority under the Federal Food, Drug, and Cosmetic Act over food, including milk and live animals intended for food." Letter from Frank Yiannas, Deputy Commissioner for Food Policy and Response, FDA, and Mindy Brashears, Deputy Under Secretary for Food Safety, USDA, to Jeff M. Witte, Secretary, New Mexico Department of Agriculture (Oct. 22, 2019) (attached as Attachment 2 to this memorandum).

Although FDA and USDA try to avoid duplication of effort while ensuring protection of the food supply, *see* FDA, Compliance Policy Guide Sec. 565.100, FDA Jurisdiction Over Meat and Poultry Products (Nov. 2005), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-565100-fda-jurisdiction-over-meat-and-poultry-products, there are some areas in which the FFDCA provides more specific coverage than the PPIA or Federal Meat Inspection Act. For example, the food adulteration provision in the FFDCA states that food is adulterated if it contains an unsafe new animal drug, 21 U.S.C. § 342(a)(2)(C)(ii), which would include unapproved new animal drugs and unsafe levels of animal drug residues. The adulteration definitions in the PPIA and Federal Meat Inspection Act do not contain provisions about unsafe animal drugs. *See* 21 U.S.C. §§ 453(g), 601(m). Because the FFDCA regulates live animals intended to be used for food, it authorizes injunctions of persons raising animals

11

for use as food to prevent unsafe animal drug residues under the FFDCA.[6]  *See*

*Scenic View Dairy,* 2011 WL 3879490.

Thus, it is well established that live food-producing animals, including

poultry, intended for use as food, are food within the meaning of the FFDCA and

subject to its provisions.

## II.      Live Poultry Is Not Exempt from FFDCA Regulation

Perdue Farms (Perdue) argues that poultry is not subject to the

whistleblower provision of the FFDCA, 21 U.S.C. § 399d, pursuant to a statutory

exemption for poultry contained in the PPIA.  That argument, however, misstates

FDA's position and ignores a critical phrase in the exemption upon which Perdue

tries to rely.  More concerning for the public, by interpreting live poultry to be

exempt from the jurisdiction of the FFDCA, Perdue's argument would undermine

FDA's ability to protect the public from unsafe animal drugs in the food supply.

Put simply, the PPIA exempts poultry and poultry products from regulation under

---

[6] As another example, FDA's regulation extends to the registration of certain
facilities holding live animals for human or animal consumption.  21 U.S.C.
§ 350d(a)(1); 21 C.F.R. § 1.227 (definition of food).  Although farms and facilities
regulated exclusively by USDA are exempt, 21 C.F.R. § 1.226(b), (g), a stockyard
or livestock market holding live food animals is not subject to sole USDA
jurisdiction and therefore would generally be required to register with FDA as a
food facility unless an exemption applies.  *See* Questions and Answers Regarding
Food Facility Registration (Seventh Edition): Guidance for Industry, at 29 (Aug.
2018), https://www.fda.gov/media/85043/download.

JA150

the FFDCA (and thus the FSMA whistleblower provision) only *to the extent* that

the poultry is otherwise regulated under the PPIA.  Because of the PPIA's focus on

the inspection of "official establishment[s] processing poultry," 21 U.S.C. § 455,

the PPIA does not extend to live animals on the farm.  Thus, the live poultry at

issue in this matter is not exempt from the FFDCA.

A. The PPIA Does Not Extend USDA Jurisdiction to Live Animals on the Farm

Under the PPIA, poultry is exempt from the FFDCA only to the extent that

the PPIA applies:

> Poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.] *to the extent of the application or extension thereto of the provisions of this chapter*, except that the provisions of this chapter shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act prior to August 18, 1968.

21 U.S.C. § 467f(a) (emphasis added).  This provision means that the PPIA ("this

chapter") governs poultry and poultry products in the areas regulated by the PPIA,[7]

---

[7] The PPIA applies most directly to "official establishments" where poultry is slaughtered and processed.  *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017); *see generally* 21 U.S.C. §§ 451-472. The PPIA contains provisions, "*inter alia*, authorizing the inspection of slaughterhouses and poultry-processing plants, 21 U.S.C. § 455, setting proper sanitation requirements, *id.* § 456, authorizing the Secretary of [Agriculture] to establish labeling and container standards, *id.* § 457, prohibiting the sale of adulterated, misbranded, or uninspected poultry products, *id.* § 458, establishing record-keeping requirements, *id.* § 460, and instituting storage and handling regulations, *id.* § 463." *Ass'n des Éleveurs de Canards*, 870 F.3d at 1144-45.

13

the most significant of which is USDA's exclusive jurisdiction over inspections in poultry processing establishments.  21 U.S.C. §§ 455, 456.  If there is not a governing provision in the PPIA, however, the FFDCA continues to apply.

The PPIA provides USDA authority to inspect poultry and poultry products both ante-mortem and post-mortem, but that authority applies "in each official establishment processing poultry or poultry products for commerce or otherwise subject to inspection under [the PPIA]."  21 U.S.C. § 455(a); 9 C.F.R. § 381.70(a) (providing for ante-mortem inspection of poultry "on the day of slaughter in any official establishment"); *see also* 21 U.S.C. § 455(b); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017) ("The PPIA most directly regulates 'official establishments,' where the 'inspection of the slaughter of poultry, or the processing of poultry products,' occurs.").

The PPIA defines an "official establishment" as an establishment "at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained under the authority of [the PPIA]."  21 U.S.C. § 453(p).  It defines "processed" as "slaughtered, canned, salted, stuffed, rendered, boned, cut up, or otherwise manufactured or processed."  21 U.S.C. § 453(w).  Thus, it is clear from the plain text of the PPIA that the inspections it authorizes occur – shortly before, during, or after slaughter – at the facility where poultry is slaughtered and/or

14

processed.  The PPIA inspection provisions do not extend USDA jurisdiction to live poultry prior to its arrival at an "official establishment."

Nor do any other provisions of the PPIA extend USDA's jurisdiction to live poultry on a farm before arrival at an official establishment.  The remainder of the PPIA contains provisions appurtenant to USDA's authority to inspect poultry and poultry products at official establishments.  Provisions include, but are not limited to, the following: cooperation with state agencies; requirements for labeling and containers; requirements for recordkeeping; and administrative provisions for the execution and enforcement of the PPIA.  *See generally* 21 U.S.C. §§ 451-472; *see also Ass'n des Éleveurs de Canards*, 870 F.3d at 1144-45.  Indeed, the very text of the PPIA removes any doubt; when Congress sought to regulate activity at locations other than an "official establishment," it used the term "upon any premises" specifically authorizing action under the FFDCA.[8]

The information provided to the Board in its original consideration of this matter may have incorrectly implied that FDA agreed that live food animals were exempt from regulation under the FFDCA and also included incomplete quotations of the relevant exemption.

---

[8] The PPIA provision that applies to dead, dying, disabled, or diseased poultry found "upon any premises," 21 U.S.C. § 467a, is expressly applied to "any authorized representative of the Secretary of Health and Human Services for purposes of the enforcement of the [FFDCA]" for any article *outside any official establishment*.  21 U.S.C. § 467f(b).

15

In its briefs before the Board, Perdue cites statements from FDA reflecting that USDA "primarily" has jurisdiction over meat and poultry products. *See*, *e.g.*, Respondent's Brief in Opposition (March 27, 2017) at 18-19. Although it is true that USDA is the *primary* regulator for meat and poultry products, USDA's jurisdiction is by no means exclusive, and the statements Perdue cites do not suggest otherwise. Indeed, as noted above, *see supra* nn. 2-4, FDA has repeatedly and consistently asserted its jurisdiction over live food-producing animals under the FFDCA.

Further, both Respondent Perdue Farms and Amici U.S. Poultry and Egg Association and National Chicken Council omitted the most critical portion of the exemption contained in the PPIA from quotes of the PPIA in their briefs, the provision limiting the FFDCA exemption for poultry "*to the extent of the application or extension thereto of the provisions of [the PPIA]*."[9] As discussed

---

[9] Briefs filed by Respondent and amici selectively omitted this critical language. *See*, *e.g.*, Respondent's Brief in Opposition (March 27, 2017), at 2 ("First, the Poultry Products Inspection Act ('PPIA'), 21 U.S.C. § 467f(a), provides that '[p]oultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetics [sic.] Act [('FDCA')],' except that the PPIA 'shall not derogate from any authority conferred by the [FDCA] prior to August 18, 1968.'") and, at 12 ("The PPIA expressly provides that '[p]oultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act,' subject to a narrow exception that the PPIA 'shall not derogate from any authority conferred by the [FDCA] prior to August 18, 1968.'"); U.S. Poultry and Egg Association and National Chicken Council's Amicus Brief in Support of Respondent Perdue Farms, Inc. (Apr. 17, 2017) at 8 ("PPIA explicitly exempted poultry and poultry products from the authority of the Federal Food, Drug, and

16

above, this language makes clear that the PPIA does not exempt all poultry from the provisions of the FFDCA under all circumstances, and it is dispositive of the matter before the Board.

B.   History of the Federal Meat Inspection Act and the PPIA

As explained above, live poultry remains subject to regulation under the FFDCA prior to entry into an official establishment.  The history of the poultry exemption and a nearly identical exemption for meat products further solidifies this point.

Congress enacted an exemption for meat products in 1938 as part of the Federal Food, Drug, and Cosmetic Act of 1938 to address the relationship between the FFDCA and the Federal Meat Inspection Act.  The Federal Meat Inspection Act requires that meat and meat products are slaughtered and processed under strictly regulated conditions, and this exemption ensures that the Federal Meat Inspection Act is the governing law for slaughter and processing.

> Meats and meat food products shall be exempt from the provisions of this Act [the FFDCA] *to the extent of the application or the extension thereto of the Meat Inspection Act*.

Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, § 902(b), 52 Stat. 1040, 1059 (June 25, 1938) (citations omitted) (emphasis added) (codified at 21

---

Cosmetic Act ('FDCA') expect [sic.] any 'authority conferred by the [FDCA] prior to August 18, 1968.'").

17

U.S.C. § 392(a)).  At the time this exemption was enacted, the FFDCA and the

Federal Meat Inspection Act were both enforced by USDA because FDA was

originally part of USDA.  Thus, it is clear that the statutory language is meant to

identify the governing statutory section, not the governing agency.  Two years

later, FDA moved to the newly created Federal Security Agency.  Reorganization

Plan No. IV of 1940, 5 Fed. Reg. 2421, 54 Stat. 1234 (June 29, 1940).

Subsequently, the Federal Security Agency became the Department of Health,

Education, and Welfare, and later the Department of Health and Human Services.

When Congress enacted the Poultry Products Inspection Act in 1957 for

mandatory USDA inspections of poultry processing facilities, it included nearly

identical exemption language as that in the Federal Meat Inspection Act.  As with

its predecessor, this provision exempted poultry and poultry products from the

FFDCA to the extent they were governed by the PPIA:

> For the purpose of preventing and eliminating burdens on commerce in poultry and poultry products, the jurisdiction of the Secretary within the scope of this Act shall be exclusive and poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act, as amended, *to the extent of the application or the extension thereto of the provisions of this Act*.

Pub. L. No. 85-172, § 18, 71 Stat. 441, 448 (1957) (emphasis added).  The House

Report explained that this provision "gives the Secretary of Agriculture exclusive

jurisdiction over poultry and poultry products within the scope of this bill and

18

provides the same exemption for poultry and poultry products from the Federal Food, Drug, and Cosmetic Act as presently applies to red meats." H.R. Rep. No. 85-465, at 6-7 (1957). The Senate Report agreed that this language "provides the same exemption for poultry and poultry products from the Federal Food, Drug, and Cosmetic Act as presently applies to red meats." S. Rep. No. 85-195, at 6 (1957). As a USDA official explained, the exemption prevented any gaps in the application of the two laws while avoiding duplication of effort:

> The purpose of this [exemption provision] is to avoid overlapping jurisdiction of the two acts and therefore prevent needless duplication of effort. At the same time the provisions of the Food, Drug, and Cosmetic Act would apply to any circumstances beyond the application of this Poultry Inspection Act, and also prevent any gaps in the application of these two laws. Under this provision we feel that the same relationships would exist between the poultry inspection program and the Food and Drug Administration as now exist between the red meat inspection program and the Food and Drug Administration. The Department [of Agriculture] believes that this subsection (a) is appropriate in that it assures complete coverage without duplication.

Hearings before the Committee on Agriculture and Forestry, 85th Cong., on S. 313, S. 645, and S. 1128, at 106 (Comm. Print 1957) (statement of Hermon I. Miller, Director, Poultry Division, Agricultural Marketing Service, USDA).

Thus, as the scope of the meat exemption depends on the scope of the Federal Meat Inspection Act, so too is the scope of the poultry exemption defined by the scope of the PPIA. Because the PPIA applies most directly to "official

19

establishments," live poultry is not exempt from the FFDCA.  Indeed, the House

Report accompanying the 1957 passage of the PPIA recognizes this explicitly,

explaining: "The bill does not regulate in any manner the handling, shipment, or

sale of live poultry."  H.R. Rep. No. 85-465, at 1 (1957).[10]  Because on-farm live

poultry were not regulated under the PPIA, they were not covered by the

exemption provision.

A decade later, Congress amended the exemptions in the PPIA and the

Federal Meat Inspection Act when it made changes that would have otherwise

limited the coverage of the FFDCA over meat and poultry.  The Wholesome Meat

Act of 1967 and Wholesome Poultry Products Act of 1968 gave USDA authority

over adulterated and misbranded meat and poultry products after those products

left the USDA-regulated processing facility.  Pub. L. No. 90-201, § 7, 81 Stat. 584,

589 (1967) (meat); Pub. L. No. 90-492, § 9, 82 Stat. 791, 800 (1968) (poultry).

---

[10] At the time, USDA already had separate legal authority to inspect live poultry for "contagious, infectious, and communicable diseases," 7 U.S.C. § 391, and to prohibit the interstate sale of diseased poultry. *See* Act of February 7, 1928, c. 30, 45 Stat. 59.  USDA began to offer a voluntary inspection and grading service to poultry processors through its Federal Poultry Inspection Service in 1926. National Research Council Committee on Public Health Risk Assessment of Poultry Inspection Programs, *Poultry Inspection in the United States: History and Current Procedures*, in POULTRY INSPECTION: THE BASIS FOR A RISK-ASSESSMENT APPROACH (1987), https://www.ncbi.nlm.nih.gov/books/NBK218008/.  USDA also had authority over live poultry under laws such as the Agricultural Marketing Act and the Packers and Stockyards Act.  USDA authority under these laws, however, is irrelevant to determining the scope of the PPIA exemption.

20

This new authority would have superseded the FFDCA to the extent the PPIA or Federal Meat Inspection Act applied. To avoid that result, Congress specified that the Wholesome Poultry Products Act did not derogate from the FFDCA's preexisting coverage of poultry or poultry products:

> Poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act to the extent of the application or extension thereto of the provisions of this Act, except that the provisions of this Act shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act prior to enactment of the Wholesome Poultry Products Act.

Pub. L. No. 90-492, § 17, 82 Stat. 791, 807 (1968) (codified at 21 U.S.C. § 467f(a)). The Federal Meat Inspection Act was similarly amended to maintain preexisting FFDCA coverage over meat. Pub. L. No. 90-201, § 16, 81 Stat. 584, 600 (1967) (codified at 21 U.S.C. § 679(a)).

These amended exemptions mean that both USDA and FDA have jurisdiction over adulterated and misbranded meat and poultry once they leave USDA-regulated facilities. The Senate Report for the Wholesome Meat Act explained that the Secretaries "would thus have concurrent jurisdiction under the Meat Inspection Act and the Federal Food, Drug, and Cosmetic Act over meats and meat food products becoming adulterated or misbranded after inspection." S. Rep. No. 90-799, at 14 (1967). Dual jurisdiction exists after inspection because both the FFDCA and the Federal Meat Inspection Act (as amended by the Wholesome Meat

21

Act) prohibit the distribution in interstate commerce of misbranded or adulterated meat.  The Federal Meat Inspection Act gives USDA exclusive jurisdiction within the processing facility, but not over live food animals on the farm.  *See generally* 21 U.S.C. §§ 601-626.  The House Report for the Wholesome Meat Act added that Congress intended for FDA and USDA to exercise this patchwork of jurisdiction to avoid conflicts:

> [T]he committee intends that the authority of the Secretary of Agriculture and the authority of the Secretary of Health, Education, and Welfare not be exercised in a manner that will cause any overlapping or conflicting requirements.  It is the committee's intent that both Secretaries shall, to the maximum extent feasible in the administration of this act and the Federal Food, Drug, and Cosmetic Act, exercise their respective authorities in connection with matters subject to concurrent jurisdiction under these acts in such manner as to avoid any unnecessary duplication of effort.

H.R. Rep. No. 90-653, at 11 (1967).

For the Wholesome Poultry Products Act, the Senate Report and House Report explained that the provision in the PPIA parallels "the [Federal Meat Inspection Act] with respect to meat and meat food products."  H.R. Rep. No. 90-1333, at 28 (1968); S. Rep. No. 90-1449, at 23 (1968).  Because FDA had jurisdiction over adulterated and misbranded meat and poultry before passage of the Wholesome Meat and Wholesome Poultry Products Acts, *see United States v. Kocmond*, 200 F.2d 370, 373 (7th Cir. 1952) (upholding misbranding conviction under the FFDCA for horse meat that was labeled only as "chucks" and "chunks");

22

*United States v. Diamond State Poultry Co.*, 125 F. Supp. 617, 617 (D. Del. 1954) (imposing criminal conviction for selling adulterated poultry in interstate commerce under the FFDCA), it continues to have jurisdiction over adulterated and misbranded meat and poultry today.

Arguments from Perdue and amici that suggest that on-farm live poultry is not food for purposes of applying the FFDCA whistleblower provision ignore that a matter must fall within the "application or extension" of the PPIA to be exempt from the FFDCA.  Because the PPIA does not extend to live poultry prior to arrival at an "official establishment," the PPIA does not apply to live animals on the farm, and therefore does not exempt them from regulation under the FFDCA. Furthermore, based on judicially recognized precedent, live food animals are food. For these reasons, FDA respectfully requests that the parties and the Board reconsider the basis for the Board's March 5, 2019, Final Decision and Order.

### III.    Animal Food is Food

In addition to the fact that live poultry on the farm is food, FDA notes that there is another connection to food that may be relevant to the Board's evaluation of whether Perdue is a covered entity under the FFDCA whistleblower provision.

The whistleblower provision covers entities "engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food," 21 U.S.C. § 399d(a); *see* 29 C.F.R. § 1987.101(d) ("*Covered entity*

23

means an entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food."). The FFDCA defines food to include "articles used for food or drink for man or other animals." 21 U.S.C. § 321(f)(1); *see* 21 C.F.R. § 507.3 ("*Animal food* means food for animals other than man and includes pet food, animal feed, and raw materials and ingredients."); *see also* Department of Labor, Investigator's Desk Aid to the FDA Food Safety Modernization Act (FSMA) Whistleblower Protection Provision, at 3 (Aug. 2018), https://www.osha.gov/sites/default/files/FSMADeskAid.pdf (explaining that the FFDCA "definition of 'food' includes . . . animal feed.").

In his complaint, Mr. Watts states that he "feeds, waters, and cares for those flocks using feed, medications, and other supplies provided by Respondent [Perdue]." Notice of Whistleblower Complaint (Feb. 23, 2015), at 2. Perdue Farms acknowledges that "Perdue will consign chicks and provide feed, fuel, medications, vaccinations, and other supplies to Watts." Respondent Perdue Farms, Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction (May 31, 2016), at 5. Under the Poultry Producer Agreement, Mr. Watts was required to use only the animal food provided by Perdue. Exhibit 1 to Perdue's April 27, 2015 Letter to W. Peterson, OSHA Regional Investigator ("PRODUCER AGREES… [t]o use only the feed, fuel, medications, vaccinations, and other supplies, which

24

PERDUE has provided, or has arranged to be provided, to PRODUCER for the raising of the chicks consigned.").

Thus, independent of any discussion of live poultry, the fact that Perdue distributed food in the form of animal feed to Mr. Watts is relevant to the Board's evaluation as to whether Perdue is a covered entity under 21 U.S.C. § 399d, as an entity engaged in the distribution of food (in this case, animal feed).[11]

## IV.    Conclusion

For the reasons discussed above, FDA respectfully requests that the Board reconsider and overturn its holding that it lacked subject matter jurisdiction over the instant case on the basis that Perdue was not engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of "food" within the meaning of the FFDCA.

<div style="text-align: right">

Respectfully submitted,

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
United States Department of
        Health and Human Services

ANNAMARIE KEMPIC

</div>

---

[11] Although live poultry and animal feed are food under the FFDCA, FDA takes no position as to whether Mr. Watts was an employee of Perdue or whether he reasonably believed that the information he provided related to a violation of the FFDCA and its implementing orders, rules, regulations, standards, or bans. 21 U.S.C. § 399d(a)(1).

<div style="text-align: center">25</div>

Deputy Chief Counsel for Litigation
Food and Drug Administration

By: *Michael Helbing*

MICHAEL D. HELBING
Associate Chief Counsel for
    Enforcement
Tel: (240) 402-6165
Email: Michael.Helbing@fda.hhs.gov

CAROLYN V. JASPERSE
Associate Chief Counsel
Tel: (301) 796-8567
Email: Carie.Jasperse@fda.hhs.gov

NICOLE L. PEPPERL
Associate Chief Counsel
Tel: (240) 402-1879
Email: Nicole.Pepperl@fda.hhs.gov

Office of the General Counsel
Food and Drug Administration
United States Department of
  Health and Human Services
10903 New Hampshire Avenue
Silver Spring, MD 20993

*Attorneys for Amicus*
*U.S. Food and Drug Administration*

Dated: March 11, 2020

26

JA164

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.    This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

- ■   this document contains 6,171 words as determined by the word count function of Microsoft Word 365 ProPlus (including textboxes, footnotes, and endnotes), **or**
- ☐   this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

- ■   this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 ProPlus in 14-point Times New Roman font, **or**

- ☐   this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

Michael D. Helbing

Attorney for United States Food and Drug Administration

Dated: March 11, 2020

27

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Amicus United States

Food and Drug Administration's Brief of Points and Authorities has been served

on the following via United States Mail, postage prepaid, on this 11th day of

March, 2020:

Thad M. Guyer, Esq.
T.M. Guyer &Friends, PC
116 Mistletoe Street
Medford, OR 97501

Karen Gray, Esq.
Government Accountability Project, Inc.
1612 K Street, NW
Suite 1100
Washington, DC 20006
*Counsel for Complainant*

Todd J. Horn
Michael J. Wilson
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202

John F. Cooney
Stephen R. Freeland
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
*Counsel for Respondent Perdue Foods, Inc,*

J. Larry Stine
Wimberly, Lawson, Steckel,
Schneider & Stine, PC

28

JA166

JA167

Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
*Counsel for Amici US Poultry & Egg Association and National Chicken Council*

Michael D. Helbing

Attorney for United States Food and Drug Administration

Dated: March 11, 2020

29

# ATTACHMENT 1

**Food Drug Cosm. L. Rep. P 38217Y (C.C.H.), 1983 WL 960719**

Food Drug Cosmetic Law Reporter

Copyright (c) 2018 CCH INCORPORATED, A Wolters Kluwer business. All rights reserved.
U.S. District CourtCase-Law

U.S. District Court, N.D. New York | March 29, 1983
No. 83-CV-233

Neal P. McCurn

¶ 38,217Y UNITED STATES OF AMERICA V. TOMAHARA ENTERPRISES, LTD. D/B/A TOMAHARA FARMS, AND EDWARD CONHAIM AND GUSTAF VANGENECHTEN, INDIVIDUALS

**Adulteration —— Regulatory Scoped —— Definition of Food —— Live Calves**

The edible tissues of live veal calves that were allegedly adulterated because they contained diethylstilbestrol (DES) constituted 'food' as defined by the Federal Food, Drug, and Cosmetic Act and were, therefore, subject to the adulteration provisions of the Act. The defendant veal farm had argued that the calves were not food while they were alive because they were capable of being eaten only after they were slaughtered. However, food need not be in its final form to constitute 'food' under the FDC Act. The fact that the calves were not capable of being eaten at the time of alleged adulteration was immaterial because they were capable of being eaten after slaughter and were raised solely for that purpose. The main concern was whether the veal calves had been given an unapproved new animal drug. Because it was within the expertise of the Food and Drug Administration to approve or disapprove the use of new animal drugs, it was a logical extension to find that the animals injected with the drug were under the jurisdiction of the FDA. The government's motion for a preliminary injunction was granted.

**Adulteration —— Exemption for Meat and Meat Food Products —— Live Calves**

The edible tissues of live veal calves that were allegedly adulterated because they contained diethylstilbestrol were not 'meat' or 'meat food products' as defined by the Meat Inspection Act and were, therefore, not exempt from the application of the Federal Food, Drug, and Cosmetic Act. The terms 'meat' and 'meat food product' were intended to include only the edible tissues of animals after slaughter. This interpretation was supported by the limited nature of the MI Act definition and by the fact that live animals were included within the definition of 'livestock' in certain federal regulations, but were not mentioned in the FDC Act exemptions. Even if the MI Act did apply to live animals and would provide a basis for governmental action, it did not preclude the government from proceeding under the FDC Act. The MI Act specifically provides that its provisions shall not derogate any authority conferred by the FDC Act, and the legislative history demonstrates that there would be concurrent jurisdiction under the MI Act and the FDC Act over meats and meat food products becoming adulterated or misbranded after inspection.

**Adulteration —— Unsafe New Animal Drug —— Preliminary Injunction —— Burden of Proof**

In an action seeking a preliminary injunction against a veal farm because of its alleged use of diethylstilbestrol (DES) in veal calves, the government established a probable likelihood that the calves were adulterated within the meaning of the FDC Act. DES was a new animal drug for which there was no approved application for use in veal calves and whose presence in food was unsafe at any detectable level. Tests of the liver and kidneys of some of the animals showed detectable levels of DES, as

did subsequent fecal samples from the animals. FDA scientists were also of the opinion that the edible tissues of the calves on the farm contained DES. The defendant had argued that the test results could be interpreted as showing only that the manure of the animals and not the calves themselves contained DES. On the application for preliminary relief, however, the government did not have to prove contamination, but only needed to show a probable likelihood that it could be proved at trial.

**Enforcement —— Injunction —— Irreparable Harm**

In an action seeking a preliminary injunction against a veal farm because of its alleged use of diethylstilbestrol in calves, the government did not have to make a showing of irreparable harm because it was a proceeding under the Federal Food, Drug, and Cosmetic Act. The passage of the Act itself was an implied finding that violations would harm the public and, if necessary, should be restrained. Aside from such an implied finding, the government demonstrated that the slaughtered calves would cause the public irreparable harm if used for food.

**Enforcement —— Interstate Commerce Preliminary Injunction —— Burden of Proof**

In an action seeking a preliminary injunction against a veal farm because of its alleged use of diethylstilbestrol in calves, the government established a reasonable likelihood that it could prove at trial that the veal calves were in interstate commerce. The defendant stated that it often used buyers who were outside the state to arrange for the purchase of the calves, and the defendant did not have the purchase orders for the calves currently being held on the farm. In addition, the defendant offered the calves for slaughter to slaughterhouses that were involved in interstate commerce. In the action for preliminary relief, the government did not have to prove to a certainty that the calves were not purchased within the state.

**Veterinary drugs —— Unapproved New Drug —— Interstate Commerce**

In a preliminary injunction action against a veal farm for its alleged use of diethylstilbestrol (DES) in veal calves, the government failed to establish that the drug had been in interstate commerce. The government had argued that, because there were no licensed manufacturers of the drug in the state, the defendant must have obtained the drug in interstate commerce. However, because there may not be any facility in the country licensed to manufacture the drug, it could not be said that the drug must have passed through interstate commerce. The government made no showing of where the drug was manufactured. Although injunctive relief could not be based on the contention that DES was an adulterated drug in interstate commerce, the government's motion for preliminary relief was granted on other grounds.

Attorneys for defendants: Richard G. Compson and Salvador J. Capecelatro, Utica, New York.
Attorneys for the government: Frederick J. Scullin, Jr., United States Attorney, and Joseph A. Favone, Stephen Terman, Francis Degnan, and Robert J. Donlan, Syracuse, New York.

UNITED STATES OF AMERICA v. TOMAHARA ENTERPRISES, LTD. d/b/a TOMAHARA FARMS, AND EDWARD CONHAIM AND GUSTAF VANGENECHTEN, INDIVIDUALS

UNITED STATES OF AMERICA v. TOMAHARA ENTERPRISES, LTD. d/b/a TOMAHARA FARMS, AND EDWARD CONHAIM AND GUSTAF VANGENECHTEN, INDIVIDUALS

In the U.S. District Court, N.D. New York. No. 83-CV-233. Memorandum Decision and Order dated March 29, 1983.

Attorneys for defendants: Richard G. Compson and Salvador J. Capecelatro, Utica, New York.

Attorneys for the government: Frederick J. Scullin, Jr., United States Attorney, and Joseph A. Favone, Stephen Terman, Francis Degnan, and Robert J. Donlan, Syracuse, New York.

Majority Opinion

**MEMORANDUM-DECISION AND ORDER**

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    2

*Background*

Edward M. Conan:[1] Plaintiff filed its complaint for injunction on March 2, 1983 and that day sought a temporary restraining order enjoining the defendants and their agents from using DES, from offering for slaughter as food any veal calves which had been administered DES, and from offering for slaughter as food any animals on Tomahara Farm. That motion was heard by District Judge Neal P. McCurn and an Order was granted. Judge McCurn thereafter conducted several conferences with the parties and signed an Order extending the TRO for an additional 10-day period. When it became evident that an evidentiary hearing would be necessary to the resolution of the case, the parties consented to the referral of this case to the undersigned. The evidentiary hearing commenced on March 16, 1983, and concluded on March 18, 1983. This opinion shall constitute the Court's finding of facts and conclusions of law. Fed. R. Civ. P. 52(a).

*Facts*

The parties in the action are the United States, in the persona of the Food and Drug Administration [FDA], Tomahara Enterprises, d/b/a Tomahara Farms, a New York corporation doing business primarily as a veal farm in New Hartford, New York, and Edward Conhaim, the President and sole stock holder of Tomahara Enterprises, Ltd.[2] [Hereinafter, the defendants will be referred to in the singular].

Tomahara Enterprises, Ltd., purchased what is now called Tomahara Farms in 1978. The defendant's veal operation is housed on that farm in a single barn. The barn is divided into four holding rooms, in addition to a feed storage room. Each holding room is equipped with approximately 100 pens, each designed to hold one veal calf. The pens are approximately the size of three orange crates, have a slatted bottom, and are raised eighteen inches above a concrete floor.

The defendant testified that he engages buyers to purchase veal calves for the farm. After purchase, the calves are placed in their pens, restrained by neck chains, and are there held until they are ready for slaughter, some twelve to sixteen weeks later. The defendant offers the calves to several slaughterhouses in New York, including Utica Veal in Utica, New York.

Sometime in November, 1982, defendant met an individual named Gus Vangenechten and offered him a position as barn manager. The government avers that Mr. Vangenechten was identified by U. S. Customs as a party violating 10 U. S. C. § 1497 on August 30, 1982, by importing into the United States an undeclared, unidentified substance, later determined to be DES dipropionate. The government further avers that he has been identified as a person supplying a veal producer with DES, and giving the producer instructions as to its oral administration to veal calves. See Aff. of E. Pitt. Smith, Pl. Ex. 3.

Although the specifics of Mr. Vangenechten's position at Tomahara are not clear, it appears that he was working on a salary plus commission basis. Mr. Vangenechten took up residence on the farm, received free room and board, and was given a weekly allowance "to live on". Defendant testified that he told Mr. Vangenechten that if the farm turned an increased profit due to a change in market conditions, he would be compensated accordingly, by a percentage of the profits. Defendant described this as a loose arrangement.

Mr. Vangenechten's duties included "doing everything" with the veal calves, including the administration of medications. He was hired to follow the defendant's program for raising veal calves. Defendant described his program as follows: all calves begin the program by receiving mastitis treatments in their ears, iodine in their navels, and vaccinations. They then receive neomyacin for two days, and sometimes mucci, depending on the time of year. All calves receive electrolytes.

Defendant administers vitamins to the calves on an "as needed" basis, normally by means of an injection. He varied this aspect of the program during Mr. Vangenechten's tenure to accommodate his preference for oral administration. Defendant testified that he has never administered any growth promoters to his calves. However, when Mr. Vangenechten worked on the farm, defendant did not "step foot" into the barn, giving Mr. Vangenechten total responsibility for the animals' daily care.

**[*Inspections and Tests*]**
On January 7, 1983, defendant offered 45 veal calves for slaughter at Utica Veal. The USDA randomly sampled liver and kidney tissues from five of the calves. Tests performed on these samples demonstrated the presence of Diethylstilbestrol [DES.] in each sample.

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    3

On January 10, 1983, defendant offered 47 veal calves to Utica Veal for slaughter. Again, five liver and kidney samples were taken. Once again, detectable levels of DES were found in the samples. Sometime after this second sale, defendant dismissed Mr. Vangenechten.

On January 13, 1983, FDA investigators David Kiessling and James Evans conducted an inspection of the veal calf barn on Tomahara Farms. At that time, the veal calf operation consisted of: 91 veal calves, approximately one week old; 100 veal calves, approximately four weeks old; and 100 veal calves, approximately eight weeks old. The investigators first inventoried the drug cabinet located in the barn and took a sample of a white substance later revealed to be penicillin. The investigators next entered room number 3, where they found a newly arrived lot of one week old calves. The investigators took fecal samples from these calves. Due to the fact that the calves had only been in that room for less than one day, the investigators were only able to collect two samples. These were obtained by scraping the bottom of the animals' pens with a sterile scoop. The samples were then placed into a sterile specimen cup.

The investigators then proceeded to room number 4, where 100 calves, aged approximately 8 weeks were located. According to the testimony of Supervising Investigator Kiessling, the defendant informed the investigators that the animals were too "spooky" for the investigators to collect the samples in the same manner as was done in the first room. Defendant then offered the investigators a shovel which was washed in hot water then used to remove the samples from the concrete floor beneath the pens. Samples were collected in a like manner from room 2.

The investigators next took samples of the feed then in use in the barn. During their investigation, the investigators found a pellet gun that was of the type formerly used to implant DES pellets in the ears of cattle. The investigators conducted an exit interview with the defendant at which they gave him receipts for the samples taken and questioned him about DES. Defendant stated that he did not know anything about DES and did not know what the gun was used for. He guessed that the gun had been left behind by the previous owner of the farm.

After leaving the farm, the investigators returned to the FDA laboratory in Syracuse, New York. Investigator Evans then proceeded to label and bag the samples collected. The samples were then placed in one large bag and sealed. That seal was broken by Mr Evans on January 14, 1983 and again on January 17, 1983. The bag was resealed each time the seal was broken. On January 17, 1983 the samples were delivered to Emery Air Freight for transport to the FDA laboratory in Denver, Colorado.

Upon arrival at the Denver facility, the samples came into the possession of Susan Torda, a chemist with the veterinarian section of the FDA. She analyzed the samples taken from defendant's barn for residues of DES by means of Gas Liquid Chromatography.

Gas Liquid Chromatography is a method whereby a drug is separated using an instrument called the GLC. That instrument is divided into five parts: inert gas; a vapor chamber; a column upon which the sample is separated from any interfering components; a detector which detects the drug; and a recorder which records what the detector has seen. The results of Ms. Torda's analysis of the samples taken from defendant's farm were that the fecal material contained detectable levels of DES, some at 10 parts per billion, some at 14 parts per billian [ppb]. No detectable levels of DES were found in the feed samples analyzed.

At the conclusion of Ms. Torda's analysis, she delivered the assay portion of the samples to Mr. William Morris, a research chemist with the FDA and a National Expert in Mass Spectroscopy. He used an instrument called the Mass Spec to do confirmatory tests on the samples tested by Ms. Torda.

The Mass Spec is a method of introducing a sample into a core and converting it into a vapor. Helium then pushes the vapor onto the head of a column. As the column increases slowly in temperature, the compounds come off the column and are then analyzed by size, weight and chemical structure. The Mass Spec is able to produce a "finger print" of the compounds it analyzes. The tests run by Mr. Morris on the fecal samples from defendant's farm confirmed the presence of DES.

Some time after receiving the test results, the FDA filed suit in this Court seeking equitable relief. It is the position of the government that the veal calves on defendant's farm have been administered DES, and are therefore adulterated food, unfit for human consumption. See 21 U. S. C. §§ 310-

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    4

*Discussion*

**The Applicable Statute**

Plaintiff brings this action under the Federal Food, Drug and Cosmetic Act. 21 U. S. C. §§ 310-392. Plaintiff alleges that the defendant has violated 21 U. S. C. § 351(a)(5) in that he has allegedly caused the adulteration of a drug, DES, and 21 U. S. C. § 342(a)(2)(D), in that he has allegedly caused the adulteration of the edible tissues of veal calves, both prohibited acts within the meaning of 21 U. S. C. § 331 (a). Defendant argues that the alleged adulteration of the edible tissues of these veal calves is not governed by the Food, Drug and Cosmetic Act [FDCA], but rather by the Meat Inspection Act [MIA], 21 U. S. C. §§ 601-695. *See* 21 U. S. C. § 392(a). The determination of which Act applies is critical, because the definition of adulteration is different under each statute. There is no question that the alleged adulteration of the drug, DES, is governed by the FDCA. Before determining whether the alleged adulteration of the edible tissues of the veal calves is exempted from regulation by the FDCA, the Court must first determine whether the calves are regulated by the FDCA in the first instance.

Plaintiff has accused the defendant of violating 21 U. S. C. § 331(a) which prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded" Defendant first contends that this section is inapplicable because the live veal calves are not food within the meaning of the FDCA.

**[*Definition of "Food"*]**

The FDCA defines food as "(1) articles used for food or drink for man or other animals, … (3) articles used for components of any such article." 21 U. S. C. § 321(f). It is the government's contention that the edible tissues of these calves are "food" because the animals are being raised for the sole purpose of providing food. The defendant, on the other hand, argues that the veal calves are not food while alive; that they are capable of being eaten only after they are slaughtered.

The government has cited no cases, nor has the Court found any, which hold that live animals raised for the purpose of providing food after slaughter are food within the meaning of section 321(f). It is clear, however, that food need not be in its final form to constitute "food" under the definition of the FDCA. See, e. g., *United States v. H. B. Gregory Co.,* 502 F. 2d 700 (7th Cir. 1974) (corn meal, poppy seeds, caraway seeds and corn grits are food); *United States v. Cassaro,* 443 F. 2d 153 (1st Cir. 1971) (flour is food); *Otis McAllister Co. v. United States,* 194 F. 2d 386 (5th Cir. 1952) (green coffee is food); *United States v. Article of Food,* 414 F. Supp. 793 (E. D. Mo. 1976) (orotic acid is food). When faced with the question whether green coffee beans are food, the Second Circuit stated: "it is common knowledge, of which a court may take judicial notice, that the drink called 'coffee' is made from roasted coffee beans. It is also common knowledge that green coffee beans are used to produce the roasted coffee beans. Hence no evidence is necessary to establish that green coffee beans are a 'food' as defined by the statute." *United States v. O. F. Bayer Co.,* 188 F. 2d 555, 557 (2d Cir. 1951).

It is the determination of this Court that judicial notice can be taken that these veal calves are "food" as defined by the statute. These calves are raised for the sole purpose of providing food. No one contends that they are being raised for any other purpose. The fact that they are not presently capable of being eaten is immaterial, as they are capable of being eaten after slaughter and are intended for that purpose.

This determination finds support in the Supreme Court case of *United States v. An Article of Drug,* 394 U. S. 784 (1969). There the Court stated that: "remedial legislation such as the Food, Drug and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public's health." 394 U. S. at 798. Giving the Act a broad construction, the Court held that an antibiotic sensitivity disc, used as a screening device to determine the proper antibiotic to be administered to a patient, was a "drug" within the meaning of the Act. *Id.;* see also O'Reilly, *Food & Drug Administration* at 9-2 (1979 ed.) (the Act is to be broadly construed "to preserve a broad range of public protection jurisdiction for the FDA").

The case presently before the Court is one which calls for the broad interpretation of the term "food". Here, the concern is whether these veal calves have been administered a "new animal drug" for which there is no approved application on file,

DES. It is the FDA which approves these applications and which has revoked the approval for the drug DES. As it is within the expertise of the FDA to approve or disapprove the use of new animal drugs, it is a logical extension to find that the animals injected with these drugs are within the jurisdiction of the FDA. See 21 U. S. C. § 360(d)(1)(h).

[*Meat Inspection Act*]

The question before the Court then becomes, whether this "food" is exempted from the application of the FDCA by the exception set forth in 21 U. S. C. § 392(a). That section provides that "[m]eats and meat food products shall be exempt from the provision of this chapter to the extent of the application or the extension thereto of the Meat Inspection Act, approved March 4, 1907, as amended." Defendant contends that, pursuant to this exemption, the alleged adulteration of these calves is governed by the terms of the Meat Inspection Act [MIA], and not the FDCA. This Court does not agree.

The regulations effecting the MIA define meat as "[t]he part of the muscle of any cattle … which is skeletal … with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing." 9 C. F. R. § 301.2tt. The MIA defines meat food product as "any product capable of use as human food which is made wholly or in part from any meat or other portion of the carcass of any cattle…." 21 U. S. C. § 610(j).

It is the determination of this Court that the terms meat and meat food product are intended to include only the edible tissues of animals after slaughter. This reading is buttressed by the fact that live animals are included within the definition of livestock, 9 C. F. R. § 301.2rr, and that term is noticeably absent from 21 U. S. C. § 392(a).

Further support for this narrow reading of the MIA is found in the case of *United States v. Articles of Food … Buffalo Jerky,* 456 F. Supp. 207 (D. Neb. 1978). In that case, the government sought to condemn bison meat containing sodium nitrite and nitrate as adulterated within the meaning of the FDCA. The defendant there argued that the government was required to proceed against these articles under the MIA. The Court held that the action was maintainable under the FDCA, finding that in view of the limited nature of the MIA definition of meat food products, bison meat was not included therein. In comparing the two statutes, the Court noted:

> [T]he Meat Inspection Act is not intended to derogate from any authority conferred by the Federal Food, Drug and Cosmetic Act. See 21 U. S. C. § 679. Rather the Meat Inspection Act creates a separate area of concern — meat and meat byproducts for human consumption — over which the Department of Agriculture is given additional powers in the interest of protecting the public health and welfare.

> The Meat Inspection Act specifically delineates the food products subject to its provisions, listing only foods derived from cattle, sheep, swine, goats, and equines. Other food products are regulated under the FDCA. In view of the safeguards of testing and regulation of ingredients set forth in the comprehensive regulations pursuant to the FDCA, the court finds that the food products derived from bison meat will be adequately regulated for the protection of the public health and welfare under either the FDCA or the MIA. In an absence of a Congressional determination to include bison meat within the more limited coverage of the Meat Inspection Act, this court is unwilling to judicially extend the provisions of the Meat Inspection Act to do so.

456 F. Supp. at 210.

The defendant asserts that the case of *United States v. 2,116 Boxes of Boned Beef,* 516 F. Supp. 321 (D. Kan. 1981), is dispositive of the question before the Court. In that case, the government proceeded against boned beef which allegedly contained detectable levels of DES. The government brought that action under the Meat Inspection Act, specifically 21 U. S. C. §§ 601(m)(1), (m)(2)(A), (m)(3), 672. Defendant reads that case as holding that the Meat Inspection Act is the only act applicable to meat and live food producing animals which contain an unapproved drug. This Court does not agree.

In the *Boned Beef* case, the Court was not presented with the question whether the government could have proceeded against the meat based on the standards set forth in the Food, Drug and Cosmetic Act. Therefore, that case is inapposite to the one before the Court.

USCA4 Appeal: 26-1374     Doc: 22-2     Filed: 06/11/2026     Pg: 145 of 508

¶ 38,217Y UNITED STATES OF AMERICA V. TOMAHARA..., Food Drug Cosm. L....

The defendant next cites this Court to two provisions of the MIA, arguing that they encompass application to live animals. 21 U. S. C. §§ 672, 673. These provisions give the U. S. Department of Agriculture [USDA] the authority to detain, seize, and condemn any "carcass, meat or meat food product of cattle … or any dead, dying, disabled or diseased cattle…." In defendant's view, these sections would be the proper authority for the government's actions against his veal calves.

First, as has already been determined, the calves in question are not meat, meat food products, or carcasses within the meaning of the MIA. Neither has either party asserted that these animals are dead, dying, disabled or diseased. However, assuming arguendo that these sections could form a basis for the government's actions in this case, they do not deny the government the authority to proceed against these animals under the provisions of the FDCA.

21 U. S. C. § 679(a) provides that "[n]otwithstanding any other provisions of law, including section 392(a) of this title, the provisions of this chapter shall not derogate from any authority conferred by the Federal Food, Drug and Cosmetic Act prior to December 15, 1967." The legislative history of this clause demonstrates that it was designed to "coordinate the FMIA and the FFDCA by providing that the provisions of the former shall not derogate from the authority conferred by the FFDCA prior to the enactment of [this amendment]." S. Rep. No. 799, 90th Cong., 1st Sess., reprinted in [1967] U. S. Code Cong. & Ad. News 2207. That report also stated:

> Sections 10, 403 and 409 of the MIA, as it would be amended by sections 10 and 16 of the bill, contains adulteration, misbranding and seizure provisions similar to those in the FFDCA and preserve the existing authority of the Secretary of HEW.

> The Secretary of Agriculture and the Secretary of HEW *would thus have concurrent jurisdiction* under the MIA and the FFDCA over meats and meat food products becoming adulterated or misbranded after inspection….

*Id.* at 2203 (emphasis added). Thus, even were this Court to hold that live veal calves were within the definition of meat or meat food products contained in the MIA, the government may still proceed against them under the FDCA. This is further supported by the affidavit of L. L. Gast, Associate Administrator, Food Safety and Inspection Service, United States Department of Agriculture.

*Injunctive Relief*

The standard in this Circuit for the grant of a preliminary injunction is that there be a

> showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Buffalo Courier Empress Inc. v. Buffalo Evening News, Inc.,* 601 F. 2d 48, 54 (2d Cir. 1979) (emphasis in original) (citations omitted). Because this is a proceeding under the FDCA, the government need not make a showing of irreparable harm. "The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, to be restrained." *United States v. Diapulse Corp. of America,* 457 F. 2d 25, 28 (2d Cir. 1972). However, even if the violation of the statute was not an implied finding of irreparable harm, it would still be the finding of this Court that the government has demonstrated that the offer of these calves as slaughter for food would cause the public irreparable harm.

[*Adulteration*]

The government has charged the defendant with the "introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." 21 U. S. C. § 331 (a). Having determined that the defendant's live veal calves are food, the Court must next determine whether they are adulterated and within interstate commerce.

21 U. S. C. § 342(a)(2)(D) defines adulterated food as food which "is, or it bears and contains, a new animal drug which is unsafe within the meaning of section 360(b) of this title." The government alleges that the calves on defendant's farm contain DES. DES is a new animal drug for which there is no approved application on file for use in veal calves. It is,

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

therefore, *per se* unsafe. If the government can show that the calves on defendant's farm contain DES, then it has met its burden of proving the animals adulterated under the FDCA.

DES is a synthetic hormone which, when administered to animals, is a growth promoter. DES also helps the animals to utilize their grain more efficiently, thus making them require less food. DES was routinely administered to cattle by farmers from the mid 1950's to 1979, when the FDA withdrew the approval of the application for its use for this purpose. The normal method of administration was by injection of pellets into the animal's ear. Thus, the drug was slowly released into the animal's system.

In 1979, the approval of the application for DES was withdrawn. This withdrawal was based on scientific evidence which showed that there was not a "no-effect level" for this drug in the edible tissues of the animals receiving the drug. Therefore, it was determined that it could not be said that the presence of this drug was safe at any detectable level in edible animal tissues. Since that time, there has been no approved use for DES in food producing animals. See generally Pl. Ex. 4.

In support of its argument that the animals on defendant's farm contain detectable levels of DES, the government points to the following facts: 1. Defendant offered two lots of veal calves in January 1983. When the livers and kidneys of five animals per lot were tested, detectable levels of DES were found. 2. On January 13, 1983, FDA investigators took fecal samples from defendant's farm. These samples, when analyzed, revealed detectable levels of DES. 3. Dr. Richard Condon and Dr. Nicholas Weber, scientists with the FDA, both opined that based on the presence of DES in the fecal samples, that DES is contained in the edible tissues of the calves on defendant's farm.

To the contrary, the defendant has suggested, through the testimony of his expert, Dr. Torrence Nett, that the fecal samples obtained by the FDA investigators could have been contaminated by possible DES residues contained in the moisture on the ceiling in the barn which may have fallen upon the manure. In this way, the test results can be interpreted as showing only that the manure contained DES, not that the calves contained DES.

This is an application for preliminary relief. The government need not prove at this point that the calves contained DES. Rather, all it need show is that there is a probable likelihood that such could be proved at trial. This it has done.

The defendant has certainly presented an interesting theory of contamination to the Court. However, his theory was undercut by the testimony of Dr. Nett at trial. When asked what he estimated to be the levels of DES in the edible tissues of these animals based on the presence of DES in the manure, Dr. Nett responded with a number, albeit a minuscule one, representing the level of DES present in the veal calves on defendant's farm. There is a probable likelihood that the calves on defendant's farm contain DES.

It is further the determination of this Court that there is a reasonable likelihood that the government can show at trial that the veal calves on defendant's farm are in interstate commerce. First the defendant stated that he often uses buyers who are outside the state to arrange for the purchase of veal calves. The defendant did not have with him the phase orders for the calves currently bring held on his farm. There exists the possibility that the government can show that these calves were not purchased within the state.

Second, even assuming that these calves were purchased within the state, there is still a reasonable likelihood that the government can prove that the animals are within interstate The defendant often offers his veal calves for slaughter to slaughterhouses which are involved in interstate commerce. In fact, the defendant has contacted such a slaughterhouse to inquire as to the price obtainable for the calves currently on his farm. Therefore, it cannot be said that these calves are not involved in interstate commerce. See *Katzenbach v. McClung,* 379 U. S. 241 (1964); *Houston E. & W. T. R. Co. v. United States,* 234 U. S. 342 (1913). This is especially true in light of the broad interpretation to be accorded this Act. See *United States v. Park,* 421 U. S. 658 (1975); *Drown v. United States,* 198 F. 2d 999 (9th Cir. 1952). The government, therefore, is entitled to injunctive relief based on its claim that the calves on defendant's farm are adulterated within the meaning of the FDCA. See 21 U. S. C. § 342(a) (2) (D).

**[*Adulterating a Drug*]**

As an additional ground for injunctive relief, the government accuses the defendant of adulterating a drug. See 21 U. S. C. § 351 (a) (5). The government contends that this drug has been involved in interstate commerce because there are no licensed manufacturer of the drug in the state. Therefore, it includes that the defendant must have obtained the drug in interstate commerce. Based on the proof currently in the record, this Court does not agree.

The government has not made any showing of where the drug allegedly used was manufactured. For all this Court knows, there may be no facility in the United States licensed to manufacture this drug. If this were true, then it could not be said that the drug *must have* passed through interstate commerce. Moreover, it is not clear to this Court that the defendant has himself administered DES to his calves. Indeed, the government's proof was directed to a showing that it was Mr. Vangenechten who administered the drug to the calves. The government has made no argument to this Court that Mr. Conhaim can be held responsible for this adulteration because of the actions of Mr. Vangenechten; there have been no agency allegations made. Therefore, the Court is a grant of injunctive relief on the government's contention that this drug adulterated.

[*Conclusion*]

Accordingly, the plaintiffs request for a preliminary injunction restraining the defendant from administering DES to any calves on his farm, enjoining defendant from offering for slaughter as food any calves which have been administered DES, and enjoining the defendant from offering for slaughter for food any veal calves currently on defendant's farm is granted.

IT IS SO ORDERED.

Footnotes

[1]      United States Magistrate, sitting by designation. 28 U. S. C. § 636(c).

[2]      Mr. Vangenechten has not been served in this case. At the start of the proof in this preliminary injunction hearing, the Court ordered that the complaint be dismissed as against Mr. Vangenechten.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 2

 

October 22, 2019

The Honorable Jeff M. Witte
Secretary
Department of Agriculture
State of New Mexico
MSC 3189, Box 30005
Las Cruces, NM  88003-8005

Dear Secretary Witte:

This responds to your request to the Food and Drug Administration (FDA) and the U.S. Department of Agriculture (USDA) for assistance in assessing the impact of groundwater contamination with certain per- and polyfluoroalkyl substances (PFAS), including perfluorooctane sulfonate (PFOS), at the Highland Dairy in Clovis, NM, on certain food produced there. FDA has regulatory authority under the Federal Food, Drug, and Cosmetic Act over food, including milk and live animals intended for food. USDA has regulatory authority under the Federal Meat Inspection Act over the meat products.

FDA analyzed the groundwater, silage, and milk produced at Highland Dairy and confirmed all were positive for PFAS contamination. In response, since the fall of 2018, FDA's Center for Food Safety and Applied Nutrition (CFSAN) has been working with you and your team at the New Mexico Department of Agriculture to assess the safety of milk produced by that operation.

To evaluate the potential safety concerns of beef that would be derived from affected dairy cattle at the Highland Dairy, USDA and FDA consulted with experts from the Environmental Protection Agency and the Agency for Toxic Substances and Disease Registry to consider the available science and appropriate methodology for evaluating PFOS in muscle (beef). This work may need to be refined further as additional research and data on PFAS exposure and toxicity become available.

USDA analyzed blood samples taken from 179 dairy cattle at the Highland Dairy. PFOS was detected in every sample. In addition, USDA purchased 30 of the affected dairy cattle and moved them to New Mexico State University in Las Cruces, NM for a follow-up study.

FDA and USDA agree that, absent any further action to mitigate herd exposure, an evaluation of the data collected from the Highland Dairy, including PFOS levels detected in blood and tissues from the herd, support the determination that any affected cattle intended for food and meat derived from such cattle are considered adulterated and should not enter the food supply. Further, based on FDA's evaluation of the PFOS levels in milk, absent any further action to mitigate herd

Page 2 – The Honorable Jeff M. Witte

exposure, milk from the affected cattle is considered adulterated and should not enter the food supply.

USDA has documented that removing affected cattle from exposure to PFOS causes the concentration of PFOS in the animals' blood and muscle tissue to decrease over time. FDA and USDA are currently evaluating the data to determine whether PFOS concentrations will decrease to a level where the affected cattle (and any meat potentially derived from such cattle) would no longer be considered adulterated under the applicable statutes. However, any decision on whether the adulterated affected cattle could enter the food supply shall only be made in consultation with FDA and USDA, and may require additional testing prior to, or immediately after, slaughter.

If you or the herd owner have additional questions, please contact Dr. Paul South, Division Director, Office of Food Safety, FDA/CFSAN at paul.south@fda.hhs.gov or Emilio Esteban, Chief Scientist, USDA Food Safety Inspection Service at emilio.esteban@usda.gov.

We look forward to working together on next steps and appreciate your patience as this joint work has been ongoing.

Sincerely,

Frank Yiannas
Deputy Commissioner Food Policy and Response
Food and Drug Administration

Mindy Brashears
Deputy Under Secretary for Food Safety
United States Department of Agriculture

Copy to:

Art Schaap – Highland Dairy

# Exhibit 8

Case 5:24-cv-00477-BO-RJ    Document 6-9    Filed 08/23/24    Page 1 of 7

JA181

**U.S. Department of Labor**    Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



In the Matter of:

CRAIG WATTS,                    ARB CASE NO.    2017-0017

        COMPLAINANT,        ALJ CASE NO.    2016-FDA-00003

    v.                         DATE:   May 28, 2020

PERDUE FARMS, INC.,

        RESPONDENT.


BEFORE:  THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant:*
    Thad M. Guyer, Esq.; Stephani L. Ayers, Esq.; *T.M. Guyer & Friends, PC*, Medford, Oregon; Karen Gray, Esq., *Government Accountability Project, Inc.*, Washington, District of Columbia

*For the Respondent:*
    Todd J. Horn, Esq.; Mitchell Y. Mirviss, Esq.; Roger A. Colaizzi, Esq.; Todd A. Harrison, Esq.; and Stephen R. Freeland, Esq.; *Venable LLP*, Washington, District of Columbia

*For the U.S. Food and Drug Administration as Amicus Curiae:*
    Michael D. Helbing, Esq.; Carolyn V. Jasperse, Esq.; and Nicole L. Pepperl, Esq.; *Food and Drug Administration, United States Department of Health and Human Services*, Washington, District of Columbia

*For the Rural Advancement Foundation International-USA, Ranchers-Cattlemen Action Legal Fund United Stockgrowers of America, and Farm and Ranch Freedom Alliance as Amici Curiae:*
    *Candace A. Spencer, Esq.,* Washington, District of Columbia

2

*For the U.S. Poultry & Egg Association & National Chicken Council as Amici Curiae:*
> J. Larry Stine, Esq.; Elizabeth K. Dorminey, Esq.; *Wimberly, Lawson, Steckel, Schneider & Stine, PC*, Atlanta, Georgia

BEFORE:  Thomas H. Burrell, *Acting Chief Administrative Appeals Judge* and Heather C. Leslie *Administrative Appeals Judge*

## DECISION AND ORDER GRANTING RECONSIDERATION AND REMANDING TO THE ADMINISTRATIVE LAW JUDGE

This case arises under the employee protection provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended by Section 402 of the Food Safety and Modernization Act of 2011 (FSMA),[1] and its implementing regulations at 29 C.F.R. § 1987 (2016).  Section 402 of the FSMA protects from retaliation an employee who has engaged in protected activity pertaining to a violation or alleged violation of the FFDCA, or any order, rule, regulation, standard, or ban under the FFDCA.  Craig Watts, the owner of C&A Farms, filed a complaint with the Department of Labor's Occupational Safety and Health Administration (OSHA) alleging that Perdue Farms, Inc. (Perdue) retaliated against him for engaging in FSMA-related protected activities.  OSHA dismissed the claim.  Watts asked for a hearing, and the Administrative Law Judge (ALJ) assigned to the case also dismissed the claim.  The ARB affirmed the ALJ's decision on March 5, 2019.  Watts appealed the case to the United States Court of Appeals for the Fourth Circuit.  On September 24, 2019, the Department of Labor moved that the Court remand the matter back to the ARB for additional consideration in light of briefing from the U.S. Food and Drug Administration (FDA).  The Fourth Circuit granted that motion on January 7, 2020. *Watts v. U.S. Dept. of Labor*, Case No. 19-1487 (4th Cir. Jan. 7, 2020).  Upon further briefing, the ARB vacates its March 5, 2019 Order and remands the matter back to the ALJ for further proceedings.

### BACKGROUND

Craig Watts contracted with Perdue Farms, Inc., to raise chickens which he received from Perdue as chicks.  After a period of several weeks, Perdue would then collect them for processing.  Watts claims that the flocks raised on his farm follow Perdue's specifications but suffer from overcrowdedness and improper hygiene.  Watts, with a third-party, recorded a video to illustrate conditions of his flock.

---

[1]    Section 402 of the FSMA is codified at 21 U.S.C. § 399d (2016); The FFDCA is codified at 21 U.S.C. § 301 *et seq.* (1938).

3

Perdue counters that Watts wanted more money, became disgruntled, and kept sick and injured chickens alive to smear Perdue's reputation. Upon learning of the video, Perdue required Watts to complete biosecurity training before a new flock would be placed with his farm. On February 19, 2015, Watts filed a whistleblower complaint claiming that the additional training requirement was retaliation for having produced the film and complained of alleged violations.

On February 8, 2016, OSHA determined that Perdue was covered under FSMA but also that Watts was not an employee of Perdue. Watts objected, and the case was assigned to an ALJ for hearing. Before the ALJ, Perdue moved to dismiss for lack of subject matter jurisdiction. The ALJ agreed and held that he lacked jurisdiction to hear Watts's claim because Watts raised chickens for Perdue. Being part of the poultry products industry, Perdue's chicken business was exempt from the FFDCA via the Poultry Products Inspection Act (PPIA), 21 U.S.C. § 451, and thus exempt from the FSMA amendments adding the whistleblower protection provision to the FFDCA. Watts appealed to the Administrative Review Board (ARB or Board). The ARB affirmed the ALJ's decision on March 5, 2019, finding that Perdue was not covered under the FFDCA. Watts appealed the ARB's decision to the Fourth Circuit. Upon further briefing, the Fourth Circuit granted DOL's motion for voluntary remand back to the ARB for further consideration. This Order of Remand follows.

## JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated authority to the ARB to issue final agency decisions for the Department of Labor in cases brought under the FSMA.[2] The ARB reviews an ALJ's dismissal *de novo*, applying the same standard that the ALJ employed under 29 C.F.R. Part 18 (2017). Pursuant to 29 C.F.R. § 18.70, the ALJ dismissed Watts's appeal for lack of subject matter jurisdiction.[3] In assessing this dismissal, we view the pleadings in a light favorable to the complainant, accepting well pled factual allegations as true provided they rise above the speculative level. The ARB does not, however, accept conclusions of law or unwarranted inferences which are presented as fact.

## DISCUSSION

The FFDCA authorizes the FDA to regulate the safety of food in interstate commerce. 21 U.S.C. §§ 301 *et seq.* Chapter 9 of the FFDCA regulates food safety

---

[2]    Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 85 Fed. Reg. 13,186 (Mar. 6, 2020).

[3]    Rule 18.70 compares with Federal Rule of Civil Procedure 12(b). We note that parties often interchange "subject matter jurisdiction" with claim-processing rules. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 503-08 (2006).

4

from the time it is imported, manufactured, or processed until it is packaged and distributed for public consumption. On January 4, 2011, Congress enacted the Food Safety Modernization Act to add employee protection to the FFDCA.[4] Section 402 of the FSMA provides that:

> (a) In general
> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)--
> (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter; . . .

21 U.S.C. § 399d(a). For purposes of this discussion, § 399d's relevant coverage language provides:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food

"Food" is the operative word that conveys the whistleblower provision's coverage. "Food" is defined in the FFDCA:

> (f) The term "food" means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

21 U.S.C. § 321(f); see also 29 C.F.R. § 1987.101(h) (implementing regulation containing identical language).

---

[4]    Pub. L. 111-353, 124 Stat. 3885 (Jan. 4, 2011).

5

Congress enacted the PPIA to protect the public from "unwholesome, adulterated, or misbranded" poultry products. 21 U.S.C. § 451 *et seq.* (1968). Section 467f of the PPIA generally exempts poultry and poultry products from the FFDCA.

> (a) Exemptions; authorities under food, drug, and cosmetic provisions unaffected:
> Poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.] to the extent of the application or extension thereto of the provisions of this chapter, except that the provisions of this chapter shall not derogate from any authority conferred by the Federal Food, Drug, and Cosmetic Act prior to August 18, 1968. . . .

21 U.S.C. § 467f(a). Furthermore, Section 403 of the FSMA provides that:

> Nothing in [the FSMA], or an amendment made by this Act, shall be construed to—
> …
> (4) alter or limit the authority of the Secretary of Agriculture under the laws administered by such Secretary, including---
> …
> (B) the Poultry Products Inspection act…

21 U.S.C. § 2251.

If the PPIA covers the employer's poultry activity at issue, then the activity is exempt from the FFDCA. FDA argues that the PPIA does not kick in to exempt poultry from the FFDCA until the poultry arrives at an *official establishment*, meaning a slaughterhouse or processing facility.[5] Because the PPIA does not apply to on-farm poultry, FDA argues that poultry is still "food" and covered by the FFDCA. FDA identifies, for example, its regulation of edible tissues of food-producing animals that contain unsafe levels of animal drugs, causing the food to be adulterated. FDA also notes that Perdue supplies the feed, fuel, medications, vaccinations, and other supplies for the chicks on Watts's farm. FDA claims that there is no question that animal feed is covered as food under the FDCA. FDA Br. at 23, citing § 321(f).

---

[5] FDA Br. at 6. "'Official establishment' means any establishment as determined by the Secretary at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained under the authority of this chapter." 21 U.S.C. § 453(p).

6

JA187

Upon further briefing, we grant the request to reconsider our March 5, 2019 ruling.  The question before the Board is whether Perdue is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food."  21 U.S.C. § 321(f).[6]  FDA argues and Perdue does not dispute that Perdue supplied the poultry animal feed for poultry on Watts's farm. Accordingly, Perdue is an entity who manufactures, process, transports, or distributes "food" within the meaning of the Act and thus is a covered entity.

In conclusion, the ARB **VACATES** its March 5, 2019 Order affirming the ALJ's decision and **REMANDS** the matter back to the ALJ for further proceedings.

**SO ORDERED.**

---

[6]      As this is the sole issue before the Board, we decline to address any other arguments on appeal.

# Exhibit 9

## UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES

*In the Matter of*

| | |
|---|---|
| **CRAIG WATTS,** | ) |
| | ) |
| *Complainant,* | ) The Honorable ALJ Pamela A. Kultgen |
| | ) |
| *v.* | )Case No. 2016-FDA-00003 |
| | ) |
| **PERDUE FARMS, INC.,** | ) |
| | ) |
| *Respondent.* | ) |

### SUPPLEMENTAL WHISTLEBLOWER COMPLAINT

Complainant Craig Watts, through his counsel, files this Supplemental Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

### I.    INTRODUCTION

1.  (a) This action arises from and concerns adverse employment actions taken against Complainant by Respondent from December 2014 to January 2016 for which a contributing factor was Complainant's activity that was protected under 21 U.S.C. § 399d. This Supplemental Complaint updates and restates the facts of his Complaint, including his constructive discharge on January 26, 2016, thirteen days before OSHA dismissed his complaint entirely for lack of jurisdiction, a finding recently reversed by the ARB.  This supplement realleges and alleges food integrity violations and practices by Perdue from 2014 to 2016 in which the company falsely claimed to be following humane poultry growing protocols when the true practices were just the opposite.  Complainant rejected

*Supplemental Complaint*                1

Perdue's implied assertion that humane poultry growing was achieved simply by discarding and concealing from public view sick and dead chickens from the company's flocks.

(b) Complainant decided to blow the whistle. He determined that the Respondent had not designed, deployed, or maintained any viable internal or external channels for reporting these deceptive marketing statements or the inhumane practices and collateral practices of Perdue for placing, maintaining, and removing those chicken flocks. Complainant regarded any external USDA channels available to growers to not be viable for reporting food integrity concerns not directly related to contamination or adulteration of the raw poultry products marketed to consumers. Complainant was unaware of any dedicated or viable FDA external reporting channels available to poultry growers. Complainant became aware of, and resorted to, public food integrity reporting channels to NGOs and the media, and thereby indirectly to Congress or other federal authorities.

(c) The poultry flocks that are the subject of this complaint at all times remained under the sole ownership and control rights and discretion of the Respondent. Complainant and growers like him were employees under contract, despite the language in those contracts by Perdue disclaiming its legal obligations to said employees.

## II.    JURISDICTION AND EXHAUSTION

2.      This complaint, having been timely filed within 180 days of the adverse actions complained of, is timely. OSHA had jurisdiction to investigate the allegations contained herein, any additional protected activity and adverse action that occurred subsequent to said complaint that reasonably would have been investigated in the scope of

*Supplemental Complaint*                           **2**

said OSHA investigation, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below. OSHA issued its letter determination on February 8, 2016, that it lacked jurisdiction over the complaint, concluding that Complainant was not a covered employee.

3.    Per the Final Decision and Order of the Administrative Review Board (ARB) entered on March 5, 2019, and all proceedings since, up to and including the present proceedings in the OALJ, Complainant's claims have been properly exhausted and will continue to be exhausted throughout the present OALJ proceedings. The 2019 ARB found:

> On February 8, 2016, OSHA determined that, while Perdue was covered under the FSMA, Watts was not a covered employee of Perdue under the FSMA. Watts requested a hearing before an ALJ. Before the ALJ, Perdue filed a motion to dismiss for lack of subject matter jurisdiction. The ALJ granted Perdue's motion to dismiss pursuant to 29 C.F.R. § 18.70(a), concluding that she lacked jurisdiction to hear Watts's claim. Specifically, the ALJ reasoned that the raising of chickens is part of the poultry products industry, which is exempt from the FFDCA pursuant to the Poultry Products Inspection Act (PPIA), 21 U.S.C. § 467f (1979), and is therefore also exempt from the FSMA amendments adding the employee protection provisions to the FFDCA. Watts appealed this decision to the Administrative Review Board (ARB or Board).

4.    The 2019 ARB also found:

> Watts also argues that even if the PPIA excludes "poultry" from coverage under the FFDCA, the DOL is still a proper forum for his complaint because Watts had a reasonable belief that he and his employer were covered under the FFDCA and the FSMA. The FSMA's implementing regulations provide that the FSMA protects an employee who has done the following:
>
> > Provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the [FFDCA] or any order, rule, regulation, standard, or ban under the [FFDCA]; 29 C.F.R. § 1987.102(b)(1).

*Supplemental Complaint*                                3

5.      On September 24, 2019, the Acting Secretary of the U.S. Department of Labor (DOL), represented by lawyers from the Solicitor's Office and by DOL Counsel for Whistleblower Programs, filed a motion with the Fourth Circuit requesting a remand of the case to the ARB. The sole objective of that motion was to allow the U.S. Food and Drug Administration (FDA) to participate as amicus because the FDA informed the Acting Secretary that the interpretation of the word "food" in this whistleblower case could have substantial implications for the FDA's ability to regulate the U.S. food supply under the FFDCA. The Petitioner separately joined in this remand request, while the Respondent, the U.S. Poultry & Egg Association, and the National Chicken Council all vigorously opposed it.  Following these vigorous oppositions, the Acting Secretary filed a reply and urged the Fourth Circuit to agree that the ARB should reconsider its decision with the benefit of the FDA's views. After considering the Acting Secretary's motion, Petitioner's response in support of it, and the oppositions filed by the Respondent and its amici, the Fourth Circuit granted the motion and remanded the case to the Board for further proceedings.

6.      On May 28, 2020, the ARB entered its "Decision and Order Granting Reconsideration and Remanding to the Administrative Law Judge".  That 2020 ARB Remand Order found:

> This case arises under the employee protection provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended by Section 402 of the Food Safety and Modernization Act of 2011 (FSMA), and its implementing regulations at 29 C.F.R. § 1987 (2016). Section 402 of the FSMA protects from retaliation an employee who has engaged in protected activity pertaining to a violation or alleged violation of the FFDCA, or any order, rule, regulation, standard, or ban under the FFDCA. Craig Watts, the owner of C&A Farms, filed a complaint with the Department of Labor's Occupational Safety and

*Supplemental Complaint*                    **4**

Health Administration (OSHA) alleging that Perdue Farms, Inc. (Perdue) retaliated against him for engaging in FSMA-related protected activities. OSHA dismissed the claim. Watts asked for a hearing, and the Administrative Law Judge (ALJ) assigned to the case also dismissed the claim. The ARB affirmed the ALJ's decision on March 5, 2019. Watts appealed the case to the United States Court of Appeals for the Fourth Circuit. On September 24, 2019, the Department of Labor moved that the Court remand the matter back to the ARB for additional consideration in light of briefing from the U.S. Food and Drug Administration (FDA). The Fourth Circuit granted that motion on January 7, 2020. *Watts v. U.S. Dept. of Labor*, Case No. 19-1487 (4th Cir. Jan. 7, 2020). Upon further briefing, the ARB vacates its March 5, 2019 Order and remands the matter back to the ALJ for further proceedings.

7.    On December 11, 2020, the OALJ entered an "Order Directing Parties to File Notices of Appearance by 1/6/2021, and Order Setting Briefing Schedule".  The parties complied.  For over a year, the OALJ has not acted further in this case, until the April 21, 2022 reassignment of the case to a new ALJ.  No pleadings on the merits have yet been filed by either party, and the only complaint of record is that originally filed with OSHA.

### III.    PARTIES

8.    Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where until January 2016 he raised chickens for Respondent under a 2009 written contract between the parties.  Under this contract, Respondent delivered flocks of chicks to Complainant, who housed and tended to each flock in accordance with standards set by Respondent.  Complainant fed, watered, and cared for those flocks using feed, medications, and other supplies provided by Respondent.

9.    Respondent retained title of each flock at all times, and an agent of Respondent typically visited Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately eight weeks.

*Supplemental Complaint*                    **5**

10. At the end of flock's growth cycle, Complainant was compensated for his services by Respondent in accordance with a payment schedule.

11. The foregoing facts demonstrate that Complainant was an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

12. At the end of their growth cycle, flocks were picked up by agents of Respondent for transport to slaughter and processing facilities owned and operated by Respondent. Respondent transported chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

13. At these facilities, Respondent slaughters, processes, and packages chickens and turkeys for sale to consumers. Respondent is one of the largest producers of poultry products in the United States and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

14. Respondent also imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which Respondent processes for use in animal feed and pet food. Those raw and processed commodities are also subject to FDA regulation apart from the poultry they are used upon.

15. The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

*Supplemental Complaint*                    **6**

## IV.    FACTUAL ALLEGATIONS

### A.    Complainant's Job, Duties, and Performance

16.    Complainant began raising chickens for Respondent in 1992.  In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms.  Respondent asked Watts to sign a new contract with them in 1999, and Complainant has been raising chickens for Respondent continuously since then.

17.    Complainant was required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent.  These standards imposed numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities.  These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

18.    An employee of Respondent regularly visited Complainant's farm to ensure that Complainant was maintaining his facilities and tending to flocks in accordance with Respondent's standards.  Complainant had no authority, discretion, or control to do anything with this livestock exclusively owned by Respondent, nor over the care and processing of those owned flocks.  Typically, these visits were conducted by Respondent's Growout Supervisor for the region surrounding Complainant's farm, Lyn Price, and occurred approximately once per week during the flocks' growth cycles.  Complainant was known by Ms. Price to be one of Respondent's most successful and conscientious farmers.

*Supplemental Complaint*                          **7**

19.     At the end of their growth cycles, flocks were rated by Respondent in what was referred to as Respondent's "tournament system."  Complainant's compensation for each cycle was based in part upon these ratings.  Under this system, which is indistinguishable from a factory worker's performance appraisals or a brokerage employee's bonus/incentive structure, and which requires frequent ongoing ratings, Respondent's farmer employees' performance was measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group.  Complainant's flocks consistently received high ratings, and Complainant had been rated the top producer in his group numerous times.

20.     Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

**B.      Background Facts Relevant to Protected Activity**

21.     Prior to 2014, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant.  In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry.

22.     Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised.

*Supplemental Complaint*                          **8**

23.    For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches and sores.

24.    Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy.  For example, many birds arrived at Complainant's farm carrying infections, and died of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink.  Many others had leg deformities, impairing their ability to move about freely and comfortably.  Additionally, the birds in Complainant's facility rapidly grew heavy and lethargic, so that within weeks after placement they spent the vast majority of their time laying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts.

25.    In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was unwarranted and likely fraudulent.  As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom might be unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified and the product not as advertised.

*Supplemental Complaint*                                9

26.    Complainant believed that the conditions described above were the result of Respondent's practices and other factors exclusively within Respondent's control.

27.    For example, Respondent controls the size of the flocks placed on Complainant's farm and the farms of other Respondent's farmer employees.   Respondent adjusted flock size to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density.  Complainant believed that Respondent crowded too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other.  Complainant believed that the flock density of flocks placed by Respondent on Complainant's farm had, at times, exceeded the National Chicken Council's animal welfare guidelines upon which Complainant believed that Respondent premised its use of the "Humanely Raised" label.

28.    Prior to 2014, Respondent stopped using antibiotics in its North Carolina hatcheries.  Like humane growing conditions, many consumers wanted drug-free birds. Complainant believed that Respondent had not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

29.    Complainant had observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities.  Complainant believed that Respondent was not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

*Supplemental Complaint*                                **10**

30.    Complainant believed that Respondent's breeding of chickens resulted in birds that gained weight too rapidly and that had a high rate of leg deformities.

31.    Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers from opening windows to allow access to sunlight and fresh air.  Complainant believed that this lack of sunlight and fresh air impaired the birds' quality of life, causing increased stress and reduced levels of activity.

32.    Complainant was prohibited by Respondent from administering any antibiotics or other medications to sick birds, and Respondent had refused to administer medication when Complainant sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

**C.    Protected Activity and Complainant's Resort to Reporting Channels**

33.    Complainant objected to Respondent's practices and conduct described above and its use of the phrase "Humanely Raised" on its labeling.  Complainant believed the opposite was true as Perdue compromised the birds' welfare and increased their risk of becoming contaminated with, and developing infections from, salmonella, e-coli, and other harmful bacteria.  He believed that this in turn was threatening the health of consumers, Perdue's brand, and the economic viability of his employment contract with the company.

34.    Complainant decided to report Respondent's practices through any viable and effective reporting channels. Complainant knew that reporting the above concerns to Perdue through its vague internal channels would be futile and career threatening: the company's

*Supplemental Complaint*                    **11**

CEO was on television touting its humanity in the industry, and Complainant's employment duties did not include regulatory enforcement and food integrity policy. He was also aware that USDA had not been involved in policing integrity within the poultry industry beyond safe growing practices that could impact post-slaughter meat safety. USDA surveillance and involvement with marketing to consumers was limited to safe inspection certification, and he was unaware of any external reporting channels to the USDA or FDA to act on his reports about consumer misrepresentation regarding human growing practices. The only viable alternative known to Complainant to protect public health, industry integrity, and consumers was to resort to public channels by reporting to industry-specific NGOs and media, which in turn have the best chance of attracting Congressional oversight. Complainant reported his concerns to Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF"). After determining that CIWF offered a viable reporting channel, Complainant arranged for the organization's investigatory visit to his farm, including fact collection by audiovisual recording of the actual living conditions of the Perdue-owned flocks.

35. On or about May 22, 2014, CIWF began videotaping the flock and conducting its investigation into Complainant's food integrity reports at his farm. CIWF continued the investigation with a visit several weeks later, including videotaping the end of the flock growth cycle.

36. CIWF condensed the footage it had filmed into an effective and concise reporting narrative, which Complainant authorized for publication. Complainant expected

*Supplemental Complaint*                    **12**

that Respondent would view the video and hoped and believed that the video's publication would prompt the public and regulators to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt a significant investigation or other action by state and federal government officials.

37. On December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm, "Abusing Chickens We Eat". The newspaper criticized the obvious poor health of the birds and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds was deceptive. The video produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, available here: http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html. This later led to further New York Times investigative journalism, and to the Sundance movie featuring Complainant, "Eating Animals", https://www.eatinganimalsmovie.com.

38. The video journalism depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities. The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of

*Supplemental Complaint*                13

the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

39.     The NYT article and other online publications disclosed that Respondent participated before publication. Twitter and other social media linked to the reports and video.

40.  Complainant's protected activity included the filing of his OSHA complaint in February 2015, which triggered Respondent to make false and disparaging statements about him, notwithstanding the company's pretextual statements that it was trying to re-educate, rather than terminate him. The Respondent succeeded in the latter one year later.

## V.     ADVERSE ACTIONS

41.     The day after release of the above referenced CIWF video, on December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm.

42.  These inspections continued, occurring almost daily, until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

43.     On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received a hand delivered letter from Respondent "implementing a

*Supplemental Complaint*                    **14**

Performance Improvement Plant for poultry welfare and biosecurity" on Complainant's farm.

44.    The December 29, 2014, letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses, and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

45.    Complainant was informed that he would not receive another flock placement until he completed a re-education program concerning proper animal welfare and biosecurity practices.

46.    A training session was planned for January 8, 2015.  Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

47.    As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2015, approximately nine days after he would have typically received a new flock.

48.    Complainant estimates that he lost approximately $4,500 in earnings due to that single delayed flock placement alone.

49.    Respondent continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily, even after January 15, 2015.

*Supplemental Complaint*                          **15**

JA203

50.     Perdue relied on the "Center for Food Integrity" (CFI) to rebut Complainant's public disclosures.  CFI provides support to the poultry industry.  On December 5, 2014, CFI released a statement blaming Watts for the state of Perdue's chickens, claiming he allowed lame chickens to continue their suffering and calling him "negligent" in his husbandry obligations.  CFI asserted the responsibility to respond to the needs of the flock lies with the farmer, but CFI provided no analysis of Perdue's actions or omissions.  CFI's defense of Perdue resulted in an embarrassing messaging dissonance because Perdue inspectors at Watts' farm on December 4, 2014, characterized his flock as "well cared for and content".

51.     Complainant lived in heightened anxiety from December 3, 2014, until January 26, 2016, that Perdue would terminate his employment contract and destroy his business and livelihood.  On or around December 19, 2014, Watts learned that Perdue had told Walmart, one of the large retailers that Perdue supplies, that Respondent would end its relationship with Complainant.

52.     According to the Perdue Producer Agreement that governed this employment relationship, the only reason a grower may be placed under the Performance Improvement Program ("PIP") is if the grower's "flocks fail to achieve Perdue's minimum standards of competitiveness."  However, Respondent's flock placed on Complainant's farm had not failed to achieve those minimum standards, and in fact had excelled.

53.     The Agreement mandated that growers be released from a PIP based on flock settlement averages.  There was no provision in Watts' agreement for placement on a PIP in

*Supplemental Complaint*                          **16**

these circumstances.  Respondent would often change the growers' requirements but not follow-through on implementing the specified obligations. As growers for Perdue, the farmers had to undertake large short-term and long-term debt obligations putting them at the whim and oppression of Perdue.

54.     Despite Respondent informing Complainant that the flock placed at his farm appeared on December 4, 2014 to be "well cared for and content", Respondent imposed extensive auditing and re-education requirements not based on the terms of the employment agreement.

55.     Respondent Perdue told Watts in a December 29, 2014 letter that Watts would have to "regain [Perdue's] trust".

56.     Perdue's announced plan of conduct kept Watts and his family in an unrelenting state of anxiety until his constructive termination in January 2016.  After his termination, he suffered additional anxiety and emotional and mental distress from the loss of his employment contract and livelihood.

57.     Respondent Perdue acted with abuse of authority or no authority in setting arbitrary, capricious, and invidious production requirements on Complainant.

58.     In said letter Perdue threatened Complainant Watts that it was alarmed and disturbed by the condition of the chickens entrusted to his care.  Perdue told him that his feelings of being unhappy with his grower relationship with Perdue disappointed them. Perdue reminded Watts that he could terminate his relationship with Perdue at any time.

*Supplemental Complaint*                          **17**

Perdue told Watts they would waive their 90-day notice requirement if Watts wished to terminate his employment contract immediately.

59.     Over six months later, Perdue continued to subject Watts to the arbitrary PIP which included bi-weekly inspections.  There was no end-date for the PIP, and Perdue offered no information as to how Watts could remove himself from the PIP.   Only after Complainant attorneys supplemented his Complaint on June 1, 2015, with allegations that Respondent was forcing him to remain on the abusive PIP or terminate the agreement, thus putting Respondent on notice of a forthcoming constructive termination claim, the company issued a notice on July 1, 2015, that the PIP had been completed.  This was pretext because the oppressive conditions and abusive treatment described above continued in the post-PIP ending of the relationship.  Complainant observed his reputation in the industry had been damaged.

60.     Perdue subjected Watts to more audits in the time following his whistleblowing than they had the prior three years combined.  On February 3, 2015, Perdue put Watts through an audit with a USDA auditor and then the next day, on February 4, 2015, Perdue sent four more truck or vanloads of auditors to Watts' farm.

61.     Despite the PIP letter stating that Complainant would receive written reports of each audit, Perdue never provided him with any reports from the audits.  Complainant did not receive any written or oral evaluations from the inspectors, nor did they provide him with a list or explanation of ways to "improve" his farm practices.  Instead, Perdue would make up entries in service reports or make suggestions for expensive equipment that were

*Supplemental Complaint*                               **18**

unmerited. This put Complainant in a state of anxiety about expensive and unnecessary changes to which Perdue subjected him for which his protected activity was an obvious contributing factor.

62.     On April 27, 2015, Perdue's lawyers in a submission to OSHA accused Complainant Watts of developing a "cruel scheme" to intentionally create substandard conditions of animal welfare at his farm to "extort" and "publicly blackmail Perdue" to OSHA investigators. OSHA is not an adjudicatory forum; it is an investigation and enforcement administration. Statements submitted to OSHA by Perdue lawyers are statements to federal investigators. Respondent reported as fact to OSHA that Complainant was intentionally allowing sick, deformed, and dying chickens to suffer in order to produce a "self-serving propaganda video" intended to create a "tsunami" of public opinion against Perdue. Such allegations were extremely upsetting to Complainant Watts, who understood this as a statement that he was grossly failing to meet the Respondent's December 2014 letter expectation that he must regain the company's trust. Additionally, OSHA still had not tried to schedule any interview of Complainant, and he felt intimidated that Perdue's allegations were preventing him from having even an interview with OSHA. As a result of Respondent's ongoing harassing actions, dishonest conduct, and an unrelenting pattern of false representations regarding flock welfare, Complainant experienced unremitting decline in his emotional and mental health. To prompt him to terminate the contract, Respondent claimed Complainant's farm needed upgrades including computerized controllers and hi-tech lighting systems, all of which would be excessively expensive and require new indebtedness.

*Supplemental Complaint*                    **19**

63.    Complainant still had debt to pay off despite his 20 plus years of operating, but experienced high chronic anxiety under attacks by Perdue's actions and statements.  He had trouble sleeping and he ruminated on Perdue's bad conduct often all day and late into the night.  The daily assault on Complainant's mental and physical health ultimately required him to withdraw from his contract with Perdue on January 26, 2016, while still awaiting some action from OSHA.  Per Complainant's letter to OSHA dated June 1, 2015, he reasonably believed that Perdue intended to force him to terminate his contract:

> Now, nearly six months later, Mr. Watts continues to be subject to the arbitrary PIP which currently includes bi-weekly inspections. Mr. Watts does not currently receive any written or oral evaluations from PIP inspectors, nor have they provided him with a list or explanation of ways to "improve" his farm practices. There is no end-date for the PIP, and Perdue has offered no information as to how Mr. Watts may remove himself from the PIP. *FN15  Perdue does not explain how this continued scrutiny is consistent with its newly voiced allegations that Mr. Watts "staged" the CIWF video*. See Resp. Statement, at 1, 9.
> *FN15 The only option Perdue has presented to Mr. Watts as a way to end the PIP is for Mr. Watts to terminate his relationship with Perdue*. See Resp. Ex. 18, Perdue Dec. 29, 2014 letter ("I take this opportunity to remind you that the growing contract allows you to terminate your relationship with us at any time and seek a contract with another poultry company or use your houses for other business purpose that you may find more rewarding.")

(Emphasis added).

## VI.  **NEXUS/CONTRIBUTING FACTOR**

64.    Respondent was aware of Complainant's use of public reporting channels to CIWF and the New York Times.

65.    Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, hours after he reports to this public channel were published.

*Supplemental Complaint*                    20

66.     The letter placing Complainant on a PIP was issued by Respondent just over three weeks later, on December 29, 2014.

67.     In the PIP letter, Respondent attributed its decision to audit Complainant's farm and place Complainant under a PIP to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent … with Perdue standards" particularly concerning.  This is direct evidence of contributing factor.

68.     In said letter, Respondent suggested it did not find any problematic conditions during its recent inspections of Complainant's farm, and described the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

69.     The flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

70.     Prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation and considered Complainant to be one of its top producers.

71.     The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's adverse actions against him from December 5, 2014, up to and including his constructive discharge on January 26, 2016.

*Supplemental Complaint*                              **21**

## VII.    CLAIM FOR RELIEF

72.        21 U.S.C. § 399d(a)(1) of the Food Safety Modernization Act created three types of statutorily protected channels for reporting and disclosing covered food safety and integrity issues: (1) an internal channel "to the employer"; (2) an external channel to any agency, department or instrumentality of "the Federal Government", which by definition includes Congress; and a second external channel to "the attorney general of a State"; and (3) a public channel to NGOs or the media who, in publishing a complainant's disclosures that may be received by one of the internal or external reporting channels, thereby function as "any person acting pursuant to a request of the employee" in "caus[ing] to be provided" said disclosures by Complainant.

73.  CIWF and the New York Times constituted such a protected public reporting channel, and both constituted a "person acting pursuant to a request of the employee".

74.  Complainant engaged in protected activity under 21 U.S.C. § 399d, the Food Safety Modernization Act's employee protection provision, when he made the above-described food integrity disclosures to the described public reporting channel.  He reasonably believed that in so doing he disclosed information relating to a violation, act or omission of the Respondent under the Food, Drug and Cosmetics Act, 21 U.S.C. 391 et seq., or an order, rule, regulation, standard, or ban thereunder (hereafter FDCA).

75.        Complainant reasonably believed that he was a covered employee under § 399d.

*Supplemental Complaint*                              **22**

76.     The FDCA prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the FDCA food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). It is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4).

77.     Filing a whistleblower complaint with OSHA is protected activity under § 399d(a)(1) because that agency is an instrumentality of the "Federal Government", and said complaint was information "provided [or] caused to be provided to the *** Federal Government."

78.     Respondent had knowledge of Complainant's protected activity in using the public channel described above, and in using the OSHA whistleblower protection channel provided by § 399d(b).

79.  Said protected activity was a contributing factor in all of Respondent's adverse actions against Complainant.  The PIP itself and suggesting that Complainant terminate his contract were directly referenced in the PIP letter.  The April 2015 disparagements of Complainant were made in direct response to his OSHA whistleblower complaint.  Both contributed to the constructive discharge.

## VIII.   PRAYER FOR RELIEF

80.     Complainant seeks compensatory damages for lost earnings, compensation and capital resulting from the loss of his employment with contract with Perdue.

*Supplemental Complaint*                          **23**

81.    Complainant seeks general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above.

82.    Complainant seeks compensatory damages for the loss of income and expense incurred caused by the above-described delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

83.    Complainant seeks an award of pre-judgment or pre-award interest on the economic damages alleged above.

84.    Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

85.    Complainant seeks reasonable costs and attorney's fees, including the costs of any expert witness fees.

86.    Complainant seeks all other relief available at law and equity.

Respectfully submitted,

s/Thad M. Guyer
Thad M. Guyer, Esq.
Of Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006

Thad M. Guyer
Stephani L. Ayers

*Supplemental Complaint*                      **24**

T.M. Guyer and Ayers & Friends, P.C.
P.O. Box 1061, Medford, OR 97501
Tel. (Stephani): 813-382-7865

Email: Thad@guyerayers.com

Attorneys for Complainant

*Supplemental Complaint*                    **25**

# Exhibit 10

JA214

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES
# NEWPORT NEWS, VIRGINIA

**Issue Date: 21 October 2022**

CASE NO.:   2016-FDA-00003

*In the Matter of:*

CRAIG WATTS,

*Complainant,*

*v.*

PERDUE FARMS, INC.,

*Respondent.*

_____

## ORDER DENYING MOTION TO DISMISS

This proceeding arises out of a complaint filed under the employee protection provisions of the Food Safety and Modernization Act (FSMA). 21 U.S.C. § 399d. On February 19, 2015, Craig Watts (Complainant) filed a Notice of Whistleblower Complaint (Complaint) with the United States Department of Labor, Occupational Safety and Health Administration (OSHA) alleging Perdue Farms, Inc. (Respondent) unlawfully retaliated against him in violation of the FSMA. On February 8, 2016, OSHA issued its finding letter. OSHA concluded that Respondent was a covered entity but Complainant was not a covered employee. On March 18, 2016, Complainant filed a letter objecting to OSHA's determination and requesting a hearing before the Office of Administrative Law Judges (OALJ).

The case was originally assigned to Administrative Law Judge Dana Rosen. On January 6, 2017, Judge Rosen issued a Decision and Order Granting Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction. Complainant appealed the decision to the Administrative Review Board (Board). The Board affirmed Judge Rosen's dismissal of the case. *Watts v. Perdue Farms, Inc.*, ARB No. 2017-0017 (Mar. 5, 2019). Complainant appealed the Board's decision to the United States Court of Appeals for the Fourth Circuit (Fourth Circuit). The Fourth Circuit remanded the case to the Board for consideration of the United States Food and Drug Administration's (FDA) briefing. *Watts v. U.S. Dept. of Labor*, No. 19-1487 (4th Cir. Jan. 7, 2020). The Board reconsidered and vacated its order affirming Judge Rosen's decision, held

- 2 -

Respondent is a covered entity, and remanded the case for further proceedings. *Watts*, ARB No. 2017-0017 (May 28, 2020).

On December 11, 2020, Judge Rosen issued an order setting a briefing schedule. In light of the complex issues presented in this matter, the briefing schedule allowed the parties to submit briefs on their positions and the legal issues. On January 29, 2021, the FDA timely filed a brief presenting its position for consideration as directed by the Fourth Circuit. On the same day, Respondent also submitted a brief seeking dismissal of the case. (R. Brief)

This matter was reassigned to the undersigned on April 21, 2022. On April 25, 2022, Complainant filed an unopposed motion for leave to file a supplemental complaint, along with its Supplemental Complaint (Supp. Comp.). On May 4, 2022, I issued an order granting Complainant's motion and setting a briefing schedule. On June 3, 2022, Respondent filed a Motion to Dismiss (Motion). On July 6, 2022, Complainant filed an Opposition to Respondent's Motion to Dismiss (Opp.). On July 18, 2022, the FDA filed an amicus statement. On July 22, 2022, Respondent filed a consent motion for leave to file a reply and its Reply to Complainant's Opposition (Reply).

**Discussion**

"A party may move to dismiss part or all of the matter for reasons recognized under controlling law, such as lack of subject matter jurisdiction, failure to state a claim upon

- 3 -

JA217

which relief can be granted, or untimeliness." 29 C.F.R. § 18.70(c). When ruling on a motion to dismiss, the administrative law judge must "accept the non-movant's factual allegations as true and draw all reasonable inferences in his favor." *Mawhinney v. Trans. Workers Union, Local 591*, ARB No. 2019-0018, OALJ No. 2012-AIR-00014, slip op. at 2 (Dec. 9, 2020).

Respondent argues Complainant's Complaint and Supplemental Complaint fail as a matter of law and should be dismissed with prejudice for four general reasons. First, Complainant did not "blow the whistle" under the FSMA. Second, the Complaint and Supplemental Complaint contain no allegations respecting animal feed. Third, Complainant was an independent contractor, not an employee. Fourth, Respondent did not retaliate against Complainant.

As discussed below, none of these arguments are persuasive. Respondent's motion to dismiss will, therefore, be denied.

**I. Whether Complainant's Actions Qualify as Whistle Blowing under the FSMA.**

Respondent argues Complainant did not blow the whistle under the FSMA because he did not provide or cause to be provided information to Respondent, the federal government, or a state attorney general. *See* Motion at 9-12. Respondent argues Complainant is attempting to re-write the statute to include a "public channel" to

- 4 -

non-governmental organizations and media outlets that publish a complainant's disclosures. *See id.* at 10-11.

Based on my review of the Complaint and Supplemental Complaint, Complainant adequately alleges he engaged in FSMA-protected activity. The FSMA protects an employee if he or "any person acting pursuant to a request of the employee" "provided, [or] caused to be provided … to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of [the Federal Food, Drug and Cosmetic Act (FDCA)]." 21 U.S.C. § 399d(a)(1); *see also* 21 U.S.C. § 301.[1] The employee is also protected from discrimination if he "objected to … any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed" constituted a violation of the FDCA. 21 U.S.C. § 399d(a)(4).

Accepting the allegations as true and drawing all reasonable inferences in the non-moving party's (Complainant's) favor, Complainant reasonably believed Respondent's use of the phrase "Humanely Raised" on Respondent's product labels was misleading to consumers and Respondent's animal husbandry practices compromised the chickens' welfare and increased their risk of becoming contaminated with and developing infections from salmonella, E. coli, and other harmful bacteria,

---

[1] The FDCA was enacted, among other things, to protect the public health by ensuring that foods are safe, wholesome, sanitary, and properly labeled. 21 U.S.C. § 393(b)(2)(A). The FSMA was enacted to amend various portions of the FDCA, 21 U.S.C. § 301 *et seq.*

- 5 -

which, in turn, posed a threat to consumers. Supp. Comp. ¶¶ 25, 33. The FDCA prohibits "[t]he adulteration or misbranding of any food … in interstate commerce." 21 U.S.C. § 331(b). Food is considered "adulterated" if "it bears or contains any poisonous or deleterious substance which may render it injurious to health," "if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," or "if it is, in whole or in part, the product of a diseased animal or of an animal which has died otherwise than by slaughter." 21 U.S.C. § 342(a)(1),(4),(5). Food is considered "misbranded" if "[i]ts labeling is false or misleading in any particular." 21 U.S.C. § 343(a). The FDA posits live poultry qualifies as "food" under the FDCA. *See* Amicus Statement, Attachment A (FDA Amicus Brief) at 7-23. Accepting the FDA's position as persuasive, I conclude Complainant reasonably believed Respondent violated the FDCA.

Respondent takes issue with Complainant not raising these allegations to Respondent directly (or to the federal government or a state attorney general directly ). R. Brief at 11-12; Motion at 10-11. Respondent argues Complainant is attempting to re-write the statute to protect reports made to non-governmental organizations and media outlets. *Id.* Respondent contends Complainant knew the correct channels to report concerns but chose not to utilize them. *Id.* Furthermore, Respondent argues the decision of the Court of Appeals for the Ninth Circuit (Ninth Circuit) in *Tides v. Boeing Co.*, 644 F.3d 809 (9th Cir. 2011) confirms Complainant's arguments are "frivolous." Reply at 6.

- 6 -

In *Tides*, the Ninth Circuit rejected the argument that disclosures of perceived violations of the Sarbanes-Oxley Act (SOX) to a newspaper were protected "because reports to the media may eventually 'cause information to be provided' to members of Congress or federal law enforcement or regulatory agencies." 644 F.3d at 815. The Ninth Circuit declined to adopt – what it described as – a "boundless interpretation" of 18 U.S.C. § 1514A(a)(1), and contrasted the SOX with other whistleblower statutes, such as the federal Whistleblower Protection Act (WPA), 5 U.S.C. § 2302, that protect reports to the media. *Id.* "When Congress wants to protect the disclosure of any information to any entity," the court stated, "it knows how to do so." *Id.*

The Ninth Circuit's interpretation of the phrase "cause to be provided" in the SOX is not binding upon this tribunal, and its analysis is not persuasive. The law does not require direct complaints from the employee to one of the three enumerated entities. The FSMA explicitly protects an employee from retaliation if "*any person* acting pursuant to a request of the employee" "provided" or "*caused to be provided,*" "to the employer, the Federal Government, or the attorney general of a State information relating to any violation of" the FDCA. 21 U.S.C. § 399d(a)(1) (emphasis added). The Merriam-Webster Dictionary defines the word "provide" as a verb meaning "to supply or make available (something wanted or needed)," or "to make something available to,"[2] and it defines the word "cause" as a verb meaning "to serve as a cause or occasion of."[3]

---

[2] Provide, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/provide.

[3] Cause, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/cause#dictionary-entry-2.

- 7 -

Black's Law Dictionary, likewise, defines "cause" as a verb meaning "[t]o bring about or effect."[4] Applying a plain and ordinary meaning of the text, the statute protects an employee from discrimination if the employee, or someone acting at his behest, supplied information about a violation of the FDCA, or made such information available, to his employer, the federal government, or a state attorney general. The employee is also protected if the conduct of the employee or his agent brought about or served as the cause of information about a violation of the FDCA being made available to the employer, federal government, or state attorney.

In summary, disclosures to a third-party (including non-governmental organizations and the media) qualify for legal protection under the FSMA, so long as the third-party published, pursuant to the employee's request, the employee's complaint about a violation of the FDCA, and the complaint was then supplied or made available to the employer, the federal government, or a state attorney general, as a consequence of the third-party's publication of the complaint.

Based on my review of the Complaint and Supplemental Complaint, Complainant adequately alleges Compassion in World Farming (CWIF), an animal welfare organization, and the *New York Times*, a world-famous newspaper, caused information about potential violations of the FDCA to be provided to Respondent. In late-May 2014, Complainant invited CWIF to observe and film his facilities at two points during the flock

---

[4] Cause, Black's Law Dictionary (11th ed. 2019).

- 8 -

growth cycle. Complaint ¶ 29-30; Supp. Comp. ¶¶ 35-36. On December 3, 2014, the *New York Times* published a column by Nicholas Kristoff, which featured CWIF's footage from Complainant's facilities. Complaint ¶ 32; Supp. Comp. ¶ 37.[5] In his column disseminating the CWIF video, Mr. Kristoff criticized Respondent's use of "Humanely Raised" on its labeling and commented upon the poor health of the chickens depicted in the video. *Id.* On December 4, 2014, the day after the column was published, Respondent dispatched inspectors to Complainant's farm, and inspections continued on a near-daily basis until December 22, 2014, when the chickens reached the end of their grow cycle and were removed from Complainant's farm. Complaint ¶ 36; Supp. Comp. ¶¶ 41, 44. One can reasonably infer Respondent learned of the Complainant's complaints by virtue of CWIF's acts and publication of the *New York Times* column because Respondent dispatched inspectors to Complainant's facilities the day after the video and column were published.

I also conclude the Complaint and Supplemental Complaint adequately allege protected activity under 21 U.S.C. § 399d(a)(4). Complainant objected to Respondent's practices, and Respondent even acknowledged Complainant's complaints about mislabeled products and animal welfare in its position letter to OSHA. *See* Supp. Comp. ¶ 33; Opp. at 2-3 (citing Respondent's Response to OSHA, pp. 7-8). Further, Complainant alleges that his mindset in reporting to CIWF was to get information to the government and to

---

[5] *See* Nicholas Kristoff, New York Times, Abusing Chickens We Eat, available at https://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html.

- 9 -

Respondent. Complaint Respondent acknowledged that Complainant "expected," "hoped," and "believed" that the video would prompt an investigation of Respondent. Complaint ¶ 31; R. Brief at 11.

Thus, accepting Complainant's factual allegations as true and drawing all reasonable inferences in his favor, Complainant provided or caused to be provided information to his employer and/or government officials. Accordingly, Respondent's motion to dismiss on the ground that Complainant did not "blow the whistle" under the FSMA is rejected.

**II. Whether the Complaint Must Allege Whistleblowing Activity Related to Animal Feed.**

Respondent argues that the Complaint and Supplemental Complaint should be dismissed with prejudice because it contains no allegations respecting animal feed provided by Respondent, which, it posits, formed "the sole very narrow basis found by" the Administrative Review Board for jurisdiction under the FSMA. Motion at 13.

Respondent's argument rests upon a flawed understanding of the Board's order following remand from the Fourth Circuit. In that order, the Board held Respondent is "an entity who manufactures, process[es], transports, or distributes 'food' within the meaning of the Act and thus is a covered entity." *Watts*, ARB No. 2017-0017, slip op. at 6 (May 28, 2020). In no way did the Board limit the subject-matter of Complainant's complaints to just those related to animal feed.

Case 5:24-cv-00477-BO-RJ   Document 6-11   Filed 08/23/24   Page 11 of 19

The FDA, in its brief, posited *both* that live animals on a farm intended for use as food are regulated under the FDCA *and* that "Animal Food is Food" under the FDCA. *See* FDA Amicus Brief at 7-25. This interpretation of the FDCA would not limit Complainant solely to whistleblowing related to animal feed. Accepting the FDA's position as persuasive and for the reasons discussed above, I conclude Complainant has adequately alleged he engaged in FSMA protected activity.

Accordingly, Respondent's argument that the Complaint and Supplemental Complaint should be dismissed because it lacks any allegations about animal feed is rejected.

**III. Whether Complainant Was an Employee or an Independent Contractor**

Respondent contends the Complaint and Supplemental Complaint should be dismissed because Complainant was an independent contractor, rather than an employee. R. Brief at 12-15; Motion at 14-17. Complainant argues that the question of whether he was an independent contractor or an employee requires a fact-intensive analysis that cannot be resolved at the motion to dismiss or summary decision stages. *See* Opp. at 6-11. In its reply, Respondent chastises Complainant for not offering "relevant support" for his position that the question of whether a complainant is an employee or independent contractor requires a fact-intensive inquiry. Reply at 9. This argument reflects a misunderstanding of the relevant law and basic civil procedure.

The FMSA does not define "employee." The Supreme Court of the United States has held when a statute does not helpfully define the term "employee," courts should apply a common-law definition. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). Courts have applied many tests, with numerous factors, across a myriad of contexts, to determine whether an individual is an employee or an independent contractor. *See Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 & nn. 18-31 (1989). Section 220(2) of the Restatement (Second) of Agency, which many courts have looked to for guidance, recommends consideration of ten *non-exhaustive* factors: (a) the extent of control which, by the agreement, the putative employer may exercise over the details of the work; (b) whether or not the individual is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the putative employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person performs the work; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of employer and employee; and (j) whether the principal is or is not in business. Courts have recognized that all of the factors of the relationship must be assessed and weighed with no factor being decisive.

*See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 319 (1992) (citations omitted); *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997). It is

- 12 -

well-established that the determination of whether an individual is an employee or an independent contractor is a highly fact-specific finding. *Id.*

Complainant has identified certain factors that weigh in his favor. Although other factors may ultimately weigh against Complainant, that cannot meet the standard for granting a motion to dismiss. At the motion to dismiss stage, I do not weigh the evidence and render a judgment; rather, I must accept all factual assertions contained in the Complaint and Supplemental Complaint and draw all reasonable inferences in Complainant's favor. Based on my review of the Complaint and Supplemental Complaint, I conclude Complainant adequately alleges Respondent exercised sufficient control over the details of Complainant's work and farm operation such that Complainant could be considered Respondent's "employee" at common law. *See* Complaint ¶¶ 3-6, 12-14, Supp. Comp. ¶¶ 8-11, 16-18, 27, 31-32, 45-46.

Accordingly, Respondent's argument that the Complaint should be dismissed because Complainant was an independent contractor is rejected.

### IV. Respondent Did Not Retaliate Against Complainant.

Lastly, Respondent argues the Complaint and Supplemental Complainant should be dismissed with prejudice because Respondent did not retaliate against Complainant. Motion at 17-18. Respondent contends increased scrutiny, additional training, and the

- 13 -

delay in placement of a new flock, which resulted in a loss of $4,500, do not constitute retaliation under the FSMA. *Id.* at 18. In its reply, Respondent argues Complainant did not dispute he was not retaliated against by Respondent. Reply at 10-11. It was unnecessary for Complainant to respond to this meritless argument. Furthermore, it is telling Respondent did not cite any relevant precedent in raising this argument.

The FSMA prohibits a covered employer from "discharg[ing] … or otherwise discriminat[ing] against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee" engaged in protected activity. 21 U.S.C. § 399d(a). The Supreme Court held that to prove retaliation, a complainant must show "a reasonable employee would have found the challenged action materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co.*, 548 U.S. 53, 68 (2006) (citations omitted). Based on my review of the Complaint and Supplemental Complaint, Complainant adequately alleges he was subject to several materially adverse actions as a result of his whistleblowing activities, including constructive discharge, increased scrutiny, implementation of a performance improvement plan, additional training, and the delay in placement of a new flock, which resulted in a financial loss of $4,500. *See* Complaint ¶¶ 36-43; Supp. Compl. ¶¶ 41-71.

Accordingly, I reject Respondent's allegation that there is no evidence of retaliation.

- 14 -

**ORDER**

For the reasons set forth above, Respondent's consent motion for leave to file a reply to

Complainant's opposition is GRANTED; and Respondent's motion to dismiss

Complainant's supplemental complaint is DENIED.


**SO ORDERED.**


PAMELA A. KULTGEN
Administrative Law Judge

PAK/PML/jcb
Newport News, Virginia

- 15 -

## SERVICE SHEET

Case Name:  **WATTS_CRAIG_v_PERDUE_FARMS_INC_**

Case Number: **2016FDA00003**

Document Title: **Order Denying Motion to Dismiss**

I hereby certify that a copy of the above-referenced document was sent to the following this 21st day of October, 2022:

**JOAN BUCHANAN**
Paralegal Specialist

OSHA-Region 4 Regional Administrator
Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
*{Electronic - Regular Email}*

Atlanta Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Sam Nunn Federal Center
Room 7T10
61 Forsyth Street, S.W.
ATLANTA GA 30303
*{Electronic - Regular Email}*

Thad Guyer, Esq
thad@guyerayers.com
TM Guyer and Ayers & Friends, P.C.
116 Mistletoe Street
PO Box 1061
MEDFORD OR 97501
*{Electronic - Regular Email}*

Stephen R Freeland, Esq
SRFreeland@Venable.com
Venable, LLP
600 Massachusetts Avenue, N.W.
WASHINGTON DC 20001
*{Electronic - Regular Email}*

J. Larry Stine, Esq
jls@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, NE
Suite 400
ATLANTA GA 30326
*{Electronic - Regular Email}*

Carolyn Jasperse
Carie.Jasperse@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4524
SILVER SPRING MD 20993
*{Electronic - Regular Email}*

**SERVICE SHEET** continued (2016FDA00003 Order)        Page: 2

Michael Helbing
Michael.Helbing@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4421A
SILVER SPRING MD 20993
        *{Electronic - Regular Email}*

Elizabeth K Dorminey
EKD@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, PC
3400 Peachtree Road NE
Suite 400
ATLANTA GA 30326
        *{Electronic - Regular Email}*

Mitchell Mirviss, Esq.
mymirviss@Venable.com
Venable LLP
750 East Pratt Street
Suite 900
BALTIMORE MD 21202
        *{Electronic - Regular Email}*

Stephen Freeland
srfreeland@venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
        *{Electronic - Regular Email}*

Roger A Colaizzi, Esq.
racolaizzi@Venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
        *{Electronic - Regular Email}*

Candace A Spencer
pr@candaceaspencer.com
Rural Advancement Foundation International-USA
P.O. Box 640
PITTSBORO NC 27312
        *{Electronic - Regular Email}*

Stephani L Ayers
stephani@guyerayers.com
TM Guyer and Ayers & Friends
116 Mistletoe
PO Box 1061
MEDFORD OR 97501
        *{Electronic - Regular Email}*

JA232

# Exhibit 11

JA233

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

IN THE MATTER OF:                               *

CRAIG WATTS                                     *

      Complainant,                         *

    v.                                        *        Case No. 2016-FDA-00003

PERDUE FARMS INC.,                              *

      Respondent.                          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**RESPONDENT PERDUE FARMS INC.'S APPLICATION FOR**
**ISSUANCE OF THIRD-PARTY SUBPOENAS**

Pursuant to 29 C.F.R. § 18.56, Respondent Perdue Farms Inc. ("Perdue"), through counsel, requests the issuance of the following third-party subpoenas to produce documents and attend depositions:

1) Subpoena to Compassion in World Farming, Inc. to produce documents, attached hereto as Exhibit A;

2) Subpoena to Compassion in World Farming, Inc. to appear and testify at a deposition, attached hereto as Exhibit B;

3) Subpoena to Leah Garces to produce documents, attached hereto as Exhibit C; and

4) Subpoena to Leah Garces to appear and testify at a deposition, attached hereto as Exhibit D.

The documents and information that the subpoenas seek are relevant to this case as Mr. Watts alleges that he reported his allegations in his Complaint to Leah Garces, who at the time was the executive director of Compassion in World Farming, Inc ("CIWF"). *See* Supplemental

Whistleblower Complaint at ¶ 34. Mr. Watts further alleges that CIWF filmed on Mr. Watts' farm, edited this footage, and made this footage available for publication. *Id*., ¶¶ 35-37.

Having met all of the requirements of 29 C.F.R. § 18.56(a), Perdue respectfully request that the Court issue the above-referenced subpoenas.

Dated: March 11, 2024                                   Respectfully submitted,


                                    _____*/s/ Roger A. Colaizzi*_____
                                    Roger A. Colaizzi
                                    Kristin M. Koger
                                    VENABLE LLP
                                    600 Massachusetts Ave., N.W.
                                    Washington, DC 20001
                                    202-344-4000
                                    202-344-8300 (fax)
                                    RColaizzi@Venable.com
                                    KMKoger@Venable.com

                                    Mitchell Y. Mirviss
                                    VENABLE LLP
                                    750 E. Pratt St., Suite 900
                                    Baltimore, MD 21202
                                    410-244-7400
                                    410-244-7742 (fax)
                                    MYMirviss@Venable.com

                                    *Counsel for Respondent Perdue Farms Inc.*

2

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of March, 2024, a true and correct copy of the foregoing Respondent Perdue Farms Inc.'s Application for Issuance of Third-Party Subpoenas was served on the following via e-mail:

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street, P.O. Box 1061
Medford, OR 97501
thad@guyerayers.com
stephani@guyerayers.com
*Counsel for Complainant*

Carolyn Jasperse
Nicole Pepperl
U.S. Dept. of Health & Human Services
10903 New Hampshire Avenue
White Oak Building 31
Room 4524
Silver Spring, MD 20993
carie.jasperse@fda.hhs.gov
nicole.pepperl@fda.hhs.gov

Candace A. Spencer
Rural Advancement Foundation
International-USA
P.O. Box 640
Pittsboro, NC 27312
pr@candaceaspencer.com

Director of Whistleblower Programs
U.S. Department of Labor
Room N 4618 FPB
200 Constitution Ave., N.W.
Washington, DC 20210
osha.dwpp@dol.gov

Mary McDonald
Counsel for Whistleblower Programs
Division of Fair Labor Standards
Department of Labor
200 Constitution Ave., N.W.
Room N-2716, FPB
Washington, D.C. 20210
mcdonald.mary@dol.gov

J. Larry Stine
Elizabeth K. Dorminey
Wimberly, Lawson, Steckel, Schneider
  & Stine, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, GA 30326
jls@wimlaw.com
ekd@wimlaw.com

Karen Gray
Government Accountability Project
1612 K Street, N.W.
Suite 1100
Washington, D.C. 20006
kareng@whistleblower.org

<div align="right">

*/s/ Kristin M. Koger*
Kristin M. Koger
</div>

3

# Perdue's Application for Issuance of Third-Party Subpoenas

# **<u>EXHIBIT A</u>**

## (CIWF Documents Subpoena)

(04/2020) OALJ Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises                              Page 1 of 3

## United States Department of Labor
## OFFICE OF ADMINISTRATIVE LAW JUDGES

In Re:

Craig Watts

_____

(Plaintiff/Complainant/Claimant)

v.

Perdue Farms Inc.                                                OALJ Case No:    2016-FDA-00003

_____

(Defendant/Respondent/Employer/Carrier)

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES

To:      Compassion in World Farming, Inc.
Address: 211 East 43rd Street, 7th Floor
         New York, NY 10017

☒   *Production:*  **YOU ARE COMMANDED** to produce the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material at your address set forth above and at the following Date  March 29, 2024        and Time  5:00 PM                :

See Attachment A.

☒   *Alternate to Personal Production:*  You may avoid personally producing the described items at your address set forth above by delivering copies of the described items to the following described location on or before the date and time set forth above.

         Place of Production:   ATTN: Kristin M. Koger, Venable LLP, KMKoger@Venable.com
                                600 Massachusetts Avenue, NW, Washington, DC 20001

☐   *Inspection:*  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object on it.

         Place of Inspection:                                           Date:

                                                                        Time:

The following provisions of the Code of Federal Regulations (C.F.R.) are attached - 29 C.F.R. §§18.56(c) and 18.52(a), relating to your protection as a person subject to a subpoena, and 29 C.F.R. §§18.56(d) and 18.56(e), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

This subpoena is issued upon the application of (indicate attorney/representative for named party):

(Person requesting subpoena)                                    (Address and Telephone Number)

                                                                Firm Name    Venable LLP

Name        Kristin M. Koger                                    Address   600 Massachusetts Ave, NW

Bar Number  DC No. 473438                                       City      Washington

Phone Number  2023444162                                        State  DC          Zip Code  20001

IN WITNESS WHEREOF the undersigned United States Department of Labor Administrative Law Judge has digitally signed this subpoena.



_____
Signature of U.S. Administrative Law Judge

4/2020) OALJ Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises                     Page 2 of 3

---

## NOTICES

---

**NOTICE:** This subpoena is only valid in proceedings before the Office of Administrative Law Judges or Office of Workers' Compensation Programs. To be valid, this subpoena must bear the digital signature of a Department of Labor (DOL) administrative law judge.

**HIPAA NOTICE:** In regard to the Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act of 1996, if this subpoena does not bear the digitized signature of a DOL administrative law judge, it is not valid under 45 C.F.R. §§164.512(e), 164.512(f) or 164.512(l).

**29 C.F.R. §18.56 Subpoenas(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions*. A party or representative responsible for requesting, issuing or serving a subpoena must take reasonable steps to avoid imposing undue burden on a person subject to the subpoena. The judge must enforce this duty and impose an appropriate sanction.

(2) *Command to Produce Materials or Permit Inspection*.
   (A) *Appearance Not Required*. A person commanded to produce documents, electronically stored information, or tangible things, or to permit inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition or hearing.
   (B) *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or representative designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises - or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served
     (i) at any time, upon notice to the commanded person, the serving party may move the judge for an order compelling production or inspection.
     (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena*.
   (A) *When Required*. On timely motion, the judge must quash or modify a subpoena that:
     (i) fails to allow a reasonable time to comply;
     (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person - except that, subject to paragraph (c)(3)(B)(iii) of this section, the person may be commanded to attend the formal hearing;
     (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     (iv) subjects a person to undue burden.
   (B) *When permitted*. To protect a person subject to or affected by a subpoena, the judge may, on motion, quash or modify the subpoena if it requires:
     (i) disclosing a trade secret or other confidential research, development, or commercial information;
     (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
     (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend the formal hearing.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:
   (A) *Documents*. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified*. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is usually maintained or in a reasonably usable form or forms.

   (A) *Electronically Stored Information Produced in Only One Form*. The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information*. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or expense. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the judge may nonetheless order discovery from such sources if the requesting party show good cause. The judge may specify conditions for the discovery.

(2) *Claiming Privilege or Protection*.
   (A) *Information Withheld*. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as hearing-preparation material must:
     (i) expressly make the claim; and
     (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced*. If information produced in response to a subpoena is subject to a claim of privilege or of protection as hearing-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the judge *in camera* for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Failure to Obey**. When a person fails to obey a subpoena, the party adversely affected by the failure may, when authorized by statute or law, apply to the appropriate District Court to enforce the subpoena.

**29 C.F.R. §18.52 Protective orders**

**(a) In General**. A party or person from whom discovery is sought may file a written motion for a protective order. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the affected parties in an effort to resolve the dispute without the judge's action. The judge may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
(1) Forbidding the disclosure or discovery;
(2) Specifying terms, including a designation of the time and place, for the disclosure or discovery;
(3) Prescribing a discovery method other than the one selected by the party seeking discovery;
(4) Forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
(5) Designating the persons who may be present while discovery is conducted;
(6) Requiring that a deposition be sealed and only opened on the judge's order;
(7) Requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and
(8) Requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the judge directs.

Case 5:24-cv-00477-BO-RJ     Document 6-12     Filed 08/23/24     Page 7 of 156

JA239

(04/2020) OALJ Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises          Page 3 of 3

## PROOF OF SERVICE

On                                    I received this subpoena and served it pursuant to 29 CFR §18.56(b) as follows:

_____          _____
Person served (print name)                Date of Service


_____          _____
Place of Service                          Manner of Service

☐  I have also tendered to the witness fees for one day's attendance and the mileage allowed by law, in the amount of
   $ _____

☐  I have not tendered witness fees for one day's attendance and for the mileage allowed by law.


## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

_____          Address:
Signature of Server          Date

_____          City: _____  State: ____  ZIP: _____
Name of Server (Print Name)

## ATTACHMENT A

Pursuant to 29 C.F.R. § 18.56, Respondent Perdue Farms Inc. ("Perdue"), by and through counsel, hereby requests Compassion in World Farming, Inc. ("CIWF") to produce the documents described below for inspection and copying as specified in the subpoena ("Subpoena"), in accordance with the Instructions and Definitions below.

## DEFINITIONS

1. "Communications" means any statement, utterance, notation, discussions, transfer or exchange of information of any nature whatsoever, by or to whomever, whether oral or written, or whether face-to-face, by telephone, virtually (for example, Google Meet, Microsoft Teams, Slack, Webex, or Zoom meetings), by mail, personal delivery, or otherwise, letters, correspondence, e-mails, conversations, memoranda, meetings, interviews, consultations, agreements, and other understandings.

2. "Document" shall mean all material defined in Federal Rule of Civil Procedure 34 and shall have the broadest meaning possible.

3. "Relating to" means showing, concerning, disclosing, referring, averring to, in connection with, comprising, evidencing, pertaining, constituting, or reviewing, in whole or in part.

4. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5. "Compassion in World Farming, Inc.," "CIWF," "you," or "your" means Compassion in World Farming, Inc., its directors, officers, owners, employees and agents.

6. "Complaints," shall refer to the Notice of Whistleblower Complaint filed in *Watts*

1

*v. Perdue Farms, Inc.*, before the United States Department of Labor Occupational Safety and Health Administration on February 23, 2015 (attached hereto as "Exhibit A") and the Supplemental Whistleblower Complaint filed in *Watts v. Perdue Farms, Inc.*, Case No. 2016-FDA-00003, before the United States Department of Labor, Office of Administrative Law Judges, filed on April 25, 2022 (attached hereto as "Exhibit B").

7.     The word "Complainant," refers to Craig Watts and any persons acting or purporting to act on Complainant's behalf including his counsel, representatives, agents, employees, consultants, or investigators and their counsel, employees, representatives, agents, investigators or consultants.

8.     "C&A Farms" shall refer to the farm/entity owned and operated by Complainant, as discussed in his Complaint.

9.     "Respondent" or "Perdue" means Perdue Farms Inc., its agents, employees, officers, directors, principals and other representatives, and its predecessors, successors, affiliates, subsidiaries, parent corporations or assigns, collectively and singularly, and their agents, employees, officers, directors, principals and other representatives.

<u>**INSTRUCTIONS**</u>

1.     Each document request listed herein shall be continuing in nature and responses thereto shall be modified or supplemented to include any additional documents, information, knowledge, or data responsive to such request that is later discovered, created or received by you or your agents.

2.     You are required to produce all documents that are in your possession, custody or control, or those of any of your representatives or that are reasonably obtainable from other sources.

2

3.      Each document request herein should be construed as a request for production of the document in its entirety, without redaction or expurgation, except in cases of attorney-client privilege.

4.      If any document or portion of any document covered by these requests is withheld from production on the grounds of privilege, please furnish a privilege log with the information required under Fed. R. Civ. P. 26(b)(5) for each such document or portion of the document that is withheld.

5.      Unless stated otherwise, the relevant time period for these Requests shall be from January 1, 2012 through the present.

6.      With the exception of Excel files and executable programs, you shall produce each electronic document: (a) as a Bates-stamped 300 dots per inch (dpi) single-page Group IV TIFF image named with the unique Bates number of the page of the document in question, followed by the extension "TIF"; (b) with an Opticon cross-reference file that enables the document to be uploaded and viewed using standard litigation support software Concordance®; (c) with Metadata in a standard Concordance® delimited file; and (d) with extracted text and/or Optical Character Recognition ("OCR") as a separate .txt file for each document named according to the beginning Bates number of the document to which it relates.  Excel files and executable programs should be produced in their native format and renamed to reflect their associated Bates number.

## DOCUMENT REQUESTS

### Document Request No. 1

Documents referring or relating to, or constituting, communications between any person employed by CIWF and Craig Watts.

3

**Document Request No. 2**

Documents referring or relating to the allegations in the Complaints.

**Document Request No. 3**

Documents referring or relating to, or constituting, communications between CIWF and the Government Accountability Project relating to Craig Watts or the Complaints.

**Document Request No. 4**

Documents referring or relating to, or discussing, any visit by CIWF to C&A Farms, including but not limited to, visits to take video footage, photographic or other images at C&A Farms.

**Document Request No. 5**

Documents referring or relating to, or discussing, the production and distribution of any video produced by CIWF that included video footage, photographic or other images taken at C&A Farms.

**Document Request No. 6**

Documents referring or relating to, or constituting, communications between CIWF and media outlets or journalists, including but not limited to the New York Times, regarding any video, photographic or other images produced by CIWF that included video footage, photographic or other images taken at C&A Farms.

**Document Request No. 7**

All video and audio recordings and images of or regarding Complainant, his Complaint, C&A Farms, or Respondent, including all unedited, "raw", unedited video footage and audio that was recorded. This includes all video and audio footage, photographic and other images that were recorded to make the video relating to Complainant's poultry farm that CIWF posted on its

4

website, even if the footage or images are not contained in the video that was posted. These video and audio recordings and images must be produced in their native format, with all metadata intact and preserved.

# EXHIBIT A

**UNITED STATES DEPARTMENT OF LABOR**
**OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION**

*In the Matter of*

| | | |
|---|---|---|
| **CRAIG WATTS,** | ) | |
| | ) | |
| *Complainant,* | ) | |
| | ) | |
| *v.* | ) | Case No. |
| | ) | |
| **PERDUE FARMS, INC.,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**NOTICE OF WHISTLEBLOWER COMPLAINT**

Complainant Craig Watts, through his counsel, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

**I.     INTRODUCTION**

1.      This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d, by Complainant, Mr. Craig Watts, against Perdue Farms, Incorporated (hereafter "Respondent"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent in December 2014, and January 2015, in retaliation for activity protected under 21 U.S.C. § 399d.

**II.     JURISDICTION**

2.      This Complaint having been timely filed within 180 days of the adverse actions complained of, OSHA has jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below.

1

## III.   PARTIES

3.      Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where he raises chickens for Respondent under a written contract between the parties. Under this contract, Respondent delivers flocks of chicks to Complainant, who houses and tends to each flock in accordance with standards set by Respondent. Complainant feeds, waters, and cares for those flocks using feed, medications, and other supplies provided by Respondent.

4.      Respondent retains title of each flock at all times, and an agent of Respondent typically visits Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately six weeks.

5.      At the end of flock's growth cycle, Respondent compensates Complainant for his services in accordance with a payment schedule.

6.      The foregoing facts demonstrate that Complainant is an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

7.      At the end of their growth cycle, Respondent's agents pick up the flocks for transport to slaughter and processing facilities owned and operated by Respondent. Respondent transports chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

8.      At these facilities, Respondent slaughters, processes and packages chickens and turkeys for sale to consumers. Respondent is one of the largest producers of poultry products in the United States, and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

9.      Respondent also imports, exports, receives and stores grains and other raw agricultural commodities, which Respondent processes for use in animal feed and pet food.

2

10.    The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

## IV.    FACTUAL ALLEGATIONS

### A.    Complainant's Job, Duties, and Performance

11.    Complainant began raising chickens for Respondent in 1992. In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms, but was asked to sign a new contract with Respondent in 1999, and has been raising chickens for Respondent continuously since then. Complainant currently raises approximately 720,000 chickens per year for Respondent.

12.    Complainant is required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent. These standards impose numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles, and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

13.    An employee of Respondent regularly visits Complainant's farm to ensure that Complainant is maintaining his facilities and tending to flocks in accordance with Respondent's standards. Typically, these visits occur approximately once per week during the flocks' growth cycles. Complainant is known by Ms. Price, Respondent's Growout Supervisor for the region surrounding Complainant's farm, to be one of Respondent's most successful and conscientious farmers.

3

14.     At the end of their growth cycles, Respondent rates flocks in what is referred to as Respondent's "tournament system." Complainant's compensation for each cycle is based in part upon these ratings. Under this system, farmers' performance is measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group. Complainant's flocks consistently receive high ratings, and Complainant has been rated the top producer in his group numerous times.

15.     Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

### B.     Background Facts Relevant to Protected Activity

16.     Several years ago, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant. In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry. The commercial depicted Perdue's Chairman walking through what he purports to be a Perdue chicken farm while extolling the virtues of Perdue's humane treatment of chickens and Perdue "doing the right thing." Perdue's Chairman noted in the commercial that consumers are much more interested in knowing how chickens are raised and treated. Perdue's "Humanely Raised" label was intentionally designed by Perdue to solicit more business from these consumers.

17.     Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised. Perdue alone sets the guidelines for Watts and their other chicken farmers

4

to follow that dictate what the chickens are fed, in what space the flock is to be contained, and what brand and type of equipment Complainant is to use.

18.    For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches, sores and increased risk of infection. Following Respondent's specifications, the chicken houses contain around 30,000 chickens packed into a tight space with barely any room to move.

19.    Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy. For example, many birds arrive at Complainant's farm carrying infections, and die of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink. Many others have leg deformities, impairing their ability to move about freely and comfortably. Following Perdue's specifications, which require the chickens to be raised to grow unnaturally large and fast, the birds in Complainant's facility rapidly grow heavy and lethargic, so that within weeks after placement they spend the vast majority of their time lying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts. The high growth rate makes it difficult for the flock to breathe and walk.

20.    In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was not truthful. As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom are wholly unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified.

5

21.     The conditions described above in paragraphs 17-20 were the result of Respondent's practices and other factors within Respondent's control.

22.     For example, Respondent controls the size of the flocks placed on Complainant's farm, which Respondent adjusts to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density. Respondent crowds too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other. The flock density of flocks placed by Respondent on Complainant's farm has, at times, even exceeded the National Chicken Council's animal welfare guidelines.

23.     A few years ago, Respondent stopped using antibiotics in its North Carolina hatcheries. Respondent has not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

24.     In recent years, Complainant has observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities. Respondent is not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

25.     Respondent's breeding of chickens has resulted in birds that gain weight too rapidly and that have a high rate of leg deformities. Within weeks after placement, these birds grow heavy and lethargic, and spend most of their time laying around on their litter, causing the birds to develop sores and large patches of red, irritated flesh on their breasts.

26.     Several years ago, Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers

6

from opening windows to allow access to sunlight and fresh air. This lack of sunlight and fresh air has impaired the birds' quality of life, causing overheating, increased stress and reduced levels of activity.

27. Respondent prohibits Complainant from administering any antibiotics or other medications to sick birds, and Respondent has refused to administer medication when Complainant has sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

### C.  *Protected Activity*

28. Complainant objected to Respondent's use of the phrase "Humanely Raised" on its labeling and to its practices and conduct described in paragraphs 22-27 above, which Complainant believed compromised the birds' welfare and increased their risk of becoming contaminated with and developing infections from salmonella, e-coli, and other harmful bacteria, in turn threatening the health of consumers.

29. In furtherance of an effort to oppose those practices and Respondent's use of the phrase "Humanely Raised" on its labeling, Complainant invited Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF"), to visit his farm and shoot audiovisual footage of the chickens in his four chicken houses. CIWF campaigns on a global level to end cruel factory farming practices, often relying on undercover investigations. In the US, chicken factory farms are notoriously inaccessible to anyone outside of the industry, yet they account for ninety-five percent of all factory-farmed animals (or nearly 9 billion animals). Director Garces reported during this investigation into Perdue that it was the first time she had been invited to observe by such a contract farmer.

7

30.     On or about May 22, 2014, CIWF Director Garces and videographer Raegan Hodge visited Complainant's farm and began videotaping the flock, which had recently been placed. Both individuals returned several weeks later to film more footage of the flock, which was then nearing the end of its growth cycle.

31.     CIWF condensed the footage it had filmed into a short video, which Complainant agreed to allow CIWF to publish at a later date. Complainant expected that Respondent would view the video, and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt an investigation or other action by government officials. This video and interview with Complainant remains a key piece of advocacy material publicly available and maintained on CIWF's website, "Why one Perdue factory famer speaks out" <http://action.ciwf.com/ea-action/action?ea.client.id=1872&ea.campaign.id=32809&ea.tracking.id=homepage&_ga=1.7779 3172.1269961080.1424111353> (See Attachment A). In his interview, Complainant explains he is disclosing his complaints because the Perdue chicken is not "as advertised"; because the consumers are being "hoodwinked"; and because the chickens are not "happy" or "healthy."

32.     Late at night on December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm. The column criticizes the apparent poor health of the birds, and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds is inappropriate. An excerpt of thevideo produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, publicly available here:

8

USCA4 Appeal: 26-1374     Doc: 22-2     Filed: 06/11/2026     Pg: 224 of 508

http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html

(See Attachment B).

33. This video depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities.

34. The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

35. The article notes that Respondent was contacted for comment before the article's publication, and many users of Twitter sent links to the video to Respondent following its publication. Forbes, The Huffington Post, Wired, and the Washington Post, among others, also reported on Complainant's interview and the video.

## V.    ADVERSE ACTIONS

36. On December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm. These inspections continued, occurring almost daily until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

9

37. On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received, via hand delivery, a two page letter from Respondent. The letter stated that Respondent was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Complainant's farm.

38. The December 29, 2014 letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

39. Complainant was informed that he would not receive another flock placement until he completed a training session concerning proper animal welfare and biosecurity practices.

40. A training session was planned for January 8, 2014. Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

41. As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2014, approximately 9 days after he would have typically received a new flock.

42. Complainant lost approximately $4,500 in earnings due to Respondent's delayed flock placement.

43. Respondent has continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily since January 15, 2015.

VI. NEXUS/CONTRIBUTING FACTOR

10

44. As noted above, Respondent was aware of the video footage taken by CIWF at the time of its publication, having been reached for comment by columnist Nicholas Kristoff, and having received messages including links to the video from users of Twitter.

45. Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, just hours after the video's publication.

46. The letter placing Complainant under a Performance Improvement Plan was issued by Respondent just over three weeks later, on December 29, 2014.

47. In the letter placing Complainant under a Performance Improvement Plan, Respondent attributes its decision to audit Complainant's farm and place Complainant under a Performance Improvement Plan to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent … with Perdue standards" particularly concerning.

48. In the letter, Respondent suggests that it did not find any problematic conditions during its recent inspections of Complainant's farm, and describes the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

49. In fact, the flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

50. As noted above, prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation, and in fact considered Complainant to be one of its top producers.

11

51.     The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's decision to place him under a Performance Improvement Plan and subject his farm to increased scrutiny, and that Respondent would not have taken those actions regardless of Complainant's protected activity.

## VII.     CLAIM FOR RELIEF

52.     Complainant engaged in protected activity under the Food Safety Modernization Act's employee protection provision when he facilitated the production and publication of video footage depicting the condition of birds placed on his farm by Respondent and criticizing Respondent's practices. As noted above, Complainant believed that the condition of the birds raised on his farm was the result of Respondent's practices and conduct described in paragraphs 22-27 that compromised the welfare of the animals and increased their risk of becoming contaminated with or developing infections from salmonella, e-coli, and other harmful bacteria, threatening the health of consumers. Additionally, as noted above, the Respondent's use of the phrase "Humanely Raised" was misleading in light of the condition of the birds raised on Complainant's farm.

53.     Complainant also caused to be provided information that he reasonably believed to be a violation of the Food, Drug and Cosmetic Act to the federal government. As a result of the conditions exposed by Complainant and CIWF in early December 2014, Senators Feinstein and Booker began taking action to have the USDA stop this misleading practice. This resulted in a letter dated January 7, 2105 where the Senators wrote to USDA Secretary Vilsack demanding intervention into this ongoing practice of mislabeling poultry as "humanely raised." The Senators noted:

12

We write today to express our serious concern that the Food Safety and Inspection Service (FSIS) is approving false and misleading labels with animal welfare claims for meat and poultry products, such as "humanely raised" or "cage free." ... As you are aware, it is a violation of the Federal Meat Inspection Act and Poultry Products Inspection Act to label a product in a manner that is misleading or false.... It is our view that claims like "humanely raised" should only be approved by FSIS, or verified through the Process Verified Program, when there is evidence that animal welfare standards set by an independent third party, and which significantly exceed standard industry practice, are being met.

54.     The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and Cosmetic Act, food is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4). 56.     Respondent had knowledge of Complainant's protected activity, and Complainant's protected activity was a contributing factor in Respondent's decisions to place Complainant under a Performance Improvement Plan and to subject Complainant's farm to increased scrutiny. Respondent would not have taken those adverse actions regardless of Complainant's protected activity.

57.     The foregoing facts demonstrate that Respondent violated the Food Safety Modernization Act's employee protection provision when it placed Complainant under a Performance Improvement Plan and subjected his farm to increased scrutiny.

## VII.    PRAYER FOR RELIEF

58.     Complainant seeks compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by Respondent, and for wages paid to his employee

13

as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

59.     Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

60.     Complainant seeks an order prohibiting Respondent from continuing to subject his facility to retaliatory increased inspections.

61.     Complainant seeks reasonable costs and attorney's fees, together with all other relief available at law and equity, including the costs of any expert witness fees.

Respectfully submitted,

Jeffery S. Gulley
Food & Public Health Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-457-0034 ext. 127
Fax. 202-457-0059
Email: JeffG@whistleblower.org

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

14

# <u>EXHIBIT B</u>

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

*In the Matter of*

| | |
|---|---|
| **CRAIG WATTS,** | ) |
| | ) |
| *Complainant,* | ) The Honorable ALJ Pamela A. Kultgen |
| | ) |
| *v.* | )Case No. 2016-FDA-00003 |
| | ) |
| **PERDUE FARMS, INC.,** | ) |
| | ) |
| *Respondent.* | ) |

**SUPPLEMENTAL WHISTLEBLOWER COMPLAINT**

Complainant Craig Watts, through his counsel, files this Supplemental Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

**I.      INTRODUCTION**

1.  (a) This action arises from and concerns adverse employment actions taken against Complainant by Respondent from December 2014 to January 2016 for which a contributing factor was Complainant's activity that was protected under 21 U.S.C. § 399d. This Supplemental Complaint updates and restates the facts of his Complaint, including his constructive discharge on January 26, 2016, thirteen days before OSHA dismissed his complaint entirely for lack of jurisdiction, a finding recently reversed by the ARB.  This supplement realleges and alleges food integrity violations and practices by Perdue from 2014 to 2016 in which the company falsely claimed to be following humane poultry growing protocols when the true practices were just the opposite.  Complainant rejected

*Supplemental Complaint*                    **1**

Perdue's implied assertion that humane poultry growing was achieved simply by discarding and concealing from public view sick and dead chickens from the company's flocks.

(b) Complainant decided to blow the whistle.  He determined that the Respondent had not designed, deployed, or maintained any viable internal or external channels for reporting these deceptive marketing statements or the inhumane practices and collateral practices of Perdue for placing, maintaining, and removing those chicken flocks. Complainant regarded any external USDA channels available to growers to not be viable for reporting food integrity concerns not directly related to contamination or adulteration of the raw poultry products marketed to consumers. Complainant was unaware of any dedicated or viable FDA external reporting channels available to poultry growers.  Complainant became aware of, and resorted to, public food integrity reporting channels to NGOs and the media, and thereby indirectly to Congress or other federal authorities.

(c) The poultry flocks that are the subject of this complaint at all times remained under the sole ownership and control rights and discretion of the Respondent.  Complainant and growers like him were employees under contract, despite the language in those contracts by Perdue disclaiming its legal obligations to said employees.

## II.    JURISDICTION AND EXHAUSTION

2.    This complaint, having been timely filed within 180 days of the adverse actions complained of, is timely.  OSHA had jurisdiction to investigate the allegations contained herein, any additional protected activity and adverse action that occurred subsequent to said complaint that reasonably would have been investigated in the scope of

*Supplemental Complaint*                    **2**

said OSHA investigation, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below.  OSHA issued its letter determination on February 8, 2016, that it lacked jurisdiction over the complaint, concluding that Complainant was not a covered employee.

3.    Per the Final Decision and Order of the Administrative Review Board (ARB) entered on March 5, 2019, and all proceedings since, up to and including the present proceedings in the OALJ, Complainant's claims have been properly exhausted and will continue to be exhausted throughout the present OALJ proceedings. The 2019 ARB found:

> On February 8, 2016, OSHA determined that, while Perdue was covered under the FSMA, Watts was not a covered employee of Perdue under the FSMA. Watts requested a hearing before an ALJ. Before the ALJ, Perdue filed a motion to dismiss for lack of subject matter jurisdiction. The ALJ granted Perdue's motion to dismiss pursuant to 29 C.F.R. § 18.70(a), concluding that she lacked jurisdiction to hear Watts's claim. Specifically, the ALJ reasoned that the raising of chickens is part of the poultry products industry, which is exempt from the FFDCA pursuant to the Poultry Products Inspection Act (PPIA), 21 U.S.C. § 467f (1979), and is therefore also exempt from the FSMA amendments adding the employee protection provisions to the FFDCA. Watts appealed this decision to the Administrative Review Board (ARB or Board).

4.    The 2019 ARB also found:

Watts also argues that even if the PPIA excludes "poultry" from coverage under the FFDCA, the DOL is still a proper forum for his complaint because Watts had a reasonable belief that he and his employer were covered under the FFDCA and the FSMA. The FSMA's implementing regulations provide that the FSMA protects an employee who has done the following:

> Provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the [FFDCA] or any order, rule, regulation, standard, or ban under the [FFDCA]; 29 C.F.R. § 1987.102(b)(1).

*Supplemental Complaint*                    **3**

5.      On September 24, 2019, the Acting Secretary of the U.S. Department of

Labor (DOL), represented by lawyers from the Solicitor's Office and by DOL Counsel for

Whistleblower Programs, filed a motion with the Fourth Circuit requesting a remand of the

case to the ARB. The sole objective of that motion was to allow the U.S. Food and Drug

Administration (FDA) to participate as amicus because the FDA informed the Acting

Secretary that the interpretation of the word "food" in this whistleblower case could have

substantial implications for the FDA's ability to regulate the U.S. food supply under the

FFDCA. The Petitioner separately joined in this remand request, while the Respondent, the

U.S. Poultry & Egg Association, and the National Chicken Council all vigorously opposed

it.  Following these vigorous oppositions, the Acting Secretary filed a reply and urged the

Fourth Circuit to agree that the ARB should reconsider its decision with the benefit of the

FDA's views. After considering the Acting Secretary's motion, Petitioner's response in

support of it, and the oppositions filed by the Respondent and its amici, the Fourth Circuit

granted the motion and remanded the case to the Board for further proceedings.

6.      On May 28, 2020, the ARB entered its "Decision and Order Granting

Reconsideration and Remanding to the Administrative Law Judge".  That 2020 ARB

Remand Order found:

> This case arises under the employee protection provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended by Section 402 of the Food Safety and Modernization Act of 2011 (FSMA), and its implementing regulations at 29 C.F.R. § 1987 (2016). Section 402 of the FSMA protects from retaliation an employee who has engaged in protected activity pertaining to a violation or alleged violation of the FFDCA, or any order, rule, regulation, standard, or ban under the FFDCA. Craig Watts, the owner of C&A Farms, filed a complaint with the Department of Labor's Occupational Safety and

*Supplemental Complaint*                    **4**

Health Administration (OSHA) alleging that Perdue Farms, Inc. (Perdue) retaliated against him for engaging in FSMA-related protected activities. OSHA dismissed the claim. Watts asked for a hearing, and the Administrative Law Judge (ALJ) assigned to the case also dismissed the claim. The ARB affirmed the ALJ's decision on March 5, 2019. Watts appealed the case to the United States Court of Appeals for the Fourth Circuit. On September 24, 2019, the Department of Labor moved that the Court remand the matter back to the ARB for additional consideration in light of briefing from the U.S. Food and Drug Administration (FDA). The Fourth Circuit granted that motion on January 7, 2020. *Watts v. U.S. Dept. of Labor*, Case No. 19-1487 (4th Cir. Jan. 7, 2020). Upon further briefing, the ARB vacates its March 5, 2019 Order and remands the matter back to the ALJ for further proceedings.

7.      On December 11, 2020, the OALJ entered an "Order Directing Parties to File Notices of Appearance by 1/6/2021, and Order Setting Briefing Schedule". The parties complied. For over a year, the OALJ has not acted further in this case, until the April 21, 2022 reassignment of the case to a new ALJ. No pleadings on the merits have yet been filed by either party, and the only complaint of record is that originally filed with OSHA.

### III.     PARTIES

8.      Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where until January 2016 he raised chickens for Respondent under a 2009 written contract between the parties. Under this contract, Respondent delivered flocks of chicks to Complainant, who housed and tended to each flock in accordance with standards set by Respondent. Complainant fed, watered, and cared for those flocks using feed, medications, and other supplies provided by Respondent.

9.      Respondent retained title of each flock at all times, and an agent of Respondent typically visited Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately eight weeks.

*Supplemental Complaint*                                    **5**

10. At the end of flock's growth cycle, Complainant was compensated for his services by Respondent in accordance with a payment schedule.

11. The foregoing facts demonstrate that Complainant was an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

12. At the end of their growth cycle, flocks were picked up by agents of Respondent for transport to slaughter and processing facilities owned and operated by Respondent. Respondent transported chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

13. At these facilities, Respondent slaughters, processes, and packages chickens and turkeys for sale to consumers. Respondent is one of the largest producers of poultry products in the United States and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

14. Respondent also imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which Respondent processes for use in animal feed and pet food. Those raw and processed commodities are also subject to FDA regulation apart from the poultry they are used upon.

15. The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

*Supplemental Complaint*                                6

## IV.    FACTUAL ALLEGATIONS

### A.    Complainant's Job, Duties, and Performance

16.    Complainant began raising chickens for Respondent in 1992.  In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms.  Respondent asked Watts to sign a new contract with them in 1999, and Complainant has been raising chickens for Respondent continuously since then.

17.    Complainant was required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent.  These standards imposed numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities.  These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

18.    An employee of Respondent regularly visited Complainant's farm to ensure that Complainant was maintaining his facilities and tending to flocks in accordance with Respondent's standards.  Complainant had no authority, discretion, or control to do anything with this livestock exclusively owned by Respondent, nor over the care and processing of those owned flocks.  Typically, these visits were conducted by Respondent's Growout Supervisor for the region surrounding Complainant's farm, Lyn Price, and occurred approximately once per week during the flocks' growth cycles.  Complainant was known by Ms. Price to be one of Respondent's most successful and conscientious farmers.

*Supplemental Complaint*                              7

19.    At the end of their growth cycles, flocks were rated by Respondent in what was referred to as Respondent's "tournament system."  Complainant's compensation for each cycle was based in part upon these ratings.  Under this system, which is indistinguishable from a factory worker's performance appraisals or a brokerage employee's bonus/incentive structure, and which requires frequent ongoing ratings, Respondent's farmer employees' performance was measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group.  Complainant's flocks consistently received high ratings, and Complainant had been rated the top producer in his group numerous times.

20.    Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

**B.**    **Background Facts Relevant to Protected Activity**

21.    Prior to 2014, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant.  In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry.

22.    Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised.

*Supplemental Complaint*                                    **8**

23.     For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches and sores.

24.     Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy.  For example, many birds arrived at Complainant's farm carrying infections, and died of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink.  Many others had leg deformities, impairing their ability to move about freely and comfortably.  Additionally, the birds in Complainant's facility rapidly grew heavy and lethargic, so that within weeks after placement they spent the vast majority of their time laying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts.

25.     In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was unwarranted and likely fraudulent.  As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom might be unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified and the product not as advertised.

*Supplemental Complaint*                    **9**

26.     Complainant believed that the conditions described above were the result of Respondent's practices and other factors exclusively within Respondent's control.

27.     For example, Respondent controls the size of the flocks placed on Complainant's farm and the farms of other Respondent's farmer employees.   Respondent adjusted flock size to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density.  Complainant believed that Respondent crowded too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other.  Complainant believed that the flock density of flocks placed by Respondent on Complainant's farm had, at times, exceeded the National Chicken Council's animal welfare guidelines upon which Complainant believed that Respondent premised its use of the "Humanely Raised" label.

28.     Prior to 2014, Respondent stopped using antibiotics in its North Carolina hatcheries.  Like humane growing conditions, many consumers wanted drug-free birds. Complainant believed that Respondent had not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

29.     Complainant had observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities.  Complainant believed that Respondent was not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

*Supplemental Complaint*                              **10**

30. Complainant believed that Respondent's breeding of chickens resulted in birds that gained weight too rapidly and that had a high rate of leg deformities.

31. Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers from opening windows to allow access to sunlight and fresh air.  Complainant believed that this lack of sunlight and fresh air impaired the birds' quality of life, causing increased stress and reduced levels of activity.

32. Complainant was prohibited by Respondent from administering any antibiotics or other medications to sick birds, and Respondent had refused to administer medication when Complainant sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

**C.** **Protected Activity and Complainant's Resort to Reporting Channels**

33. Complainant objected to Respondent's practices and conduct described above and its use of the phrase "Humanely Raised" on its labeling.  Complainant believed the opposite was true as Perdue compromised the birds' welfare and increased their risk of becoming contaminated with, and developing infections from, salmonella, e-coli, and other harmful bacteria.  He believed that this in turn was threatening the health of consumers, Perdue's brand, and the economic viability of his employment contract with the company.

34. Complainant decided to report Respondent's practices through any viable and effective reporting channels. Complainant knew that reporting the above concerns to Perdue through its vague internal channels would be futile and career threatening: the company's

*Supplemental Complaint*                **11**

CEO was on television touting its humanity in the industry, and Complainant's employment duties did not include regulatory enforcement and food integrity policy.  He was also aware that USDA had not been involved in policing integrity within the poultry industry beyond safe growing practices that could impact post-slaughter meat safety.  USDA surveillance and involvement with marketing to consumers was limited to safe inspection certification, and he was unaware of any external reporting channels to the USDA or FDA to act on his reports about consumer misrepresentation regarding human growing practices.  The only viable alternative known to Complainant to protect public health, industry integrity, and consumers was to resort to public channels by reporting to industry-specific NGOs and media, which in turn have the best chance of attracting Congressional oversight.  Complainant reported his concerns to Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF").  After determining that CIWF offered a viable reporting channel, Complainant arranged for the organization's investigatory visit to his farm, including fact collection by audiovisual recording of the actual living conditions of the Perdue-owned flocks.

35.    On or about May 22, 2014, CIWF began videotaping the flock and conducting its investigation into Complainant's food integrity reports at his farm. CIWF continued the investigation with a visit several weeks later, including videotaping the end of the flock growth cycle.

36.    CIWF condensed the footage it had filmed into an effective and concise reporting narrative, which Complainant authorized for publication.  Complainant expected

*Supplemental Complaint*                    **12**

that Respondent would view the video and hoped and believed that the video's publication would prompt the public and regulators to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt a significant investigation or other action by state and federal government officials.

37. On December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm, "Abusing Chickens We Eat". The newspaper criticized the obvious poor health of the birds and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds was deceptive. The video produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, available here: http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html. This later led to further New York Times investigative journalism, and to the Sundance movie featuring Complainant, "Eating Animals", https://www.eatinganimalsmovie.com.

38. The video journalism depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities. The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of

*Supplemental Complaint*                    **13**

the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

39. The NYT article and other online publications disclosed that Respondent participated before publication. Twitter and other social media linked to the reports and video.

40. Complainant's protected activity included the filing of his OSHA complaint in February 2015, which triggered Respondent to make false and disparaging statements about him, notwithstanding the company's pretextual statements that it was trying to re-educate, rather than terminate him. The Respondent succeeded in the latter one year later.

<p style="text-align:center"><strong>V.    ADVERSE ACTIONS</strong></p>

41. The day after release of the above referenced CIWF video, on December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm.

42. These inspections continued, occurring almost daily, until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

43. On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received a hand delivered letter from Respondent "implementing a

*Supplemental Complaint*                              **14**

Performance Improvement Plant for poultry welfare and biosecurity" on Complainant's farm.

44.     The December 29, 2014, letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses, and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

45.     Complainant was informed that he would not receive another flock placement until he completed a re-education program concerning proper animal welfare and biosecurity practices.

46.     A training session was planned for January 8, 2015.  Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

47.     As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2015, approximately nine days after he would have typically received a new flock.

48.     Complainant estimates that he lost approximately $4,500 in earnings due to that single delayed flock placement alone.

49.     Respondent continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily, even after January 15, 2015.

*Supplemental Complaint*                    **15**

50. Perdue relied on the "Center for Food Integrity" (CFI) to rebut Complainant's public disclosures. CFI provides support to the poultry industry. On December 5, 2014, CFI released a statement blaming Watts for the state of Perdue's chickens, claiming he allowed lame chickens to continue their suffering and calling him "negligent" in his husbandry obligations. CFI asserted the responsibility to respond to the needs of the flock lies with the farmer, but CFI provided no analysis of Perdue's actions or omissions. CFI's defense of Perdue resulted in an embarrassing messaging dissonance because Perdue inspectors at Watts' farm on December 4, 2014, characterized his flock as "well cared for and content".

51. Complainant lived in heightened anxiety from December 3, 2014, until January 26, 2016, that Perdue would terminate his employment contract and destroy his business and livelihood. On or around December 19, 2014, Watts learned that Perdue had told Walmart, one of the large retailers that Perdue supplies, that Respondent would end its relationship with Complainant.

52. According to the Perdue Producer Agreement that governed this employment relationship, the only reason a grower may be placed under the Performance Improvement Program ("PIP") is if the grower's "flocks fail to achieve Perdue's minimum standards of competitiveness." However, Respondent's flock placed on Complainant's farm had not failed to achieve those minimum standards, and in fact had excelled.

53. The Agreement mandated that growers be released from a PIP based on flock settlement averages. There was no provision in Watts' agreement for placement on a PIP in

*Supplemental Complaint*                    **16**

these circumstances. Respondent would often change the growers' requirements but not follow-through on implementing the specified obligations. As growers for Perdue, the farmers had to undertake large short-term and long-term debt obligations putting them at the whim and oppression of Perdue.

54. Despite Respondent informing Complainant that the flock placed at his farm appeared on December 4, 2014 to be "well cared for and content", Respondent imposed extensive auditing and re-education requirements not based on the terms of the employment agreement.

55. Respondent Perdue told Watts in a December 29, 2014 letter that Watts would have to "regain [Perdue's] trust".

56. Perdue's announced plan of conduct kept Watts and his family in an unrelenting state of anxiety until his constructive termination in January 2016. After his termination, he suffered additional anxiety and emotional and mental distress from the loss of his employment contract and livelihood.

57. Respondent Perdue acted with abuse of authority or no authority in setting arbitrary, capricious, and invidious production requirements on Complainant.

58. In said letter Perdue threatened Complainant Watts that it was alarmed and disturbed by the condition of the chickens entrusted to his care. Perdue told him that his feelings of being unhappy with his grower relationship with Perdue disappointed them. Perdue reminded Watts that he could terminate his relationship with Perdue at any time.

*Supplemental Complaint*                    **17**

Perdue told Watts they would waive their 90-day notice requirement if Watts wished to terminate his employment contract immediately.

59.    Over six months later, Perdue continued to subject Watts to the arbitrary PIP which included bi-weekly inspections.  There was no end-date for the PIP, and Perdue offered no information as to how Watts could remove himself from the PIP.   Only after Complainant attorneys supplemented his Complaint on June 1, 2015, with allegations that Respondent was forcing him to remain on the abusive PIP or terminate the agreement, thus putting Respondent on notice of a forthcoming constructive termination claim, the company issued a notice on July 1, 2015, that the PIP had been completed.  This was pretext because the oppressive conditions and abusive treatment described above continued in the post-PIP ending of the relationship.  Complainant observed his reputation in the industry had been damaged.

60.    Perdue subjected Watts to more audits in the time following his whistleblowing than they had the prior three years combined.  On February 3, 2015, Perdue put Watts through an audit with a USDA auditor and then the next day, on February 4, 2015, Perdue sent four more truck or vanloads of auditors to Watts' farm.

61.    Despite the PIP letter stating that Complainant would receive written reports of each audit, Perdue never provided him with any reports from the audits.  Complainant did not receive any written or oral evaluations from the inspectors, nor did they provide him with a list or explanation of ways to "improve" his farm practices.  Instead, Perdue would make up entries in service reports or make suggestions for expensive equipment that were

*Supplemental Complaint*                    **18**

unmerited.  This put Complainant in a state of anxiety about expensive and unnecessary changes to which Perdue subjected him for which his protected activity was an obvious contributing factor.

62.     On April 27, 2015, Perdue's lawyers in a submission to OSHA accused Complainant Watts of developing a "cruel scheme" to intentionally create substandard conditions of animal welfare at his farm to "extort" and "publicly blackmail Perdue" to OSHA investigators.  OSHA is not an adjudicatory forum; it is an investigation and enforcement administration.  Statements submitted to OSHA by Perdue lawyers are statements to federal investigators.  Respondent reported as fact to OSHA that Complainant was intentionally allowing sick, deformed, and dying chickens to suffer in order to produce a "self-serving propaganda video" intended to create a "tsunami" of public opinion against Perdue. Such allegations were extremely upsetting to Complainant Watts, who understood this as a statement that he was grossly failing to meet the Respondent's December 2014 letter expectation that he must regain the company's trust.  Additionally, OSHA still had not tried to schedule any interview of Complainant, and he felt intimidated that Perdue's allegations were preventing him from having even an interview with OSHA. As a result of Respondent's ongoing harassing actions, dishonest conduct, and an unrelenting pattern of false representations regarding flock welfare, Complainant experienced unremitting decline in his emotional and mental health.  To prompt him to terminate the contract, Respondent claimed Complainant's farm needed upgrades including computerized controllers and hi-tech lighting systems, all of which would be excessively expensive and require new indebtedness.

*Supplemental Complaint*                           **19**

63.    Complainant still had debt to pay off despite his 20 plus years of operating, but experienced high chronic anxiety under attacks by Perdue's actions and statements.  He had trouble sleeping and he ruminated on Perdue's bad conduct often all day and late into the night.  The daily assault on Complainant's mental and physical health ultimately required him to withdraw from his contract with Perdue on January 26, 2016, while still awaiting some action from OSHA.  Per Complainant's letter to OSHA dated June 1, 2015, he reasonably believed that Perdue intended to force him to terminate his contract:

> Now, nearly six months later, Mr. Watts continues to be subject to the arbitrary PIP which currently includes bi-weekly inspections. Mr. Watts does not currently receive any written or oral evaluations from PIP inspectors, nor have they provided him with a list or explanation of ways to "improve" his farm practices. There is no end-date for the PIP, and Perdue has offered no information as to how Mr. Watts may remove himself from the PIP. ***FN15***  *Perdue does not explain how this continued scrutiny is consistent with its newly voiced allegations that Mr. Watts "staged" the CIWF video*. See Resp. Statement, at 1, 9.
> *FN15 The only option Perdue has presented to Mr. Watts as a way to end the PIP is for Mr. Watts to terminate his relationship with Perdue*. See Resp. Ex. 18, Perdue Dec. 29, 2014 letter ("I take this opportunity to remind you that the growing contract allows you to terminate your relationship with us at any time and seek a contract with another poultry company or use your houses for other business purpose that you may find more rewarding.")

(Emphasis added).

## VI.  NEXUS/CONTRIBUTING FACTOR

64.    Respondent was aware of Complainant's use of public reporting channels to CIWF and the New York Times.

65.    Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, hours after he reports to this public channel were published.

*Supplemental Complaint*                    **20**

66.     The letter placing Complainant on a PIP was issued by Respondent just over three weeks later, on December 29, 2014.

67.     In the PIP letter, Respondent attributed its decision to audit Complainant's farm and place Complainant under a PIP to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent … with Perdue standards" particularly concerning.  This is direct evidence of contributing factor.

68.     In said letter, Respondent suggested it did not find any problematic conditions during its recent inspections of Complainant's farm, and described the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

69.     The flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

70.     Prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation and considered Complainant to be one of its top producers.

71.     The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's adverse actions against him from December 5, 2014, up to and including his constructive discharge on January 26, 2016.

*Supplemental Complaint*                          **21**

## VII.   CLAIM FOR RELIEF

72.     21 U.S.C. § 399d(a)(1) of the Food Safety Modernization Act created three types of statutorily protected channels for reporting and disclosing covered food safety and integrity issues: (1) an internal channel "to the employer"; (2) an external channel to any agency, department or instrumentality of "the Federal Government", which by definition includes Congress; and a second external channel to "the attorney general of a State"; and (3) a public channel to NGOs or the media who, in publishing a complainant's disclosures that may be received by one of the internal or external reporting channels, thereby function as "any person acting pursuant to a request of the employee" in "caus[ing] to be provided" said disclosures by Complainant.

73.   CIWF and the New York Times constituted such a protected public reporting channel, and both constituted a "person acting pursuant to a request of the employee".

74.   Complainant engaged in protected activity under 21 U.S.C. § 399d, the Food Safety Modernization Act's employee protection provision, when he made the above-described food integrity disclosures to the described public reporting channel.  He reasonably believed that in so doing he disclosed information relating to a violation, act or omission of the Respondent under the Food, Drug and Cosmetics Act, 21 U.S.C. 391 et seq., or an order, rule, regulation, standard, or ban thereunder (hereafter FDCA).

75.     Complainant reasonably believed that he was a covered employee under § 399d.

*Supplemental Complaint*                         **22**

76.     The FDCA prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the FDCA food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). It is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4).

77.     Filing a whistleblower complaint with OSHA is protected activity under § 399d(a)(1) because that agency is an instrumentality of the "Federal Government", and said complaint was information "provided [or] caused to be provided to the *** Federal Government."

78.     Respondent had knowledge of Complainant's protected activity in using the public channel described above, and in using the OSHA whistleblower protection channel provided by § 399d(b).

79.     Said protected activity was a contributing factor in all of Respondent's adverse actions against Complainant. The PIP itself and suggesting that Complainant terminate his contract were directly referenced in the PIP letter. The April 2015 disparagements of Complainant were made in direct response to his OSHA whistleblower complaint. Both contributed to the constructive discharge.

## VIII.   PRAYER FOR RELIEF

80.     Complainant seeks compensatory damages for lost earnings, compensation and capital resulting from the loss of his employment with contract with Perdue.

*Supplemental Complaint*                          **23**

81.    Complainant seeks general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above.

82.    Complainant seeks compensatory damages for the loss of income and expense incurred caused by the above-described delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

83.    Complainant seeks an award of pre-judgment or pre-award interest on the economic damages alleged above.

84.    Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

85.    Complainant seeks reasonable costs and attorney's fees, including the costs of any expert witness fees.

86.    Complainant seeks all other relief available at law and equity.

Respectfully submitted,

s/Thad M. Guyer
Thad M. Guyer, Esq.
Of Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006

Thad M. Guyer
Stephani L. Ayers

*Supplemental Complaint*                    **24**

T.M. Guyer and Ayers & Friends, P.C.
P.O. Box 1061, Medford, OR 97501
Tel. (Stephani): 813-382-7865

Email: Thad@guyerayers.com

Attorneys for Complainant

*Supplemental Complaint*                    **25**

# Perdue's Application for Issuance of Third-Party Subpoenas

# **<u>EXHIBIT B</u>**

## (Garces Documents Subpoena)

(04/2020) OALJ Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises                                      Page 1 of 3

## United States Department of Labor
## OFFICE OF ADMINISTRATIVE LAW JUDGES

In Re:

Craig Watts
_____

(Plaintiff/Complainant/Claimant)

v.

Perdue Farms Inc.                                                    OALJ Case No:    2016-FDA-00003
_____

(Defendant/Respondent/Employer/Carrier)

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES

To:          Leah Garces, President, Mercy for Animals
Address:     7908 Santa Monica Blvd.
             West Hollywood, California 90046

☒ *Production:*  **YOU ARE COMMANDED** to produce the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material at your address set forth above and at the following Date  March 29, 2024        and Time  5:00 PM                :

See Attachment A.

☒ *Alternate to Personal Production:*  You may avoid personally producing the described items at your address set forth above by delivering copies of the described items to the following described location on or before the date and time set forth above.

Place of Production:   ATTN: Kristin M. Koger, Venable LLP, KMKoger@Venable.com
                       600 Massachusetts Avenue, NW, Washington, DC 20001

☐ *Inspection:*  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object on it.

Place of Inspection:                                                  Date:

                                                                     Time:

The following provisions of the Code of Federal Regulations (C.F.R.) are attached - 29 C.F.R. §§18.56(c) and 18.52(a), relating to your protection as a person subject to a subpoena, and 29 C.F.R. §§18.56(d) and 18.56(e), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

This subpoena is issued upon the application of (indicate attorney/representative for named party):

(Person requesting subpoena)                                         (Address and Telephone Number)

                                                                     Firm Name    Venable LLP

Name            Kristin M. Koger                                     Address   600 Massachusetts Ave, NW

Bar Number   DC No. 473438                                           City      Washington

Phone Number    2023444162                                          State   DC            Zip Code   20001

IN WITNESS WHEREOF the undersigned United States Department of Labor Administrative Law Judge has digitally signed this subpoena.



_____
Signature of Administrative Law Judge

JA288

4/2020) OALJ Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises     Page 2 of 3

## NOTICES

**NOTICE:** This subpoena is only valid in proceedings before the Office of Administrative Law Judges or Office of Workers' Compensation Programs. To be valid, this subpoena must bear the digital signature of a Department of Labor (DOL) administrative law judge.

**HIPAA NOTICE:** In regard to the Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act of 1996, if this subpoena does not bear the digitized signature of a DOL administrative law judge, it is not valid under 45 C.F.R. §§164.512(e), 164.512(f) or 164.512(l).

**29 C.F.R. §18.56 Subpoenas(c) Protecting a Person Subject to a Subpoena**.

(1) *Avoiding Undue Burden or Expense; Sanctions*. A party or representative responsible for requesting, issuing or serving a subpoena must take reasonable steps to avoid imposing undue burden on a person subject to the subpoena. The judge must enforce this duty and impose an appropriate sanction.
(2) *Command to Produce Materials or Permit Inspection*.
(A) *Appearance Not Required*. A person commanded to produce documents, electronically stored information, or tangible things, or to permit inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition or hearing.
(B) *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or representative designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises - or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served
(i) at any time, upon notice to the commanded person, the serving party may move the judge for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) *Quashing or Modifying a Subpoena*.
(A) *When Required*. On timely motion, the judge must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person - except that, subject to paragraph (c)(3)(B)(iii) of this section, the person may be commanded to attend the formal hearing;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When permitted*. To protect a person subject to or affected by a subpoena, the judge may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend the formal hearing.
(d) **Duties in Responding to a Subpoena.**
(1) *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:
(A) *Documents*. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified*. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is usually maintained or in a reasonably usable form or forms.

(A) *Electronically Stored Information Produced in Only One Form*. The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information*. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or expense. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the judge may nonetheless order discovery from such sources if the requesting party show good cause. The judge may specify conditions for the discovery.
(2) *Claiming Privilege or Protection*.
(A) *Information Withheld*. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as hearing-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced*. If information produced in response to a subpoena is subject to a claim of privilege or of protection as hearing-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the judge *in camera* for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
(e) **Failure to Obey**. When a person fails to obey a subpoena, the party adversely affected by the failure may, when authorized by statute or law, apply to the appropriate District Court to enforce the subpoena.

**29 C.F.R. §18.52 Protective orders**

(a) **In General**. A party or person from whom discovery is sought may file a written motion for a protective order. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the affected parties in an effort to resolve the dispute without the judge's action. The judge may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
(1) Forbidding the disclosure or discovery;
(2) Specifying terms, including a designation of the time and place, for the disclosure or discovery;
(3) Prescribing a discovery method other than the one selected by the party seeking discovery;
(4) Forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
(5) Designating the persons who may be present while discovery is conducted;
(6) Requiring that a deposition be sealed and only opened on the judge's order;
(7) Requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and
(8) Requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the judge directs.

(04/2020) OALJ Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises     Page 3 of 3

## PROOF OF SERVICE

On _____     I received this subpoena and served it pursuant to 29 CFR §18.56(b) as follows:

_____          _____
Person served (print name)                 Date of Service

_____          _____
Place of Service                           Manner of Service

☐  I have also tendered to the witness fees for one day's attendance and the mileage allowed by law, in the amount of
$ _____

☐  I have not tendered witness fees for one day's attendance and for the mileage allowed by law.

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Address: _____

_____
Signature of Server          Date

_____          City: _____  State: ____  ZIP: _____
Name of Server (Print Name)

## ATTACHMENT A

Pursuant to 29 C.F.R. § 18.56, Respondent Perdue Farms Inc. ("Perdue"), by and through counsel, hereby request that Leah Garces produce the documents described below for inspection and copying as specified in the subpoena ("Subpoena"), in accordance with the Instructions and Definitions below.

## DEFINITIONS

1.      "Communications" means any statement, utterance, notation, discussions, transfer or exchange of information of any nature whatsoever, by or to whomever, whether oral or written, or whether face-to-face, by telephone, virtually (for example, Google Meet, Microsoft Teams, Slack, Webex, or Zoom meetings), by mail, personal delivery, or otherwise, letters, correspondence, e-mails, conversations, memoranda, meetings, interviews, consultations, agreements, and other understandings.

2.      "Document" shall mean all material defined in Federal Rule of Civil Procedure 34 and shall have the broadest meaning possible.

3.      "Relating to" means showing, concerning, disclosing, referring, averring to, in connection with, comprising, evidencing, pertaining, constituting, or reviewing, in whole or in part.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5.      "Complaints," shall refer to the Notice of Whistleblower Complaint filed in *Watts v. Perdue Farms, Inc.*, before the United States Department of Labor Occupational Safety and Health Administration on February 23, 2015 (attached hereto as "Exhibit A") and the

1

Supplemental Whistleblower Complaint filed in *Watts v. Perdue Farms, Inc.*, Case No. 2016-FDA-00003, before the United States Department of Labor, Office of Administrative Law Judges, filed on April 25, 2022 (attached hereto as "Exhibit B").

6. "Complainant," refers to Craig Watts and any persons acting or purporting to act on Complainant's behalf including his counsel, representatives, agents, employees, consultants, or investigators and their counsel, employees, representatives, agents, investigators or consultants.

7. "C&A Farms" shall refer to the farm/entity owned and operated by Complainant, as discussed in his Complaint.

8. "You," or "your" means Leah Garces and any of her agents and other representatives.

9. "Compassion in World Farming, Inc." or "CIWF" means Compassion in World Farming, Inc., its directors, officers, owners, employees and agents.

## INSTRUCTIONS

1. Each document request listed herein shall be continuing in nature and responses thereto shall be modified or supplemented to include any additional documents, information, knowledge, or data responsive to such request that is later discovered, created or received by you or your agents.

2. You are required to produce all documents that are in your possession, custody or control, or those of any of your representatives or that are reasonably obtainable from other sources.

3. Each document request herein should be construed as a request for production of the document in its entirety, without redaction or expurgation, except in cases of attorney-client privilege.

2

4.      If any document or portion of any document covered by these requests is withheld from production on the grounds of privilege, please furnish a privilege log with the information required under Fed. R. Civ. P. 26(b)(5) for each such document or portion of the document that is withheld.

5.      Unless stated otherwise, the relevant time period for these Requests shall be from January 1, 2012 through the present.

6.      With the exception of Excel files and executable programs, you shall produce each electronic document: (a) as a Bates-stamped 300 dots per inch (dpi) single-page Group IV TIFF image named with the unique Bates number of the page of the document in question, followed by the extension "TIF"; (b) with an Opticon cross-reference file that enables the document to be uploaded and viewed using standard litigation support software Concordance®; (c) with Metadata in a standard Concordance® delimited file; and (d) with extracted text and/or Optical Character Recognition ("OCR") as a separate .txt file for each document named according to the beginning Bates number of the document to which it relates.  Excel files and executable programs should be produced in their native format and renamed to reflect their associated Bates number.

## DOCUMENT REQUESTS

### Document Request No. 1

Documents referring or relating to, or constituting, communications between You and Craig Watts.

### Document Request No. 2

Documents referring or relating to the allegations in the Complaints.

3

**Document Request No. 3**

Documents referring or relating to, or constituting, communications between You and the Government Accountability Project relating to Craig Watts or the Complaints.

**Document Request No. 4**

Documents referring or relating to, or constituting, communications between You and CIWF relating to Craig Watts or the Complaints.

**Document Request No. 5**

Documents referring or relating to, or discussing, any visit by You to C&A Farms, including but not limited to, visits to take footage at C&A Farms.

**Document Request No. 6**

Documents referring or relating to, or discussing, the production and distribution of any video, audio, photographic or other images You recorded that included video footage, photographic or other images taken at C&A Farms.

**Document Request No. 7**

Documents referring or relating to, or constituting, communications between You and media outlets or journalists, including but not limited to the New York Times, regarding any video, audio, photographic or other images produced by you or CIWF that included footage taken at C&A Farms.

**Document Request No. 8**

All video and audio recordings and images of or regarding Complainant, his Complaint, C&A Farms, or Respondent, including all unedited, "raw" video footage and audio that was recorded. This includes all audio, video footage, photographic and other images that were recorded to make the video relating to Complainant's poultry farm that CIWF posted on its website, even if

4

the footage or images are not contained in the video that was posted. These video and audio recordings and images must be produced in their native format, with all metadata intact and preserved.

JA295

# EXHIBIT A

**UNITED STATES DEPARTMENT OF LABOR**
**OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION**

*In the Matter of*

| | |
|---|---|
| **CRAIG WATTS,** ) | |
| ) | |
| *Complainant,* ) | |
| ) | |
| *v.* ) | Case No. |
| ) | |
| **PERDUE FARMS, INC.,** ) | |
| ) | |
| *Respondent.* ) | |

<u>**NOTICE OF WHISTLEBLOWER COMPLAINT**</u>

Complainant Craig Watts, through his counsel, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

**I.    INTRODUCTION**

1.     This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d, by Complainant, Mr. Craig Watts, against Perdue Farms, Incorporated (hereafter "Respondent"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent in December 2014, and January 2015, in retaliation for activity protected under 21 U.S.C. § 399d.

**II.    JURISDICTION**

2.     This Complaint having been timely filed within 180 days of the adverse actions complained of, OSHA has jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below.

1

### III.  PARTIES

3.      Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where he raises chickens for Respondent under a written contract between the parties. Under this contract, Respondent delivers flocks of chicks to Complainant, who houses and tends to each flock in accordance with standards set by Respondent. Complainant feeds, waters, and cares for those flocks using feed, medications, and other supplies provided by Respondent.

4.      Respondent retains title of each flock at all times, and an agent of Respondent typically visits Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately six weeks.

5.      At the end of flock's growth cycle, Respondent compensates Complainant for his services in accordance with a payment schedule.

6.      The foregoing facts demonstrate that Complainant is an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

7.      At the end of their growth cycle, Respondent's agents pick up the flocks for transport to slaughter and processing facilities owned and operated by Respondent. Respondent transports chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

8.      At these facilities, Respondent slaughters, processes and packages chickens and turkeys for sale to consumers. Respondent is one of the largest producers of poultry products in the United States, and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

9.      Respondent also imports, exports, receives and stores grains and other raw agricultural commodities, which Respondent processes for use in animal feed and pet food.

2

10.     The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

## IV.     FACTUAL ALLEGATIONS

### A.     Complainant's Job, Duties, and Performance

11.     Complainant began raising chickens for Respondent in 1992. In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms, but was asked to sign a new contract with Respondent in 1999, and has been raising chickens for Respondent continuously since then. Complainant currently raises approximately 720,000 chickens per year for Respondent.

12.     Complainant is required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent. These standards impose numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles, and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

13.     An employee of Respondent regularly visits Complainant's farm to ensure that Complainant is maintaining his facilities and tending to flocks in accordance with Respondent's standards. Typically, these visits occur approximately once per week during the flocks' growth cycles. Complainant is known by Ms. Price, Respondent's Growout Supervisor for the region surrounding Complainant's farm, to be one of Respondent's most successful and conscientious farmers.

3

14. At the end of their growth cycles, Respondent rates flocks in what is referred to as Respondent's "tournament system." Complainant's compensation for each cycle is based in part upon these ratings. Under this system, farmers' performance is measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group. Complainant's flocks consistently receive high ratings, and Complainant has been rated the top producer in his group numerous times.

15. Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

### B. Background Facts Relevant to Protected Activity

16. Several years ago, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant. In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry. The commercial depicted Perdue's Chairman walking through what he purports to be a Perdue chicken farm while extolling the virtues of Perdue's humane treatment of chickens and Perdue "doing the right thing." Perdue's Chairman noted in the commercial that consumers are much more interested in knowing how chickens are raised and treated. Perdue's "Humanely Raised" label was intentionally designed by Perdue to solicit more business from these consumers.

17. Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised. Perdue alone sets the guidelines for Watts and their other chicken farmers

4

to follow that dictate what the chickens are fed, in what space the flock is to be contained, and what brand and type of equipment Complainant is to use.

18.    For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches, sores and increased risk of infection. Following Respondent's specifications, the chicken houses contain around 30,000 chickens packed into a tight space with barely any room to move.

19.    Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy. For example, many birds arrive at Complainant's farm carrying infections, and die of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink. Many others have leg deformities, impairing their ability to move about freely and comfortably. Following Perdue's specifications, which require the chickens to be raised to grow unnaturally large and fast, the birds in Complainant's facility rapidly grow heavy and lethargic, so that within weeks after placement they spend the vast majority of their time lying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts. The high growth rate makes it difficult for the flock to breathe and walk.

20.    In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was not truthful. As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom are wholly unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified.

5

21.     The conditions described above in paragraphs 17-20 were the result of Respondent's practices and other factors within Respondent's control.

22.     For example, Respondent controls the size of the flocks placed on Complainant's farm, which Respondent adjusts to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density. Respondent crowds too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other. The flock density of flocks placed by Respondent on Complainant's farm has, at times, even exceeded the National Chicken Council's animal welfare guidelines.

23.     A few years ago, Respondent stopped using antibiotics in its North Carolina hatcheries. Respondent has not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

24.     In recent years, Complainant has observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities. Respondent is not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

25.     Respondent's breeding of chickens has resulted in birds that gain weight too rapidly and that have a high rate of leg deformities. Within weeks after placement, these birds grow heavy and lethargic, and spend most of their time laying around on their litter, causing the birds to develop sores and large patches of red, irritated flesh on their breasts.

26.     Several years ago, Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers

6

from opening windows to allow access to sunlight and fresh air. This lack of sunlight and fresh air has impaired the birds' quality of life, causing overheating, increased stress and reduced levels of activity.

27. Respondent prohibits Complainant from administering any antibiotics or other medications to sick birds, and Respondent has refused to administer medication when Complainant has sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

### C. *Protected Activity*

28. Complainant objected to Respondent's use of the phrase "Humanely Raised" on its labeling and to its practices and conduct described in paragraphs 22-27 above, which Complainant believed compromised the birds' welfare and increased their risk of becoming contaminated with and developing infections from salmonella, e-coli, and other harmful bacteria, in turn threatening the health of consumers.

29. In furtherance of an effort to oppose those practices and Respondent's use of the phrase "Humanely Raised" on its labeling, Complainant invited Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF"), to visit his farm and shoot audiovisual footage of the chickens in his four chicken houses. CIWF campaigns on a global level to end cruel factory farming practices, often relying on undercover investigations. In the US, chicken factory farms are notoriously inaccessible to anyone outside of the industry, yet they account for ninety-five percent of all factory-farmed animals (or nearly 9 billion animals). Director Garces reported during this investigation into Perdue that it was the first time she had been invited to observe by such a contract farmer.

7

30. On or about May 22, 2014, CIWF Director Garces and videographer Raegan Hodge visited Complainant's farm and began videotaping the flock, which had recently been placed. Both individuals returned several weeks later to film more footage of the flock, which was then nearing the end of its growth cycle.

31. CIWF condensed the footage it had filmed into a short video, which Complainant agreed to allow CIWF to publish at a later date. Complainant expected that Respondent would view the video, and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt an investigation or other action by government officials. This video and interview with Complainant remains a key piece of advocacy material publicly available and maintained on CIWF's website, "Why one Perdue factory famer speaks out" <http://action.ciwf.com/ea-action/action?ea.client.id=1872&ea.campaign.id=32809&ea.tracking.id=homepage&_ga=1.7779 3172.1269961080.1424111353> (See Attachment A). In his interview, Complainant explains he is disclosing his complaints because the Perdue chicken is not "as advertised"; because the consumers are being "hoodwinked"; and because the chickens are not "happy" or "healthy."

32. Late at night on December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm. The column criticizes the apparent poor health of the birds, and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds is inappropriate. An excerpt of thevideo produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, publicly available here:

8

http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html

(See Attachment B).

33. This video depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities.

34. The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

35. The article notes that Respondent was contacted for comment before the article's publication, and many users of Twitter sent links to the video to Respondent following its publication. Forbes, The Huffington Post, Wired, and the Washington Post, among others, also reported on Complainant's interview and the video.

V. ADVERSE ACTIONS

36. On December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm. These inspections continued, occurring almost daily until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

9

37. On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received, via hand delivery, a two page letter from Respondent. The letter stated that Respondent was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Complainant's farm.

38. The December 29, 2014 letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

39. Complainant was informed that he would not receive another flock placement until he completed a training session concerning proper animal welfare and biosecurity practices.

40. A training session was planned for January 8, 2014. Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

41. As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2014, approximately 9 days after he would have typically received a new flock.

42. Complainant lost approximately $4,500 in earnings due to Respondent's delayed flock placement.

43. Respondent has continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily since January 15, 2015.

## VI. NEXUS/CONTRIBUTING FACTOR

10

44.    As noted above, Respondent was aware of the video footage taken by CIWF at the time of its publication, having been reached for comment by columnist Nicholas Kristoff, and having received messages including links to the video from users of Twitter.

45.    Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, just hours after the video's publication.

46.    The letter placing Complainant under a Performance Improvement Plan was issued by Respondent just over three weeks later, on December 29, 2014.

47.    In the letter placing Complainant under a Performance Improvement Plan, Respondent attributes its decision to audit Complainant's farm and place Complainant under a Performance Improvement Plan to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent ... with Perdue standards" particularly concerning.

48.    In the letter, Respondent suggests that it did not find any problematic conditions during its recent inspections of Complainant's farm, and describes the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

49.    In fact, the flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

50.    As noted above, prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation, and in fact considered Complainant to be one of its top producers.

11

51.     The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's decision to place him under a Performance Improvement Plan and subject his farm to increased scrutiny, and that Respondent would not have taken those actions regardless of Complainant's protected activity.

## VII.     CLAIM FOR RELIEF

52.     Complainant engaged in protected activity under the Food Safety Modernization Act's employee protection provision when he facilitated the production and publication of video footage depicting the condition of birds placed on his farm by Respondent and criticizing Respondent's practices. As noted above, Complainant believed that the condition of the birds raised on his farm was the result of Respondent's practices and conduct described in paragraphs 22-27 that compromised the welfare of the animals and increased their risk of becoming contaminated with or developing infections from salmonella, e-coli, and other harmful bacteria, threatening the health of consumers. Additionally, as noted above, the Respondent's use of the phrase "Humanely Raised" was misleading in light of the condition of the birds raised on Complainant's farm.

53.     Complainant also caused to be provided information that he reasonably believed to be a violation of the Food, Drug and Cosmetic Act to the federal government. As a result of the conditions exposed by Complainant and CIWF in early December 2014, Senators Feinstein and Booker began taking action to have the USDA stop this misleading practice. This resulted in a letter dated January 7, 2105 where the Senators wrote to USDA Secretary Vilsack demanding intervention into this ongoing practice of mislabeling poultry as "humanely raised." The Senators noted:

12

We write today to express our serious concern that the Food Safety and Inspection Service (FSIS) is approving false and misleading labels with animal welfare claims for meat and poultry products, such as "humanely raised" or "cage free." ... As you are aware, it is a violation of the Federal Meat Inspection Act and Poultry Products Inspection Act to label a product in a manner that is misleading or false.... It is our view that claims like "humanely raised" should only be approved by FSIS, or verified through the Process Verified Program, when there is evidence that animal welfare standards set by an independent third party, and which significantly exceed standard industry practice, are being met.

54. The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and Cosmetic Act, food is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4). 56. Respondent had knowledge of Complainant's protected activity, and Complainant's protected activity was a contributing factor in Respondent's decisions to place Complainant under a Performance Improvement Plan and to subject Complainant's farm to increased scrutiny. Respondent would not have taken those adverse actions regardless of Complainant's protected activity.

57. The foregoing facts demonstrate that Respondent violated the Food Safety Modernization Act's employee protection provision when it placed Complainant under a Performance Improvement Plan and subjected his farm to increased scrutiny.

## VII. PRAYER FOR RELIEF

58. Complainant seeks compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by Respondent, and for wages paid to his employee

13

as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

59.    Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

60.    Complainant seeks an order prohibiting Respondent from continuing to subject his facility to retaliatory increased inspections.

61.    Complainant seeks reasonable costs and attorney's fees, together with all other relief available at law and equity, including the costs of any expert witness fees.

Respectfully submitted,

Jeffery S. Gulley
Food & Public Health Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-457-0034 ext. 127
Fax. 202-457-0059
Email: JeffG@whistleblower.org

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

14

# EXHIBIT B

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

*In the Matter of*

| | |
|---|---|
| **CRAIG WATTS,** | ) |
| | ) |
| *Complainant,* | ) The Honorable ALJ Pamela A. Kultgen |
| | ) |
| *v.* | )Case No. 2016-FDA-00003 |
| | ) |
| **PERDUE FARMS, INC.,** | ) |
| | ) |
| *Respondent.* | ) |

## SUPPLEMENTAL WHISTLEBLOWER COMPLAINT

Complainant Craig Watts, through his counsel, files this Supplemental Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

### I.    INTRODUCTION

1.  (a) This action arises from and concerns adverse employment actions taken against Complainant by Respondent from December 2014 to January 2016 for which a contributing factor was Complainant's activity that was protected under 21 U.S.C. § 399d. This Supplemental Complaint updates and restates the facts of his Complaint, including his constructive discharge on January 26, 2016, thirteen days before OSHA dismissed his complaint entirely for lack of jurisdiction, a finding recently reversed by the ARB.  This supplement realleges and alleges food integrity violations and practices by Perdue from 2014 to 2016 in which the company falsely claimed to be following humane poultry growing protocols when the true practices were just the opposite.  Complainant rejected

*Supplemental Complaint*                    **1**

Perdue's implied assertion that humane poultry growing was achieved simply by discarding and concealing from public view sick and dead chickens from the company's flocks.

(b) Complainant decided to blow the whistle.  He determined that the Respondent had not designed, deployed, or maintained any viable internal or external channels for reporting these deceptive marketing statements or the inhumane practices and collateral practices of Perdue for placing, maintaining, and removing those chicken flocks. Complainant regarded any external USDA channels available to growers to not be viable for reporting food integrity concerns not directly related to contamination or adulteration of the raw poultry products marketed to consumers. Complainant was unaware of any dedicated or viable FDA external reporting channels available to poultry growers.  Complainant became aware of, and resorted to, public food integrity reporting channels to NGOs and the media, and thereby indirectly to Congress or other federal authorities.

(c) The poultry flocks that are the subject of this complaint at all times remained under the sole ownership and control rights and discretion of the Respondent.  Complainant and growers like him were employees under contract, despite the language in those contracts by Perdue disclaiming its legal obligations to said employees.

## II.    JURISDICTION AND EXHAUSTION

2.      This complaint, having been timely filed within 180 days of the adverse actions complained of, is timely.  OSHA had jurisdiction to investigate the allegations contained herein, any additional protected activity and adverse action that occurred subsequent to said complaint that reasonably would have been investigated in the scope of

*Supplemental Complaint*                              **2**

said OSHA investigation, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below.  OSHA issued its letter determination on February 8, 2016, that it lacked jurisdiction over the complaint, concluding that Complainant was not a covered employee.

3.    Per the Final Decision and Order of the Administrative Review Board (ARB) entered on March 5, 2019, and all proceedings since, up to and including the present proceedings in the OALJ, Complainant's claims have been properly exhausted and will continue to be exhausted throughout the present OALJ proceedings. The 2019 ARB found:

> On February 8, 2016, OSHA determined that, while Perdue was covered under the FSMA, Watts was not a covered employee of Perdue under the FSMA. Watts requested a hearing before an ALJ. Before the ALJ, Perdue filed a motion to dismiss for lack of subject matter jurisdiction. The ALJ granted Perdue's motion to dismiss pursuant to 29 C.F.R. § 18.70(a), concluding that she lacked jurisdiction to hear Watts's claim. Specifically, the ALJ reasoned that the raising of chickens is part of the poultry products industry, which is exempt from the FFDCA pursuant to the Poultry Products Inspection Act (PPIA), 21 U.S.C. § 467f (1979), and is therefore also exempt from the FSMA amendments adding the employee protection provisions to the FFDCA. Watts appealed this decision to the Administrative Review Board (ARB or Board).

4.    The 2019 ARB also found:

> Watts also argues that even if the PPIA excludes "poultry" from coverage under the FFDCA, the DOL is still a proper forum for his complaint because Watts had a reasonable belief that he and his employer were covered under the FFDCA and the FSMA. The FSMA's implementing regulations provide that the FSMA protects an employee who has done the following:
>
> > Provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the [FFDCA] or any order, rule, regulation, standard, or ban under the [FFDCA]; 29 C.F.R. § 1987.102(b)(1).

*Supplemental Complaint*                    **3**

5.　　On September 24, 2019, the Acting Secretary of the U.S. Department of Labor (DOL), represented by lawyers from the Solicitor's Office and by DOL Counsel for Whistleblower Programs, filed a motion with the Fourth Circuit requesting a remand of the case to the ARB. The sole objective of that motion was to allow the U.S. Food and Drug Administration (FDA) to participate as amicus because the FDA informed the Acting Secretary that the interpretation of the word "food" in this whistleblower case could have substantial implications for the FDA's ability to regulate the U.S. food supply under the FFDCA. The Petitioner separately joined in this remand request, while the Respondent, the U.S. Poultry & Egg Association, and the National Chicken Council all vigorously opposed it.  Following these vigorous oppositions, the Acting Secretary filed a reply and urged the Fourth Circuit to agree that the ARB should reconsider its decision with the benefit of the FDA's views. After considering the Acting Secretary's motion, Petitioner's response in support of it, and the oppositions filed by the Respondent and its amici, the Fourth Circuit granted the motion and remanded the case to the Board for further proceedings.

6.　　On May 28, 2020, the ARB entered its "Decision and Order Granting Reconsideration and Remanding to the Administrative Law Judge".  That 2020 ARB Remand Order found:

> This case arises under the employee protection provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended by Section 402 of the Food Safety and Modernization Act of 2011 (FSMA), and its implementing regulations at 29 C.F.R. § 1987 (2016). Section 402 of the FSMA protects from retaliation an employee who has engaged in protected activity pertaining to a violation or alleged violation of the FFDCA, or any order, rule, regulation, standard, or ban under the FFDCA. Craig Watts, the owner of C&A Farms, filed a complaint with the Department of Labor's Occupational Safety and

*Supplemental Complaint*                **4**

Health Administration (OSHA) alleging that Perdue Farms, Inc. (Perdue) retaliated against him for engaging in FSMA-related protected activities. OSHA dismissed the claim. Watts asked for a hearing, and the Administrative Law Judge (ALJ) assigned to the case also dismissed the claim. The ARB affirmed the ALJ's decision on March 5, 2019. Watts appealed the case to the United States Court of Appeals for the Fourth Circuit. On September 24, 2019, the Department of Labor moved that the Court remand the matter back to the ARB for additional consideration in light of briefing from the U.S. Food and Drug Administration (FDA). The Fourth Circuit granted that motion on January 7, 2020. *Watts v. U.S. Dept. of Labor*, Case No. 19-1487 (4th Cir. Jan. 7, 2020). Upon further briefing, the ARB vacates its March 5, 2019 Order and remands the matter back to the ALJ for further proceedings.

7.       On December 11, 2020, the OALJ entered an "Order Directing Parties to File Notices of Appearance by 1/6/2021, and Order Setting Briefing Schedule".  The parties complied.  For over a year, the OALJ has not acted further in this case, until the April 21, 2022 reassignment of the case to a new ALJ.  No pleadings on the merits have yet been filed by either party, and the only complaint of record is that originally filed with OSHA.

### III.    PARTIES

8.       Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where until January 2016 he raised chickens for Respondent under a 2009 written contract between the parties.  Under this contract, Respondent delivered flocks of chicks to Complainant, who housed and tended to each flock in accordance with standards set by Respondent.  Complainant fed, watered, and cared for those flocks using feed, medications, and other supplies provided by Respondent.

9.       Respondent retained title of each flock at all times, and an agent of Respondent typically visited Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately eight weeks.

*Supplemental Complaint*                    **5**

10.    At the end of flock's growth cycle, Complainant was compensated for his services by Respondent in accordance with a payment schedule.

11.    The foregoing facts demonstrate that Complainant was an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

12.    At the end of their growth cycle, flocks were picked up by agents of Respondent for transport to slaughter and processing facilities owned and operated by Respondent.  Respondent transported chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

13.    At these facilities, Respondent slaughters, processes, and packages chickens and turkeys for sale to consumers.  Respondent is one of the largest producers of poultry products in the United States and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

14.    Respondent also imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which Respondent processes for use in animal feed and pet food.  Those raw and processed commodities are also subject to FDA regulation apart from the poultry they are used upon.

15.    The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

*Supplemental Complaint*                                6

## IV.　FACTUAL ALLEGATIONS

### A.　Complainant's Job, Duties, and Performance

16.　Complainant began raising chickens for Respondent in 1992.  In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms.  Respondent asked Watts to sign a new contract with them in 1999, and Complainant has been raising chickens for Respondent continuously since then.

17.　Complainant was required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent.  These standards imposed numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities.  These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

18.　An employee of Respondent regularly visited Complainant's farm to ensure that Complainant was maintaining his facilities and tending to flocks in accordance with Respondent's standards.  Complainant had no authority, discretion, or control to do anything with this livestock exclusively owned by Respondent, nor over the care and processing of those owned flocks.  Typically, these visits were conducted by Respondent's Growout Supervisor for the region surrounding Complainant's farm, Lyn Price, and occurred approximately once per week during the flocks' growth cycles.  Complainant was known by Ms. Price to be one of Respondent's most successful and conscientious farmers.

*Supplemental Complaint*　　　　　　　　　　**7**

19.     At the end of their growth cycles, flocks were rated by Respondent in what was referred to as Respondent's "tournament system."  Complainant's compensation for each cycle was based in part upon these ratings.  Under this system, which is indistinguishable from a factory worker's performance appraisals or a brokerage employee's bonus/incentive structure, and which requires frequent ongoing ratings, Respondent's farmer employees' performance was measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group.  Complainant's flocks consistently received high ratings, and Complainant had been rated the top producer in his group numerous times.

20.     Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

B.      **Background Facts Relevant to Protected Activity**

21.     Prior to 2014, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant.  In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry.

22.     Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised.

*Supplemental Complaint*                            **8**

23.    For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches and sores.

24.    Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy.  For example, many birds arrived at Complainant's farm carrying infections, and died of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink.  Many others had leg deformities, impairing their ability to move about freely and comfortably.  Additionally, the birds in Complainant's facility rapidly grew heavy and lethargic, so that within weeks after placement they spent the vast majority of their time laying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts.

25.    In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was unwarranted and likely fraudulent.  As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom might be unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified and the product not as advertised.

*Supplemental Complaint*                                    **9**

26.     Complainant believed that the conditions described above were the result of Respondent's practices and other factors exclusively within Respondent's control.

27.     For example, Respondent controls the size of the flocks placed on Complainant's farm and the farms of other Respondent's farmer employees.   Respondent adjusted flock size to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density.  Complainant believed that Respondent crowded too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other.  Complainant believed that the flock density of flocks placed by Respondent on Complainant's farm had, at times, exceeded the National Chicken Council's animal welfare guidelines upon which Complainant believed that Respondent premised its use of the "Humanely Raised" label.

28.     Prior to 2014, Respondent stopped using antibiotics in its North Carolina hatcheries.  Like humane growing conditions, many consumers wanted drug-free birds. Complainant believed that Respondent had not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

29.     Complainant had observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities.  Complainant believed that Respondent was not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

*Supplemental Complaint*                    **10**

30.     Complainant believed that Respondent's breeding of chickens resulted in birds that gained weight too rapidly and that had a high rate of leg deformities.

31.     Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers from opening windows to allow access to sunlight and fresh air.  Complainant believed that this lack of sunlight and fresh air impaired the birds' quality of life, causing increased stress and reduced levels of activity.

32.     Complainant was prohibited by Respondent from administering any antibiotics or other medications to sick birds, and Respondent had refused to administer medication when Complainant sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

**C.     Protected Activity and Complainant's Resort to Reporting Channels**

33.     Complainant objected to Respondent's practices and conduct described above and its use of the phrase "Humanely Raised" on its labeling.  Complainant believed the opposite was true as Perdue compromised the birds' welfare and increased their risk of becoming contaminated with, and developing infections from, salmonella, e-coli, and other harmful bacteria.  He believed that this in turn was threatening the health of consumers, Perdue's brand, and the economic viability of his employment contract with the company.

34.     Complainant decided to report Respondent's practices through any viable and effective reporting channels. Complainant knew that reporting the above concerns to Perdue through its vague internal channels would be futile and career threatening: the company's

*Supplemental Complaint*                    **11**

CEO was on television touting its humanity in the industry, and Complainant's employment duties did not include regulatory enforcement and food integrity policy. He was also aware that USDA had not been involved in policing integrity within the poultry industry beyond safe growing practices that could impact post-slaughter meat safety. USDA surveillance and involvement with marketing to consumers was limited to safe inspection certification, and he was unaware of any external reporting channels to the USDA or FDA to act on his reports about consumer misrepresentation regarding human growing practices. The only viable alternative known to Complainant to protect public health, industry integrity, and consumers was to resort to public channels by reporting to industry-specific NGOs and media, which in turn have the best chance of attracting Congressional oversight. Complainant reported his concerns to Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF"). After determining that CIWF offered a viable reporting channel, Complainant arranged for the organization's investigatory visit to his farm, including fact collection by audiovisual recording of the actual living conditions of the Perdue-owned flocks.

35.    On or about May 22, 2014, CIWF began videotaping the flock and conducting its investigation into Complainant's food integrity reports at his farm. CIWF continued the investigation with a visit several weeks later, including videotaping the end of the flock growth cycle.

36.    CIWF condensed the footage it had filmed into an effective and concise reporting narrative, which Complainant authorized for publication. Complainant expected

*Supplemental Complaint*                    **12**

that Respondent would view the video and hoped and believed that the video's publication would prompt the public and regulators to join him in opposing Respondent's labeling and problematic animal husbandry practices.  Complainant also hoped and believed that the video's publication would prompt a significant investigation or other action by state and federal government officials.

37.     On December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm, "Abusing Chickens We Eat".  The newspaper criticized the obvious poor health of the birds and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds was deceptive.  The video produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, available here: http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html. This later led to further New York Times investigative journalism, and to the Sundance movie featuring Complainant, "Eating Animals", https://www.eatinganimalsmovie.com.

38.     The video journalism depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around.  The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts.  Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities.  The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of

*Supplemental Complaint*                    **13**

the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

39. The NYT article and other online publications disclosed that Respondent participated before publication. Twitter and other social media linked to the reports and video.

40. Complainant's protected activity included the filing of his OSHA complaint in February 2015, which triggered Respondent to make false and disparaging statements about him, notwithstanding the company's pretextual statements that it was trying to re-educate, rather than terminate him. The Respondent succeeded in the latter one year later.

## V.    ADVERSE ACTIONS

41. The day after release of the above referenced CIWF video, on December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm.

42. These inspections continued, occurring almost daily, until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

43. On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received a hand delivered letter from Respondent "implementing a

*Supplemental Complaint*                    **14**

Performance Improvement Plant for poultry welfare and biosecurity" on Complainant's farm.

44.    The December 29, 2014, letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses, and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

45.    Complainant was informed that he would not receive another flock placement until he completed a re-education program concerning proper animal welfare and biosecurity practices.

46.    A training session was planned for January 8, 2015.  Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

47.    As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2015, approximately nine days after he would have typically received a new flock.

48.    Complainant estimates that he lost approximately $4,500 in earnings due to that single delayed flock placement alone.

49.    Respondent continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily, even after January 15, 2015.

*Supplemental Complaint*                    **15**

50.    Perdue relied on the "Center for Food Integrity" (CFI) to rebut Complainant's public disclosures.  CFI provides support to the poultry industry.  On December 5, 2014, CFI released a statement blaming Watts for the state of Perdue's chickens, claiming he allowed lame chickens to continue their suffering and calling him "negligent" in his husbandry obligations.  CFI asserted the responsibility to respond to the needs of the flock lies with the farmer, but CFI provided no analysis of Perdue's actions or omissions.  CFI's defense of Perdue resulted in an embarrassing messaging dissonance because Perdue inspectors at Watts' farm on December 4, 2014, characterized his flock as "well cared for and content".

51.    Complainant lived in heightened anxiety from December 3, 2014, until January 26, 2016, that Perdue would terminate his employment contract and destroy his business and livelihood.  On or around December 19, 2014, Watts learned that Perdue had told Walmart, one of the large retailers that Perdue supplies, that Respondent would end its relationship with Complainant.

52.    According to the Perdue Producer Agreement that governed this employment relationship, the only reason a grower may be placed under the Performance Improvement Program ("PIP") is if the grower's "flocks fail to achieve Perdue's minimum standards of competitiveness."  However, Respondent's flock placed on Complainant's farm had not failed to achieve those minimum standards, and in fact had excelled.

53.    The Agreement mandated that growers be released from a PIP based on flock settlement averages.  There was no provision in Watts' agreement for placement on a PIP in

*Supplemental Complaint*                    **16**

these circumstances.  Respondent would often change the growers' requirements but not follow-through on implementing the specified obligations. As growers for Perdue, the farmers had to undertake large short-term and long-term debt obligations putting them at the whim and oppression of Perdue.

54.     Despite Respondent informing Complainant that the flock placed at his farm appeared on December 4, 2014 to be "well cared for and content", Respondent imposed extensive auditing and re-education requirements not based on the terms of the employment agreement.

55.     Respondent Perdue told Watts in a December 29, 2014 letter that Watts would have to "regain [Perdue's] trust".

56.     Perdue's announced plan of conduct kept Watts and his family in an unrelenting state of anxiety until his constructive termination in January 2016.  After his termination, he suffered additional anxiety and emotional and mental distress from the loss of his employment contract and livelihood.

57.     Respondent Perdue acted with abuse of authority or no authority in setting arbitrary, capricious, and invidious production requirements on Complainant.

58.     In said letter Perdue threatened Complainant Watts that it was alarmed and disturbed by the condition of the chickens entrusted to his care.  Perdue told him that his feelings of being unhappy with his grower relationship with Perdue disappointed them. Perdue reminded Watts that he could terminate his relationship with Perdue at any time.

*Supplemental Complaint*                              **17**

Perdue told Watts they would waive their 90-day notice requirement if Watts wished to terminate his employment contract immediately.

59.    Over six months later, Perdue continued to subject Watts to the arbitrary PIP which included bi-weekly inspections.  There was no end-date for the PIP, and Perdue offered no information as to how Watts could remove himself from the PIP.   Only after Complainant attorneys supplemented his Complaint on June 1, 2015, with allegations that Respondent was forcing him to remain on the abusive PIP or terminate the agreement, thus putting Respondent on notice of a forthcoming constructive termination claim, the company issued a notice on July 1, 2015, that the PIP had been completed.  This was pretext because the oppressive conditions and abusive treatment described above continued in the post-PIP ending of the relationship.  Complainant observed his reputation in the industry had been damaged.

60.    Perdue subjected Watts to more audits in the time following his whistleblowing than they had the prior three years combined.  On February 3, 2015, Perdue put Watts through an audit with a USDA auditor and then the next day, on February 4, 2015, Perdue sent four more truck or vanloads of auditors to Watts' farm.

61.    Despite the PIP letter stating that Complainant would receive written reports of each audit, Perdue never provided him with any reports from the audits.  Complainant did not receive any written or oral evaluations from the inspectors, nor did they provide him with a list or explanation of ways to "improve" his farm practices.  Instead, Perdue would make up entries in service reports or make suggestions for expensive equipment that were

*Supplemental Complaint*                            **18**

unmerited. This put Complainant in a state of anxiety about expensive and unnecessary changes to which Perdue subjected him for which his protected activity was an obvious contributing factor.

62. On April 27, 2015, Perdue's lawyers in a submission to OSHA accused Complainant Watts of developing a "cruel scheme" to intentionally create substandard conditions of animal welfare at his farm to "extort" and "publicly blackmail Perdue" to OSHA investigators. OSHA is not an adjudicatory forum; it is an investigation and enforcement administration. Statements submitted to OSHA by Perdue lawyers are statements to federal investigators. Respondent reported as fact to OSHA that Complainant was intentionally allowing sick, deformed, and dying chickens to suffer in order to produce a "self-serving propaganda video" intended to create a "tsunami" of public opinion against Perdue. Such allegations were extremely upsetting to Complainant Watts, who understood this as a statement that he was grossly failing to meet the Respondent's December 2014 letter expectation that he must regain the company's trust. Additionally, OSHA still had not tried to schedule any interview of Complainant, and he felt intimidated that Perdue's allegations were preventing him from having even an interview with OSHA. As a result of Respondent's ongoing harassing actions, dishonest conduct, and an unrelenting pattern of false representations regarding flock welfare, Complainant experienced unremitting decline in his emotional and mental health. To prompt him to terminate the contract, Respondent claimed Complainant's farm needed upgrades including computerized controllers and hi-tech lighting systems, all of which would be excessively expensive and require new indebtedness.

*Supplemental Complaint*                    **19**

63. Complainant still had debt to pay off despite his 20 plus years of operating, but experienced high chronic anxiety under attacks by Perdue's actions and statements. He had trouble sleeping and he ruminated on Perdue's bad conduct often all day and late into the night. The daily assault on Complainant's mental and physical health ultimately required him to withdraw from his contract with Perdue on January 26, 2016, while still awaiting some action from OSHA. Per Complainant's letter to OSHA dated June 1, 2015, he reasonably believed that Perdue intended to force him to terminate his contract:

> Now, nearly six months later, Mr. Watts continues to be subject to the arbitrary PIP which currently includes bi-weekly inspections. Mr. Watts does not currently receive any written or oral evaluations from PIP inspectors, nor have they provided him with a list or explanation of ways to "improve" his farm practices. There is no end-date for the PIP, and Perdue has offered no information as to how Mr. Watts may remove himself from the PIP. *FN15 Perdue does not explain how this continued scrutiny is consistent with its newly voiced allegations that Mr. Watts "staged" the CIWF video*. See Resp. Statement, at 1, 9.
> *FN15 The only option Perdue has presented to Mr. Watts as a way to end the PIP is for Mr. Watts to terminate his relationship with Perdue*. See Resp. Ex. 18, Perdue Dec. 29, 2014 letter ("I take this opportunity to remind you that the growing contract allows you to terminate your relationship with us at any time and seek a contract with another poultry company or use your houses for other business purpose that you may find more rewarding.")

(Emphasis added).

## VI. NEXUS/CONTRIBUTING FACTOR

64. Respondent was aware of Complainant's use of public reporting channels to CIWF and the New York Times.

65. Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, hours after he reports to this public channel were published.

*Supplemental Complaint*                    **20**

66. The letter placing Complainant on a PIP was issued by Respondent just over three weeks later, on December 29, 2014.

67. In the PIP letter, Respondent attributed its decision to audit Complainant's farm and place Complainant under a PIP to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent … with Perdue standards" particularly concerning. This is direct evidence of contributing factor.

68. In said letter, Respondent suggested it did not find any problematic conditions during its recent inspections of Complainant's farm, and described the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

69. The flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

70. Prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation and considered Complainant to be one of its top producers.

71. The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's adverse actions against him from December 5, 2014, up to and including his constructive discharge on January 26, 2016.

*Supplemental Complaint*                21

## VII.    CLAIM FOR RELIEF

72.    21 U.S.C. § 399d(a)(1) of the Food Safety Modernization Act created three types of statutorily protected channels for reporting and disclosing covered food safety and integrity issues: (1) an internal channel "to the employer"; (2) an external channel to any agency, department or instrumentality of "the Federal Government", which by definition includes Congress; and a second external channel to "the attorney general of a State"; and (3) a public channel to NGOs or the media who, in publishing a complainant's disclosures that may be received by one of the internal or external reporting channels, thereby function as "any person acting pursuant to a request of the employee" in "caus[ing] to be provided" said disclosures by Complainant.

73.    CIWF and the New York Times constituted such a protected public reporting channel, and both constituted a "person acting pursuant to a request of the employee".

74.    Complainant engaged in protected activity under 21 U.S.C. § 399d, the Food Safety Modernization Act's employee protection provision, when he made the above-described food integrity disclosures to the described public reporting channel.  He reasonably believed that in so doing he disclosed information relating to a violation, act or omission of the Respondent under the Food, Drug and Cosmetics Act, 21 U.S.C. 391 et seq., or an order, rule, regulation, standard, or ban thereunder (hereafter FDCA).

75.    Complainant reasonably believed that he was a covered employee under § 399d.

*Supplemental Complaint*                               **22**

76. The FDCA prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the FDCA food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). It is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4).

77. Filing a whistleblower complaint with OSHA is protected activity under § 399d(a)(1) because that agency is an instrumentality of the "Federal Government", and said complaint was information "provided [or] caused to be provided to the *** Federal Government."

78. Respondent had knowledge of Complainant's protected activity in using the public channel described above, and in using the OSHA whistleblower protection channel provided by § 399d(b).

79. Said protected activity was a contributing factor in all of Respondent's adverse actions against Complainant. The PIP itself and suggesting that Complainant terminate his contract were directly referenced in the PIP letter. The April 2015 disparagements of Complainant were made in direct response to his OSHA whistleblower complaint. Both contributed to the constructive discharge.

## VIII.   **PRAYER FOR RELIEF**

80. Complainant seeks compensatory damages for lost earnings, compensation and capital resulting from the loss of his employment with contract with Perdue.

81.    Complainant seeks general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above.

82.    Complainant seeks compensatory damages for the loss of income and expense incurred caused by the above-described delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

83.    Complainant seeks an award of pre-judgment or pre-award interest on the economic damages alleged above.

84.    Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

85.    Complainant seeks reasonable costs and attorney's fees, including the costs of any expert witness fees.

86.    Complainant seeks all other relief available at law and equity.

Respectfully submitted,

s/Thad M. Guyer
Thad M. Guyer, Esq.
Of Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006

Thad M. Guyer
Stephani L. Ayers

*Supplemental Complaint*                    **24**

T.M. Guyer and Ayers & Friends, P.C.
P.O. Box 1061, Medford, OR 97501
Tel. (Stephani): 813-382-7865

Email: Thad@guyerayers.com

Attorneys for Complainant

*Supplemental Complaint*                    **25**

# Perdue's Application for Issuance of Third-Party Subpoenas

# **<u>EXHIBIT C</u>**

## (CIWF Deposition Subpoena)

(04/2020) Administrative Subpoena to Appear and Testify at a Deposition                    Page 1 of 3

# United States Department of Labor
# OFFICE OF ADMINISTRATIVE LAW JUDGES

In Re:

Craig Watts

(Plaintiff/Complainant/Claimant)

v.

OALJ Case No: 2016-FDA-00003

Perdue Farms Inc.

(Defendant/Respondent/Employer/Carrier)

## SUBPOENA TO APPEAR AND TESTIFY AT A DEPOSITION

To:   Compassion in World Farming, Inc.       Address  211 East 43rd Street

City  New York                                State  NY    Zip Code   10017

**YOU ARE DIRECTED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in the above captioned proceeding.  If you are an organization that is not a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Attachment A.

Place of Testimony:                           Date:   04/08/2024

Venable LLP
151 West 42nd Street                          Time:   10:00 AM
New York, NY

The deposition will be recorded by this method:   Stenographic and Audio/Visual Recording

**YOU MUST ALSO BRING WITH YOU** the following documents, electronically stored information, or tangible things and permit their inspection, copying, testing or sampling of material (blank if not applicable):

The provisions of Code of Federal Regulations (CFR) 29 C.F.R. §§18.56(c) and 18.52(a), relating to your protection as a person subject to a subpoena, and 29 CFR §§18.56(d) and 18.56(e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

This subpoena is issued upon the application of (indicate attorney/representative for named party):

(Person requesting subpoena)                          (Address and Telephone Number)

|  |  |  |  |
|---|---|---|---|
| | | Firm Name | Venable LLP |
| Name | Kristin M. Koger | Address | 600 Massachusetts Ave, NW |
| Bar Number | DC No. 473438 | City | Washington |
| Phone Number | 2023444162 | State  DC | Zip Code  20001 |

**If this subpoena commands the production of documents, electronically stored information, or tangible things, a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  29 C.F.R. §18.56(b)**

IN WITNESS WHEREOF the undersigned United States Department of Labor Administrative Law Judge has digitally signed this subpoena.

Signature of Administrative Law Judge

## NOTICES

**NOTICE:** This subpoena is only valid in proceedings before the Office of Administrative Law Judges or Office of Workers' Compensation Programs. To be valid, this subpoena must bear the digital signature of a Department of Labor (DOL) administrative law judge.

**29 C.F.R. §18.56 Subpoenas**

**(c) Protecting a Person Subject to a Subpoena**.
*(1)  Avoiding Undue Burden or Expense; Sanctions*.  A party or representative responsible for requesting, issuing or serving a subpoena must take reasonable steps to avoid imposing undue burden on a person subject to the subpoena.  The judge must enforce this duty and impose an appropriate sanction.
*(2)  Command to Produce Materials or Permit Inspection*.
   *(A)  Appearance Not Required*.  A person commanded to produce documents, electronically stored information, or tangible things, or to permit inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition or hearing.
   *(B)  Objections*.  A person commanded to produce documents or tangible things or to permit inspection may serve on the party or representative designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises  - or to producing electronically stored information in the form or forms requested.  The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served
     (i)  At any time, upon notice to the commanded person, the serving party may move the judge for an order compelling production or inspection.
     (ii)  These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
*(3)  Quashing or Modifying a Subpoena*.
   *(A)  When Required*.  On timely motion, the judge must quash or modify a subpoena that:
     (i)  fails to allow a reasonable time to comply;
     (ii)  requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person  - except that, subject to paragraph (c)(3)(B)(iii) of this section, the person may be commanded to attend the formal hearing;
     (iii)  requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     (iv)  subjects a person to undue burden.
   *(B)  When permitted*.  To protect a person subject to or affected by a subpoena, the judge may, on motion, quash or modify the subpoena if it requires:
     (i)  disclosing a trade secret or other confidential research, development, or commercial information;
     (ii)  disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
     (iii)  a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend the formal hearing.
**(d) Duties in Responding to a Subpoena.**
(1) *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:
   (A)  *Documents*.  A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B)  *Form for Producing Electronically Stored Information Not Specified*.  If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is usually maintained or in a reasonably usable form or forms.

**HIPAA NOTICE:** In regard to the Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act of 1996, if this subpoena does not bear the digitized signature of a DOL administrative law judge, it is not valid under 45 C.F.R. §§164.512(e), 164.512 (f) or 164.512(l).

   (C)  *Electronically Stored Information Produced in Only One Form*.  The person responding need not produce the same electronically stored information in more than one form.
   (D)  *Inaccessible Electronically Stored Information*.  The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or expense.  On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost.  If that showing is made, the judge may nonetheless order discovery from such sources if the requesting party show good cause.  The judge may specify conditions for the discovery.
(2) *Claiming Privilege or Protection*.
   (A)  *Information Withheld*.  A person withholding subpoenaed information under a claim that it is privileged or subject to protection as hearing-preparation material must:
     (i)  expressly make the claim; and
     (ii)  describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B)  *Information Produced*.  If information produced in response to a subpoena is subject to a claim of privilege or of protection as hearing-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the judge *in camera* for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Failure to Obey**.  When a person fails to obey a subpoena, the party adversely affected by the failure may, when authorized by statute or law, apply to the appropriate District Court to enforce the subpoena.

**29 C.F.R. §18.52 Protective orders**

**(a)  In General**.  A party or person from whom discovery is sought may file a written motion for a protective order.  The motion must include a certification that the movant has in good faith conferred or attempted to confer with the affected parties in an effort to resolve the dispute without the judge's action. The judge may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
(1)  Forbidding the disclosure or discovery;
(2)  Specifying terms, including a designation of the time and place,  for  the disclosure or discovery;
(3)  Prescribing a discovery method other than the one selected by the party seeking discovery;
(4)  Forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
(5)  Designating the persons who may be present while discovery is conducted;
(6)  Requiring that a deposition be sealed and only opened on the judge's order;
(7)  Requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and
(8)  Requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the judge directs.

Case 5:24-cv-00477-BO-RJ    Document 6-12    Filed 08/23/24    Page 107 of 156

JA339

## PROOF OF SERVICE

On      I received this subpoena and served it pursuant to 29 CFR §18.56(b) as follows:

_____     _____

Person served (print name)        Date of Service

_____     _____

Place of Service        Manner of Service

☐ I have also tendered to the witness fees for one day's attendance and the mileage allowed by law, in the amount of $ _____

☐ I have not tendered witness fees for one day's attendance and for the mileage allowed by law.

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Address:

_____
Signature of Server     Date

City:

_____
Name of Server (Print Name)

State:    ZIP:

## ATTACHMENT A

Pursuant to 29 C.F.R. §§ 18.56 and 18.64(b)(6), Respondent Perdue Farms Inc. ("Perdue"), by and through counsel, will take the deposition of Compassion in World Farming, Inc. ("CIWF") on Monday, April 8, 2024 at 10:00 AM Eastern. CIWF shall designate one or more persons who shall be prepared to testify on its behalf regarding the Topics of examination specified below. CIWF is requested to provide, in writing at least three (3) business days prior to the deposition, the name(s) of the person(s) who will testify on CIWF's behalf concerning the Topics of examination specified below.

The deposition will be conducted before a person duly authorized to administer oaths, shall be recorded by audio, video, and stenographic means, and will continue from day-to-day until completed.

## DEFINITIONS

1.    "Communications" means any statement, utterance, notation, discussions, transfer or exchange of information of any nature whatsoever, by or to whomever, whether oral or written, or whether face-to-face, by telephone, virtually (for example, Google Meet, Microsoft Teams, Slack, Webex, or Zoom meetings), by mail, personal delivery, or otherwise, letters, correspondence, e-mails, conversations, memoranda, meetings, interviews, consultations, agreements, and other understandings.

2.    "Document" shall mean all material defined in Federal Rule of Civil Procedure 34 and shall have the broadest meaning possible.

3.    "Relating to" means showing, concerning, disclosing, referring, averring to, in connection with, comprising, evidencing, pertaining, constituting, or reviewing, in whole or in part.

1

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5.      "Complaints," shall refer to the Notice of Whistleblower Complaint filed in *Watts v. Perdue Farms, Inc.*, before the United States Department of Labor Occupational Safety and Health Administration on February 23, 2015 (attached hereto as "Exhibit A") and the Supplemental Whistleblower Complaint filed in *Watts v. Perdue Farms, Inc.*, Case No. 2016-FDA-00003, before the United States Department of Labor, Office of Administrative Law Judges, filed on April 25, 2022 (attached hereto as "Exhibit B").

6.      "Complainant," refers to Craig Watts and any persons acting or purporting to act on Complainant's behalf including his counsel, representatives, agents, employees, consultants, or investigators and their counsel, employees, representatives, agents, investigators or consultants.

7.      "C&A Farms" shall refer to the farm/entity owned and operated by Complainant, as discussed in his Complaint.

8.      "Respondent" or "Perdue" means Perdue Farms Inc., its agents, employees, officers, directors, principals and other representatives, and its predecessors, successors, affiliates, subsidiaries, parent corporations or assigns, collectively and singularly, and their agents, employees, officers, directors, principals and other representatives.

9.      "Compassion in World Farming, Inc.," "CIWF," "you," or "your" means Compassion in World Farming, Inc., its directors, officers, owners, employees and agents.

10.     Unless stated otherwise, the relevant time period for these Topics shall be from January 1, 2012 through the present.

2

## DEPOSITION TOPICS

**Topic No. 1**

The allegations in the Complaints relating to CIWF.

**Topic No. 2**

Communications between any person employed by CIWF and Craig Watts.

**Topic No. 3**

Communications between CIWF and the Government Accountability Project relating to

Craig Watts.

**Topic No. 4**

Any visit by CIWF to C&A Farms, including but not limited to, visits to take video footage,

photographic or other images at C&A Farms.

**Topic No. 5**

The production and distribution of any video produced by CIWF that included video

footage, photographic or other images taken at C&A Farms.

**Topic No. 6**

Communications between CIWF and media outlets or journalists, including but not limited

to the New York Times, regarding any video, photographic or other images produced by CIWF

that included footage taken at C&A Farms.

3

# EXHIBIT A

**UNITED STATES DEPARTMENT OF LABOR**
**OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION**

*In the Matter of*

| | | |
|---|---|---|
| **CRAIG WATTS,** | ) | |
| | ) | |
| *Complainant,* | ) | |
| | ) | |
| *v.* | ) | Case No. |
| | ) | |
| **PERDUE FARMS, INC.,** | ) | |
| | ) | |
| *Respondent.* | ) | |

### NOTICE OF WHISTLEBLOWER COMPLAINT

Complainant Craig Watts, through his counsel, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

### I.    INTRODUCTION

1.    This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d, by Complainant, Mr. Craig Watts, against Perdue Farms, Incorporated (hereafter "Respondent"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent in December 2014, and January 2015, in retaliation for activity protected under 21 U.S.C. § 399d.

### II.    JURISDICTION

2.    This Complaint having been timely filed within 180 days of the adverse actions complained of, OSHA has jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below.

1

## III. PARTIES

3. Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where he raises chickens for Respondent under a written contract between the parties. Under this contract, Respondent delivers flocks of chicks to Complainant, who houses and tends to each flock in accordance with standards set by Respondent. Complainant feeds, waters, and cares for those flocks using feed, medications, and other supplies provided by Respondent.

4. Respondent retains title of each flock at all times, and an agent of Respondent typically visits Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately six weeks.

5. At the end of flock's growth cycle, Respondent compensates Complainant for his services in accordance with a payment schedule.

6. The foregoing facts demonstrate that Complainant is an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

7. At the end of their growth cycle, Respondent's agents pick up the flocks for transport to slaughter and processing facilities owned and operated by Respondent. Respondent transports chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

8. At these facilities, Respondent slaughters, processes and packages chickens and turkeys for sale to consumers. Respondent is one of the largest producers of poultry products in the United States, and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

9. Respondent also imports, exports, receives and stores grains and other raw agricultural commodities, which Respondent processes for use in animal feed and pet food.

2

10. The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

## IV. FACTUAL ALLEGATIONS

### A. Complainant's Job, Duties, and Performance

11. Complainant began raising chickens for Respondent in 1992. In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms, but was asked to sign a new contract with Respondent in 1999, and has been raising chickens for Respondent continuously since then. Complainant currently raises approximately 720,000 chickens per year for Respondent.

12. Complainant is required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent. These standards impose numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles, and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

13. An employee of Respondent regularly visits Complainant's farm to ensure that Complainant is maintaining his facilities and tending to flocks in accordance with Respondent's standards. Typically, these visits occur approximately once per week during the flocks' growth cycles. Complainant is known by Ms. Price, Respondent's Growout Supervisor for the region surrounding Complainant's farm, to be one of Respondent's most successful and conscientious farmers.

3

14.     At the end of their growth cycles, Respondent rates flocks in what is referred to as Respondent's "tournament system." Complainant's compensation for each cycle is based in part upon these ratings. Under this system, farmers' performance is measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group. Complainant's flocks consistently receive high ratings, and Complainant has been rated the top producer in his group numerous times.

15.     Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

### B.     Background Facts Relevant to Protected Activity

16.     Several years ago, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant. In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry. The commercial depicted Perdue's Chairman walking through what he purports to be a Perdue chicken farm while extolling the virtues of Perdue's humane treatment of chickens and Perdue "doing the right thing." Perdue's Chairman noted in the commercial that consumers are much more interested in knowing how chickens are raised and treated. Perdue's "Humanely Raised" label was intentionally designed by Perdue to solicit more business from these consumers.

17.     Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised. Perdue alone sets the guidelines for Watts and their other chicken farmers

4

to follow that dictate what the chickens are fed, in what space the flock is to be contained, and what brand and type of equipment Complainant is to use.

18.     For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches, sores and increased risk of infection. Following Respondent's specifications, the chicken houses contain around 30,000 chickens packed into a tight space with barely any room to move.

19.     Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy. For example, many birds arrive at Complainant's farm carrying infections, and die of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink. Many others have leg deformities, impairing their ability to move about freely and comfortably. Following Perdue's specifications, which require the chickens to be raised to grow unnaturally large and fast, the birds in Complainant's facility rapidly grow heavy and lethargic, so that within weeks after placement they spend the vast majority of their time lying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts. The high growth rate makes it difficult for the flock to breathe and walk.

20.     In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was not truthful. As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom are wholly unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified.

5

21.     The conditions described above in paragraphs 17-20 were the result of Respondent's practices and other factors within Respondent's control.

22.     For example, Respondent controls the size of the flocks placed on Complainant's farm, which Respondent adjusts to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density. Respondent crowds too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other.  The flock density of flocks placed by Respondent on Complainant's farm has, at times, even exceeded the National Chicken Council's animal welfare guidelines.

23.     A few years ago, Respondent stopped using antibiotics in its North Carolina hatcheries.  Respondent has not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

24.     In recent years, Complainant has observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities. Respondent is not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

25.     Respondent's breeding of chickens has resulted in birds that gain weight too rapidly and that have a high rate of leg deformities.  Within weeks after placement, these birds grow heavy and lethargic, and spend most of their time laying around on their litter, causing the birds to develop sores and large patches of red, irritated flesh on their breasts.

26.     Several years ago, Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers

6

from opening windows to allow access to sunlight and fresh air. This lack of sunlight and fresh air has impaired the birds' quality of life, causing overheating, increased stress and reduced levels of activity.

27.     Respondent prohibits Complainant from administering any antibiotics or other medications to sick birds, and Respondent has refused to administer medication when Complainant has sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

### C.     Protected Activity

28.     Complainant objected to Respondent's use of the phrase "Humanely Raised" on its labeling and to its practices and conduct described in paragraphs 22-27 above, which Complainant believed compromised the birds' welfare and increased their risk of becoming contaminated with and developing infections from salmonella, e-coli, and other harmful bacteria, in turn threatening the health of consumers.

29.     In furtherance of an effort to oppose those practices and Respondent's use of the phrase "Humanely Raised" on its labeling, Complainant invited Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF"), to visit his farm and shoot audiovisual footage of the chickens in his four chicken houses. CIWF campaigns on a global level to end cruel factory farming practices, often relying on undercover investigations. In the US, chicken factory farms are notoriously inaccessible to anyone outside of the industry, yet they account for ninety-five percent of all factory-farmed animals (or nearly 9 billion animals). Director Garces reported during this investigation into Perdue that it was the first time she had been invited to observe by such a contract farmer.

7

30.     On or about May 22, 2014, CIWF Director Garces and  videographer Raegan Hodge visited Complainant's farm and began videotaping the flock, which had recently been placed. Both individuals returned several weeks later to film more footage of the flock, which was then nearing the end of its growth cycle.

31.     CIWF condensed the footage it had filmed into a short video, which Complainant agreed to allow CIWF to publish at a later date.  Complainant expected that Respondent would view the video, and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt an investigation or other action by government officials.  This video and interview with Complainant remains a key piece of advocacy material publicly available and maintained on CIWF's website, "Why one Perdue factory famer speaks out" <http://action.ciwf.com/ea-action/action?ea.client.id=1872&ea.campaign.id=32809&ea.tracking.id=homepage&_ga=1.7779 3172.1269961080.1424111353> (See Attachment A).  In his interview, Complainant explains he is disclosing his complaints because the Perdue chicken is not "as advertised"; because the consumers are being "hoodwinked"; and because the chickens are not "happy" or "healthy."

32.     Late at night on December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm. The column criticizes the apparent poor health of the birds, and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds is inappropriate.  An excerpt of thevideo produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, publicly available here:

8

http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html

(See Attachment B).

33. This video depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities.

34. The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

35. The article notes that Respondent was contacted for comment before the article's publication, and many users of Twitter sent links to the video to Respondent following its publication. Forbes, The Huffington Post, Wired, and the Washington Post, among others, also reported on Complainant's interview and the video.

V.   ADVERSE ACTIONS

36. On December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm. These inspections continued, occurring almost daily until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

9

37.     On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received, via hand delivery, a two page letter from Respondent. The letter stated that Respondent was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Complainant's farm.

38.     The December 29, 2014 letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

39.     Complainant was informed that he would not receive another flock placement until he completed a training session concerning proper animal welfare and biosecurity practices.

40.     A training session was planned for January 8, 2014. Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

41.     As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2014, approximately 9 days after he would have typically received a new flock.

42.     Complainant lost approximately $4,500 in earnings due to Respondent's delayed flock placement.

43.     Respondent has continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily since January 15, 2015.

## VI.     NEXUS/CONTRIBUTING FACTOR

10

44. As noted above, Respondent was aware of the video footage taken by CIWF at the time of its publication, having been reached for comment by columnist Nicholas Kristoff, and having received messages including links to the video from users of Twitter.

45. Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, just hours after the video's publication.

46. The letter placing Complainant under a Performance Improvement Plan was issued by Respondent just over three weeks later, on December 29, 2014.

47. In the letter placing Complainant under a Performance Improvement Plan, Respondent attributes its decision to audit Complainant's farm and place Complainant under a Performance Improvement Plan to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent ... with Perdue standards" particularly concerning.

48. In the letter, Respondent suggests that it did not find any problematic conditions during its recent inspections of Complainant's farm, and describes the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

49. In fact, the flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

50. As noted above, prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation, and in fact considered Complainant to be one of its top producers.

11

51.     The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's decision to place him under a Performance Improvement Plan and subject his farm to increased scrutiny, and that Respondent would not have taken those actions regardless of Complainant's protected activity.

## VII.    CLAIM FOR RELIEF

52.     Complainant engaged in protected activity under the Food Safety Modernization Act's employee protection provision when he facilitated the production and publication of video footage depicting the condition of birds placed on his farm by Respondent and criticizing Respondent's practices.  As noted above, Complainant believed that the condition of the birds raised on his farm was the result of Respondent's practices and conduct described in paragraphs 22-27 that compromised the welfare of the animals and increased their risk of becoming contaminated with or developing infections from salmonella, e-coli, and other harmful bacteria, threatening the health of consumers.  Additionally, as noted above, the Respondent's use of the phrase "Humanely Raised" was misleading in light of the condition of the birds raised on Complainant's farm.

53.     Complainant also caused to be provided information that he reasonably believed to be a violation of the Food, Drug and Cosmetic Act to the federal government.  As a result of the conditions exposed by Complainant and CIWF in early December 2014, Senators Feinstein and Booker began taking action to have the USDA stop this misleading practice.  This resulted in a letter dated January 7, 2105 where the Senators wrote to USDA Secretary Vilsack demanding intervention into this ongoing practice of mislabeling poultry as "humanely raised."  The Senators noted:

12

We write today to express our serious concern that the Food Safety and Inspection Service (FSIS) is approving false and misleading labels with animal welfare claims for meat and poultry products, such as "humanely raised" or "cage free." ... As you are aware, it is a violation of the Federal Meat Inspection Act and Poultry Products Inspection Act to label a product in a manner that is misleading or false.... It is our view that claims like "humanely raised" should only be approved by FSIS, or verified through the Process Verified Program, when there is evidence that animal welfare standards set by an independent third party, and which significantly exceed standard industry practice, are being met.

54. The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and Cosmetic Act, food is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4). 56. Respondent had knowledge of Complainant's protected activity, and Complainant's protected activity was a contributing factor in Respondent's decisions to place Complainant under a Performance Improvement Plan and to subject Complainant's farm to increased scrutiny. Respondent would not have taken those adverse actions regardless of Complainant's protected activity.

57. The foregoing facts demonstrate that Respondent violated the Food Safety Modernization Act's employee protection provision when it placed Complainant under a Performance Improvement Plan and subjected his farm to increased scrutiny.

## VII. PRAYER FOR RELIEF

58. Complainant seeks compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by Respondent, and for wages paid to his employee

13

as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

59.     Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

60.     Complainant seeks an order prohibiting Respondent from continuing to subject his facility to retaliatory increased inspections.

61.     Complainant seeks reasonable costs and attorney's fees, together with all other relief available at law and equity, including the costs of any expert witness fees.

Respectfully submitted,

Jeffery S. Gulley
Food & Public Health Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-457-0034 ext. 127
Fax. 202-457-0059
Email: JeffG@whistleblower.org

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

14

# EXHIBIT B

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

*In the Matter of*

| | |
|---|---|
| **CRAIG WATTS,** | ) |
| | ) |
| *Complainant,* | ) The Honorable ALJ Pamela A. Kultgen |
| | ) |
| *v.* | )Case No. 2016-FDA-00003 |
| | ) |
| **PERDUE FARMS, INC.,** | ) |
| | ) |
| *Respondent.* | ) |

<u>**SUPPLEMENTAL WHISTLEBLOWER COMPLAINT**</u>

Complainant Craig Watts, through his counsel, files this Supplemental Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d.

**I.     INTRODUCTION**

1.  (a) This action arises from and concerns adverse employment actions taken against Complainant by Respondent from December 2014 to January 2016 for which a contributing factor was Complainant's activity that was protected under 21 U.S.C. § 399d. This Supplemental Complaint updates and restates the facts of his Complaint, including his constructive discharge on January 26, 2016, thirteen days before OSHA dismissed his complaint entirely for lack of jurisdiction, a finding recently reversed by the ARB.  This supplement realleges and alleges food integrity violations and practices by Perdue from 2014 to 2016 in which the company falsely claimed to be following humane poultry growing protocols when the true practices were just the opposite.  Complainant rejected

*Supplemental Complaint*                    1

Perdue's implied assertion that humane poultry growing was achieved simply by discarding and concealing from public view sick and dead chickens from the company's flocks.

(b) Complainant decided to blow the whistle. He determined that the Respondent had not designed, deployed, or maintained any viable internal or external channels for reporting these deceptive marketing statements or the inhumane practices and collateral practices of Perdue for placing, maintaining, and removing those chicken flocks. Complainant regarded any external USDA channels available to growers to not be viable for reporting food integrity concerns not directly related to contamination or adulteration of the raw poultry products marketed to consumers. Complainant was unaware of any dedicated or viable FDA external reporting channels available to poultry growers. Complainant became aware of, and resorted to, public food integrity reporting channels to NGOs and the media, and thereby indirectly to Congress or other federal authorities.

(c) The poultry flocks that are the subject of this complaint at all times remained under the sole ownership and control rights and discretion of the Respondent. Complainant and growers like him were employees under contract, despite the language in those contracts by Perdue disclaiming its legal obligations to said employees.

## II.    JURISDICTION AND EXHAUSTION

2.    This complaint, having been timely filed within 180 days of the adverse actions complained of, is timely. OSHA had jurisdiction to investigate the allegations contained herein, any additional protected activity and adverse action that occurred subsequent to said complaint that reasonably would have been investigated in the scope of

*Supplemental Complaint*                    **2**

said OSHA investigation, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below. OSHA issued its letter determination on February 8, 2016, that it lacked jurisdiction over the complaint, concluding that Complainant was not a covered employee.

3. Per the Final Decision and Order of the Administrative Review Board (ARB) entered on March 5, 2019, and all proceedings since, up to and including the present proceedings in the OALJ, Complainant's claims have been properly exhausted and will continue to be exhausted throughout the present OALJ proceedings. The 2019 ARB found:

> On February 8, 2016, OSHA determined that, while Perdue was covered under the FSMA, Watts was not a covered employee of Perdue under the FSMA. Watts requested a hearing before an ALJ. Before the ALJ, Perdue filed a motion to dismiss for lack of subject matter jurisdiction. The ALJ granted Perdue's motion to dismiss pursuant to 29 C.F.R. § 18.70(a), concluding that she lacked jurisdiction to hear Watts's claim. Specifically, the ALJ reasoned that the raising of chickens is part of the poultry products industry, which is exempt from the FFDCA pursuant to the Poultry Products Inspection Act (PPIA), 21 U.S.C. § 467f (1979), and is therefore also exempt from the FSMA amendments adding the employee protection provisions to the FFDCA. Watts appealed this decision to the Administrative Review Board (ARB or Board).

4. The 2019 ARB also found:

> Watts also argues that even if the PPIA excludes "poultry" from coverage under the FFDCA, the DOL is still a proper forum for his complaint because Watts had a reasonable belief that he and his employer were covered under the FFDCA and the FSMA. The FSMA's implementing regulations provide that the FSMA protects an employee who has done the following:

>> Provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the [FFDCA] or any order, rule, regulation, standard, or ban under the [FFDCA]; 29 C.F.R. § 1987.102(b)(1).

*Supplemental Complaint*                    **3**

5. On September 24, 2019, the Acting Secretary of the U.S. Department of Labor (DOL), represented by lawyers from the Solicitor's Office and by DOL Counsel for Whistleblower Programs, filed a motion with the Fourth Circuit requesting a remand of the case to the ARB. The sole objective of that motion was to allow the U.S. Food and Drug Administration (FDA) to participate as amicus because the FDA informed the Acting Secretary that the interpretation of the word "food" in this whistleblower case could have substantial implications for the FDA's ability to regulate the U.S. food supply under the FFDCA. The Petitioner separately joined in this remand request, while the Respondent, the U.S. Poultry & Egg Association, and the National Chicken Council all vigorously opposed it. Following these vigorous oppositions, the Acting Secretary filed a reply and urged the Fourth Circuit to agree that the ARB should reconsider its decision with the benefit of the FDA's views. After considering the Acting Secretary's motion, Petitioner's response in support of it, and the oppositions filed by the Respondent and its amici, the Fourth Circuit granted the motion and remanded the case to the Board for further proceedings.

6. On May 28, 2020, the ARB entered its "Decision and Order Granting Reconsideration and Remanding to the Administrative Law Judge". That 2020 ARB Remand Order found:

> This case arises under the employee protection provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended by Section 402 of the Food Safety and Modernization Act of 2011 (FSMA), and its implementing regulations at 29 C.F.R. § 1987 (2016). Section 402 of the FSMA protects from retaliation an employee who has engaged in protected activity pertaining to a violation or alleged violation of the FFDCA, or any order, rule, regulation, standard, or ban under the FFDCA. Craig Watts, the owner of C&A Farms, filed a complaint with the Department of Labor's Occupational Safety and

*Supplemental Complaint*                    **4**

Health Administration (OSHA) alleging that Perdue Farms, Inc. (Perdue) retaliated against him for engaging in FSMA-related protected activities. OSHA dismissed the claim. Watts asked for a hearing, and the Administrative Law Judge (ALJ) assigned to the case also dismissed the claim. The ARB affirmed the ALJ's decision on March 5, 2019. Watts appealed the case to the United States Court of Appeals for the Fourth Circuit. On September 24, 2019, the Department of Labor moved that the Court remand the matter back to the ARB for additional consideration in light of briefing from the U.S. Food and Drug Administration (FDA). The Fourth Circuit granted that motion on January 7, 2020. *Watts v. U.S. Dept. of Labor*, Case No. 19-1487 (4th Cir. Jan. 7, 2020). Upon further briefing, the ARB vacates its March 5, 2019 Order and remands the matter back to the ALJ for further proceedings.

7.      On December 11, 2020, the OALJ entered an "Order Directing Parties to File Notices of Appearance by 1/6/2021, and Order Setting Briefing Schedule".  The parties complied.  For over a year, the OALJ has not acted further in this case, until the April 21, 2022 reassignment of the case to a new ALJ.  No pleadings on the merits have yet been filed by either party, and the only complaint of record is that originally filed with OSHA.

### III.    PARTIES

8.      Complainant Craig Watts owns and operates C&A Farms in Fairmont, North Carolina, where until January 2016 he raised chickens for Respondent under a 2009 written contract between the parties.  Under this contract, Respondent delivered flocks of chicks to Complainant, who housed and tended to each flock in accordance with standards set by Respondent.  Complainant fed, watered, and cared for those flocks using feed, medications, and other supplies provided by Respondent.

9.      Respondent retained title of each flock at all times, and an agent of Respondent typically visited Complainant's farm approximately once per week to check on each flock throughout its growth cycle, which lasts approximately eight weeks.

*Supplemental Complaint*                    **5**

10.     At the end of flock's growth cycle, Complainant was compensated for his services by Respondent in accordance with a payment schedule.

11.     The foregoing facts demonstrate that Complainant was an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e).

12.     At the end of their growth cycle, flocks were picked up by agents of Respondent for transport to slaughter and processing facilities owned and operated by Respondent.  Respondent transported chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

13.     At these facilities, Respondent slaughters, processes, and packages chickens and turkeys for sale to consumers.  Respondent is one of the largest producers of poultry products in the United States and sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.

14.     Respondent also imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which Respondent processes for use in animal feed and pet food.  Those raw and processed commodities are also subject to FDA regulation apart from the poultry they are used upon.

15.     The foregoing facts demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

*Supplemental Complaint*                    **6**

## IV.    FACTUAL ALLEGATIONS

### A.    Complainant's Job, Duties, and Performance

16.    Complainant began raising chickens for Respondent in 1992.  In 1998, Complainant ended his contract with Respondent and began raising chickens for another poultry producer, Mountaire Farms.  Respondent asked Watts to sign a new contract with them in 1999, and Complainant has been raising chickens for Respondent continuously since then.

17.    Complainant was required to house and tend the flocks placed on his farm by Respondent in accordance with standards set by Respondent.  These standards imposed numerous requirements on the structure, outfitting, and maintenance of Complainant's facilities.  These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional tasks to be performed on particular key dates during and in between the flocks' cycles.

18.    An employee of Respondent regularly visited Complainant's farm to ensure that Complainant was maintaining his facilities and tending to flocks in accordance with Respondent's standards.  Complainant had no authority, discretion, or control to do anything with this livestock exclusively owned by Respondent, nor over the care and processing of those owned flocks.  Typically, these visits were conducted by Respondent's Growout Supervisor for the region surrounding Complainant's farm, Lyn Price, and occurred approximately once per week during the flocks' growth cycles.  Complainant was known by Ms. Price to be one of Respondent's most successful and conscientious farmers.

*Supplemental Complaint*                          7

19. At the end of their growth cycles, flocks were rated by Respondent in what was referred to as Respondent's "tournament system." Complainant's compensation for each cycle was based in part upon these ratings. Under this system, which is indistinguishable from a factory worker's performance appraisals or a brokerage employee's bonus/incentive structure, and which requires frequent ongoing ratings, Respondent's farmer employees' performance was measured by assessing the quality of each flock, and each flock is placed in a group and given a rating based upon a comparison to other farmers' flocks in the group. Complainant's flocks consistently received high ratings, and Complainant had been rated the top producer in his group numerous times.

20. Prior to the adverse actions discussed below, Respondent had never admonished or otherwise taken any adverse action against Complainant, and Complainant had never received any complaints about his performance.

**B.    Background Facts Relevant to Protected Activity**

21. Prior to 2014, Respondent began affixing the phrase "Humanely Raised" on the labeling of certain of its poultry products, including those raised by Complainant. In June 2012, while staying in a motel room in Brookings, South Dakota, Complainant saw a commercial released by Respondent advertising its "Humanely Raised" poultry.

22. Complainant noted that the condition of the flock depicted in the commercial did not match the condition of the flocks raised on his farm or other farms on which Respondent's chickens were raised.

*Supplemental Complaint*                    **8**

23.    For example, while the flocks depicted in Respondent's commercial appeared to have ample space to roam around freely, the flocks in Complainant's facilities were typically so crowded that birds would step on each other to access food and water, leading to scratches and sores.

24.    Additionally, while the flocks depicted in Respondent's commercial appeared to be healthy, active, and content, the birds in Complainant's facilities often appeared discontented and unhealthy.  For example, many birds arrived at Complainant's farm carrying infections, and died of apparent illness shortly after placement, sometimes at the pans where the birds eat and drink.  Many others had leg deformities, impairing their ability to move about freely and comfortably.  Additionally, the birds in Complainant's facility rapidly grew heavy and lethargic, so that within weeks after placement they spent the vast majority of their time laying down on top of their litter, causing them to lose feathers and develop large patches of red, irritated flesh across their breasts.

25.    In light of the condition of the flocks at his facility and at other facilities where Respondent's birds are raised, Complainant believed that use of the phrase "Humanely Raised" on their labeling was unwarranted and likely fraudulent.  As a result, Complainant believed that Respondent's use of that phrase on its labeling was misleading to consumers, most of whom might be unaware of the actual conditions in which Respondent's chickens are raised, and most of whom Complainant believed would, if made aware, agree that the labeling was unjustified and the product not as advertised.

*Supplemental Complaint*                                    **9**

26.     Complainant believed that the conditions described above were the result of Respondent's practices and other factors exclusively within Respondent's control.

27.     For example, Respondent controls the size of the flocks placed on Complainant's farm and the farms of other Respondent's farmer employees.   Respondent adjusted flock size to achieve a target density of pounds of poultry per square foot of floor space in each chicken house, referred to as the flock density.  Complainant believed that Respondent crowded too many chickens into each house, impairing the birds' ability to move around freely and access food and water without trampling each other.  Complainant believed that the flock density of flocks placed by Respondent on Complainant's farm had, at times, exceeded the National Chicken Council's animal welfare guidelines upon which Complainant believed that Respondent premised its use of the "Humanely Raised" label.

28.     Prior to 2014, Respondent stopped using antibiotics in its North Carolina hatcheries.  Like humane growing conditions, many consumers wanted drug-free birds. Complainant believed that Respondent had not improved sanitation and other conditions in its hatcheries since it stopped using antibiotics, causing more birds to develop infections while in the hatchery.

29.     Complainant had observed an increase in the number of chicks placed on his farm carrying bacterial infections and genetic deformities.  Complainant believed that Respondent was not culling sick and deformed birds from flocks at the hatchery with a level of care sufficient to minimize suffering and prevent the introduction and spread of diseases among the flocks placed on Complainant's farm.

*Supplemental Complaint*                                  **10**

30. Complainant believed that Respondent's breeding of chickens resulted in birds that gained weight too rapidly and that had a high rate of leg deformities.

31. Respondent changed its facility standards to require that birds be kept in houses with solid walls devoid of any windows or other openings, prohibiting farmers from opening windows to allow access to sunlight and fresh air. Complainant believed that this lack of sunlight and fresh air impaired the birds' quality of life, causing increased stress and reduced levels of activity.

32. Complainant was prohibited by Respondent from administering any antibiotics or other medications to sick birds, and Respondent had refused to administer medication when Complainant sought help dealing with apparent outbreaks of disease among flocks placed on his farm.

**C.    Protected Activity and Complainant's Resort to Reporting Channels**

33. Complainant objected to Respondent's practices and conduct described above and its use of the phrase "Humanely Raised" on its labeling. Complainant believed the opposite was true as Perdue compromised the birds' welfare and increased their risk of becoming contaminated with, and developing infections from, salmonella, e-coli, and other harmful bacteria. He believed that this in turn was threatening the health of consumers, Perdue's brand, and the economic viability of his employment contract with the company.

34. Complainant decided to report Respondent's practices through any viable and effective reporting channels. Complainant knew that reporting the above concerns to Perdue through its vague internal channels would be futile and career threatening: the company's

*Supplemental Complaint*                                    **11**

CEO was on television touting its humanity in the industry, and Complainant's employment duties did not include regulatory enforcement and food integrity policy.  He was also aware that USDA had not been involved in policing integrity within the poultry industry beyond safe growing practices that could impact post-slaughter meat safety.  USDA surveillance and involvement with marketing to consumers was limited to safe inspection certification, and he was unaware of any external reporting channels to the USDA or FDA to act on his reports about consumer misrepresentation regarding human growing practices.  The only viable alternative known to Complainant to protect public health, industry integrity, and consumers was to resort to public channels by reporting to industry-specific NGOs and media, which in turn have the best chance of attracting Congressional oversight.  Complainant reported his concerns to Leah Garces, the Director of an animal welfare organization called Compassion in World Farming ("CIWF").  After determining that CIWF offered a viable reporting channel, Complainant arranged for the organization's investigatory visit to his farm, including fact collection by audiovisual recording of the actual living conditions of the Perdue-owned flocks.

35.    On or about May 22, 2014, CIWF began videotaping the flock and conducting its investigation into Complainant's food integrity reports at his farm. CIWF continued the investigation with a visit several weeks later, including videotaping the end of the flock growth cycle.

36.    CIWF condensed the footage it had filmed into an effective and concise reporting narrative, which Complainant authorized for publication.  Complainant expected

*Supplemental Complaint*                           **12**

that Respondent would view the video and hoped and believed that the video's publication would prompt the public and regulators to join him in opposing Respondent's labeling and problematic animal husbandry practices. Complainant also hoped and believed that the video's publication would prompt a significant investigation or other action by state and federal government officials.

37.     On December 3, 2014, columnist Nicholas Kristoff published an article in the New York Times concerning the condition of the chickens on Complainant's farm, "Abusing Chickens We Eat". The newspaper criticized the obvious poor health of the birds and suggests that Respondent's use of the phrase "Humanely Raised" to describe these birds was deceptive. The video produced by CIWF using footage from Complainant's farm was embedded within the web version of the article, available here: http://www.nytimes.com/2014/12/04/opinion/nicholas-kristof-abusing-chickens-we-eat.html. This later led to further New York Times investigative journalism, and to the Sundance movie featuring Complainant, "Eating Animals", https://www.eatinganimalsmovie.com.

38.     The video journalism depicts birds crowded wall-to-wall in one of Complainant's chicken houses, panting and trampling each other to move around. The footage shows many laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts. Some of the birds shown are dead or apparently ill, and many others have apparent leg deformities. The video's narrator describes the condition of the birds depicted as unnatural and inhumane, noting that many of

*Supplemental Complaint*                    **13**

the birds are barely able to move, and that many die due to illness and genetic issues. The narrator attributes these problems to genetic deformities, rapid weight gain, poor health among the birds placed by Respondent on Complainant's farm, and the fact that Respondent prohibits Complainant from giving the birds access to sunlight and fresh air.

39.     The NYT article and other online publications disclosed that Respondent participated before publication. Twitter and other social media linked to the reports and video.

40.  Complainant's protected activity included the filing of his OSHA complaint in February 2015, which triggered Respondent to make false and disparaging statements about him, notwithstanding the company's pretextual statements that it was trying to re-educate, rather than terminate him. The Respondent succeeded in the latter one year later.

## V.     ADVERSE ACTIONS

41.     The day after release of the above referenced CIWF video, on December 4, 2014, Respondent sent two of its employees, Phil Bare and Rick Sharpton, to inspect Complainant's farm.

42.  These inspections continued, occurring almost daily, until the flock Complainant was then raising reached the end of its growth cycle and was removed on December 22, 2014.

43.     On December 29, 2014, a week after Respondent picked up the flocks from his farm, Complainant received a hand delivered letter from Respondent "implementing a

*Supplemental Complaint*                    **14**

Performance Improvement Plant for poultry welfare and biosecurity" on Complainant's farm.

44.     The December 29, 2014, letter stated that prior to placing another flock at Complainant's farm, Respondent would be auditing Complainant's chicken houses, and requiring Complainant to be "retrained on biosecurity and poultry welfare," and that Respondent would send agents to perform frequent, unannounced checks following placement of the next flock.

45.     Complainant was informed that he would not receive another flock placement until he completed a re-education program concerning proper animal welfare and biosecurity practices.

46.     A training session was planned for January 8, 2015.  Two days prior to the training session, Mr. Watts was informed that his assistant would be required to attend the training session with him.

47.     As a result of these actions, Respondent did not place a new flock on Complainant's farm until January 15, 2015, approximately nine days after he would have typically received a new flock.

48.     Complainant estimates that he lost approximately $4,500 in earnings due to that single delayed flock placement alone.

49.     Respondent continued to subject Complainant to intensive scrutiny, sending auditors to visit and inspect Complainant's farm almost daily, even after January 15, 2015.

*Supplemental Complaint*                    **15**

50.    Perdue relied on the "Center for Food Integrity" (CFI) to rebut Complainant's public disclosures.  CFI provides support to the poultry industry.  On December 5, 2014, CFI released a statement blaming Watts for the state of Perdue's chickens, claiming he allowed lame chickens to continue their suffering and calling him "negligent" in his husbandry obligations.  CFI asserted the responsibility to respond to the needs of the flock lies with the farmer, but CFI provided no analysis of Perdue's actions or omissions.  CFI's defense of Perdue resulted in an embarrassing messaging dissonance because Perdue inspectors at Watts' farm on December 4, 2014, characterized his flock as "well cared for and content".

51.    Complainant lived in heightened anxiety from December 3, 2014, until January 26, 2016, that Perdue would terminate his employment contract and destroy his business and livelihood.  On or around December 19, 2014, Watts learned that Perdue had told Walmart, one of the large retailers that Perdue supplies, that Respondent would end its relationship with Complainant.

52.    According to the Perdue Producer Agreement that governed this employment relationship, the only reason a grower may be placed under the Performance Improvement Program ("PIP") is if the grower's "flocks fail to achieve Perdue's minimum standards of competitiveness."  However, Respondent's flock placed on Complainant's farm had not failed to achieve those minimum standards, and in fact had excelled.

53.    The Agreement mandated that growers be released from a PIP based on flock settlement averages.  There was no provision in Watts' agreement for placement on a PIP in

*Supplemental Complaint*                    16

these circumstances. Respondent would often change the growers' requirements but not follow-through on implementing the specified obligations. As growers for Perdue, the farmers had to undertake large short-term and long-term debt obligations putting them at the whim and oppression of Perdue.

54.     Despite Respondent informing Complainant that the flock placed at his farm appeared on December 4, 2014 to be "well cared for and content", Respondent imposed extensive auditing and re-education requirements not based on the terms of the employment agreement.

55.     Respondent Perdue told Watts in a December 29, 2014 letter that Watts would have to "regain [Perdue's] trust".

56.     Perdue's announced plan of conduct kept Watts and his family in an unrelenting state of anxiety until his constructive termination in January 2016. After his termination, he suffered additional anxiety and emotional and mental distress from the loss of his employment contract and livelihood.

57.     Respondent Perdue acted with abuse of authority or no authority in setting arbitrary, capricious, and invidious production requirements on Complainant.

58.     In said letter Perdue threatened Complainant Watts that it was alarmed and disturbed by the condition of the chickens entrusted to his care. Perdue told him that his feelings of being unhappy with his grower relationship with Perdue disappointed them. Perdue reminded Watts that he could terminate his relationship with Perdue at any time.

*Supplemental Complaint*                      **17**

Perdue told Watts they would waive their 90-day notice requirement if Watts wished to terminate his employment contract immediately.

59.     Over six months later, Perdue continued to subject Watts to the arbitrary PIP which included bi-weekly inspections.  There was no end-date for the PIP, and Perdue offered no information as to how Watts could remove himself from the PIP.   Only after Complainant attorneys supplemented his Complaint on June 1, 2015, with allegations that Respondent was forcing him to remain on the abusive PIP or terminate the agreement, thus putting Respondent on notice of a forthcoming constructive termination claim, the company issued a notice on July 1, 2015, that the PIP had been completed.  This was pretext because the oppressive conditions and abusive treatment described above continued in the post-PIP ending of the relationship.  Complainant observed his reputation in the industry had been damaged.

60.     Perdue subjected Watts to more audits in the time following his whistleblowing than they had the prior three years combined.  On February 3, 2015, Perdue put Watts through an audit with a USDA auditor and then the next day, on February 4, 2015, Perdue sent four more truck or vanloads of auditors to Watts' farm.

61.     Despite the PIP letter stating that Complainant would receive written reports of each audit, Perdue never provided him with any reports from the audits.  Complainant did not receive any written or oral evaluations from the inspectors, nor did they provide him with a list or explanation of ways to "improve" his farm practices.  Instead, Perdue would make up entries in service reports or make suggestions for expensive equipment that were

*Supplemental Complaint*                              **18**

unmerited. This put Complainant in a state of anxiety about expensive and unnecessary changes to which Perdue subjected him for which his protected activity was an obvious contributing factor.

62. On April 27, 2015, Perdue's lawyers in a submission to OSHA accused Complainant Watts of developing a "cruel scheme" to intentionally create substandard conditions of animal welfare at his farm to "extort" and "publicly blackmail Perdue" to OSHA investigators. OSHA is not an adjudicatory forum; it is an investigation and enforcement administration. Statements submitted to OSHA by Perdue lawyers are statements to federal investigators. Respondent reported as fact to OSHA that Complainant was intentionally allowing sick, deformed, and dying chickens to suffer in order to produce a "self-serving propaganda video" intended to create a "tsunami" of public opinion against Perdue. Such allegations were extremely upsetting to Complainant Watts, who understood this as a statement that he was grossly failing to meet the Respondent's December 2014 letter expectation that he must regain the company's trust. Additionally, OSHA still had not tried to schedule any interview of Complainant, and he felt intimidated that Perdue's allegations were preventing him from having even an interview with OSHA. As a result of Respondent's ongoing harassing actions, dishonest conduct, and an unrelenting pattern of false representations regarding flock welfare, Complainant experienced unremitting decline in his emotional and mental health. To prompt him to terminate the contract, Respondent claimed Complainant's farm needed upgrades including computerized controllers and hi-tech lighting systems, all of which would be excessively expensive and require new indebtedness.

*Supplemental Complaint*                    **19**

63.    Complainant still had debt to pay off despite his 20 plus years of operating, but experienced high chronic anxiety under attacks by Perdue's actions and statements.  He had trouble sleeping and he ruminated on Perdue's bad conduct often all day and late into the night.  The daily assault on Complainant's mental and physical health ultimately required him to withdraw from his contract with Perdue on January 26, 2016, while still awaiting some action from OSHA.  Per Complainant's letter to OSHA dated June 1, 2015, he reasonably believed that Perdue intended to force him to terminate his contract:

> Now, nearly six months later, Mr. Watts continues to be subject to the arbitrary PIP which currently includes bi-weekly inspections. Mr. Watts does not currently receive any written or oral evaluations from PIP inspectors, nor have they provided him with a list or explanation of ways to "improve" his farm practices. There is no end-date for the PIP, and Perdue has offered no information as to how Mr. Watts may remove himself from the PIP. ***FN15***  *Perdue does not explain how this continued scrutiny is consistent with its newly voiced allegations that Mr. Watts "staged" the CIWF video*. See Resp. Statement, at 1, 9.
> ***FN15*** *The only option Perdue has presented to Mr. Watts as a way to end the PIP is for Mr. Watts to terminate his relationship with Perdue*. See Resp. Ex. 18, Perdue Dec. 29, 2014 letter ("I take this opportunity to remind you that the growing contract allows you to terminate your relationship with us at any time and seek a contract with another poultry company or use your houses for other business purpose that you may find more rewarding.")

(Emphasis added).

## VI.  NEXUS/CONTRIBUTING FACTOR

64.    Respondent was aware of Complainant's use of public reporting channels to CIWF and the New York Times.

65.    Respondent began conducting daily inspections of Complainant's farm on December 4, 2014, hours after he reports to this public channel were published.

*Supplemental Complaint*                    **20**

66.    The letter placing Complainant on a PIP was issued by Respondent just over three weeks later, on December 29, 2014.

67.    In the PIP letter, Respondent attributed its decision to audit Complainant's farm and place Complainant under a PIP to the conditions depicted in the video published by CIWF, emphasizing that it found his "willingness to portray conditions that are inconsistent … with Perdue standards" particularly concerning.  This is direct evidence of contributing factor.

68.    In said letter, Respondent suggested it did not find any problematic conditions during its recent inspections of Complainant's farm, and described the conditions depicted in the video as inconsistent with its past observations of Complainant's performance.

69.    The flock depicted in the video was rated the second best by Respondent in Respondent's tournament system, and the conditions depicted in the video were neither unusual nor inconsistent with those seen by Respondent's agents during their regular inspections of Complainant's farm.

70.    Prior to the video's publication, Respondent had never expressed any concerns regarding Complainant's operation and considered Complainant to be one of its top producers.

71.    The foregoing facts demonstrate that Complainant's protected activity was a contributing factor in Respondent's adverse actions against him from December 5, 2014, up to and including his constructive discharge on January 26, 2016.

*Supplemental Complaint*                    **21**

## VII.    <u>CLAIM FOR RELIEF</u>

72.    21 U.S.C. § 399d(a)(1) of the Food Safety Modernization Act created three types of statutorily protected channels for reporting and disclosing covered food safety and integrity issues: (1) an internal channel "to the employer"; (2) an external channel to any agency, department or instrumentality of "the Federal Government", which by definition includes Congress; and a second external channel to "the attorney general of a State"; and (3) a public channel to NGOs or the media who, in publishing a complainant's disclosures that may be received by one of the internal or external reporting channels, thereby function as "any person acting pursuant to a request of the employee" in "caus[ing] to be provided" said disclosures by Complainant.

73. CIWF and the New York Times constituted such a protected public reporting channel, and both constituted a "person acting pursuant to a request of the employee".

74. Complainant engaged in protected activity under 21 U.S.C. § 399d, the Food Safety Modernization Act's employee protection provision, when he made the above-described food integrity disclosures to the described public reporting channel.  He reasonably believed that in so doing he disclosed information relating to a violation, act or omission of the Respondent under the Food, Drug and Cosmetics Act, 21 U.S.C. 391 et seq., or an order, rule, regulation, standard, or ban thereunder (hereafter FDCA).

75.    Complainant reasonably believed that he was a covered employee under § 399d.

*Supplemental Complaint*                 **22**

76.     The FDCA prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the FDCA food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). It is deemed to be adulterated if it has been "held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4).

77.     Filing a whistleblower complaint with OSHA is protected activity under § 399d(a)(1) because that agency is an instrumentality of the "Federal Government", and said complaint was information "provided [or] caused to be provided to the *** Federal Government."

78.     Respondent had knowledge of Complainant's protected activity in using the public channel described above, and in using the OSHA whistleblower protection channel provided by § 399d(b).

79.  Said protected activity was a contributing factor in all of Respondent's adverse actions against Complainant. The PIP itself and suggesting that Complainant terminate his contract were directly referenced in the PIP letter. The April 2015 disparagements of Complainant were made in direct response to his OSHA whistleblower complaint. Both contributed to the constructive discharge.

## VIII.  **PRAYER FOR RELIEF**

80.     Complainant seeks compensatory damages for lost earnings, compensation and capital resulting from the loss of his employment with contract with Perdue.

*Supplemental Complaint*                     **23**

81.    Complainant seeks general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above.

82.    Complainant seeks compensatory damages for the loss of income and expense incurred caused by the above-described delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014.

83.    Complainant seeks an award of pre-judgment or pre-award interest on the economic damages alleged above.

84.    Complainant seeks expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan.

85.    Complainant seeks reasonable costs and attorney's fees, including the costs of any expert witness fees.

86.    Complainant seeks all other relief available at law and equity.

Respectfully submitted,

s/Thad M. Guyer
Thad M. Guyer, Esq.
Of Counsel
Government Accountability Project
1612 K Street, NW, Suite 1100
Washington, DC 20006

Thad M. Guyer
Stephani L. Ayers

*Supplemental Complaint*                    24

T.M. Guyer and Ayers & Friends, P.C.
P.O. Box 1061, Medford, OR 97501
Tel. (Stephani): 813-382-7865

Email: Thad@guyerayers.com

Attorneys for Complainant

*Supplemental Complaint*                    **25**

# Perdue's Application for Issuance of Third-Party Subpoenas

# **EXHIBIT D**

## (Garces Deposition Subpoena)

(04/2020) Administrative Subpoena to Appear and Testify at a Deposition

Page 1 of 3

# United States Department of Labor
## OFFICE OF ADMINISTRATIVE LAW JUDGES

In Re:

Craig Watts

(Plaintiff/Complainant/Claimant)

v.

OALJ Case No:    2016-FDA-00003

Perdue Farms Inc.

(Defendant/Respondent/Employer/Carrier)

## SUBPOENA TO APPEAR AND TESTIFY AT A DEPOSITION

To:    Leah Garces, President, Mercy for Animals    Address    7908 Santa Monica Blvd.

City  West Hollywood    State  CA   Zip Code  90046

**YOU ARE DIRECTED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in the above captioned proceeding.  If you are an organization that is not a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Place of Testimony:

Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067

Date:  04/12/2024

Time:  10:00 AM

The deposition will be recorded by this method:    Stenographic and Audio/Visual Recording

**YOU MUST ALSO BRING WITH YOU** the following documents, electronically stored information, or tangible things and permit their inspection, copying, testing or sampling of material (blank if not applicable):

The provisions of Code of Federal Regulations (CFR) 29 C.F.R. §§18.56(c) and 18.52(a), relating to your protection as a person subject to a subpoena, and 29 CFR §§18.56(d) and 18.56(e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

This subpoena is issued upon the application of (indicate attorney/representative for named party):

(Person requesting subpoena)    (Address and Telephone Number)

Firm Name    Venable LLP

Name    Kristin M. Koger    Address    600 Massachusetts Ave, NW

Bar Number    DC No. 473438    City    Washington

Phone Number    2023444162    State  DC   Zip Code  20001

**If this subpoena commands the production of documents, electronically stored information, or tangible things, a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  29 C.F.R. §18.56(b)**

IN WITNESS WHEREOF the undersigned United States Department of Labor Administrative Law Judge has digitally signed this subpoena.

Signature of _____

JA386

## NOTICES

**NOTICE:** This subpoena is only valid in proceedings before the Office of Administrative Law Judges or Office of Workers' Compensation Programs. To be valid, this subpoena must bear the digital signature of a Department of Labor (DOL) administrative law judge**.**

**29 C.F.R. §18.56 Subpoenas**

**(c) Protecting a Person Subject to a Subpoena**.
(1)  *Avoiding Undue Burden or Expense; Sanctions*.  A party or representative responsible for requesting, issuing or serving a subpoena must take reasonable steps to avoid imposing undue burden on a person subject to the subpoena.  The judge must enforce this duty and impose an appropriate sanction.
(2)  *Command to Produce Materials or Permit Inspection*.
   (A)  *Appearance Not Required*.  A person commanded to produce documents, electronically stored information, or tangible things, or to permit inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition or hearing.
   (B)  *Objections*.  A person commanded to produce documents or tangible things or to permit inspection may serve on the party or representative designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises  - or to producing electronically stored information in the form or forms requested.  The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served
      (i)  At any time, upon notice to the commanded person, the serving party may move the judge for an order compelling production or inspection.
      (ii)  These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3)  *Quashing or Modifying a Subpoena*.
   (A)  *When Required*.  On timely motion, the judge must quash or modify a subpoena that:
      (i)  fails to allow a reasonable time to comply;
      (ii)  requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person  - except that, subject to paragraph (c)(3)(B)(iii) of this section, the person may be commanded to attend the formal hearing;
      (iii)  requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv)  subjects a person to undue burden.
   (B)  *When permitted*.  To protect a person subject to or affected by a subpoena, the judge may, on motion, quash or modify the subpoena if it requires:
      (i)  disclosing a trade secret or other confidential research, development, or commercial information;
      (ii)  disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
      (iii)  a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend the formal hearing.
**(d) Duties in Responding to a Subpoena.**
(1) *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:
   (A)  *Documents*.  A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B)  *Form for Producing Electronically Stored Information Not Specified*.  If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is usually maintained or in a reasonably usable form or forms.

**HIPAA NOTICE:** In regard to the Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act of 1996, if this subpoena does not bear the digitized signature of a DOL administrative law judge, it is not valid under 45 C.F.R. §§164.512(e), 164.512 (f) or 164.512(l).

   (C)  *Electronically Stored Information Produced in Only One Form*.  The person responding need not produce the same electronically stored information in more than one form.
   (D)  *Inaccessible Electronically Stored Information*.  The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or expense.  On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost.  If that showing is made, the judge may nonetheless order discovery from such sources if the requesting party show good cause.  The judge may specify conditions for the discovery.
(2) *Claiming Privilege or Protection*.
   (A)  *Information Withheld*.  A person withholding subpoenaed information under a claim that it is privileged or subject to protection as hearing-preparation material must:
      (i)  expressly make the claim; and
      (ii)  describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B)  *Information Produced*.  If information produced in response to a subpoena is subject to a claim of privilege or of protection as hearing-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the judge *in camera* for a determination of the claim.  The person who produced the information must preserve the information until the claim is resolved.
**(e) Failure to Obey**.  When a person fails to obey a subpoena, the party adversely affected by the failure may, when authorized by statute or law, apply to the appropriate District Court to enforce the subpoena.

**29 C.F.R. §18.52 Protective orders**

**(a)  In General**.  A party or person from whom discovery is sought may file a written motion for a protective order.  The motion must include a certification that the movant has in good faith conferred or attempted to confer with the affected parties in an effort to resolve the dispute without the judge's action.  The judge may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
(1)  Forbidding the disclosure or discovery;
(2)  Specifying terms, including a designation of the time and place,  for  the disclosure or discovery;
(3)  Prescribing a discovery method other than the one selected by the party seeking discovery;
(4)  Forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
(5)  Designating the persons who may be present while discovery is conducted;
(6)  Requiring that a deposition be sealed and only opened on the judge's order;
(7)  Requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and
(8)  Requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the judge directs.

Case 5:24-cv-00477-BO-RJ    Document 6-12    Filed 08/23/24    Page 155 of 156

JA387

(04/2020) Administrative Subpoena to Appear and Testify at a Deposition                    Page 3 of 3

## PROOF OF SERVICE

On _____ I received this subpoena and served it pursuant to 29 CFR §18.56(b) as follows:

_____                    _____
Person served (print name)                           Date of Service

_____                    _____
Place of Service                                     Manner of Service

☐  I have also tendered to the witness fees for one day's attendance and the mileage allowed by law, in the amount of
   $ _____

☐  I have not tendered witness fees for one day's attendance and for the mileage allowed by law.

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Address: 

_____
Signature of Server          Date

_____
Name of Server (Print Name)

City: _____   State: _____   ZIP: _____

# Exhibit 12

Case 5:24-cv-00477-BO-RJ    Document 6-13    Filed 08/23/24    Page 1 of 7

# UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES
**Newport News, VA**

_____

**Issue Date: 15 March 2024**

**Case No.:    2016-FDA-00003**

*In the Matter of:*

**CRAIG WATTS,**
*Complainant,*

*v.*

**PERDUE FARMS, INC.,**
*Respondent.*

_____

## ORDER QUASHING SUBPOENAS

This proceeding arises out of a complaint filed under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d (FSMA).  On March 11, 2024, Respondent requested subpoenas for third-party witnesses, Compassion in World Farming, Inc. and Leah Garces, to produce documents and give testimony at a deposition.  The subpoena requests must be quashed.

The Administrative Review Board recently held Department of Labor administrative law judges do not have the power to issue subpoenas to third-party witnesses in the absence of explicit statutory authority to do so.  *Fagan v. Dep't of the Navy*, ARB No. 2023-0006, ALJ No. 2021-CER-00001 (Feb. 28, 2024).  Based on my review of the law, the FSMA does not confer explicit subpoena authority on Department of Labor

administrative law judges.  *Compare with* 21 U.S.C. § 876 (conferring subpoena authority on the Attorney General).  Therefore, I lack the authority to compel third-party witnesses to provide documents or give deposition testimony in this case.

Based on the foregoing, IT IS ORDERED that Respondent's subpoena requests directed at Compassion in World Farming, Inc. and Leah Garces, are QUASHED.

- 2 -

**SO ORDERED.**


                                    **PAMELA A. KULTGEN**
                                    Administrative Law Judge


PAK/PML/jcb
Newport News, Virginia


- 3 -

# SERVICE SHEET

Case Name:  **WATTS_CRAIG_v_PERDUE_FARMS_INC_**

Case Number: **2016FDA00003**

Document Title: **Order Quashing Subpoenas**

I hereby certify that a copy of the above-referenced document was sent to the following this 15th day of March, 2024:

**JOAN BUCHANAN**
Paralegal Specialist

OSHA-Region 4 Regional Administrator
Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
*{Electronic - Regular Email}*

J. Larry Stine, Esq
jls@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, NE
Suite 400
ATLANTA GA 30326
*{Electronic - Regular Email}*

Atlanta Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Sam Nunn Federal Center
Room 7T10
61 Forsyth Street, S.W.
ATLANTA GA 30303
*{Electronic - Regular Email}*

Carolyn Jasperse
Carie.Jasperse@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4524
SILVER SPRING MD 20993
*{Electronic - Regular Email}*

Michael Helbing
Michael.Helbing@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4421A
SILVER SPRING MD 20993
*{Electronic - Regular Email}*

Thad Guyer, Esq
thad@guyerayers.com
TM Guyer and Ayers & Friends, P.C.
116 Mistletoe Street
PO Box 1061
MEDFORD OR 97501
*{Electronic - Regular Email}*

**SERVICE SHEET** continued (2016FDA00003 Order)     Page: 2

Mitchell Mirviss, Esq.
mymirviss@Venable.com
Venable LLP
750 East Pratt Street
Suite 900
BALTIMORE MD 21202
     *{Electronic - Regular Email}*

Roger A Colaizzi, Esq.
racolaizzi@Venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
     *{Electronic - Regular Email}*

Candace A Spencer
pr@candaceaspencer.com
Rural Advancement Foundation International-USA
P.O. Box 640
PITTSBORO NC 27312
     *{Electronic - Regular Email}*

Elizabeth K Dorminey
EKD@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, PC
3400 Peachtree Road NE
Suite 400
ATLANTA GA 30326
     *{Electronic - Regular Email}*

Stephani Ayers
stephani@whistleblowerdefenders.com
POB 1061
MEDFORD OR 97501
     *{Electronic - Regular Email}*

Kristin Koger
kmkoger@venable.com
Venable LLP
600 Massachusetts Ave., NW
WASHINGTON, D.C. DC 20001
     *{Electronic - Regular Email}*

Thad Guyer
tmguyer@tmguyer.com
116 Mistletloe Street
MEDFORD OR 97501
     *{Electronic - Regular Email}*

JA395

# Exhibit 13

Case 5:24-cv-00477-BO-RJ   Document 6-14   Filed 08/23/24   Page 1 of 15

JA396

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

IN THE MATTER OF:                          *

CRAIG WATTS                                *

      Complainant,                       *

      v.                                 *     Case No. 2016-FDA-00003

PERDUE FARMS INC.,                         *

      Respondent.                        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**RESPONDENT PERDUE FARMS INC.'S MOTION TO**
**CERTIFY FOR INTERLOCUTORY APPEAL OR TO**
**RECONSIDER THE MARCH 15, 2024 ORDER**

Pursuant to 28 U.S.C. § 1292 and 29 C.F.R. § 18.93, Respondent Perdue Farms Inc. ("Perdue" or "Respondent"), through counsel, moves to certify the Administrative Law Judge's ("ALJ") March 15, 2024 Order Quashing Subpoenas ("the March 15 Order") for interlocutory appeal and stay proceedings pending the resolution of such interlocutory appeal. In the alternative, Perdue moves for reconsideration of the March 15 Order, and requests the ALJ issue the subpoenas that Perdue seeks. On March 25, 2024, the undersigned counsel for Perdue and counsel for Complainant conferred pursuant to 29 CFR § 18.33(c)(3). Counsel for Complainant represented that they would oppose this motion.

**BACKGROUND**

Complainant's Supplemental Whistleblower Complaint ("the Complaint"), filed on April 25, 2022, alleges under the Food Safety Modernization Act ("FSMA"), 21 U.S.C. § 399d, that Craig Watts ("Watts" or "Complainant") was an employee and was engaged in "protected activity"

that led to his "constructive discharge" as a chicken grower for Perdue.[1] Compl. ¶¶ 1, 74. Specifically, Complainant contends that this purported "protected activity" included reporting his concerns to Compassion in World Farming ("CIWF") and its director at the time, Leah Garces ("Garces"). *See id*. ¶ 34. Complainant arranged for CIWF and Garces to visit his farm with a film crew in May 2014 to film a group of live chickens that were placed—in good health—on his farm by Perdue. *Id*. ¶ 35. Several weeks later, CIWF and Garces returned to Complainant's farm to film more footage of the same flock that was nearing the end of its growth cycle. *Id*. The chickens were in deplorable condition by that time. CIWF then edited the footage into a short video and released it on its website. *See id*. ¶¶ 36-38.

The only video recording from Complainant's farm that Perdue has access to is the one that has been edited and published publicly. Accordingly, despite Complainant's allegations that this video evidence purportedly demonstrates that Perdue does not "humanely raise" its chickens, noticeably absent from the record is the complete video footage—which Perdue cannot access—that is central to Complainant's allegations. This video footage is likely to demonstrate whether Complainant purportedly blew the whistle on Perdue, or rather, himself.

In the midst of discovery, on March 11, 2024, Perdue applied for issuance of document and deposition subpoenas to both CIWF and Garces in order to obtain, among other things, the video evidence recorded on Complainant's farm. On March 15, 2024, this Court issued an order quashing Perdue's subpoena requests. Specifically, the Court primarily relied on the Administrative Review Board's ("ARB") decision in *Fagan v. Dep't of the Navy*, ARB No. 2023-0006, ALJ No. 2021-CER-00001, 2024 WL 1091871 (Feb. 28, 2024), and determined that the

---

[1] Perdue continues to maintain that the Complaint fails as a matter of law as set forth in Perdue's Motion to Dismiss Complainant's Supplemental Complaint (June 3, 2022).

2

FSMA's whistleblower provision does not confer administrative law judges with explicit subpoena authority.

Discovery in this case is set to close on April 30, 2024, and dispositive motions are due on May 28, 2024. The hearing in this case is set to begin on August 12, 2024. Without the ability to obtain evidence germane to Complainant's claims, Perdue is hamstrung in its ability to prepare its defenses and test the material allegations contained in Watts' Complaint.

For the reasons explained further below, the ARB's decision in *Fagan* presents legal and factual distinctions that, when considered, mandate the issuance of the requested subpoenas in the present case to afford Perdue its right to due process.

## ARGUMENT

**I.      The March 15, 2024 Order Meets the Certification Requirements for Interlocutory Appeal.**

An interlocutory order must meet three elements to be certified for immediate appeal to the ARB. Here, declining to issue Perdue's subpoenas of third-party witnesses central to Watts' claims meets all three elements.

When determining whether an ALJ's interlocutory order is appropriate for appeal, the Department of Labor's Office of Administrative Law Judges ("OALJ") "follow[s] the procedure provided for United States District Court judges at 28 U.S.C. § 1292(b), which requires that the [ALJ] state in writing that the issue is an appropriate one for appeal." *Lindner v. Citimortgage Inc.*, ARB No. 2017-CFP-00007, OSHA No. 7-7080-16-139, 2018 WL 10921515, at *2 (May 3, 2018) (citations omitted). Though "appeals of interlocutory orders are disfavored," *id.* at *3, the elements of Section 1292(b) are met when an interlocutory order involves (1) "a controlling question of law," (2) which contains a "substantial ground for difference of opinion," and (3) "an immediate appeal of which would materially advance the ultimate termination of the litigation." *Heckman v.*

<div align="center">3</div>

*M3 Transport LLC/SLT Expressway, Inc.*, ARB No. 16-083, ALJ No. 2012-STA-059, 2016 WL 7212571, at *1 (Nov. 10, 2016) (citing 28 U.S.C. § 1292(b)). Both the ALJ and the ARB "must agree that the case is a proper candidate for immediate review[.]" *Powers v. Pinnacle Airlines, Inc.*, ARB No. 05-138, ALJ No. 2005-SOX-65, 2005 WL 4889054, at *4 (ARB Oct. 31, 2005) (citing *In re Ford Motor Co.*, 344 F.3d 648, 654 (7th Cir. 2002)).

First, the March 15 Order involves a controlling question of law because the denial of issuing subpoenas to CIWF and Garces materially impacts Perdue's ability to prepare an adequate defense to facts that Watts has placed at issue in his complaint. As explained further below, the ARB's decision in *Fagan* was limited to a *complainant's* request for subpoenas to third-party witnesses. Notably, Perdue could not identify a single court that has considered whether a respondent's due process rights are adversely affected when it is not allowed to seek third-party information regarding facts placed at issue by a complainant, further illustrating the controlling question of law that is at stake here. Second, substantial grounds for a difference of opinion exist because courts prior to the ARB's decision in *Fagan* determined that an ALJ has the inherent authority to issue subpoenas. Finally, given that a hearing has not taken place in the present case, an immediate appeal of the March 15 Order would materially advance the termination of this litigation and avoid the chance of re-opening discovery and conducting a second hearing. Therefore, an interlocutory appeal is warranted.

### A.    Whether DOL ALJs Have the Authority to Issue Respondent's Third-Party Subpoenas is a Controlling Question of Law.

Whether fundamental fairness requires the ALJ to issue subpoenas so that Perdue may obtain information from third parties that is central to Watts' claims is precisely the sort of controlling question that is ripe for interlocutory review. *See Lindner*, 2018 WL 10921515, at *3 (granting request to certify issue for interlocutory appeal); *Fagan v. Dep't of the Navy*, Case No.

4

2021-CER-00001 (Oct. 19, 2022) (same). Under Section 1292(b), "a question is controlling if it is dispositive of the case *or* if a reversal would save time and expense." *Terry v. June*, 368 F. Supp. 2d 538, 539 (W.D. Va. 2005) (citing CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3930 (2d ed. 1996)). Stated differently, "[a] legal issue is controlling if it could materially affect the outcome of the case." *In re Boss Mgmt. Grp., Inc.*, No. 05cv61589, 2007 WL 1959172, at *5 (W.D. Va. July 3, 2007) (quoting *In re City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002)). *See also Coal for Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, No. CIV. CCB-06-2773, 2015 WL 4040425, at *4 (D. Md. June 29, 2015) (an order involves a controlling question of law when, "if erroneous, [it] would be reversible error on final appeal.") (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974)).

Here, denial of due process by declining to issue subpoenas due to a narrow reading of the OALJ's authority is a controlling question of law that could materially affect the outcome of the litigation. While "lack of subpoena power is not a *per se* denial of due process[,]" courts nevertheless must analyze the unique circumstances that each case presents, with particular attention to the other means that the party has to present evidence in their case. *See Wool v. Maryland-Nat'l Cap. Park & Plan. Comm'n*, 664 F. Supp. 225, 231 (D. Md. 1987) (citing *Prebble v. Brodrick*, 535 F.2d 605, 615-16 (10th Cir. 1976)). As the Supreme Court explained in *Mathews v. Eldridge*, "due process, 'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961). Rather, "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Here, it is evident that this particular situation requires the

ALJ to exercise subpoena authority to prevent Perdue from being denied due process, and failure to do so will materially affect the outcome of this litigation.

    1.    <u>Denying a Subpoena is a Violation of Perdue's Due Process Rights and Will Materially Affect the Outcome of this Litigation.</u>

In analyzing whether administrative procedures are constitutionally sufficient and comply with due process, courts engage in a three-factor test that balances the governmental and private interests affected. *See id.* (citing *Arnett v. Kennedy*, 416 U.S. 134, 167-168 (1974) (POWELL, J., concurring in part); *Goldberg v. Kelly*, 397 U.S. 254, 263-266 (1970); *Cafeteria Workers*, 367 U.S. at 895). Specifically, courts must consider: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (citing *Goldberg*, 397 U.S. at 263-271. Here, an analysis of these factors demonstrates both that Perdue has a due process right and that the information sought will materially affect the outcome of this litigation.

First, Perdue's private interest that will be affected by the failure to issue a subpoena is immense. Specifically, Perdue seeks documents in the possession of CIWF and its former director, Leah Garces, related to the footage that CIWF filmed on Watts' farm and later published. It is this footage that serves as the entire basis for Watts' whistleblower claim, and as such, Perdue is entitled to test the basis for these claims through discovery. Moreover, because of the direct nexus between this information and the claims, it is evident that the decision to issue or deny a subpoena will materially impact Perdue's defenses and the outcome of this litigation.

<div align="center">6</div>

Second, the risk that Perdue will be deprived of its right to due process without the ability to subpoena any third-party information is clear. As outlined above, one of the factors that courts consider is whether the party has other means to present the evidence. Here, Perdue has no other means to present, much less obtain, this evidence without a third-party subpoena. Additionally, case law holds that a party is denied due process where an ALJ relies upon certain evidence as the basis for their decision, while also denying a request to subpoena evidence that potentially runs counter. In *Souch v. Califano*, the Fourth Circuit held that an ALJ's failure to issue a subpoena in an entitlement to benefits case under the Federal Coal Mine Health and Safety Act was a violation of claimant's due process rights. 599 F.2d 577 (4th Cir. 1979). Specifically, the Court explained that by denying benefits based on certain x-ray evidence regarding the claimant's condition, while simultaneously refusing to issue subpoenas to witnesses that could rebut that evidence, the ALJ violated the claimant's due process rights. *Id.* at 580. This was because "the ALJ removed any possibility of claimant winning on the X-ray evidence by refusing to credit positive X-rays and simultaneously preventing any means of rebutting the negative X-rays." *Id.* That is precisely the situation here. By allowing the claim to proceed, the ALJ has credited the purported evidence that Watts engaged in protected activity by working with CIWF and Garces. However, this purported evidence only tells a portion of the story, and Perdue is entitled to a subpoena that would allow it to obtain evidence to rebut Watts' case. Without this evidence, Perdue's defense will be impaired, and its due process rights violated.

Finally, the Court would not be burdened by the addition of this procedural requirement. Indeed, prior to *Fagan*, ALJs routinely proceeded on the premise that they possessed subpoena power and regularly utilized it. *See e.g., Moody v. Empire Hotel Development, Inc.*, Case No. 2020-FDA-00006 (Aug. 11, 2020); *Sears v. Birdsong Corp.*, Case No. 2019-FDA-00017 (Aug. 19,

7

JA403

2019); *Sangraal v. Culver's of Lincoln*, Case No. 2017-FDA-00001 (Aug. 6, 2020). Clarity from the ARB as to whether the OALJ has the authority to issue third-party subpoenas only further streamlines this case, demonstrating that the burden, if any, is minimal.

**B.      Substantial Grounds for a Difference of Opinion Exist Between the March 15 Order's Reliance on *Fagan* and the Unique Circumstances of This Case.**

There are at least two substantial grounds for a difference of opinion here. First, whether the OALJ's authority under the FSMA differs from the substantive statutes in *Fagan*. Second, whether the ALJ's "powers . . . to conduct fair and impartial proceedings" are triggered when Perdue seeks third-party subpoenas as a respondent in this case, such that the ALJ can take "any appropriate action authorized by the [Federal Rules of Civil Procedure]." 29 C.F.R. § 18.12(b).

"The level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3930 (3d ed. 2023). This standard is met in appeals "where reasonable jurists might disagree on an issue's resolution." *Adams v. S. Produce Distrib., Inc.*, No. 7:20-CV-53-FL, 2021 WL 394842, at *3 (E.D.N.C. Feb. 4, 2021) (quoting *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). Further, "[a] substantial ground for disagreement may arise if there is a novel and difficult issue of first impression, or if there is a circuit split and the controlling circuit has not commented on the conflicting issue." *Id.* (quoting *United States ex rel. A1 Procurement, LLC v. Thermcor, Inc.*, 173 F. Supp. 3d 320, 323 (E.D. Va. 2016)).

First, *Fagan* is distinguishable on the grounds that the ARB did not have the opportunity to analyze the whistleblower provision of the FSMA, but rather analyzed CERCLA and the SDWA. Until *Fagan*—a case decided less than one month ago—the ARB previously determined that ALJs are "entitled to use subpoenas simply by virtue of the agency's discretion to choose

<div align="center">8</div>

procedural mechanisms." *Childers v. Carolina Power & Light Co.*, ARB No. 1998-0077, ALJ No. 1997-ERA-00032, 2000 WL 1920346, at *7 (Dec. 29, 2000). While the March 15 Order concluded that "the FSMA does not confer <u>explicit</u> subpoena authority on [ALJs,]" this does not end the inquiry. As the ARB explained in *Fagan*, the implicit meaning of the text and the statutory context must also be analyzed. 2024 WL 1091871, at *8, 11. Here, as outlined further below, the FSMA differs from CERCLA and SWDA in that the complainant is given a choice of forum. This distinct feature, and its consequences, offers important statutory context that indicates ALJs possess subpoena authority under the FSMA to avoid illogical and unwarranted results. At a minimum, it creates an uncertainty that provides a credible basis for a difference of opinion, making it appropriate for interlocutory appeal.[2]

Second, Perdue is not similarly situated to the complainant in *Fagan* and the cases cited therein, because Perdue did not institute this action and was not given a choice as to forum.[3] Indeed, under 21 U.S. Code § 399d(b)(4), Watts could have filed his case in federal court but opted not to do so, initiating these proceedings instead. This strategic choice was and is unavailable to Perdue. Important to the ARB's decision in *Fagan* that the ALJ did not have inherent subpoena power was the rationale that "whistleblower complainants have several methods available to obtain information from employers or other parties without a subpoena through the discovery process." 2024 WL 1091871, at *9. Perdue as the respondent has no such options available to it.

---

[2] The ARB in *Fagan* also did not have a meaningful opportunity to address the procedural due process issues when determining that ALJs do not have subpoena authority under CERCLA and the SWDA. Specifically, the parties in *Fagan* only "*suggest[ed]* the lack of ALJ subpoena power could possibly raise due process concerns." 2024 WL 1091871, at *10 (emphasis added). Accordingly, the ARB addressed due process in one four-sentence paragraph in an opinion spanning 18 pages. *Id.*

[3] Denying respondents the right to any third-party discovery in ALJ proceedings, but not federal court, will encourage complainants to forum shop. *See Ferens v. John Deere Co.*, 494 U.S. 516, 527 (1990) (explaining that "[a]n opportunity for forum shopping exists whenever a party has a choice of forums that will apply different laws").

9

Had this action proceeded in federal court, there would be no dispute that Perdue has the right to the information that it now seeks—information clearly relevant as Watts placed a portion of this information at issue in this case. Such information that Perdue seeks would reveal whether Complainant actually "blew the whistle" on Perdue or if he merely publicized his own animal neglect. By filing this action with the Department of Labor, rather than a federal court, Watts meaningfully circumvented procedural protections that Perdue would otherwise be afforded, including, but not limited to, third-party discovery. This outcome is clearly illogical, unwarranted, and raises questions as to whether the ALJ can take "any appropriate action authorized by the [Federal Rules of Civil Procedure]" to remedy this procedural deficiency and violation of due process. 29 C.F.R. § 18.12(b).

>   **C.      Interlocutory Appeal May Materially Advance the Termination of This Litigation.**

Ensuring that this proceeding implements the appropriate procedural requirements prior to a final hearing materially advances the termination of this litigation. Resolution of a question materially advances the ultimate termination of litigation when such a resolution could serve to avoid trial or otherwise substantially shorten the litigation. *Clark Const. Grp., Inc. v. Allglass Sys., Inc*, No. CIV.A. DKC 2002-1590, 2005 WL 736606, at *4 (D. Md. Mar. 30, 2005). This includes a determination that "appellate review might avoid protracted and expensive litigation." *Thomas v. Maximus, Inc.*, No. 3:21CV498 (DJN), 2022 WL 1482008, at *6 (E.D. Va. May 10, 2022) (internal citations omitted).

Receiving a decision on whether the ALJ has the authority to issue a subpoena in this circumstance will clearly advance these interests. Specifically, if litigation were to proceed without any third-party discovery and either *Fagan* or the March 15 Order were overturned only after a final hearing, the parties would have to reopen discovery and/or hold a second hearing on the

10

merits. As such, a decision on this controlling legal issue sooner will save the Court and Parties trouble and expense because it negates the present prospect of a second hearing, and the ALJ can issue one decision on a complete record. As succinctly explained in the Order Granting Motion to Certify Interlocutory Appeal by the underlying ALJ in *Fagan*, "[t]wo sets of appeals and one hearing is less litigation overall than two hearings and two sets of appeals." *Fagan,* Case No. 2021-CER-00001, at 5 (Oct. 19, 2022). Accordingly, Perdue's Motion for Interlocutory Certification should be granted.

<p style="text-align:center">***</p>

For these reasons, Perdue respectfully request that the ALJ issue an order in accordance with 28 U.S.C. § 1292(b) stating that the March 15 Order involves a "controlling question of law" as to which there is "substantial ground for difference of opinion," and that immediate appeal "may materially advance the ultimate termination of the litigation." Further, because part of the purpose of granting the interlocutory appeal is to avoid protracted and expensive litigation, this Court should also conclude that the case should be stayed pending a decision from the ARB. *See Hutchens v. Cap. One Servs., LLC*, No. 3:19CV546, 2020 WL 6121950, at *6 (E.D. Va. Oct. 16, 2020) (granting stay when the court certified interlocutory appeal because "an immediate appeal would allow the Parties to define the contours of the litigation . . . [and] immediate appeal and clarification of the scope of the Plaintiffs' suits clearly might avoid protracted and expensive litigation.") (internal citations and quotation marks omitted).

## II.    In the Alternative, the ALJ Should Reconsider Its March 15 Order and Issue the Subpoenas.

Alternatively, with the benefit of full briefing on this issue, this Court should reconsider its March 15 Order and issue the subpoenas. In cases pending before the Office of Administrative Law Judges, motions for reconsideration are governed by Federal Rule of Civil Procedure 59(e),

<p style="text-align:center">11</p>

<p style="text-align:center">JA407</p>

and can be granted if they fall under one of the following three circumstances: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; [or] (3) to correct a manifest error of law or fact." *Carbon Russell v. Shire Pharmaceuticals*, No. 2018-SOX-00009 (Aug. 2, 2018) (citations omitted). Here, a manifest error of law and fact exists where, despite this Court finding that the FSMA does not expressly provide for subpoena authority, the OALJ has the implicit authority to issue third-party subpoenas from respondents to whistleblower complaints. Among "all the powers necessary to conduct *fair and impartial* proceedings," the ALJ has the authority to "issue subpoenas authorized by law;" "exercise powers vested in the Secretary of Labor that relate to proceedings before the Office of Administrative Law Judges;" and "where applicable *take any appropriate action authorized by the [Federal Rules of Civil Procedure]*." 29 C.F.R. § 18.12(b).

As discussed above, *Fagan* held that both CERCLA and the SDWA do not expressly provide for subpoena authority, and the remedial purpose of those statutes do not trigger an inherent authority for an ALJ to issue third-party subpoenas where whistleblower complainants had other avenues of obtaining the information sought. Because Perdue, as respondent, does not have any such avenues to obtain the information it seeks, and because Perdue is at the whims of Watts' choice of forum (before an ALJ or in federal court), Perdue is denied its due process rights to a fair and impartial proceeding. Accordingly, this court has the authority—namely under the Federal Rules of Civil Procedure—to take appropriate action. If the appropriate action is not to exercise inherent subpoena authority, then it must be dismissal as an action depriving a party of its procedural due process rights cannot proceed.

## CONCLUSION

For the reasons stated above, the ALJ should certify its March 15 Order for interlocutory appeal to the ARB, and accordingly, stay discovery in this case. In the alternative, and also for the

12

reasons stated above, the ALJ should reconsider its March 15 Order and issue the subpoenas requested by Perdue.

Dated: March 25, 2024                     Respectfully submitted,


                                          _____/s/ Roger A. Colaizzi_____
                                          Roger A. Colaizzi
                                          Kristin M. Koger
                                          VENABLE LLP
                                          600 Massachusetts Ave., N.W.
                                          Washington, DC 20001
                                          202-344-4000
                                          202-344-8300 (fax)
                                          RColaizzi@Venable.com
                                          KMKoger@Venable.com

                                          Mitchell Y. Mirviss
                                          VENABLE LLP
                                          750 E. Pratt St., Suite 900
                                          Baltimore, MD 21202
                                          410-244-7400
                                          410-244-7742 (fax)
                                          MYMirviss@Venable.com

                                          *Counsel for Respondent Perdue Farms Inc.*

13

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2024, a true and correct copy of the foregoing

Respondent Perdue Farms Inc.'s Motion to Certify an Interlocutory Appeal or for Reconsideration

of the March 15, 2024 Order was served on the following via e-mail:

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street, P.O. Box 1061
Medford, OR 97501
thad@guyerayers.com
stephani@guyerayers.com
*Counsel for Complainant*

Carolyn Jasperse
Nicole Pepperl
U.S. Dept. of Health & Human Services
10903 New Hampshire Avenue
White Oak Building 31
Room 4524
Silver Spring, MD 20993
carie.jasperse@fda.hhs.gov
nicole.pepperl@fda.hhs.gov

Candace A. Spencer
Rural Advancement Foundation
International-USA
P.O. Box 640
Pittsboro, NC 27312
pr@candaceaspencer.com

Director of Whistleblower Programs
U.S. Department of Labor
Room N 4618 FPB
200 Constitution Ave., N.W.
Washington, DC 20210
osha.dwpp@dol.gov

Mary McDonald
Counsel for Whistleblower Programs
Division of Fair Labor Standards
Department of Labor
200 Constitution Ave., N.W.
Room N-2716, FPB
Washington, D.C. 20210
mcdonald.mary@dol.gov

J. Larry Stine
Elizabeth K. Dorminey
Wimberly, Lawson, Steckel, Schneider
& Stine, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, GA 30326
jls@wimlaw.com
ekd@wimlaw.com

Karen Gray
Government Accountability Project
1612 K Street, N.W.
Suite 1100
Washington, D.C. 20006
kareng@whistleblower.org

*/s/ Kristin M. Koger*
Kristin M. Koger

14

# Exhibit 14

JA411

# UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES
### Newport News, VA

_____

**Issue Date: 18 April 2024**

**Case No.:    2016-FDA-00003**

*In the Matter of:*

**CRAIG WATTS,**
*Complainant,*

*v.*

**PERDUE FARMS, INC.,**
*Respondent.*

_____

## ORDER DENYING CERTIFICATION OF INTERLOCUTORY APPEAL AND DENYING RECONSIDERATION OF ORDER QUASHING SUBPOENAS

On March 11, 2024, Respondent requested subpoenas for third-party witnesses, Compassion in World Farming, Inc. (CIWF) and Leah Garces, to produce documents and give testimony at a deposition.

On March 15, 2024, I issued an Order Quashing Subpoenas.  I quashed the subpoenas because the Administrative Review Board (ARB) recently held in *Fagan v. Dep't of the Navy*, ARB No. 2023-0006, ALJ No. 2021-CER-00001 (Feb. 28, 2024) that in the absence of explicit statutory authority, Department of Labor (DOL) administrative law judges (ALJ) do not have the power to issue subpoenas to third-party witnesses, and the Food Safety Modernization Act (FSMA) does not explicitly confer subpoena authority on DOL ALJs.

On March 25, 2024, Respondent filed a motion to certify the Order Quashing Subpoenas for interlocutory appeal, or in the alternative, to reconsider. On April 8, 2024, Complainant filed a response in opposition to Respondent's motions. On April 9, 2024, Complainant filed a motion to accept the out-of-time response. On April 10, 2024, Respondent filed a motion for leave to file a reply to Complainant's response and its reply. On April 11, 2024, I held a status conference with the parties to discuss the pending motions. The transcript of that status conference is incorporated herein.

## I. Respondent's Motion for Certification for Interlocutory Appeal

The ARB does not generally accept petitions for review of an ALJ's interlocutory order. *See Heckman v. M3 Transport LLC/SLT Expressway, Inc.*, ARB No. 16-083, ALJ No. 2012-STA-059, slip op. at 2 (Nov. 10, 2016). A party may move the tribunal to certify an order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Section 1292(b) permits a tribunal to certify an interlocutory appeal to an appellate body for immediate review when: (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion in resolving the issues presented by the order; and (3) an immediate appeal may materially advance the litigation's ultimate termination. 28 U.S.C. § 1292(b); *Fagan v. Dep't of the Navy*, ARB No. 2023-0006, ALJ No. 2021-CER-00001, slip op. at 2 (April 6, 2023) (Order Granting Interlocutory Review). Furthermore, the party seeking certification must persuade the tribunal that "exceptional circumstances justify a departure from the basic policy of postponing appellate review

- 2 -

JA413

until after the entry of a final [decision and order]." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978).

Upon careful review of the parties' filings, I find that Respondent has not established that my Order Quashing Subpoenas "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Moreover, this case does not present "exceptional circumstances" justifying a departure from the ordinary procedure of postponing appellate review by the ARB until after the ALJ issues a final decision and order. *Livesay*, 437 U.S. at 475. Therefore, I will deny Respondent's motion to certify the Order Quashing Subpoenas for interlocutory appeal to the ARB.

### A. Controlling Question of Law

Respondent contends the question of whether DOL ALJs possess the power to subpoena third-party witnesses is a controlling question of law because denial of the subpoenas will result in a denial of due process to Respondent. Respondent alleges that the decision to quash the subpoena is reversible error. *See* Motion at 4-8.

Respondent seeks documents and testimony from CIWF and Ms. Garces, so that it can potentially prove Complainant did not reasonably believe Respondent was violating the FDCA.[1] While I am sympathetic to Respondent's concerns about access to relevant,

---

[1] To prove FSMA protected activity, Complainant must establish he "provided [or] caused to be provided … to the employer … information relating to any violation of, or any act or omission the employee

probative, and material evidence, I am not convinced Respondent will be deprived of due process simply because CIWF and Ms. Garces cannot be compelled to produce documents or testify under oath in this proceeding.  Respondent will have the opportunity to depose and/or cross-examine Complainant about the contents of the CIWF video and the overall conditions on his farm.  Although Respondent might not receive all the information it wants before trial, Respondent will not be denied the opportunity to mount a meaningful defense in this case.[2]

Accordingly, I conclude the subpoena authority issue is not a controlling question of law.

### B. Substantial Ground for Difference of Opinion

Respondent argues there are at least two substantial grounds for difference of opinion. *See* Motion at 8-10.  First, the ARB's decision in *Fagan* analyzed subpoena power question under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Safe Water Drinking Act (SWDA), not the FSMA.  *Id.* at 8-9. Second, Respondent is not similarly situated to the complainant in *Fagan* because Respondent did not institute this action and was not given a choice of forum. *Id.* at 9-10.

---

*reasonably believes* to be a violation of any provision of [the Federal Food, Drug and Cosmetic Act (FDCA)] or any order, rule, regulation, standard, or ban under [the FDCA]."  21 U.S.C. § 399d(a)(1) (emphasis added).

[2] I encourage Respondent to make a good-faith attempt to negotiate with CIWF and Ms. Garces to obtain the evidence it seeks voluntarily, without compulsory process. Further, I expect Complainant to assist in these good faith efforts to obtain the requested information, to the extent that Complainant's assistance would be helpful.  The parties are referred to the discussion of this topic at the April 11, 2024 status conference.

- 4 -

Respondent correctly points out that the ARB did not analyze subpoena authority question under the FSMA; however, *Fagan*'s rationale and holding is not narrowly tailored to the CERCLA and the SDWA.  Respondent does not dispute that the FSMA does not explicitly provide subpoena authority to DOL ALJs.  I reject Respondent's contention that implicit subpoena authority flows only to one party and not the other.  Respondent has not identified any rational basis for why the ARB might conclude the FSMA implicitly confers subpoena authority, or why respondents are entitled to subpoena third-party witnesses while complainants would be denied the same right.  The fact that the FMSA includes a federal court kick-out provision, 21 U.S.C. § 399d(b)(4)(A), does not imply DOL ALJs enjoy the same powers as Article III courts.

There are no reasonable bases to distinguish the issue in this matter from the ARB's very recent holding in *Fagan*.  Accordingly, I conclude Respondent has not established there are substantial grounds for difference of opinion with respect to the subpoena authority issue under the FSMA.

### C. Advancement of Termination of Litigation

Respondent argues an immediate appeal may materially advance the litigation's ultimate termination because it will save the parties time, trouble, and expense. *See* Motion at 10-11.

Respondent's argument puts the cart before the horse.  Respondent presupposes, that in an appeal after a final determination, the ARB will reverse its decision in *Fagan*,

- 5 -

vacate my final decision and order based on my refusal to issue subpoenas to CIWF and Ms. Garces, and then remand for further proceedings.  As noted above, the evidence sought by these subpoenas goes to only a single element of Claimant's *prima facie* case – whether Complainant's belief that there was a violation of the FDCA was reasonable.  See *supra* note 1.  Based on the procedural history of this matter, I have little doubt that at least one party will appeal my final decision and order to the ARB.  There always remains the possibility the ARB will find some error in my decision requiring vacatur and remand.  This is no different from any other case.  Moreover, this case has been pending before the DOL since February 2015 – *more than nine years*.  Certifying this case just for interlocutory appeal of the subpoena authority issue only risks even further delay, and there is little chance an interlocutory appeal will actually expedite the litigation.

Accordingly, I conclude that immediate appeal is unlikely to materially advance the litigation's ultimate termination.

**D. Exceptional Circumstances**

Respondent's motion and reply fail to acknowledge that interlocutory appeals are the exception, not the rule.  Specifically, Respondent neglected to show "exceptional circumstances" justifying a departure from the general rule that the ARB will only review an ALJ's final decision and order.  *Livesay*, 437 U.S. at 475.  The only thing exceptional about this case is the sheer length of time it has taken the DOL to issue a final decision.  Even if Respondent were able to establish all three elements necessary for

- 6 -

Section 1292(b) certification, I would nevertheless exercise my discretion to deny certification because this case has been pending before the DOL for nearly a decade. If I erred by denying Respondent's request for subpoenas, Respondent will have ample opportunity for recourse to correct that error, if necessary.

## II. Respondent's Motion for Reconsideration

In the alternative, Respondent requests reconsideration of my Order Quashing Subpoenas. *See* Motion at 11-12.  The Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges (Rules) state that "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for or controlled by these rules, or a governing statute, regulation, or executive order." 29 C.F.R. § 18.10(a).  Because the Rules do not supply a standard governing motions for reconsideration, I will borrow the standard set forth in the FRCP.  FRCP 59(e) permits a tribunal to alter or amend its decision to (1) accommodate an intervening change in controlling law, (2) account for newly discovered evidence, or (3) correct a manifest error of law or fact.  *Trevino v. City of Fort Worth*, 944 F.3d 567, 570 (5th Cir. 2019). I conclude Respondent has not established any of the above grounds for reconsideration.  Accordingly, the motion for reconsideration is denied.

## III. Complainant's Motion to Accept Out-of-Time Response

According to the DOL's e-filing/e-service system, Complainant did not file his response until 11:34 P.M. on April 8, 2024.  That filing was rejected because the document was corrupted and unreadable. Complainant re-filed his response the next day at 9:55 A.M.

- 7 -

I consider the response timely filed because the response was originally filed before midnight on April 8, 2024. On April 9, 2024, Complainant filed a motion to accept the out-of-time response. The motion is denied, as moot, because I consider Complainant's response to be timely filed.

### IV. Respondent's Motion for Leave to File a Reply

At the status conference, I initially denied Respondent's motion for leave to file a reply because reply briefs are generally disfavored. Upon reconsideration, I granted the motion to ensure the reply will be made part of the record for appellate purposes only.

### ORDER

Based on the foregoing, IT IS ORDERED:

1. Respondent's motion to certify the Order Quashing Subpoenas, dated March 15, 2024, for interlocutory appeal to the Administrative Review Board is DENIED;

2. Respondent's motion for reconsideration of the Order Quashing Subpoenas, dated March 15, 2024, is DENIED;

3. Complainant's motion to accept the out-of-time response is DENIED, as moot; and

4. Respondent's motion for leave to file a reply is GRANTED.

**SO ORDERED.**


                                        **PAMELA A. KULTGEN**
                                        Administrative Law Judge


PAK/PML/jcb
Newport News, Virginia

## SERVICE SHEET

Case Name:  **WATTS_CRAIG_v_PERDUE_FARMS_INC_**

Case Number: **2016FDA00003**

Document Title: **Order**

I hereby certify that a copy of the above-referenced document was sent to the following this 18th day of April, 2024:

**JOAN BUCHANAN**
Paralegal Specialist

OSHA-Region 4 Regional Administrator
Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
          *{Electronic - Regular Email}*

J. Larry Stine, Esq
jls@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, NE
Suite 400
ATLANTA GA 30326
          *{Electronic - Regular Email}*

Atlanta Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Sam Nunn Federal Center
Room 7T10
61 Forsyth Street, S.W.
ATLANTA GA 30303
          *{Electronic - Regular Email}*

Carolyn Jasperse
Carie.Jasperse@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4524
SILVER SPRING MD 20993
          *{Electronic - Regular Email}*

Michael Helbing
Michael.Helbing@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4421A
SILVER SPRING MD 20993
          *{Electronic - Regular Email}*

Thad Guyer, Esq
thad@guyerayers.com
TM Guyer and Ayers & Friends, P.C.
116 Mistletoe Street
PO Box 1061
MEDFORD OR 97501
          *{Electronic - Regular Email}*

**SERVICE SHEET** continued (2016FDA00003 Order)          Page: 2

Mitchell Mirviss, Esq.
mymirviss@Venable.com
Venable LLP
750 East Pratt Street
Suite 900
BALTIMORE MD 21202
     *{Electronic - Regular Email}*

Roger A Colaizzi, Esq.
racolaizzi@Venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
     *{Electronic - Regular Email}*

Candace A Spencer
pr@candaceaspencer.com
Rural Advancement Foundation International-USA
P.O. Box 640
PITTSBORO NC 27312
     *{Electronic - Regular Email}*

Elizabeth K Dorminey
EKD@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, PC
3400 Peachtree Road NE
Suite 400
ATLANTA GA 30326
     *{Electronic - Regular Email}*

Stephani Ayers
stephani@whistleblowerdefenders.com
POB 1061
MEDFORD OR 97501
     *{Electronic - Regular Email}*

Kristin Koger
kmkoger@venable.com
Venable LLP
600 Massachusetts Ave., NW
WASHINGTON, D.C. DC 20001
     *{Electronic - Regular Email}*

Thad Guyer
tmguyer@tmguyer.com
116 Mistletloe Street
MEDFORD OR 97501
     *{Electronic - Regular Email}*

Thad Guyer
116 Mistletoe Street
MEDFORD OR 97501
     *{Electronic - Regular Email}*

JA422

# Exhibit 15

JA424



600 MASSACHUSETTS AVE., NW   WASHINGTON, DC 20001
**T** 202.344.4000  **F** 202.344.8300  www.Venable.com

July 19, 2024

**t** 202.344.8051
**f** 202.344.8300
RColaizzi@Venable.com

**VIA EMAIL**

Hon. Pamela A. Kultgen
Office of Administrative Law Judges
United States Department of Labor
11870 Merchants Walk
Suite 204
Newport News, VA 23606

    Re:    **Craig Watts v. Perdue Farms Inc., Case No. 2016-FDA-00003**

Dear Judge Kultgen:

On behalf of the Respondent, Perdue Farms Inc., in the above-referenced matter, I am writing to request a conference before Your Honor as soon as possible given time-sensitive issues resulting from the United States Supreme Court's recent decision in *S.E.C. v. Jarkesy*, 603 U.S. ___, 114 S. Ct. 2117 (rel. June 27, 2024). Respondent also requests that the Court temporarily suspend discovery pending the conference.

The *Jarkesy* decision, as well as the preceding Fifth Circuit decision, *Jarkesy v. S.E.C.*, 34 F.4th 446 (2024) speaks directly to whether the Office of the Administrative Law Judges has subject-matter jurisdiction in the instant case. In light of *Jarkesy*, Perdue intends to move to dismiss for lack of subject-matter jurisdiction due to (a) the violation of the jury-trial right guaranteed by the Seventh Amendment pursuant to *Jarkesy*; (b) the Office of the Administrative Law Judges' non-legality under the Take Care Clause; and (c) violation of the nondelegation doctrine and the right to a process equal to or in an Article III court consistent with due process. Respondent also intends to move to amend its answer to include additional affirmative defenses addressing these and related issues and to request a jury trial, as well as to move to stay the proceedings pending Your Honor's resolution of the issues relating to subject-matter jurisdiction.

In light of the potential impact of *Jarkesy*, Respondent requests that the Court conduct a conference to set a briefing schedule for Respondent's impending motions. Because discovery is scheduled to close on August 12, 2024 and the potential lack of subject-matter jurisdiction could render all discovery moot, Respondent also requests that the Court temporarily suspend discovery until the Court rules on the impending motion for stay. This request is consistent with the approach taken by other administrative law judges who have ordered briefing on the impact of *Jarkesy* and



Hon. Pamela A. Kultgen
July 19, 2024
Page 2


cancelled proceedings to allow time for consideration of the briefs and a determination of the issues. *See, e.g.*, *Admin'r, Wage & Hour Div., U.S. Dep't of Labor v. A.R. Zapote Harvesting, LLC*, ALJ Case No. 2022-TAE-00009 (July 11, 2024); *Principal Dep. Admin'r, Wage and Hour Div., U.S. Dep't of Labor v. Mow-It-Alls, Inc.*, ALJ No. 2022-TAE-00012 (July 3, 2024).

　　　　Please do not hesitate to reach out with any questions or concerns. Thank you for your time and consideration.



　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　Roger A. Colaizzi


cc:　　Thad M. Guyer, Esq., *Counsel for Complainant*
　　　　Stephani Ayers, Esq., *Counsel for Complainant*

# Exhibit 16

Case 5:24-cv-00477-BO-RJ    Document 6-17    Filed 08/23/24    Page 1 of 5

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of

**CRAIG WATTS**,

    Complainant,

                       The Honorable Pamela Kultgen

v.                             Case No. 2016-FDA-00003

**PERDUE FARMS, INC.,**

    Respondent.

_____

**COMPLAINANT'S OPPOSITION TO RESPONDENT'S**
**REQUEST FOR CONFERENCE AND TEMPORARY STAY**

Complainant Craig Watts hereby opposes Respondent Perdue Farms Inc.'s July 19, 2024 letter requesting a conference with the Court and a temporary stay of discovery to address alleged subject matter jurisdiction issues arising from the Supreme Court's recent decision in SEC v. Jarkesy, 603 U.S. ___, 114 S. Ct. 2117 (2024). Perdue's request is improper and should be denied.

Neither the Office of Administrative Law Judges (OALJ) nor the Administrative Review Board, nor the Secretary of Labor has jurisdiction to declare a statutory scheme unconstitutional. No one in the DOL has been authorized by Congress to adjudicate the constitutional issues Perdue intends to raise. It is a well-established principle of administrative law that agencies lack the authority to rule on the constitutionality of their own enabling statutes or statutory jurisdiction. See, e.g., *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.") (citation and internal quotation marks

1

omitted); Califano v. Sanders, 430 U.S. 99, 109 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures . . . .").

This principle is grounded in the separation of powers. Administrative agencies are creatures of statute, and it is the exclusive province of the Judiciary to decide the constitutionality of statutes. See *Marbury v. Madison,* 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Agencies cannot simply declare their own organic statutes or regulations unconstitutional. See *Oestereich v. Selective Serv. Sys. Local Bd. No. 11,* 393 U.S. 233, 242 (1968) (Harlan, J., concurring) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.").  Here, neither the OALJ Rules of Practice and Procedure nor the Food Safety Modernization Act (FSMA) grant ALJs any authority to decide constitutional questions regarding their own jurisdiction. The OALJ is a purely statutory creation, and its powers are limited to those expressly conferred by Congress. Nothing in the FSMA's whistleblower provisions suggests that ALJs have free-floating authority to adjudicate the constitutional validity of the statute under which this proceeding arises.

The Supreme Court's *Jarkesy* decision does not change this analysis or somehow vest the OALJ with newfound powers. *Jarkesy* arose from a constitutional challenge filed in an Article III court, not before an ALJ. The Court did not *sub silentio* overturn decades of precedent regarding the limits of agency authority to decide constitutional questions. Perdue's attempt to raise these issues before Your Honor is essentially an invitation for the OALJ to exceed its statutory jurisdiction and usurp the role of the Judiciary. The OALJ should decline that improper invitation.

In sum, the OALJ lacks authority to decide the constitutional issues Perdue intends to raise. Perdue must present any constitutional challenges in an appropriate Article III forum, not

through a unilateral letter demand for an administrative hearing. The request for a conference

and stay of discovery should be denied so that this matter may proceed expeditiously to an

evidentiary hearing as scheduled.


Respectfully submitted,

s/Thad M. Guyer
Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax: 1-888-866-4720
Email: Thad@guyerayers.com
Attorneys for Complainant


| CERTIFICATE OF SERVICE |
|---|

I hereby certify that on this 19th day of July 2024, a true and correct copy of the foregoing
Opposition to Respondent's Request for Conference and Temporary Stay was served on the
following via electronic mail:

Roger A. Colaizzi
Todd A. Harrison
Kristin M. Koger
Venable LP
600 Massachusetts Ave., NW
Washington, DC 20001
racolaizzi@venable.com
taharrison@venable.com

Todd J. Horn
Michael J. Wilson
Mitchell Mirviss
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
tjhorn@venable.com
mjwilson@venable.com
mymirviss@venable.com

3

Counsel for Respondent Perdue Foods, Inc.

s/ Thad M. Guyer

4

# Exhibit 17

Case 5:24-cv-00477-BO-RJ    Document 6-18    Filed 08/23/24    Page 1 of 8

JA432

# UNITED STATES DEPARTMENT OF LABOR
### OFFICE OF ADMINISTRATIVE LAW JUDGES
### Newport News, VA

_____

**Issue Date: 23 July 2024**

**Case No.:    2016-FDA-00003**

*In the Matter of:*

**CRAIG WATTS,**
*Complainant,*

*v.*

**PERDUE FARMS, INC.,**
*Respondent.*

_____

### ORDER DENYING CONFERENCE CALL AND STAY OF DISCOVERY AND ORDER GRANTING MOTION TO AMEND SCHEDULING ORDER

A formal hearing into this matter is scheduled to commence on October 28, 2024.  On July 19, 2024, Respondent filed a letter[1] requesting a conference call to establish a briefing schedule for its impending motion to dismiss.  Respondent intends to move for dismissal because the Office of Administrative Law Judges allegedly lacks subject-matter jurisdiction to hear and decide this case.[2] Respondent furthermore requests a temporary stay of discovery until that motion is resolved.  On the same day, Complainant filed a response in opposition.

---

[1] Counsel is referred to 29 C.F.R. § 18.33, indicating that requests for an order must be made by motion. Future requests may not be granted if not compliant with section 18.33.

[2] Respondent "intends to move to dismiss for lack of subject-matter jurisdiction due to (a) the violation of the jury-trial right guaranteed by the Seventh Amendment pursuant to *Jarkesy*; (b) the Office of the Administrative Law Judges' non-legality under the Take Care Clause; and (c) violation of the nondelegation doctrine and the right to a process equal to or in an Article III court consistent with due process."

I will deny Respondent's requests for a conference call and a stay of discovery. I lack the power and authority to decide constitutional questions, regardless of whether I agree with Respondent's position on this issue. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." (citations omitted)). Therefore, I cannot and will not grant any motion to dismiss on constitutional grounds.[3] However, Respondent may file its motion to dismiss, to the extent necessary to preserve its constitutional arguments for appellate review; Complainant may file a response to the extent necessary to preserve its opposition to Respondent's position. I neither expect nor require either of these filings to be lengthy, as they should solely be sufficient to preserve the party's position for any possible appeal on this issue. Thus, a stay of discovery to allow the parties to prepare these filings is not necessary.

In addition, on July 22, 2024, the parties filed a joint motion to amend the pre-hearing scheduling order. I will grant that motion. As the parties are aware, this matter has been pending before this office or on appeal for more than eight years and has been pending before me on remand for more than two years. I am not inclined to further delay the hearing in this matter, absent extraordinary cause.

---

[3] The parties may confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues.

- 2 -

Accordingly, IT IS ORDERED that:

1. Respondent's motions for a status conference and temporary stay of discovery are DENIED;

2. Respondent may, pursuant to the schedule below, file a motion to dismiss sufficient to preserve its constitutional challenges; if Respondent submits such a motion to dismiss on constitutional grounds, Complainant may file a response sufficient to preserve its opposition.

3. The joint motion to amend the scheduling order and reschedule the hearing is GRANTED and AMENDED as follows:

   a. The parties shall complete discovery no later than **September 13, 2024**;

   b. The parties may file dispositive motions no later than **September 25, 2024,** and the responding party may file a response in opposition within fourteen (14) days of service of the motion;

   c. The parties shall exchange exhibit and witness lists, stipulations, pre-hearing statements, and exhibits no later than **October 4, 2024**;

   d. The parties shall file exhibit and witness lists, exhibits, pre-hearing statements, and evidentiary objections no later than **October 18, 2024**; and

   e. In all other respects, the instructions set forth in the Orders Rescheduling Hearing and Amended Scheduling Orders, dated January 5, 2024 and May 14, 2024, remain in effect.  The hearing will commence at 9:00 a.m. each day the week of October 28-November 1, 2024.

- 3 -

**SO ORDERED.**

**PAMELA A. KULTGEN**
Administrative Law Judge

PAK/PML/jcb
Newport News, Virginia

- 4 -

# SERVICE SHEET

Case Name:  **WATTS_CRAIG_v_PERDUE_FARMS_INC_**

Case Number: **2016FDA00003**

Document Title: **ORDER DENYING CONFERENCE CALL AND STAY OF DISCOVERY AND ORDER GRANTING MOTION TO AMEND SCHEDULING OR**

I hereby certify that a copy of the above-referenced document was sent to the following this 23rd day of July, 2024:

**Amy Ouellette**
Paralegal Specialist

OSHA-Region 4 Regional Administrator
Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
*{Electronic - Regular Email}*

J. Larry Stine, Esq
jls@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, NE
Suite 400
ATLANTA GA 30326
*{Electronic - Regular Email}*

OSHA, Whistlebl Director
OSHA.DWPP@dol.gov
Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
*{Electronic - Regular Email}*

Carolyn Jasperse
Carie.Jasperse@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4524
SILVER SPRING MD 20993
*{Electronic - Regular Email}*

Michael Helbing
Michael.Helbing@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4421A
SILVER SPRING MD 20993
*{Electronic - Regular Email}*

Atlanta Regional Solicitor
m-atl.fedcourt@dol.gov
Regional Solicitor
U. S. Department of Labor
Sam Nunn Federal Center
Room 7T10
61 Forsyth Street, S.W.
ATLANTA GA 30303

*{Electronic - Regular Email}*

**SERVICE SHEET** continued (2016FDA00003 Order)        Page: 2

Mitchell Mirviss, Esq.
mymirviss@Venable.com
Venable LLP
750 East Pratt Street
Suite 900
BALTIMORE MD 21202
*{Electronic - Regular Email}*

Roger A Colaizzi, Esq.
racolaizzi@Venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
*{Electronic - Regular Email}*

Candace A Spencer
pr@candaceaspencer.com
Rural Advancement Foundation International-USA
P.O. Box 640
PITTSBORO NC 27312
*{Electronic - Regular Email}*

Elizabeth K Dorminey
EKD@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, PC
3400 Peachtree Road NE
Suite 400
ATLANTA GA 30326
*{Electronic - Regular Email}*

Stephani Ayers
stephani@whistleblowerdefenders.com
POB 1061
MEDFORD OR 97501
*{Electronic - Regular Email}*

Kristin Koger
kmkoger@venable.com
Venable LLP
600 Massachusetts Ave., NW
WASHINGTON, D.C. DC 20001
*{Electronic - Regular Email}*

Thad Guyer
tmguyer@tmguyer.com
116 Mistletloe Street
MEDFORD OR 97501
*{Electronic - Regular Email}*

Thad Guyer
thad@guyerayers.com
116 Mistletoe Street
MEDFORD OR 97501
*{Electronic - Regular Email}*

JA439

# Exhibit 18

Case 5:24-cv-00477-BO-RJ    Document 6-19    Filed 08/23/24    Page 1 of 26

JA440

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

IN THE MATTER OF:                    *

CRAIG WATTS,                         *

        Complainant,              *

      v.                            *        Case No. 2016-FDA-00003

PERDUE FARMS INC.,                   *

        Respondent.               *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**RESPONDENT PERDUE FARMS INC.'S MOTION TO DISMISS**
**FOR LACK OF SUBJECT-MATTER JURISDICTION**

Pursuant to 29 C.F.R. § 18.70, Respondent Perdue Farms Inc. ("Perdue"), by and through its undersigned counsel, hereby respectfully moves to dismiss this case for lack of subject-matter jurisdiction and further moves to stay the proceedings pending the Court's decision.[1]

**INTRODUCTION**

One month ago, the Supreme Court definitively held that Article I administrative law judges ("ALJs") cannot adjudicate legal claims and remedies, *i.e.*, claims arising at law like those sought by Complainant Watts here, because the Seventh Amendment requires that they be tried by a jury if so requested by a party. *S.E.C. v. Jarkesy*, 144 S. Ct. 2117, 2127–28 (2024). The Supreme Court affirmed a decision by the Fifth Circuit holding that SEC ALJs lack subject-matter jurisdiction over federal securities-fraud enforcement proceedings brought administratively by the

---

[1] Perdue is permitted to move to dismiss for lack of subject-matter jurisdiction at any time. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.") (quotation marks and citation omitted). Perdue also understands that the Court has already ordered that it will deny any requested stay of discovery. July 23, 2024 Order at 2. This renewed request for a stay is therefore made for the record pursuant to the Court's directive that Perdue may move to dismiss as necessary to preserve its constitutional arguments and its position for any possible appeal and appellate review. *Id.* & n.3.

SEC on three separate grounds (only the first of which was reached by the Supreme Court): (1) the unavailability of a jury trial, violating the jury-trial right guaranteed by the Seventh Amendment; (2) the violation of Article II's Take Care Clause resulting from the absence of direct presidential executive authority over ALJs, who can be removed only for cause by the SEC, whose members, in turn, can be removed only for cause as well; and (3) violation of the nondelegation doctrine and the right to a process equal to or in an Article III court consistent with due process and the right to a jury trial of all claims and remedies so triable, and vesting a party, especially a private party, with power to elect between an Article I and Article III tribunal without any intelligible standard to guide that election. *See Jarkesy v. S.E.C.*, 34 F.4th 446, 463–65 (5th Cir. 2022) ("*Jarkesy I*"), *aff'd and remanded*, 144 S. Ct. 2117 (2024) ("*Jarkesy II*"). Indeed, for the first and third issues, the facts in this case are stronger than in *Jarkesy*.

This Court thus lacks subject-matter jurisdiction over the claims. The Supreme Court has spoken. These proceedings are unconstitutional and should be halted immediately.

In response to Perdue's letter advising the Court of *Jarkesy* and its decisive impact on these proceedings, the Court indicated that it believed that it *cannot* address a constitutional infirmity in its statutory jurisdiction and authority. *See* July 23, 2024 Order ("Order") at 2. That view is wrong, but, regardless, it illustrates vividly the patent constitutional injustice in forcing Perdue to defend these claims in an unconstitutional administrative proceeding bereft of basic discovery rights without any recourse until a distant day when the case reaches an Article III court. The notion that the Court lacks *any* power to consider its *own* unconstitutional assertion of power over the claims is a dubious form of justice.

2

## ARGUMENT

**I.      Under *Jarkesy*, Perdue Is Entitled to a Jury Trial of Watts' FSMA Claims, which Prevents this Court from Adjudicating His Claims against Perdue.**

On June 27, 2024, the Supreme Court issued *Jarkesy II*, which squarely holds that a party defending legal claims brought under a federal statute in an administrative agency vested with both prosecutorial and judicial authority is entitled under the Seventh Amendment "to be tried by a jury of his peers before a neutral adjudicator." 144 S. Ct. at 2139. *Jarkesy II*'s Seventh Amendment ruling is dispositive here. All of Watts' claims of statutory violations and most of his requested remedies under the Food Safety Modernization Act ("FSMA") are legal. Yet this administrative proceeding cannot be tried to a jury, and instead, in direct derogation of the Seventh Amendment per *Jarkesy II*, this Court has determined that an ALJ employed by the Department of Labor ("DOL") will try it, subject to administrative review by DOL's Appellate Review Board ("ARB"), and then by the DOL Secretary, before it can be heard by an Article III appellate court with limited power of judicial review. Though his FSMA claims are currently being prosecuted by the Complainant, the DOL retains ultimate authority over the matter; it may elect to join as a party "at any time at any stage" of the proceedings and even may take over its prosecution by petitioning for review of an ALJ decision. 29 C.F.R. § 1987.108(a)(1). By contrast, at no stage in this internal process required by the FSMA and DOL regulations may Perdue ever obtain a jury trial to defend itself.

Adding constitutional insult to the constitutional injury, the FSMA provided Complainant with a vehicle to pursue a jury trial if he so elected, through a kickout clause allowing him to bring his claims at law or equity in a U.S. District Court if the Secretary has not issued a final decision within 210 days of the filing of his complaint, and again within 90 days of any final written decision by the Secretary. 21 U.S.C. § 399d(b)(4)(A). If—and only if—Complainant files such a

3

federal action, either party may elect a jury trial of the action. *Id.* Thus, Watts' whistleblower rights and remedies are triable by a jury under the FSMA—and thus trigger Seventh Amendment protection[2]—but, under this scheme, Perdue's right to a jury trial hinges entirely upon the unfettered discretion of its adversary, Watts, whether to kick out his claims to federal court. This major wrinkle placing a party's core constitutional right under the plenary control of its adversary makes the denial of a jury trial here a greater constitutional deprivation than in *Jarkesy*.

The FSMA has a second crucial feature not present in *Jarkesy*: remedies that include compensatory damages. *See* 21 U.S.C. § 399d(b)(3)(B), (C). These conclusively demonstrate that Congress intended that the rights and obligations under the statute are legal in nature.

Even without these additional features, *Jarkesy II*'s analysis of the federal securities claims brought by the SEC requires a jury trial here. The Supreme Court employed the settled test for applying the Seventh Amendment, which principally focuses on the distinction between law and equity: (1) whether the claims have a late-18th century English common-law analogue; (2) whether the remedies sound primarily in law or equity; and (3) if the two-part test is satisfied, whether the claim falls within a limited "public right" exception for a class of cases that are so inherently public in nature that Congress may assign them for special treatment by an Article I forum.[3] *See Jarkesy II*, 144 S. Ct. at 2128-34; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989). Of the first two elements, the second test (remedies) is "more important." *Jarkesy II*, 144 S. Ct. at 2129. And

---

[2] This statutory provision establishes a Seventh Amendment right to jury trial that cannot be abrogated. *See Jarkesy II*, 144 S. Ct. at 2128 (explaining that the reference to "common law" in the Seventh Amendment was "in contradistinction to equity, and admiralty, and maritime jurisprudence," so "[t]he Amendment therefore embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume" (internal quotation marks omitted)); *Curtis v. Loether*, 415 U.S. 189, 194 (1974) ("The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law.").

[3] Examples include tariffs and revenue collection, relations with American Indian tribes, immigration, and veterans' benefits. *See Jarkesy II*, 144 S. Ct. at 2132–34.

4

the public-rights exception is applied narrowly, with a strong "presumption" favoring adjudication in an Article III court. *Id*. at 2134.

> ### A. Watts' Retaliation Claim Is Analogous to Common-Law Contract and Tort Claims.

The FSMA provides for a cause of action if someone "has been discharged or otherwise discriminated against" due to activity protected under the FSMA. 21 U.S.C. § 399d(a), (b). Watts' retaliation claim under the FSMA has several common-law analogues.[4]

First, it resembles late 18th-century English common-law breach-of-contract and tort claims for compensatory damages, as reflected by modern-day claims for wrongful discharge and breach of an employment contract. *See, e.g.*, *Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 669 (7th Cir. 1996) ("Lebow's unlawful discharge claim [of retaliation for union organizing] is comparable to a common-law action for breach of an employment contract."); *Waldrop v. S. Co. Servs., Inc.*, 24 F.3d 152, 156 (11th Cir. 1994) (finding unlawful discharge claim under Rehabilitation Act analogous to common-law breach-of-contract action); *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1524 (11th Cir. 1991) (finding constructive-discharge claim under Jury System Improvements Act analogous to common-law breach-of-contract action); *Smith v. Barton*, 914 F.2d 1330, 1337 (9th Cir. 1990) (finding unlawful-discharge claim under the Rehabilitation Act "closely analogous" to claim for breach of express or implied employment); *Schmidt v. Levi Strauss & Co.*, 621 F. Supp. 2d 796, 801 (N.D. Cal. 2008) (in considering a whistleblower claim under Sarbanes-Oxley, finding that "[a] close analogy might be made to the claim of wrongful

---

[4] In determining whether Watts' FSMA claim has an 18th century common-law analogue, it does not matter that the subject-matter of the claim (retaliation for public statements about conditions of food production) is modern and without an 18th-century ancestor or analogue. *See Jarkesy II*, 144 S. Ct. at 2128-29 (discussing *Tull v. United States*, 481 U.S. 412, 418-19 (1987), which held that the "statutory nature of the claim was not legally relevant," so that Clean Water Act claims for penalties met this first test because generic "penalties" were litigated at common law in the 18th century); *id.* at 2139 ("this Court clarified in *Tull* that the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims").

discharge which existed at common law"); *cf. Rogers v. Exxon Res. & Eng'g Corp.*, 550 F.2d 834, 838 (3d Cir. 1977) (finding that Age Discrimination in Employment Act suit for back wages is essentially a "routine contract action" in which the Seventh Amendment guarantees a jury trial), *overruled on other grounds by Smith v. Jos. Schlitz Brewing Co.*, 584 F.2d 1231 (3d Cir. 1978); *see also Stonehill Coll. v. Mass. Comm'n Against Discrim'n*, 808 N.E.2d 205, 215 (Mass. 2004) ("Following the Supreme Court's lead, Federal courts have analogized wrongful discharge and employment discrimination cases to common-law wrongful discharge actions.").

It also closely resembles a common-law tort claim. A federal statutory claim for monetary damages caused by the violation of a legal duty imposed by the statute is generally treated as a tort, irrespective of its novel statutory nature. *See, e.g., Curtis*, 415 U.S. at 195 (affirming jury-trial right for fair-housing discrimination claim under Title VII, reasoning that "[a] damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach," such that "this cause of action is analogous to a number of tort actions recognized at common law"); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709–11 (1999) (applying this principle to a § 1983 regulatory-taking claim); *Tamosaitis v. URS Inc.*, 781 F.3d 468, 486 (9th Cir. 2015) (requiring jury trial for Energy Reorganization Act whistleblower-retaliation claim brought in federal court under complainant opt-out right because it is comparable to wrongful discharge, "a tort so widely accepted in American jurisdictions today" that courts "are confident that it has become part of our evolving common law") (internal quotation marks omitted); *Schmidt*, 621 F. Supp. 2d at 801 ("[A] wrongful discharge suit exhibits the classic elements of a tort cause of action." (internal quotation marks omitted)).

6

Because Watts' FMSA claim has several common-law analogues sounding in contract and tort, Watts' claim meets the first *Jarkesy* element.

### B.    Watts Seeks Legal Remedies.

The second element of *Jarkesy*'s Seventh Amendment test also is satisfied. Watts seeks commonplace legal remedies, including emotional-distress and compensatory damages. His Supplemental Complaint seeks, *inter alia*, (1) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue," Supp. Compl. ¶ 80; (2) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above," *id.* ¶ 81; (3) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014," *id.* ¶ 82; (4) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion, *id.* ¶ 85; and (5) "all other relief available at law and equity," *id.* ¶ 86. These claims are—at least in significant part—legal in nature, and all of these remedies are legal in nature, entitling Perdue to a jury trial under the Seventh Amendment.

First, "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life," *id.* ¶ 80, resulting from the purported loss of his alleged employment contract, hostile work conditions, and damage to his reputation, are quintessential legal compensatory damages, no different from those available in tort, that are subject to a jury trial under settled Seventh Amendment jurisprudence. *See, e.g.*, *Jarkesy II*, 144 S. Ct. at 2129 ("While monetary relief can be legal or equitable, money damages are the prototypical common law remedy." (citing *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255 (1993))); *Wooddell v. Intern'l*

*Broth. of Elec. Workers, Loc. 71*, 502 U.S. 93, 98 (1991)) ("A personal injury action is of course a prototypical example of an action at law, to which the Seventh Amendment applies.").

Second, Watts' claim for "compensatory damages" to his business in the form of lost income and incurred expenses from delayed placement of flocks, Supp. Compl. ¶ 82—*i.e.*, the equivalent of a lost-profit claim and incurring extra salary cost for an employee—also is a clearly legal claim. *See Goettsch v. Goettsch*, 29 F. Supp. 3d 1231, 1242 (N.D. Iowa 2014) (finding that compensatory damages are legal in nature when they focus on "plaintiffs' perceived losses and harm").

Third, backpay is a legal, rather than equitable, form of relief. *See, e.g.*, *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 573 (1990) ("[T]he remedy of backpay sought in this duty of fair representation action is legal in nature."); *Eichorn v. AT&T Corp.*, 484 F.3d 644, 656 (3d Cir. 2007) ("The remedy they seek is thus akin to 'back pay,' which is not an equitable remedy within the meaning of the statute."); *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1254 (10th Cir. 2004) (rejecting argument that backpay for ERISA § 510 violation was equitable because award "is based on each individual class member's loss rather than Defendant's gain ... [and] is thus in the nature of compensatory damages"); *id.* ("A backpay claim is remedially analogous to personal injury or breach of contract claims because backpay awards compensate employees for lost wages and benefits[.]"); *see also Eichorn*, 484 F.3d at 656 (3d Cir. 2007) ("Back pay claims do not differ remedially from the personal injury claim for lost wages, or the contract claim for past wages due, for example ... [s]o, while reinstatement is clearly equitable as a form of injunctive relief, back pay seems to be just as clearly legal." (quoting 2 Dan B. Dobbs, *Law of Remedies* § 6.10(5) at 226 (2d ed.1993) (footnotes omitted))). The backpay remedies in numerous statutory schemes have been deemed legal and compensatory, and not equitable/restitutionary.

8

JA448

*See, e.g.*, *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 964–65 (9th Cir. 2002) (explaining that back pay under the Family Medical Leave Act is a legal remedy); *EEOC v. Baltimore Cnty.*, 904 F.3d 330, 332 (4th Cir. 2018) ("[B]ack pay is a mandatory, legal remedy under the FLSA.").[5]

For these reasons, Watts' FSMA claim meets both elements of the *Jarkesy* test.

### C.     After *Jarkesy II*, the Public-Rights Exception Does Not Apply.

Even if the claims and remedies are legal under the above two-part test, a small window precludes application of the Seventh Amendment if the claim sufficiently advances a "public right." *Jarkesy II* effectively closes that window to only a very narrow group of cases addressing special policy concerns like immigration and veterans' benefits. Whistleblowing protection does not constitute a "public right" under *Jarkesy II*.

*Jarkes*y *II* emphasizes that the "public rights" exception is simply that—an extremely narrow exception to the general rule requiring jury trials—with a strong presumption that a legal action analogous to the common law must be adjudicated in an Article III court and triable by jury. *See Jarkesy II*, 144 S. Ct. at 2132 ("If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory"); *id.* at 2134 ("'[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts.'" (quoting *N. Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 69 n.23 (1982) (Brennan, J., plurality))); *id.* at 2147 (Gorsuch, J., concurring) ("we look for some 'deeply rooted' tradition of nonjudicial adjudication before permitting a case to be tried in a different forum under different procedures").

---

[5] The FSMA also provides for a "Penalty" of attorneys' fees and costs, expert witness fees, and similar expenses. 21 U.S.C. § 399d(b)(3)(C). Civil penalties of this kind are legal remedies for the purposes of the Seventh Amendment. *See Jarkesy II*, 144 S. Ct. at 2129; *Tull*, 481 U.S. at 421–22.

Under this narrowed standard, it is immaterial that the claim is, or could be, prosecuted by a federal agency enforcing federal law. Not even the SEC's role in prosecuting security fraud under the federal securities statutes turned fraud claims—which are legal in nature—into a public right. *See id.* at 2135 ("we have never held that 'the presence of the United States as a proper party to the proceeding is ... sufficient' by itself to trigger the exception. … Again, what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled.") (internal citation omitted). Rather, all that matters is that the claims involved relief that generally "'could only be enforced in courts of law,'" and which "target the same basic conduct as common law fraud," employ the same terms of art, and operate pursuant to similar legal principles. *Id.* at 2136 (quoting *Tull*, 481 U.S. at 422). Thus, if the action is fundamentally legal in nature, it involves a "'matter[ ] of private rather than public right,'" *id.* (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)), and "'Congress may not withdraw' it 'from judicial cognizance.'" *Id.* (quoting *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). The *Jarkesy* majority further concluded that "the object of this SEC action is to regulate transactions between private individuals interacting in a pre-existing market. To do so, the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts. This is a common law suit in all but name." *Id.* Thus, the close similarity between statutory securities fraud and common-law fraud was all that mattered, rendering the public-right exception tissue-thin, even in the context of government enforcement. If the claim is clearly legal, the public right exception no longer applies.

Here, too, this case is stronger than in *Jarkesy II*. There, the prosecuting agency, the SEC, sought statutory penalties payable to the federal government, not to private litigants. Here, the claims are prosecuted by a private party, Watts, seeking remedies that are entirely personal to him

<center>10</center>

<center>JA450</center>

without any direct financial benefit to the public. The claims are quintessentially private. If claims for security-fraud penalties brought by the SEC are not public, then surely Watts' claims seeking compensation for emotional distress are not public, either.

## II.    The OALJ, as Constituted, Lacks Subject-Matter Jurisdiction over Watts' Claims because Its Removal Protections Violate Article II's Take Care Clause.

Watts' claims should be dismissed for a second reason—DOL's Office of Administrative Law Judges ("OALJ") lacks jurisdiction to hear Watts' claims because its ALJs violate the Take Care Clause (Art. II, § 3, requiring the President to "take Care that the Laws be faithfully executed") because they are doubly insulated from the presidential removal power.

The Supreme Court declined to address this issue in *Jarkesy II* after granting *certiorari* and hearing full argument on it. Thus, the Fifth Circuit's prior ruling that SEC ALJs are unconstitutional because the statutory removal provisions governing them are unconstitutional remains good law. *See Jarkesy I*, 34 F.4th at 463–65. It reasoned that the "ALJs perform substantial executive functions[,]" so the President "must have sufficient control over the performance of their functions, and, by implication, he must be able to choose who holds the positions." *Id.* at 463. "Two layers of for-cause protection" under civil service laws "impede that control; Supreme Court precedent [thus] forbids such impediment." *Id.*[6]

---

[6] The Fifth Circuit's logic is compelling. It relied upon *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), which held that members of the Public Company Accounting Oversight Board ("PCAOB"), who answered to the SEC Commissioners, but could be removed by the SEC only for willful violations or unreasonable failure to enforce compliance after notice and hearing, were too far removed from the President's constitutional oversight and removal authority over all executive officers. *Id.* at 498. Critically, they enjoyed double insulation— not only did the Commissioners have limited removal authority, but the President has limited removal authority over the Commissioners, limited to "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 486-87. SEC ALJs stand in similar shoes as PCAOB members because "they can only be removed by the SEC Commissioners if good cause is found by the Merits Systems Protection Board" ("MSPB"), who, like SEC Commissioners, "can only be removed by the President for cause." *Jarkesy I*, 34 F.4th at 464. Under *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), if the ALJs exercise "significant authority pursuant to the laws of the United States" on a "continuing and permanent" basis, they are officers, not employees who comprise "the broad swath of 'lesser functionaries' in the Government's workforce." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *Buckley*, 424 U.S. at 126 n.162).

11

The Fifth Circuit's reasoning applies to ALJs in general. First, it pointed out that the Supreme Court has already decided that "SEC ALJs are 'inferior officers' under the Appointments Clause because they have substantial authority within SEC enforcement actions." *Jarkesy I*, 34 F.4th at 464 (quoting *Lucia v. SEC*, 585 U.S. 237, 245–46 (2018)). DOL ALJs are indistinguishable from SEC ALJs in this regard. If the latter are officers, so are the former. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), holds that the Appointment Clause is violated if the President lacks the ability to discipline or replace such inferior officers. One layer of insulation from Presidential plenary power is acceptable, but, per *Free Enterprise Fund*, two layers is not because "the President is no longer the judge of the Board's conduct." *Id.* at 496; *see also SpaceX v. N.L.R.B.,* No. W-24-CV-00203-ADA, 2024 WL 3512082, at *2 (W.D. Tex. July 23, 2024) (finding that the NLRB ALJs are unconstitutionally insulated from removal).

In *Lucia*, the Supreme Court relied upon a prior decision that had "applied the unadorned 'significant authority' test to adjudicative officials who are near-carbon copies of the Commission's ALJs." *See* 585 U.S. at 246 (citing *Freytag v. Comm'r*, 501 U.S. 868 (1991)). *Freytag* reviewed the status of the "special trial judges" ("STJs") of the United States Tax Court, concluding that the STJs are officers, not mere employees. Among other things, it pointed to their presiding over adversarial hearings: they "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders[,]" exercising "significant discretion." 501 U.S. at 881–82. STJs "prepare proposed findings and an opinion" adjudicating charges and assessing tax liabilities. *Id.* at 874. This substantial authority meant that they are officers, even when their decisions are not final. *Lucia* applied *Freytag*'s holding about Tax Court STJs to SEC ALJs, pointing out that SEC ALJs have more autonomy because the SEC

12

can elect not to review an ALJ decision, making it final action of the SEC. *Jarkesy I* then applied *Lucia*'s holding about SEC ALJs to the Take Care Clause.

DOL ALJs stand in the same shoes as SEC ALJs. *See* 5 U.S.C. § 3105. They exercise the same power and authority and thus equally qualify as officers of the United States subject to presidential authority. They also are subject to 5 U.S.C. § 7521(a), which provides that ALJs may be removed by the Secretary "only for good cause established and determined by the [MSPB] on the record after opportunity for hearing before the Board." And MSPB members, in turn, also can be removed only for cause, *i.e.*, they "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). Thus, as in *Jarkesy I*, "if the President wanted [a DOL] ALJ to be removed, at least two layers of for-cause protection stand in the President's way." 34 F.4th at 465. They are "sufficiently insulated from removal that the President cannot take care that the laws are faithfully executed. The statutory removal restrictions are unconstitutional." *Id*.

Perdue recognizes that the Supreme Court has not yet decided the issue, and that the Ninth and Tenth Circuits have held that the double insulation against removal does not render DOL ALJs unconstitutional. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1136 (9th Cir. 2021) (rejecting removal challenge to DOL ALJ considering compensation award under the Black Lung Benefits Act); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 764 (10th Cir. 2024) (finding that CPSC ALJs are constitutional despite double insulation from removal). But *Jarkesy I* is the more persuasively reasoned authority, as reflected by its affirmance in *Jarkesy II* on other grounds. It should be followed here, lest further unconstitutional litigation occur unnecessarily.

The Fourth Circuit has yet to decide which approach to follow. Instead, in the one case to reach it, it declined to address constitutionality and instead held that the defendant had failed to

demonstrate any harm caused to it from adjudicating the case before a DOL ALJ with a possible constitutional infirmity regarding the presidential removal authority. *See K & R Contractors LLC v. Keene*, 86 F.4th 135, 148–49 (4th Cir. 2023). But that hurdle is overcome in this case based upon the Court's Order issued July 23, 2024.

This Court ruled in the Order that it lacks any power whatsoever to apply *Jarkesy I* or *Jarkesy II* and address any constitutional infirmity in the statutory authority in these proceedings— whether it be the failure to honor the Seventh Amendment's right to jury trial, or the violation of the nondelegation doctrine by conducting proceedings without the protections of an Article III tribunal and providing a private party with the power to control Perdue's Seventh Amendment rights without providing any intelligible standard to guide that election. *See* Order at 2 ("I lack the power and authority to decide constitutional questions, regardless of whether I agree with Respondent's position on this issue. … Therefore, I cannot and will not grant any motion to dismiss on constitutional grounds.") (internal citation omitted). Perdue respectfully disagrees with the Court that it lacks the power to consider whether it lacks the power to decide this case; this argument is presented below in Part IV. But the problem goes further than just clear legal error: in ruling that it lacks the power to decide whether it is the constitutionally proper tribunal to hear these claims, the Court is forsaking its most fundamental and sacred duty: to faithfully follow and apply the Constitution at all times. Simply put, the Court is violating its oath of office.

Under 5 U.S.C. § 3331, all officers of the United States except the President must swear an oath to support and bear true faith and allegiance to the Constitution:

> An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath: "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully

14

discharge the duties of the office on which I am about to enter. So help me God."
This section does not affect other oaths required by law.

In ruling that the Court lacks authority to determine whether its statutory and regulatory procedures and jurisdiction violate the Constitution and even refusing to consider whether it is violating the Constitution, the Court is abandoning its oath of office. Willingly presiding over a potentially illegal proceeding without stopping to assess and address that illegality in the face of dispositive Supreme Court precedent is itself illegal. With due respect, this is a paradigm instance where the presidential removal authority should come into play. If an entire agency of ALJs will not consider recent Supreme Court case law that goes to the heart of their jurisdiction over cases that they lack power to hear because they cannot, and will not, conduct jury trials guaranteed by the Seventh Amendment to the Constitution, then, yes, profound injury has occurred.

Thus, the Fifth Circuit's decision applies here. The OALJ in the DOL, as presently constituted, cannot adjudicate Watts' claims and thus lacks subject-matter jurisdiction unless a constitutionally permissible ALJ is secured to conduct the case.

III.    **The FSMA Violates Separation of Powers and Due Process under the Nondelegation Doctrine by Giving a Private Party Legislative Authority Without Intelligible Standards to Deny Perdue a Jury Trial and Other Vital Rights Afforded in an Article III Court.**

*Jarkesy I* also held on a third ground for dismissal that directly applies here: Congress has exceeded its Article I authority by delegating to a third party, in this case a private party (Watts), the power to choose (twice, at separate junctures) whether to keep an action before the DOL or in an Article III court. At least in *Jarkesy*, this power was vested in a different government agency, the SEC. Here, an adverse private-party litigant has unfettered, plenary discretion without any controlling limit or principle to control whether Perdue can exercise its *statutory* right under the FSMA and constitutional right under the Seventh Amendment to have a jury hear and decide its case; its right to have an Article III judge preside over the trial whether a jury sits or not; to have

15

the right to subpoena third parties for discovery and trial if necessary; and to have all Rules of Federal Evidence and Civil Procedure apply.  It is difficult to imagine a more one-sided and unfair situation than where the party who, purported, is seeking millions of dollars in damages from another party gets to select whether the factfinder will be a jury or an ALJ; whether the defendant party will be able to get key discovery from the complainant's principal source(s) of evidence; whether the sitting judge to conduct the tribunal meets the constitutional qualifications and has the constitutional powers available under Article III; whether a neutral Article III judge will preside should the agency elect to participate; and whether the administrative agency hearing the matter will have the right to engage and participate as prosecuting party if it so elects.  The unfairness of this one-sided arrangement violates due process; the lack of any intelligible principle to guide this unfettered discretion violates separation of powers under the basic strictures of the nondelegation doctrine.

Addressing a similar stark contrast between a trial before an SEC ALJ and one before an Article III court, the Fifth Circuit held that Congress violated separation of powers by unconstitutionally delegating to the SEC "unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency." *Jarkesy I*, 34 F.4th at 459.  The failure to attach an "intelligible principle" to guide the SEC's exercise of delegated authority was crucial.  *Id.* at 461–62.

The only aggravating factor in *Jarkesy* not present here is that, there, the agency (the SEC) always acts in two roles: prosecutor and tribunal.  Here, the agency may elect not to act in those dual capacities. From a nondelegation doctrine perspective, this lone distinction disadvantages Perdue, because it gives unfettered power to a private party adversary that has a 100% personal financial interest in securing the maximum possible judgment without *any* accountability to

16

anyone or any guiding intelligible standard to limit his exercise of that authority. An unconstitutional delegation of core legislative authority to a private actor is more offensive to the Constitution because it is fundamentally extraconstitutional in nature and not merely a breach of accepted governmental authority.

This authority is fundamental legislative power that cannot be shared or delegated to any non-legislative-branch actor. Under the separation of powers, "the mode of determining which cases are assigned to administrative tribunals is completely within congressional control." *Id.* at 461 (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932) (internal quotation marks omitted)). Applied here to FSMA complainants, this, too "[i]s a delegation of legislative power." *Id.* Indeed, it is the same delegation of power that was decided in *Jarkesy I*. Only the recipient is different, and, in this case, that compounds the violation.

The separation-of-powers rule is violated because the power being exercised (deciding which tribunal will decide the claims) is fundamentally legislative, and not executive, *i.e.*, it is not a form of prosecutorial discretion. *See Jarkesy I*, 34 F.4th at 461–62. Substituting the FSMA potential prosecuting parties here (OSHA and Watts) for the SEC in *Jarkesy*, the Fifth Circuit's analysis applies perfectly:

> Congress did not, for example, merely give [OSHA and Watts] the power to decide whether to bring enforcement actions in the first place, or to choose where to bring a case among those district courts that might have proper jurisdiction. It instead effectively gave [Watts] the power to decide which defendants should receive *certain legal processes* (those accompanying Article III proceedings) and which should not. Such a decision—to assign certain actions to agency adjudication—is a power that Congress uniquely possesses.

*Id.* at 462 (emphasis in original).

The same is true for the second half of the analysis: Congress' failure to attach any "intelligible principle" to guide the exercise of delegated legislative power. Here, as in *Jarkesy*, complete plenary authority has been delegated without any restraint on the exercise of discretion.

17

Once the requisite 210-day waiting period for agency enforcement has lapsed, the kickout right attached and Watts had unfettered power to file the action in federal court if he chose. *See* 21 U.S.C. § 399d(b)(4)(A). When the Secretary issues her final decision, the kickout right will renew. *Id*. Again, substitute Watts for the SEC in the Fifth Circuit's analysis and nothing changes:

> Congress' grant of authority to [Watts] here is similarly open-ended. . . . Congress has given [Watts] exclusive authority and absolute discretion to decide whether to bring [FSMA anti-retaliation] enforcement actions within the agency instead of in an Article III court. Congress has said nothing at all indicating how [Watts] should make that call in any given case. If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution.

*Id.* at 462. The Fifth Circuit did not invent these principles but instead applied black-letter Supreme Court principles underlying the nondelegation doctrine.[7]

### IV. This Court Has Constitutional Authority to Decide the Constitutional Limits to its Jurisdiction.

Finally, the Court should reconsider its decision previewed in the Order that it lacks authority to entertain this Motion because, it believes, the OALJ lacks authority to consider whether it lacks constitutional authority to hear the claims statutorily authorized via the FSMA. With due respect, Watts' position, adopted by the Court, that the Court lacks power to decide whether it lacks power to decide Watts' claims misreads Supreme Court precedent, violates due process, and illustrates all too vividly why this tribunal is the wrong one to hear the claims.

The Court rested its conclusion on the statement in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) that "adjudication of the constitutionality of congressional enactments has

---

[7] As *Jarkesy I* explains, "the Supreme Court has made clear that Congress cannot 'delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative.'" *Id.* at 460 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825), and citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested.")). "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it.'" *Id.* at 461 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

18

generally been thought beyond the jurisdiction of administrative agencies." *Id.* at 215 (citations omitted). But in quoting this sentence to the Court as if it were an absolute prohibition against consideration of any jurisdiction to consider a constitutional challenge to the FSMA, Watts omitted the sentence that immediately follows: "*This rule is not mandatory, however*, and is perhaps of less consequence where, as here, the reviewing body is not the agency itself but an independent Commission established exclusively to adjudicate Mine Act disputes." *Id.* (emphasis added). *Thunder Basin*'s statement was dictum—the commission's authority was not itself at issue, and the Supreme Court noted that it had previously addressed constitutional issues. *See id.* Even the sentence relied upon by the Court qualifies the principle as only having "*generally* been thought" to be the case. *Id.* (emphasis added). *Thunder Basin*'s dictum does not establish a binding rule.

Moreover, tracing this dictum back to the source, it in no way reflects some overarching separation-of-power principle that administrative adjudicatory agencies necessarily lack the power to question the constitutional legitimacy of their statutory mandates—*i.e.*, that they are courts in name but not in practice, lacking the most fundamental power of any court: to opine on the applicable law.

The *Thunder Basin* dictum quoted from *Johnson v. Robison*, 415 U.S. 361, 368 (1974) (in turn quoting *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S 233, 242 (1968) (Harlan, J., concurring in result)) and citing *Pub. Util. Comm'n of Calif. v. United States*, 355 U.S. 534, 539 (1958) ("*P.U.C.*"). *Johnson* merely stated, again in dicta, that a right of judicial review was supported by the administrative practice of the Veterans' Administration. Its jurisdiction was "supported by the administrative practice of the Veterans' Administration" not to address constitutional challenges to its authority; it made no pronouncement about whether that practice was constitutionally mandated. *See* 415 U.S. at 368. It, in turn, cited a concurrence by Justice

<div align="center">19</div>

Harlan in *Oestereich*, a Selective Service case at the height of the Vietnam War, denying pre-induction review of alleged procedural irregularities. The lone concurrence's principal point was the exigency of a wartime draft; its second point was that the draft board had taken the position that it would not address the constitutionality of draft laws, and Justice Harlan believed this "generally" to be true for agencies. *See* 393 U.S. at 242. Moreover, Justice Harlan's principal source was *P.U.C.*, a 1958 decision that does not support the principle.

*P.U.C.* addressed a state law that gave a state public utility commission plenary authority over carrier rates for federal employees and goods, superseding longstanding practice of federally negotiated discounts; the issue was preemption, federal sovereignty, and the Supremacy Clause. One of California's arguments was ripeness, as the P.U.C. had not yet interfered with federally negotiated rates; one of the Court's responses was that it should not be expected that a state commission would entertain a constitutional challenge to the state statute giving it authority to supersede federal sovereignty. In its next sentence, the Court indicated that an agency might accept the authority to review constitutionality: "If, as in *Aircraft & Diesel Equipment Corp. v. Hirsch*, 331 U. S. 752, and *Allen v. Grand Cen. Aircraft Co.*, 347 U.S. 535, an administrative proceeding might leave no remnant of the constitutional question, the administrative remedy plainly should be pursued." *P.U.C.*., 355 U.S. at 539–40. *P.U.C.* also stated that a prime instance of when the authority should not be exercised was the opposite of the situation in this case: "where … judicial relief sought [i]s the only effective way of protecting the asserted constitutional right." *Id.* at 540; *see also Riggin v. Off. of Senate Fair Empl. Pracs.*, 61 F.3d 1563, 1569 (Fed. Cir. 1995) (stating that the principle may be applied "when the consequence of committing the issue to the agency would be to deny judicial review of the constitutional claim") (citing *Johnson v. Robinson* as an example).

Contrary to Watts' reading of *Thunder Basin* as prohibiting Article I tribunals from considering the constitutionality of their statutory authority,[8] since *Thunder Basin*, courts and agencies have acknowledged or exercised this power.  For example, in *Pehringer*, the Ninth Circuit described how the Benefits Review Board ("BRB") within DOL had considered similar constitutional challenges in a Black Lung Disease benefit case:

> Decker timely appealed to the BRB, contesting the ALJ's decision on the post-hearing motion, the constitutionality of Judge Sellers' appointment, and the constitutionality of the statutory removal protections. The BRB affirmed the ALJ's decision. It determined that the Secretary's ratification of the ALJ's appointment cured any Appointments Clause problem. The BRB then found 5 U.S.C. § 7521 constitutional, distinguishing [*Lucia*] and [*Free Enterprise Fund*].

8 F.4th at 1128–29.  In *Elgin v. Dep't of Treasury*, 567 U.S. 1, 16 (2012), the Supreme Court recognized that neither *Thunder Basin* nor its antecedents bar administrative consideration of constitutional challenges: "We need not, and do not, decide whether the MSPB's view of its power is correct, or whether the oft-stated principle that agencies cannot declare a statute unconstitutional is truly a matter of jurisdiction.  *See* [*Thunder Basin*, 510 U.S. at 215] (describing this rule as 'not mandatory')."

Since *Elgin*, courts have acknowledged that some latitude exists.  The Fourth Circuit, for instance, has acknowledged that no black line precludes administrative authority to consider constitutional issues:

> Moreover, the Supreme Court has similarly rejected the drawing of jurisdictional lines between agencies and federal courts based on the nature of constitutional claims. *See Elgin,* 132 S. Ct. at 2135–26 (noting that the line between facial, as-applied, and other constitutional challenges to statutes is "hazy at best and incoherent at worst").

---

[8] *See* Complainant's Opposition to Respondent's Request for Conference and Temporary Stay (July 19, 2024) at 1–2.

*Bennett v. SEC*, 844 F.3d 174, 184 (4th Cir. 2016);[9] *See also  Jolley v. United States*, No. 21-5181, 2024 WL 1521633, at \*1 (D.C. Cir. Apr. 9, 2024) (holding that constitutional challenge to ALJs were moot because the MSPB had already addressed the challenge on the merits). Other federal court decisions also acknowledge latitude:

> More recently, the Supreme Court has taken a different approach, and in that regard, has recognized that administrative agencies, such as FERC, may have "expertise [that] could be brought to bear on the ... questions presented." *Thunder Basin*, 510 U.S. at 212–13, 114 S. Ct. 771.
>
> Indeed, in *Elgin*, the Supreme Court "adopted a broader conception of agency expertise in the jurisdictional context."

*N.J. Conserv'n Found'n v. FERC*, 353 F. Supp. 3d 289, 307-08 (D.N.J. 2018) (quoting *Tilton v. S.E.C.*, 834 F.3d 276, 289 (2d Cir. 2016); *see also Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at \*7 (4th Cir. Apr. 19, 2022) (affirming that the principle "is not mandatory" and that "where an independent body—here, the Merit Systems Protection Board—hears constitutional challenges, it makes little sense to hamstring agencies by limiting the scope of arguments they may consider") (internal quotations omitted).   Recent Supreme Court decisions allowing these constitutional challenges to be brought in U.S. District Court have tellingly failed to say that the agencies lack any authority to address those issues—which they surely would have said had that been so. Instead, the Court pointed to agencies' lack of "technical expertise" in constitutional law, making collateral Article III litigation appropriate.  *See, e.g.*, *Axon Enter. Inc. v. F.T.C.*, 143 S. Ct. 890,

---

[9] *Bennett* further notes a line of analogous cased cited in a recent Second Circuit decision where litigants "unsuccessfully challenge[d] the constitutionality of the initial tribunal—including the authority of the presiding decision maker" and then had "to endure the proceeding and await possible vindication on appeal." *Id.* at 184 n.10 (citing *Tilton v. S.E.C.*, 834 F.3d 276, 285 (2d Cir. 2016)).  One of the cases cited in *Tilton* is *In re al-Nashiri*, 791 F.3d 71, 75 (D.C. Cir, 2015), which denied a mandamus petition by a Guantanamo prisoner seeking immediate D.C. Circuit review of a decision by the United States Court of Military Commissions Review ("USCMCR") denying his constitutional Appointments-Clause challenge to certain USCMCR judges hearing his interlocutory appeal.  Even though the USCMCR is an Article I court, it decided multiple such challenges to the constitutionality of certain of its judges under the Appointments Clause. *See Ortiz v. United States*, 585 U.S. 427, 434 (2019); Br. of United States, *Ortiz v. United States*, No. 2017-3610443, 2017 WL 3614403, at \*3-5 (Aug. 18, 2017) (discussing multiple USCMCR decisions).

22

906 (2023) ("they fall outside the Commissions' sphere of expertise"); *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021) ("structural constitutional challenges … usually fall outside the adjudicators' areas of technical expertise").  These vague statements plainly do not foreclose agency action.

Thus, the Court is not constitutionally prohibited from addressing the merits of this motion. It has power to consider whether it has power to adjudicate this case.  The challenges go to subject-matter jurisdiction, and this Court plainly has authority over that.  *See* 29 C.F.R. 18.70(a) ("A party may move to dismiss part or all of the matter for reasons recognized under controlling law, such as lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, or untimeliness.")  Indeed, Judge Rosen previously dismissed Watts' complaint for lack of subject-matter jurisdiction.  That Order explains why the Court has authority to rule here:

> Subject matter jurisdiction "refers to a tribunal's power to hear a case." *Snyder v. Bechtel Int'l Oil, Gas, & Chem.*, ALJ Case No. 2015-CPS-00004 (2015) (quoting *Morrison v. Nat'l Australian Bank*, 561 U.S. 267 (2010)).  "The Department of Labor's subject matter is invoked when the parties are properly before it, the proceeding is of a kind or class which the court is authorized to adjudicate, and the claim set forth in the paper writing invoking the court's action is obviously not frivolous." *Snyder*, 2015-CPS-00004 at 10 (quoting *Sasse v. U.S. Dept. of Justice*, ARB No. 99-053, ALJ No. 1998-CAA-007, slip op. at 3 (ARB Aug. 31, 2000)). Under the analogous Federal Rule of Civil Procedure 12(b)(1) and controlling law as incorporated by 29 C.F.R. 18.70(a), the Complainant bears the burden of proof in asserting that the court's jurisdiction is proper. *Ahluwalia*, 2007-SOX-44 at 2; *see also* 29 C.F.R. 18.70(a).

Jan. 6, 2017 Order at 3.  These principles apply here.  The Motion addresses this "'tribunal's power to hear a case.'" *Id*. (quoting *Snyder*, ALJ Case No. 2015-CPS-00004 at 10).  It addresses whether "'the parties are properly before it [and] the proceeding is of a kind or class which the court is authorized to adjudicate….'" *Id.*.  This Court has the power.  It has the duty and obligation to use it.

The alternative—years of futile, extra-jurisdictional litigation in a case that, as the Court has pointed out, is already eight years old—is untenable.  Surely, even an administrative court

23

JA463

cannot be powerless to acknowledge its lack of power. Absent any case law *requiring* such a surreal, upside-down, utterly illogical, and patently wasteful outcome, this Court should exercise its inherent authority, address the Motion on its merits, apply *Jarkesy I* and *II*'s black-letter, dead-on holdings, and dismiss these claims so a lawful tribunal can hear them and a jury can try them.

## CONCLUSION

For the foregoing reasons, Respondent Perdue respectfully requests that its Motion to Dismiss be granted and this case dismissed for lack of subject matter jurisdiction.

Dated: July 29, 2024                    Respectfully submitted,

                                        _____*/s/ Roger A. Colaizzi*_____
                                        Roger A. Colaizzi
                                        Kristin M. Koger
                                        VENABLE LLP
                                        600 Massachusetts Ave., N.W.
                                        Washington, DC 20001
                                        202-344-4000
                                        202-344-8300 (fax)
                                        RColaizzi@Venable.com
                                        KMKoger@Venable.com

                                        Mitchell Y. Mirviss
                                        VENABLE LLP
                                        750 E. Pratt St., Suite 900
                                        Baltimore, MD 21202
                                        410-244-7400
                                        410-244-7742 (fax)
                                        MYMirviss@Venable.com

                                        *Counsel for Respondent Perdue Farms Inc.*

JA464

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of July, 2024, a true and correct copy of the foregoing

Respondent Perdue Farms Inc.'s Motion to Dismiss was served on the following via e-mail:

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street, P.O. Box 1061
Medford, OR 97501
thad@guyerayers.com
stephani@guyerayers.com
*Counsel for Complainant*

Carolyn Jasperse
Nicole Pepperl
U.S. Dept. of Health & Human Services
10903 New Hampshire Avenue
White Oak Building 31
Room 4524
Silver Spring, MD 20993
carie.jasperse@fda.hhs.gov
nicole.pepperl@fda.hhs.gov

Candace A. Spencer
Rural Advancement Foundation
International-USA
P.O. Box 640
Pittsboro, NC 27312
pr@candaceaspencer.com

Director of Whistleblower Programs
U.S. Department of Labor
Room N 4618 FPB
200 Constitution Ave., N.W.
Washington, DC 20210
osha.dwpp@dol.gov

Mary McDonald
Counsel for Whistleblower Programs
Division of Fair Labor Standards
Department of Labor
200 Constitution Ave., N.W.
Room N-2716, FPB
Washington, D.C. 20210
mcdonald.mary@dol.gov

J. Larry Stine
Elizabeth K. Dorminey
Wimberly, Lawson, Steckel, Schneider
  & Stine, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, GA 30326
jls@wimlaw.com
ekd@wimlaw.com

Karen Gray
Government Accountability Project
1612 K Street, N.W.
Suite 1100
Washington, D.C. 20006
kareng@whistleblower.org


        */s/ Kristin M. Koger*
         Kristin M. Koger

# Exhibit 19

Case 5:24-cv-00477-BO-RJ    Document 6-20    Filed 08/23/24    Page 1 of 6

JA466

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of

**CRAIG WATTS,**

      Complainant,

v.                         Case No. 2016-FDA-00003

**PERDUE FARMS, INC.,**

      Respondent.

_____

## COMPLAINANT'S OPPOSITION TO RESPONDENT'S MOTION FOR LEAVE TO AMEND ANSWER AND MOTION TO DISMISS

Complainant Craig Watts hereby opposes Respondent Perdue Farms Inc.'s Motion for Leave to Amend Answer and Motion to Dismiss. Both motions should be denied as futile and contrary to this Court's prior rulings.

### I. Legal Standard

While leave to amend should be freely given when justice so requires, a court may deny a motion to amend when the amendment would be futile. *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010). Futility is apparent if the proposed amended pleading fails to state a claim or defense under the applicable rules and accompanying standards. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). As the Fourth Circuit has explained, there is no error in disallowing an amendment when the claim sought to be pleaded by amendment plainly would be subject to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420-21 (4th Cir. 1990).

1

## II. Argument

### A. <u>The Proposed Amendment is Futile</u>

Perdue's proposed amendment is futile because the defenses it seeks to add would not survive a motion to dismiss. The proposed amendment attempts to raise constitutional challenges based on the Supreme Court's decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) (finding that unlike prior cases upholding the "public rights exception" to statutorily created claims that did not exist at common, an SEC fraud claim was in essence a common law claim.). See Jarkesy reference to *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 444 (1977) (public exception applied where petitioners cited by the Secretary of Labor ordered to abate hazards that violated a mandatory occupational safety standard promulgated by the Secretary under § 5(a)(2) of OSHA, 29 U.S.C.S. § 654(a)(2).).

However, this court has already indicated that it lacks the authority to adjudicate such constitutional issues. In her Order dated July 23, 2024, the court explicitly indicated that it lacks the power and authority to decide constitutional questions, regardless of whether the court agreed with Respondent's position on the constitutional issue. The Order was clear that the court cannot and will not grant any motion to dismiss on constitutional grounds.

This ruling is consistent with well-established Supreme Court precedent that adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994). Given this Court's clear statement that it will not entertain constitutional challenges to its jurisdiction, Perdue's proposed amendment is plainly futile. The new defenses Perdue seeks to add - including alleged violations of the Seventh Amendment, are constitutional in nature.

### B. <u>The Motion to Dismiss Should Be Denied</u>

2

JA468

Perdue's motion to dismiss should be denied for the same reasons that its motion to amend is futile. This Court has already ruled that it lacks the authority to decide constitutional questions or grant motions to dismiss on constitutional grounds. Perdue's motion to dismiss is based entirely on constitutional arguments that this Court has already determined it cannot consider. Moreover, while *Jarkesy* may have implications for the constitutionality of certain administrative proceedings, it does not empower this court to rule on its own constitutionality or jurisdiction. As this court correctly noted in the July 23, 2024 Order, such determinations are beyond the scope of its authority, and therefore it is futile and meritless to consider Perdue's Motion to Dismiss further. Perdue's argument that this Court can and should rule on its own jurisdiction misinterprets the relevant case law and is contrary to the law of the case at his point.

## C. Granting Either Motion Would Cause Undue Delay

Both motions, if granted, would cause undue delay in a case that has already been pending for over eight years. This court has already expressed reluctance to further delay the hearing in this matter, absent extraordinary cause. Extraordinary cause may be provided by the Respondent taking its claims to an Article III court, but not to this court. Allowing an amendment to add defenses that this court cannot consider, or granting a motion to dismiss on grounds this Court has already said it cannot entertain, does not constitute such extraordinary cause.

Complainant is not willing to remove this case to federal court of his claims. Unless and until Perdue files a case against the Department of Labor in federal court to press its constitutional claims, there is not basis to further delay discovery.

3

JA469

### III. Conclusion

For the foregoing reasons, both Perdue's motion for leave to amend its answer and its motion to dismiss should be denied as futile. The proposed amendment and the motion to dismiss fail to state any claim or defense upon which this Court could grant relief, given its lack of authority to adjudicate constitutional issues. Accordingly, Complainant respectfully requests that the Court deny both Respondent's Motion for Leave to Amend Answer and its Motion to Dismiss.

Respectfully submitted,

s/Thad M. Guyer

_____

Thad M. Guyer
Stephani L. Ayers
GOVERNMENT ACCOUNTABILITY PROJECT, INC.
T.M. Guyer and Ayers & Friends, P.C.
P.O. Box 1061
Medford, OR 97501

Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690

Email: Thad@guyerayers.com
Attorneys for Complainant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of July 2024, a true and correct copy of the

foregoing Opposition to Respondent's Motion to Amend and Motion to Dismiss was served on

the following via electronic mail:


Roger A.
Colaizzi Todd
A. Harrison
Kristin M.
Koger Venable
LP
600 Massachusetts Ave.,
NW Washington, DC
20001
racolaizzi@venable.com
taharrison@venable.com

Todd J. Horn
Michael J.
Wilson Mitchell
Mirviss Venable
LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
tjhorn@venable.com
mjwilson@venable.com
mymirviss@venable.com

Counsel for Respondent Perdue Foods,

Inc.


s/ Thad M. Guyer

# Exhibit 20

# UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES
### Newport News, VA

_____

**Issue Date: 08 August 2024**

**Case No.:    2016-FDA-00003**

*In the Matter of:*

**CRAIG WATTS,**
*Complainant,*

*v.*

**PERDUE FARMS, INC.,**
*Respondent.*

_____

### ORDER DENYING RESPONDENT'S MOTIONS TO DISMISS AND FOR LEAVE TO AMEND ANSWER AND GRANTING JOINT MOTION FOR CONTINUANCE AND AMENDED SCHEDULING ORDER

On July 23, 2024, I issued an order denying Respondent's request for a stay of discovery to allow the parties to brief the potential application of Securities and Exchange Commission v. Jarkesy, 144 S.Ct. 2117 (June 27, 2024).  I acknowledged that I lacked the authority to decide the constitutional question at issue, citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), but provided both Respondent and Complainant the opportunity to file documents to ensure the issue was preserved for appeal.  *See also Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 673-75 (6th Cir. 2018) (collecting cases).

On July 29, 2024, Respondent filed a Motion to Dismiss and Motion for Leave to Amend Answer.  Complainant responded in opposition to the motions the following day.  As

stated previously, I lack the authority to decide these constitutional questions or the power to grant the relief Respondent requests, thus, I will deny the motions. I stress that nothing in this order should be read to indicate that I agree with the substance of Respondent's motion that this case is similar to and subject to the holding in *Jarkesy*. The issue is certainly not as black and white as Respondent purports.[1]

Although in his response to Respondent's motions, Complainant stated that there was "no[] basis to further delay discovery," on August 7, 2024, the parties filed a joint motion to amend the scheduling order and continue the hearing. As previously note, the undersigned is loathe to further delay this matter, as it has already been pending for many years. This is also the third time the parties have moved to continue the hearing, making it the fourth scheduled hearing dates. However, as both parties agree to the extensions of time, I will grant the joint motion. **No further continuances of the hearing or amendments to the scheduling order** will be granted absent direction by an Article III court or by *extraordinary* cause shown by the parties.

IT IS ORDERED that:

1. Respondent's motions to dismiss and for leave to amend answer are DENIED.

2. The joint motion to amend the scheduling order and reschedule the hearing is GRANTED and AMENDED as follows:

---

[1] The undersigned does not appreciate Respondent's accusation that I am violating my oath of office by so ruling. I take my oath to public service and to the Constitution and laws of the United States very seriously and have done so every time I have taken that oath over 27 years of public service. As an administrative law judge, my position is a creation of statute. I can not and will not exceed my authority, which is entirely consistent with my oath of office.

- 2 -

3.  The parties shall complete discovery no later than **January 17, 2025**;

4.  The parties may file dispositive motions no later than **February 14, 2025**;

5.  The parties shall exchange exhibit and witness lists, stipulations, pre-hearing statements, and exhibits no later than **March 14, 2025**; and

6.  The parties shall file exhibit and witness lists, exhibits, pre-hearing statements, and evidentiary objections no later than **March 28, 2025**.[2]

7.  The hearing is continued to commence at **9:00 a.m. each day the week of April 14-18, 2025, in Fayetteville, North Carolina**, until completed. The specific hearing location will be designated in a subsequent Notice of Location. A request for a continuance due to a prior judicial setting or other existing conflict must be filed within fourteen (14) days of receipt of this notice.

---

[2] In all other respects, the instructions set forth in the Order Rescheduling Hearing and Amended Scheduling, dated January 5, 2024, remain in effect.

- 3 -

**SO ORDERED.**

**PAMELA A. KULTGEN**
Administrative Law Judge

PAK/PML/jcb
Newport News, Virginia

- 4 -

## SERVICE SHEET

Case Name: **WATTS_CRAIG_v_PERDUE_FARMS_INC_**

Case Number: **2016FDA00003**

Document Title: **Order**

I hereby certify that a copy of the above-referenced document was sent to the following this 8th day of August, 2024:

**JOAN BUCHANAN**
Paralegal Specialist

OSHA-Region 4 Regional Administrator
Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
        *{Electronic - Regular Email}*

Carolyn Jasperse
Carie.Jasperse@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4524
SILVER SPRING MD 20993
        *{Electronic - Regular Email}*

Bayley Court Reporter
Court Reporting Service
Bayley Reporting, Inc.
12945 Seminole Blvd., Bldg. 1
Suite 14
SEMINOLE FL 33778
        *{Electronic - Regular Email}*

Michael Helbing
Michael.Helbing@fda.hhs.gov
U.S. Department of Health and Human Services
10903 New Hampshire Avenue
White Oak Building 31, Room 4421A
SILVER SPRING MD 20993
        *{Electronic - Regular Email}*

J. Larry Stine, Esq
jls@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, P.
3400 Peachtree Road, NE
Suite 400
ATLANTA GA 30326
        *{Electronic - Regular Email}*

Mitchell Mirviss, Esq.
mymirviss@Venable.com
Venable LLP
750 East Pratt Street
Suite 900
BALTIMORE MD 21202
        *{Electronic - Regular Email}*

JA477

**SERVICE SHEET** continued (2016FDA00003 Hearing Reschedul) Page: 2

Roger A Colaizzi, Esq.
racolaizzi@Venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
          *{Electronic - Regular Email}*

Thad Guyer
thad@guyerayers.com
116 Mistletoe Street
MEDFORD OR 97501
          *{Electronic - Regular Email}*

Candace A Spencer
pr@candaceaspencer.com
Rural Advancement Foundation International-USA
P.O. Box 640
PITTSBORO NC 27312
          *{Electronic - Regular Email}*

Elizabeth K Dorminey
EKD@wimlaw.com
Wimberly, Lawson, Steckel, Schneider & Stine, PC
3400 Peachtree Road NE
Suite 400
ATLANTA GA 30326
          *{Electronic - Regular Email}*

Stephani Ayers
stephani@whistleblowerdefenders.com
POB 1061
MEDFORD OR 97501
          *{Electronic - Regular Email}*

Kristin Koger
kmkoger@venable.com
Venable LLP
600 Massachusetts Ave., NW
WASHINGTON, D.C. DC 20001
          *{Electronic - Regular Email}*

Thad Guyer
tmguyer@tmguyer.com
116 Mistletloe Street
MEDFORD OR 97501
          *{Electronic - Regular Email}*

JA479

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24-CV-00477-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.**, 31149 Ocean City Road Salisbury, Maryland 21804 | |
| Plaintiff, | **ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT CRAIG WATTS** |
| v. | |
| **JULIE SU**, in her official capacity as Acting Secretary of the United States Department of Labor, | |
| **PAMELA KULTGEN**, in her official capacity as an Administrative Law Judge of the United States Department of Labor, | |
| **UNITED STATES DEPARTMENT OF LABOR**, | |
| **THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR**, | |
| *and* | |
| **CRAIG WATTS**, | |
| Defendants. | |

Defendant Craig Watts by his undersigned attorneys, answers the Complaint and pleads affirmative defenses thereto as follows:

**INTRODUCTION (paras 1-12)**

1.      Admitted first sentence only.

2.      Admitted except the allegation "unconstitutional."

3.      Admitted except the allegation "as an independent contractor" only up to the

1

point of the footnote 1 number, and Watts admits the last sentence.

4. Admitted.

5. Denied.

6. Denied.

7. Denied.

8. Denied.

9. Denied.

10. Denied.

11. Denied.

12. Denied.

**JURISDICTION AND VENUE (paras 13-15)**

13. Admitted.

14. Admitted.

15. Admitted.

**PARTIES (paras 16-21)**

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted except the allegation "as an independent contractor."

2

## BACKGROUND (paras. 22-58)

I.    **Watts' Agreement with Perdue (paras. 22-28)**

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted except the allegation "Watts implemented a punitive scheme."

26.    Denied.

27.    Denied.

28.    Denied.

II.    **Administrative Proceedings (paras. 29-46)**

29.    Admitted.

30.    Admitted.

31.    Admitted.

32.    Admitted.

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Admitted.

38.    Admitted.

39.    Admitted.

40.    Admitted.

41.    Denied.

3

42. Denied

43. Admitted.

44. Admitted.

45. Admitted.

46. Admitted.

**III.** **The Unconstitutionality of the OALJ Proceedings against Perdue (paras 47-58)**

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Admitted except as to the word "outrageous".

58. Denied.

**CLAIMS FOR RELIEF**

**COUNT I (paras. 59-64)**

**VIOLATION OF SEVENTH AMENDMENT**
**Against All Defendants**

59. Denied.

4

60.    Denied.

61.    Denied.

62.    Admitted.

63.    Denied.

64.    Denied.

## COUNT II (paras 65-69)

### VIOLATION OF ARTICLE III
**Against All Defendants**

65.    Denied.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

## COUNT III (paras 70-77)

### VIOLATION OF PRESIDENT'S REMOVAL AUTHORITY
**UNDER ARTICLE II**
**Against All Defendants**

70.    Denied.

71.    Admitted.

72.    Admitted.

73.    Admitted.

74.    Admitted.

75.    Denied.

5

76.   Denied.

77.   Denied.

## COUNT IV (paras 78-84)

### VIOLATION OF NONDELEGATION DOCTRINE AND SEPARATION OF POWERS UNDER ARTICLE I
**Against All Defendants**

78.   Denied.

79.   Admitted.

80.   Admitted, except the first and last sentence.

81.   Denied.

82.   Denied.

83.   Admitted as to last sentence only.

84.   Denied.

## COUNT V (paras. 85-94)

### VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE
**Against All Defendants**

85.   Denied.

86.   Admitted only if it is applicable to both parties.

87.   Denied.

88.   Admitted, except as to the phrase "as is constitutionally required" and if it is applicable to both parties.

89.   Denied

90.   Admitted, except for the phrase "due process is further denied".

91.   Admitted only up to and including the phrase "de novo review".

6

JA485

92.    Admitted only as to the first sentence.

93.    Denied.

94.    Denied.

95.    Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE: WAIVER

1.  Plaintiff had or should have had knowledge of all constitutional rights it has alleged in Counts I, II, III, IV and V, and by failing to have asserted them during its nine years of litigation in the Department of Labor and the Fourth Circuit, has demonstrated explicitly or implicitly an intention to relinquish and otherwise waive those rights.

2.  Prior to the commencement of this action, Plaintiff had already waived all of its constitutional challenges other than those under Count V (Violation of the Fifth Amendment's Due Process Clause-- lack of subpoena power) by having failed to timely and reasonably raise them with the Administrative Review Board of the Department of Labor and the Fourth Circuit Court of Appeals when the action was pending there. As to Count V, at the time of filing this action, Plaintiff has waived its right to subpoena and depose the "third party activist group" referenced in para. 25 and/or the New York Times as referenced in para. 26 by failing to seek that discovery in this Court.

3.  Also as to Count V, the "third party activist group" had agreed to a voluntary deposition and discovery shortly before this action was filed, and that voluntary offer of discovery still stands.

4.  Plaintiff has long since had a right to assert its constitutional right to a jury trial, or to an Article III judicial officer, under the Seventh Amendment and under Article III, per Counts I and II. By failing to timely assert those rights in the past nine years litigating in the Department

7

of Labor and the Fourth Circuit, Plaintiff has waived those rights.

5. By otherwise failing to assert its constitutional rights to adjudication of its claims and defenses before a removable presidential appointee, as pleaded in Count III, or to assert any other due process rights to have the same statutory rights and prerogatives as Watts under the FMSA, Plaintiff has waived those rights.

6. The Plaintiff is a corporate person, has the right to sue and be sued, and may be bound to an explicit or implied knowing waiver of any and all rights conferred upon it by the Constitution and laws of the United States.

7. Each and every constitutional claim and violation alleged by Plaintiff could have been asserted at any time since the administrative proceeding was commenced in 2015. Each and every allegation made in the complaint and filed with this court could have been prosecuted in this court since 2015.

8. For almost a decade Plaintiff has made continuing and effective use of the administrative processes of the Department of Labor that it now claims are unconstitutional. So long as its first two motions to dismiss were granted by the OALJ and affirmed by the ARB, Plaintiff has embraced and benefited from the DOL administrative justice system. Even when the current ALJ denied its motion to dismiss in 2022, Plaintiff continued to use the process, including issuing extensive discovery requests. Plaintiff failed to raise any constitutional issues in either appeal taken to the ARB, or to include such issues in its 2021 Motion to Dismiss, as described in paras. 34 to 38.

9. The recent jurisprudence referenced in the complaint and that has inspired the Plaintiff to file this action, to wit, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) and *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) neither changed nor overruled preexisting constitutional precedent, and

8

JA487

those preexisting precedents would have supported assertion of every claim Plaintiff now asserts before this court.

10. Similarly, the numerous Supreme Court cases alleged in the complaint, starting with *Marbury v. Madison*, 5 U.S. 137, 176-78 (1803), would have enabled this action to have been commenced years ago, commencing in 2015, and by having failed to act upon those Supreme Court precedents to invoke the subject matter jurisdiction of this Court under 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201-02 as alleged in paras. 13 and 14, Plaintiff has waived all claims under those older precedents.

### SECOND AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS

1. The statute of limitations for every civil action commenced against the United States is six years from the date a party knew or should have known that its rights were being infringed upon by a federal statute, rule or administrative action, 28 U. S. C. §2401(a).

2. Purdue knew or should have known that it was being injured by the administrative regulations and/or being subjected to an allegedly unconstitutional administrative action not later than the April 26, 2016 joint motion by the parties staying the administrative proceeding to allow Perdue's "planned Motion to Dismiss on jurisdictional grounds." *See* Decision and Order Granting Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction, January 6, 2017, p.2 (ECF 6-4 p. 3).

3. Because Watts has been joined as party in this action under Counts I, II, III, IV and V "against all defendants" the same as the United States, and because he is facing the same regulatory and statutory challenges; and because "under FSMA, Congress grants to Watts—not even an administrative agency—unfettered discretion to adjudicate his FSMA claims in either an administrative proceeding before the OALJ with up to two further levels of DOL administrative review, or in federal court with a mutual option to elect a trial by jury" (para. 80), he has

9

standing to assert the limitations period prescribed by 28 U. S. C. §2401(a).

4. Plaintiff's claims under Counts I, II, III and IV are time barred under 28 U. S. C. §2401(a), and therefore must be dismissed.

### THIRD AFFIRMATIVE DEFENSE: FAILURE TO STATE A CLAIM UNDER COUNTS I AND II FOR DENIAL OF SEVENTH AMENDMENT AND ARTICLE III RIGHTS

1. A claim for relief under the FMSA, and the forms of equitable and legal relief that it authorizes, is a specialized statutory public cause of action consisting of four administrative phases: (a) an OSHA "investigation" that has no quasi-judicial adjudicative function; (b) an OALJ proceeding if either party in its unfettered discretion seeks an administrative de novo review of the OSHA findings and order; and (c) Administrative Procedures Act (APA) style review by the ARB; and (d) judicial review by a U.S. Court of Appeals applying the APA.

2. OSHA investigators and administrative law judges within the OALJ receive special training and acquire specialized experience in applying federal whistleblower statutes, especially those like the FMSA which prescribed a shifting contributory factor burden of proof scheme unknown to the common law.

2. The entirety of this administrative mechanism under the FMSA is to protect America's food supply, and toward that objective, the FDA is authorized to enter the administrative litigation as it did in this case pursuant to its statutory mission of protecting that food supply. The FDA is a highly specialized administration within the executive branch.

3. The FMSA does not authorize the adjudication of contract rights, or tort claims of any kind and the parties may wage breach of contract, wrongful termination and infliction of emotional distress litigation in the courts by separate action. Section 399d(c) of the FMSA-Effect of section, provides:

10

(1)Other laws: Nothing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law.

(2)Rights of employees: Nothing in this section shall be construed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement. The rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment.

4.  The contract between the parties allowed either party to terminate it without cause upon 90 days' notice. (Para. 24). Plaintiff did not terminate the contract with Watts. Instead, Watts withdrew under conditions that he alleged were actionable under the FMSA as "constructive" discharge. (Supp. Complaint, ECF 6-10).

5. English common law did not recognize a free-standing tort or other cause of action for constructive discharge.

6.  English common law did not recognize a free-standing tort or other cause of action for infliction of emotional distress.

7.  English common law did not recognize a free-standing tort of wrongful discharge or wrongful termination of employment. Nor did early American common law, which adopted an "at will" employment law regime.

8. Except for a small class of physical injury "strict liability" torts, English common law did not recognize any tort that did not require the injured party to prove intent, motivation or negligence.

9. The FMSA protects only employees in the food industry who disclose to Congress, public officials or company employees food safety dangers to the public.  Outside of this public function, the FMSA provides no right of action for vindicating private rights of action.

10.  The FMSA does not require covered employee to make any showing of legal causation, intent or motivation by the employer, but requires only a showing of "contributing

11

JA490

factor" that itself need not have caused, but needs only to tend to influence in any way imposition of an adverse action. 21 U.S.C.A. § 399d(2)(C)(iii), cited in *Murray v. UBS Sec., LLC*, 601 U.S. 23, n.1 (2024) (FMSA is a statute like the Sarbanes Oxley Act whistleblower provision, for which no showing of intent is required). The English common law recognized no such causation and intent-free tort action, nor any other action analogous to the FMSA.

11.  The FMSA allows the award of attorney's fees only as a form of relief to the employee, a practice not known to the English common law, which provided for the prevailing party to recover his attorneys fees from the losing party as a matter of course.  This is known as the "English Rule" which does not govern in federal litigation.

12.  Based upon the foregoing, Plaintiff has failed to state a claim for relief under FRCP 12(b)(6).  The FMSA is purely a public law serving public purposes and not based upon or rooted in the English common law, which under *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) means that no Seventh Amendment right to jury trial applies and administrative adjudication of liability and remedies, including money damages and attorney's fees, is appropriate.

<div align="center">

**FOURTH AFFIRMATIVE DEFENSE: FAILURE TO STATE
A CLAIM UNDER COUNTS III, IV OR V FOR VIOLATION
OF ARTICLE III, APPOINTMENTS CLAUSE OR DUE
PROCESS RIGHTS**

**<u>Count V</u>**

</div>

1. Count V fails to state a claim that Watts violated Plaintiff's due process rights.

2. Count V fails to state a claim that the FMSA or its implementing regulations (29 CFR Part 1987), or the Rules of Practice and Procedure of the OALJ (29 CFR Part 18) violated Plaintiff's due process rights. Despite references to Part 1987 in paras. 55 and 56, Count V does not seek a declaration under 28 U.S.C. §§ 2201-02 that any provision thereof is unconstitutional on its face or as applied.  Instead, there is only a generalized prayer for relief that "the

<div align="center">

12

</div>

<div align="center">

JA491

</div>

proceedings", "further proceedings" (para. 12), and "Administrative Proceedings" (prayer 2 of Prayer for Relief, original capitalization) be declared "unlawful".

3.  The failure to plead that any specific regulatory provisions under Part 18 or Part 1987 are unconstitutional and should be enjoined fails to meet the pleading standards imposed by FRCP 8, as construed by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

4.  The failure to plead that any specific FMSA provisions are unconstitutional and should be enjoined fails to meet the pleading standards imposed by FRCP 8, as construed by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

5.  Under FSMA, Congress has granted to Watts, as it has done under numerous other "private attorney general" statutes (*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968)) the right to initiate administrative proceedings often followed by de novo judicial review to vindicate publicly created rights. The commencement of such statutory claims is always within the unfettered discretion of the class of protected persons recognized by Congress.

6.  Under the FMSA, Congress has given Watts the unfettered discretion to adjudicate his FSMA claims against the Plaintiff in administrative proceedings before the OALJ with up to two further levels of DOL administrative review.  The first level is to the ARB and second to the Fourth Circuit.  Alternatively, Congress determined that protection of the American food supply was best served by allowing Watts alone to initiate *de novo* judicial action under the FMSA in federal district court either before or after a final decision by the Secretary of Labor. (Paras. 54 and 80).

7.  Congress chose well in giving this statutory power to Watts.  Watts believes that the food supply is best protected by whistleblower litigation in the far less costly and more informal

13

JA492

administrative mechanism of the OALJ under its Part 18 evidentiary and procedural rules.

Congress has the right to structure the adjudicative mechanisms of the lower federal courts.

Article III, Section 1 provides:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Congress met this obligation by enacting the Judiciary Act of 1789, which created thirteen judicial districts, each of which had one district judge.

8.  Watts has never sought to remove his case to federal court for *de novo* review, and declined the suggestion of the OALJ that he stipulate with Plaintiff to do so. (Para. 43). Even after remand from the Fourth Circuit and the ARB in 2021, Watts continued exclusive use of the OALJ and reaffirmed use of this administrative forum with the filing of a supplemental complaint. (Para. 39).  Watts has no desire to abandon almost a decade of administrative proceedings just to start over by kicking out to federal district court.

9. The complaint does not allege that Watts has abused or arbitrarily used in any manner the "unfettered discretion and absolute control over which tribunal will hear his claims"  that Congress has conferred upon him. (Para. 57).

10. The complaint does not allege that Watts has exercised, used or abused any "outrageous advantage of testing the Article I waters and then removing the claims to federal court", (para. 57) or that this advantage has to date benefited him in any manner, or disadvantaged the Plaintiff in any way.

11.  The complaint does not allege that Watts has suffered any denial of rights or fairness or due process different than those suffered by Plaintiff as to the unavailability of subpoenas to aid discovery. (Para. 55).

14

JA493

12.  The complaint does not allege that Watts has any substantive or procedural advantage of any kind under the Part 18 or Part 187 rules and regulations of the OALJ.

13. The complaint does not allege that Watts has to date enjoyed any unfair advantage at the ARB.

14. The complaint does not allege that within the OALJ and ARB adjudicative proceedings to date that Congress has conferred any power, privilege or authority upon Watts not enjoyed by Plaintiff, nor imposed any disability therein upon Plaintiff not also suffered by Watts.

### Counts III and IV

15. As to Counts III and IV, the Federal Rules of Civil Procedure are drawn under the authority of the act of June 19, 1934, U.S.C., Title 28, §723b [see § 2072] (Rules in actions at law; Supreme Court authorized to make), and §723c [see § 2072] (Union of equity and action at law rules; power of Supreme Court) and also other grants of rule making power to the Court. Rule 1 originally stated that: "These rules govern the procedure in all civil actions and proceedings in the United States district courts *** [and] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."

16.  By vesting judicial power in such inferior Courts as the Congress may from time to time ordain and establish, the Framers allowed Congress to decide whether to establish lower federal courts. Because Congress has the authority to decide whether the lower federal courts should exist, the legislature is also understood to enjoy broad power to structure the lower courts, make procedural rules for them, and regulate their jurisdiction.

17.  Congress is also empowered by Article II, Section 2, Clause 2 to create federal

15

agencies, including the Department of Labor: Congress shall have the power to establish "all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

18. Congress has chosen to "secure the just, speedy, and inexpensive determination" of statutorily created whistleblower actions and proceedings by establishing and funding specialized administrative investigatory functions and tribunals in the Department of Labor.

19. Congress has the power under Article II to confer upon whistleblowers the unfettered rights to utilize the administrative and judicial bodies that Congress alone has the power to create and fund. Craig Watts has been conferred that power by Congress in the FMSA.

20. All injuries or harm alleged by Plaintiff in Watts having unfettered control over de novo review are speculative and have not given rise to any justiciable case or controversy growing out of the actual administrative proceedings to date.

21. According to Plaintiff's rendition of the facts of Watts' administrative claims, his claims are meritless. (Paras. 25, 27 and 28). For purposes of testing the pleadings that allegation is presumed true. Therefore, Plaintiff contends it will never face an administrative judgment by the OALJ or ARB to be executed against it.

22. If the OALJ rules for Watts, then all of the constitutional claims raised in this action can be raised to the ARB and then to the Fourth Circuit. If Watts seek de novo review, then the parties will be on equal footing, both with a right to a jury trial. (Para. 54).

23. If both parties had an equal right to kick out to federal court after administrative exhaustion, then the result would be the same-- one jury trial invoked by the losing party in the

16

DOL proceedings.

24.  All claims of injury from the jury kickout provision are speculative, and entail no potential injury other than that some of the time and resources used by Perdue in an administrative hearing will have rendered no benefit to the company. However, his court can take judicial notice that any time spent in an administrative hearing will likely serve a purpose of discovery and preparation for any de novo trial that Watts may elect to commence.

25.   Based upon the foregoing, Plaintiff has failed to state a claim for relief under FRCP 12(b)(6) as to its claims under Counts I, II, III, IV and V.

## PRAYER FOR RELIEF

For these reasons, Watts respectfully requests that this Court:

1. Deny Plaintiff's motion to preliminarily and permanently enjoin Defendants from continuing the pending ALJ proceedings against Perdue;

2. Declare that the Administrative Proceedings against Perdue are lawful and that Defendants may proceed with such proceedings;

3. Award such other and further relief as this Court may deem just and proper, including but not limited to reasonable attorney's fees and costs.

Dated: December 4, 2024

Respectfully Submitted,

/s/ Elisabeth R. Connell
Elisabeth R. Connell (D.C. Bar No. 1616972)
John A. Kolar (D.C. Bar No. 953292)
GOVERNMENT ACCOUNTABILITY PROJECT
1612 K St., N.W., Suite 808
Washington, DC 20006
P: 202-449-6040
Elisabethc@whistleblower.org
Jackk@whistleblower.org

17

JA496

Thad M. Guyer (O.R. Bar No. 821443)
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
P: 202-417-3910
tmguyer@tmguyer.com/thad@guyerayers.com

Attorneys for Defendant Craig Watts


*/s/Gary W. Jackson*
Gary W. Jackson
Law Offices of James Scott Farrin
555 S. Mangum Street, Suite 800
Durham, NC 27701
Phone: (919) 688-4991
gjackson@farrin.com
N.C. Bar No. 13976
Local Civil Rule 83.1(d) Attorney for Defendant
Craig Watts

18

JA497

**CERTIFICATE OF SERVICE**

I certify that the foregoing documents has been served via this Court's ECF email notification system this 4th day of December 2024 upon the attorneys for all parties.


/s/ Elisabeth R. Connell

19

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:24-cv-00477-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>          Plaintiff,<br><br>v.<br><br>**JULIE SU**, in her official capacity as Acting Secretary of the U.S. Department of Labor, et al.,<br><br>          Defendants. | **PLAINTIFF PERDUE FARM INC.'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** |

**PLAINTIFF PERDUE FARMS INC.'S**
**LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Perdue Farms Inc. ("Perdue") submits the following statement of undisputed material facts, including citations to evidence supporting the statements, which is provided in the accompanying Appendix, listed as enumerated exhibits.

1.      Defendant Craig Watts is a poultry farmer who owns and operates C&A Farms in Fairmont, North Carolina.  (Appendix, Ex. 1, Whistleblower Compl., ¶ 3 (Feb. 23, 2015)).

2.      Plaintiff Perdue is an integrated poultry producer engaged in business throughout the United States, including North Carolina.  *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model); *see also* (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25).

3.      In the administrative proceedings and related judicial review, Perdue alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Watts.  (Compl. ¶ 22, ECF No. 6; Watts

1

Answer ¶ 22, ECF No. 25). The growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id.*

4.    Watts raised chickens for Perdue under a standard written contract (the "Agreement"). (Compl. ¶ 23, ECF No. 6; Watts Answer ¶ 23, ECF No. 25). Watts raised chicks for Perdue subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See id.*; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement thus imposed upon Watts extensive requirements to protect the well-being of the poultry. (Compl. ¶ 23).

5.    Watts' Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. (Compl. ¶ 24, ECF No. 6; Watts Answer ¶ 24, ECF No. 25). In exchange, Watts agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. *Id.* Typically, chicks would be raised by contractor farmers for several weeks before removal. (Appendix, Ex. 1, Whistleblower Compl. ¶ 4).

6.    For years, Watts complained about the amount and system of compensation to which he agreed to accept in his contract with Perdue, to no avail. (Compl. ¶ 25, ECF No. 6; Watts Answer ¶ 25, ECF No. 25; Appendix, Ex. 22, Colaizzi Decl. ¶ 3).

7.    In May 2014, Mr. Watts, working with a cinematography group and at least one third-party activist group, invited to his farm a film crew from a private third-party organization to film a group of live chicks that were recently placed on his farm by Perdue. (Appendix Ex. 1, Whistleblower Compl. ¶¶ 29, 30). Several weeks later, the private third-party organization returned to his poultry farm to film more footage of the flock, which was then nearing the end of its growth cycle. *Id.* at ¶ 30. Watts alleged that the chickens in his care were in deplorable

2

condition, *id.* at ¶ 33, describing them as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id*. at ¶ 38. He alleged that the condition of his chickens showed they were not "Humanely Raised," as Perdue had indicated on product labels and in advertising for a brand. *Id.* at ¶¶ 31–32. The third-party then allegedly edited the footage into a short video and released it on its website. *See id.* at ¶ 31. The video received coverage in national news media. *Id.* at ¶¶ 32, 35.

8.      Perdue, in turn, alleged in the DOL proceedings that the video demonstrates that Watts had failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks. (Appendix, Ex. 22, Colaizzi Decl. ¶ 4). For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive, despite manifest suffering of multiple chicks from incurable deformities. *Id.* The video showed chickens in considerable heat distress, but Watts' ventilation fans were not operating. *Id.* Not only had Watts disregarded the chickens' welfare, but, Perdue alleged, he also had violated the "biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks. *Id.*

9.      In the DOL proceedings and related judicial review, Perdue alleged that, upon viewing the video, Perdue sent its Poultry Welfare auditors to Watts' poultry farm to ascertain the condition of the flock. (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 7). Moreover, a non-profit, third-party entity comprised of animal welfare experts also reviewed the video and prepared a report that concluded that Watts was responsible for the substandard conditions in his chicken houses on the video. *Id.*

10.      Relying largely on this report, on December 29, 2014, Perdue wrote a letter to Watts advising him that it had concluded that he needed to complete supplemental biosecurity and animal

welfare training prior to the placement of a new flock, in order to prevent further poultry welfare and biosecurity violations. *Id.*; *see also* Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39.

11.     On February 23, 2015, Watts filed a whistleblower complaint in OSHA against Perdue alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the video. (Appendix, Ex. 1, Whistleblower Compl.). Watts argued that Perdue's labeling of chicken as "Humanely Raised" was misleading because he did not raise them humanely on his farm. *Id.* at ¶¶ 20, 52. He further claimed that he was subjected to adverse employment actions, including increased scrutiny of operations, additional training prior to the placement of Perdue's next flock, a delay in the placement of his flock, and implementation of a Performance Improvement Program. *Id.* at ¶¶ 1, 36-43. The complaint sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,]" plus "all other relief available at law and equity." *Id.* at ¶¶ 58, 61.

12.     On February 8, 2016, an OSHA regional investigator found that Watts was not an employee of Perdue, and the complaint was dismissed. (Appendix, Ex. 3, Secretary's Findings, Report of Investigation and Complaint). Watts appealed to the OALJ, and Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims that Perdue fails to raise chickens humanely as advertised arise under the Poultry Product Inspections Act ("PPIA"), 21 U.S.C. § 451 et seq., a statute enforced by USDA, not FSMA, which generally is enforced by the U.S. Food and Drug Administration ("FDA"). (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 9). On January 6, 2017, a DOL ALJ agreed and dismissed Watts' complaint. (Appendix, Ex. 4, ALJ's Decision and Order Granting Respondent's Motion to

4

Dismiss for Lack of Subject Matter Jurisdiction, Jan. 6, 2017).  Watts appealed to DOL's Administrative Review Board ("ARB"), which affirmed on March 5, 2019.  (Appendix, Ex. 5, ARB Decision).  Watts appealed to the Fourth Circuit, but, before briefing, DOL moved for voluntary remand to the ARB for the limited purpose of permitting the FDA to file an amicus brief. (Appendix, Ex. 6, DOL Mot. for Voluntary Remand (Sept. 24, 2019)).  The Fourth Circuit granted the request summarily and remanded to the ARB on January 7, 2020.  (Appendix, Ex. 7, Order Granting Mot. for Remand).

13.    Before the ARB, FDA principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including issues concerning conditions under which the poultry was raised.  (Appendix, Ex. 8, FDA Amicus Br. 5–12 (Mar. 11, 2020)).  At the end of its brief, the FDA asserted that, because "animal food is food," and because Perdue supplied Watts with animal food, this was an "independent" point that "may be relevant to the [ARB's] evaluation" of subject matter jurisdiction, *id.* at 23, 25, even though none of Watts' claims concerned chicken feed supplied by Perdue.  On December 6, 2020, the ARB agreed with FDA's tail-end suggestion and remanded to the OALJ, ruling that, because Perdue "supplied the poultry animal feed for poultry on Watts' farm[,]" Perdue distributes food under FSMA "and thus is a covered entity." (Appendix, Ex. 9, ARB Decision at 6).

14.    Perdue moved to dismiss in the OALJ on January 29, 2021, which remained pending through April 21, 2022, when the case was reassigned to ALJ Pamela Kultgen.  (Appendix, Ex. 22, Colaizzi Decl. ¶ 5). Watts never sought to revive the dormant proceedings until he filed a supplemental complaint on April 25, 2022.  *Id.*

15.    Watts filed a supplemental complaint on April 25, 2022 that elaborated upon his allegations against Perdue but still did not question the chicken feed.  (Appendix, Ex. 10, Watts

Supplemental Whistleblower Compl.).  His requested relief included (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion; and (e) "all other relief available at law and equity."  *Id.* at ¶¶ 80, 81, 82, 85.

16.     ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022.  (Appendix, Ex. 11, OALJ Dec. and Order at 10-11).

17.     On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, *inter alia*, the video evidence forming the heart of Watts' claims.  (Appendix, Ex. 12, Perdue's Application for Subpoenas).  These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority.  (Appendix, Ex. 13, Order Quashing Subpoenas (Mar. 15, 2024)).  Perdue moved for reconsideration or, in the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims.  (Appendix, Ex. 14, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)).  On April 24, 2024, ALJ Kultgen denied this motion.  (Appendix, Ex. 15, Order Denying Mot. to Certify Interlocutory Appeal).

6

18.    On July 19, 2024, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 16, Perdue's Letter Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id*. Watts opposed. (Appendix, Ex. 17, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 18, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id*., but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

19.    Perdue moved to dismiss for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 19, Perdue's Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing whether *Jarkesy I or II* applied. (Appendix, Ex. 20, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

7

20.    On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, again ruling that she lacked authority to decide constitutional questions.  (Appendix, Ex. 20, Order Denying Mot. to Dismiss).  She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction.  *Id.* at 2-3.

Dated: February 19, 2025                    Respectfully submitted,

<div style="margin-left:40%">

_____/s/ Margaret Santen_____
Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com
Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)

</div>

8

mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

9

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:24-cv-00477-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>    Plaintiff,<br><br>v.<br><br>**JULIE SU**, in her official capacity as Acting Secretary of the U.S. Department of Labor, et al.,<br><br>    Defendants. | **APPENDIX TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS** |

**APPENDIX TO PLAINTIFF PERDUE'S
LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

| Ex. No. | Description |
|---|---|
| 1 | Notice of Whistleblower Complaint (February 23, 2015) |
| 2 | Perdue's Opposition to Dept. of Labor's Motion for Voluntary Remand (October 4, 2019) |
| 3 | OSHA Findings, Report of Investigation and Complaint, docketed Feb. 12, 2016 |
| 4 | ALJ Decision and Order (January 6, 2017) |
| 5 | ARB Decision (March 5, 2019) |
| 6 | Dept. of Labor's Motion for Voluntary Remand (September 24, 2019) |
| 7 | Order Granting Motion for Remand (January 7, 2020) |
| 8 | FDA Amicus Brief (March 11, 2020) |
| 9 | ARB Decision (May 28, 2020) |
| 10 | Supplemental Whistleblower Complaint (April 25, 2022) |

| Ex. No. | Description |
|---------|-------------|
| 11 | ALJ Decision and Order (October 21, 2022) |
| 12 | Perdue's Application for Subpoenas (March 11, 2024) |
| 13 | Order Quashing Subpoenas (March 15, 2024) |
| 14 | Perdue's Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024) |
| 15 | Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024) |
| 16 | Perdue's Letter Requesting Conference (July 19, 2024) |
| 17 | Watts' Response to Request for Conference (July 19, 2024) |
| 18 | Order Denying Conference Call (July 23, 2024) |
| 19 | Perdue's Motion to Dismiss (July 29, 2024) |
| 20 | Watts' Opposition to Motion to Dismiss (July 30, 2024) |
| 21 | Order Denying Motion to Dismiss (August 8, 2024) |
| 22 | Declaration of Roger A. Colaizzi |

Dated: February 19, 2025

Respectfully submitted,

_____/s/ Margaret Santen_____
Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600

2

Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

3

# Exhibit 22

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:24-cv-00477-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.,** <br><br>      Plaintiff, <br><br> v. <br><br> **JULIE SU**, in her official capacity as Acting Secretary of the U.S. Department of Labor, et al., <br><br>      Defendants. | **DECLARATION OF ROGER A. COLAIZZI IN SUPPORT OF PLAINTIFF PERDUE FARMS INC.'S MOTION FOR SUMMARY JUDGMENT** |

I, Roger A. Colaizzi, declare as follows:

1.      I am an attorney at Venable LLP. I offer this Declaration in support of Plaintiff Perdue Farms Inc.'s Motion for Summary Judgment. The following statements are based upon my personal knowledge.

2.      I have represented Perdue throughout the administrative proceedings against Perdue brought by Defendant Craig Watts in the Department of Labor. I therefore have personal knowledge of the filings in those proceedings and the various events that have occurred there.

3.      In the Department of Labor proceedings, Perdue alleges that for years Mr. Watts complained about the amount and system of compensation from Perdue, which complaints were unsuccessful.

4.      In the Department of Labor proceedings, Perdue alleges, inter alia: that the video demonstrates that Mr. Watts failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks; that for example, rather than euthanize sick and injured chickens in his flock as was his obligation, Mr. Watts kept some of them alive, despite manifest

suffering of multiple chicks from incurable deformities; that the video showed chickens in considerable heat distress yet Watts' ventilation fans were not operating; and, that he also had violated the "biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks.

5.    Following remand of Mr. Watts' claims from the ARB to the OALJ, Perdue moved to dismiss in the OALJ on January 29, 2021.  That motion remained pending through April 21, 2022, when the case was reassigned to ALJ Pamela Kultgen.  Mr. Watts never sought to revive the dormant proceedings until he filed a supplemental complaint on April 25, 2022.

6.    All of the following exhibits included in Perdue's Appendix of evidence supporting its Local Rule 56.1 Statement of Undisputed Facts are true and correct copies of various filings in the administrative proceedings and related judicial review in Mr. Watts' FSMA claims against Perdue.

| Appendix Ex. No. | Description |
|---|---|
| 1 | Notice of Whistleblower Complaint (February 23, 2015) |
| 2 | Perdue's Opposition to Dept. of Labor's Motion for Voluntary Remand (October 4, 2019) |
| 3 | OSHA Findings, Report of Investigation and Complaint, docketed Feb. 12, 2016 |
| 4 | ALJ Decision and Order (January 6, 2017) |
| 5 | ARB Decision (March 5, 2019) |
| 6 | Dept. of Labor's Motion for Voluntary Remand (September 24, 2019) |
| 7 | Order Granting Motion for Remand (January 7, 2020) |
| 8 | FDA Amicus Brief (March 11, 2020) |
| 9 | ARB Decision (May 28, 2020) |
| 10 | Supplemental Whistleblower Complaint (April 25, 2022) |

2

| 11 | ALJ Decision and Order (October 21, 2022) |
| 12 | Perdue's Application for Subpoenas (March 11, 2024) |
| 13 | Order Quashing Subpoenas (March 15, 2024) |
| 14 | Perdue's Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024) |
| 15 | Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024) |
| 16 | Perdue's Letter Requesting Conference (July 19, 2024) |
| 17 | Watts' Response to Request for Conference (July 19, 2024) |
| 18 | Order Denying Conference Call (July 23, 2024) |
| 19 | Perdue's Motion to Dismiss (July 29, 2024) |
| 20 | Watts' Opposition to Motion to Dismiss (July 30, 2024) |
| 21 | Order Denying Motion to Dismiss (August 8, 2024) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of February 2025 in Washington, DC.

*/s/ Roger A. Colaizzi*
Roger A. Colaizzi

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

|  |  |
|---|---|
| PERDUE FARMS INC., <br><br> Plaintiff, <br><br> v. <br><br> LORI CHAVEZ-DEREMER, in her official capacity as Secretary of the United States Department of Labor, *et al.*, <br><br> Defendants. | Civil Action No. 5:24-cv-00477-BO |

## GOVERNMENT DEFENDANTS' LOCAL RULE 56.1(a) RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), the Government Defendants respectfully submit this response to Plaintiff's statement of material facts, ECF No. 50.

1.      Defendant Craig Watts is a poultry farmer who owns and operates C&A Farms in Fairmont, North Carolina. (Appendix, Ex. 1, Whistleblower Compl., ¶ 3 (Feb. 23, 2015)).

**RESPONSE**: Undisputed.

2.      Plaintiff Perdue is an integrated poultry producer engaged in business throughout the United States, including North Carolina. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model); *see also* (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25).

**RESPONSE**: Undisputed.

3.      In the administrative proceedings and related judicial review, Perdue alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Watts. (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25). The growers provide the land, facilities, equipment, and labor to raise the chicks over the course

of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id*.

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

4.    Watts raised chickens for Perdue under a standard written contract (the "Agreement"). (Compl. ¶ 23, ECF No. 6; Watts Answer ¶ 23, ECF No. 25). Watts raised chicks for Perdue subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See id*.; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement thus imposed upon Watts extensive requirements to protect the well-being of the poultry. (Compl. ¶ 23).

**RESPONSE**: The first sentence is undisputed. The second and third sentences speak to a question of law (namely, what federal laws and regulations Perdue and Watts were "subject to," and the nature of the obligations imposed by those requirements) instead of statements of fact, and are therefore inappropriately included in the Statement of Material Facts.

5.    Watts' Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. (Compl. ¶ 24, ECF No. 6; Watts Answer ¶ 24, ECF No. 25). In exchange, Watts agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. *Id.* Typically, chicks would be raised by contractor farmers for several weeks before removal. (Appendix, Ex. 1, Whistleblower Compl. ¶ 4).

**RESPONSE**: Undisputed.

6.    For years, Watts complained about the amount and system of compensation to which he agreed to accept in his contract with Perdue, to no avail. (Compl. ¶ 25, ECF No. 6; Watts Answer ¶ 25, ECF No. 25; Appendix, Ex. 22, Colaizzi Decl. ¶ 3).

**RESPONSE**: Undisputed.

7.    In May 2014, Mr. Watts, working with a cinematography group and at least one third-party activist group, invited to his farm a film crew from a private third-party organization to film a group of live

2

chicks that were recently placed on his farm by Perdue. (Appendix Ex. 1, Whistleblower Compl. ¶¶ 29, 30). Several weeks later, the private third-party organization returned to his poultry farm to film more footage of the flock, which was then nearing the end of its growth cycle. *Id.* at ¶ 30. Watts alleged that the chickens in his care were in deplorable condition, *id.* at ¶ 33, describing them as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id.* at ¶ 38. He alleged that the condition of his chickens showed they were not "Humanely Raised," as Perdue had indicated on product labels and in advertising for a brand. *Id.* at ¶¶ 31–32. The third-party then allegedly edited the footage into a short video and released it on its website. *See id.* at ¶ 31. The video received coverage in national news media. *Id.* at ¶¶ 32, 35.

**RESPONSE**: Undisputed.

8.       Perdue, in turn, alleged in the DOL proceedings that the video demonstrates that Watts had failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks. (Appendix, Ex. 22, Colaizzi Decl. ¶ 4). For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive, despite manifest suffering of multiple chicks from incurable deformities. *Id.* The video showed chickens in considerable heat distress, but Watts' ventilation fans were not operating. *Id.* Not only had Watts disregarded the chickens' welfare, but, Perdue alleged, he also had violated the "biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks. *Id.*

**RESPONSE**: Undisputed that Perdue alleged in the administrative proceedings that Watts did not fulfill his biosecurity and animal welfare responsibilities in raising the chicks.

9.       In the DOL proceedings and related judicial review, Perdue alleged that, upon viewing the video, Perdue sent its Poultry Welfare auditors to Watts' poultry farm to ascertain the condition of the flock. (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 7). Moreover, a non-profit, third-party entity comprised of animal welfare experts also reviewed the video and prepared a report that concluded that Watts was responsible for the substandard conditions in his chicken houses on the video. *Id.*

3

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

10.    Relying largely on this report, on December 29, 2014, Perdue wrote a letter to Watts advising him that it had concluded that he needed to complete supplemental biosecurity and animal welfare training prior to the placement of a new flock, in order to prevent further poultry welfare and biosecurity violations. *Id.*; *see also* Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39.

**RESPONSE**: Undisputed, but incomplete. Watts has also alleged that Perdue's letter stated that it was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Watts' farm, including that Perdue would be "auditing" Watts' chicken houses and "would send agents to perform frequent, unannounced checks following placement of the next flock," in addition to the training requirement. Pl.'s Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39, ECF No. 51-1.

11.    On February 23, 2015, Watts filed a whistleblower complaint in OSHA against Perdue alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the video. (Appendix, Ex. 1, Whistleblower Compl.). Watts argued that Perdue's labeling of chicken as "Humanely Raised" was misleading because he did not raise them humanely on his farm. *Id.* at ¶¶ 20, 52. He further claimed that he was subjected to adverse employment actions, including increased scrutiny of operations, additional training prior to the placement of Perdue's next flock, a delay in the placement of his flock, and implementation of a Performance Improvement Program. *Id.* at ¶¶ 1, 36-43. The complaint sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,]" plus "all other relief available at law and equity." *Id.* at ¶¶ 58, 61.

**RESPONSE**: Undisputed, but incomplete. Watts' complaint also sought injunctive "expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan," as well as "an order prohibiting [Perdue] from continuing to subject his facility to retaliatory increased inspections." Pl.'s Appendix Ex. 1, Whistleblower Compl. ¶¶ 59-60.

4

12.    On February 8, 2016, an OSHA regional investigator found that Watts was not an employee of Perdue, and the complaint was dismissed. (Appendix, Ex. 3, Secretary's Findings, Report of Investigation and Complaint). Watts appealed to the OALJ, and Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims that Perdue fails to raise chickens humanely as advertised arise under the Poultry Product Inspections Act ("PPIA"), 21 U.S.C. § 451 et seq., a statute enforced by USDA, not FSMA, which generally is enforced by the U.S. Food and Drug Administration ("FDA"). (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 9). On January 6, 2017, a DOL ALJ agreed and dismissed Watts' complaint. (Appendix, Ex. 4, ALJ's Decision and Order Granting Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Jan. 6, 2017). Watts appealed to DOL's Administrative Review Board ("ARB"), which affirmed on March 5, 2019. (Appendix, Ex. 5, ARB Decision). Watts appealed to the Fourth Circuit, but, before briefing, DOL moved for voluntary remand to the ARB for the limited purpose of permitting the FDA to file an amicus brief. (Appendix, Ex. 6, DOL Mot. for Voluntary Remand (Sept. 24, 2019)). The Fourth Circuit granted the request summarily and remanded to the ARB on January 7, 2020. (Appendix, Ex. 7, Order Granting Mot. for Remand).

**RESPONSE**: Undisputed.

13.    Before the ARB, FDA principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including issues concerning conditions under which the poultry was raised. (Appendix, Ex. 8, FDA Amicus Br. 5–12 (Mar. 11, 2020)). At the end of its brief, the FDA asserted that, because "animal food is food," and because Perdue supplied Watts with animal food, this was an "independent" point that "may be relevant to the [ARB's] evaluation" of subject matter jurisdiction, *id.* at 23, 25, even though none of Watts' claims concerned chicken feed supplied by Perdue. On December 6, 2020, the ARB agreed with FDA's tail-end suggestion and remanded to the OALJ, ruling that, because Perdue "supplied the poultry animal feed for poultry on Watts' farm[,]" Perdue distributes food under FSMA "and thus is a covered entity." (Appendix, Ex. 9, ARB Decision at 6).

**RESPONSE**: As to the first sentence, it is undisputed that FDA argued that live poultry intended for use as food is "food" within the meaning of the FDCA. The second sentence is undisputed but incomplete and

5

misleading. FDA's argument that animal feed is food was not a "tail-end suggestion," but a separate section in FDA's amicus brief that encompassed over two pages. *See* Pl.'s Appendix Ex. 8 at 23-25, ECF No. 51-8. The third sentence is undisputed but incomplete. The ARB decision stated that "[t]he question before the Board is whether Perdue is an 'entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food.' 21 U.S.C. § 321(f). FDA argues and Perdue does not dispute that Perdue supplied the poultry animal feed for poultry on Watts's farm. Accordingly, Perdue is an entity who manufactures, process, transports, or distributes 'food' within the meaning of the Act and thus is a covered entity." Pl.'s Appendix Ex. 9 at 6, ECF No. 51-9.

14.     Perdue moved to dismiss in the OALJ on January 29, 2021, which remained pending through April 21, 2022, when the case was reassigned to ALJ Pamela Kultgen. (Appendix, Ex. 22, Colaizzi Decl. ¶ 5). Watts never sought to revive the dormant proceedings until he filed a supplemental complaint on April 25, 2022. *Id.*

**RESPONSE**: The first sentence is undisputed. As to the second sentence, it is undisputed that nothing new was filed in the administrative proceedings while the parties waited for an ALJ to resolve the motion to dismiss.

15.     Watts filed a supplemental complaint on April 25, 2022 that elaborated upon his allegations against Perdue but still did not question the chicken feed. (Appendix, Ex. 10, Watts Supplemental Whistleblower Compl.). His requested relief included (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion; and (e) "all other relief available at law and equity." *Id.* at ¶¶ 80, 81, 82, 85.

6

**RESPONSE**: Disputed to the extent Perdue's statement asserts that Watt's supplemental complaint did not address feed, and disputed as to the completeness of Perdue's description of Watt's requested relief. In his supplemental complaint, Watts alleged that he "fed, watered, and cared for those flocks using feed, medications, and other supplies provided by [Perdue]," and that Perdue "imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which [Perdue] processes for use in animal feed and pet food." Pl.'s Appendix, Ex. 10, Watts Supplemental Whistleblower Compl. ¶¶ 8, 14, ECF No. 51-10. Additionally, as to the final sentence, Watts also sought injunctive "expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan." *Id.* ¶ 84.

16.    ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022. (Appendix, Ex. 11, OALJ Dec. and Order at 10-11).

**RESPONSE**: Undisputed.

17.    On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (Appendix, Ex. 12, Perdue's Application for Subpoenas). These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority. (Appendix, Ex. 13, Order Quashing Subpoenas (Mar. 15, 2024)). Perdue moved for reconsideration or, in the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. (Appendix, Ex. 14, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)). On April 24, 2024, ALJ Kultgen denied this motion. (Appendix, Ex. 15, Order Denying Mot. to Certify Interlocutory Appeal).

**RESPONSE**: Disputed as to the claim that the "the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims," which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts.

7

18.    On July 19, 2024, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 16, Perdue's Letter Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id*. Watts opposed. (Appendix, Ex. 17, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 18, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id*., but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

**RESPONSE**: Disputed as to the characterization of the ALJ's order as inconsistent with portions of the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts. Additionally, disputed as to the assertion that the ALJ "den[ied] Perdue's motion before the motion was ever filed." The ALJ issued a written decision denying Perdue's motion to dismiss on August 8, 2024, after the motion to dismiss was filed. Pl.'s Appendix, Ex. 21, Order Denying Mot. to Dismiss, ECF No. 51-21.

19.    Perdue moved to dismiss for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 19, Perdue's Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing whether *Jarkesy I or II* applied.

<div align="center">

8

JA522

</div>

(Appendix, Ex. 20, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

**RESPONSE**: Undisputed.

20.     On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, again ruling that she lacked authority to decide constitutional questions. (Appendix, Ex. 20, Order Denying Mot. to Dismiss). She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

**RESPONSE**: Disputed as to Perdue's characterization of the ALJ's order as "ruling that she lacked authority to decide constitutional questions."  The ALJ did not rule that she "lacked authority to decide constitutional questions," only that she "lacked the authority to decide the constitutional question at issue" in Perdue's motion. Pl.'s Appendix, Ex. 21, Order Denying Mot. to Dismiss at 1-2.


Dated: March 12, 2025

Respectfully submitted,


YAAKOV M. ROTH
Acting Assistant Attorney General

JULIE STRAUS HARRIS
CHRISTOPHER R. HALL
Assistant Branch Directors

*/s/ Andrew J. Rising*
ANDREW J. RISING
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Rm. 12520
Washington, DC 20005
(202) 514-0265
Andrew.J.Rising@usdoj.gov

*Counsel for the Government Defendants*

9

JA523

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### No. 5:24-cv-00477-BO

**PERDUE FARMS INC.**,

Plaintiff,

v.

**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the United States Department of Labor, *et al.*,

Defendants.

## DEFENDANT CRAIG WATTS LOCAL RULE 56.1(a) RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), Defendant Watts respectfully submits this response to Plaintiff's statement of material facts, ECF No. 50.

1. Defendant Craig Watts is a poultry farmer who owns and operates C&A Farms in Fairmont, North Carolina. (Appendix, Ex. 1, Whistleblower Compl., ¶ 3 (Feb. 23, 2015)).

**RESPONSE**: Undisputed.

2. Plaintiff Perdue is an integrated poultry producer engaged in business throughout the United States, including North Carolina. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model); *see also* (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25).

**RESPONSE**: Undisputed.

3. In the administrative proceedings and related judicial review, Perdue alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding

flocks; it delivers its chicks to independent contract growers, such as Watts. (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25). The growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id*.

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

4.      Watts raised chickens for Perdue under a standard written contract (the "Agreement"). (Compl. ¶ 23, ECF No. 6; Watts Answer ¶ 23, ECF No. 25). Watts raised chicks for Perdue subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See id*.; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement thus imposed upon Watts extensive requirements to protect the well-being of the poultry. (Compl. ¶ 23).

**RESPONSE**: The first sentence is undisputed. The second and third sentences speak to a question of law (namely, what federal laws and regulations Perdue and Watts were "subject to," and the nature of the obligations imposed by those requirements) instead of statements of fact, and are therefore inappropriately included in the Statement of Material Facts.

5.      Watts' Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. (Compl. ¶ 24, ECF No. 6; Watts Answer ¶ 24, ECF No. 25). In exchange, Watts agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. *Id.* Typically, chicks would be raised by contractor farmers for several weeks before removal. (Appendix, Ex. 1, Whistleblower Compl. ¶ 4).

**RESPONSE**: Undisputed.

6.      For years, Watts complained about the amount and system of compensation to

which he agreed to accept in his contract with Perdue, to no avail. (Compl. ¶ 25, ECF No. 6; Watts Answer ¶ 25, ECF No. 25; Appendix, Ex. 22, Colaizzi Decl. ¶ 3).

RESPONSE: Undisputed.

7.     In May 2014, Mr. Watts, working with a cinematography group and at least one third-party activist group, invited to his farm a film crew from a private third-party organization to film a group of live chicks that were recently placed on his farm by Perdue. (Appendix Ex. 1, Whistleblower Compl. ¶¶ 29, 30). Several weeks later, the private third-party organization returned to his poultry farm to film more footage of the flock, which was then nearing the end of its growth cycle. *Id.* at ¶ 30. Watts alleged that the chickens in his care were in deplorable condition, *id.* at ¶ 33, describing them as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id*. at ¶ 38. He alleged that the condition of his chickens showed they were not "Humanely Raised," as Perdue had indicated on product labels and in advertising for a brand. *Id.* at ¶¶ 31–32. The third-party then allegedly edited the footage into a short video and released it on its website. *See id.* at ¶ 31. The video received coverage in national news media. *Id.* at ¶¶ 32, 35.

RESPONSE: Undisputed.

8.     Perdue, in turn, alleged in the DOL proceedings that the video demonstrates that Watts had failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks. (Appendix, Ex. 22, Colaizzi Decl. ¶ 4). For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive, despite manifest suffering of multiple chicks from incurable deformities. *Id.* The video showed chickens in considerable heat distress, but Watts' ventilation fans were not operating. *Id.* Not only had Watts disregarded the chickens' welfare, but, Perdue alleged, he also had violated the

"biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks. *Id.*

**RESPONSE**: Undisputed that Perdue alleged in the administrative proceedings these claims that Watts did not fulfill his biosecurity and animal welfare responsibilities in raising the chicks. Watts denied these allegations.

9.    In the DOL proceedings and related judicial review, Perdue alleged that, upon viewing the video, Perdue sent its Poultry Welfare auditors to Watts' poultry farm to ascertain the condition of the flock. (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 7). Moreover, a non-profit, third- party entity comprised of animal welfare experts also reviewed the video and prepared a report that concluded that Watts was responsible for the substandard conditions in his chicken houses on the video. *Id.*

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review and further alleged there was a "non-profit third-party" entity of "animal welfare experts" who reviewed the video and prepared said report. Watts disputed these allegations in the administrative proceedings and related judicial review.

10.    Relying largely on this report, on December 29, 2014, Perdue wrote a letter to Watts advising him that it had concluded that he needed to complete supplemental biosecurity and animal welfare training prior to the placement of a new flock, in order to prevent further poultry welfare and biosecurity violations. *Id.*; *see also* Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39.

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review, but incomplete. Perdue has alleged it relied largely on this report to write said letter. Watts disputed the report was what Perdue relied upon; instead Watts alleged

retaliation was Perdue's motivation. Watts has also alleged that Perdue's letter stated that it was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Watts' farm, including that Perdue would be "auditing" Watts' chicken houses and "would send agents to perform frequent, unannounced checks following placement of the next flock," in addition to the training requirement. Pl.'s Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39, ECF No. 51-1.

11.     On February 23, 2015, Watts filed a whistleblower complaint in OSHA against Perdue alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the video. (Appendix, Ex. 1, Whistleblower Compl.). Watts argued that Perdue's labeling of chicken as "Humanely Raised" was misleading because he did not raise them humanely on his farm. *Id.* at ¶¶ 20, 52. He further claimed that he was subjected to adverse employment actions, including increased scrutiny of operations, additional training prior to the placement of Perdue's next flock, a delay in the placement of his flock, and implementation of a Performance Improvement Program. *Id.* at ¶¶ 1, 36-43. The complaint sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,]" plus "all other relief available at law and equity." *Id.* at ¶¶ 58, 61.

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review, but incomplete. Disputed as to "Watts argued" as Watts did not argue that Perdue's labeling of chicken as "Humanely Raised" was misleading because *he* did not raise them humanely on his farm. Watts' complaint also sought injunctive "expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan," as well as "an order prohibiting [Perdue] from continuing to subject his facility to retaliatory increased

inspections." Pl.'s Appendix Ex. 1, Whistleblower Compl. ¶¶ 59-60.

12.    On February 8, 2016, an OSHA regional investigator found that Watts was not an employee of Perdue, and the complaint was dismissed. (Appendix, Ex. 3, Secretary's Findings, Report of Investigation and Complaint). Watts appealed to the OALJ, and Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims that Perdue fails to raise chickens humanely as advertised arise under the Poultry Product Inspections Act ("PPIA"), 21 U.S.C. § 451 et seq., a statute enforced by USDA, not FSMA, which generally is enforced by the U.S. Food and Drug Administration ("FDA"). (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 9). On January 6, 2017, a DOL ALJ agreed and dismissed Watts' complaint. (Appendix, Ex. 4, ALJ's Decision and Order Granting Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Jan. 6, 2017). Watts appealed to DOL's Administrative Review Board ("ARB"), which affirmed on March 5, 2019. (Appendix, Ex. 5, ARB Decision). Watts appealed to the Fourth Circuit, but, before briefing, DOL moved for voluntary remand to the ARB for the limited purpose of permitting the FDA to file an amicus brief. (Appendix, Ex. 6, DOL Mot. for Voluntary Remand (Sept. 24, 2019)). The Fourth Circuit granted the request summarily and remanded to the ARB on January 7, 2020. (Appendix, Ex. 7, Order Granting Mot. for Remand).

**RESPONSE**: Undisputed.

13.    Before the ARB, FDA principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including issues concerning conditions under which the poultry was raised. (Appendix, Ex. 8, FDA Amicus Br. 5–12 (Mar. 11, 2020)). At the end of its brief, the FDA asserted that, because "animal food is food," and because Perdue supplied Watts with animal food, this was an "independent" point that "may be relevant to the [ARB's]

evaluation" of subject matter jurisdiction, *id.* at 23, 25, even though none of Watts' claims concerned chicken feed supplied by Perdue. On December 6, 2020, the ARB agreed with FDA's tail-end suggestion and remanded to the OALJ, ruling that, because Perdue "supplied the poultry animal feed for poultry on Watts' farm[,]" Perdue distributes food under FSMA "and thus is a covered entity." (Appendix, Ex. 9, ARB Decision at 6).

**RESPONSE**: As to the first sentence, it is undisputed that FDA argued that live poultry intended for use as food is "food" within the meaning of the FDCA. The second sentence is undisputed but incomplete and misleading. FDA's argument that animal feed is food was not a "tail-end suggestion," but a separate section in FDA's amicus brief that encompassed over two pages. *See* Pl.'s Appendix Ex. 8 at 23-25, ECF No. 51-8. The third sentence is undisputed but incomplete. The ARB decision stated that "[t]he question before the Board is whether Perdue is an 'entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food.' 21 U.S.C. § 321(f). FDA argues and Perdue does not dispute that Perdue supplied the poultry animal feed for poultry on Watts's farm. Accordingly, Perdue is an entity who manufactures, process, transports, or distributes 'food' within the meaning of the Act and thus is a covered entity." Pl.'s Appendix Ex. 9 at 6, ECF No. 51-9.

14.    Perdue moved to dismiss in the OALJ on January 29, 2021, which remained pending through April 21, 2022, when the case was reassigned to ALJ Pamela Kultgen. (Appendix, Ex. 22, Colaizzi Decl. ¶ 5). Watts never sought to revive the dormant proceedings until he filed a supplemental complaint on April 25, 2022. *Id*.

**RESPONSE**: The first sentence is undisputed.  As to the second sentence, it is undisputed that nothing new was filed in the administrative proceedings while the parties waited for an ALJ to resolve the motion to dismiss, but disputed as to Watts 'never sought to revive' as Watts made inquiries as to the status of the case.

15.     Watts filed a supplemental complaint on April 25, 2022 that elaborated upon his allegations against Perdue but still did not question the chicken feed. (Appendix, Ex. 10, Watts Supplemental Whistleblower Compl.). His requested relief included (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion; and (e) "all other relief available at law and equity." *Id.* at ¶¶ 80, 81, 82, 85.

**RESPONSE**: Disputed to the extent Perdue's statement asserts that Watt's supplemental complaint did not address feed and disputed as to the completeness of Perdue's description of Watt's requested relief.  In his supplemental complaint, Watts alleged that he "fed, watered, and cared for those flocks using feed, medications, and other supplies provided by [Perdue]," and that Perdue "imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which [Perdue] processes for use in animal feed and pet food." Pl.'s Appendix, Ex. 10, Watts Supplemental Whistleblower Compl.¶¶ 8, 14,  ECF No. 51-10. Additionally, as to the final sentence, Watts also sought injunctive "expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan." *Id*. ¶ 84.

16.     ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022. (Appendix,

Ex. 11, OALJ Dec. and Order at 10-11).

**RESPONSE**: Undisputed.

17.    On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (Appendix, Ex. 12, Perdue's Application for Subpoenas). These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority. (Appendix, Ex. 13, Order Quashing Subpoenas (Mar. 15, 2024)). Perdue moved for reconsideration or, in the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. (Appendix, Ex. 14, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)). On April 24, 2024, ALJ Kultgen denied this motion. (Appendix, Ex. 15, Order Denying Mot. to Certify Interlocutory Appeal).

**RESPONSE**: Disputed as to the claim that the "the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims," which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts. Also disputed as Defendant Watts had worked with Perdue and third parties on arrangements for cooperative third party discovery from Perdue's requested parties.

18.    On July 19, 2024, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 16, Perdue's Letter

Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id*. Watts opposed. (Appendix, Ex. 17, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 18, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id*., but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

**RESPONSE**: Disputed as to the characterization of the ALJ's order as inconsistent with portions of the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts. Additionally, disputed as to the assertion that the ALJ "den[ied] Perdue's motion before the motion was ever filed." The ALJ issued a written decision denying Perdue's motion to dismiss on August 8, 2024, after the motion to dismiss was filed. Pl.'s Appendix, Ex. 21, Order Denying Mot. to Dismiss, ECF No. 51- 21.

19.    Perdue moved to dismiss for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 19, Perdue's Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing whether *Jarkesy I or II* applied. (Appendix, Ex. 20, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

**RESPONSE**: Undisputed.

20.    On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, again ruling that she lacked authority to decide constitutional questions. (Appendix, Ex. 20, Order Denying Mot. to Dismiss). She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

**RESPONSE**: Disputed as to Perdue's characterization of the ALJ's order as "ruling that she lacked authority to decide constitutional questions." The ALJ did not rule that she "lacked authority to decide constitutional questions," only that she "lacked the authority to decide the constitutional question at issue" in Perdue's motion. Pl.'s Appendix, Ex. 21, Order Denying Mot. to Dismiss at 1-2.

Dated: March 12, 2025

Respectfully Submitted,

/s/ *Stephani L. Ayers*

Stephani L. Ayers Washington State Bar #31610
GOVERNMENT ACCOUNTABILITY PROJECT
1612 K St., N.W., Suite 808
Washington, DC 20006
P: (813) 382-7865
stephani@whistleblowerdefenders.com

Attorneys for Defendant Craig Watts

/s/*Gary W. Jackson*
Gary W. Jackson
Law Offices of James Scott Farrin
555 S. Mangum Street, Suite 800

Durham, NC 27701
Phone: (919) 688-4991
gjackson@farrin.com
N.C. Bar No. 13976
Local Civil Rule 83.1(d) Attorney for Defendant

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>      Plaintiff,<br><br>v.<br><br>**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al.,<br><br>      Defendants. | **Case No. 5:24-cv-00477** |

**PLAINTIFF PERDUE FARMS INC.'S**
**NOTICE OF APPEAL**

Notice is hereby given that the above-named plaintiff, Perdue Farms Inc., hereby appeals to the United States Court of Appeals for the Fourth Circuit from the order (ECF No. 73) and final judgment (ECF No. 74) entered by the Court on March 9, 2026.

Dated: April 1, 2026

Respectfully submitted,

*/s/ Margaret Santen*
Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

JA536

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*


*/s/ Kristin M. Koger*
Kristin M. Koger
Roger A. Colaizzi
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*


*/s/ Mitchell Y. Mirviss*
Mitchell Y. Mirviss
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on April 1, 2026, a true and correct copy of the foregoing document has been furnished via electronic mail by virtue of the Court's CM/ECF System to counsel of record, including:

Brittany Bruns
United States Department of Justice
Civil Division, Federal Programs Branch
2201 L Street NW
Washington, DC 20005
Tel: 202-531-1325
Email: Brittany.S.Bruns@usdoj.gov

*Counsel for the Government Defendants*

Stephani Ayers
T.M. Guyer and Ayers & Friends, PC
P.O. Box 1061
Medford, OR 97501
Tel: 813-382-7865
Email: Stephani@whistleblowerdefenders.com

Gary W. Jackson
555 S. Magnum Street, Suite 100
Durham, NC 27701
Tel: 704-650-9655
Email: gjackson@ncadvocates.com

*Counsel for Defendant Craig Watts*

/s/ *Vanessa N. Garrido*
Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

3