**Nos. 26-1374, 26-1375**

In The
# United States Court of Appeals for the Fourth Circuit

**PERDUE FARMS, INC.,**

*Plaintiff-Appellant,*

*v.*

**KEITH E. SONDERLING, in his official capacity as Acting U.S. Secretary of Labor, et al.**
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of North Carolina
Nos. 24-cv-00477, 24-cv-00594 (Hon. Louise W. Flanagan)

**JOINT APPENDIX**

**VOLUME 3 of 3 | JA539–JA739**

(*Counsel listed on inside cover*)

Brett A. Shumate
*Assistant Attorney General*
Daniel Aguilar
David L. Peters
*Attorneys, Appellate Staff*
*Civil Division*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 598-6735
david.l.peters@usdoj.gov

*Counsel for Government*
*Defendants*

Thad M. Guyer
T M GUYER & FRIENDS, PC
Government Accountability
Project
116 Mistletoe Street
Medford, OR 97501
(206) 941-2869
thad@guyerayers.com

*Counsel for Rudy Howell and*
*Craig Watts*

Gary W. Jackson
Attorney at Law
555 South Mangum Street
Suite 100
Durham, NC 27701
(919) 298-2722
gjackson@ncadvocates.com

*Counsel for Rudy Howell and*
*Craig Watts*

Megan Barbero
Courtney L. Dixon
Elizabeth M. Wilson
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4540
mbarbero@venable.com

*Counsel for Perdue Farms, Inc.*

**TABLE OF CONTENTS**[*]

| Docket, ECF No. | Description | Page No. |
|---|---|---|
| **Volume 1** | | |
| 5:24-cv-00477, 73 5:24-cv-00594, 67 | Order granting defendants' motions for summary judgment and to dismiss (Mar. 9, 2026) | JA1 |
| 5:24-cv-00477, 74 | Judgment (Mar. 9, 2026) | JA34 |
| 5:24-cv-00594, 68 | Judgment (Mar. 9, 2026) | JA35 |
| **Volume 2 (Watts)** | | |
| 5:24-cv-00477, N/A | District Court Docket Report | JA36 |
| 5:24-cv-00477, 6 | Complaint for declaratory and injunctive relief (Aug. 23, 2024) | JA48 |
| 5:24-cv-00477, 6-1 | Declaration of Roger A. Colaizzi in Support of Plaintiff Perdue Farms Inc.'s Complaint for Declaratory and Injunctive Relief and list of attached exhibits | JA75 |
| 5:24-cv-00477, 6-2 | Exhibit 1 to complaint: Notice of Whistleblower Complaint | JA77 |
| 5:24-cv-00477, 6-3 | Exhibit 2 to complaint: OSHA Findings | JA92 |
| 5:24-cv-00477, 6-4 | Exhibit 3 to complaint: ALJ Decision and Order dated Jan. 6, 2017 | JA97 |
| 5:24-cv-00477, 6-5 | Exhibit 4 to complaint:, Administrative Review Board Decision dated Mar. 5, 2019 | JA110 |
| 5:24-cv-00477, 6-6 | Exhibit 5 to complaint: Dept of Labor's Motion for Voluntary Remand | JA117 |
| 5:24-cv-00477, 6-7 | Exhibit 6 to complaint: Order Granting Motion for Remand | JA129 |
| 5:24-cv-00477, 6-8 | Exhibit 7 to complaint: FDA Amicus Brief | JA131 |
| 5:24-cv-00477, 6-9 | Exhibit 8 to complaint: Administrative Review Board Decision dated May 28, 2020 | JA181 |
| 5:24-cv-00477, 6-10 | Exhibit 9 to complaint: Supplemental Whistleblower Complaint | JA188 |
| 5:24-cv-00477, 6-11 | Exhibit 10 to complaint: ALJ Decision and Order dated Oct. 21, 2022 | JA214 |
| 5:24-cv-00477, 6-12 | Exhibit 11 to complaint: Respondent's Application for Subpoenas | JA233 |
| 5:24-cv-00477, 6-13 | Exhibit 12 to complaint: Order Quashing Subpoenas | JA389 |
| 5:24-cv-00477, 6-14 | Exhibit 13 to complaint: Respondent's Motion to Certify Interlocutory Appeal or to Reconsider | JA396 |
| 5:24-cv-00477, 6-15 | Exhibit 14 to complaint: Order Denying Motion to Certify Interlocutory Appeal or to Reconsider | JA411 |

---

[*] To avoid unnecessary duplication, this joint appendix includes exhibits the first time they appear in the record and omits duplicate exhibits refiled later in the record or that appear in both cases.

1

| | | |
|---|---|---|
| 5:24-cv-00477, 6-16 | Exhibit 15 to complaint: Respondent's Letter Requesting Conference and Stay | JA424 |
| 5:24-cv-00477, 6-17 | Exhibit 16 to complaint: Complainant's Response to Request for Conference and Stay | JA427 |
| 5:24-cv-00477, 6-18 | Exhibit 17 to complaint: Order Denying Conference and Stay | JA432 |
| 5:24-cv-00477, 6-19 | Exhibit 18 to complaint: Respondent's Motion to Dismiss | JA440 |
| 5:24-cv-00477, 6-20 | Exhibit 19 to complaint: Complainant's Opposition to Motion to Dismiss | JA466 |
| 5:24-cv-00477, 6-21 | Exhibit 20 to complaint: Order Denying Motion to Dismiss | JA472 |
| 5:24-cv-00477, 25 | Watts's Answer to Complaint (Dec. 4, 2024) | JA480 |
| 5:24-cv-00477, 50 | Perdue's Statement of Undisputed Material Facts (Feb. 19, 2025) | JA499 |
| 5:24-cv-00477, 51 | Appendix to Perdue's Statement of Undisputed Facts (Table of Contents) | JA508 |
| 5:24-cv-00477, 51-22 | Exhibit 22 to Appendix to Perdue's Statement of Undisputed Facts: Declaration of Roger A. Colaizzi | JA511 |
| 5:24-cv-00477, 56 | Government's Response to Perdue's Statement of Material Facts (Mar. 12, 2025) | JA515 |
| 5:24-cv-00477, 57-1 | Watts's Response to Perdue's Statement of Material Facts (Mar. 12, 2025) | JA524 |
| 5:24-cv-00477, 75 | Notice of Appeal (Apr. 1, 2026) | JA536 |
| **Volume 3 (Howell)** | | |
| 24-cv-00594, N/A | District Court Docket Report | JA539 |
| 5:24-cv-00594, 1 | Complaint for declaratory and injunctive relief (Oct. 18, 2024) | JA550 |
| 5:24-cv-00594, 1-1 | Declaration of Robert A. Colaizzi and list of exhibits | JA577 |
| 5:24-cv-00594, 1-2 | Exhibit 1 to complaint: Notice of Whistleblower Complaint | JA579 |
| 5:24-cv-00594, 1-4 | Exhibit 3 to complaint: OSHA letter dated Jan. 27, 2022 | JA599 |
| 5:24-cv-00594, 1-5 | Exhibit 4 to complaint: OSHA Findings | JA602 |
| 5:24-cv-00594, 1-6 | Exhibit 5 to complaint: Howell OSHA Objections and Restated Complaint | JA607 |
| 5:24-cv-00594, 1-7 | Exhibit 6 to complaint: ALJ Decision and Order dated Dec. 14, 2022 | JA633 |
| 5:24-cv-00594, 1-8 | Exhibit 7 to complaint: ALJ Scheduling Order dated Sep. 25, 2024 | JA644 |
| 5:24-cv-00594, 35 | Perdue's Statement of Undisputed Material Facts (Mar. 17, 2025) | JA650 |
| 5:24-cv-00594, 36 | Appendix to Perdue's Statement of Facts (list of exhibits) | JA660 |

2

| | | |
|---|---|---|
| 5:24-cv-00594, 36-18 | Exhibit 18 to Perdue's Statement of Facts: ALJ Order Granting Joint Motion to Stay | JA663 |
| 5:24-cv-00594, 36-19 | Exhibit 19 to Perdue's Statement of Facts: Declaration of Roger A. Colaizzi | JA667 |
| 5:24-cv-00594, 37-2 | Howell's Statement of Undisputed Facts (Mar. 17, 2025) | JA672 |
| 5:24-cv-00594, 43 | Government Defendants' Response to Perdue's Statement of Material Facts (Apr. 7, 2025) | JA686 |
| 5:24-cv-00594, 44-1 | Howell's Response to Perdue's Statement of Material Facts (Apr. 7, 2025) | JA698 |
| 5:24-cv-00594, 48 | Perdue's Response to Howell's Statement of Undisputed Facts (Apr. 28, 2025) | JA716 |
| 5:24-cv-00594, 69 | Notice of appeal (Apr. 1, 2026) | JA737 |

3

Query     Reports     Utilities     Help     Log Out

APPEAL,CLOSED

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:24-cv-00594-FL

Perdue Farms Inc. v. Su et al
Assigned to: District Judge Louise Wood Flanagan
related Case: 5:24-cv-00477-FL
Case in other court:  USCA, 25-01106
                              USCA, 26-01375
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 10/18/2024
Date Terminated: 03/09/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Perdue Farms Inc.**
                  represented by     **Kristin M Koger**
Venable LLP
Litigation
600 Massachusetts Avenue, NW
Washington DC, DC 20001
202-344-4162
Email: kmkoger@venable.com
*ATTORNEY TO BE NOTICED*

              **Margaret Santen**
Ogletree Deakins
201 South College Street
Ste 2300
Charlotte, NC 28244
704-342-2588
Email: Margaret.Santen@ogletree.com
*ATTORNEY TO BE NOTICED*

              **Mitchell Mirviss**
Venable LLP
750 East Pratt Street, 9th Floor
Baltimore, MD 21202
410-244-7412
Fax: 410-244-7742
Email: mymirviss@venable.com
*ATTORNEY TO BE NOTICED*

              **Roger A. Colaizzi**
Venable LLP
600 Massachusetts Ave.
Washington, DC 20001
202-344-8051
Fax: 202-344-8300
Email: racolaizzi@venable.com
*ATTORNEY TO BE NOTICED*

JA539

**Vanessa N. Garrido**
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road
Forum IV, Suite 600
Raleigh, NC 27615
919-789-3194
Fax: 919-783-9412
Email: vanessa.garrido@ogletree.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Lori Chavez-DeRemer**
*in her official capacity as Secretary of the United States Department of Labor*

represented by  **Brittany Bruns**
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202-531-1325
Email: brittany.s.bruns@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katharine Paige O'Hale - AUSA Account - DO NOT USE**
United States Attorney's Office
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
919-856-4530
Fax: 919-856-4487
Email: paige.ohale@usdoj.gov
*TERMINATED: 08/19/2025*
*LEAD ATTORNEY*

**Andrew James Rising-DO NOT USE - DOJ ACCOUNT**
DOJ-Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Ste 11406
Washington, DC 20005
202-514-0265
Email: andrew.j.rising@usdoj.gov
*TERMINATED: 02/18/2026*

**Defendant**

**Pamela Kultgen**
*in her official capacity as an Administrative Law Judge of the United States Department of Labor*

represented by  **Brittany Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA540

**Katharine Paige O'Hale - AUSA Account
- DO NOT USE**
(See above for address)
*TERMINATED: 08/19/2025*
*LEAD ATTORNEY*

**Andrew James Rising-DO NOT USE -
DOJ ACCOUNT**
(See above for address)
*TERMINATED: 02/18/2026*

**Defendant**

**United States Department of Labor**                     represented by   **Brittany Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katharine Paige O'Hale - AUSA Account
- DO NOT USE**
(See above for address)
*TERMINATED: 08/19/2025*
*LEAD ATTORNEY*

**Andrew James Rising-DO NOT USE -
DOJ ACCOUNT**
(See above for address)
*TERMINATED: 02/18/2026*

**Defendant**

**The Office of Administrative Law Judges
of the United States Department of Labor**     represented by   **Brittany Bruns**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katharine Paige O'Hale - AUSA Account
- DO NOT USE**
(See above for address)
*TERMINATED: 08/19/2025*
*LEAD ATTORNEY*

**Andrew James Rising-DO NOT USE -
DOJ ACCOUNT**
(See above for address)
*TERMINATED: 02/18/2026*

**Defendant**

**Rudy Howell**                     represented by   **Stephani Ayers**
T.M. Guyer and Ayers & Friends, PC
Pob 1061
Medford, OR 97501
813-382-7865
Email:
stephani@whistleblowerdefenders.com
*LEAD ATTORNEY*

JA541

*ATTORNEY TO BE NOTICED*

**Elisabeth Connell**
Government Accountability Project
1612 K St., NW
Suite 808
Washington, DC 20006
202-449-6040
Email: elisabeth.connell@gmail.com
*TERMINATED: 09/30/2025*

**Gary W. Jackson**
Gary W. Jackson, Attorney at Law
555 S. Mangum Street, Suite 100
North Carolina
Durham, NC 27701
704-650-9655
Email: gjackson@ncadvocates.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/18/2024 | 1 | **COMPLAINT** against All Defendants ( Filing fee $ 405 receipt number ANCEDC-7818084.), filed by Perdue Farms Inc.. (Attachments: # 1 Affidavit Declaration of Roger A. Colaizzi, # 2 Exhibit Ex. 1 - Howell OSHA Complaint (February 11, 2021), # 3 Exhibit Ex. 2 - Watts Constitutional Action Complaint (August 20, 2024), # 4 Exhibit Ex. 3 - OSHA January 2022 Letter (January 27, 2022), # 5 Exhibit Ex. 4 - OSHA Findings (April 8, 2022), # 6 Exhibit Ex. 5 - Howell OSHA Objections and Restated Complaint (May 6, 2022), # 7 Exhibit Ex. 6 - ALJ Decision and Order (December 14, 2022), # 8 Exhibit Ex. 7 - September 2024 Amended Scheduling Order (September 25, 2024), # 9 Civil Cover Sheet, # 10 Proposed Summons Kultgen, # 11 Proposed Summons U.S. Department of Labor, # 12 Proposed Summons Howell, # 13 Proposed Summons OALJ, # 14 Proposed Summons Su, # 15 Proposed Summons Garland, # 16 Proposed Summons Civil Process Clerk) (Garrido, Vanessa) (Entered: 10/18/2024) |
| 10/18/2024 | 2 | MOTION for Preliminary Injunction filed by Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 10/18/2024) |
| 10/18/2024 | 3 | Memorandum in Support regarding 2 MOTION for Preliminary Injunction filed by Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 10/18/2024) |
| 10/18/2024 | 4 | Financial Disclosure Statement by Perdue Farms Inc. (Garrido, Vanessa) (Entered: 10/18/2024) |
| 10/18/2024 | 5 | Notice of Appearance filed by Vanessa N. Garrido on behalf of Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 10/18/2024) |
| 10/24/2024 | | Notice to Counsel - All Counsel should file a Notice of Appearance. (Rudd, D.) (Entered: 10/24/2024) |
| 10/24/2024 | 6 | Summons Issued as to Rudy Howell, Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor, Attorney General, US Attorney. *(*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.*)* (Rudd, D.) (Entered: 10/24/2024) |

| | | |
|---|---|---|
| 10/24/2024 | | NOTICE OF DEFICIENCY regarding 2 Motion for Preliminary Injunction. In accordance with Section IV.D.1 of the CM/ECF Policy and Procedures Manual, the document must contain the electronic signature of the CM/ECF user under whose log-in and password the document was submitted. On or before 10/27/2024, counsel must refile. Alternatively, Margaret Santen may file a notice of appearance. (McNally, Kimberly) (Entered: 10/24/2024) |
| 10/24/2024 | 7 | Notice of Appearance filed by Margaret Santen on behalf of Perdue Farms Inc.. (Santen, Margaret) (Entered: 10/24/2024) |
| 10/28/2024 | | TEXT ORDER REASSIGNING CASE. At the direction of the Court and for the continued efficient administration of justice, this case is reassigned to United States District Judge Terrence W. Boyle for all further proceedings. Chief United States District Judge Richard E. Myers II is no longer assigned to the case. All future filings should reflect the revised case number of 5:24-CV-594-BO-RJ. Signed by Peter A. Moore, Jr., Clerk of Court on 10/28/2024. (Hockaday, A.) (Entered: 10/28/2024) |
| 11/07/2024 | 8 | Notice of Appearance filed by Kristin M Koger on behalf of Perdue Farms Inc.. (Koger, Kristin) (Entered: 11/07/2024) |
| 12/11/2024 | 9 | Affidavit of Service filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit Proof of Delivery) (Garrido, Vanessa) (Entered: 12/11/2024) |
| 12/12/2024 | 10 | Affidavit of Service filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit Su Proof of Delivery, # 2 Exhibit ALJ Proof of Delivery, # 3 Exhibit DOL Proof of Delivery, # 4 Exhibit OALJ Proof of Delivery, # 5 Exhibit USAG Proof of Delivery) (Garrido, Vanessa) (Entered: 12/12/2024) |
| 12/16/2024 | 11 | Notice of Appearance filed by Katharine Paige O'Hale on behalf of Julie Su, Pamela Kultgen, United States Department of Labor, The Office of Administrative Law Judges of the United States Department of Labor. (O'Hale, Katharine) (Entered: 12/16/2024) |
| 12/16/2024 | 12 | RESPONSE in Opposition regarding 2 MOTION for Preliminary Injunction filed by Julie Su, Pamela Kultgen, United States Department of Labor, The Office of Administrative Law Judges of the United States Department of Labor. (O'Hale, Katharine) (Entered: 12/16/2024) |
| 12/20/2024 | 13 | Notice of Special Appearance for non-district by Mitchell Mirviss on behalf of Perdue Farms Inc.. (Mirviss, Mitchell) (Entered: 12/20/2024) |
| 12/23/2024 | | Set Hearing as to 2 MOTION for Preliminary Injunction. Motion Hearing set for 1/17/2025 at 11:00 AM in Elizabeth City - Courtroom before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 12/23/2024) |
| 12/23/2024 | | Set Hearing as to 2 MOTION for Preliminary Injunction. **(CORRECTION)** Motion Hearing set for 1/17/2025 at 11:00 AM in **Greenville** - Courtroom before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 12/23/2024) |
| 12/23/2024 | 14 | Notice of Special Appearance for non-district by Roger A. Colaizzi on behalf of Perdue Farms Inc.. (Colaizzi, Roger) (Entered: 12/23/2024) |
| 12/30/2024 | 15 | REPLY to Response to Motion regarding 2 MOTION for Preliminary Injunction filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 12/30/2024) |
| 01/02/2025 | 16 | Consent MOTION Consent Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing filed by Perdue Farms Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing) (Koger, Kristin) (Entered: 01/02/2025) |

JA543

| 01/06/2025 | 17 | Waiver of Service Returned Executed filed by Perdue Farms Inc.. (Garrido, Vanessa) (Entered: 01/06/2025) |
|---|---|---|
| 01/08/2025 | | Motion Submitted to District Judge Terrence W. Boyle regarding 16 Consent MOTION Consent Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing. (Stouch, L.) (Entered: 01/08/2025) |
| 01/09/2025 | 18 | ORDER granting 16 Motion for Mitchell Y. Mirviss, Esq. to Appear Remotely at January 17, 2025 Hearing. Signed by District Judge Terrence W. Boyle on 1/8/2025. Counsel will be emailed the videoconference information. (Stouch, L.) (Entered: 01/09/2025) |
| 01/09/2025 | 19 | Notice of Special Appearance for non-district by Elisabeth Connell on behalf of Rudy Howell. (Connell, Elisabeth) (Entered: 01/09/2025) |
| 01/14/2025 | 20 | Consent MOTION for Leave to Appear Remotely at Jan. 17, 2025 Hearing filed by Rudy Howell. (Attachments: # 1 Exhibit Dec. 17, 2024 Scheduling Order, # 2 Text of Proposed Order) (Connell, Elisabeth) (Entered: 01/14/2025) |
| 01/15/2025 | | Motion Submitted to District Judge Terrence W. Boyle regarding 20 Consent MOTION for Leave to Appear Remotely at Jan. 17, 2025 Hearing. (Stouch, L.) (Entered: 01/15/2025) |
| 01/16/2025 | 21 | Notice of Special Appearance for non-district by Stephani Ayers on behalf of Rudy Howell. (Ayers, Stephani) (Entered: 01/16/2025) |
| 01/16/2025 | 22 | ORDER granting 20 Motion for Leave to Appear Remotely at Jan. 17, 2025 Hearing. Signed by District Judge Terrence W. Boyle on 1/16/2025. (Stouch, L.) (Entered: 01/16/2025) |
| 01/16/2025 | 23 | Consent MOTION briefing schedule filed by Rudy Howell. (Attachments: # 1 Text of Proposed Order) (Ayers, Stephani) (Entered: 01/16/2025) |
| 01/16/2025 | 24 | Notice of Appearance filed by Gary W. Jackson on behalf of Rudy Howell. (Jackson, Gary) (Entered: 01/16/2025) |
| 01/17/2025 | 25 | Minute Entry for proceedings held in Greenville, NC before District Judge Terrence W. Boyle: Motion Hearing held on 1/17/2025. All parties present and ready to proceed. Oral argument held. Written order to follow. (Court Reporter Jenny Carroll, Official Court Reporter) (Stouch, L.) (Entered: 01/27/2025) |
| 01/29/2025 | 26 | **ORDER denying 2 Motion for Preliminary Injunction. Signed by District Judge Terrence W. Boyle on 1/28/2025.** (Stouch, L.) Modified on 8/20/2025 (Collins, S). (Entered: 01/29/2025) |
| 01/29/2025 | 27 | ORDER granting 23 Motion and Setting a Briefing Schedule on Dispositive Motions. Signed by District Judge Terrence W. Boyle on 1/28/2025. (Stouch, L.) (Entered: 01/29/2025) |
| 01/31/2025 | 28 | Notice of Interlocutory Appeal filed by Perdue Farms Inc. as to 26 Order on Motion for Preliminary Injunction. Filing fee, receipt number ANCEDC-7965077. (Santen, Margaret) (Entered: 01/31/2025) |
| 02/03/2025 | 29 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 28 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 02/03/2025) |
| 02/04/2025 | 30 | US Court of Appeals Case Number 25-1106 (Anisha Walker, Case Manager) as to 28 Notice of Interlocutory Appeal filed by Perdue Farms Inc. (Foell, S.) (Entered: 02/04/2025) |
| 02/04/2025 | 31 | ORDER of US Court of Appeals consolidating cases 25-1105-L (5:24-CV-477-BO) and 25-1106. (Foell, S.) (Entered: 02/04/2025) |

JA544

| | | |
|---|---|---|
| 02/27/2025 | 32 | OFFICIAL TRANSCRIPT for dates of 01/17/2025, before Judge Terrence W. Boyle, regarding 28 Notice of Interlocutory Appeal Court Reporter Jenny Carroll, Telephone number jenny_carroll@nced.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 3/23/2025. Redacted Transcript Deadline set for 4/2/2025. Release of Transcript Restriction set for 5/31/2025. (Carroll, Jennifer) (Entered: 02/27/2025) |
| 02/27/2025 | | NOTICE of Filing of Official Transcript 32 Appeal Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Carroll, Jennifer) (Entered: 02/27/2025) |
| 03/17/2025 | 33 | MOTION for Summary Judgment filed by Perdue Farms Inc.. (Santen, Margaret) (Entered: 03/17/2025) |
| 03/17/2025 | 34 | Memorandum in Support regarding 33 MOTION for Summary Judgment filed by Perdue Farms Inc.. (Santen, Margaret) (Entered: 03/17/2025) |
| 03/17/2025 | 35 | Statement of Material Facts regarding 33 MOTION for Summary Judgment filed by Perdue Farms Inc.. (Santen, Margaret) (Entered: 03/17/2025) |
| 03/17/2025 | 36 | Appendix to the Statement of Facts regarding 33 MOTION for Summary Judgment filed by Perdue Farms Inc.. (Attachments: # 1 Exhibit Complaint of Retaliation (February 11, 2021), # 2 Exhibit OSHA January 2022 Letter (January 27, 2022), # 3 Exhibit OSHA Findings (April 8, 2022), # 4 Exhibit OSHA Objections and Restated Complaint (May 6, 2022), # 5 Exhibit ALJ Decision and Order (December 14, 2022), # 6 Exhibit September 2024 ALJ Scheduling Order (September 25, 2024), # 7 Exhibit First USDCT Action Complaint (August 20, 2024), # 8 Exhibit Perdues Application for Subpoenas (March 11, 2024), # 9 Exhibit Order Quashing Subpoenas (March 15, 2024), # 10 Exhibit Perdues Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024), # 11 Exhibit Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024), # 12 Exhibit Perdues Letter Requesting Conference (July 19, 2024), # 13 Exhibit Watts Response to Request for Conference (July 19, 2024), # 14 Exhibit Order Denying Conference Call (July 23, 2024), # 15 Exhibit Perdues Motion to Dismiss (July 29, 2024), # 16 Exhibit Watts Opposition to Motion to Dismiss (July 30, 2024), # 17 Exhibit Order Denying Motion to Dismiss (August 8, 2024), # 18 Exhibit Order Granting Joint Motion to Stay (March 11, 2025), # 19 Exhibit Declaration of Roger A. Colaizzi) (Santen, Margaret) (Entered: 03/17/2025) |
| 03/17/2025 | 37 | MOTION for Summary Judgment filed by Rudy Howell. (Attachments: # 1 Memorandum of Law in Support, # 2 Statement of Undisputed Facts, # 3 Declaration) (Ayers, Stephani) (Entered: 03/17/2025) |
| 03/18/2025 | 38 | Proposed Order regarding 37 MOTION for Summary Judgment filed by Rudy Howell. (Ayers, Stephani) (Entered: 03/18/2025) |
| 03/27/2025 | 39 | Consent MOTION for Extension of Time to File Response/Reply as to 37 MOTION for Summary Judgment *for Lack of Subject Matter Jurisdiction* filed by Perdue Farms Inc.. (Attachments: # 1 Text of Proposed Order) (Koger, Kristin) (Entered: 03/27/2025) |

JA545

| | | |
|---|---|---|
| 03/28/2025 | | Motion Submitted to District Judge Terrence W. Boyle regarding [39] Consent MOTION for Extension of Time to File Response/Reply as to [37] MOTION for Summary Judgment *for Lack of Subject Matter Jurisdiction*. (Stouch, L.) (Entered: 03/28/2025) |
| 03/31/2025 | 40 | ORDER granting [39] Motion for Extension of Time to File Response. It is therefore ordered that the time for Plaintiff to file its response to Defendant Howell's Motion to Dismiss (ECF No. 37) be extended to 21 days after the filing of Defendant Howell's response to Plaintiffs Motion for Summary Judgment to coincide with Plaintiff's deadline for responding to that pleading and restore the schedule for dispositive briefing established previously by the Parties and ordered by the Court. Signed by District Judge Terrence W. Boyle on 3/29/2025. (Stouch, L.) (Entered: 03/31/2025) |
| 04/07/2025 | 41 | MOTION to Dismiss for Lack of Jurisdiction *and*, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,*, MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,* filed by Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor. (O'Hale, Katharine) (Entered: 04/07/2025) |
| 04/07/2025 | 42 | Memorandum in Support regarding [41] MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,* filed by Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor. (O'Hale, Katharine) (Entered: 04/07/2025) |
| 04/07/2025 | 43 | RESPONSE regarding [35] Statement of Material Facts filed by Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor. (O'Hale, Katharine) (Entered: 04/07/2025) |
| 04/07/2025 | 44 | Memorandum in Opposition regarding [34] Memorandum in Support, [35] Statement of Material Facts, [33] MOTION for Summary Judgment filed by Rudy Howell. (Attachments: # [1] Response to Disputed Facts) (Ayers, Stephani) (Entered: 04/07/2025) |
| 04/22/2025 | 45 | ORDER of US Court of Appeals granting motion to voluntarily dismiss [28] Notice of Interlocutory Appeal filed by Perdue Farms Inc. (Foell, S.) (Entered: 04/22/2025) |
| 04/22/2025 | 46 | MANDATE of US Court of Appeals as to [28] Notice of Interlocutory Appeal filed by Perdue Farms Inc.. (Foell, S.) (Entered: 04/22/2025) |
| 04/28/2025 | 47 | *RESPONSE/REPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' DISPOSITIVE MOTIONS, AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT RESPONSE* regarding [37] MOTION for Summary Judgment , [44] Memorandum in Opposition, [41] MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,*, [42] Memorandum in Support, [33] MOTION for Summary Judgment filed by Perdue Farms Inc. (Koger, Kristin) Modified on 8/20/2025 (Collins, S.). (Entered: 04/28/2025) |
| 04/28/2025 | 48 | RESPONSE regarding [37] MOTION for Summary Judgment -- *Response to Statement of Undisputed Facts* filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 04/28/2025) |
| 04/28/2025 | 49 | MOTION to Strike [37] MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements* filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 04/28/2025) |
| 04/28/2025 | 50 | Memorandum in Support regarding [49] MOTION to Strike [37] MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements* filed |

| | | |
|---|---|---|
| | | by Perdue Farms Inc.. (Attachments: # 1 Exhibit Ex. 1 - May, June 2024 Emails) (Koger, Kristin) (Entered: 04/28/2025) |
| 05/12/2025 | 51 | GOVERNMENT DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT regarding 41 MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,* filed by Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor. (O'Hale, Katharine) Modified on 8/20/2025 (Collins, S). (Entered: 05/12/2025) |
| 05/12/2025 | 52 | REPLY to Response to Motion regarding 37 MOTION for Summary Judgment filed by Rudy Howell. (Ayers, Stephani) (Entered: 05/12/2025) |
| 05/19/2025 | 53 | Memorandum in Opposition regarding 49 MOTION to Strike 37 MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements*, 50 Memorandum in Support, filed by Rudy Howell. (Attachments: # 1 Affidavit [Re-Executed Under Penalty of Perjury], # 2 Exhibit Perdue Request to Stay All Discovery) (Ayers, Stephani) (Entered: 05/19/2025) |
| 06/02/2025 | 54 | REPLY to Response to Motion regarding 49 MOTION to Strike 37 MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements* filed by Perdue Farms Inc.. (Koger, Kristin) (Entered: 06/02/2025) |
| 06/03/2025 | | Motions and Briefing Submitted to District Judge Terrence W. Boyle regarding 41 MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,*, 37 MOTION for Summary Judgment , 49 MOTION to Strike 37 MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements*, 33 MOTION for Summary Judgment . (Stouch, L.) (Entered: 06/03/2025) |
| 08/01/2025 | | **Set Hearing: Motion Hearing set for 8/26/2025 at 11:30 AM in Elizabeth City - Courtroom before District Judge Terrence W. Boyle.** (Stouch, L.) (Entered: 08/01/2025) |
| 08/18/2025 | 55 | Notice of Substitution of Counsel filed by Andrew James Rising on behalf of Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor substituting for Katharine Paige OHale. (Rising, Andrew) (Entered: 08/18/2025) |
| 08/18/2025 | 56 | MOTION to Continue *August 26, 2025 Motions Hearing* filed by Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor. (Rising, Andrew) (Entered: 08/18/2025) |
| 08/19/2025 | 57 | **TEXT ORDER REASSIGNING CASE. At the direction of the Court and for the continued efficient administration of justice, this case is reassigned to United States District Judge Louise W. Flanagan for all further proceedings. United States District Judge Terrence W. Boyle is no longer assigned to this case. All future filings should reflect the revised case number of 5:24-cv-594-FL.** Signed by Peter A. Moore, Jr., Clerk of Court on 8/19/2025. (Stouch, L.) (Entered: 08/19/2025) |
| 08/19/2025 | | Notice to Counsel - **The hearing before United States District Judge Terrence W. Boyle scheduled for 8/26/2025 at 11:30 am in Elizabeth City has been cancelled.** (Stouch, L.) (Entered: 08/19/2025) |
| 08/20/2025 | 58 | TEXT ORDER REASSIGNING CASE. At the direction of the Court, this Case is reassigned to Chief Judge Richard E. Myers II for all further proceedings. District Judge |

| | | |
|---|---|---|
| | | Louise Wood Flanagan is no longer assigned to case. All future filings shall reflect the revised case number of 5:24-CV-594-M.Signed by Peter A. Moore, Jr., Clerk of Court on 8/20/2025. (Moore, P.) (Entered: 08/20/2025) |
| 08/20/2025 | 59 | TEXT ORDER. Order (58) entered in error this Case remains assigned to District Judge Louise Wood Flanagan for all further proceedings. Chief Judge Richard E. Myers, II is not assigned to case All future filings shall reflect the revised case number of 5:24-CV-594-FL.Signed by Peter A. Moore, Jr., Clerk of Court on 8/20/2025. (Moore, P.) (Entered: 08/20/2025) |
| 08/20/2025 | | Motions No Longer Submitted to District Judge Terrence W. Boyle: regarding 41 MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,*, 37 MOTION for Summary Judgment , 49 MOTION to Strike 37 MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements*, 56 MOTION to Continue *August 26, 2025 Motions Hearing*, 33 MOTION for Summary Judgment . (Collins, S) (Entered: 08/20/2025) |
| 08/20/2025 | | Motions Submitted to District Judge Louise Wood Flanagan regarding 41 MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,*, 37 MOTION for Summary Judgment , 49 MOTION to Strike 37 MOTION for Summary Judgment -- *Motion to Strike Declaration of Stephani Ayers and Related Statements*, 56 MOTION to Continue *August 26, 2025 Motions Hearing*, 33 MOTION for Summary Judgment . (Collins, S) (Entered: 08/20/2025) |
| 08/22/2025 | 60 | **ORDER granting 56 MOTION to Continue August 26, 2025 Motions Hearing. Signed by District Judge Louise Wood Flanagan on 8/22/2025.** (Collins, S) (Entered: 08/22/2025) |
| 09/08/2025 | 61 | Notice of Supplemental Authority filed by Perdue Farms Inc. regarding 37 MOTION for Summary Judgment , 41 MOTION to Dismiss for Lack of Jurisdiction *and* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *, or in the alternative,* MOTION for Summary Judgment *, and Opposition to Plaintiff's Motion for Summary Judgment,*, 33 MOTION for Summary Judgment *Notice of Supplemental Authorities*. (Attachments: # 1 Exhibit A - Sun Valley Orchards, LLC v. DOL, ___ F.4th ___, 2025 WL 2112927 (3d Cir. Jul. 29, 2025), # 2 Exhibit B -Wulferic, LLC v. FDA, ___ F. Supp. 3d ___, 2025 WL 2200923 (N.D. Tex. Aug. 1, 2025), , # 3 Exhibit C - Space Exploration Technologies Corp. v. NLRB, ___ F.4th ___, 2025 WL 2396748 (5th Cir. Aug. 19, 2025) (SpaceX),) (Koger, Kristin) Modified on 9/9/2025 to label exhibits. (Collins, S). (Entered: 09/08/2025) |
| 09/22/2025 | 62 | RESPONSE regarding 61 Notice - other,,, filed by Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor. (Rising, Andrew) (Entered: 09/22/2025) |
| 09/29/2025 | 63 | MOTION to Withdraw as Attorney *Elisabeth R. Connell* filed by Rudy Howell. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order) (Connell, Elisabeth) (Entered: 09/29/2025) |
| 09/30/2025 | | Notice to Counsel regarding: 63 Motion to Withdraw as Attorney. Counsel provided an incomplete signature block. Counsel does not have to refile but should refer to Section IV.D of the CM/ECF Policy Manual for signature block requirements on future pleadings. Further, counsel is directed to update contact information in CM/ECF by choosing "Utilities" and selecting "Maintain Your Account." Contact the clerk's office if additional assistance is required. (Collins, S) (Entered: 09/30/2025) |

| | | |
|---|---|---|
| 09/30/2025 | 64 | **ORDER granting 63 Motion to Withdraw as Attorney. Attorney Elisabeth Connell terminated. Signed by District Judge Louise Wood Flanagan on 9/30/2025.** (Collins, S) (Entered: 09/30/2025) |
| 10/29/2025 | 65 | Notice filed by Perdue Farms Inc. regarding 62 Response, 61 Notice - other,,, *Omnibus Notice of Supplemental Authority and Reply/Response to the Department of Labor's Supplemental Memos*. (Attachments: # 1 1 - Comcast Corp. v. DOL, 2025 WL 2712424 (E.D. Va. Sept. 23, 2025)) (Koger, Kristin) (Entered: 10/29/2025) |
| 02/13/2026 | 66 | Notice of Substitution of Counsel filed by Brittany Bruns on behalf of Pamela Kultgen, Julie Su, The Office of Administrative Law Judges of the United States Department of Labor, United States Department of Labor substituting for Andrew J. Rising. (Bruns, Brittany) (Entered: 02/13/2026) |
| 03/09/2026 | 67 | **ORDER denying 33 Motion for Summary Judgment; granting 37 Motion for Summary Judgment; granting 41 Motion to Dismiss for Lack of Jurisdiction; granting 41 Motion to Dismiss for Failure to State a Claim; granting 41 Motion for Summary Judgment; finding as moot 49 Motion to Strike. Signed by District Judge Louise Wood Flanagan on 3/9/2026.** (Collins, S) (Entered: 03/09/2026) |
| 03/09/2026 | 68 | **JUDGMENT - Signed by Peter A. Moore, Jr., Clerk of Court on 3/9/2026.** (Collins, S) (Entered: 03/09/2026) |
| 04/01/2026 | 69 | Notice of Appeal filed by Perdue Farms Inc.. Filing fee, receipt number ANCEDC-8550566. (Garrido, Vanessa) (Entered: 04/01/2026) |
| 04/01/2026 | 70 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 69 Notice of Appeal. (Foell, S.) (Entered: 04/01/2026) |
| 04/02/2026 | 71 | US Court of Appeals Case Number 26-1375 (A. Walker, Case Manager) as to 69 Notice of Appeal filed by Perdue Farms Inc.. (Foell, S.) (Entered: 04/02/2026) |
| 04/02/2026 | 72 | ORDER of US Court of Appeals as to 69 Notice of Appeal filed by Perdue Farms Inc. The court consolidates Case No. 26-1374(L)(5:24-CV-477-FL) and Case No. 26-1375. (Foell, S.) (Entered: 04/02/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/13/2026 10:03:05 | | |
| **PACER Login:** | emacksey98 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-00594-FL |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **PERDUE FARMS INC.,**<br>31149 Ocean City Road<br>Salisbury, Maryland 21804<br><br>       Plaintiff,<br><br>v.<br><br>**JULIE SU**, in her official capacity as Acting Secretary of the United States Department of Labor,<br><br>**PAMELA KULTGEN**, in her official capacity as an Administrative Law Judge of the United States Department of Labor,<br><br>**UNITED STATES DEPARTMENT OF LABOR**,<br><br>**THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR**,<br><br>*and*<br><br>**RUDY HOWELL,**<br><br>      Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Perdue Farms Inc. ("Perdue"), by its undersigned attorneys, alleges and states as follows:

### INTRODUCTION

1.     Perdue brings this action for declaratory relief under 28 U.S.C. §§ 2201-02, to enjoin the governmental Defendants from conducting unconstitutional administrative proceedings against Perdue currently pending in the U.S. Department of Labor ("DOL")'s Office of

1

Administrative Law Judges ("OALJ"), *Howell v. Perdue Farms Inc.*, No. 2022-FDA-00004 (the "Pending Administrative Proceedings"). Those proceedings are unconstitutional for multiple reasons, including, *inter alia*, deprivation of Perdue's constitutional right to a jury trial guaranteed by the Seventh Amendment as recently affirmed by the Supreme Court in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) ("*Jarkesy II*").

2.      The Pending Administrative Proceedings involve claims against Perdue for compensatory damages and other relief under the employee-protection (whistleblower) provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d ("FSMA") currently pending before DOL Administrative Law Judge ("ALJ") Pamela Kultgen. An evidentiary hearing on the merits is scheduled to commence on June 23, 2025 to be tried by ALJ Kultgen without a jury and without the discovery and evidentiary protections available in an Article III court, subject to review by an appellate board and potential further determination by Acting Secretary of Labor Julie Su. The purpose of this action is to prevent DOL, its OALJ, Secretary Su, and ALJ Kultgen from continuing this unconstitutional proceeding against Perdue.

3.      The underlying facts concern a dispute between Perdue and one of its independent contractors, Rudy Howell, who owns and operates the Robert Miller poultry farm in Fairmont, North Carolina. Howell raised chickens for Perdue as an independent contractor under a written contract.   On February 11, 2021, Howell filed a complaint against Perdue with DOL's Occupational Safety and Health Administration ("OSHA"), alleging retaliation by Perdue in violation of the FSMA. *See* Declaration of Roger A. Colaizzi, Ex. 1, Notice of Whistleblower Complaint (Feb. 11, 2021) ("OSHA Complaint" or "OSHA Compl.").[1] Perdue vigorously denies Howell's claims, which he brought following years of complaints about the amount and system

---

[1] All Exhibits referenced in this Complaint are exhibits to the Colaizzi Declaration.

2

compensation he received from Perdue. During the height of the pandemic, he allowed and participated in filming and tours by a third-party animal rights group and non-governmental "public health advocates," and also allowed removal of two sick chickens, all of which violated the terms of his contract with Perdue, its programs for poultry welfare and bio-security, and its Covid-19 protocols. After learning of Howell's violations, Perdue took remedial action and terminated its contract with Howell. In the Pending Administrative Proceedings, Howell alleges that the remedial action taken by Perdue constitutes retaliation prohibited by FSMA's whistleblower protections.

4.     Perdue is not asking this Court to litigate the merits of Howell's accusations. Instead, Perdue brings five constitutional challenges to the Pending Administrative Proceedings and seeks to halt any further proceedings therein.

5.     *First*, in *Jarkesy II*, the Supreme Court held that trying legal claims administratively violates the Seventh Amendment constitutional right to a jury trial. *See Jarkesy II*, 144 S. Ct. at 2127-28. Here, Howell's claims are legal in nature, seeking compensatory damages including damages for emotional distress, business losses, backpay, and more. Howell's claims are thus close analogues to common-law wrongful-discharge actions for breach of contract and tort and are triable by jury under the Seventh Amendment. The Pending Administrative Proceedings deny Perdue its constitutional right to a jury trial.

6.     *Second*, separate from the Seventh Amendment right to a jury trial, Howell's claims implicate private rights (*e.g.*, the contractual relationship between Howell and Perdue and Perdue's right to property placed in direct issue by Howell's claims for damages), that must be adjudicated in an Article III court. Adjudicating those rights in an Article I tribunal violates Article III and the separation of powers vesting the federal judicial power exclusively in the judicial branch.

3

7.      *Third*, the FSMA statutory scheme accords Howell, a private litigant, power to kick out his claims to an Article III district court and elect a jury trial, but without providing any intelligible standard to curb or even guide his discretion. Howell may even do so after an adverse ruling by the ALJ or the Secretary of Labor. By delegating unfettered legislative power to an individual litigant to decide whether his claims should be tried before an Article I ALJ or an Article III district court with the right to a jury trial and full due-process protections unavailable in the OALJ, FSMA violates the nondelegation doctrine of the constitutional separation of powers. *See Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022) ("*Jarkesy I*"), *aff'd on other gds. and remanded*, 144 S. Ct. 2117 (2024).

8.      *Fourth*, OALJ's ALJs are unconstitutionally shielded from presidential oversight mandated by the Take Care Clause, U.S. Const. art. II, sec. 2, because they are doubly insulated from the presidential removal power: they can be removed *only* for cause and *only* by the Merit Systems Protection Board ("MSPB"), whose members can be removed *only* for cause by the President. In *Jarkesy I*, the Fifth Circuit held that such double insulation is unconstitutional. *See Jarkesy I*, 34 F.4th at 463-65.

9.      *Fifth*, the OALJ proceedings violate due process because they lack basic procedural protections, such as the right to subpoena third parties for testimony and mandatory application of the Federal Rules of Evidence, and because they unfairly disadvantage Perdue by, *inter alia*, giving kickout rights to Howell and not to Perdue and allowing DOL to participate in multiple capacities such as adjudicator and prosecutor.

10.      This case is closely related and parallel to another action recently filed by Perdue in this Court, *Perdue Farms Inc. v. Su, et al.*, E.D.N.C. Case No. 5:24-cv-00477-BO (the "First USDCT Action"). That action addresses DOL administrative proceedings brought by a different

4

farmer, Craig Watts, against Perdue, addressing nearly identical retaliation claims under FSMA (the "Watts Administrative Proceedings"). The two sets of administrative proceedings are identical in nearly all material respects, including assignment to the same ALJ.

11. Perdue challenged the constitutionality of the Watts Administrative Proceedings in light of *Jarkesy*. ALJ Kultgen refused to hear Perdue's constitutional challenges, ruling that, as an ALJ, she "lacks the power and authority to decide constitutional questions." Facing constitutionally infirm administrative proceedings, presided over by an ALJ who refuses to even consider their constitutionality, Perdue brought the First USDCT Action in this Court to halt the proceedings.

12. Howell's claims against Perdue mirror Watts' claims against Perdue. As both cases bring FSMA claims for compensatory damages and have been assigned to the same ALJ, the same constitutional violations arise in both administrative proceedings. All of the constitutional claims brought in the First USDCT Action are brought here.

13. The *Jarkesy* decisions and another recent Supreme Court ruling, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), have brought these decisions to a head. *Axon* holds that Perdue's constitutional claims against the DOL proceedings should be adjudicated by this Court, even while those proceedings are pending in the OALJ. Specifically, it held that parallel challenges to the constitutional authority of SEC and FTC ALJs are entitled to immediate "here-and-now" adjudication and, where appropriate, injunctive relief from an Article III district court. *Id.* at 195. Under *Axon* as applied here, the district court should take swift action to prevent "here-and-now" injury by averting unconstitutional administrative enforcement proceedings without waiting for completion of the administrative process and limited judicial review by a circuit court of appeals.

5

14.    Perdue sits in the same precarious shoes as did the respective plaintiffs in *Axon*—facing an imminent unconstitutional administrative adjudication of claims against it that belong in an Article III court. And its constitutional deprivations plainly echo those brought in *Jarkesy*. To prevent the acute harm from being required to endure administrative proceedings that are facially and irreparably unconstitutional, this Court should preliminarily and permanently enjoin the proceedings, declare further proceedings unlawful, instruct the ALJ to dismiss the case, and grant such other relief as this Court deems necessary or proper.

**JURISDICTION AND VENUE**

15.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the United States Constitution as applied to a federal statute, FSMA, and seeks relief against officers of the United States. *Axon* applied a three-part test to establish this Court's subject matter jurisdiction over Perdue's constitutional claims. *First*, "could 'precluding district court jurisdiction foreclose all meaningful judicial review' of the claim?" 598 U.S. at 186 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)). *Second*, "is the claim 'wholly collateral' to the statute's review provisions?" *Id*. *Third*, "is the claim 'outside the agency's expertise'?" *Id.* As *Axon* explains, "when the answer to all three questions is yes, we presume that Congress does not intend to limit jurisdiction." *Id.*

16.    Here, Perdue's constitutional challenges satisfy all three *Axon* jurisdiction factors. *First*, Perdue is challenging the unconstitutional structure of the Pending Administrative Proceedings, not the remedies being sought therein, so the harm from having to adjudicate in a structurally unconstitutional forum is not remediable afterwards. *See id.* at 191 ("[B]eing subjected to unconstitutional agency authority" is a "here-and-now injury" that is "impossible to remedy once the proceeding is over."). As in *Axon*, this no different than a right "not to stand trial" that is

6

"effectively lost" if review is deferred until after trial. *Id. Second*, Perdue's constitutional challenges to the ALJ's authority are entirely collateral to the merits of Howell's FSMA claims against Perdue. *Id.* at 193. *Third*, the ALJ expressly ruled that Perdue's constitutional challenge is beyond the OALJ's expertise and thus declined to consider any challenge to its authority.

17.    This Court has the authority to grant injunctive and declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and its inherent equitable powers.

18.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B). The individual governmental Defendants are acting in their official capacity as officers of an agency of the United States, and the federal agencies exercise authority in this District. A substantial part of the events or omissions giving rise to Perdue's claims occurred within this District. Howell's farm is located in Fairmont, North Carolina, within this District, and most of the pertinent facts and events at issue in the administrative action took place there. ALJ Kultgen has scheduled the evidentiary hearing on the merits of Howell's claims to be held in Fayetteville, North Carolina, located within this District.

**PARTIES**

19.    Plaintiff Perdue is a privately held Maryland corporation with its principal place of business in Salisbury, Maryland. Perdue is an integrated poultry producer engaged in business throughout the United States. It maintains multiple facilities in North Carolina and contracts with independent chicken growers in North Carolina and in other states.

20.    Defendant Julie Su is the Acting Secretary of Labor. She is statutorily responsible for investigating and adjudicating complaints filed pursuant to the FSMA. She is sued in her official capacity.

21. Defendant Pamela Kultgen is the ALJ presiding over *Howell v. Perdue Farms Inc.*, No. 2022-FDA-00004 pending before the DOL's OALJ. She is sued in her official capacity.

22. DOL is an agency of the federal government that, among other things, is statutorily tasked with investigating and adjudicating complaints filed pursuant to the FSMA. 21 U.S.C. § 399d(b).

23. OALJ is responsible for adjudicating complaints filed pursuant to the FSMA.

24. Defendant Rudy Howell resides in North Carolina, in this District. Howell owns and operates the Robert Miller poultry farm in Fairmont, North Carolina.

**BACKGROUND**

I.      **Howell's Agreement with Perdue.**

25. Perdue is an integrated poultry producer engaged in business throughout the United States. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model). Within this integrated operation, Perdue owns hatcheries and breeding flocks. It delivers its chicks to independent contract growers, such as Howell. Independent growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *See id.*

26. Howell is a farmer who raised chicks for Perdue under a standard independent-contractor agreement (the "Agreement"), in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See id.* at 684-85; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement imposed upon Howell, *inter alia,* extensive requirements to protect the well-being of the poultry.

27. Howell's Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. The Agreement provided that Perdue would consign chicks and provide feed, fuel, medications, vaccinations, and

8

other supplies to Howell. In exchange, Howell agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. Typically, chicks would be raised by contractor farmers for several weeks before removal.

28.    For years, Howell complained about the amount and system of compensation he had accepted in his contract with Perdue. Eventually, dissatisfied by the lack of improvement, Howell adopted a strategy utilized by his friend, Craig Watts, also an independent contractor farmer for Purdue. As Perdue has alleged in the Watts Administrative Proceedings and in the First USDCT Action, in 2014, Watts invited an animal rights group to his farm to film his flock of Perdue chicks in sick and inhumane condition, blaming Perdue even though an independent investigation concluded that the chickens' condition was his responsibility alone.

29.    Howell reprised Watts' ploy. In July 2020, Howell invited non-governmental self-proclaimed "public health advocates," as well as a filmmaker from the animal rights organization, We Animals Media ("WAM"), onto his farm in the middle of the COVID-19 pandemic to film a group of chicks in apparent sick and inhumane condition, that he had deliberately let suffer for weeks. Nine days after this visit, WAM posted a description of the visit to Howell's farm, describing chickens in deplorable condition and how Howell had permitted the filmmaker to remove those chicks (one of which died shortly after leaving Howell's farm). A few days later, on July 29, 2020, Howell again permitted non-governmental "public health advocates" and another film crew to access his farm, and the next day, July 30, 2020, WAM posted the video footage of the visit to Howell's farm. Despite the pandemic, it was evident from the video and an ensuing article about the filmmakers' visits that neither Howell nor any of the visitors was masked or followed the CDC recommendations for 6-ft. social distancing, which Perdue's independent growers were requested to follow at that time.

9

30.    Critically, Howell failed to include any information about any of the visitors on the visitor sheets for his farm. Only one of the visitors even signed in as a visitor. This was in clear violation of Perdue's poultry welfare and bio-security programs and COVID-19 protocols. Allowing non-essential unmasked visitors into the chicken houses recklessly placed at risk Perdue's employees (flock advisors, transporters, and technical employees) and Perdue's flock.

31.    On August 20, 2020, Perdue notified Howell that it was invoking the termination terms of the Agreement, which permitted either party to terminate the Agreement "for any reason" so long as 90 days' prior written notice is provided to the other party. Perdue explained to Howell that, by hosting touring groups of visitors inside his poultry houses, he had violated Perdue's poultry welfare and bio-security programs, as well as the COVID-19 protocols put in place. Rather than place more birds in Howell's facility given his disregard for Perdue's safety protocols, Perdue provided Howell with a lump-sum payment to cover the average profit he could have netted during the 90-day period. In response, Howell filed a retaliation claim in OSHA under FSMA, claiming that Perdue terminated his contract in retaliation for his alleged protected activity.

## II.    The Pending Administrative Proceedings.

32.    The FSMA provides whistleblower protections for employees of entities engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food that is subject to the Food, Drug, and Cosmetic Act ("FDCA").

33.    On February 11, 2021, Howell filed his OSHA Complaint for alleged unlawful employment retaliation by Perdue against his involvement in the WAM video, as well as his alleged reports of purportedly unsanitary conditions. Colaizzi Decl. Ex. 1, OSHA Compl. ¶¶ 22-36. Howell alleged that, based on his prior alleged "reports" of bad food, high cull rates, non-

10

functioning scales, and dirty trays, which he subsequently reported to the tour groups he permitted on his farm, he was subjected to adverse employment actions. *See id.* ¶¶ 34-43.

34.    The OSHA Complaint sought compensatory damages for "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." *See id.* § IX, Prayer for Relief ¶¶ C, D, E, & J.

35.    On January 27, 2022, OSHA sent Howell's counsel a letter informing Howell that, as 210 days had passed since Howell had filed his OSHA Complaint, Howell had the right under FSMA to file his claim in federal court. *See* Colaizzi Decl. Ex. 3, OSHA Letter at 1. Its letter reported a conversation with Howell's counsel in which counsel stated that Howell's case would be refiled in federal district court, so OSHA informed Howell that, as a result, it was suspending its investigation. *See id.* OSHA further advised that Howell had thirty days to file his case in federal court. *See id.* Thirty days came and went, and Howell never filed his OSHA Complaint in federal court.

36.    On April 8, 2022, DOL dismissed the OSHA Complaint based upon the findings of an OSHA regional investigator. Colaizzi Decl. Ex. 4, OSHA Findings. DOL determined that there was "no reasonable cause to believe" that Perdue had violated FSMA because (a) Perdue's activity in raising chickens did not fall within the scope of the FDCA, and (b) under the test established in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), and a moderately different "right-to-control" test—both of which DOL uses to determine employee status under whistleblower statutes—Howell was not Perdue's employee. *Id.* at 1-2.

37.    On May 6, 2022, Howell appealed OSHA's findings to the OALJ and filed an amended ("restated") complaint. *See* Colaizzi Decl. Ex. 5, Howell OSHA Objs. and Restated

11

JA560

Complaint (the "Restated Complaint"). His Restated Complaint attempted to align, at least in part, with a supplemental complaint filed by Watts in the Watts Administrative Proceedings. It sought the same compensatory damages as before, namely "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." *See id.* § IX, Prayer for Relief ¶¶ C, D, E, & J.

38.    Perdue moved to dismiss Howell's Restated Complaint because Howell was not an "employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's requirements, and Howell had failed to allege any act of retaliation by Perdue. On December 14, 2022,  ALJ Kultgen denied Perdue's motion. Colaizzi Decl. Ex. 6, OALJ Dec. and Order.

39.    Discovery ensued. A five-day merits hearing in the Pending Administrative Proceedings was scheduled to commence on March 17, 2025, but Perdue and Howell moved to extend the deadlines in light of this impending action and accompanying motion for preliminary injunction.  On September 25, 2024, ALJ Kultgen amended the scheduling order and rescheduled the hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. *See* Colaizzi Decl. Ex. 7, Scheduling Order (September 25, 2024).  Pursuant to the ALJ's latest scheduling order, discovery is set to close on March 7, 2025, and a multi-day merits hearing is scheduled to commence on June 23, 2025 in Fayetteville, North Carolina. *Id*.

**III.    The Watts Administrative Proceedings.**

40.    Apart from some factual variations, the Pending Administrative Proceedings are substantively identical to the Watts Administrative Proceedings in all material respects relating to the constitutional issues raised in this action and in the First USDCT Action.

12

41.    The Watts Administrative Proceedings concerned a similar dispute between Perdue and another one of its independent contractors, Craig Watts, who owns and operates farms in North Carolina and raises chickens for Perdue as an independent contractor, just like Howell. Watts' dispute with Perdue antedates Howell's dispute with Perdue, and Watts engaged in a similar scheme of raising a flock in deplorable condition and then inviting an animal rights group onto his farm to tape and publicize the results. After Perdue took modest remedial action, Watts, just like Howell, alleged retaliation by Perdue in violation of FSMA's whistleblower activities on his farms.

42.    Perdue attempted to take third-party discovery from the animal rights group and others regarding the visit and the preparation of the video taken of the condition of the chicks on Watts' farm. *See* Colaizzi Decl. Ex. 2, First USDCT Action Compl. ¶ 41. ALJ Kultgen quashed Perdue's request for third-party subpoenas, ruling that DOL's statutory procedures do not provide ALJs with authority to issue subpoenas. *Id.* Perdue moved for reconsideration, explaining that the lack of discovery violated due process, and, in the alternative, requested leave for interlocutory appeal, but ALJ Kultgen denied this motion as well. *Id.*

43.    In both administrative proceedings:

- Complainants seek legal remedies (*i.e.*, compensatory damages) for Perdue's alleged violations of the FSMA.

- Complainants have elected to adjudicate their FSMA claims in an administrative proceeding before the OALJ and have not (yet) kicked them out to an Article III court.

- ALJ Kultgen is presiding, and the same attorneys represent Howell and Watts.

- To mount a proper defense against these claims, Perdue needs third-party subpoenas to obtain discovery and evidence regarding the visits made to the farms by the animal rights and/or "public health advocates" and their video footage.

## IV.    *Jarkesy I* and *II.*

44.    On June 27, 2024, the Supreme Court issued its landmark ruling in *Jarkesy II*.

13

45.     In light of *Jarkesy II*, on July 19, 2024, Perdue wrote to the ALJ apprising her of the decision and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to seek leave to amend its answer based upon *Jarkesy I* and *II*. *See* Colaizzi Decl. Ex. 2, First USDCT Action Compl. ¶ 42. Despite the extraordinary circumstances, the ALJ denied Perdue's request for a temporary stay and further denied Perdue's request to amend its answer to request a jury trial and to add defenses arising under *Jarkesy I* and *II*. She ruled that ALJs "'lack the power and authority to decide constitutional questions" and thus "cannot and will not grant any motion to dismiss on constitutional grounds.'" *Id.* Even though the order denied Perdue's motions before the motion was ever filed, it allowed Perdue to file its motions to preserve Perdue's positions for appellate consideration. *Id.*

46.     On July 29, 2024, Perdue moved to dismiss the Watts Administrative Proceedings for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* and further moved for leave to amend its answer. *Id.* ¶ 44. On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and for leave to amend, again ruling that she lacked authority to decide constitutional questions and could not grant the requested relief. *Id.* ¶ 45. She did, however, grant the parties' joint request to extend the discovery cut-off and merits hearing date by six months to allow the First USDCT Action to adjudicate Perdue's motion for preliminary injunction.

47.     On August 20, 2024, Perdue filed the First USDCT Action against Acting Secretary Su, ALJ Kultgen, DOL, and the OALJ, along with a motion for preliminary injunction seeking to halt the Watts Administrative Proceedings.

### V.     The Unconstitutionality of the OALJ Proceedings against Perdue.

48.     The Pending Administrative Proceedings are unconstitutional under *Jarkesy I* and *II*. Even though the OALJ is well aware of the constitutional bars, it declined to act upon them in

14

either the Watts or the Pending Administrative Proceedings because, it says, administrative agencies are powerless to consider their lack of constitutional power to enforce the laws they administer.

49.     The ALJ's refusal to consider whether her proceeding is unconstitutional vividly shows why Article I courts are not proper tribunals to adjudicate claims that sound in law and involve private rights.  By declining to address, let alone apply, clear Supreme Court authority (*Jarkesy II*) holding that the Pending Administrative Proceedings are unconstitutional, the ALJ is knowingly forcing Perdue to submit to an illegal adjudication.

50.     The ALJ proceedings thus are unconstitutional and violate Perdue's rights.

51.     The first reason that the Pending Administrative Proceedings are unconstitutional is that they violate Perdue's Seventh Amendment right to a jury trial. "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency[.]" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989). *Jarkesy II* holds that claims like Howell's claims against Perdue, which seek compensatory damages for, *inter alia*, emotional distress, business losses, and backpay, as well as FSMA penalties of attorney's fees and costs, sound in law, not equity, and amount to a suit at common law and entitle Perdue to the protections of the Seventh Amendment. *See Jarkesy II,* 144 S. Ct. at 2128-31. OALJ proceedings do not allow for a jury trial. Allowing the claims to be tried by an ALJ without a jury would thus violate Perdue's constitutional rights and should be enjoined.

52.     The second reason the Pending Administrative Proceedings are unconstitutional is that they violate Article III and thus violate the separation of powers. Article III provides that the judicial power of the United States is vested "in one supreme Court, and in such inferior Courts as

15

the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Also pursuant to Article III, this judicial power "extend[s] to all Cases, in Law and Equity, arising under … the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. Congress may not grant judicial power "on entities outside Article III." *Stern v. Marshall*, 564 U.S. 462, 484 (2011). The Article III judicial power protects all private rights, such as life, liberty, or property; these may be adjudicated only in Article III courts, and not by administrative agencies. Because lawsuits seeking money damages "implicate the core private right to property[,]" they must be brought in an Article III judicial forum and cannot be heard by an Article I administrative tribunal. *See Axon*, 598 U.S. at 204 (Thomas, J., concurring).

53.    The third reason that the ongoing proceedings are unconstitutional is that the ALJ is insulated from the President's supervision by two levels of for-cause removal protection. The Secretary of Labor may remove ALJ Kultgen "only for good cause established and determined by the Merit Systems Protection Board ["MSPB"] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). MSPB members similarly may be removed by the President only for cause, *i.e.*, they "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). This double layer of for-cause removal violates Article II of the Constitution, which grants the power to execute federal law to the President "alone." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). Under Article II, the President must have adequate "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 514-15 (2010). One layer of insulation from Presidential plenary power is acceptable, but two layers are not. *Id.* at 515; *see also Seila Law*, 591 U.S. at 213. Thus, the double layer of removal protection currently afforded to ALJs in the OALJ

16

does not grant the President removal authority required by Article II and precludes further litigation under that scheme.

54.    Perdue has been injured by the lack of proper oversight over the OALJ. The ALJ is presiding over a proceeding that is allegedly illegal without stopping to assess and address its illegality in the face of binding Supreme Court precedent. In the Watts Administrative Action, the ALJ not only refused to consider the constitutionality of the proceedings, but denied leave to allow Perdue to amend its answer to add these constitutional defenses and to request a jury trial. Perdue therefore is directly affected by a lack of proper oversight over the ALJ.

55.    The fourth reason that the ongoing proceedings are unconstitutional is that they exceed legislative authority under Article I by violating separation of powers and the nondelegation doctrine. FSMA accords private parties such as Howell unfettered discretion whether to proceed in an Article I court or whether to kickout his claims to an Article III U.S. district court. Indeed, FSMA accords Howell this unilateral kickout power twice, first if OSHA does not reach a final decision on his claims within 210 days of the filing of his complaint, and again within 90 days after the Secretary of Labor renders her final decision in the matter. 21 U.S.C. § 399d(b)(4)(A). Because the federal proceedings are *de novo*, *id.*, this second kickout right gives Howell, but not Perdue, the unfettered right to treat the lengthy administrative process (*i.e.*, the ALJ hearing, ARB review, and final DOL decision) as if it never happened. Once removed to federal court, either party may demand a trial by jury. *Id.* Under the nondelegation doctrine, Congress may not delegate its legislative power to a non-legislative party to determine whether a matter belongs in an Article I or Article III court without providing an "intelligible principle" to guide the exercise of that power. *See Jarkesy I*, 34 F.4th at 459, 462-63. Here, the FSMA provides no such "intelligible principle" and instead allows *a private litigant*, Howell, the unilateral and

17

plenary power to decide whether his claims will be heard in an Article III court, with full due-process protections, and be subject to trial by jury, without affording any such authority to his adversary party, Perdue.

56.    The fifth and final reason that the ongoing proceedings are unconstitutional is that they violate due process. Perdue lacks the right to subpoena third parties for testimony and documents, depriving it of the basic right to discover facts concerning the key evidence in the case. *See Souch v. Califano*, 599 F.2d 577, 580 (4th Cir. 1979) (holding that an ALJ's failure to issue a subpoena for testimony and documents underlying key adverse evidence violates claimant's due process rights). OALJ's ALJs "have broad discretion to limit discovery in order to expedite the hearing." 29 C.F.R. § 1987.107(b). Neither the Federal Rules of Evidence nor any other "[f]ormal rules of evidence" may be applied by the ALJ at the merits hearing. 29 C.F.R. § 1987.107(d). The ALJ has not been confirmed by the U.S. Senate as meeting the high standards expected from an Article III judge to exercise judicial power and preside over a trial. She has ruled that she lacks authority and will not consider fundamental constitutional questions concerning subject-matter jurisdiction, in stark contrast to an Article III court's inherent judicial authority to determine whether actions by Article I officers violate the Constitution. *See Marbury v. Madison*, 5 U.S. 137, 176-78 (1803). As *Marbury* aptly put it, "[t]his is of the very essence of judicial duty." *Id.* at 178.

57.    Each of those violations of fundamental fairness is compounded by DOL's right under its own regulations to join the proceedings at any time and effectively serve as both litigant/prosecutor and adjudicator/ultimate decision-maker in a single matter. Under 29 C.F.R. § 1987.108(a)(1), the Assistant Secretary for OSHA has plenary discretion to "participate at any time at any stage of the proceeding" as either a party or as an amicus curiae, including the right to petition for review of an ALJ decision or an ALJ's approval or disapproval of any settlement

18

between the parties. Depending on the stage of the proceedings, a settlement between the parties must be approved by OSHA, the ALJ, or the ARB, respectively. 29 C.F.R. § 1987.111(a), (b), & (d). Finally, for good cause or under "special circumstances not contemplated" in the regulations (which are undefined and thus unbounded), both the ALJ and the ARB may waive any rule or regulation governing their respective proceeding. 29 C.F.R. § 1987.115.

58.     Perdue's private adversary, Howell, has unfettered discretion and absolute control over which tribunal will hear his claims. No comparable right extends to Perdue. Adding insult to injury, if he loses in the DOL, Howell has the further right to refile his claims in federal district court for *de novo* proceedings, until 90 days after the Secretary's final ruling, giving him (but not Perdue) an outrageous advantage of testing the Article I waters and then removing the claims to federal court should he ultimately decide that he might fare better if given a second chance by litigating in a different forum.

59.     The Supreme Court has made it perfectly clear that the deprivation of a constitutional right constitutes an irreparable injury, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and that the time to review and resolve such constitutional violations is now. *Axon*, 598 U.S. at 191. *Axon* holds that federal district courts should rule on constitutional challenges to agency enforcement proceedings to prevent "here-and-now" injuries that "cannot be undone" through appellate review, and thus must be ruled upon as they arise. *Id.* Under *Axon*, the proceedings should be enjoined, as appellate review following a final decision by the Secretary cannot remedy the constitutional violations, nor can the unconstitutional nature of the proceedings be severed to redress the injury without affecting the adjudication.

19

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE SEVENTH AMENDMENT**
**Against All Defendants**

60.　Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

61.　The Seventh Amendment entitles parties to a jury trial of claims that are "'legal in nature.'" *Jarkesy II*, 144 S. Ct. at 2128 (citation omitted).

62.　Howell's claims against Perdue are legal in nature because they are akin to an 18th century common-law claim for breach of action or a personal-injury tort claim for damages, and because he seeks compensatory damages, including damages for emotional distress and reputational harm, business losses, and backpay, and penalties under the FSMA for attorney's fees and costs. *See id.* at 2129 (describing "money damages" as a "prototypical common law remedy").

63.　The value in controversy exceeds twenty dollars.

64.　Howell's claims against Perdue seeking a personal award of money damages do not fall within the narrow "public rights" exception to the Seventh Amendment's right to a jury trial. *See id*. at 2131-34.

65.　ALJ Kultgen's impending adjudication of Howell's claims, scheduled to commence in less than nine months, on June 23, 2025, will violate Perdue's Seventh Amendment right to a trial by jury and thereby constitute an irreparable "here-and-now" harm to Perdue.

### COUNT II

**VIOLATION OF ARTICLE III**
**Against All Defendants**

66.　Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

20

67.     Because Howell is seeking compensatory damages and penalties, and further seeks to adjudicate the parties' private contract rights, Perdue's private rights are at stake in the Pending Administrative Proceedings.

68.     Claims involving private rights cannot be removed from the jurisdiction of the Article III courts. Howell's claims and requested relief address private rights and thus implicate the judicial power, which Article III of the Constitution vests exclusively in the federal courts. By adjudicating the claims before an Article I ALJ and subsequent administrative review and decision, Howell's election to proceed in the OALJ usurps what the Constitution leaves to the exclusive jurisdiction of Article III courts.

69.     Howell's claims do not implicate administrative expertise or efficiency. They do not require administrative adjudication, nor are they uniquely suited to administrative adjudication, as similar "actions are commonly considered by federal courts or without the federal government's involvement." *Jarkesy I*, 34 F.4th at 459.

70.     Accordingly, ALJ Kultgen and DOL's continued administrative adjudication of Howell's claims violates Article III of the Constitution and constitutes an ongoing irreparable harm to Perdue.

## COUNT III

**VIOLATION OF THE PRESIDENT'S REMOVAL AUTHORITY UNDER ARTICLE II**
**Against All Defendants**

71.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

72.     Article II of the Constitution provides that the President must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and vests the President with the sole "authority to remove those who assist him." *Free Enter. Fund*, 561 U.S. at 513-14.

21

73. DOL ALJs are "inferior officers" within the executive branch of the United States subject to the President's removal authority.

74. The Secretary of Labor may remove ALJ Kultgen "only for good cause established and determined by the [MSPB]." 5 U.S.C. § 7521(a).

75. MSPB members, in turn, may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

76. Accordingly, even though she is exercising executive authority, two levels of for-cause removal protections insulate ALJ Kultgen from presidential control, which violates Article II of the Constitution and irreparably harms Perdue.

77. This violation of Article II is not severable or mitigable. Per *Axon*, it inflicts an actionable "here-and-now" injury.

78. Perdue is thus entitled to relief "to ensure that the [legal] standards to which [Perdue is] subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.

## COUNT IV

### VIOLATION OF NONDELEGATION DOCTRINE
### AND SEPARATION OF POWERS UNDER ARTICLE I
**Against All Defendants**

79. Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

80. Under the separation of powers required by the Constitution, Congress may delegate legislative authority to an administrative agency only if it provides an "intelligible principle" by which that agency can exercise that power. *See Jarkesy I*, 34 F.4th at 459, 462-63.

81. The FSMA provides no such "intelligible principle." Once 210 days have lapsed since Howell filed his initial complaint, under FSMA, Congress grants to Howell—not even an administrative agency—unfettered discretion to adjudicate his FSMA claims in either an administrative proceeding before the OALJ with up to two further levels of DOL administrative review, or in federal court with a mutual option to elect a trial by jury. That right re-vests for 90 additional days after the Secretary of Labor issues her final decision, when Howell may move his claims to an Article III federal court for *de novo* adjudication—giving him, but not Perdue, the unfettered right to a do-over should he receive an adverse result in the Pending Administrative Proceedings. Despite vesting legislative power in a private party to select between an Article I and an Article III tribunal, Congress failed to provide any standard, guidance, or intelligible principle on how that party should exercise its discretion.

82. Congress has exceeded its Article I authority by delegating to a third party, in this case a private party (Howell), the power to choose (twice, at separate junctures) whether to keep an action before the DOL or to move it to an Article III court.

83. Congress's delegation of authority to a private party, unconstrained by an intelligible principle, to decide whether to subject his private dispute with Perdue to administrative adjudication, violates Article I of the Constitution, the separation of powers required by the Constitution, and the nondelegation doctrine limiting congressional authority.

84. The FSMA statutory scheme constitutes a more egregious violation of the nondelegation doctrine than did the securities laws at issue in *Jarkesy I*. There, the third party was a different government agency, the SEC. Here, Howell is an adverse private-party litigant, who has been vested with unfettered, plenary discretion, without any controlling limit or principle, to deny Perdue its statutory option under the FSMA and constitutional rights under the Seventh

23

Amendment to have a jury hear and decide its case. In exercising this unfettered power, Howell has a 100% personal financial interest in securing the maximum possible judgment without any accountability to anyone or any guiding intelligible standard to limit his exercise of that authority.

85.    The FSMA's violation of the separation of powers and the nondelegation doctrine thus violates the Constitution and constitutes an ongoing irreparable harm to Perdue.

## COUNT V

### VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE
**Against All Defendants**

86.    Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

87.    The OALJ's purported lack of statutory power to issue third-party subpoenas facially violates Perdue's due-process rights under the Fifth Amendment and materially impairs Perdue's ability to defend itself in the OALJ proceeding. This harm is especially acute as applied in this case, where Perdue needs third-party subpoenas to investigate key facts in the case—the visits and video footage filmed on Howell's farm that constitute the heart of Howell's retaliation claims against Perdue. Moreover, under DOL regulations, the ALJ has broad discretion to limit discovery in order to expedite the merits hearing.

88.    The acute harm from a lack of basic discovery of documents and testimony about key evidence in the case could be compounded by the inapplicability of the Federal Rules of Evidence, creating substantial uncertainty as to what evidentiary rules will govern the Pending Administrative Proceedings.

89.    If the action had been brought in an Article III court, as is constitutionally required, Perdue would be granted subpoena power and full discovery rights, and would be granted the full constitutional protections afforded by Article III courts.

90.    Due process is denied when an ALJ relies upon certain evidence as the basis for their decision yet denies a request to subpoena documents or testimony directly related to that evidence and potentially undermines it. *See Souch v. Califano*, 599 F.2d 577 (4th Cir. 1979).

91.    Due process is further denied by the statutory scheme in FSMA, which accords an adverse private party, Howell, unfettered discretion to control whether Purdue can adjudicate its defenses in an Article III court and try them before a jury. FSMA even provides Howell—but not Perdue—the right to redo the case in an Article III federal court should he lose in the DOL.

92.    Because FSMA authorizes Howell, a private third-party adverse actor, to choose whether Perdue is afforded the protections of an Article III court; whether Perdue is given the opportunity to defend itself in front of a neutral Article III judge who meets constitutional requirements; whether to erase an adverse result in the DOL by moving his claims to federal court for *de novo* review; and whether or not Perdue can access its Seventh Amendment right to a jury trial, the Pending Administrative Proceedings violate Perdue's due-process rights by implicating fundamental questions of fairness.

93.    FSMA also accords DOL a right to participate at any time and then become both prosecutor and adjudicator, including the rights to petition for review of ALJ orders and to approve or disapprove of settlements between the parties. By allowing DOL to participate in multiple roles, the statutory scheme violates Perdue's due-process rights to a fair and impartial adjudicator.

94.    The ALJ's prior ruling in *Watts* that she lacks any authority to consider constitutional challenges to her authority further violates Perdue's due-process rights, as it deprives Perdue of an adjudicator who can fulfill "the very essence of judicial duty." *Marbury*, 5 U.S. at 178. Requiring a litigant to endure years of illegal, unconstitutional litigation because the tribunal

25

declares that it lacks power to halt its own extra-jurisdictional proceedings is fundamentally unfair and thus violates due process.

95.    This one-sided, fundamentally unfair scheme is inherent in the underlying proceedings and thus constitutes an ongoing irreparable harm to Perdue and should be enjoined.

## PRAYER FOR RELIEF

For these reasons, Perdue respectfully requests that this Court:

1. Enjoin the governmental Defendants from continuing the pending ALJ proceedings against Perdue;

2. Declare that the Pending Administrative Proceedings against Perdue are unlawful and that the governmental Defendants may not proceed with such proceedings;

3. Award such other and further relief as this Court may deem just and proper, including but not limited to reasonable attorney's fees and costs.

Dated: October 18, 2024                    Respectfully submitted,


                                        _____/s/Margaret Santen_____
                                        Margaret Santen
                                        N.C. Bar No. 52927
                                        Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                                        201 South College Street, Suite 2300
                                        Charlotte, NC 28244
                                        704-405-3119
                                        maggie.santen@ogletree.com

                                        Vanessa N. Garrido
                                        N.C. Bar No. 53470
                                        Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                                        8529 Six Forks Road, Suite 600
                                        Raleigh, NC 27615
                                        919-789-3194
                                        vanessa.garrido@ogletree.com

                                        *Local Civil Rule 83.1(d) Attorneys for Plaintiff*


26

Roger A. Colaizzi (notice of special appearance to be filed)
Kristin M. Koger (notice of special appearance to be filed)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (notice of special appearance to be filed)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

27

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **PERDUE FARMS INC.,** <br><br>        Plaintiff, <br><br> v. <br><br> **JULIE SU**, in her official capacity as Acting Secretary of the U.S. Department of Labor, et al., <br><br>        Defendants. | **DECLARATION OF ROGER A. COLAIZZI IN SUPPORT OF PLAINTIFF PERDUE FARMS INC.'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

I, Roger A. Colaizzi, declare as follows:

1.  I am an attorney at Venable LLP.  I offer this Declaration in support of Plaintiff Perdue Farms Inc.'s Complaint for Declaratory and Injunctive Relief.

2.  Attached hereto are true and correct copies of the following exhibits:

| Ex. No. | Description |
|---------|-------------|
| 1 | Notice of Whistleblower Complaint (February 11, 2021) |
| 2 | First USDCT Action Complaint (August 20, 2024) |
| 3 | OSHA January 2022 Letter (January 27, 2022) |
| 4 | OSHA Findings (April 8, 2022) |
| 5 | Howell OSHA Objections and Restated Complaint (May 6, 2022) |
| 6 | ALJ Decision and Order (December 14, 2022) |
| 7 | September 2024 ALJ Scheduling Order (September 25, 2024) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of October 2024 in Washington, DC.

/s/Roger A. Colaizzi
Roger A. Colaizzi

# Exhibit 1

UNITED STATES DEPARTMENT OF LABOR

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

*In the Matter of*

---

**RUDY HOWELL,**                          )
    *Complainant,*                       )
*v.*                                               )     Case No.
**PERDUE FARMS, INC.,**              )
    *Respondent.*                        )

---

## COMPLAINT OF RETALIATION

Complainant, Rudy Howell, through his counsel the Government Accountability Project, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d against Respondent Perdue Farms, Inc. Complainant was unlawfully retaliated against by Respondent Perdue Farms, Inc. when Complainant made protected disclosures regarding Perdue's insanitary conditions and threats to food safety.

## I.     INTRODUCTION

1. This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d by Complainant, Mr. Rudy Howell, against Perdue Farms, Incorporated (hereafter "Respondent" or "Perdue Farms" or "Perdue"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent via letter dated August 18, 2020, in retaliation for activity protected under the above statutes. Complainant first received notice of this retaliatory action on August 20, 2020.

1

Complaint of Retaliation

## II.    JURISDICTION

2.    This Complaint was timely filed within 180 days of notice of the adverse actions complained of herein. OSHA has jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below. OSHA has jurisdiction over Respondent as a covered entity by the Food Safety Modernization Act and over Complainant as an employee of Respondent.

### A.    Perdue is a Covered Entity by the Food Safety Modernization Act (FSMA).

3.    The FSMA's whistleblower provision protects employees of covered entities which are engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importing of food. 21 U.S.C. § 399d(a); 29 C.F.R. § 1987.101(d). The FFDCA defines "food," in part, as "(1) articles used for food or drink in man or other animals ..." and (3) "articles used for components of any such article." 21 U.S.C. § 321(f). "Food" includes live food animals. 21 C.F.R. §§ 1.377, 1.227, 1.276(b)(5)(ii). Under the FFDCA, the term "food" includes both (a) animal feed, *see, e.g.*, *Watts v. Perdue Farms, Inc.*, No. 2017-0017, at 6 (D.O.L. Admin. Rev. Bd. May 28, 2020), -and- (b) live animals intended for human consumption, *see, e.g.*, *Morales Sanchez v. New Fashion Pork, LLC*, No. 2020-0004 (A.L.J. Order Nov. 3, 2020

4. Respondent Perdue Farms, Inc. is a U.S. food and agricultural products company headquartered at 31149 Old Ocean City Rd, Salisbury, MD 21804-1806. Perdue Farms, Inc. is one of the nation's largest producers of chicken and turkey. It also produces beef, lamb, and pork products. It operates live productions and processing facilities in about fifteen U.S. states. Perdue Farms slaughters nearly 700 million chickens every year. For the fiscal year closing March 2020, Perdue Farms posted $7.1 billion in revenue. Respondent Perdue may be contacted through its

2

Complaint of Retaliation

counsel Clayton E. Bailey, Bailey Brauer PLLC, Campbell Centre I, 8350 N. Central Expy, Suite 650, Dallas, TX 75206, Tel 214 360 7433, cbailey@baileybrauer.com.

5. Respondent Perdue Farms works with a network of farmers and ranchers across the U.S. to create its products. Networks are comprised of cattle ranchers, sheep farmers, hog farmers and poultry farmers who must follow a specific and strict set of farming protocols to raise livestock for the Perdue brands.

6. Respondent Perdue is a covered entity subject to the provisions of the FSMA. Perdue manufactures, processes, transports, receives, holds, and distributes 'food' within the meaning of 21 U.S.C. § 399d(a). First, the chickens that Perdue holds for use as human food constitute food within the meaning of the FFDCA. Second, Perdue manufactures, receives, and/or holds "articles used for food or drink for" the chicken that it is raising. Respondent supplies Complainant with both chickens and chicken feed. Both the chickens (as an article used for food in man) and the chicken feed (as an article used in food for other animals) that Perdue provides to Howell are considered "food" under the FFDCA.

**B. Complainant is an Employee of Respondent Covered by the Whistleblower Protections Granted Under FSMA.**

8. Howell owns and operates the Robert Miller poultry farm in Fairmont, North Carolina. For over 25 years, Howell was contracted exclusively to Respondent to raise chickens for them pursuant to an "Poultry Producer Agreement." Respondent awarded Howell "Top Producer" several times. Respondent never disciplined Howell, nor audited him for any potential non-compliance or performance issues, prior to his sudden retaliatory termination.

9. As of July 2020, Howell reported to Perdue Flock Supervisor Dean

3

Complaint of Retaliation

Shuttleworth. Flock Supervisor Shuttleworth reported to Perdue's Live Production Manager Lyn Price. Perdue's Live Production Manager Price reported to Perdue's Plant Manager Randy Brown. The Plant Manager reported to Perdue's Director of Live Production Tim Little.

10.     Today more than 90 percent of broiler chickens and most turkeys are raised by farmers under contract to poultry companies such as Perdue. These companies are referred to as "integrators" because of their integrated supply chain. Perdue represents to the farmers that its vertical integration provides unparalleled support to its poultry farmers, including: (1) A flock adviser providing ongoing guidance to help maximize the farmer's flock performance— and income; (2) Dedicated veterinarians for each of the growing regions, backed by Perdue's own animal health lab (3) A Technical Services Department that rivals many research universities and houses Perdue's experts in poultry health and nutrition; (4) Research to support continuous improvement in animal care. Perdue controls the stages of production through vertical integration including: 1. Breeder operations and contract farms; 2. Hatcheries; 3. Feed ingredient sourcing and feed mills; 4. Grow-out operations, including contract broiler and turkey farms; 5. Technical and veterinary services; 6. Harvesting and processing; 7. Marketing, sales and distribution.

11.     Respondent Perdue exerted an extreme level of control over Howell and his farm operations sufficient to operate as Howell's employer. Pursuant to their contract, Perdue selected and consigned chicks to Howell to raise. The contract granted Perdue the authority to determine the number and breed of chickens Howell raised, the time allowed for processing each flock, and placement for future flocks. The contract required that Howell only use feed, medication, vaccinations, or other supplies provided by or arranged by Perdue. Perdue maintained ownership of the chickens.

4

Complaint of Retaliation

12. In exchange, Howell agreed to accept the consigned chicks, and to feed, water, and care for them until the chicks were removed at Perdue's direction. Howell further agreed to use only the feed, medications, vaccinations, and other supplies Respondent Perdue provided. Respondent required Howell to house and tend the flocks in accordance with Respondent's standards. These standards imposed numerous requirements on the structure, outfitting, and maintenance of Howell's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional specific tasks to be performed on certain key dates during and in between the flocks' cycles.

13. Respondent assigned Howell a Perdue Flock Supervisor. Respondent checked in at least weekly and often twice a week on Howell's farm to ensure that Howell was maintaining the facilities and tending to flocks in accordance with Respondent's dictated standards. Perdue's agreement granted them the right to place Howell on a Performance Improvement Plan if Howell's flocks failed to achieve Perdue's minimum standards of competitiveness.

14. At the end of the chick's growth cycles, or roughly six (6) weeks after placement, Respondent removed the chickens. Perdue compensated Howell per flock based on rankings and ratings assigned in Respondent's "tournament system." Farmers are ranked against one another, and top-ranked farmers can be paid up to 50 percent more than the bottom ranked farmers. The ranking formula is mainly based on feed efficiency: how much weight the chickens gained, compared to how much feed the company supplied. Respondent reserved the right to pay as much, or as little, for each chicken based on their set standards that were mostly beyond Howell's control.

15. Howell had little control over the farm's poultry profit margins. Howell could not grow for, nor sell chickens to, any other poultry company because Respondent required Howell

5

Complaint of Retaliation

to house exclusively Respondent's chicks. Because Respondent delivered the type and number of chicks Howell was to grow, dictated the point of removal in the growth cycle, determined the quality and timing of feed, and determined the pay structure, Howell's profits were largely controlled by the Respondent. Respondent's tournament style rating and pricing system resulted in wide variations in Howell's profits.

16.    Evidenced by their fully integrated monopsony structure, and because Respondent's business is mass production and sale of poultry to the U.S. and international consumer market, Howell's role in raising chickens for Respondent is the most integral part of Respondent's business.

17.    Since his start with Perdue, Howell has participated in annual trainings and updates for poultry welfare. In recent years, Perdue Flock Supervisors have met with farmers on their farms to discuss any updates to the poultry welfare standards. Howell has implemented Perdue's poultry welfare requirements.

18.    Perdue has issued Management Guidelines to Howell for the conduct of farm operations. These guidelines cover a wide range of topics, including cleaning food pans, drinker lines, houses, and items like managing litter, applying insecticide, and cutting the grass. The Guidelines also address required twice daily walkdowns, specific temperature, lighting, and ventilation requirements.

19.    Perdue also issued "Biosecurity Never Evers and Dedicated Tos." These protocols centered around trying to prevent contamination of the flock from the outside world, especially from other flocks or individuals in contact with other flocks. The Dedicated Tos required proper cleaning and disinfection of all non-farm dedicated equipment prior to entering the chicken house and proper dress and disinfecting of individuals accessing the chicken house. The

6

Complaint of Retaliation

protocols also instructed farmers to allow only authorized visitors and to have all visitors comply with biosecurity requirements. Howell's most recent Farm Bio-security Risk Assessment Score was a 647, well above the Growing Area Average Risk Assessment score of 612 received by other farms.

20.    Perdue has not issued specific COVID-19 protocols for the poultry farmers like Howell.  On May 15, 2020, Perdue sent a letter to Howell informing him they intended to reduce flock placement density due to government regulations restricting business operations and travel and current poultry market conditions. In early 2020, as the COVID-19 pandemic spread into North Carolina, Perdue shared a video regarding company-wide safety issues in an email newsletter. The video pertained mostly to plant employees and gave no specific instruction to farmers regarding operations on-farm.

21.    In 2016, Perdue released an "animal welfare policy," disclosing its alleged current practices and representing to undertake future planned improvements to meet growing customer and consumer demand for poultry raised to higher welfare standards. One facet of the policy was committing to doubling the rate of activity of Perdue's birds within three years. Perdue's policy put forward, as one option to achieve this goal, the transition to breeds of birds that grow slower, and thus are capable of more activity, because selective breeding for rapid growth can cause immobility and animal suffering, including leg deformities and heart attacks. In July 2017, Perdue signed on to the "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues." As a result, Perdue promised its customers it would meet the animal welfare criteria consumers desired and demanded, including raising and studying these slower-growing chickens and strengthening relationships with farmers.

## III.    PROTECTED ACTIVITY

7

Complaint of Retaliation

22.     After being in business with Perdue Farms for some time, Howell began to recognize lapses of sanitation and health standards on the part of Perdue. He noted that Perdue was delivering poor quality feed and sickly chicks. He observed Respondent was careless and abusive with chickens, delivering chicks in filthy trays, failing to sanitize trailers and catch machines, and willfully dropping chickens on their heads during their weighing. He shared these and other concerns several times, first with Respondent and then with regulatory agencies, lawmakers, the media, and the public.

23.     In the mid- to late 2019 timeframe, Howell observed that he was having to cull uncharacteristically high numbers of sickly birds. On June 27, 2019, Howell recorded culling 148 birds in one house. He confirmed with other growers that they also were experiencing high cull volumes.

24.     Beginning in November 2019, Howell observed that the scales—used to determine when the maximum number of birds had been put in an individual cage for transport—were not functioning properly. The dangerous effect was that catch crews did not know how many birds were in the transport cages, and some cages were thus overfilled. - creating potential insanitary conditions and threatening animal welfare. Howell reported these insanitary conditions and threats to animal welfare to Perdue through his Live Haul Performance & Service Score report in November 2019, and again in January 2020, March 2020, and June 2020.

25.      Due to lack of redress, Howell began sharing his concerns with the media and, by extension, the public.  On March 14, 2020, *The Guardian* reported on Howell's food and feed safety concerns, including his reports that Perdue was sending the farmers low-quality feed

(including wet and moldy feed that endangered the health of the chickens) and that Perdue was sending farmers large numbers of sickly birds that had to be culled.

26.    On April 24, 2020, Howell sent photos of the dirty trays in which Perdue was delivering chicks to Perdue's Director of Live Production Tim Little. Having received no response, on April 30, 2020, Howell escalated his concerns to USDA Resident Agent Supervisor Wayne Basford. Howell noted that Perdue had delivered chicks in dirty trays, contrary to the company's stated policies for biosecurity and sanitation. Howell also reported he was concerned that Perdue's use of dirty trays for his chicks, specifically, may have been retaliation for his reports of concerns.

27.    On June 1, 2020, Howell reported sanitation issues with the catch machine. A catch machine uses rubber fingers on rotating drums to catch and move chickens into cages for loading onto a truck. Howell reported to Perdue via his Live Haul Performance & Service Score report that Perdue's catch machine was dirty and housed a dead chicken from a prior catch. He reported that Perdue's trailers also were dirty. These violations of Perdue's stated policies for biosecurity and sanitation presented cross-contamination threats to his flocks.

28.    On or around June 22, 2020, Crystal Coast Waterkeeper Larry Baldwin contacted Howell to request access to his farm and chicken houses for a group of public health advocates. As a Waterkeeper and part of the Coastal Carolina Riverwatch (hereinafter CCRW), Baldwin works with communities, businesses, and governmental agencies to stop the negative impacts of the swine and poultry industry. In furtherance of his efforts to oppose Respondent's practices, Howell agreed to meet with this group, share his concerns regarding animal welfare and public health, and collaborate to develop solutions.

Complaint of Retaliation

29. On June 27, 2020, Howell escalated his concern that Perdue was violating sanitation rules by delivering chicks in dirty, insanitary trays to Plant Manager Randy Brown. Howell also attached copies of the Live Haul Performance & Service Score reports recording his concerns about the contaminated trailer and catch machines. Brown told Howell that Brown would check with his Plant Manager and Live Haul Manager. However, Perdue did not respond further to Howell's concerns.

30. On June 30, 2020, Howell informed his flock supervisor, Dean Shuttleworth, of his visitors and requested four sets of coveralls for the visitors, consistent with biosecurity protocols. By providing Howell with disposable coveralls at Howell's chicken houses, Shuttleworth necessarily was aware of Howell's visitors.

31. On July 8, 2020, Howell hosted four public health advocates at the farm's chicken houses, including Waterkeeper Larry Baldwin, Lumber Riverkeeper Jefferson Currie II, Cape Fear Riverkeeper Kemp Burdette, and videographer for We Animals Media (WAM) Kelly Guerin. WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and organizations to use for animal welfare advocacy.  Howell and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols.

32. During the July 8, 2020 tour of the chicken house, Guerin videotaped the flock, and Howell informed the advocates of his ongoing concerns—that large numbers of the birds he had been receiving from Respondent were arriving sick and unviable, that he had to undertake a high volume of culling, and that there were insanitary conditions of transport and weighing. He discussed Respondent's lack of responsiveness. Howell specifically identified two birds designated to be euthanized because they were injured and/or too small to reach food and water

10

Complaint of Retaliation

freely. He demonstrated the procedure of cervical dislocation (basically a decapitation of the chick by hand) as a means to cull chickens. Guerin asked if she could take home with her two birds identified as "culls," who otherwise would not survive. Because chick mortality is a farmer-specific responsibility and not in violation of his contract with Respondent, Howell permitted her to take the chicks. An individual chick, even in perfect health, is valued at less than one dollar.

33.     On or around July 15, 2020, Baldwin asked for chicken house access for a second group of Waterkeepers and another film crew. Howell agreed and again contacted his flock supervisor to request disposable coveralls. His flock supervisor delivered the requested coveralls for the second set of public health advocates. On July 29, 2020, Baldwin, Currie, Haw Riverkeeper Emily Sutton, and three members of Lockwood Films visited Howell's chicken houses. Consistent with biosecurity protocols, all members of the group wore protective gear, either the coveralls provided by Perdue or unused Tyvek suits brought by the visitors. Howell and Simmons were both present, again, and ensured biosecurity protocols were followed. During this second visit, Howell reiterated his concerns that Perdue supplied him with large numbers of birds that were sick and unviable; that he had to undertake a high volume of culling; and that the chicken were subjected to insanitary conditions of transport and weighing.

34.     On July 17, 2020, We Animals Media posted a description of Guerin's visit to Howell's chicken houses to its Facebook page. The group noted that these chicken houses were usually inaccessible to anyone outside of the industry, but that they had been invited by the farmer to bring transparency to the poultry industry. Guerin reported observing a chick lying on the floor unresponsive and breathing heavily and another chick tinier than the others stumbling around with closed eyes and a beak encrusted with feces. Guerin described asking to rescue the

11

Complaint of Retaliation

two chicks, to which Howell agreed.  She detailed naming the lone surviving chick "Sweet Pea" and placing her with Piedmont Farm Animal Refuge.

35.     On July 30, 2020, We Animals Media published its footage of Howell's chicken houses in a documentary and a collateral written piece that exposed animal welfare and public health concerns associated with industrial poultry farming on its website. Howell expected that Perdue would review the video footage—and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's problematic animal husbandry practices. Howell also hoped and believed that the video's publication would prompt further investigation or other action by government officials. This video remains a key piece of advocacy material publicly available and maintained on We Animals Media's website: "Mass Culling: System Shutdowns and the Failures of Factory Faming" (available here: https://weanimalsmedia.org/2020/07/30/system-shutdowns-and-the-failures-of-factory-farming/).

36.     On August 4, 2020, Sentient Media published an article, "Despite Perdue's High Welfare Standards, Some Chickens Can't Survive 45 Days," which described Guerin's visit to Howell's chicken houses and some of Howell's concerns. The article noted that—despite Perdue's commitment to consumers in its 2016 animal welfare policy and 2017 "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues"—it was still growing sickly chickens unable to survive. Guerin reported her observations that Howell's chickens from Perdue were still crumbling under the burden of selective breeding; young chicks could take only a few steps before plopping down with their legs splayed behind them. Guerin reported that Howell had walked among the birds unable to stand and demonstrated the culling procedure. Guerin noted the culling by Howell was not an anomaly, but rather standard daily procedure that Perdue reminded the farmer to do, including in postings in his barn. Guerin reported Howell allowed her

Complaint of Retaliation

to try to rescue two dying chicks that Howell was otherwise going to euthanize under Perdue's standards. She noted that Howell reported that Perdue retaliated against farmers who speak out, including by sending them birds who are sicker, smaller, or hatched too late.

## IV. ADVERSE ACTIONS

36.     On August 18, 2020, with no prior warning to, inquiry of, or discussion with Howell, Respondent terminated Howell's 25-plus year relationship with Perdue. Perdue's stated cause for such action was the allegation that Howell "materially breached" his contractual obligations to Perdue over the "past several months" by "touring groups of visitors inside [his] poultry houses." Perdue claimed the presence of these visitors violated Perdue's Poultry Welfare and Bio-Security Programs and COVID-19 protocols. Perdue also claimed Howell "converted" Perdue's property without Perdue's consent.

## V. NEXUS/CONTRIBUTING FACTOR

37.      Howell reasonably believed his disclosures to the Respondent, public health advocates, and media crews were violations of the FFDCA/FSMA, as those disclosures pertained to the insanitary transport and storage conditions of chickens, welfare of live chickens for future consumption (i.e. "food") and/or the quality of animal feed, the subject matters over which FSMA has jurisdiction.

38.     As noted above, Respondent was aware of Howell's protected disclosures. Howell's disclosures about insanitary conditions and threats to flock health, including as detailed *infra* at paragraphs 23-27 and 29-30, were made directly to Respondent. Howell's cooperation with and disclosures to the media and public health advocates about biosecurity, food safety, and feed quality (see *infra* paragraphs 28, 30-36) were publicly available via the internet, from *The Guardian* in March 2020, We The Animals in July 2020, and Sentient Media in August 2020. *The Guardian* also contacted Respondent directly for comment on its article.

13

Complaint of Retaliation

JA592

39. Respondent also was aware of Howell's involvement with media and public advocates because Howell informed his supervisor of the visits and Respondent supervisor delivered protective gear to Howell for the group.

40. Perdue sent Howell the termination letter just two weeks after the most recent publication from the media members visiting Howell's farm. Respondent specifically referenced the advocate visitors in Howell's termination letter, claiming Howell was "touring groups of visitors." Respondent's claim that Howell "converted" Respondent's property reflects an acknowledgement that Respondent was aware of the media coverage regarding the two sickly chicks rescued from culling and Howell's reports of poor chicken health to the visitors.

41. Respondent terminated Howell with no investigation, inquiry, or discussion with Howell. Respondent asserted that Howell committed a material breach of their contract by hosting a group of visitors at Howell's chicken houses. However, the Poultry Producer Agreement makes no reference to visitors. Respondent claimed Howell violated bio security protocols and COVID protocols, but Howell requested and received personal protective gear from Respondent for use with the visitors to meet bio security profiles. Further Howell did not receive COVID guidance from Respondent that was applicable to his farm. Respondent did not identify any biosecurity protocols or COVID protocols that Howell violated. Though Respondent had notice of the visits well in advance, Respondent did not invoke these objections to visitors at any point prior to the visits.

42. Howell's protected activities were a contributing factor in the adverse action taken against him. Respondent's decision to terminate Howell was made in reprisal for his protected activity to Respondent and to the media and public.

43.    The foregoing facts demonstrate that Respondent terminated Howell's employment in violation of the Food Safety Modernization Act's employee protection provision, 21 U.S.C. § 399d.

15

Complaint of Retaliation

#### IV.    CLAIM FOR RELIEF

52. Howell engaged in protected activity under the Food Safety Modernization Act's employee-protection provision when he reported insanitary conditions, lack of quality feed, and unhealthy flocks to Respondent supervisors and government regulators. He also engaged in protected activity when he facilitated access to advocacy groups for the production and publication of video footage and news articles depicting the conditions of birds placed on his farm by Respondent and criticizing Respondent's practices. As noted above, Howell believed that the condition of the birds raised on his farms was the result of Respondent's practices and conduct described above in paragraphs 21 to 35.

53. Under the FFDCA, "food" is defined as articles (and components thereof) used for food or drink for man or other animals. 21 U.S.C. § 321(f). Thus, Perdue is a covered entity for purposes of the whistleblower provision because it processes, packs, transports, distributes, receives, and holds live animals used for food. See 21 C.F.R. §§ 1.377 ("Food has the meaning given in section 201(f) of the act (21 U.S.C.321(f)). Examples of food include . . . live food animals."); 1.227 ("Examples of food include ... live food animals"), 1.276(b)(5)(ii) ("Examples of food include . . . live food animals."), 1.328 ("Examples of food include . . . live food animals."). Perdue is also a "covered entity" for purposes of the whistleblower provision if it manufactures, processes, packs, transports, distributes, receives, holds, and/or imports food or drink for live animals it is raising. 21 U.S.C. § 399d; 29 C.F.R. § 1987.101(d).

54. The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and

Complaint of Retaliation

16

Cosmetic Act, food is deemed to be adulterated if it has been "prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," 21 U.S.C. § 342(a)(4), or if it is transported or offered for transport under conditions that are not in compliance with regulations relating to sanitation, 21 U.S.C. § 342(i).

55. Respondent had knowledge of Howell's protected activity, and Howell's protected activity was a contributing factor in Respondent's decision to terminate Complainant. Respondent would not have taken those adverse actions regardless of Complainants protected activity.

56. The allegations of the foregoing paragraphs are incorporated by reference and demonstrate that Respondent violated the Food Safety Modernizations Act employee protection provisions when it terminated Complainant.

## V. **PRAYER FOR RELIEF**

WHEREFORE, Complainant respectfully requests the following relief:

A. reinstatement with the same status that Complainant would have had, but for the retaliation;

B. if reinstatement is not possible, front pay in lieu of reinstatement;

C. lost wages, bonuses, and additional payments, from the time period since Complainant's termination to present that Complainant would have received had he not been terminated;

D. compensation for equipment and farm value lost;

E. damages for pain, suffering, mental anguish, and injury to Complainant's career and reputation;

17

Complaint of Retaliation

F.  prejudgment interest on all compensatory damages at the federal rate of interest;

G.  compensation for special damages, including litigation costs, expert witness fees, and reasonable attorney fees and expenses;

H.  an injunction instructing Respondent not to retaliate or discriminate against Complainant in any manner for his protected activity Complainant in any manner for his protected activity under the Food Safety Modernization Act, or for pursuing this action;

I.  an order that Respondent expunge Complainant's employment record of any reference to the exercise of his rights under the employee protection provision of the Food Safety Modernization Act and of any references to his termination; and

J.  any and all additional relief that may be available from law or equity, including the costs of this action.

18

Complaint of Retaliation

Dated this 11th   day of February 2021.

Respectfully submitted,


s/Stephani L. Ayers
Gabrielle DeStefano
Staff Attorney
GOVERNMENT ACCOUNTABILITY
PROJECT
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-449-6038
Email: gabrielled@whistleblower.org

Eric Spengler, Esq.
SPENGLER & AGANS PLLC
352 N. Caswell Road
Charlotte, NC 28204
Tel. 704-910-5469
Fax: 704-730-7861
Email: eric@spengleraganslaw.com


Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

19

Complaint of Retaliation

# Exhibit 3

Case 5:24-cv-00594-BO-RJ    Document 1-4    Filed 10/18/24    Page 1 of 3

JA599

**U.S. Department of Labor**     Occupational Safety and Health Administration
Kansas City Regional Office
2300 Main Street, Suite 1010
Kansas City, MO 64108-2447



January 27, 2022

Rudy Howell
c/o Stephani Ayers
T. M. Guyers & Friends P. C.
P. O. Box 1061
Medford OR 97501
stephani@whistleblowerdefenders.com

Re: **Perdue Farms, Inc./Howell/Casefile No: 7-4120-21-045**

Dear Ms. Ayers:

On February 12, 2021, your client (Rudy Howell) filed a complaint with the Occupational Safety and Health Administration ("OSHA") under the FDA Food Safety Modernization Act (FSMA), 21 U.S.C. 399d. Over 210 days have passed since you filed this complaint. Under FSMA, if the Secretary has not issued a final decision within 210 days of the filing of the complaint, and there is no showing that such delay is due to the bad faith of Complainant, Complainant may bring a *de novo* action in federal district court.

You notified this office by telephone and email on January 25, 2022, that you intended to file the above-captioned case in federal court. As a result of your electing to proceed with the case in federal court, we are suspending our investigation of the case. Within seven days after filing a complaint in federal court, please provide OSHA with a copy of the file-stamped complaint. The file-stamped complaint may be sent to OSHA by email. The date of filing with OSHA is the postmark date or the email date of the submission to OSHA. If you have not provided OSHA with a copy of your complaint within 30 days of receipt of this letter, please submit a status update to this office at that time.

If at any time you have questions or require further information regarding employee or employer rights and responsibilities under FSMA or any other whistleblower statute administered by OSHA, please contact this office.

JA600

Sincerely,

For Kristina Carignan
Regional Supervisory Investigator

cc: Perdue Farms, Inc.
c/o Roger A. Colaizzi
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
RAColaizzi@Venable.com

# Exhibit 4

JA602

**U.S. DEPARTMENT OF LABOR**

**Occupational Safety and Health Administration**
**Kansas City Regional Office**
**2300 Main Street, Suite 1010**
**Kansas City, Missouri  64108-2447**



April 8, 2022

Rudy Howell
c/o Stephani Ayers
T. M. Guyers & Friends P. C.
P. O. Box 1061
Medford OR 97501
stephani@whistleblowerdefenders.com

Re: Perdue Farms, Inc./Howell/Casefile No: 7-4120-21-045

Dear Ms. Ayers:

This is to advise you that we have completed our investigation of the above-referenced complaint filed by your client (Complainant) against Perdue Farms, Inc. (Respondent) on February 12, 2021 under Section 402 of the FDA Food Safety Modernization Act (FSMA), 21 U.S.C. 399d. In brief, you alleged that Respondent terminated Complainant's employment contract in retaliation for his complaints regarding food safety to Respondent, government regulators, and members of the press.

Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region VII, finds there is no reasonable cause to believe that Respondent violated Section 402 of the FSMA and issues the following findings:

### Secretary's Findings

On or about August 20, 2020 Complainant contends that he suffered an adverse employment action when Respondent terminated his employment contract. On February 12, 2021, Complainant filed a complaint with the Secretary of Labor alleging that Respondent retaliated against him in violation of Section 402 of the FSMA. As this complaint was filed within 180 days of the alleged adverse action, it is deemed timely.

The parties are not covered under the FSMA because Respondent is not an entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food, within the meaning of 21 U.S.C. §399d(a) and/or Complainant is not an employee within the meaning of 21 U.S.C. §399d(a). A review of the Darden Factors compared to the evidence showed that Complainant was able to set his own work schedule and employ his own strategies to raise the chickens in his care. Complainant has special skills regarding the raising of chickens, owns the facilities and land where the chickens are raised, and pays the utilities at the farm which Complainant owns.  Complainant did not receive a salary, benefits, or an hourly wage from Respondent; his earnings were based on lump sum payments according to a competitive contract system and payroll taxes were not removed by Respondent. Complainant was free to hire assistants and would be required by the contract with Respondent to manage

any assistants he hired.    Respondent is a poultry producer and Complainant was under contract with Respondent to raise chickens owned by Respondent.

As a result of the investigation, the burden of establishing that Complainant was retaliated against in violation of Section 402 of the FSMA cannot be sustained. Complainant's allegations did not make a prima facie showing. The evidence showed that Complainant was not an employee within the meaning of 21 U.S.C. §399d(a) Consequently, this complaint is dismissed.

Respondent and Complainant have 30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge (ALJ).  If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with:


Chief Administrative Law Judge
Office of Administrative Law Judges
U.S. Department of Labor
800 K Street NW, Suite 400 North
Washington, D.C. 20001-8002
Phone: (202) 693-7300
Fax: (202) 693-7365


With copies to:


Steven J. Kaplan
Acting Regional Administrator
U.S. Department of Labor, OSHA
2300 Main Street, Suite 1010
Kansas City, MO  64108

And

Perdue Farms, Inc.
c/o Roger Colaizzi
Venable LLP
600 Massachusetts Ave N. W.
Washington DC 20001
racolaizzi@venable.com

In addition, please be advised that the U.S.  Department of Labor does not represent any party in the hearing; rather, each party presents his or her own case.  The hearing is an adversarial proceeding before an ALJ in which the parties are allowed an opportunity to present their evidence for the record.  The ALJ who conducts the hearing will issue a decision based on the evidence and arguments presented by the parties.  Review of the ALJ's decision may be sought from the Administrative Review Board, to which the Secretary of Labor has delegated responsibility for issuing final agency decisions under the Act.  A copy of this letter has been sent to the Chief Administrative Law Judge along with a copy of your complaint.

The rules and procedures for the handling of FSMA cases can be found in Title 29 of the Code of Federal Regulations, Part 1987 (FSMA) and may be obtained at www.whistleblowers.gov.

Sincerely,

FOR KEVIN CRAIN
Assistant Regional Administrator

cc:  Respondent
    Chief Administrative Law Judge, USDOL
    (FSMA)Food and Drug Administration

**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
Kansas City Regional Office
2300 Main Street, Suite 1010
Kansas City, Missouri  64108-2447



April 8, 2022

Dear Employer:

The U.S. Department of Labor, Region VII OSHA offers a Free and Confidential outreach/training program for your business. Based on available resources, an experienced Whistleblower Investigator will train you and your management staff on current laws enforced by OSHA's Whistleblower Protection Program. This training will include: explaining the elements of a Whistleblower violation, the investigative process if you receive written notification from OSHA regarding a whistleblower complaint, early resolution, remedies/outcomes, and answer any questions you or your staff may have regarding whistleblower laws enforced by OSHA.

OSHA's Whistleblower Protection Program enforces the whistleblower provisions of more than twenty whistleblower statutes protecting employees who report violations of various workplace safety and health, airline, commercial motor carrier, consumer product, environmental, financial reform, food safety, health insurance reform, motor vehicle safety, nuclear, pipeline, public transportation agency, railroad, maritime, and securities laws. Rights afforded by these whistleblower protection laws include, but are not limited to; worker participation in safety and health activities; reporting a work-related injury, illness or fatality; or reporting a violation of the statutes herein.

If you would like additional information on this free service, please contact Kristina Carignan, Regional Supervisory Investigator at (816) 502-9008.

Sincerely,

KEVIN CRAIN
Assistant Regional Administrator
Region VII - Whistleblower Protection Program

JA607

# Exhibit 5

Case 5:24-cv-00594-BO-RJ    Document 1-6    Filed 10/18/24    Page 1 of 26

JA607



1612 K Street, NW, Suite #1100
Washington, DC 20006
(202) 457-0034 | info@whistleblower.org

May 6, 2022

Chief Administrative Law Judge
USDOL-Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, D.C. 20001-8002
OALJ-Filings@dol.gov
Telephone: (202) 693-7300
Fax: (202) 693-7365

> Re:    Perdue Farm, Inc. /Howell/Case No. 7-4120-21-045

Dear Chief Judge Henley:

Rudy Howell, through his undersigned counsel, objects to the Secretary's Findings in the above-captioned matter. Those Findings are contained in the April 8, 2022 letter from Mr. Kevin Crain, Assistant Regional Administrator, Occupational Safety and Health Administration, Kansas City Regional Office, to counsel for Rudy Howell.  Mr. Howell received the Findings by electronic mail on April 11, 2022. Therefore, Mr. Howell's objections conveyed in this letter, which are due on or before May 11, 2022, are timely.  Attached as well is Complainant's Restated Complaint.

Rudy Howell objects to the Findings as follows:

1.    Mr. Howell objects to the findings that: "[t]he parties are not covered under the FSMA because Respondent is not an entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food, within the meaning of 21 U.S.C. §399d(a) and/or Complainant is not an employee within the meaning of 21 U.S.C. §399d(a)." (Findings, p. 1) and "[t]he evidence showed that Complainant was not an employee within the meaning of 21 U.S.C. §399d (a)."  (Findings, p. 2).  Complainant presented evidence that showed he was an employee, including evidence of the significant control Respondent exercised over him and the chicken raising operations in which Complainant was engaged for Respondent.

2.    Mr. Howell objects to the finding that "A review of the Darden Factors compared to the evidence showed that Complainant was able to set his own work schedule and employ his own strategies to raise the chickens in his care. Complainant has special skills regarding the raising of chickens, owns the facilities and land where the chickens are raised, and pays the utilities at the farm which Complainant owns. Complainant did not receive a salary, benefits or an hourly wage from Respondent; his earnings were based on lump sum payments according to a

1

competitive contract system and payroll taxes were not removed by Respondent. Complainant was free to hire assistants and would be required by the contract with Respondent to manage any assistants he hired." (Findings, p. 1-2). Complainant objects that the Darden analysis leads to the conclusion that Complainant was an employee. There was ample evidence specifically to the contrary, showing that Perdue determined and supplied the feed, medicine and supplies for the chickens, and that Perdue set the standards for housing and tending to the flocks, including requiring numerous requirements on the structure, outfitting, and maintenance of the chicken facilities. Perdue also supplied the chicks and required Complainant to exclusively house Respondent's chicks. The evidence also showed that Complainant could not set his own schedule, that instead Perdue required various tasks to be performed on each day and required additional tasks to be performed on certain key dates during and in between the flocks' growth cycle. The evidence further showed that other Perdue employees were regularly at the farm overseeing the facility and Complainant's performance.

3.      Mr. Howell objects to the findings "the burden of establishing that Complainant was retaliated against in violation of Section 402 of the FSMA cannot be sustained. Complainant's allegations did not make a prima facie showing." (Findings, p. 2). Complainant notes OSHA did not analyze any allegations nor make any findings as to any of the other elements of an FSMA claim, only making a determination that Complainant was not an employee.

4.      Mr. Howell reserves the right to add additional objections pending the conclusion of discovery and further investigation.

Mr. Howell further requests a hearing regarding his Complaint.

Respectfully submitted,

s/Stephani L. Ayers
for the Government Accountability Project

Counsel for Rudy Howell


cc:

Counsel for Perdue
Clayton E. Bailey
cbailey@baileybrauer.com
Campbell Centre I
8350 N. Central Expy, Suite 650
Dallas, Texas 75206
Tel: (214) 360-7433
Fax: (214) 360-7435

2

Kevin Crain
Occupational Safety and Health Administration
Kansas City Regional Office
 2300 Main Street, Suite 1010
 Kansas City, Missouri 64108-2447

Assistant Secretary

 the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor.

3

**UNITED STATES DEPARTMENT OF LABOR**

**OFFICE OF ADMINISTRATIVE LAW JUDGES**

*In the Matter of*

| | |
|---|---|
| **RUDY HOWELL,** | ) |
| *Complainant,* | ) |
| *v.* | ) OSHA Case No. 7-4120-21-045 |
| **PERDUE FARMS, INC.,** | ) |
| *Respondent.* | ) |

**RESTATED COMPLAINT OF RETALIATION**

Complainant, Rudy Howell, through his counsel the Government Accountability Project, files this Complaint alleging violations of the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d against Respondent Perdue Farms, Inc. Complainant was unlawfully discriminated against by Respondent Perdue Farms, Inc. when Complainant made protected disclosures regarding Perdue's insanitary conditions and threats to food safety.

## I.    INTRODUCTION

1.    This is an action arising under the employee protection provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d by Complainant, Mr. Rudy Howell, against Perdue Farms, Incorporated (hereafter "Respondent" or "Perdue Farms" or "Perdue"). This action arises from and concerns adverse employment actions taken against Complainant by Respondent via letter dated August 18, 2020, in retaliation for activity protected under the above statutes. Complainant first received notice of this retaliatory action on August 20, 2020. This Restated Complaint realleges and alleges food integrity violations and practices by Perdue, including from

Complaint of Retaliation

2019-2020, in which the company falsely claimed to be meeting various food safety and integrity growing protocols.

2.  Complainant decided to make protected disclosures regarding his concerns.  After many attempts at internal reporting without resolution, he determined that the Respondent had not designed, deployed or maintained any viable internal or external channels for reporting these deceptive marketing statements or the inhumane practices and collateral practices of Perdue for placing, maintaining and removing those chicken flocks.  Complainant regarded any external USDA channels available to growers to not be viable for reporting food integrity concerns not directly related to contamination or adulteration of the raw poultry products marketed to consumers. Complainant was unaware of any dedicated or viable FDA external reporting channels available to poultry growers.  Complainant became aware of and resorted to public food integrity reporting channels to NGOs and the media, and thereby indirectly to Congress or other federal authorities.

3. The poultry flocks that are the subject of this complaint at all times remained under the sole ownership and control rights and discretion of the Respondent.  Complainant and growers like him were employees under contract, despite the language in those contacts by Perdue disclaiming its legal obligations to said employees.

## II.      <u>JURISDICTION</u>

4.      This Complaint was timely filed within 180 days of notice of the adverse actions complained of herein. OSHA had jurisdiction to investigate the allegations contained herein, and to issue findings and enter a recommended decision and preliminary order granting the relief requested below. OSHA has jurisdiction over Respondent as a covered entity by the Food Safety Modernization Act and over Complainant as an employee of Respondent. However, OSHA

2

Complaint of Retaliation

issued a determination letter dated April 8, 2022, received by Complainant on April 11, 2022, finding, incorrectly, that Complainant was not an employee of Respondent.

### A.     Covered Entities under the Food Safety Modernization Act (FSMA).

5.     The FSMA's whistleblower provision protects employees of covered entities which are engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importing of food. 21 U.S.C. § 399d(a); 29 C.F.R. § 1987.101(d). The FFDCA defines "food," in part, as "(1) articles used for food or drink in man or other animals ..." and (3) "articles used for components of any such article." 21 U.S.C. § 321(f). "Food" includes live food animals. 21 C.F.R. §§ 1.377, 1.227, 1.276(b)(5)(ii). Under the FFDCA, the term "food" includes both (a) animal feed, *see, e.g.*, *Watts v. Perdue Farms, Inc.*, No. 2017-0017, at 6 (D.O.L. Admin. Rev. Bd. May 28, 2020), -and- (b) live animals intended for human consumption, *see, e.g.*, *Morales Sanchez v. New Fashion Pork, LLC*, No. 2020-0004 (A.L.J. Order Nov. 3, 2020).

### IV. PARTIES

6.   Respondent Perdue Farms, Inc. is a U.S. food and agricultural products company headquartered at 31149 Old Ocean City Rd, Salisbury, MD 21804-1806. Perdue Farms, Inc. is one of the nation's largest producers of chicken and turkey. It also produces beef, lamb, and pork products. It operates live productions and processing facilities in about fifteen U.S. states. Perdue Farms slaughters nearly 700 million chickens every year. For the fiscal year closing March 2020, Perdue Farms posted $7.1 billion in revenue.

7.   Respondent Perdue works with a network of farmers and ranchers across the U.S. to create its products. Networks are comprised of cattle ranchers, sheep farmers, hog farmers and poultry farmers who must follow a specific and strict set of farming protocols to raise livestock for the Perdue brands.

Complaint of Retaliation

8. Respondent Perdue is a covered entity subject to the provisions of the FSMA. Perdue manufactures, processes, transports, receives, holds, and distributes 'food' within the meaning of 21 U.S.C. § 399d(a). First, the chickens that Perdue holds for use as human food constitute food within the meaning of the FFDCA. Second, Perdue manufactures, receives, and/or holds "articles used for food or drink for" the chicken that it is raising. Respondent supplies Complainant with both chickens and chicken feed. Both the chickens (as an article used for food in man) and the chicken feed (as an article used in food for other animals) that Perdue provides to Howell are considered "food" under the FFDCA.

9. Howell owns and operates the Robert Miller poultry farm in Fairmont, North Carolina. For over 25 years, Howell was contracted exclusively to Respondent to raise chickens for them pursuant to an "Poultry Producer Agreement." Respondent awarded Howell "Top Producer" several times. Respondent never disciplined Howell, nor audited him for any potential non-compliance or performance issues, prior to his sudden retaliatory termination.

## V. FACTUAL ALLEGATIONS

### A. Complainant's Job, Duties, and Performance

10. Today more than 90 percent of broiler chickens and most turkeys are raised by farmers under contract to poultry companies such as Perdue. These companies are referred to as "integrators" because of their integrated supply chain. Perdue represents to the farmers that its vertical integration provides unparalleled support to its poultry farmers, including: (1) A flock adviser providing ongoing guidance to help maximize the farmer's flock performance— and income; (2) Dedicated veterinarians for each of the growing regions, backed by Perdue's own animal health lab (3) A Technical Services Department that rivals many research universities and houses Perdue's experts in poultry health and nutrition; (4) Research to support continuous

4

Complaint of Retaliation

improvement in animal care. Perdue controls the stages of production through vertical integration including: 1. Breeder operations and contract farms; 2. Hatcheries; 3. Feed ingredient sourcing and feed mills; 4. Grow-out operations, including contract broiler and turkey farms; 5. Technical and veterinary services; 6. Harvesting and processing; 7. Marketing, sales and distribution.

11.     Respondent Perdue exerted an extreme level of control over Howell and his farm operations sufficient to operate as Howell's employer. Pursuant to their contract, Perdue selected and consigned chicks to Howell to raise. The contract granted Perdue the authority to determine the number and breed of chickens Howell raised, the time allowed for processing each flock, and placement for future flocks. The contract required that Howell only use feed, medication, vaccinations, or other supplies provided by or arranged by Perdue. Perdue maintained ownership of the chickens.

12.     In exchange, Howell agreed to accept the consigned chicks, and to feed, water, and care for them until the chicks were removed at Perdue's direction. Howell further agreed to use only the feed, medications, vaccinations, and other supplies Respondent Perdue provided. Respondent required Howell to house and tend the flocks in accordance with Respondent's standards. These standards imposed numerous requirements on the structure, outfitting, and maintenance of Howell's facilities. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional specific tasks to be performed on certain key dates during and in between the flocks' cycles.

13.     Respondent assigned Howell a Perdue Flock Supervisor.  Respondent checked in at least weekly and often twice a week on Howell's farm to ensure that Howell was maintaining the facilities and tending to flocks in accordance with Respondent's dictated standards. Perdue's

agreement granted them the right to place Howell on a Performance Improvement Plan if Howell's flocks failed to achieve Perdue's minimum standards of competitiveness.

14. As of July 2020, Howell reported to Perdue Flock Supervisor Dean Shuttleworth. Flock Supervisor Shuttleworth reported to Perdue's Live Production Manager Lyn Price. Perdue's Live Production Manager Price reported to Perdue's Plant Manager Randy Brown. The Plant Manager reported to Perdue's Director of Live Production Tim Little.

15. At the end of the chick's growth cycles, or roughly six (6) weeks after placement, Respondent removed the chickens for transport to slaughter and processing facilities owned and operated by Respondent.  Respondent transported chickens and turkeys from over two thousand farms to slaughter and processing facilities in over a dozen states.

16. At these facilities, Respondent slaughters, processes and packages chickens and turkeys for sale to consumers.  Respondent is one of the largest producers of poultry products in the United States, and it sells whole birds and various other poultry products to retail food outlets and foodservice customers throughout the United States and abroad.  Respondent also imports, exports, receives and stores grains and other raw and processed agricultural commodities and products, which Respondent processes for use in animal feed and pet food.  Those raw and processed commodities and processed are also subject to FDA regulation apart from the poultry they are used upon.

17. Perdue compensated Howell per flock based on rankings and ratings assigned in Respondent's "tournament system."  Under this system, which is indistinguishable from a factory worker's performance appraisals or a brokerage employee's bonus/incentive structure which require frequent ongoing ratings, farmers are ranked against one another, and top-ranked farmers can be paid up to 50 percent more than the bottom ranked farmers. The ranking formula

6

Complaint of Retaliation

is mainly based on feed efficiency: how much weight the chickens gained, compared to how much feed the company supplied. Respondent reserved the right to pay as much, or as little, for each chicken based on their set standards that were mostly beyond Howell's control.

18.    Howell had little control over the farm's poultry profit margins. Howell could not grow for, nor sell chickens to, any other poultry company because Respondent required Howell to house exclusively Respondent's chicks. Because Respondent delivered the type and number of chicks Howell was to grow, dictated the point of removal in the growth cycle, determined the quality and timing of feed, and determined the pay structure, Howell's profits were largely controlled by the Respondent. Respondent's tournament style rating and pricing system resulted in wide variations in Howell's profits.

19.    Evidenced by their fully integrated monopsony structure, and because Respondent's business is mass production and sale of poultry to the U.S. and international consumer market, Howell's role in raising chickens for Respondent is the most integral part of Respondent's business.

20.    The foregoing facts demonstrate that Complainant was an "employee" of Respondent within the meaning of 21 U.S.C. § 399d(a) and 29 C.F.R. § 1987.101(e). These foregoing facts also demonstrate that Respondent is an "entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food" within the meaning of 21 U.S.C. § 399d(a).

### B. Background Facts Relevant to Protected Activity

21.    Since his start with Perdue, Howell has participated in annual trainings and updates for poultry welfare. In recent years, Perdue Flock Supervisors have met with farmers on

7

their farms to discuss any updates to the poultry welfare standards. Howell has implemented Perdue's poultry welfare requirements.

22.     Perdue has issued Management Guidelines to Howell for the conduct of farm operations. These guidelines cover a wide range of topics, including cleaning food pans, drinker lines, houses, and items like managing litter, applying insecticide, and cutting the grass. The Guidelines also address required twice daily walkdowns, specific temperature, lighting, and ventilation requirements.

23.     Perdue also issued "Biosecurity Never Evers and Dedicated Tos." These protocols centered around trying to prevent contamination of the flock from the outside world, especially from other flocks or individuals in contact with other flocks. The Dedicated Tos required proper cleaning and disinfection of all non-farm dedicated equipment prior to entering the chicken house and proper dress and disinfecting of individuals accessing the chicken house. The protocols also instructed farmers to allow only authorized visitors and to have all visitors comply with biosecurity requirements. Howell's most recent Farm Bio-security Risk Assessment Score was a 647, well above the Growing Area Average Risk Assessment score of 612 received by other farms.

24.     Before he was terminated, Perdue had not issued specific COVID-19 protocols for the poultry farmers like Howell.  On May 15, 2020, Perdue sent a letter to Howell informing him they intended to reduce flock placement density due to government regulations restricting business operations and travel and current poultry market conditions. In early 2020, as the COVID-19 pandemic spread into North Carolina, Perdue shared a video regarding company-wide safety issues in an email newsletter. The video pertained mostly to plant employees and gave no specific instruction to farmers regarding operations on-farm.

8

Complaint of Retaliation

25.    In 2016, Perdue released an "animal welfare policy," disclosing its alleged current practices and representing to undertake future planned improvements to meet growing customer and consumer demand for poultry raised to higher welfare standards. One facet of the policy was committing to doubling the rate of activity of Perdue's birds within three years. Perdue's policy put forward, as one option to achieve this goal, the transition to breeds of birds that grow slower, and thus are capable of more activity, because selective breeding for rapid growth can cause immobility and animal suffering, including leg deformities and heart attacks. In July 2017, Perdue signed on to the "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues." As a result, Perdue promised its customers it would meet the animal welfare criteria consumers desired and demanded, including raising and studying these slower-growing chickens and strengthening relationships with farmers.

## V.    PROTECTED ACTIVITY

26.    After being in business with Perdue Farms for some time, Howell began to recognize lapses of sanitation and health standards on the part of Perdue. He noted that Perdue was delivering poor quality feed and sickly chicks. He observed Respondent was careless and abusive with chickens, delivering chicks in filthy trays, failing to sanitize trailers and catch machines, and willfully dropping chickens on their heads during their weighing. He shared these and other concerns several times, first with Respondent and then with regulatory agencies, lawmakers, the media, and the public.

27.    In the mid- to late 2019 timeframe, Howell observed that he was having to cull uncharacteristically high numbers of sickly birds. On June 27, 2019, Howell recorded culling 148 birds in one house. He confirmed with other growers that they also were experiencing high cull volumes.

9

Complaint of Retaliation

28.    Beginning in November 2019, Howell observed that the scales—used to determine when the maximum number of birds had been put in an individual cage for transport—were not functioning properly. The dangerous effect was that catch crews did not know how many birds were in the transport cages, and some cages were thus overfilled. - creating potential insanitary conditions and threatening animal welfare. Howell reported these insanitary conditions and threats to animal welfare to Perdue through his Live Haul Performance & Service Score report in November 2019, and again in January 2020, March 2020, and June 2020.

29.    Due to lack of redress, Howell began sharing his concerns with the media and, by extension, the public.  On March 14, 2020, *The Guardian* reported on Howell's food and feed safety concerns, including his reports that Perdue was sending the farmers low-quality feed (including wet and moldy feed that endangered the health of the chickens) and that Perdue was sending farmers large numbers of sickly birds that had to be culled.

30.    On April 24, 2020, Howell sent photos of the dirty trays in which Perdue was delivering chicks to Perdue's Director of Live Production Tim Little. Having received no response, on April 30, 2020, Howell escalated his concerns to USDA Resident Agent Supervisor Wayne Basford. Howell noted that Perdue had delivered chicks in dirty trays, contrary to the company's stated policies for biosecurity and sanitation. Howell also reported he was concerned that Perdue's use of dirty trays for his chicks, specifically, may have been retaliation for his reports of concerns.

31.    On June 1, 2020, Howell reported sanitation issues with the catch machine. A catch machine uses rubber fingers on rotating drums to catch and move chickens into cages for loading onto a truck. Howell reported to Perdue via his Live Haul Performance & Service Score

10

report that Perdue's catch machine was dirty and housed a dead chicken from a prior catch. He reported that Perdue's trailers also were dirty. These violations of Perdue's stated policies for biosecurity and sanitation presented cross-contamination threats to his flocks.

32. On June 27, 2020, Howell escalated his concern that Perdue was violating sanitation rules by delivering chicks in dirty, insanitary trays to Plant Manager Randy Brown. Howell also attached copies of the Live Haul Performance & Service Score reports recording his concerns about the contaminated trailer and catch machines. Brown told Howell that Brown would check with his Plant Manager and Live Haul Manager. However, Perdue did not respond further to Howell's concerns.

33. On June 30, 2020, Howell informed his flock supervisor, Dean Shuttleworth, of his visitors and requested four sets of coveralls for the visitors, consistent with biosecurity protocols. By providing Howell with disposable coveralls at Howell's chicken houses, Shuttleworth necessarily was aware of Howell's visitors.

34. Complainant decided to report Respondent's practices through other viable and effective reporting channels. Complainant knew that reporting the above concerns to Perdue through its vague internal channels was consistently futile given his past experiences. He was also aware that USDA had not been involved in policing integrity within the poultry industry beyond safe growing practices that could impact post-slaughter meat safety. USDA surveillance and involvement with marketing to consumers was limited to safe inspection certification, and he was unaware of any external reporting channels to the USDA or FDA to act on his reports about consumer misrepresentation regarding human growing practices. The only viable alternative known to Complainant to protect public health, industry integrity and consumers was to resort to public channels by reporting to industry-specific NGOs and media, which in turn has the best

11

Complaint of Retaliation

chance of attracting Congressional oversight.   In furtherance of his efforts to oppose Respondent's practices, Howell agreed to meet with CCRW, share his concerns regarding animal welfare and public health, and collaborate to develop solutions. On or around June 22, 2020, Crystal Coast Waterkeeper Larry Baldwin had contacted Howell to request access to Howell's farm and chicken houses for a group of public health advocates. As a Waterkeeper and part of the Coastal Carolina Riverwatch (hereinafter CCRW), Baldwin works with communities, businesses, and governmental agencies to stop the negative impacts of the swine and poultry industry.  Thus, determined to use this available NGO channel, on July 8, 2020, Howell hosted four public health advocates at the farm's chicken houses, including Waterkeeper Larry Baldwin, Lumber Riverkeeper Jefferson Currie II, Cape Fear Riverkeeper Kemp Burdette, and videographer for We Animals Media (WAM) Kelly Guerin. WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and organizations to use for animal welfare advocacy.  Howell and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols.

35. During the July 8, 2020 tour of the chicken house, Guerin videotaped the flock, and Howell informed the advocates of his ongoing concerns—that large numbers of the birds he had been receiving from Respondent were arriving sick and unviable, that he had to undertake a high volume of culling, and that there were insanitary conditions of transport and weighing. He discussed Respondent's lack of responsiveness. Howell specifically identified two birds designated to be euthanized because they were injured and/or too small to reach food and water freely. He demonstrated the procedure of cervical dislocation (basically a decapitation of the chick by hand) as a means to cull chickens. Guerin asked if she could take home with her two

12

Complaint of Retaliation

JA622

birds identified as "culls," who otherwise would not survive. Because chick mortality is a farmer-specific responsibility and not in violation of his contract with Respondent, Howell permitted her to take the chicks. An individual chick, even in perfect health, is valued at less than one dollar.

36.     On or around July 15, 2020, Baldwin asked for chicken house access for a second group of Waterkeepers and another film crew. Howell agreed and again contacted his flock supervisor to request disposable coveralls. His flock supervisor delivered the requested coveralls for the second set of public health advocates. On July 29, 2020, Baldwin, Currie, Haw Riverkeeper Emily Sutton, and three members of Lockwood Films visited Howell's chicken houses. Consistent with biosecurity protocols, all members of the group wore protective gear, either the coveralls provided by Perdue or unused Tyvek suits brought by the visitors. Howell and Simmons were both present, again, and ensured biosecurity protocols were followed. During this second visit, Howell reiterated his concerns that Perdue supplied him with large numbers of birds that were sick and unviable; that he had to undertake a high volume of culling; and that the chicken were subjected to insanitary conditions of transport and weighing.

37.     On July 17, 2020, We Animals Media posted a description of Guerin's visit to Howell's chicken houses to its Facebook page. The group noted that these chicken houses were usually inaccessible to anyone outside of the industry, but that they had been invited by the farmer to bring transparency to the poultry industry. Guerin reported observing a chick lying on the floor unresponsive and breathing heavily and another chick tinier than the others stumbling around with closed eyes and a beak encrusted with feces. Guerin described asking to rescue the two chicks, to which Howell agreed.  She detailed naming the lone surviving chick "Sweet Pea" and placing her with Piedmont Farm Animal Refuge.

13

Complaint of Retaliation

38.     On July 30, 2020, We Animals Media published its footage of Howell's chicken houses in a documentary and a collateral written piece that exposed animal welfare and public health concerns associated with industrial poultry farming on its website. Howell expected that Perdue would review the video footage—and hoped and believed that the video's publication would prompt the public to join him in opposing Respondent's problematic animal husbandry practices. Howell also hoped and believed that the video's publication would prompt further investigation or other action by government officials. This video remains a key piece of advocacy material publicly available and maintained on We Animals Media's website: "Mass Culling: System Shutdowns and the Failures of Factory Faming" (available here: https://weanimalsmedia.org/2020/07/30/system-shutdowns-and-the-failures-of-factory-farming/).

39.     On August 4, 2020, Sentient Media published an article, "Despite Perdue's High Welfare Standards, Some Chickens Can't Survive 45 Days," which described Guerin's visit to Howell's chicken houses and some of Howell's concerns. The article noted that—despite Perdue's commitment to consumers in its 2016 animal welfare policy and 2017 "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues"—it was still growing sickly chickens unable to survive. Guerin reported her observations that Howell's chickens from Perdue were still crumbling under the burden of selective breeding; young chicks could take only a few steps before plopping down with their legs splayed behind them. Guerin reported that Howell had walked among the birds unable to stand and demonstrated the culling procedure. Guerin noted the culling by Howell was not an anomaly, but rather standard daily procedure that Perdue reminded the farmer to do, including in postings in his barn. Guerin reported Howell allowed her to try to rescue two dying chicks that Howell was otherwise going to euthanize under Perdue's

14

Complaint of Retaliation

standards. She noted that Howell reported that Perdue retaliated against farmers who speak out, including by sending them birds who are sicker, smaller, or hatched too late.

## VI. ADVERSE ACTIONS

40. On August 18, 2020, with no prior warning to, inquiry of, or discussion with Howell, Respondent terminated Howell's 25-plus year relationship with Perdue. Perdue's stated cause for such action was the allegation that Howell "materially breached" his contractual obligations to Perdue over the "past several months" by "touring groups of visitors inside [his] poultry houses." Perdue claimed the presence of these visitors violated Perdue's Poultry Welfare and Bio-Security Programs and COVID-19 protocols. Perdue also claimed Howell "converted" Perdue's property without Perdue's consent.

## VII. NEXUS/CONTRIBUTING FACTOR

41. Howell reasonably believed his disclosures to the Respondent, public health advocates, and media crews were violations of the FFDCA/FSMA, as those disclosures pertained to the insanitary transport and storage conditions of chickens, welfare of live chickens for future consumption (i.e. "food") and/or the quality of animal feed, the subject matters over which FSMA has jurisdiction.

42. As noted above, Respondent was aware of Howell's protected disclosures. Howell's disclosures about insanitary conditions and threats to flock health, including as detailed *infra* at paragraphs 26-28 and 30-32, were made directly to Respondent. Howell's cooperation with and disclosures to the media and public health advocates about biosecurity, food safety, and feed quality (see *infra* paragraphs 29, 34-39) were publicly available via the internet, from *The Guardian* in March 2020, We The Animals in July 2020, and Sentient Media in August 2020. *The Guardian* also contacted Respondent directly for comment on its article.

15

Complaint of Retaliation

43.      Respondent also was aware of Howell's involvement with media and public advocates because Howell informed his supervisor of the visits and Respondent supervisor delivered protective gear to Howell for the group.

44.      Perdue sent Howell the termination letter just two weeks after the most recent publication from the media members visiting Howell's farm. Respondent specifically referenced the advocate visitors in Howell's termination letter, claiming Howell was "touring groups of visitors." Respondent's claim that Howell "converted" Respondent's property reflects an acknowledgement that Respondent was aware of the media coverage regarding the two sickly chicks rescued from culling and Howell's reports of poor chicken health to the visitors.

45.      Respondent terminated Howell with no investigation, inquiry, or discussion with Howell. Respondent asserted that Howell committed a material breach of their contract by hosting a group of visitors at Howell's chicken houses. However, the Poultry Producer Agreement makes no reference to visitors. Respondent claimed Howell violated bio security protocols and COVID protocols, but Howell requested and received personal protective gear from Respondent for use with the visitors to meet bio security profiles. Further Howell did not receive COVID guidance from Respondent that was applicable to his farm. Respondent did not identify any biosecurity protocols or COVID protocols that Howell violated. Though Respondent had notice of the visits well in advance, Respondent did not invoke these objections to visitors at any point prior to the visits.

46.      Howell's protected activities were a contributing factor in the adverse action taken against him. Respondent's decision to terminate Howell was made in reprisal for his protected activity to Respondent and to the media and public.

16

Complaint of Retaliation

47.     The foregoing facts demonstrate that Respondent terminated Howell's employment in violation of the Food Safety Modernization Act's employee protection provision, 21 U.S.C. § 399d.

## VIII.   CLAIM FOR RELIEF

48. 21 U.S.C. § 399d(a)(1) of the Food Safety Modernization Act created three types of statutorily protected channels for reporting and disclosing covered food safety and integrity issues: (1) an internal channel "to the employer"; (2) an external channel to any agency, department or instrumentality of "the Federal Government", which by definition includes Congress; and a second external channel to "the attorney general of a State"; and (3) a public channel to NGOs or the media who, in publishing a complainant's disclosures that may be received by one of the internal or external reporting channels, thereby function as "any person acting pursuant to a request of the employee" in "caus[ing] to be provided" said disclosures by Complainant.

49.  CCRW and the Guardian constituted such a protected public reporting channel, and both constituted a "person acting pursuant to a request of the employee".

50. Howell engaged in protected activity under 21 U.S.C. § 399d, the Food Safety Modernization Act's employee-protection provision when he reported insanitary conditions, lack of quality feed, and unhealthy flocks to Respondent supervisors and government regulators. He also engaged in protected activity when he used the described public reporting channel and facilitated access to, and provided information for, advocacy groups for the production and publication of video footage and news articles depicting the conditions of birds placed on his farm by Respondent and criticizing Respondent's practices. As noted above, Howell believed that the condition of the birds raised on his farms was the result of Respondent's practices and

17

Complaint of Retaliation

JA627

conduct described above.  He reasonably believed that in making his disclosures that he disclosed information relating to a violation, act or omission of the Respondent under the Food, Drug and Cosmetics Act, 21 U.S.C. 391 et seq., or an order, rule, regulation, standard, or ban thereunder (hereafter FDCA).  Complainant reasonably believed that he was a covered employee under § 399d.

51. Under the FFDCA, "food" is defined as articles (and components thereof) used for food or drink for man or other animals. 21 U.S.C. § 321(f). Thus, Perdue is a covered entity for purposes of the whistleblower provision because it processes, packs, transports, distributes, receives, and holds live animals used for food. See 21 C.F.R. §§ 1.377 ("Food has the meaning given in section 201(f) of the act (21 U.S.C.321(f)). Examples of food include . . . live food animals."); 1.227 ("Examples of food include ... live food animals"), 1.276(b)(5)(ii) ("Examples of food include . . . live food animals."), 1.328 ("Examples of food include . . . live food animals.").  Perdue is also a "covered entity" for purposes of the whistleblower provision if it manufactures, processes, packs, transports, distributes, receives, holds, and/or imports food or drink for live animals it is raising. 21 U.S.C. § 399d; 29 C.F.R. § 1987.101(d).

52. The Food, Drug, and Cosmetic Act prohibits the delivery or receipt in interstate commerce of food that is "adulterated or misbranded." 21 U.S.C. § 331(c). Under the Food, Drug, and Cosmetic Act, food is deemed to be "misbranded" where its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a)(2). Further, under the Food, Drug, and Cosmetic Act, food is deemed to be adulterated if it has been "prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," 21 U.S.C. § 342(a)(4), or if it is transported or offered

18

Complaint of Retaliation

for transport under conditions that are not in compliance with regulations relating to sanitation, 21 U.S.C. § 342(i).

53. Respondent had knowledge of Howell's protected activity in using the public channel described above, and in making his internal reports, and Howell's protected activity was a contributing factor in Respondent's decision to terminate Complainant. Respondent would not have taken those adverse actions regardless of Complainants protected activity.

54. The allegations of the foregoing paragraphs are incorporated by reference and demonstrate that Respondent violated the Food Safety Modernization Act employee protection provisions when it terminated Complainant.

## IX. **PRAYER FOR RELIEF**

WHEREFORE, Complainant respectfully requests the following relief:

A. reinstatement with the same status that Complainant would have had, but for the retaliation;

B. if reinstatement is not possible, front pay in lieu of reinstatement;

C. lost wages, bonuses, and additional payments, from the time period since Complainant's termination to present that Complainant would have received had he not been terminated;

D. compensation for equipment and farm value lost;

E. damages for pain, suffering, mental anguish, and injury to Complainant's career and reputation;

F. prejudgment interest on all compensatory damages at the federal rate of interest;

G. compensation for special damages, including litigation costs, expert witness fees, and reasonable attorney fees and expenses;

19

Complaint of Retaliation

H.  an injunction instructing Respondent not to retaliate or discriminate against Complainant in any manner for his protected activity Complainant in any manner for his protected activity under the Food Safety Modernization Act, or for pursuing this action;

I.  an order that Respondent expunge Complainant's employment record of any reference to the exercise of his rights under the employee protection provision of the Food Safety Modernization Act and of any references to his termination; and

J.  any and all additional relief that may be available from law or equity, including the costs of this action.

20

Complaint of Retaliation

JA630

Dated this 6th  day of May 2022.


Respectfully submitted,


s/Stephani L. Ayers
Gabrielle DeStefano
Staff Attorney
GOVERNMENT ACCOUNTABILITY
PROJECT
1612 K Street, NW, Suite 1100
Washington, DC 20006
Tel. 202-449-6038
Email: gabrielled@whistleblower.org

Eric Spengler, Esq.
SPENGLER & AGANS PLLC
352 N. Caswell Road
Charlotte, NC 28204
Tel. 704-910-5469
Fax: 704-730-7861
Email: eric@spengleraganslaw.com


Thad M. Guyer
Stephani L. Ayers
T.M. Guyer & Friends, P.C.
P.O. Box 1061
Medford, OR 97501
Tel. (Stephani): 813-382-7865
Tel. (Thad): 541-203-0690
Fax. 1-888-866-4720
Email: Thad@guyerayers.com

21

Complaint of Retaliation

Filed this 6th day of May with:

Chief Administrative Law Judge
USDOL-Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, D.C. 20001-8002
Telephone: (202) 693-7300
Fax: (202) 693-7365
OALJ-Filings@dol.gov


And served on:

Counsel for Perdue
Clayton E. Bailey
cbailey@baileybrauer.com
Campbell Centre I
8350 N. Central Expy, Suite 650
Dallas, Texas 75206
Tel: (214) 360-7433
Fax: (214) 360-7435


s/Stephani L. Ayers
Stephani L. Ayers

22

Complaint of Retaliation

# Exhibit 6

JA633

# UNITED STATES DEPARTMENT OF LABOR
### OFFICE OF ADMINISTRATIVE LAW JUDGES
### Newport News, VA

_____

**Issue Date: 14 December 2022**

**CASE NO.:**   2022-FDA-00004

*In the Matter of:*

**RUDY HOWELL,**
*Complainant,*

*v.*

**PERDUE FARMS, INC.,**
*Respondent.*

_____

**ORDER DENYING MOTION TO DISMISS**

This proceeding arises out of a complaint filed under the employee protection provisions of the Food Safety and Modernization Act (FSMA).  21 U.S.C. § 399d. On October 7, 2022, Respondent filed a motion to dismiss (Motion).  On October 13, 2022, Complainant filed an opposition to the motion to dismiss.  On October 20, 2022, the United States Food and Drug Administration (FDA) filed an amicus brief.

"A party may move to dismiss part or all of the matter for reasons recognized under controlling law, such as lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, or untimeliness."  29 C.F.R. § 18.70(c).  When ruling on a motion to dismiss, the administrative law judge must "accept the non-movant's factual allegations as true and draw all reasonable inferences in his favor."  *Mawhinney v. Trans. Workers Union, Local 591*, ARB No. 2019-0018, OALJ No. 2012-AIR-00014, slip op. at 2 (Dec. 9, 2020).

Respondent argues the Complaint must be dismissed with prejudice because:

(1) Complainant was not an "employee" for purposes of the FSMA employee protection provisions; (2) Complainant failed to blow the whistle about animal feed; and

(3) Respondent did not retaliate against Complainant for protected activity.[1]

---

[1] These arguments are similar to those I recently considered and rejected in *Watts v. Perdue Farms, Inc.*, OALJ No. 2016-FDA-00003 (Oct. 21, 2022) (Order Denying Motion to Dismiss).

## I.    Whether Complainant Was an Employee or an Independent Contractor

Respondent argues the Complaint must be dismissed because Complainant was an independent contractor, not a covered employee.  Motion at 9-12.  At this stage of the proceeding, I am required to accept Complainant's factual assertions as true and draw all reasonable inferences in his favor.

The FMSA does not define "employee." The Supreme Court of the United States has held when a statute does not helpfully define the term "employee," courts should apply a common-law definition. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). In determining whether an individual is an employee, Courts have recognized that numerous factors must be assessed and weighed and no factor is alone decisive. Further, this determination is a highly fact-specific finding.  *See Id.*; *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997).

Based upon my review of the Complaint, Complainant adequately alleges Respondent exercised sufficient control of his work and farm operation such that he could be considered Respondent's "employee" at common law.  *See* Complainant's Restated Complaint of Retaliation (Compl.) ¶¶ 8-21.  Accordingly, this argument is rejected.

## II. Whether Complainant's Actions Qualify as Whistleblowing under the FSMA and whether the Complaint Must Allege Whistleblowing Activity Related to Animal Feed.

Respondent argues the Complaint must be dismissed because Complainant never complained about animal feed directly to Perdue. Motion at 12-15. Respondent argues the FSMA does not protect the provision of information to the media, animal rights groups, or public health advocates, emphasizing the statutory language requiring reports be made to "the employer, the Federal Government, or the attorney general of a State." *Id.* at 12 (citing 21 U.S.C. § 399d(a)(1)). Respondent argues the FDA has no jurisdiction to entertain complaints about malfunctioning scales, dirty trays, and sanitation issues with the catch machine and trailers. Motion at 13-14. Respondent argues the FDA only has jurisdiction over allegations relating to animal feed, which, it states, formed "the sole basis for jurisdiction found by the ARB [Administrative Review Board] in *Watts*." *Id.* at 14 (citing *Watts v. Perdue Farms, Inc.*, ARB No. 2017-0017 (May 28, 2020) (Decision and Order Granting Reconsideration and Remanding to the Administrative Law Judge)). The FDA disputes Respondent's argument that the ARB, in *Watts*, held animal feed to be the only available basis for jurisdiction, calling the argument "misleading and inaccurate." FDA Amicus Br. at 2.

Contrary to Respondent's position, the FSMA does not require *direct* complaints from an employee to his employer, the federal government, or a state attorney general, in order to qualify for protection against retaliation. *See Watts*, OALJ No. 2016 FDA-00003, slip op. at 4-8 (Oct. 21, 2022). Rather, it also protects an employee

- 4 -

from retaliation if one of the three enumerated entities – the complainant's employer, the federal government, or a state attorney general – receives the employee's complaint via a third-party intermediary.  *Id.* at 6 ("[D]isclosures to a third-party (including non-governmental organizations and the media) qualify for legal protection under the FSMA, so long as the third-party published, pursuant to the employee's request, the employee's complaint about a violation of the FDCA [Federal Food, Drug and Cosmetic Act], and the complaint was then supplied or made available to the employer, the federal government, or a state attorney general, as a consequence of the third-party's publication of the complaint."); *but see Tides v. Boeing Co.,* 644 F.3d 809, 815 (9th Cir. 2011) (holding disclosures to the media unprotected by the Sarbanes-Oxley Act's coterminous whistleblower protection provision).

Furthermore, the FSMA does not only protect complaints about animal feed, as Respondent suggests.  *See Watts*, OALJ No. 2016-FDA-00003, slip op. at 10-11 (Oct. 21, 2022).  The law broadly protects the provision of *any information* the employee reasonably believes to be a violation of the FDCA. *Id.*

Based on my review of the Complaint, I conclude Complainant adequately alleges he engaged in FSMA protected activity.  Accepting the allegations as true and drawing all reasonable inferences in Complainant's favor, Complainant reasonably believed

- 5 -

Respondent's animal husbandry and sanitation practices violated the FDCA,[2] and when complaints made directly to Respondent went ignored, The Guardian,[3] We Animals Media,[4] and Sentient Media[5] published Complainant's complaints (or, broadly construed, evidence supporting his claims) about said violations.  *See* Compl. ¶¶ 26-39. One can reasonably infer Respondent learned of Complainant's complaints by virtue of the media because Respondent terminated the relationship with Complainant shortly (14 days) after the Sentient Media article was published.  *Id.* ¶ 39.  Respondent acknowledges that Complainant had made complaints to Respondent regarding unsanitary conditions and high cull rates.  *See* Motion at 16-17; Compl. ¶ 28, 30-33. Furthermore, Complainant alleges that he expected Respondent would review the footage provided to these outside organizations, that publication would lead to changes, or that these actions would lead to investigation by government officials.  *See* Compl. ¶ 38.

---

[2] The FDCA prohibits "[t]he adulteration … of any food … in interstate commerce." 21 U.S.C. § 331(b). Food is considered "adulterated" "if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health," or "if it is, in whole or in part, the product of a diseased animal or of an animal which has died otherwise than by slaughter." 21 U.S.C. § 342(a)(4),(5). According to the FDA, animal feed and live poultry both qualify as "food" under the FDCA. FDA Amicus Br. at 2.

[3] Michael Sainanto, 'I can't get above water': how America's chicken giant Perdue controls farmers, The Guardian (March 14, 2020), available at https://www.theguardian.com/environment/2020/mar/14/i-cant-get-above-water-how-americas-chicken-giant-perdue-controls-farmers.

[4] Kelly Guerin, *System Shutdowns and the Failures of Factory Farming*, We Animals Media (July 30, 2020), available at https://weanimalsmedia.org/2020/07/30/system-shutdowns-and-the-failures-of-factory-farming/ (video of Complainant's farm embedded in article: https://www.youtube.com/watch?v=LBSjsgF-ypg&t=1s).

[5] Jennifer Mishler, Despite Perdue's High Welfare Standards, Some Chickens Can't Survive 45 Days, Sentient Media (Aug. 4, 2020) available at https://sentientmedia.org/despite-perdues-high-welfare-standards-some-chickens-cant-survive-45-days/.

JA639

Accordingly, I conclude Complainant adequately alleges he engaged in protected activity under 21 U.S.C. § 399d(a)(1) and (4). Respondent's arguments are therefore rejected.

### III.      Whether Respondent Retaliated Against Complainant.

Respondent argues the Complaint must be dismissed because Respondent terminated the relationship for reasons unrelated to alleged protected activity.  Motion at 15-19. Respondent argues it terminated the relationship because Complainant violated its bio-security and COVID-19 protocols by allowing non-essential and unauthorized visitors at his farm.  *Id.* at 18.  Based on my review of the Complaint, I conclude Complainant adequately alleges Respondent retaliated against him for engaging in FSMA protected activity. Compl. ¶¶ 41-46.  Accordingly, this argument is also rejected.

### ORDER

Based on the foregoing, IT IS ORDERED that Respondent's motion to dismiss is DENIED.

- 7 -

**SO ORDERED.**

PAMELA A. KULTGEN
Administrative Law Judge

PAK/PML/jcb
Newport News, Virginia

- 8 -

# SERVICE SHEET

Case Name: **Howell_v_Perdue_Farm_Inc_**

Case Number: **2022FDA00004**

Document Title: **Order Denying Respondents Motion to Dismiss**

I hereby certify that a copy of the above-referenced document was sent to the following this 14th day of December, 2022:

**JOAN BUCHANAN**
Paralegal Specialist

OSHA-Region 4 Regional Administrator
Regional Administrator
Region 4
U. S. Department of Labor, OSHA
61 Forsyth Street, S.W.
ATLANTA GA 30303
　　　　*{Electronic - Regular Email}*

Atlanta Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Sam Nunn Federal Center
Room 7T10
61 Forsyth Street, S.W.
ATLANTA GA 30303
　　　　*{Electronic - Regular Email}*

Thad M. Guyer, Esq.
thad@guyerayers.com
P.O. Box 1061
MEDFORD OR 97501
　　　　*{Electronic - Regular Email}*

Stephani L. Ayers, Esq.
stephani@guyerayers.com
P.O. Box 1061
MEDFORD OR 97501
　　　　*{Electronic - Regular Email}*

Gabrielle DeStefano, Esq.
gabrielled@whistleblower.org
Government Accountability Project
1612 K Street, NW, Suite 1100
WASHINGTON DC 20006
　　　　*{Electronic - Regular Email}*

Eric Spengler, Esq.
eric@sab.law
Spengler & Agans
352 N. Caswell Road
CHARLOTTE NC 28204
　　　　*{Electronic - Regular Email}*

Roger A. Colaizzi, Esq.
racolaizzi@venable.com
Venable
600 Massachusetts Ave., NW
WASHINGTON DC 20001
　　　　*{Electronic - Regular Email}*

**SERVICE SHEET** continued (2022FDA00004 Order)          Page: 2

Mitchell Y. Mirviss, Esq.
mymirviss@venable.com
Venable
600 Massachusetts Ave., NW
WASHINGTON DC 20001
          *{Electronic - Regular Email}*

Stephen R. Freeland, Esq.
srfreeland@venable.com
Venable
600 Massachusetts Ave., NW
WASHINGTON DC 20001
          *{Electronic - Regular Email}*

Stephen Freeland
srfreeland@venable.com
Venable LLP
600 Massachusetts Ave NW
WASHINGTON DC 20001
          *{Electronic - Regular Email}*

Stephani Ayers
stephani@whistleblowerdefenders.com
POB 1061
MEDFORD OR 97501
          *{Electronic - Regular Email}*

Nicole Pepperl, Esq
Nicole.Pepperl@fda.hhs.gov
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Room 4335
SILVER SPRING MD 20993-0002
          *{Electronic - Regular Email}*

JA643

# Exhibit 7

Case 5:24-cv-00594-BO-RJ    Document 1-8    Filed 10/18/24    Page 1 of 6

JA644

# UNITED STATES DEPARTMENT OF LABOR
### OFFICE OF ADMINISTRATIVE LAW JUDGES
### Newport News, VA

_____

Issue Date: 25 September 2024

**Case No.:    2022-FDA-00004**

_In the Matter of:_

**RUDY HOWELL,**
_Complainant,_

_v._

**PERDUE FARMS, INC.,**
_Respondent._

_____

## AMENDED NOTICE OF HEARING AND SCHEDULING ORDER

On September 20, 2024, the parties filed a joint motion for amended scheduling order, including rescheduling the hearing.  The parties reported that the additional time was needed to allow for adjudication of Respondent's constitutional challenges in Federal district court.  _See Watts v. Perdue Farms, inc._, No. 2016-FDA-00003; _Perdue Farms, Inc. v. Su, et al_, No. 5:24-CV-00477-BO (E.D.N.C.).

Because both parties agree to the extensions of time, I will grant the joint motion.  This is also the third time the parties have moved to continue the hearing, making it the fourth scheduled hearing dates.  **No further continuances of the hearing or**

**amendments to the scheduling order** will be granted absent direction by an Article III court or by extraordinary cause shown by the parties.

IT IS ORDERED that the joint motion to amend the scheduling order and reschedule the hearing is GRANTED and AMENDED as follows:

1.  The parties shall complete discovery no later than **March 7, 2025**;

2.  The parties may file dispositive motions no later than **April 4, 2025,** and responses to motions are due 14 days after the motions are filed;

3.  The parties shall exchange exhibit and witness lists, stipulations, pre-hearing statements, and exhibits no later than **April 28, 2025**; and

4.  The parties shall file exhibit and witness lists, exhibits, pre-hearing statements, and evidentiary objections no later than **May 16, 2025**, and responses to evidentiary objections are due within 14 days of filing.[1]

5.  The hearing is continued to commence at **9:00 a.m. each day the week of June 23-27, 2025, in Fayetteville, North Carolina**, until completed.  The specific hearing location will be designated in a subsequent Notice of Location. A request for a continuance due to a prior judicial setting or other existing conflict must be filed within fourteen (14) days of receipt of this notice.

---

[1] In all other respects, the instructions set forth in the Order Rescheduling Hearing and Amended Scheduling, dated January 30, 2024, remain in effect.

- 2 -

**SO ORDERED.**

**PAMELA A. KULTGEN**
Administrative Law Judge

PAK/jcb
Newport News, Virginia

- 3 -

## SERVICE SHEET

Case Name:  **Howell_v_Perdue_Farm_Inc_**

Case Number: **2022FDA00004**

Document Title: **AMENDED NOTICE OF HEARING AND SCHEDULING ORDER**

I hereby certify that a copy of the above-referenced document was sent to the following this 25th day of September, 2024:

**JOAN BUCHANAN**
Paralegal Specialist

| | |
|---|---|
| OSHA-Region 4 Regional Administrator | Stephani Ayers |
| Regional Administrator | stephani@whistleblowerdefenders.com |
| Region 4 | POB 1061 |
| U. S. Department of Labor, OSHA | MEDFORD OR 97501 |
| 61 Forsyth Street, S.W. | *{Electronic - Regular Email}* |
| ATLANTA GA 30303 | |
| *{Electronic - Regular Email}* | Thad M. Guyer, Esq. |
| | thad@guyerayers.com |
| Bayley Court Reporter | P.O. Box 1061 |
| Court Reporting Service | MEDFORD OR 97501 |
| Bayley Reporting, Inc. | *{Electronic - Regular Email}* |
| 12945 Seminole Blvd., Bldg. 1 | |
| Suite 14 | Eric Spengler, Esq. |
| SEMINOLE FL 33778 | eric@sab.law |
| *{Electronic - Regular Email}* | Spengler & Agans |
| | 352 N. Caswell Road |
| Atlanta Regional Solicitor | CHARLOTTE NC 28204 |
| m-atl.fedcourt@dol.gov | *{Electronic - Regular Email}* |
| Regional Solicitor | |
| U. S. Department of Labor | Roger A. Colaizzi, Esq. |
| Sam Nunn Federal Center | racolaizzi@venable.com |
| Room 7T10 | Venable |
| 61 Forsyth Street, S.W. | 600 Massachusetts Ave., NW |
| ATLANTA GA 30303 | WASHINGTON DC 20001 |
| *{Electronic - Regular Email}* | *{Electronic - Regular Email}* |

**SERVICE SHEET** continued (2022FDA00004 Hearing Reschedul) Page: 2

Mitchell Y. Mirviss, Esq.
mymirviss@venable.com
Venable
600 Massachusetts Ave., NW
WASHINGTON DC 20001
  *{Electronic - Regular Email}*

Nicole Pepperl, Esq
Nicole.Pepperl@fda.hhs.gov
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Room 4335
SILVER SPRING MD 20993-0002
  *{Electronic - Regular Email}*

Gabrielle DeStefano
gabrielled@whistleblower.org
Government Accountability Project
1612 K Street NW
WASHINGTON DC 20006
  *{Electronic - Regular Email}*

Kristin Koger
kmkoger@venable.com
Venable LLP
600 Massachusetts Ave., NW
WASHINGTON, D.C. DC 20001
  *{Electronic - Regular Email}*

Thad Guyer
tmguyer@tmguyer.com
116 Mistletloe Street
MEDFORD OR 97501
  *{Electronic - Regular Email}*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:24-cv-00594-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>        Plaintiff,<br><br>v.<br><br>**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al.,<br><br>        Defendants. | **PLAINTIFF PERDUE FARM INC.'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** |

**PLAINTIFF PERDUE FARMS INC.'S**
**LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Perdue Farms Inc. ("Perdue") submits the following statement of undisputed material facts, including citations to evidence supporting the statements, which is provided in the accompanying Appendix, listed as enumerated exhibits.

1.    This is an action for declaratory relief under 28 U.S.C. §§ 2201-02, to enjoin the governmental Defendants from conducting certain administrative proceedings against Perdue currently pending in the U.S. Department of Labor ("DOL")'s Office of Administrative Law Judges ("OALJ"), *Howell v. Perdue Farms Inc.*, No. 2022-FDA-00004 (the "Pending Administrative Proceedings"). (Compl. ¶ 1, ECF No. 1).

2.    This case is closely related and parallel to another action recently filed by Perdue in this Court, *Perdue Farms Inc. v. Su, et al.*, E.D.N.C. Case No. 5:24-cv-00477-BO (the "First USDCT Action"). (Compl. ¶ 10, ECF No. 1). That action addresses DOL administrative

1

proceedings brought by a different farmer, Craig Watts ("Watts"), against Perdue, addressing nearly identical retaliation claims under FSMA (the "Watts Administrative Proceedings"). *Id.*

3.      Defendant Rudy Howell is a poultry farmer who owns and operates the Robert Miller poultry farm in Fairmont, North Carolina.   (Appendix, Ex. 4, Claimant's Restated Complaint of Retaliation, ¶ 9 (May 6, 2022) ("Restated Compl.")).

4.      In the Pending Administrative Proceedings, Perdue alleged that it is an integrated poultry producer engaged in business throughout the United States, including North Carolina. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model); *see also* Appendix, Ex. 19, Colaizzi Decl. ¶ 3.

5.      In the Pending Administrative Proceedings, Perdue further alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Howell.   (Appendix, Ex. 19, Colaizzi Decl. ¶ 3).  Perdue also alleged that the growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id.*

6.      Howell raised chickens for Perdue under a standard written contract (the "Agreement").   (Appendix, Ex. 4, Restated Compl. ¶ 9).   In the Pending Administrative Proceedings, Perdue alleged that Howell did this subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See Bunting*, 611 F. Supp. at 683-84; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements); Appendix, Ex. 19, Colaizzi Decl. ¶ 4.  Perdue further alleged that the Agreement thus imposed upon Howell extensive requirements to protect the well-being of the poultry. *Id.*

2

7. Perdue also alleged that Howell's Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. (Appendix, Ex. 19, Colaizzi Decl. ¶ 5). In exchange, Howell agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. (*Id.*; Appendix, Ex. 4, Restated Compl. ¶ 12). Typically, Perdue alleged, chicks would be raised by contractor farmers for several weeks before removal. (*Id.*; *see also* Appendix, Ex. 4, Restated Compl. ¶ 15).

8. In the Pending Administrative Proceedings, Perdue alleges that for years, Howell publicly and actively criticized Perdue, claiming that Perdue's policies make it impossible for farmers to make sufficient income. (Appendix, Ex. 19, Colaizzi Decl. ¶ 6).

9. In July 2020, Mr. Howell invited non-governmental self-proclaimed "public health advocates," as well as a filmmaker from an animal rights organization We Animals Media ("WAM"), onto his farm in the middle of the COVID-19 pandemic to film a group of live chicks that were in apparent sick and inhumane condition. (Appendix Ex. 4, Restated Compl. ¶¶ 34-38). Nine days after this visit, WAM posted a description of the visit to Howell's farm, describing chickens in deplorable condition and how Howell had permitted the filmmaker to remove those chicks (one of which died shortly after leaving Howell's farm). *Id.* A few days later, on July 29, 2020, Howell again permitted non-governmental "public health advocates" and another film crew to access his farm, and the next day, July 30, 2020, WAM posted the video footage of the visit to Howell's farm. *Id.*

10. In the Pending Administrative Proceedings, Perdue has alleged that despite the pandemic, it was evident from the video and an ensuing article about the filmmakers' visits that neither Howell nor any of the visitors was masked or followed the CDC recommendations for 6-

3

ft. social distancing, which Perdue's independent growers were requested to follow at that time. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).

11.     Perdue also alleged that Howell failed to include any information about any of the visitors on the visitor sheets for his farm and that only one of the visitors even signed in as a visitor. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).  It further alleged that this was in clear violation of Perdue's poultry welfare and bio-security programs and COVID-19 protocols and that allowing non-essential unmasked visitors into the chicken houses placed at risk Perdue's employees (flock advisors, transporters, and technical employees) and Perdue's flock. *Id.*

12.     On or about August 20, 2020, Perdue notified Howell that it was invoking the termination terms of the Agreement, which permitted either party to terminate the Agreement "for any reason" so long as 90 days' prior written notice is provided to the other party.  (Appendix Ex. 4, Restated Compl. ¶ 40).  Perdue explained to Howell that, by hosting touring groups of visitors inside his poultry houses, he had violated Perdue's poultry welfare and bio-security programs, as well as the COVID-19 protocols put in place. *Id.*  In the Pending Administrative Proceedings, Perdue alleged that rather than place more birds in Howell's facility given his disregard for Perdue's safety protocols, Perdue provided Howell with a lump-sum payment to cover the average profit he could have netted during the 90-day period. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).

13.     In response the termination of Howell's contract, on February 11, 2021, Howell filed a whistleblower complaint in OSHA against Perdue ("OSHA Complaint") alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the WAM video, as well as his alleged reports of purportedly unsanitary conditions. (Appendix Ex. 1, OSHA Compl. (February 11, 2021)). Howell alleged that, based on his prior alleged "reports" of bad food, high cull rates, non-functioning scales, and dirty trays, which he

4

subsequently reported to the tour groups he permitted on his farm, he was subjected to adverse employment actions. *Id.* ¶¶ 31-36.

14.    Howell's OSHA Complaint sought compensatory damages for "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Appendix, Ex. 1, OSHA Compl. § IV, Prayer for Relief ¶¶ C, D, E, & J).

15.    On January 27, 2022, OSHA sent Howell's counsel a letter informing Howell that, as 210 days had passed since Howell had filed his OSHA Complaint, Howell had the right under FSMA to file his claim in federal court. (Appendix, Ex. 2, OSHA Letter at 1). Its letter reported a conversation with Howell's counsel in which counsel stated that Howell's case would be refiled in federal district court, so OSHA informed Howell that, as a result, it was suspending its investigation. *Id.* OSHA further advised that Howell had thirty days to file his case in federal court. *Id.* Thirty days came and went, and Howell never filed his OSHA Complaint in federal court. Appendix, Ex. 19, Colaizzi Decl. ¶ 9.

16.    On April 8, 2022, DOL dismissed the OSHA Complaint based upon the findings of an OSHA regional investigator. (Appendix, Ex. 3, OSHA Findings). DOL determined that there was "no reasonable cause to believe" that Perdue had violated FSMA because (a) Perdue's activity in raising chickens did not fall within the scope of the FDCA, and (b) under the test established in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), and a moderately different "right-to-control" test—both of which DOL uses to determine employee status under whistleblower statutes—Howell was not Perdue's employee. *Id.* at 1-2.

17.     On May 6, 2022, Howell appealed OSHA's findings to the OALJ and filed an amended ("restated") complaint. (Appendix, Ex. 4, Restated Complaint).  It sought the same compensatory damages as before, namely "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Appendix, Ex. 4, Restated Complaint, § IX, Prayer for Relief ¶¶ C, D, E, & J).

18.     Perdue moved to dismiss Howell's Restated Complaint because Howell was not an "employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's requirements, and Howell had failed to allege any act of retaliation by Perdue.  (Appendix, Ex. 19, Colaizzi Decl. ¶ 8).  On December 14, 2022, ALJ Kultgen denied Perdue's motion.  (Appendix, Ex. 5, OALJ Dec. and Order).

19.     Discovery ensued. On September 25, 2024, ALJ Kultgen amended the scheduling order and rescheduled the previously scheduled hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction.  (Appendix, Ex. 6, Scheduling Order (September 25, 2024)).  On March 4, 2025, Perdue and Howell moved to stay the Pending Administrative Proceedings pending this Court's decision on dispositive motions and on March 11, 2025, ALJ Kultgen granted that motion and stayed the Pending Administrative Proceedings. (Appendix, Ex. 18, Order Granting Joint Motion to Stay (March 11, 2025)).

20.     Apart from some factual variations, the Pending Administrative Proceedings are substantively identical to the Watts Administrative Proceedings in all material respects relating to the constitutional issues raised in this action and in the First USDCT Action. (Compl., ECF No. 1; Appendix, Ex. 7, First USDCT Action Complaint).

6

21.    The Watts Administrative Proceedings concerned a similar dispute between Perdue and another one of its independent contractors, Watts, who owns and operates farms in North Carolina and raises chickens for Perdue as an independent contractor, just like Howell. (Appendix, Ex. 7, First USDCT Action Complaint). Watts' dispute with Perdue antedates Howell's dispute with Perdue, and Watts engaged in a similar scheme of raising a flock in deplorable condition and then inviting an animal rights group onto his farm to tape and publicize the results. *Id.* After Perdue took modest remedial action, Watts, just like Howell, alleged retaliation by Perdue in violation of FSMA's whistleblower activities on his farms. *Id.*

22.    In both administrative proceedings:

- Complainants seek legal remedies (*i.e.*, compensatory damages) for Perdue's alleged violations of the FSMA.

- Complainants have elected to adjudicate their FSMA claims in an administrative proceeding before the OALJ and have not (yet) kicked them out to an Article III court.

- ALJ Kultgen is presiding, and the same attorneys represent Howell and Watts.

- To mount a proper defense against these claims, Perdue needs third-party subpoenas to obtain discovery and evidence regarding the visits made to the farms by the animal rights and/or "public health advocates" and their video footage.

(Compl. ¶ 43, ECF No. 1); *see also* Appendix, Ex. 7, First USDCT Complaint.

23.    On March 11, 2024, Perdue applied for document and deposition subpoenas in the Watts Administrative Proceedings to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (Appendix, Ex. 8, Perdue's Application for Subpoenas). These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority. (Appendix, Ex. 9, Watts Order Quashing Subpoenas (Mar. 15, 2024)). Perdue moved for reconsideration or, in

7

the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. (Appendix, Ex. 10, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)). On April 18, 2024, ALJ Kultgen denied this motion. (Appendix, Ex. 11, Order Denying Mot. to Certify Interlocutory Appeal).

24.    On July 19, 2024, in the Watts Administrative Proceedings, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 12, Perdue's Letter Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id*. Watts opposed. (Appendix, Ex. 13, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 14, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id*., but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

25. Perdue moved to dismiss the Watts Administrative Proceedings for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 15, Perdue's Watts Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing whether *Jarkesy I or II* applied. (Appendix, Ex. 16, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

26. On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend in the Watts Administrative Proceedings, again ruling that she lacked authority to decide constitutional questions. (Appendix, Ex. 17, Watts Order Denying Mot. to Dismiss). She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

Dated: March 17, 2025

Respectfully submitted,

 /s/ *Margaret Santen*

Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

9

Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:24-cv-00594-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>        Plaintiff,<br><br>v.<br><br>**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al.,<br><br>        Defendants. | **APPENDIX TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS** |

**APPENDIX TO PLAINTIFF PERDUE'S**
**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

| Ex. No. | Description |
|---|---|
| 1 | Complaint of Retaliation (February 11, 2021) |
| 2 | OSHA January 2022 Letter (January 27, 2022) |
| 3 | OSHA Findings (April 8, 2022) |
| 4 | OSHA Objections and Restated Complaint (May 6, 2022) |
| 5 | ALJ Decision and Order (December 14, 2022) |
| 6 | September 2024 ALJ Scheduling Order (September 25, 2024) |
| 7 | First USDCT Action Complaint (August 20, 2024) |
| 8 | Perdue's Application for Subpoenas (March 11, 2024) |
| 9 | Order Quashing Subpoenas (March 15, 2024) |
| 10 | Perdue's Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024) |

| Ex. No. | Description |
|---|---|
| 11 | Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024) |
| 12 | Perdue's Letter Requesting Conference (July 19, 2024) |
| 13 | Watts' Response to Request for Conference (July 19, 2024) |
| 14 | Order Denying Conference Call (July 23, 2024) |
| 15 | Perdue's Motion to Dismiss (July 29, 2024) |
| 16 | Watts' Opposition to Motion to Dismiss (July 30, 2024) |
| 17 | Order Denying Motion to Dismiss (August 8, 2024) |
| 18 | Order Granting Joint Motion to Stay (March 11, 2025) |
| 19 | Declaration of Roger A. Colaizzi |

Dated: March 17, 2025

Respectfully submitted,

/s/ *Margaret Santen*
Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

2

Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

3

# EXHIBIT 18

Case 5:24-cv-00594-BO-RJ    Document 36-18    Filed 03/17/25    Page 1 of 4

JA663

# UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES
### Newport News, VA

_____

**Issue Date: 11 March 2025**

**Case No.:     2022-FDA-00004**

*In the Matter of:*

**RUDY HOWELL,**
*Complainant,*

*v.*

**PERDUE FARMS, INC.,**
*Respondent.*

_____

## ORDER GRANTING JOINT MOTION TO STAY

On March 4, 2025, the parties filed a joint motion to stay these proceedings. The

parties pointed to the pending interlocutory litigation in the U.S. District Court for the

Eastern District of North Carolina, *Perdue Farms, Inc. v. Su, et al*, Case Number

5:24-CV-00594, and the U.S. Court of Appeals for the Fourth Circuit, Case

Number 25-1106.[1] The parties request a stay pending resolution of the dispositive

motions before the District Court.

---

[1] And the companion case, which is an interlocutory appeal in *Watts v. Perdue Farms, Inc.*,
2016-FDA-00003. *See Perdue Farms, Inc. v. Su, et al*, Case Number 5:24-CV-00477 (E.D.N.C.), and
Case Number 25-1105 (4th Cir.).

As previously stated, this matter has been delayed several times and I am loathe to delay it further.  However, as Complainant agrees to delay his claim, I will grant the motion.

The undersigned advises the parties that I have a new attorney advisor.  Paul-Michael Lowey is no longer with my office.  Permitted inquiries may be directed to Rebecca Wescott, at wescott.rebecca@dol.gov or 757 591-5146.

Upon review, IT IS ORDERED that:

1.  The motion to stay is GRANTED;

2.  The hearing scheduled for the week of October 27-31, 2025, is CANCELED;

3.  The parties shall notify this tribunal **within 30 days of receipt of an order on the dispositive motions** before the U.S. District Court for the Eastern District of North Carolina.  That notice should include a proposed path for moving this litigation forward, including proposed dates for: completion of discovery; filing of dispositive motions; filing of exhibits and witness lists, stipulations, pre-hearing statements, and exhibits; and a hearing.

**SO ORDERED.**



Digitally signed by Pamela A. Kultgen
DN: CN=Pamela A. Kultgen,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Newport News, S=VA, C=US
Location: Newport News VA

**PAMELA A. KULTGEN**
Administrative Law Judge

PAK/jcb
Newport News, Virginia

# EXHIBIT 19

JA667

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:24-cv-00594-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>        Plaintiff,<br><br>v.<br><br>**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al.,<br><br>        Defendants. | **DECLARATION OF ROGER A. COLAIZZI IN SUPPORT OF PLAINTIFF PERDUE FARMS INC.'S MOTION FOR SUMMARY JUDGMENT** |

I, Roger A. Colaizzi, declare as follows:

1.      I am an attorney at Venable LLP.  I offer this Declaration in support of Plaintiff Perdue Farms Inc.'s Motion for Summary Judgment.  The following statements are based upon my personal knowledge.

2.      I have represented Perdue throughout the administrative proceedings against Perdue brought by Defendant Rudy Howell in the Department of Labor (the "Pending Administrative Proceedings").  I therefore have personal knowledge of the filings in those proceedings and the various events that have occurred there.

3.      In the Pending Administrative Proceedings, Perdue alleged that it is an integrated poultry producer engaged in business throughout the United States, including North Carolina. Perdue further alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Howell.  Perdue also alleged that the growers provide the land, facilities, equipment, and labor to

raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing.

4. In the Pending Administrative Proceedings, Perdue alleged that Howell raised chickens for Perdue subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. Perdue further alleged that the parties' agreement thus imposed upon Howell extensive requirements to protect the well-being of the poultry.

5. In the Pending Administrative Proceedings, Perdue also alleged that Howell's agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. It further alleged that in exchange, Howell agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. Perdue alleged that typically chicks would be raised by contractor farmers for several weeks before removal.

6. In the Pending Administrative Proceedings, Perdue alleges that for years, Mr. Howell publicly and actively criticized Perdue, claiming that Perdue's policies make it impossible for farmers to make sufficient income.

7. In the Pending Administrative Proceedings, Perdue alleged that despite the pandemic, it was evident from the video posted by We Animals Media concerning a visit to Howell's farm and an ensuing article about the filmmakers' visits that neither Howell nor any of the visitors was masked or followed the CDC recommendations for 6-ft. social distancing, which Perdue's independent growers were requested to follow at that time. Perdue also alleged that Howell failed to include any information about any of the visitors on the visitor sheets for his farm and that only one of the visitors even signed in as a visitor. It further alleged that this was in clear

2

violation of Perdue's poultry welfare and bio-security programs and COVID-19 protocols and that allowing non-essential unmasked visitors into the chicken houses placed at risk Perdue's employees (flock advisors, transporters, and technical employees) and Perdue's flock. Perdue also alleged that rather than place more birds in Howell's facility given his disregard for Perdue's safety protocols, Perdue provided Howell with a lump-sum payment to cover the average profit he could have netted during the 90-day period.

8.     After Howell filed his Restated Complaint, Perdue moved to dismiss the Restated Complaint because Howell was not an "employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's requirements, and Howell had failed to allege any act of retaliation by Perdue.

9.     Howell has never filed his OSHA Complaint in federal court.

10.    All of the following exhibits included in Perdue's Appendix of evidence supporting its Local Rule 56.1 Statement of Undisputed Facts are true and correct copies of various filings in the administrative proceedings and related judicial review in Mr. Howell's FSMA claims against Perdue, as well as the First USDCT Action.

| Appendix Ex. No. | Description |
|---|---|
| 1 | Complaint of Retaliation (February 11, 2021) |
| 2 | OSHA January 2022 Letter (January 27, 2022) |
| 3 | OSHA Findings (April 8, 2022) |
| 4 | OSHA Objections and Restated Complaint (May 6, 2022) |
| 5 | ALJ Decision and Order (December 14, 2022) |
| 6 | September 2024 ALJ Scheduling Order (September 25, 2024) |

3

| Appendix Ex. No. | Description |
|---|---|
| 7 | First USDCT Action Complaint (August 20, 2024) |
| 8 | Perdue's Application for Subpoenas (March 11, 2024) |
| 9 | Order Quashing Subpoenas (March 15, 2024) |
| 10 | Perdue's Motion to Certify Interlocutory Appeal or Reconsideration (March 25, 2024) |
| 11 | Order Denying Motion to Certify Interlocutory Appeal (April 18, 2024) |
| 12 | Perdue's Letter Requesting Conference (July 19, 2024) |
| 13 | Watts' Response to Request for Conference (July 19, 2024) |
| 14 | Order Denying Conference Call (July 23, 2024) |
| 15 | Perdue's Motion to Dismiss (July 29, 2024) |
| 16 | Watts' Opposition to Motion to Dismiss (July 30, 2024) |
| 17 | Order Denying Motion to Dismiss (August 8, 2024) |
| 18 | Order Granting Joint Motion to Stay (March 11, 2025) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of March 2025 in Washington, DC.

<i>/s/ Roger A Colaizzi</i><br>Roger A. Colaizzi

4

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **PERDUE FARMS INC.**,<br>31149 Ocean City Road<br>Salisbury, Maryland 21804<br><br>    Plaintiff,<br><br>v.<br><br>**LORI    CHAVEZ-DEREMER**, in her official capacity as Secretary of the United States Department of Labor,<br><br>**PAMELA KULTGEN**, in her official capacity as an Administrative Law Judge of the United States Department of Labor,<br><br>**UNITED STATES DEPARTMENT OF LABOR**,<br><br>**THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR**,<br><br>*and*<br><br>**RUDY HOWELL**,<br><br>    Defendants. | **DEFENDANT'S STATEMENT OF UNDISPUTED FACTS** |

### I.    Background Facts

1.    Rudy Howell owns and operates the Robert Miller farm in Fairmont, North Carolina. (Complaint, para. 24) [Doc. #1]. Howell, like Watts, is a Robeson County poultry farmer who raised chickens for Perdue under a contract similar to Watts. [Doc.#12, p. 12].

2.    Perdue is an integrated poultry producer engaged in business throughout the United States. (Complaint, para. 25) [Doc. #1].   Today more than 90 percent of broiler chickens and most

1

turkeys are raised by farmers under contract to poultry companies such as Perdue. (Howell Administrative Complaint, Ex. 5, para. 10) [Doc #1-6, p. 8] [hereinafter Admin. Comp.]). These companies are referred to as "integrators" because of their integrated supply chain. *Id*. Perdue represents to the farmers that its vertical integration provides unparalleled support to its poultry farmers, including: (1) A flock adviser providing ongoing guidance to help maximize the farmer's flock performance— and income; (2) Dedicated veterinarians for each of the growing regions, backed by Perdue's own animal health lab (3) A Technical Services Department that rivals many research universities and houses Perdue's experts in poultry health and nutrition; (4) Research to support continuous improvement in animal care. (*Id*., at pp. 8-9).

3.      Perdue controls the stages of production through vertical integration including: 1. Breeder operations and contract farms; 2. Hatcheries; 3. Feed ingredient sourcing and feed mills; 4. Grow-out operations, including contract broiler and turkey farms; 5. Technical and veterinary services; 6. Harvesting and processing; 7. Marketing, sales and distribution. (Admin. Comp., at pp. 8-9 [Doc. #1-6]). Within this integrated operation, Perdue owns hatcheries and breeding flocks. (Complaint, para. 25 [Doc. #1]). Perdue delivers its chicks to growers, such as Howell. *Id*.  Growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id*.

4.      Perdue exerted an extreme level of control over Howell and his farm operations. (Admin. Comp., para. 11, [Doc. #1-6, at p. 9]). Pursuant to their contract, Perdue selected and consigned the chicks to Howell to raise. *Id*. The contract granted Perdue the authority to determine the number and breed of chickens Howell raised, the time allowed for processing each flock, and placement for future flocks.  *Id*. The contract required that Howell only use feed, medication, vaccinations, or other supplies provided by or arranged by Perdue. (*Id*., *See also* Complaint, para. 27).

2

Perdue maintained ownership of the chickens. (Admin. Comp., para. 11, [Doc. #1-6, at p. 9]).

5.    In exchange, Howell agreed to accept the consigned chicks, and to feed, water, and care for them until the chicks were removed at Perdue's direction.  (*Id.,* at para. 12, [Doc. #1-6, at p. 9]). (*See also*, Complaint, para. 27, [Doc. #1]). Howell further agreed to use only the feed, medications, vaccinations, and other supplies Perdue provided. (Admin Comp., para. 12, [Doc #1-6, at p. 9]). Perdue required Howell to house and tend the flocks in accordance with Perdue's standards. *Id*. These standards imposed numerous requirements on the structure, outfitting, and maintenance of Howell's facilities. *Id*. These standards also set forth various tasks required to be performed on each day of the flocks' growth cycles and additional specific tasks to be performed on certain key dates during and in between the flocks' cycles. *Id.* Typically, chicks would be raised by farmers for several weeks before removal. (Complaint, para. 27, [Doc. #1, p. 8-9]).

6.    The poultry flocks that are placed with the grower remained under the ownership and control rights and discretion of Perdue. (Admin. Comp., para. 3, [Doc. #1-6, p. 6]). Howell has consistently maintained that growers like him were employees under contract. *Id.* Howell raised chicks for Perdue for over 25 years pursuant to various contracts. (Complaint, para. 26, [Doc. #1], Admin. Comp., para. 3, [Doc. #1-6, p. 19]).

7.    Perdue assigned Howell a Perdue Flock Supervisor. (Admin Comp., para. 13, [Doc. #1-6, p. 9]). Perdue checked in at least weekly and often twice a week on Howell's farm to ensure that Howell was maintaining the facilities and tending to flocks in accordance with Perdue's dictated standards. *Id*. Perdue's agreement granted them the right to place Howell on a Performance Improvement Plan if Howell's flocks failed to achieve Perdue's minimum standards of competitiveness.  *Id*.  Perdue never did so. (Admin Comp., para. 40, [Doc. #1-6, p. 19]).

8.    After being in business with Perdue Farms for some time, Howell began to

3

recognize lapses of sanitation and health standards on the part of Perdue. [Doc. #1-6, p. 13]. He noted that Perdue was delivering poor quality feed and sickly chicks. [Doc. #1-6, p. 13]. He observed Perdue was careless and abusive with chickens, delivering chicks in filthy trays, failing to sanitize trailers and catch machines, and willfully dropping chickens on their heads during their weighing. [Doc. #1-6, p. 13]. He shared these and other concerns several times, first with Perdue and then with regulatory agencies, lawmakers, the media, and the public. [Doc. #1-6, p. 13].

9.      In the mid- to late 2019 timeframe, Howell observed that he was having to cull uncharacteristically high numbers of sickly birds. [Doc. #1-6, p. 13]. On June 27, 2019, Howell recorded culling 148 birds in one house. [Doc. #1-6, p. 13]. He confirmed with other growers that they also were experiencing high cull volumes. [Doc. #1-6, p. 13].

10.     Beginning in November 2019, Howell observed that the scales—used to determine when the maximum number of birds had been put in an individual cage for transport—were not functioning properly. [Doc. #1-6, p. 14]. The dangerous effect was that catch crews did not know how many birds were in the transport cages, and some cages were thus overfilled - creating potential insanitary conditions and threatening animal welfare. [Doc. #1-6, p. 14]. Howell reported these insanitary conditions and threats to animal welfare to Perdue through his Live Haul Performance & Service Score report in November 2019, and again in January 2020, March 2020, and June 2020. [Doc. #1-6, p. 14].

11.     Due to lack of redress, Howell began sharing his concerns with the media and, by extension, the public. [Doc. #1-6, p. 14]. On March 14, 2020, The Guardian reported on Howell's food and feed safety concerns, including his reports that Perdue was sending the farmers low-quality feed (including wet and moldy feed that endangered the health of the chickens) and that Perdue was sending farmers large numbers of sickly birds that had to be culled. [Doc. #1-6, p. 14].

4

12.    On April 24, 2020, Howell sent photos of the dirty trays in which Perdue was delivering chicks to Perdue's Director of Live Production Tim Little. [Doc. #1-6, p. 14].  Howell received no response, and thus on April 30, 2020, Howell escalated his concerns to USDA Resident Agent Supervisor Wayne Basford. [Doc. #1-6, p. 14]. Howell noted that Perdue had delivered chicks in dirty trays, contrary to the company's stated policies for biosecurity and sanitation. [Doc. #1-6, p. 14].Howell also reported he was concerned that Perdue's use of dirty trays for his chicks, specifically, may have been retaliation for his reports of concerns. [Doc. #1-6, p. 14].

13.    On June 1, 2020, Howell reported sanitation issues with the catch machine. [Doc. #1-6, p. 14]. A catch machine uses rubber fingers on rotating drums to catch and move chickens into cages for loading onto a truck. [Doc. #1-6, p. 14]. Howell reported to Perdue via his Live Haul Performance & Service Score report that Perdue's catch machine was dirty and housed a dead chicken from a prior catch.  [Doc. #1-6, p. 14]. He reported that Perdue's trailers also were dirty. [Doc. #1-6, p. 14-15]. These violations of Perdue's stated policies for biosecurity and sanitation presented cross-contamination threats to his flocks. [Doc. #1-6, p. 15].

14.    On June 27, 2020, Howell escalated his concern that Perdue was violating sanitation rules by delivering chicks in dirty, insanitary trays to Plant Manager Randy Brown. [Howell Administrative Complaint, Ex 5, para. 32] [Doc 1-6, p. 15]. Howell also attached copies of the Live Haul Performance & Service Score reports recording his concerns about the contaminated trailer and catch machines. *Id*.  Brown told Howell that Brown would check with his Plant Manager and Live Haul Manager. *Id*. However, Perdue did not respond further to Howell's concerns. (*Id*.)

15.  Howell did not have success getting resolution to his concerns and as such decided to make reports via channels to receive regulator and public attention.  [Doc. #1-6, p. 16, para. 34]. *Id*. He knew that reporting the above concerns to Perdue. through its vague internal channels was consistently futile given his past experiences. *Id.*  On or around June 22, 2020, Crystal Coast

5

Waterkeeper Larry Baldwin had contacted Howell to request access to Howell's farm and chicken houses for a group of public health advocates. As a Waterkeeper and part of the Coastal Carolina Riverwatch (hereinafter CCRW), Baldwin works with communities, businesses, and governmental agencies to stop the negative impacts of the swine and poultry industry. [Doc. #1-6, p. 16, para. 34].

16. On June 30, 2020, Howell informed his flock supervisor, Dean Shuttleworth, of his visitors and requested four sets of coveralls for the visitors, consistent with biosecurity protocols. [Doc. # 1-6, p. 15, para. 33]. By providing Howell with disposable coveralls at Howell's chicken houses, Shuttleworth necessarily was aware of Howell's visitors. [Doc. # 1-6, p. 15, para. 33].

17. On July 8, 2020, Howell hosted four public health advocates at the farm's chicken houses, including Waterkeeper Larry Baldwin, Lumber Riverkeeper Jefferson Currie II, Cape Fear Riverkeeper Kemp Burdette, and videographer for We Animals Media (WAM) Kelly Guerin. [Doc. #1-6, p. 15, para. 34]. WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and organizations to use for animal welfare advocacy. [Doc. #1-6, p. 15, para. 34]. Howell and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols. [Doc. #1-6, p. 15, para. 34].

18. During the July 8, 2020 tour of the chicken house, Guerin videotaped the flock, and Howell informed the advocates of his ongoing concerns—that large numbers of the birds he had been receiving from Perdue were arriving sick and unviable, that he had to undertake a high volume of culling, and that there were insanitary conditions of transport and weighing. [Doc. #1-6, p. 16, para. 35]. He discussed Perdue's lack of responsiveness. [Doc. #1-6, p. 16, para. 35]. Howell specifically identified two birds designated to be euthanized because they were injured

6

and/or too small to reach food and water freely. [Doc. #1-6, p. 16, para. 35]. He demonstrated the procedure of cervical dislocation (basically a decapitation of the chick by hand) as a means to cull chickens. (Admin. Comp., para. 35) [Doc. #1-6, p. 16]. Guerin asked if she could take home with her two birds identified as "culls," who otherwise would not survive. [Doc. #1-6, p. 16-17, para. 35]. Because chick mortality is a farmer-specific responsibility and not in violation of his contract with Respondent, Howell permitted her to take the chicks. [Doc. #1-6, p. 17, para. 35]. An individual chick, even in perfect health, is valued at less than one dollar. [Doc. #1-6, p. 17, para. 35].

19. On or around July 15, 2020, Baldwin asked for chicken house access for a second group of Waterkeepers and another film crew. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. Howell agreed and again contacted his flock supervisor to request disposable coveralls. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. His flock supervisor delivered the requested coveralls for the second set of public health advocates. (Admin. Comp., para. 36) [Doc. #1-6, p. 17].

20. On July 29, 2020, Baldwin, Currie, Haw Riverkeeper Emily Sutton, and three members of Lockwood Films visited Howell's chicken houses. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. Consistent with biosecurity protocols, all members of the group wore protective gear, either the coveralls provided by Perdue or unused Tyvek suits brought by the visitors. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. Howell and Simmons were both present, again, and ensured biosecurity protocols were followed. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. During this second visit, Howell reiterated his concerns that Perdue supplied him with large numbers of birds that were sick and unviable; that he had to undertake a high volume of culling; and that the chickens were subjected to insanitary conditions of transport and weighing. (Admin. Comp., para. 36) [Doc. #1-6, p. 17].

21. On July 17, 2020, We Animals Media posted a description of Guerin's visit to

7

Howell's chicken houses to its Facebook page. (Admin. Comp., para. 37) [Doc. #1-6, p. 17]. The group noted that these chicken houses were usually inaccessible to anyone outside of the industry, but that they had been invited by the farmer to bring transparency to the poultry industry.  (Admin. Comp., para. 37) [Doc. #1-6, p. 17]. Guerin reported observing a chick lying on the floor unresponsive and breathing heavily and another chick tinier than the others stumbling around with closed eyes and a beak encrusted with feces.  (Admin. Comp., para. 37) [Doc. #1-6, p. 17].  Guerin described asking to rescue the two chicks, to which Howell agreed. (Admin. Comp., para. 37) [Doc. #1-6, p. 17]. She detailed naming the lone surviving chick "Sweet Pea" and placing her with Piedmont Farm Animal Refuge. (Admin. Comp., para. 37) [Doc. #1-6, p. 17].

22.  On July 30, 2020, We Animals Media published its footage of Howell's chicken houses in a documentary and a collateral written piece that exposed animal welfare and public health concerns associated with industrial poultry farming on its website.  [Doc. #1-6, p. 18, para. 38]. Howell expected that Perdue would review the video footage—and hoped and believed that the video's publication would prompt the public to join him in opposing Perdue's problematic animal husbandry practices.  [Doc. #1-6, p. 18, para. 38]. Howell also hoped and believed that the video's publication would prompt further investigation or other action by government officials. [Doc. #1-6, p. 18, para. 38].  This video was a key piece of advocacy material publicly available and maintained on We Animals Media's website: "Mass Culling: System Shutdowns and the Failures of Factory Faming" (available here: https://weanimalsmedia.org/2020/07/30/system-shutdowns-and-the-failures-of-factoryfarming/). [Doc. #1-6, p. 18, para. 38].

23. On August 4, 2020, Sentient Media published an article, "Despite Perdue's High Welfare Standards, Some Chickens Can't Survive 45 Days," which described Guerin's visit to Howell's chicken houses and some of Howell's concerns. [Doc. #1-6, p. 18, para. 39]. The article noted that—despite Perdue's commitment to consumers in its 2016 animal welfare policy and 2017

8

"Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues"—it was still growing sickly chickens unable to survive. [Doc. #1-6, p. 18, para. 39]. Guerin reported her observations that Howell's chickens from Perdue were still crumbling under the burden of selective breeding; young chicks could take only a few steps before plopping down with their legs splayed behind them. [Doc. #1-6, p. 18, para. 39]. Guerin reported that Howell had walked among the birds unable to stand and demonstrated the culling procedure. [Doc. #1-6, p. 18, para. 39]. Guerin noted the culling by Howell was not an anomaly, but rather standard daily procedure that Perdue reminded the farmer to do, including in postings in his barn. [Doc. #1-6, p. 18, para. 39]. Guerin reported Howell allowed her to try to rescue two dying chicks that Howell was otherwise going to euthanize under Perdue's standards. [Doc. #1-6, p. 18-19, para. 39]. She noted that Howell reported that Perdue retaliated against farmers who speak out, including by sending them birds who are sicker, smaller, or hatched too late. [Doc. #1-6, p. 18, para. 39].

24. On August 18, 2020, with no prior warning to, inquiry of, or discussion with Howell, Perdue terminated Howell's 25-plus year relationship with Perdue. [Doc. #1-6, p. 19, para. 40] Perdue's stated cause for such action was the allegation that Howell "materially breached" his contractual obligations to Perdue over the "past several months" by "touring groups of visitors inside [his] poultry houses." [Doc. #1-6, p. 19, para. 40] Perdue claimed the presence of these visitors violated Perdue's Poultry Welfare and Bio-Security Programs and COVID-19 protocols. *Id*. Perdue also claimed Howell "converted" Perdue's property without Perdue's consent. *Id.*

## II.    Procedural History

25. The FSMA provides whistleblower protections for employees of entities engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food that is subject to the Food, Drug, and Cosmetic Act ("FDCA"). [Complaint, para. 32, Doc #1].

9

26.    On February 11, 2021, Howell filed his OSHA Complaint for alleged unlawful employment retaliation by Perdue against his involvement in the advocacy with regards to the public and environmental health NGOs, the WAM video, media reports, and unsanitary conditions. [Doc. #1-6, paras 22-36]. Howell alleged that, based on his prior "reports" of bad food, high cull rates, non-functioning scales, and dirty trays, which he subsequently reported to the advocacy and NGO groups he permitted on his farm, he was subjected to adverse employment actions. (Complaint, para. 33 [Doc #1, p.10]).

27.    The OSHA Complaint sought compensatory damages for "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." [Complaint, para. 34, [Doc #1, p.11]).

28.    On January 27, 2022, OSHA sent Howell's counsel a letter informing Howell that, as 210 days had passed since Howell had filed his OSHA Complaint, Howell had the right under FSMA to file his claim in federal court. (Complaint, para. 35, [Doc #1, p.11]).  Howell declined to file in federal court and notified OSHA of the same.

29.    On April 8, 2022, DOL dismissed the OSHA Complaint based upon the findings of an OSHA regional investigator.  Complaint, para. 36, [Doc #1, p.11]).

30.    On May 6, 2022, Howell appealed OSHA's findings to the OALJ and filed an amended ("restated") complaint. (Complaint, para. 36, [Doc #1, p.12]).  Howell sought the same compensatory damages as before, namely "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Complaint, para. 37).

31.    Perdue moved to dismiss Howell's Restated Complaint because Howell was not an

10

"employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's requirements, and Howell had failed to allege any act of retaliation by Perdue. (Complaint, para. 38). On December 14, 2022, ALJ Kultgen denied Perdue's motion. (Complaint, para. 38).

32.     Discovery ensued. (Complaint, para. 39, [Doc. #1, p. 12]. A five-day merits hearing in the Pending Administrative Proceedings was scheduled to commence on March 17, 2025, but Perdue and Howell moved to extend the deadlines in light of this impending action and motion for preliminary injunction. *Id*. On September 25, 2024, ALJ Kultgen amended the scheduling order and rescheduled the hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id*.

### III.     The Watts Administrative Proceedings

33.     The Howell Administrative Proceedings are factually, temporally and procedurally distinct from the Watts Administrative Proceedings in some key respects.

34.     The Watts Administrative Proceedings concerned a dispute between Perdue and another one of its growers, Craig Watts, who owned and operated a farm in North Carolina and raised chickens for Perdue. Watts' dispute with Perdue antedates Howell's dispute with Perdue by six years.  (Complaint, para. 40, [Doc. #1]).

35.     Perdue attempted to take third-party discovery in Watts from the NGOs and media who visited and the prepares the video taken on Watts' farm.  (Complaint, para. 42, [Doc. #1]). ALJ Kultgen quashed Perdue's request for third-party subpoenas, ruling that DOL's statutory procedures do not provide ALJs with authority to issue subpoenas. *Id.*  However, Watts' counsel and Perdue's counsel negotiated the provision of that third party discovery from the NGOs.  (Ayers Dec., para. 4). The NGOs were in fact collecting documents and negotiating the terms of the deposition they would provide, but Perdue abandoned this request. (See Ayers Dec., para. 4). Instead of continuing to obtain this discovery, Perdue counsel dropped its request and chose to

11

pursue an action in district court challenging the constitutionality of the DOL proceedings. (See Ayers Dec., para. 4).   Perdue never sought any third-party discovery in the Howell Administrative Proceedings, and none was denied to them.  (See Ayers Dec., para. 4).

36.      In both the Howell and Watts administrative proceedings:

- Complainants seek legal remedies (*i.e.*, compensatory damages) for Perdue's alleged violations of the FSMA.

- Complainants have elected to adjudicate their FSMA claims in an administrative proceeding before the OALJ and have not kicked them out to an Article III court.

- ALJ Kultgen is presiding, and the same attorneys represent Howell and Watts.

(Complaint, para. 43, [Doc. #1, p. 13]).

37.      However, key differences include the Watts administrative claim was pending for over a decade, due to no fault of Watts, but rather the various appeals. (Ayers Dec., Para. 5). Watts filed his FSMA complaint on February 23, 2015, and Howell filed on February 11, 2021, creating a six-year gap in applicable legal standards. (Ayers Dec., Para. 5). Watts' case encountered a multi-level appeal process including initial OSHA dismissal (February 8, 2016), ALJ dismissal (January 6, 2017), ARB affirmation (March 5, 2019), and Fourth Circuit remand (January 7, 2020). *Id*. These procedural hurdles significantly delayed resolution. (Ayers Dec., Para. 5).  Perdue's responses to the protected activities also differed significantly: Watts was required to complete supplemental biosecurity and animal welfare training, while Howell's contract was terminated immediately. (Ayers Dec., Para. 6). This severity difference impacts damage claims and remedy characterizations.  *Id*.

## IV.    *Jarkesy I* and *II.*

38.      On June 27, 2024, the Supreme Court issued its ruling in *Jarkesy II*. (Complaint, para. 44, [Doc. #1, p. 13-14]).

12

39.    In light of *Jarkesy II*, on July 19, 2024, Perdue wrote to the ALJ apprising her of the decision and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to seek leave to amend its answer based upon *Jarkesy I* and *II*. (*Id.*, para. 45). The ALJ denied Perdue's request for a temporary stay and further denied Perdue's request to amend its answer to request a jury trial and to add defenses arising under *Jarkesy I* and *II*.  (*Id.*, para. 45). She ruled that ALJs "'lack the power and authority to decide constitutional questions" and thus "cannot and will not grant any motion to dismiss on constitutional grounds.'" *Id.*

40.    On July 29, 2024, Perdue moved to dismiss the Watts Administrative Proceedings for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* and further moved for leave to amend its answer.  (*Id.*, para. 46). On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and for leave to amend, again ruling that she lacked authority to decide constitutional questions and could not grant the requested relief.  (*Id.*, para. 46). She did, however, grant the parties' joint request to extend the discovery cut-off and merits hearing date by six months to allow the First USDCT Action to adjudicate Perdue's motion for preliminary injunction. (*Id.*, para. 46).

41.    On August 20, 2024, Perdue filed the First USDCT Action against Acting Secretary Su, ALJ Kultgen, DOL, and the OALJ, along with a motion for preliminary injunction seeking to halt the Watts Administrative Proceedings. (*Id.*, para. 47).

42.    Perdue filed the second USDCT Action against Acting Secretary Su, ALJ Kultgen, DOL, and the OALJ, along with a motion for preliminary injunction seeking to halt the Howell Administrative Proceedings. *Id.*

43.    Those preliminary injunctions were denied. [Doc. #26].

44.    The OALJ has stayed the administrative proceedings pending resolution of this matter.  (Ayers Dec., para. 7).

13

Dated: March 17, 2025

Respectfully Submitted,


/s/ *Stephani L. Ayers*

Stephani L. Ayers (Wash. Bar # 31610)
On behalf of
GOVERNMENT ACCOUNTABILITY PROJECT
1612 K St., N.W., Suite 808
Washington, DC 20006
P: (813) 382-7865
stephani@whistleblowerdefenders.com

Attorneys for Defendant Rudy Howell


*/s/Gary W. Jackson*
Gary W. Jackson
Law Offices of James Scott Farrin
555 S. Mangum Street, Suite 800
Durham, NC 27701
Phone: (919) 688-4991
gjackson@farrin.com
N.C. Bar No. 13976

Local Civil Rule 83.1(d) Attorney for Defendant
Rudy Howell


14

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

PERDUE FARMS INC.,

        Plaintiff,

    v.

LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of the United States
Department of Labor, *et al.*,

        Defendants.

Civil Action No. 5:24-cv-00594-BO

## GOVERNMENT DEFENDANTS' LOCAL RULE 56.1(a) RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), the Government Defendants respectfully submit this response to Plaintiff's statement of material facts, ECF No. 35.

1.      This is an action for declaratory relief under 28 U.S.C. §§ 2201-02, to enjoin the governmental Defendants from conducting certain administrative proceedings against Perdue currently pending in the U.S. Department of Labor ("DOL")'s Office of Administrative Law Judges ("OALJ"), *Howell v. Perdue Farms Inc.*, No. 2022-FDA-00004 (the "Pending Administrative Proceedings"). (Compl. ¶ 1, ECF No. 1).

    **RESPONSE:**   Undisputed.

2.      This case is closely related and parallel to another action recently filed by Perdue in this Court, *Perdue Farms Inc. v. Su, et al.*, E.D.N.C. Case No. 5:24-cv-00477-BO (the "First USDCT Action"). (Compl. ¶ 10, ECF No. 1). That action addresses DOL administrative proceedings brought by a different farmer, Craig Watts ("Watts"), against Perdue, addressing nearly identical retaliation claims under FSMA (the "Watts Administrative Proceedings"). *Id.*

    **RESPONSE:**   Undisputed.

3.      Defendant Rudy Howell is a poultry farmer who owns and operates the Robert Miller poultry farm in Fairmont, North Carolina. (Appendix, Ex. 4, Claimant's Restated Complaint of Retaliation, ¶ 9 (May 6, 2022) ("Restated Compl.")).

**RESPONSE**:    Undisputed.

4.      In the Pending Administrative Proceedings, Perdue alleged that it is an integrated poultry producer engaged in business throughout the United States, including North Carolina. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model); *see also* Appendix, Ex. 19, Colaizzi Decl. ¶ 3.

**RESPONSE**:    Undisputed that Perdue alleged as much in the administrative proceedings.

5.      In the Pending Administrative Proceedings, Perdue further alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Howell. (Appendix, Ex. 19, Colaizzi Decl. ¶ 3). Perdue also alleged that the growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id*.

**RESPONSE**:    Undisputed that Perdue alleged as much in the administrative proceedings.

6.      Howell raised chickens for Perdue under a standard written contract (the "Agreement"). (Appendix, Ex. 4, Restated Compl. ¶ 9). In the pending Administrative Proceedings, Perdue alleged that Howell did this subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See Bunting*, 611 F. Supp. at 683-84; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements); Appendix, Ex. 19, Colaizzi Decl. ¶ 4. Perdue further alleged that the Agreement thus imposed upon Howell extensive requirements to protect the well-being of the poultry. *Id.*

**RESPONSE**: The first sentence is undisputed. The second and third sentences speak to a question of law (namely, what federal laws and regulations Perdue and Howell were "subject to," and the nature of

2

the obligations imposed by those requirements) instead of statements of fact, and are therefore inappropriately included in the Statement of Material Facts.

7.    Perdue also alleged that Howell's Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. (Appendix, Ex. 19, Colaizzi Decl. ¶ 5). In exchange, Howell agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. (*Id.*; Appendix, Ex. 4, Restated Compl. ¶ 12). Typically, Perdue alleged, chicks would be raised by contractor farmers for several weeks before removal. (*Id.*; see also Appendix, Ex. 4, Restated Compl. ¶ 15).

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings.

8.    In the Pending Administrative Proceedings, Perdue alleges that for years, Howell publicly and actively criticized Perdue, claiming that Perdue's policies make it impossible for farmers to make sufficient income. (Appendix, Ex. 19, Colaizzi Decl. ¶ 6).

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings.

9.    In July 2020, Mr. Howell invited non-governmental self-proclaimed "public health advocates," as well as a filmmaker from an animal rights organization We Animals Media ("WAM"), onto his farm in the middle of the COVID-19 pandemic to film a group of live chicks that were in apparent sick and inhumane condition. (Appendix Ex. 4, Restated Compl. ¶¶ 34-38). Nine days after this visit, WAM posted a description of the visit to Howell's farm, describing chickens in deplorable condition and how Howell had permitted the filmmaker to remove those chicks (one of which died shortly after leaving Howell's farm). *Id.* A few days later, on July 29, 2020, Howell again permitted non-governmental "public health advocates" and another film crew to access his farm, and the next day, July 30, 2020, WAM posted the video footage of the visit to Howell's farm. *Id.*

**RESPONSE**:   Undisputed, but incomplete. In his complaint, Howell stated that the individuals he invited onto his property are public health advocates, and WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and organizations to use for animal welfare advocacy. Pl.'s Appendix Ex. 4, Restated Compl.

Case 5:24-cv-00594-BO-RJ    Document 43    Filed 04/07/25    Page 3 of 12

¶ 31. Howell further stated that he and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols. *Id.* During the advocates' tour, Howell identified two birds who were designated to be euthanized because they were injured and/or too small to reach food and water freely. *Id.* ¶ 32. One of the advocates asked if she could take the two chicks since they would otherwise be euthanized. *Id.* Howell stated that because chick mortality is a farmer-specific responsibility and not in violation of his contract with Perdue, he permitted her to take the chicks. *Id.* He also stated that an individual chick, even in perfect health, is valued at less than one dollar. *Id.*

10.     In the Pending Administrative Proceedings, Perdue has alleged that despite the pandemic, it was evident from the video and an ensuing article about the filmmakers' visits that neither Howell nor any of the visitors was masked or followed the CDC recommendations for 6-ft. social distancing, which Perdue's independent growers were requested to follow at that time. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).

**RESPONSE**:    Undisputed that Perdue alleged in the administrative proceedings that Howell and visitors were not masked or following CDC social-distancing recommendations.

11.     Perdue also alleged that Howell failed to include any information about any of the visitors on the visitor sheets for his farm and that only one of the visitors even signed in as a visitor. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7). It further alleged that this was in clear violation of Perdue's poultry welfare and bio-security programs and COVID-19 protocols and that allowing non-essential unmasked visitors into the chicken houses placed at risk Perdue's employees (flock advisors, transporters, and technical employees) and Perdue's flock. *Id.*

**RESPONSE**:    Undisputed that Perdue alleged as much in the administrative proceedings.

12.     On or about August 20, 2020, Perdue notified Howell that it was invoking the termination terms of the Agreement, which permitted either party to terminate the Agreement "for any reason" so long as 90 days' prior written notice is provided to the other party. (Appendix Ex. 4, Restated Compl. ¶ 40). Perdue explained to Howell that, by hosting touring groups of visitors inside his poultry houses, he had violated Perdue's poultry welfare and bio-security programs, as well as the COVID-19 protocols put in place. *Id.* In the Pending Administrative Proceedings, Perdue alleged that rather than place more birds in

4

Howell's facility given his disregard for Perdue's safety protocols, Perdue provided Howell with a lump-sum payment to cover the average profit he could have netted during the 90-day period. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).

**RESPONSE**:　Undisputed, but incomplete. Howell has also alleged that Perdue "terminated Howell with no investigation, inquiry, or discussion with Howell. [Perdue] asserted that Howell committed a material breach of their contract by hosting a group of visitors at Howell's chicken houses. However, the Poultry Producer Agreement makes no reference to visitors. [Perdue] claimed Howell violated bio security protocols and COVID protocols, but Howell requested and received personal protective gear from [Perdue] for use with the visitors to meet bio security profiles. Further Howell did not receive COVID guidance from [Perdue] that was applicable to his farm. [Perdue] did not identify any biosecurity protocols or COVID protocols that Howell violated. Though [Perdue] had notice of the visits well in advance, Respondent did not invoke these objections to visitors at any point prior to the visits." Pl.'s Appendix Ex. 4, Restated Complaint at ¶ 45.

13.　In response the termination of Howell's contract, on February 11, 2021, Howell filed a whistleblower complaint in OSHA against Perdue ("OSHA Complaint") alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the WAM video, as well as his alleged reports of purportedly unsanitary conditions. (Appendix Ex. 1, OSHA Compl. (February 11, 2021)). Howell alleged that, based on his prior alleged "reports" of bad food, high cull rates, non-functioning scales, and dirty trays, which he subsequently reported to the tour groups he permitted on his farm, he was subjected to adverse employment actions. *Id.* ¶¶ 31-36.

**RESPONSE:**　Undisputed but incomplete. Howell alleged that he reported his concerns via, *inter alia*, his Live Haul Performance & Service Score report in November 2019, January 2020, March 2020, and June 2020. Howell further alleged that he reported his concerns to Perdue's Director of Live Production Tim Little, USDA's Resident Agent Supervisor Wayne Basford, and Plant Manager Randy Brown. Pl.'s Appendix Ex. 4, Restated Complaint at ¶¶ 26-39.

5

14.      Howell's OSHA Complaint sought compensatory damages for "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Appendix, Ex. 1, OSHA Compl. § IV, Prayer for Relief ¶¶ C, D, E, & J).

**RESPONSE:**   Undisputed but incomplete. Howell's complaint also sought, *inter alia*, "an injunction instructing [Perdue] not to retaliate or discriminate against [Howell] in any manner for his protected activity [Howell] [sic] in any manner for his protected activity under the Food Safety Modernization Act, or for pursuing this action," and "an order that Respondent expunge Complainant's employment record of any reference to the exercise of his rights under the employee protection provision of the Food Safety Modernization Act and of any references to his termination." Pl.'s Appendix Ex. 1, Original Complaint at Prayer for Relief, ¶¶ A–J.

15.      On January 27, 2022, OSHA sent Howell's counsel a letter informing Howell that, as 210 days had passed since Howell had filed his OSHA Complaint, Howell had the right under FSMA to file his claim in federal court. (Appendix, Ex. 2, OSHA Letter at 1). Its letter reported a conversation with Howell's counsel in which counsel stated that Howell's case would be refiled in federal district court, so OSHA informed Howell that, as a result, it was suspending its investigation. *Id.* OSHA further advised that Howell had thirty days to file his case in federal court. *Id.* Thirty days came and went, and Howell never filed his OSHA Complaint in federal court. Appendix, Ex. 19, Colaizzi Decl. ¶ 9.

**RESPONSE:**   Undisputed.

16.      On April 8, 2022, DOL dismissed the OSHA Complaint based upon the findings of an OSHA regional investigator. (Appendix, Ex. 3, OSHA Findings). DOL determined that there was "no reasonable cause to believe" that Perdue had violated FSMA because (a) Perdue's activity in raising chickens did not fall within the scope of the FDCA, and (b) under the test established in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), and a moderately different "right-to-control" test—both of which DOL uses to determine employee status under whistleblower statutes—Howell was not Perdue's employee. *Id.* at 1-2.

6

**RESPONSE:** Undisputed.

17.     On May 6, 2022, Howell appealed OSHA's findings to the OALJ and filed an amended ("restated") complaint. (Appendix, Ex. 4, Restated Complaint). It sought the same compensatory damages as before, namely "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Appendix, Ex. 4, Restated Complaint, § IX, Prayer for Relief ¶¶ C, D, E, & J).

**RESPONSE:** Howell's restated complaint also sought, *inter alia*, "an injunction instructing [Perdue] not to retaliate or discriminate against [Howell] in any manner for his protected activity [Howell] [sic] in any manner for his protected activity under the Food Safety Modernization Act, or for pursuing this action," and "an order that Respondent expunge Complainant's employment record of any reference to the exercise of his rights under the employee protection provision of the Food Safety Modernization Act and of any references to his termination." Pl.'s Appendix Ex. 4, Restated Complaint at Prayer for Relief, ¶¶ A–J.

18.     Perdue moved to dismiss Howell's Restated Complaint because Howell was not an "employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's requirements, and Howell had failed to allege any act of retaliation by Perdue. (Appendix, Ex. 19, Colaizzi Decl. ¶ 8). On December 14, 2022, ALJ Kultgen denied Perdue's motion. (Appendix, Ex. 5, OALJ Dec. and Order).

**RESPONSE:** Undisputed.

19.     Discovery ensued. On September 25, 2024, ALJ Kultgen amended the scheduling order and rescheduled the previously scheduled hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. (Appendix, Ex. 6, Scheduling Order (September 25, 2024)). On March 4, 2025, Perdue and Howell moved to stay the Pending Administrative Proceedings pending this Court's decision on dispositive motions and on March 11, 2025, ALJ Kultgen granted that motion and stayed the

7

Pending Administrative Proceedings. (Appendix, Ex. 18, Order Granting Joint Motion to Stay (March 11, 2025)).

**RESPONSE:**   Undisputed.

20.      Apart from some factual variations, the Pending Administrative Proceedings are substantively identical to the Watts Administrative Proceedings in all material respects relating to the constitutional issues raised in this action and in the First USDCT Action. (Compl., ECF No. 1; Appendix, Ex. 7, First USDCT Action Complaint).

**RESPONSE:**   Undisputed.

21.      The Watts Administrative Proceedings concerned a similar dispute between Perdue and another one of its independent contractors, Watts, who owns and operates farms in North Carolina and raises chickens for Perdue as an independent contractor, just like Howell. (Appendix, Ex. 7, First USDCT Action Complaint). Watts' dispute with Perdue antedates Howell's dispute with Perdue, and Watts engaged in a similar scheme of raising a flock in deplorable condition and then inviting an animal rights group onto his farm to tape and publicize the results. *Id.* After Perdue took modest remedial action, Watts, just like Howell, alleged retaliation by Perdue in violation of FSMA's whistleblower activities on his farms. *Id.*

**RESPONSE:**   As to the first sentence, it is undisputed that the Watts matter concerned a similar dispute between Perdue and Watts, however, it is not undisputed that Howell and Watts are independent contractors, as the question of their status as employees under FSMA is being litigated in the administrative proceedings. The timeline that Watts' complaint predates Howell's complaint is undisputed. The characterization of Howell's claims as ones arising under the FSMA is undisputed. Watts's allegations regarding Perdue's actions and retaliation are set forth in Watts' complaint in *Perdue Farms, Inc. v. Chavez-Deremer*, *et al.*, E.D.N.C. No. 5:24-cv-477-BO ("*Perdue I*"), ECF No. 51-1.

22.      In both administrative proceedings:

   • Complainants seek legal remedies (i.e., compensatory damages) for Perdue's alleged violations of the FSMA.

   • Complainants have elected to adjudicate their FSMA claims in an administrative proceeding before the OALJ and have not (yet) kicked them out to an Article III court.

8

> • ALJ Kultgen is presiding, and the same attorneys represent Howell and Watts.
>
> • To mount a proper defense against these claims, Perdue needs third-party subpoenas to obtain discovery and evidence regarding the visits made to the farms by the animal rights and/or "public health advocates" and their video footage.

(Compl. ¶ 43, ECF No. 1); see also Appendix, Ex. 7, First USDCT Complaint.

**RESPONSE:**   Regarding the first bullet point, Watts and Howell seek equitable remedies. Pl.'s Appendix Ex. 4, ECF No. 36-4; *Perdue I*, Pl's Appendix Ex. 1, ECF No. 51-1. The second and third bullet points are undisputed. Regarding the fourth bullet point, Perdue's allegation that it cannot "mount a proper defense" without third-party subpoenas implicates legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts.

23.    On March 11, 2024, Perdue applied for document and deposition subpoenas in the Watts Administrative Proceedings to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (Appendix, Ex. 8, Perdue's Application for Subpoenas). These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority. (Appendix, Ex. 9, Watts Order Quashing Subpoenas (Mar. 15, 2024)). Perdue moved for reconsideration or, in the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. (Appendix, Ex. 10, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)). On April 18, 2024, ALJ Kultgen denied this motion. (Appendix, Ex. 11, Order Denying Mot. to Certify Interlocutory Appeal).

**RESPONSE:**   Disputed as to the claim that the "the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims," which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts.

24.     On July 19, 2024, in the Watts Administrative Proceedings, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 12, Perdue's Letter Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id*. Watts opposed. (Appendix, Ex. 13, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 14, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id.*, but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id.* at 2 n.3.

**RESPONSE**:    Disputed as to the characterization of the ALJ's order as inconsistent with portions of the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts. Additionally, disputed as to the assertion that the ALJ "den[ied] Perdue's motion before the motion was ever filed." The ALJ issued a written decision denying Perdue's motion to dismiss in the Watts Administrative Proceedings on August 8, 2024, after the motion to dismiss was filed. Pl.'s Appendix, Ex. 17, Order Denying Mot. to Dismiss, ECF No. 36-17.

25.     Perdue moved to dismiss the Watts Administrative Proceedings for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 15, Perdue's Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing

whether *Jarkesy I or II* applied. (Appendix, Ex. 16, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

      **RESPONSE**:   Undisputed.

      26.     On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend in the Watts Administrative Proceedings, again ruling that she lacked authority to decide constitutional questions. (Appendix, Ex. 17, Order Denying Mot. to Dismiss). She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

      **RESPONSE**:   Disputed as to Perdue's characterization of the ALJ's order as "ruling that she lacked authority to decide constitutional questions." The ALJ did not rule that she "lacked authority to decide constitutional questions," only that she "lacked the authority to decide the constitutional question at issue" in Perdue's motion. Pl.'s Appendix, Ex. 17, Order Denying Mot. to Dismiss at 1-2.

Dated: April 7, 2025

                                       DANIEL P. BUBAR
                                       Acting United States Attorney

                                       BY:    */s/ K. Paige O'Hale*
                                       K. PAIGE O'HALE
                                       Assistant United States Attorney
                                       Chief, Civil Division
                                         Eastern District of North Carolina
                                         150 Fayetteville Street, Suite 2100
                                       Raleigh, NC 27601
                                       Telephone: (919) 856-4870
                                       Email: paige.ohale@usdoj.gov
                                       NC Bar # 44667

                                       *Counsel for the Government Defendants*

11

## CERTIFICATE OF SERVICE

I do hereby certify that I have this 7th day of April 2025, served a copy of the foregoing upon counsel for all parties by electronically filing the foregoing with the Court on this date using the CM/ECF system.

/s/ K. Paige O'Hale
K. PAIGE O'HALE
Assistant United States Attorney
Chief, Civil Division
Eastern District of North Carolina
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4870
Email: paige.ohale@usdoj.gov
NC Bar # 44667

*Counsel for the Government Defendants*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO. 5:24-cv-00594-BO-RJ

**PERDUE FARMS INC.,**

     Plaintiff,

v.

**LORI CHAVEZ-DEREMER**, in her
official  capacity as Secretary of the
U.S. Department of Labor, et al.,

     Defendants.

_____

**DEFENDANT RUDY HOWELL'S LOCAL RULE 56.1(a) RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a),

Defendant Howell respectfully submits this response to Plaintiff Perdue Farm

Inc.'s Local Civil Rule 56.1 "Statement of Undisputed Material Facts", ECF No.

35.

1. This is an action for declaratory relief under 28 U.S.C. §§ 2201-02, to

enjoin the governmental Defendants from conducting certain administrative

proceedings against Perdue currently pending in the U.S. Department of Labor

("DOL")'s Office of Administrative Law Judges ("OALJ"), *Howell v. Perdue*

*Farms Inc.*, No. 2022-FDA-00004 (the "Pending Administrative Proceedings").

**Response:** Undisputed.

2. This case is closely related and parallel to another action recently

1

filed by Perdue in this Court, *Perdue Farms Inc. v. Su, et al.*, E.D.N.C. Case No. 5:24-cv-00477-BO (the "First USDCT Action"). (Compl. ¶ 10, ECF No. 1). That action addresses DOL administrative proceedings brought by a different farmer, Craig Watts ("Watts"), against Perdue, addressing nearly identical retaliation claims under FSMA (the "Watts Administrative Proceedings"). *Id*.

**Response:** Undisputed as to the first sentence. Disputed as to the characterization in the second sentence of "nearly identical" as such is subjective opinion and said actions involve different time frames, different actors, different actions, different disclosures, and different outcomes.

3. Defendant Rudy Howell is a poultry farmer who owns and operates the Robert Miller Farm in Fairmont, North Carolina.

**Response:** Undisputed.

4. In the Pending Administrative Proceedings, Perdue alleged that it is an integrated poultry producer engaged in business throughout the United States, including North Carolina.

**Response:** Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

5. In the Pending Administrative Proceedings, Perdue alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Howell.

2

Perdue also alleged that the growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing.

**Response:** Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

6. Howell raised chickens for Perdue under a standard written contract (the "Agreement"). In the Pending Administrative Proceedings, Perdue alleged that Howell did this subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. Perdue further alleged that the Agreement thus imposed upon Howell extensive requirements to protect the well-being of the poultry.

**Response:** Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

7. Perdue also alleged that Howell's Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. In exchange, Howell agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. Typically, Perdue alleged, chicks would be raised by contractor farmers for several weeks before removal.

3

**Response:** Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

8. In the Pending Administrative Proceedings, Perdue alleges that for years, Howell publicly and actively criticized Perdue, claiming that Perdue's policies make it impossible for farmers to make sufficient income. (Appendix, Ex. 19, Colaizzi Decl. ¶ 6).

**Response:** Disputed. Perdue cites its lawyer's declaration that it made this allegation in the administrative proceedings, but it does not point to a source in the administrative proceedings where Perdue claimed that "Howell publicly and actively criticized Perdue, claiming that Perdue's policies made it impossible for farmers to make sufficient income." Perdue has not identified a source where it has made this particular allegation. Howell's documented concerns speak for themselves.

9. In July 2020, Mr. Howell invited non-governmental self-proclaimed "public health advocates," as well as a filmmaker from an animal rights organization We Animals Media ("WAM"), onto his farm in the middle of the COVID-19 pandemic to film a group of live chicks that were in apparent sick and inhumane condition. Nine days after this visit, WAM posted a description of the visit to Howell's farm, describing chickens in deplorable condition and how Howell had permitted the filmmaker to remove those chicks (one of which died

4

shortly after leaving Howell's farm). *Id.* A few days later, on July 29, 2020, Howell again permitted non-governmental "public health advocates" and another film crew to access his farm, and the next day, July 30, 2020, WAM posted the video footage of the visit to Howell's farm. *Id.*

**Response:** Disputed.   The organizations who visited are established nonprofit 501C3 organizations with demonstrated health and environmental missions to protect, not "self-proclaimed".  Disputed further as on July 8, 2020, Howell hosted four public health advocates at the farm's chicken houses, including Waterkeeper Larry Baldwin, Lumber Riverkeeper Jefferson Currie II, Cape Fear Riverkeeper Kemp Burdette, and videographer for We Animals Media (WAM) Kelly Guerin.  [Doc. #1-6, p. 15, para. 34].  Disputed further as WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and organizations to use for animal welfare advocacy.  [Doc. #1-6, p. 15, para. 34].

10. In the Pending Administrative Proceedings, Perdue has alleged that despite the pandemic, it was evident from the video and an ensuing article about the filmmakers' visits that neither Howell nor any of the visitors was masked or followed the CDC recommendations for 6-ft. social distancing, which Perdue's independent growers were requested to follow at that time. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).

5

**Response:** Disputed. Perdue's characterization is argumentative and omits evidence that Howell told Perdue about his visitors, provided coveralls (provided by Perdue), enforced biosecurity, and complied with CDC guidance as understood by independent growers. Disputed also in that Howell and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols known to them. [Doc. #1-6, p. 15, para. 34]. Further disputed in that Perdue did not convey to Howell what it was that he was alleged to have violated with regards to biosecurity protocols and is making these claims after the fact.

11. Perdue also alleged that Howell failed to include any information about any of the visitors on the visitor sheets for his farm and that only one of the visitors even signed in as a visitor. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7). It further alleged that this was in clear violation of Perdue's poultry welfare and bio-security programs and COVID-19 protocols and that allowing non- essential unmasked visitors into the chicken houses placed at risk Perdue's employees (flock advisors, transporters, and technical employees) and Perdue's flock. *Id.*

**Response:** Disputed. Perdue is now making these allegations and claiming they are supported based on Perdue's attorney's declaration in this matter, without pointing to an original source of it raising these alleged concerns below. Further disputed as ignoring that Howell maintained visitor logs and that Howell provided biosecurity gear for each visitor, demonstrating good-faith compliance. Disputed

6

JA703

further in that Perdue did not provide any published COVID-19 protocols to the farmers and Perdue employees were not at any risk from Howell or his guests.

12. On or about August 20, 2020, Perdue notified Howell that it was invoking the termination terms of the Agreement, which permitted either party to terminate the Agreement "for any reason" so long as 90 days' prior written notice is provided to the other party. (Appendix Ex. 4, Restated Compl. ¶ 40). Perdue explained to Howell that, by hosting touring groups of visitors inside his poultry houses, he had violated Perdue's poultry welfare and bio-security programs, as well as the COVID-19 protocols put in place. *Id.* In the Pending Administrative Proceedings, Perdue alleged that rather than place more birds in Howell's facility given his disregard for Perdue's safety protocols, Perdue provided Howell with a lump-sum payment to cover the average profit he could have netted during the 90-day period. (Appendix, Ex. 19, Colaizzi Decl. ¶ 7).

**Response:** Disputed as to the third sentence as Perdue only invoked protection of its "assets"- "the poultry"—as reason for not placing ore chickens with Howell: "During the interim period, Perdue has elected not to place chicks on your poultry farm to protect its assets-that is, the poultry."

13. In response the termination of Howell's contract, on February 11, 2021, Howell filed a whistleblower complaint in OSHA against Perdue ("OSHA

Complaint") alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the WAM video, as well as his alleged reports of purportedly unsanitary conditions. (Appendix Ex. 1, OSHA Compl. (February 11, 2021)). Howell alleged that, based on his prior alleged "reports" of bad food, high cull rates, non-functioning scales, and dirty trays, which he subsequently reported to the tour groups he permitted on his farm, he was subjected to adverse employment actions. *Id.* ¶¶ 31-36.

**Response:** Disputed as to Perdue's characterization, as Howell filed his OSHA Complaint for unlawful employment retaliation by Perdue against his involvement in the advocacy with regards to the public and environmental health NGOs, the WAM video, media reports, and unsanitary conditions. [Doc. #1-6, paras 22-36]. Howell a l s o alleged that, based on his prior "reports" of bad food, high cull rates, non-functioning scales, and dirty trays, which he subsequently reported to the advocacy and NGO groups he permitted on his farm, he was subjected to adverse employment actions. [Complaint, para. 33].

14. Howell's OSHA Complaint sought compensatory damages for "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and

8

equity….” (Appendix, Ex. 1, OSHA Compl. § IV, Prayer for Relief ¶¶ C, D, E, & J).

**Response:** Undisputed.

15. On January 27, 2022, OSHA sent Howell's counsel a letter informing Howell that, as 210 days had passed since Howell had filed his OSHA Complaint, Howell had the right under FSMA to file his claim in federal court. (Appendix, Ex. 2, OSHA Letter at 1). Its letter reported a conversation with Howell's counsel in which counsel stated that Howell's case would be refiled in federal district court, so OSHA informed Howell that, as a result, it was suspending its investigation. *Id*. OSHA further advised that Howell had thirty days to file his case in federal court. *Id.* Thirty days came and went, and Howell never filed his OSHA Complaint in federal court. Appendix, Ex. 19, Colaizzi Decl. ¶ 9.

**Response:** Disputed as to incomplete. Perdue omits that Howell had declined to file in federal court and notified OSHA of the same.

16. On April 8, 2022, DOL dismissed the OSHA Complaint based upon the findings of an OSHA regional investigator. (Appendix, Ex. 3, OSHA Findings). DOL determined that there was "no reasonable cause to believe" that Perdue had violated FSMA because (a) Perdue's activity in raising chickens did not fall within the scope of the FDCA, and (b) under the test established in

9

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), and a moderately different "right-to- control" test—both of which DOL uses to determine employee status under whistleblower statutes—Howell was not Perdue's employee. *Id.* at 1-2.

**Response:** Disputed in part. Howell disputes OSHA's legal conclusions regarding FSMA's scope and the application of the Darden test to independent growers.

17. On May 6, 2022, Howell appealed OSHA's findings to the OALJ and filed an amended ("restated") complaint. (Appendix, Ex. 4, Restated Complaint). It sought the same compensatory damages as before, namely "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Appendix, Ex. 4, Restated Complaint, § IX, Prayer for Relief ¶¶ C, D, E, & J)

**Response:** Undisputed.

18. Perdue moved to dismiss Howell's Restated Complaint because Howell was not an "employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's requirements, and Howell had failed to allege any act of retaliation by Perdue. (Appendix, Ex. 19, Colaizzi Decl. ¶ 8). On December 14, 2022, ALJ Kultgen denied Perdue's motion. (Appendix, Ex.

10

5, OALJ Dec. and Order).

**Response:** Undisputed as to this is what Perdue claimed as grounds for dismissal, but obviously Howell and the ALJ did not agree as to any of those reasons.

19. Discovery ensued. On September 25, 2024, ALJ Kultgen amended the scheduling order and rescheduled the previously scheduled hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. (Appendix, Ex. 6, Scheduling Order (September 25, 2024)).  On March 4, 2025, Perdue and Howell moved to stay the Pending Administrative Proceedings pending this Court's decision on dispositive motions and on March 11, 2025, ALJ Kultgen granted that motion and stayed the Pending Administrative Proceedings. (Appendix, Ex. 18, Order Granting Joint Motion to Stay (March 11, 2025)).

**Response:** Undisputed as to Howell and Perdue sought discovery. Disputed as Howell, but not Perdue, cooperated in discovery "ensuing".

20. Apart from some factual variations, the Pending Administrative Proceedings are substantively identical to the Watts Administrative Proceedings in all material respects relating to the constitutional issues raised in this action and in the First USDCT Action. (Compl., ECF No. 1; Appendix, Ex. 7, First USDCT Action Complaint).

11

**Response:** Disputed as to substantively identical being an opinion characterization by Perdue.

21. The Watts Administrative Proceedings concerned a similar dispute between Perdue and another one of its independent contractors, Watts, who owns and operates farms in North Carolina and raises chickens for Perdue as an independent contractor, just like Howell. (Appendix, Ex. 7, First USDCT Action Complaint). Watts' dispute with Perdue antedates Howell's dispute with Perdue, and Watts engaged in a similar scheme of raising a flock in deplorable condition and then inviting an animal rights group onto his farm to tape and publicize the results. *Id.* After Perdue took modest remedial action, Watts, just like Howell, alleged retaliation by Perdue in violation of FSMA's whistleblower activities on his farms. *Id.*

**Response:** Disputed.  Neither employee is an independent contractor. Neither employee engaged in any kind of "scheme".  Both employees followed the demands and instructions for raising chickens set forth by Perdue, and they used the feed, chickens, and medications provided by Perdue in accordance with Perdue's instructions.  Both employees use the equipment mandated by Perdue and conducted their operations in accordance with Perdue demands.  Neither employee created sick chickens or deplorable conditions.

22. In both administrative proceedings:

12

- Complainants seek legal remedies (*i.e.*, compensatory damages) for Perdue's alleged violations of the FSMA.

- Complainants have elected to adjudicate their FSMA claims in an administrative proceeding before the OALJ and have not (yet) kicked them out to an Article III court.

- ALJ Kultgen is presiding, and the same attorneys represent Howell and Watts.

- To mount a proper defense against these claims, Perdue needs third-party subpoenas to obtain discovery and evidence regarding the visits made to the farms by the animal rights and/or "public health advocates" and their video footage.

(Compl. ¶ 43, ECF No. 1); *see also* Appendix, Ex. 7, First USDCT

Complaint

**Response:** Disputed. It is Perdue's claim, not fact, that they need third-party subpoenas. Yet, Perdue has never sought third-party discovery in the Howell matter, nor has it been denied third-party discovery in the Howell matter. In Watts, Plaintiffs' counsel had worked cooperatively to obtain third-party discovery with Perdue. In fact, Plaintiff had negotiated agreement with third parties to provide some testimony and documentation to Perdue. Perdue was never denied third-party discovery; simply put the ALJ did not issue subpoenas. Neither party can obtain subpoenas in either proceeding, but both are free to work cooperatively with each other and third parties to get the discovery that they need. Perdue ceased all efforts to do so in favor of this proceeding.

23. On March 11, 2024, Perdue applied for document and deposition subpoenas in the Watts Administrative Proceedings to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (Appendix, Ex. 8, Perdue's Application for Subpoenas). These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority. (Appendix, Ex. 9, Watts Order Quashing Subpoenas (Mar. 15, 2024)). Perdue moved for reconsideration or, in the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. (Appendix, Ex. 10, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)). On April 18, 2024, ALJ Kultgen denied this motion. (Appendix, Ex. 11, Order Denying Mot. to Certify Interlocutory Appeal).

**Response:** Undisputed, except this statement omits that the party from whom Perdue desired the subpoena agreed to voluntarily provide the deposition and requested footage, as described above in response to 22. Perdue never sought third-party discovery in Howell.

24. On July 19, 2024, in the Watts Administrative Proceedings, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for

14

lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 12, Perdue's Letter Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id.* Watts opposed. (Appendix, Ex. 13, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 14, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id.*, but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id.* at 2 n.3.

**Response:** Undisputed, except that Perdue's *Thunder Basin* arguments are purely legal and wrong.

25. Perdue moved to dismiss the Watts Administrative Proceedings for lack of subject- matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 15, Perdue's Watts Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing whether *Jarkesy I or II* applied. (Appendix, Ex. 16, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

**Response:** Undisputed, except that Watts believed that while the ALJ herself could not rule the proceedings unconstitutional, Perdue could raise such constitutional challenges to the ARB or Fourth Circuit should any order be entered finding Perdue liable under the FMSA.

26. On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend in the Watts Administrative Proceedings, again ruling that she lacked authority to decide constitutional questions. (Appendix, Ex. 17, Watts Order Denying Mot. to Dismiss). She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

**Response:** Undisputed.

Dated: April 7, 2025

/s/Stephani L. Ayers

Stephani L. Ayers (Wash. Bar # 31610)
GOVERNMENT ACCOUNTABILITY
PROJECT
1612 K St., N.W., Suite 808
Washington, DC 20006
P: (813) 382-7865
stephani@whistleblowerdefenders.com

Attorneys for Defendant Rudy Howell


/s/Gary W. Jackson
Gary W. Jackson
Law Offices of James Scott Farrin
555 S. Mangum Street, Suite 800
Durham, NC 27701
Phone: (919) 688-4991
gjackson@farrin.com
N.C. Bar No. 13976

Local Civil Rule 83.1(d) Attorney for
Defendant Rudy Howell

---

## CERTIFICATE OF SERVICE

I hereby certify that on this day I filed the foregoing with the Clerk of Court

using the CM/ECF system, which will send notification of such filing to all

counsel of record.

Dated: April 7, 2025

/s/ *Stephani L. Ayers*

17

Attorney for Defendant Rudy Howell

18

JA715

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:24-cv-00594-BO-RJ**

|  |  |
|---|---|
| **PERDUE FARMS INC.**, <br><br>    Plaintiff, <br><br> v. <br><br> **LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al., <br><br>    Defendants. |  |

**PLAINTIFF PERDUE FARMS INC.'S LOCAL RULE 56.1(a) RESPONSE**
**TO DEFENDANT RUDY HOWELL'S STATEMENT OF UNDISPUTED FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), Plaintiff Perdue Farms Inc. ("Perdue") respectfully submits this response to Defendant Rudy Howell's Statement of Undisputed Facts, ECF No. 37-2.

1.    Rudy Howell owns and operates the Robert Miller farm in Fairmont, North Carolina. (Complaint, para. 24) [Doc. #1]. Howell, like Watts, is a Robeson County poultry farmer who raised chickens for Perdue under a contract similar to Watts. [Doc.#12, p. 12].

    **RESPONSE:**

The first sentence is not disputed. The second sentence cites to ECF No. 12, the legal memorandum filed by the Department of Labor Defendants ("DOL Defs.") opposing Perdue's motion for a preliminary injunction. Factual assertions or allegations in a brief are hearsay and are not supported by verified statement of a witness with personal knowledge. Fed. R. Civ. P. 56 and Local Rule 56.1(a)(4) require the movant's statement of undisputed facts in support of a summary-judgment motion to cite admissible evidence supporting each factual assertion. Hearsay is not admissible evidence and may not be used to support Howell's summary-judgment motion. See *Md. Highways Contractors Ass'n v. Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary

JA716

judgment."). Accordingly, the second sentence is not supported by admissible evidence and may not be considered by the Court. In further support, Perdue incorporates by reference its legal argument at pp. 39-41 of its Reply Memorandum.

2.     Perdue is an integrated poultry producer engaged in business throughout the United States. (Complaint, para. 25) [Doc. #1]. Today more than 90 percent of broiler chickens and most turkeys are raised by farmers under contract to poultry companies such as Perdue. (Howell Administrative Complaint, Ex. 5, para. 10) [Doc #1-6, p. 8] [hereinafter Admin. Comp.]). These companies are referred to as "integrators" because of their integrated supply chain. *Id*. Perdue represents to the farmers that its vertical integration provides unparalleled support to its poultry farmers, including: (1) A flock adviser providing ongoing guidance to help maximize the farmer's flock performance— and income; (2) Dedicated veterinarians for each of the growing regions, backed by Perdue's own animal health lab (3) A Technical Services Department that rivals many research universities and houses Perdue's experts in poultry health and nutrition; (4) Research to support continuous improvement in animal care. (*Id*., at pp. 8-9).

**RESPONSE:**

The first sentence is not disputed. The second, third, and fourth sentences cite to Howell's unverified complaint filed in the DOL proceedings ("Howell's Administrative Complaint"). The cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

3.     Perdue controls the stages of production through vertical integration including: 1. Breeder operations and contract farms; 2. Hatcheries; 3. Feed ingredient sourcing and feed mills; Grow-out operations, including contract broiler and turkey farms; 5. Technical and veterinary services; 6. Harvesting and processing; 7. Marketing, sales and distribution. (Admin. Comp., at pp. 8-9 [Doc. #1-6]). Within this integrated operation, Perdue owns hatcheries and breeding flocks. (Complaint, para. 25 [Doc. #1]). Perdue delivers its chicks to growers, such as Howell. *Id*. Growers provide the land, facilities, equipment, and labor to raise the chicks over the course of

2

approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id.*

**RESPONSE:**

The second, third, and fourth sentences are not disputed. The first sentence cites to Howell's unverified complaint filed in the DOL proceedings. The cited statement is inadmissible hearsay and thus does not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

4.      Perdue exerted an extreme level of control over Howell and his farm operations. (Admin. Comp., para. 11, [Doc. #1-6, at p. 9]). Pursuant to their contract, Perdue selected and consigned the chicks to Howell to raise. *Id.* The contract granted Perdue the authority to determine the number and breed of chickens Howell raised, the time allowed for processing each flock, and placement for future flocks. *Id.* The contract required that Howell only use feed, medication, vaccinations, or other supplies provided by or arranged by Perdue. (*Id.*, *See also* Complaint, para. 27).

**RESPONSE:**

All four sentences cite to Howell's unverified complaint filed in the DOL proceedings. The cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference. The last sentence also cites to Perdue's Complaint in this case (ECF No. 1, ¶ 27), but the Complaint does *not* state or imply that Perdue's contract with Howell required that Howell only use feed, medication, vaccinations, or other supplies provided or arranged by Perdue. Thus, the last sentence is not supported by admissible evidence as required by Rule 56 and Local Rule 56.1(a)(4).

5.      In exchange, Howell agreed to accept the consigned chicks, and to feed, water, and care for them until the chicks were removed at Perdue's direction. (*Id.,* at para. 12, [Doc. #1-6, at p. 9]). (*See also*, Complaint, para. 27, [Doc. #1]). Howell further agreed to use only the feed, medications, vaccinations, and other supplies Perdue provided. (Admin Comp., para. 12, [Doc #1-6, at p. 9). Perdue required Howell to house and tend the flocks in accordance with Perdue's standards. *Id.* These standards imposed numerous requirements on the structure, outfitting, and maintenance of Howell's facilities. *Id.* These standards also set forth various tasks required to be

3

JA718

performed on each day of the flocks' growth cycles and additional specific tasks to be performed on certain key dates during and in between the flocks' cycles. *Id.* Typically, chicks would be raised by farmers for several weeks before removal. (Complaint, para. 27, [Doc. #1, p. 8-9]).

**RESPONSE:**

The last (sixth) sentence is not disputed. All five preceding sentences cite to Howell's unverified complaint filed in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference. The first sentence further cites to Perdue's Complaint, ECF No. 1, ¶ 27, but the Complaint does not say, as Howell asserts, that the chicks were removed "at Perdue's direction."

6.      The poultry flocks that are placed with the grower remained under the ownership and control rights and discretion of Perdue. (Admin. Comp., para. 3, [Doc. #1-6, p. 6]). Howell has consistently maintained that growers like him were employees under contract. *Id.* Howell raised chicks for Perdue for over 25 years pursuant to various contracts. (Complaint, para. 26, [Doc. #1], Admin. Comp., para. 3, [Doc. #1-6, p. 19]).

**RESPONSE:**

All three sentences cite to Howell's unverified complaint filed in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference. The last sentence also cites to Perdue's Complaint, ECF No. 1, ¶ 26, but the cited sentence does not say, as Howell asserts, that Howell raised chicks for Perdue "for over 25 years pursuant to various contracts." It does not specify or imply any number of years, and instead of describing "various contracts," it refers only to a single "Agreement". *See id.*

7.      Perdue assigned Howell a Perdue Flock Supervisor. (Admin Comp., para. 13, [Doc. #1-6, p. 9]). Perdue checked in at least weekly and often twice a week on Howell's farm to ensure that Howell was maintaining the facilities and tending to flocks in accordance with Perdue's dictated standards. *Id.* Perdue's agreement granted them the right to place Howell on a Performance Improvement Plan if Howell's flocks failed to achieve Perdue's minimum standards of competitiveness. *Id.* Perdue never did so. (Admin Comp., para. 40, [Doc. #1-6,

4

p. 19]).

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

8.      After being in business with Perdue Farms for some time, Howell began to recognize lapses of sanitation and health standards on the part of Perdue. [Doc. #1-6, p. 13]. He noted that Perdue was delivering poor quality feed and sickly chicks. [Doc. #1-6, p. 13]. He observed Perdue was careless and abusive with chickens, delivering chicks in filthy trays, failing to sanitize trailers and catch machines, and willfully dropping chickens on their heads during their weighing. [Doc. #1-6, p. 13]. He shared these and other concerns several times, first with Perdue and then with regulatory agencies, lawmakers, the media, and the public. [Doc. #1-6, p. 13].

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

9.      In the mid- to late 2019 timeframe, Howell observed that he was having to cull uncharacteristically high numbers of sickly birds. [Doc. #1-6, p. 13]. On June 27, 2019, Howell recorded culling 148 birds in one house. [Doc. #1-6, p. 13]. He confirmed with other growers that they also were experiencing high cull volumes. [Doc. #1-6, p. 13].

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

10.     Beginning in November 2019, Howell observed that the scales—used to determine when the maximum number of birds had been put in an individual cage for  transport—were not functioning properly. [Doc. #1-6, p. 14]. The dangerous effect was that catch crews did not know

5

how many birds were in the transport cages, and some cages were thus overfilled - creating potential insanitary conditions and threatening animal welfare. [Doc. #1-6, p. 14]. Howell reported these insanitary conditions and threats to animal welfare to Perdue through his Live Haul Performance & Service Score report in November 2019, and again in January 2020, March 2020, and June 2020. [Doc. #1-6, p. 14].

**RESPONSE:**

All three sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

11.    Due to lack of redress, Howell began sharing his concerns with the media and, by extension, the public. [Doc. #1-6, p. 14]. On March 14, 2020, The Guardian reported on Howell's food and feed safety concerns, including his reports that Perdue was sending the farmers low-quality feed (including wet and moldy feed that endangered the health of the chickens) and that Perdue was sending farmers large numbers of sickly birds that had to be culled. [Doc. #1-6, p. 14].

**RESPONSE:**

Both sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

12.    On April 24, 2020, Howell sent photos of the dirty trays in which Perdue was delivering chicks to Perdue's Director of Live Production Tim Little. [Doc. #1-6, p. 14]. Howell received no response, and thus on April 30, 2020, Howell escalated his concerns to USDA Resident Agent Supervisor Wayne Basford. [Doc. #1-6, p. 14]. Howell noted that Perdue had delivered chicks in dirty trays, contrary to the company's stated policies for biosecurity and sanitation. [Doc. #1-6, p. 14].Howell also reported he was concerned that Perdue's use of dirty trays for his chicks, specifically, may have been retaliation for his reports of concerns. [Doc. #1-6, p. 14].

6

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

13.      On June 1, 2020, Howell reported sanitation issues with the catch machine. [Doc. #1-6, p. 14]. A catch machine uses rubber fingers on rotating drums to catch and move chickens into cages for loading onto a truck. [Doc. #1-6, p. 14]. Howell reported to Perdue via his Live Haul Performance & Service Score report that Perdue's catch machine was dirty and housed a dead chicken from a prior catch. [Doc. #1-6, p. 14]. He reported that Perdue's trailers also were dirty. [Doc. #1-6, p. 14-15]. These violations of Perdue's stated policies for biosecurity and sanitation presented cross-contamination threats to his flocks. [Doc. #1-6, p. 15].

**RESPONSE:**

All five sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

14.      On June 27, 2020, Howell escalated his concern that Perdue was violating sanitation rules by delivering chicks in dirty, insanitary trays to Plant Manager Randy Brown. [Howell Administrative Complaint, Ex 5, para. 32] [Doc 1-6, p. 15]. Howell also attached copies of the Live Haul Performance & Service Score reports recording his concerns about the contaminated trailer and catch machines. *Id.* Brown told Howell that Brown would check with his Plant Manager and Live Haul Manager. *Id.* However, Perdue did not respond further to Howell's concerns. (*Id.*)

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

7

JA722

15.    Howell did not have success getting resolution to his concerns and as such decided to make reports via channels to receive regulator and public attention. [Doc. #1-6, p. 16, para. 34]. *Id*. He knew that reporting the above concerns to Perdue. through its vague internal channels was consistently futile given his past experiences. *Id.*  On or around June 22, 2020, Crystal Coast Waterkeeper Larry Baldwin had contacted Howell to request access to Howell's farm and chicken houses for a group of public health advocates. As a Waterkeeper and part of the Coastal Carolina Riverwatch (hereinafter CCRW), Baldwin works with communities, businesses, and governmental agencies to stop the negative impacts of the swine and poultry industry. [Doc. #1-6, p. 16, para. 34].

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings.  These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

16.    On June 30, 2020, Howell informed his flock supervisor, Dean Shuttleworth, of his visitors and requested four sets of coveralls for the visitors, consistent with biosecurity protocols. [Doc. # 1-6, p. 15, para. 33]. By providing Howell with disposable coveralls at Howell's chicken houses, Shuttleworth necessarily was aware of Howell's visitors. [Doc. # 1-6, p. 15, para. 33].

**RESPONSE:**

Both sentences cite to Howell's unverified complaint in the DOL proceedings.  These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

17.    On July 8, 2020, Howell hosted four public health advocates at the farm's chicken houses, including Waterkeeper Larry Baldwin, Lumber Riverkeeper Jefferson Currie II, Cape Fear Riverkeeper Kemp Burdette, and videographer for We Animals Media (WAM) Kelly Guerin. [Doc. #1-6, p. 15, para. 34].  WAM's mission is to document the lives of animals in the human environment and create a resource of animal stories and images for media, policymakers, and

8

organizations to use for animal welfare advocacy. [Doc. #1-6, p. 15, para. 34]. Howell and his farmhand, Lucas Simmons, were both present and ensured that the group followed all biosecurity protocols. [Doc. #1-6, p. 15, para. 34].

**RESPONSE:**

All three sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

18.    During the July 8, 2020 tour of the chicken house, Guerin videotaped the flock, and Howell informed the advocates of his ongoing concerns—that large numbers of the birds he had been receiving from Perdue were arriving sick and unviable, that he had to undertake a high volume of culling, and that there were insanitary conditions of transport and weighing. [Doc. #1-6, p. 16, para. 35]. He discussed Perdue's lack of responsiveness. [Doc. #1-6, p. 16, para. 35]. Howell specifically identified two birds designated to be euthanized because they were injured and/or too small to reach food and water freely. [Doc. #1-6, p. 16, para. 35]. He demonstrated the procedure of cervical dislocation (basically a decapitation of the chick by hand) as a means to cull chickens. (Admin. Comp., para. 35) [Doc. #1-6, p. 16]. Guerin asked if she could take home with her two birds identified as "culls," who otherwise would not survive. [Doc. #1-6, p. 16-17, para. 35]. Because chick mortality is a farmer-specific responsibility and not in violation of his contract with Respondent, Howell permitted her to take the chicks. [Doc. #1-6, p. 17, para. 35]. An individual chick, even in perfect health, is valued at less than one dollar. [Doc. #1-6, p. 17, para. 35].

**RESPONSE:**

All seven sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

19.    On or around July 15, 2020, Baldwin asked for chicken house access for a second

9

group of Waterkeepers and another film crew. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. Howell agreed and again contacted his flock supervisor to request disposable coveralls. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. His flock supervisor delivered the requested coveralls for the second set of public health advocates. (Admin. Comp., para. 36) [Doc. #1-6, p. 17].

**RESPONSE:**

All three sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

20.     On July 29, 2020, Baldwin, Currie, Haw Riverkeeper Emily Sutton, and three members of Lockwood Films visited Howell's chicken houses. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. Consistent with biosecurity protocols, all members of the group wore protective gear, either the coveralls provided by Perdue or unused Tyvek suits brought by the visitors. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. Howell and Simmons were both present, again, and ensured biosecurity protocols were followed. (Admin. Comp., para. 36) [Doc. #1-6, p. 17]. During this second visit, Howell reiterated his concerns that Perdue supplied him with large numbers of birds that were sick and unviable; that he had to undertake a high volume of culling; and that the chickens were subjected to insanitary conditions of transport and weighing. (Admin. Comp., para. 36) [Doc. #1-6, p. 17].

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

21.     On July 17, 2020, We Animals Media posted a description of Guerin's visit to Howell's chicken houses to its Facebook page. (Admin. Comp., para. 37) [Doc. #1-6, p. 17]. The group noted that these chicken houses were usually inaccessible to anyone outside of the industry, but that they had been invited by the farmer to bring transparency to the poultry industry. (Admin.

10

Comp., para. 37) [Doc. #1-6, p. 17]. Guerin reported observing a chick lying on the floor unresponsive and breathing heavily and another chick tinier than the others stumbling around with closed eyes and a beak encrusted with feces. (Admin. Comp., para. 37) [Doc. #1-6, p. 17]. Guerin described asking to rescue the two chicks, to which Howell agreed. (Admin. Comp., para. 37) [Doc. #1-6, p. 17]. She detailed naming the lone surviving chick "Sweet Pea" and placing her with Piedmont Farm Animal Refuge. (Admin. Comp., para. 37) [Doc. #1-6, p. 17].

**RESPONSE:**

All five sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

22.     On July 30, 2020, We Animals Media published its footage of Howell's chicken houses in a documentary and a collateral written piece that exposed animal welfare and public health concerns associated with industrial poultry farming on its website. [Doc. #1-6, p. 18, para. 38]. Howell expected that Perdue would review the video footage—and hoped and believed that the video's publication would prompt the public to join him in opposing Perdue's problematic animal husbandry practices. [Doc. #1-6, p. 18, para. 38]. Howell also hoped and believed that the video's publication would prompt further investigation or other action by government officials. [Doc. #1-6, p. 18, para. 38]. This video was a key piece of advocacy material publicly available and maintained on We Animals Media's website: "Mass Culling: System Shutdowns and the Failures of Factory Faming" (available here: https://weanimalsmedia.org/2020/07/30/system-shutdowns-and-the-failures-of-factoryfarming/). [Doc. #1-6, p. 18, para. 38].

**RESPONSE:**

All four sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

23.     On August 4, 2020, Sentient Media published an article, "Despite Perdue's High

11

Welfare Standards, Some Chickens Can't Survive 45 Days," which described Guerin's visit to Howell's chicken houses and some of Howell's concerns. [Doc. #1-6, p. 18, para. 39]. The article noted that—despite Perdue's commitment to consumers in its 2016 animal welfare policy and 2017 "Joint Animal Protection Agency Statement on Broiler Chicken Welfare Issues"—it was still growing sickly chickens unable to survive. [Doc. #1-6, p. 18, para. 39]. Guerin reported her observations that Howell's chickens from Perdue were still crumbling under the burden of selective breeding; young chicks could take only a few steps before plopping down with their legs splayed behind them. [Doc. #1-6, p. 18, para. 39]. Guerin reported that Howell had walked among the birds unable to stand and demonstrated the culling procedure. [Doc. #1-6, p. 18, para. 39]. Guerin noted the culling by Howell was not an anomaly, but rather standard daily procedure that Perdue reminded the farmer to do, including in postings in his barn. [Doc. #1-6, p. 18, para. 39]. Guerin reported Howell allowed her to try to rescue two dying chicks that Howell was otherwise going to euthanize under Perdue's standards. [Doc. #1-6, p. 18-19, para. 39]. She noted that Howell reported that Perdue retaliated against farmers who speak out, including by sending them birds who are sicker, smaller, or hatched too late. [Doc. #1-6, p. 18, para. 39].

**RESPONSE:**

All seven sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

24.    On August 18, 2020, with no prior warning to, inquiry of, or discussion with Howell, Perdue terminated Howell's 25-plus year relationship with Perdue. [Doc. #1-6, p. 19, para. 40] Perdue's stated cause for such action was the allegation that Howell "materially breached" his contractual obligations to Perdue over the "past several months" by "touring groups of visitors inside [his] poultry houses." [Doc. #1-6, p. 19, para. 40] Perdue claimed the presence of these visitors violated Perdue's Poultry Welfare and Bio-Security Programs and COVID-19 protocols.

12

*Id*. Perdue also claimed Howell "converted" Perdue's property without Perdue's consent. *Id.*

**RESPONSE:**

All three sentences cite to Howell's unverified complaint in the DOL proceedings. These cited statements are inadmissible hearsay and thus do not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference.

25. The FSMA provides whistleblower protections for employees of entities engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food that is subject to the Food, Drug, and Cosmetic Act ("FDCA"). [Complaint, para. 32, Doc #1].

**RESPONSE:**

This statement is not disputed.

26. On February 11, 2021, Howell filed his OSHA Complaint for alleged unlawful employment retaliation by Perdue against his involvement in the advocacy with regards to the public and environmental health NGOs, the WAM video, media reports, and unsanitary conditions. [Doc. #1-6, paras 22-36]. Howell alleged that, based on his prior "reports" of bad food, high cull rates, non-functioning scales, and dirty trays, which he subsequently reported to the advocacy and NGO groups he permitted on his farm, he was subjected to adverse employment actions. (Complaint, para. 33 [Doc #1, p.10]).

**RESPONSE:**

The first sentence cites to Howell's unverified complaint in the DOL proceedings. This cited statement is inadmissible hearsay and thus does not require any response by Perdue, for the reasons set forth in Perdue's Response to SUF No. 1, *supra*, which is incorporated by reference. The second sentence is not disputed.

27. The OSHA Complaint sought compensatory damages for "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other

13

relief available at law and equity…." [Complaint, para. 34, [Doc #1, p.11]).

**RESPONSE:**

This statement is not disputed.

28.    On January 27, 2022, OSHA sent Howell's counsel a letter informing Howell that, as 210 days had passed since Howell had filed his OSHA Complaint, Howell had the right under FSMA to file his claim in federal court. ( Complaint, para. 35, [Doc #1, p.11]). Howell declined to file in federal court and notified OSHA of the same.

**RESPONSE:**

The first sentence is not disputed. Howell does not cite any admissible evidence (or any other source) for his assertion in the second sentence as required by Local Rule 56.1(a)(4). The statement thus does not require any response by Perdue.

29.    On April 8, 2022, DOL dismissed the OSHA Complaint based upon the findings of an OSHA regional investigator. Complaint, para. 36, [Doc #1, p.11]).

**RESPONSE:**

This statement is not disputed.

30.    On May 6, 2022, Howell appealed OSHA's findings to the OALJ and filed an amended ("restated") complaint. ( Complaint, para. 36, [Doc #1, p.12]). Howell sought the same compensatory damages as before, namely "damages for pain, suffering, mental anguish, and injury to [Howell's] career and reputation," "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments," plus "all other relief available at law and equity…." (Complaint, para. 37).

**RESPONSE:**

These statements are not disputed.

31.    Perdue moved to dismiss Howell's Restated Complaint because Howell was not an "employee" under FSMA, Howell had failed to "blow the whistle" about animal feed per FSMA's

14

requirements, and Howell had failed to allege any act of retaliation by Perdue. (Complaint, para. 38). On December 14, 2022,  ALJ Kultgen denied Perdue's motion. (Complaint, para. 38).

**RESPONSE:**

These statements are not disputed.

32.     Discovery ensued. (Complaint, para. 39, [Doc. #1, p. 12]. A five-day merits hearing in the Pending Administrative Proceedings was scheduled to commence on March 17, 2025, but Perdue and Howell moved to extend the deadlines in light of this impending action and motion for preliminary injunction.  *Id*. On September 25, 2024, ALJ Kultgen amended the scheduling order and rescheduled the hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id*.

**RESPONSE:**

These statements are not disputed.

33.     The Howell Administrative Proceedings are factually, temporally and procedurally distinct from the Watts Administrative Proceedings in some key respects.

**RESPONSE:**

Howell does not cite any admissible evidence (or any other source) for this assertion as required by Local Rule 56.1(a)(4). The statement thus does not require any response by Perdue. The statement also is vague (*e.g.*, "in some key respects"), argumentative, and subjective (*e.g.*, "factually, temporally, and procedurally distinct from …) and not proper for an SUF.

34.     The Watts Administrative Proceedings concerned a dispute between Perdue and another one of its growers, Craig Watts, who owned and operated a farm in North Carolina and raised chickens for Perdue. Watts' dispute with Perdue antedates Howell's dispute with Perdue by six years.  (Complaint, para. 40, [Doc. #1]).

**RESPONSE:**

Howell's cited source for this statement, Perdue's Complaint, ECF No. 1 ¶ 40, does not state anything about the dispute at issue in the Watts proceeding nor does it state anything about

15

the length of time separating the disputes involving Watts and Howell.  While Perdue's Complaint, ECF No. 1 ¶ 41 states that Watts' dispute with Perdue antedates Howell's dispute with Perdue, it does not specify any length of time separating the disputes, nor does it provide years or any other basis to justify the statement that Watts preceded Howell by six years.

35.    Perdue attempted to take third-party discovery in Watts from the NGOs and media who visited and the prepares the video taken on Watts' farm.  (Complaint, para. 42, [Doc. #1]). ALJ Kultgen quashed Perdue's request for third-party subpoenas, ruling that DOL's statutory procedures do not provide ALJs with authority to issue subpoenas. *Id.*  However, Watts' counsel and Perdue's counsel negotiated the provision of that third party discovery from the NGOs.  (Ayers Dec., para. 4). The NGOs were in fact collecting documents and negotiating the terms of the deposition they would provide, but Perdue abandoned this request. (See Ayers Dec., para. 4). Instead of continuing to obtain this discovery, Perdue counsel dropped its request and chose to pursue an action in district court challenging the constitutionality of the DOL proceedings. (See Ayers Dec., para. 4).   Perdue never sought any third-party discovery in the Howell Administrative Proceedings, and none was denied to them. (See Ayers Dec., para. 4).

**RESPONSE:**

The first two sentences are not disputed.  The third, fourth, fifth and sixth sentences cite to ECF 37-3, a document entitled "Declaration of Stephani L. Ayers."  However, the "Declaration of Stephani L. Ayers" is neither sworn before an official authorized to administer oath nor made under penalty of perjury.  The statements set forth in the "Declaration of Stephani L. Ayers" are hearsay and are not supported by verified statement of a witness with personal knowledge.  Fed. R. Civ. P. 56 and Local Rule 56.1(a)(4) require the movant's statement of undisputed facts in support of a summary-judgment motion to cite admissible evidence supporting each factual assertion.  Hearsay is not admissible evidence and may not be used to support Howell's summary-judgment motion.  See *Md. Highways Contractors Ass'n v. Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").  Accordingly, the third, fourth, fifth and sixth sentences are not supported by admissible evidence and may not be considered by the Court.  In further support, Perdue incorporates by reference its legal argument at pp. 39-41 of its Reply Memorandum as well as its Motion to Strike Declaration of Stephanie L. Ayers and Related Statements filed contemporaneously herewith.

36.    In both the Howell and Watts administrative proceedings:

16

- Complainants seek legal remedies (*i.e.*, compensatory damages) for Perdue's alleged violations of the FSMA.

- Complainants have elected to adjudicate their FSMA claims in an administrative proceeding before the OALJ and have not kicked them out to an Article III court.

- ALJ Kultgen is presiding, and the same attorneys represent Howell and Watts.

(Complaint, para. 43, [Doc. #1, p. 13]).

**RESPONSE:**

This statement is not disputed.

37.     However, key differences include the Watts administrative claim was pending for over a decade, due to no fault of Watts, but rather the various appeals. (Ayers Dec., Para. 5). Watts filed his FSMA complaint on February 23, 2015, and Howell filed on February 11, 2021, creating a six-year gap in applicable legal standards. (Ayers Dec., Para. 5). Watts' case encountered a multi-level appeal process including initial OSHA dismissal (February 8, 2016), ALJ dismissal (January 6, 2017), ARB affirmation (March 5, 2019), and Fourth Circuit remand (January 7, 2020). *Id*. These procedural hurdles significantly delayed resolution. (Ayers Dec., Para. 5). Perdue's responses to the protected activities also differed significantly: Watts was required to complete supplemental biosecurity and animal welfare training, while Howell's contract was terminated immediately. (Ayers Dec., Para. 6). This severity difference impacts damage claims and remedy characterizations. *Id*.

**RESPONSE:**

All of the sentences cite to ECF 37-3, a document entitled "Declaration of Stephani L. Ayers."  However, the "Declaration of Stephani L. Ayers" is neither sworn before an official authorized to administer oath nor made under penalty of perjury.  The statements set forth in the "Declaration of Stephani L. Ayers" are hearsay and are not supported by verified statement of a witness with personal knowledge.  Fed. R. Civ. P. 56 and Local Rule 56.1(a)(4) require the movant's statement of undisputed facts in support of a summary-judgment motion to cite admissible evidence supporting each factual assertion.  Hearsay is not admissible evidence and may not be used to support Howell's summary-judgment motion.  See *Md. Highways Contractors*

17

*Ass'n v. Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Accordingly, all of the sentences are not supported by admissible evidence and may not be considered by the Court. In further support, Perdue incorporates by reference its legal argument at pp. 39-41 of its Reply Memorandum as well as its Motion to Strike Declaration of Stephanie L. Ayers and Related Statements filed contemporaneously herewith.

38.     On June 27, 2024, the Supreme Court issued its ruling in *Jarkesy II*. (Complaint, para.44, [Doc. #1, p. 13-14]).

**RESPONSE:**

This statement is not disputed.

39.     In light of *Jarkesy II*, on July 19, 2024, Perdue wrote to the ALJ apprising her of the decision and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to seek leave to amend its answer based upon *Jarkesy I* and *II*. (*Id.*, para. 45). The ALJ denied Perdue's request for a temporary stay and further denied Perdue's request to amend its answer to request a jury trial and to add defenses arising under *Jarkesy I* and *II*. (*Id.*, para. 45). She ruled that ALJs "'lack the power and authority to decide constitutional questions" and thus "cannot and will not grant any motion to dismiss on constitutional grounds.'" *Id.*

**RESPONSE:**

These statements are not disputed.

40.     On July 29, 2024, Perdue moved to dismiss the Watts Administrative Proceedings for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* and further moved for leave to amend its answer. (*Id.*, para. 46). On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and for leave to amend, again ruling that she lacked authority to decide constitutional questions and could not grant the requested relief. (*Id.*, para. 46). She did, however, grant the parties' joint request to extend the discovery cut-off and merits hearing date by six months to allow the First USDCT Action to adjudicate Perdue's motion for preliminary injunction. (*Id.*, para. 46).

18

**RESPONSE:**

These statements are not disputed.

41.    On August 20, 2024, Perdue filed the First USDCT Action against Acting Secretary Su, ALJ Kultgen, DOL, and the OALJ, along with a motion for preliminary injunction seeking to halt the Watts Administrative Proceedings. (*Id*., para. 47).

**RESPONSE:**

This statement is not disputed.

42.    Perdue filed the second USDCT Action against Acting Secretary Su, ALJ Kultgen, DOL, and the OALJ, along with a motion for preliminary injunction seeking to halt the Howell Administrative Proceedings. *Id.*

**RESPONSE**:

This statement is not disputed.

43.    Those preliminary injunctions were denied. [Doc.  #26].

**RESPONSE**:

This statement is not disputed, assuming that it refers to Perdue's motions for preliminary injunction.

44.    The OALJ has stayed the administrative proceedings pending resolution of this matter.  (Ayers Dec., para. 7).

**RESPONSE**:

This statement is not disputed.

19

Dated: April 28, 2025

Respectfully submitted,

/s/ *Roger A. Colaizzi*

Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

20

JA735

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2025, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

/s/ *Roger A. Colaizzi*
Roger A. Colaizzi

21

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **PERDUE FARMS INC.,**<br><br>          Plaintiff,<br><br>v.<br><br>**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al.<br><br>          Defendants. | **Case No. 5:24-cv-00594** |

**PLAINTIFF PERDUE FARMS INC.'S**
<u>**NOTICE OF APPEAL**</u>

Notice is hereby given that the above-named plaintiff, Perdue Farms Inc., hereby appeals

to the United States Court of Appeals for the Fourth Circuit from the order (ECF No. 67) and final

judgment (ECF No. 68) entered by the Court on March 9, 2026.

Dated: April 1, 2026              Respectfully submitted,

                                                    */s/ Margaret Santen*
                                                    Margaret Santen
                                                    N.C. Bar No. 52927
                                                    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                                                    201 South College Street, Suite 2300
                                                    Charlotte, NC 28244
                                                    704-405-3119
                                                    maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*


*/s/ Kristin M. Koger*
Kristin M. Koger
Roger A. Colaizzi
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*


*/s/ Mitchell Y. Mirviss*
Mitchell Y. Mirviss
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

2

JA738

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on April 1, 2026, a true and correct copy of the foregoing document has been furnished via electronic mail by virtue of the Court's CM/ECF System to counsel of record, including:

Brittany Bruns
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: 202-531-1325
Email: Brittany.S.Bruns@usdoj.gov

*Counsel for the Government Defendants*

Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe St., P.O. Box 1061
Medford, OR 97501
Tel: 813-382-7865
Email: stephani@guyerayers.com

Gary W. Jackson
555 S. Mangum Street, Suite 100
Durham, NC 27701
Tel: 704-650-9655
Email: Gjackson@ncadvocates.com

*Counsel for Defendant Rudy Howell*

/s/ Vanessa N. Garrido
Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

3

JA739