**Nos. 26-1374, 26-1375**

In The

# United States Court of Appeals for the Fourth Circuit

**PERDUE FARMS, INC.,**

*Plaintiff-Appellant,*

*v.*

**KEITH E. SONDERLING, in his official capacity as Acting U.S. Secretary of Labor, et al.**
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of North Carolina
Nos. 24-cv-00477, 24-cv-00594 (Hon. Louise W. Flanagan)

## OPENING BRIEF OF PLAINTIFF-APPELLANT

Megan Barbero
Courtney L. Dixon
Elizabeth M. Wilson
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4540
mbarbero@venable.com
cldixon@venable.com

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Perdue Farms, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. No publicly held corporation has a direct financial interest in the outcome of this litigation.

*/s/ Megan Barbero*
Megan Barbero

i

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT..............................................i

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION............................................... 4

STATEMENT OF THE ISSUES.................................................. 4

STATEMENT OF THE CASE ..................................................... 5

    A. Statutory and Regulatory Background ..................................... 5

    B. Factual and Procedural Background........................................ 7

        1. Watts's and Howell's Administrative Claims ........................ 8

        2. The Administrative Proceedings ..................................... 12

        3. The District Court Proceedings ...................................... 15

SUMMARY OF ARGUMENT.................................................... 18

STANDARD OF REVIEW........................................................ 24

ARGUMENT ........................................................................ 24

  I.  Perdue Is Entitled to a Jury Trial in Federal Court Under the Seventh Amendment and Article III. ............................................ 24

    A. Retaliation Claims Seeking Compensatory Damages are Legal in Nature. .................................................................. 25

    B. The Public Rights Exception Does Not Apply........................ 39

  II.  Perdue is Entitled to Relief from Administrative Proceedings Presided Over by an ALJ Who is Unconstitutionally Insulated from Removal by the President. ................................................. 45

    A. Perdue Is Suffering a Here-and-Now Injury from Being Forced to Proceed Before an Unaccountable ALJ................... 46

    B. The District Court Erred in Requiring Perdue to Show Additional Harm................................................................ 49

  III.  The Administrative Proceedings Violate Due Process. ................. 55

CONCLUSION ..................................................................... 63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axon Enterprise, Inc. v. FTC,*
598 U.S. 175 (2023) ....................................................................... passim

*Bayer v. Neiman Marcus Grp., Inc.,*
861 F.3d 853 (9th Cir. 2017) ............................................................ 28

*Calcutt v. FDIC,*
37 F.4th 293 (6th Cir. 2022) ............................................................ 53

*Caperton v. A.T. Massey Coal Co., Inc.,*
556 U.S. 868 (2009) .......................................................................... 55

*Care One, LLC v. NLRB,*
166 F.4th 335 (2d Cir. 2026) ........................................................... 54

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936) .......................................................................... 60

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.,*
526 U.S. 687 (1999) ..................................................................... 30, 37

*Collins v. Yellen,*
594 U.S. 220 (2021) ......................................................................... passim

*Consumer Fin. Prot. Bureau v. Law Offs. of Crystal Moroney, P.C.,*
63 F.4th 174 (2d Cir. 2023) ............................................................. 53

*Curtis v. Loether,*
415 U.S. 189 (1974) ......................................................................... passim

*Dominion Coal Corp. v. Dir., Off. of Workers' Comp. Programs,*
164 F.4th 353 (4th Cir. 2026) .......................................................... 51

*Duke v. Uniroyal Inc.,*
928 F.2d 1413 (4th Cir. 1991) ..................................................... 34, 37

*Feltner v. Columbia Pictures Television, Inc.,*
523 U.S. 340 (1998) .......................................................................... 30

*Finley v. Kraft Heinz Inc.,*
146 F.4th 382 (4th Cir. 2025) .......................................................... 45

iii

*Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ............................................................22, 46, 47, 48

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ...................................................................... passim

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ................................................................21, 27, 31

*Guerra v. Consol. Rail Corp.*,
936 F.3d 124 (3d Cir. 2019)................................................................59

*Harris v. Bessent*,
160 F.4th 1235 (D.C. Cir. 2025)..........................................................47

*Harvard Maintenance, Inc. v. NLRB*,
165 F.4th 886 (5th Cir. 2026)..............................................26, 32, 33

*Hill v. Winn-Dixie Stores, Inc.*,
934 F.2d 1518 (11th Cir. 1991) ..............................................35, 38, 39

*Hiran Mgmt., Inc. v. NLRB*,
157 F.4th 719 (5th Cir. 2025)......................................................29, 33

*In re Express Scripts, Inc.*,
__ F.4th __, 2026 WL 1355370 (4th Cir. 2026).............................28, 37

*Jarkesy v. SEC*,
132 F.4th 745 (5th Cir. 2024)..............................................................60

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022)...............................................................60

*K & R Contractors, LLC v. Keene*,
86 F.4th 135 (4th Cir. 2023)..............................................47, 51, 52

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
103 F.4th 748 (10th Cir. 2024)...........................................................54

*Lebow v. American Trans Air, Inc.*,
86 F.3d 661 (7th Cir. 1996) ..........................................................38, 39

*Liu v. SEC*,
591 U.S. 71 (2020) ..............................................................................31

*Lucia v. SEC*,
585 U.S. 237 (2018) ............................................................................47

iv

*McClelland v. Andrus,*
606 F.2d 1278 (D.C. Cir. 1979) .............................................................56

*Mertens v. Hewitt Assocs.,*
508 U.S. 248 (1993) .........................................................25, 33, 36

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
59 U.S. 272 (1856) .............................................................40

*Nguyen v. CNA Corp.,*
44 F.3d 234 (4th Cir. 1995) .............................................................24

*NLRB v. Starbucks Corp.,*
159 F.4th 455 (6th Cir. 2025)....................................................... passim

*Overwell Harvest, Ltd. v. Trading Techs. Int'l, Inc.,*
114 F.4th 852 (7th Cir. 2024)....................................................28

*Pandazides v. Virginia Bd. of Educ.,*
13 F.3d 823 (4th Cir. 1994) ....................................................39

*Parsons v. Bedford, Breedlove & Robeson,*
28 U.S. 433 (1830) ....................................................24

*Pereira v. Farace,*
413 F.3d 330 (2d Cir. 2005)....................................................29

*Pollard v. E.I. du Pont de Nemours & Co.,*
532 U.S. 843 (2001) ....................................................34

*Rockville Cars, LLC v. City of Rockville, Md.,*
891 F.3d 141 (4th Cir. 2018) ....................................................24

*Rose v. PSA Airlines, Inc.,*
80 F.4th 488 (4th Cir. 2023)....................................................20, 28, 31

*Ross v. Bernhard,*
396 U.S. 531 (1970) ....................................................37

*SEC v. Jarkesy,*
603 U.S. 109 (2024) ....................................................passim

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) ....................................................46, 48, 49, 62

*Sligo Creek Ctr. v. United States Dep't of Health & Hum. Servs.,*
__ F.4th __, 2026 WL 1615174 (4th Cir. 2026)....................................................41

*Souch v. Califano,*
   599 F.2d 577 (4th Cir. 1979) ..................................................56, 58, 61

*Space Expl. Tech. Co. v. NLRB,*
   151 F.4th 761 (5th Cir. 2025)..............................................23, 52, 53, 54

*Sripetch v. SEC,*
   608 U.S. __, 2026 WL 1593329 (2026) ....................................28, 30, 31

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408 (2003) .............................................................................26

*Stern v. Marshall,*
   564 U.S. 462 (2011) .............................................................................40

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
   988 F.3d 690 (4th Cir. 2021) ...............................................................37

*Stone v. Instrumentation Lab'y Co.,*
   591 F.3d 239 (4th Cir. 2009) ...............................................................59

*Tamosaitis v. URS, Inc.,*
   781 F.3d 468 (9th Cir. 2015) ..........................................................36, 37

*Tull v. U.S.,*
   481 U.S. 412 (1987) .............................................................................32

*Waldrop v. Southern Co. Servs., Inc.,*
   24 F.3d 152 (11th Cir. 1994) ...........................................................29, 39

*Withrow v. Larkin,*
   421 U.S. 35 (1975) ...............................................................................55

## Statutes and Constitutional Provisions

21 U.S.C. § 399d

   § 399d(a).......................................................................................... 1, 5

   § 399d(b).......................................................................................... 1, 5

   § 399d(b)(3)(A) ............................................................................ passim

   § 399d(b)(3)(B) ........................................................................ 6, 25, 35

   § 399d(b)(3)(C) ....................................................................................6

   § 399d(b)(4) .........................................................................................7

   § 399d(b)(4)(A) ....................................................................... 7, 45, 59

§ 399d(b)(5) ...........................................................................................7, 58

28 U.S.C. § 1291 ......................................................................................4

28 U.S.C. § 1331 ...................................................................................... 4

5 U.S.C. § 1202 .....................................................................................47

5 U.S.C. § 706 ..................................................................................7, 58

5 U.S.C. § 7521 .....................................................................................47

U.S. Const. amend. VII ........................................................................24

U.S. Const. art. II .................................................................................46

**Regulations**

29 C.F.R. § 1987.105 ...............................................................................6

29 C.F.R. § 1987.106 ...............................................................................6

29 C.F.R. § 1987.107 .............................................................................59

29 C.F.R. § 1987.110 .............................................................................58

29 C.F.R. § 1987.114 ...............................................................................7

85 Fed. Reg. 58393 (Sep. 18, 2020) .......................................................5

**Other Authorities**

3 S. Williston, Law of Contracts § 1338 (1920) .....................................30

*Damages*, Black's Law Dictionary (11th ed. 2019) ...............................28

Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies*
    (3d ed. 2018)..........................................................................27, 30, 31

Letter from Acting Solicitor Gen., Dep't of Just., to Mike Johnson,
    Speaker, U.S. House of Representatives (Feb. 20, 2025)
    https://www.justice.gov/oip/media/1390336/dl ....................................47

Restatement (Second) Torts § 903, cmt. A .............................................26

## INTRODUCTION

Two independent poultry farmers, Craig Watts and Rudy Howell, filed administrative complaints against Perdue Farms, Inc. in the Department of Labor under the Food Safety Modernization Act (FSMA). Watts and Howell allege that Perdue unlawfully terminated or constructively terminated their contracts and they seek compensatory damages, including for lost earnings, lost farm and equipment value, wages paid to an employee, emotional and mental distress, and damage to their careers and reputation. These administrative claims are currently before an administrative law judge (ALJ), who will preside over the case, make factual findings, and determine whether Perdue is liable for the damages that claimants demand. *See* 21 U.S.C. § 399d(a)-(b).

The Seventh Amendment and Article III do not permit these claims for money damages by private parties against a private company to be heard in administrative proceedings. *SEC v. Jarkesy*, 603 U.S. 109 (2024). Watts and Howell seek classic legal relief and their claims resemble common-law causes of action. These claims belong in district court, where Perdue would have the right to a jury, the case would be presided

over by an Article III judge, and discovery would be available. Perdue filed these suits to halt the unconstitutional administrative proceedings.

The district court correctly recognized that Watts's and Howell's claims resemble common law breach-of-contract and wrongful-discharge claims. It also recognized that they seek monetary damages, the prototypical legal remedy. But it then treated those damages as equitable relief not implicating the jury-trial right on the theory that they are meant to make the claimants "whole." That gets the law backwards. Compensatory damages are a classic form of legal relief precisely because they compensate a victim for loss. Watts and Howell are not asking Perdue to restore ill-gotten gains or release funds it wrongfully holds. They seek monetary damages measured by their alleged losses. That is legal relief.

Nor do these claims fit within the narrow public rights exception to Article III. They are not claims by the government to collect revenue, administer benefits, regulate immigration, or resolve any other matter historically committed to the political branches. They are private claims by private parties seeking money damages from another private party. The district court's application of the public rights exception is foreclosed by Supreme Court precedent and stretches the exception beyond

2

recognition. The mere fact that Congress created a forum for complaints within the agency does not convert these claims into public rights matters. Congress may create rights and remedies. But it may not assign legal claims seeking compensatory damages to an agency tribunal and deny defendants the Article III court and jury the Constitution requires.

The remaining constitutional defects confirm the point. Perdue is being forced to litigate before an ALJ insulated by two layers of removal protection—a structure that the government concedes is unconstitutional. But the district court found that Perdue was not harmed by this defect because it could not show that the President would seek to remove the specific ALJ presiding over these proceedings. The court misapplied the retrospective harm analysis where a litigant seeks relief from an already concluded agency adjudication under *Collins v. Yellen*, 594 U.S. 220 (2021). That analysis has nothing to say about the "here-and-now" injury Perdue suffers from ongoing litigation in an unconstitutional agency proceeding under *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023). The proceeding before an unconstitutional adjudicator is itself the injury.

3

If more were needed to invalidate these proceedings, the ALJ has already denied third-party subpoenas for evidence central to Perdue's defense on the theory that she lacks statutory authority to issue such subpoenas. And the statute grants claimants, but not Perdue, the unilateral choice to abandon the ongoing administrative proceedings and proceed anew in federal court. The Constitution does not permit such a fundamentally unfair and one-sided scheme. The district court's judgment should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. JA52, JA555. The district court entered final judgment in favor of defendants on March 9, 2026. JA34-35. Plaintiff filed a timely notice of appeal on April 1, 2026. JA737. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Whether Perdue is entitled under the Seventh Amendment and Article III to a jury trial in federal court on claims by private litigants seeking compensatory damages for alleged retaliatory termination of contracts?

4

**II.** Whether Perdue is entitled to relief from administrative proceedings before an ALJ who is unconstitutionally insulated from removal by the President?

**III.** Whether the administrative proceedings violate due process where the ALJ refused to issue third-party subpoenas and only claimants, not Perdue, can elect to proceed in district court where such discovery would be available?

## STATEMENT OF THE CASE

### A.  Statutory and Regulatory Background

The Food Safety Modernization Act protects certain food-industry employees from being terminated or discriminated against for protected whistleblowing activity. 21 U.S.C. § 399d(a). Employees who believe their employer has violated this provision may file an administrative complaint against that employer with the Department of Labor, *id.* § 399d(a)-(b), which has delegated responsibility for handling such complaints to the Occupational Safety and Health Administration (OSHA), *see* Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 85 Fed. Reg. 58393 (Sep. 18, 2020). OSHA investigates the complaint and issues written findings. 29

C.F.R. § 1987.105. Any party may object and request a hearing before an ALJ. *See id.* § 1987.106.

If the agency finds that a violation has occurred, the statute directs that the agency "shall order" the employer to "provide compensatory damages to the complainant," "take affirmative action to abate the violation," and "reinstate the complainant to his or her former position together with compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment." 21 U.S.C. § 399d(b)(3)(B). The statute further directs that the agency shall, at the request of the complainant, assess reasonable attorneys' fees and costs incurred in connection with the bringing of the complaint. *Id.* § 399d(b)(3)(C).

During the administrative proceedings, if the agency has not issued a final decision within specified timeframes, the statute provides the complainant—but not the employer—the option to elect to proceed in federal district court where a jury trial is available. Specifically, the complainant may opt to "bring an action at law or equity for de novo review in the appropriate district court" if there has not been a final decision of the agency within 210 days of the filing of the administrative complaint

6

or within 90 days of OSHA's written determination. 21 U.S.C. § 399d(b)(4)(A); 29 C.F.R. § 1987.114(a).

If an employee chooses this option, a jury trial is available at the request of either party and the district court may grant "all relief necessary to make the employee whole, including injunctive relief and compensatory damages." 21 U.S.C. § 399d(b)(4). But "[u]nless the complainant" elects to proceed in district court, the statute does not provide any opportunity for a de novo jury trial. *See id.* § 399d(b)(5). The employer may only bring a challenge to the agency's final decision in the courts of appeals and that court's "[r]eview shall conform to chapter 7 of title 5." *Id.*; *see* 5 U.S.C. § 706 (providing for substantial evidence review on the agency's record).

## B.    Factual and Procedural Background

Perdue is a poultry producer that, as relevant here, owns hatcheries and breeding flocks. JA499-500. As part of its integrated business model, Perdue contracts with independent poultry farmers who raise chicks that are provided by Perdue. JA499-500. The farmers raise the chicks for approximately six to eight weeks, after which they are returned to Perdue. JA499-500.

7

These cases arise out of contractual relationships Perdue entered with Watts and Howell, two poultry-farm operators who each filed administrative complaints with the Department of Labor alleging that Perdue terminated or constructively terminated their contracts in retaliation for protected activity.

### 1.    Watts's and Howell's Administrative Claims

**a.** Watts raised chicks for Perdue under a standard written agreement that renewed with each flock. JA500. For years, Watts complained about the amount and system of compensation under the contract. JA500.

In 2014, Watts invited a film crew from a third-party organization to his farm to record a group of live chicks that had been placed by Perdue. JA200, JA500. According to Watts, the chicks in his care were in a deplorable state and the conditions of the chickens showed that they were not "Humanely Raised," as Perdue had indicated on product labels and advertising for one of its consumer brands. JA198-200, JA500-501. The video was edited and then released on the third-party organization's website and was covered in the news. JA199-200, JA500-501.

8

When Perdue reviewed the video, it determined that Watts had failed to comply with his contractual biosecurity and animal-welfare responsibilities in raising the chicks. JA501. Perdue accordingly sent auditors to Watts's farm to ascertain the condition of the flock. JA501. A nonprofit, third-party entity also reviewed the video of Watts's farm and prepared a report concluding that Watts was responsible for the substandard conditions shown in the video. JA501. Perdue informed Watts that he needed to complete supplemental biosecurity and animal-welfare training prior to the placement of a new flock. JA501-502. A new flock was placed on Watts's farm in January 2015. JA203.

In February 2015, Watts filed a complaint with the Department of Labor. JA78. As amended, the complaint alleges that Perdue had taken retaliatory actions against him to force him to terminate his contract with the company. JA189. Watts alleged that Perdue had required him and one of his employees to attend a supplemental training session and that Perdue had delayed placing a new flock on his farm, resulting in approximately $4,500 in lost earnings. JA203. Watts further alleged that he was subject to increased audits and inspections by Perdue, and that he was

9

required to remain on a performance improvement plan even though his contract did not contemplate such a plan in these circumstances. JA204.

Watts seeks "compensatory damages" for lost income and expenses allegedly caused by the "delayed placements" of new flocks on his farm by Perdue, "wages paid" to his employee for the employee's attendance at the mandatory training session, lost "earnings, compensation and capital resulting from the loss of his" contract with Perdue, and mental and emotional distress and "damage to his reputation." JA211-212. Watts further requests "expungement" of the letter placing him on a performance improvement plan and "reasonable costs and attorney's fees." JA211-212.

**b.** Like Watts, Howell raised chicks for Perdue under a standard written contract that renewed with each flock. JA651-652. And like Watts, Howell for years criticized Perdue's policies as not providing sufficient income for farmers. JA652.

In July 2020, during the COVID-19 pandemic, Howell invited self-proclaimed "public health advocates" and a filmmaker from an animal-rights organization onto his farm to film a group of live chicks that were allegedly sick and in inhumane condition. JA621-623, JA652. The animal-rights organization posted a description of the visit online, noting

10

the condition of the chicks and that Howell had permitted the filmmaker to remove chicks from the farm, one of which subsequently died. JA623, JA652. That same month, Howell again permitted another film crew to access his farm, and the video footage was posted on the animal-rights organization's website. JA623-624, JA652.

The video and article showed that Howell was not following Perdue's biosecurity and animal-welfare protocols or pandemic-related public-health guidelines in place at the time. JA621, JA652-53. In August 2020, Perdue notified Howell that it was invoking the agreement's termination provision, which allowed either party to terminate the agreement for any reason with 90 days' notice. JA653. Instead of placing a new flock with Howell, Perdue provided a lump-sum payment to cover the average profit Howell could have netted during the 90-day period. JA653.

In February 2021, Howell filed an administrative complaint against Perdue with the Department of Labor, which he amended in May 2022, alleging that the termination of his contract was in retaliation for his involvement in the animal-rights organization video, as well as his alleged reports of purportedly unsanitary conditions. JA603, JA608.

11

Howell's administrative complaint requests "compensation for equipment and farm value lost," "lost wages, bonuses, and additional payments" he would have received if the contract had not been terminated, and "damages for pain, suffering, mental anguish, and injury to" his career and reputation, as well as "interest on all compensatory damages." JA629. Howell also requests, among other relief, "reinstatement" of his contract or "front pay in lieu of reinstatement," as well as "compensation for special damages, including litigation costs" and attorney's fees. JA629.

### 2.    The Administrative Proceedings

Perdue objected to the administrative proceedings on several grounds that are not at issue in this case, including that these claims are not covered by the FSMA (but rather fall under a different statute administered by the U.S. Department of Agriculture) and that Watts and Howell are independent contractors and not "employees" under the FSMA's whistleblower provisions. Perdue maintains those objections to the administrative proceedings but they are not the basis of Perdue's district court complaints, which seek to enjoin those proceedings on constitutional grounds. Because Perdue's other objections are not currently

12

before the Court, only the procedural history relevant to the instant dispute is discussed below.

As relevant here, by 2024, both the Watts and Howell administrative proceedings were pending before the same ALJ. *See, e.g.*, JA433-436, JA645-647. Because both proceedings have been pending for over 210 days, both Watts and Howell have the ongoing option under the statute to initiate a de novo suit in federal district court, though neither claimant has done so. JA654.

In March 2024, in the Watts proceedings, Perdue applied for subpoenas to obtain documents and testimony from the third-party organization that filmed and released the video that is the subject of Watts's retaliation claims. JA288. The subpoenas sought, among other things, the "unedited" video footage taken on Watts's farm. JA294. The ALJ quashed the subpoenas, reasoning that ALJs lack the statutory authority "to compel third-party witnesses to provide documents or give deposition testimony." JA391. Perdue moved for reconsideration, arguing that basic discovery about the preparation and production of the video underlying Watts's whistleblower claim was necessary for Perdue to defend itself

13

against Watts's allegations, but the ALJ declined to reconsider the order. JA412.

In July 2024, Perdue filed a motion with the ALJ to dismiss the Watts proceeding, arguing that the proceeding violates Perdue's constitutional rights. Perdue urged that it is entitled to a jury trial under the Seventh Amendment because Watts's claim sounds in contract or tort and seeks compensatory damages; that the proceedings violate the separation of powers because the ALJ is unconstitutionally insulated from removal by the President; and that the proceedings violate due process and the nondelegation doctrine because claimants under the FSMA may opt to proceed in federal district court where third-party discovery and a jury trial is available, but the statute does not grant Perdue that choice. JA445-JA446, JA451, 455-456. The ALJ denied Perdue's motion, explaining that it "lack[s] the authority" to address "these constitutional questions" and lacks "the power to grant the relief [Perdue] requests." JA474. Because the ALJ presiding over both cases held that she lacked the authority to address constitutional claims, Perdue did not separately seek dismissal from the ALJ of the Howell proceedings on constitutional grounds.

14

### 3.    The District Court Proceedings

Perdue filed these suits in federal district court, arguing that the ongoing administrative proceedings violate Perdue's constitutional rights and requesting declaratory and injunctive relief. Perdue argued that it has a right to a jury trial in federal court under the Seventh Amendment because the claims resemble common-law claims and seek compensatory damages; that these private disputes cannot be removed from Article III courts; that the proceedings violate the separation-of-powers and Article II because the ALJ presiding over both cases is unconstitutionally insulated from removal; and that the proceedings violate due process and the nondelegation doctrine. JA50-51, JA552-553.[1] The ALJ stayed the administrative proceedings pending the outcome of the litigation. JA655.

In both cases, Perdue and the claimants filed cross-motions for summary judgment and the government moved to dismiss or, in the alternative, for summary judgment. On March 9, 2026, the district court

---

[1] Perdue sought preliminary injunctions in both cases, which the district court denied for failure to establish irreparable harm. JA3. Perdue appealed, but after the ALJ granted a stay of the administrative proceedings, JA655, the parties agreed to voluntary dismissal of the appeals, Order, *Perdue Farms v. Su*, Nos. 25-1105, 25-1106 (Apr. 22, 2025) (granting motion for voluntary dismissal).

entered a consolidated order granting defendants' motions. JA2. The district court recognized that it had subject-matter jurisdiction over the dispute and that Perdue's claims were timely, but the court ruled against Perdue on each of its constitutional arguments.

*First*, the district court held that the claimants' retaliation claims do not implicate the Seventh Amendment. The district court recognized that the retaliation claims are analogous to common-law claims "for wrongful discharge and breach of contract." JA14. The district court also recognized that claimants sought monetary damages, which is "the prototypical common law remedy." JA16 (quoting *Jarkesy*, 603 U.S. at 123). Yet the district court reasoned that Watts's and Howell's claims for compensatory damages are "equitable" in nature because they are intended to make claimants "whole" and "restore the status quo." JA16-17. The district court characterized those claims as "essentially for front and back pay," which the court reasoned are equitable remedies. JA17.

The district court further held that, even if the claims implicate the Seventh Amendment, the public rights exception would permit the claims to be heard without a jury and outside an Article III tribunal. The district court reasoned that because the FSMA serves "a weighty public

16

purpose" and involves "large-scale protection of the public health and safety," even claims brought by private individuals against a private company involve "public" rights rather than "private" rights, and so Congress could assign their adjudication to an administrative agency. JA20-21.

*Second*, the district court held that Perdue was not entitled to relief on its claim that the ALJ's removal protections violate Article II. The district court recognized that Department of Labor ALJs "enjoy two layers of removal protection," which the court acknowledged "appears to violate Article II." JA24. The court held, however, that Perdue was entitled to relief from the pending proceedings only if it could show that the President had "attempted to remove the officer but was prevented from doing so" or that the President "had publicly expressed that he would remove the officer if not prevented by statute," and that Perdue had not made such a showing. JA25.

*Third*, the district court rejected Perdue's arguments that administrative proceedings violate due process, reasoning that Perdue had not established that the proceedings were fundamentally unfair and that Perdue lacked standing to raise certain arguments about the fairness of the procedures. Perdue asserted that the proceedings violate due process

17

for several reasons, including because the ALJ held that she had no authority to issue Perdue's third-party subpoenas for key evidence and because the FSMA gives the claimants the unilateral ability to leave the administrative proceedings and opt to proceed anew in district court, while Perdue lacks any such choice. The district court reasoned that the refusal to issue subpoenas did not violate due process because the ALJ had not "relied upon any information [Perdue] would like to subpoena." JA30. And the district court held that Perdue lacks Article III standing to challenge the statute's one-sided do-over provision, reasoning that Perdue has no injury because neither Watts nor Howell have "invoked" that provision to withdraw their claims from the administrative forum. JA28-29.

## SUMMARY OF ARGUMENT

**I.** Perdue is entitled to a jury trial in federal court on Watts's and Howell's administrative claims seeking compensatory damages for Perdue's alleged retaliatory termination of their contracts. The district court's contrary reasoning misunderstands the distinctions between legal and equitable relief and extends the public rights exception beyond recognition.

18

**A.** "The Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature,'" an inquiry that looks to the "cause of action and the remedy it provides," with the remedy being "the 'more important' consideration." *Jarkesy*, 603 U.S. at 122-23 (quotation omitted). As in *Jarkesy*, the remedy sought here is "all but dispositive." *Id.* at 123. To remedy Perdue's alleged wrongful termination of their contracts, Watts and Howell seek compensatory damages, "the traditional form of relief offered in the courts of law." *Curtis v. Loether*, 415 U.S. 189, 196-97 (1974). Watts and Howell request, for example, compensatory damages for lost earnings, lost farm and equipment value, wages paid to an employee, emotional and mental distress, and damage to their careers and reputation. Those are quintessential legal remedies. And the nature of the cause of action at issue "confirms" that these claims are legal in nature. *Jarkesy*, 603 U.S. at 125. Watts's and Howell's retaliation claims are analogous to a common-law breach-of-contract or tort action: claimants allege that they raised chicks for Perdue under a written contract with the company, that Perdue wrongfully terminated that contract in retaliation for protected activity, and that claimants are damaged by that breach and owed compensation.

19

The district court acknowledged that Watts's and Howell's claims are analogous to common-law causes of action and that claimants request monetary damages, which "are the prototypical common law remedy." JA16 (quoting *Jarkesy*, 603 U.S. at 123). Yet the district court concluded that Watts's and Howell's administrative complaints do not implicate the Seventh Amendment, reasoning that because the "damages requested by Watts and Howell" seek to "restore the status quo" rather than to "punish," they are "equitable" in nature. JA16, JA19. That fundamentally misunderstands the distinctions between legal and equitable relief. Contrary to the district court's suggestion, "[p]unitive remedies" and "legal remedies" are not "one and the same." *NLRB v. Starbucks Corp.*, 159 F.4th 455, 480 (6th Cir. 2025). Punitive remedies "are merely a subset of the broader range of legal remedies," which include compensatory damages. *Id.* The district court was likewise wrong to suggest that relief is equitable if it may loosely be described as intended to "restore the status quo." *Id.* Compensatory damages, by definition, aim to redress a victim's losses. But damages measured by a victim's loss and that seek to compensate that loss are "the quintessential *legal* remedy." *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 498 (4th Cir. 2023) (emphasis added). Traditional equitable

20

remedies, by contrast, aim to remove improper gains from a defendant and are measured by the wrongdoer's gain rather than the victim's loss. *See, e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214-15 (2002). The district court's contrary reasoning stems from a "flawed understanding of" a sentence from *Jarkesy*, which the district court read out of context. *Starbucks*, 159 F.4th at 475, 480.

**B.** The district court further erred in concluding that these retaliation claims by private individuals may be adjudicated before the agency without a jury because the "public rights exception" applies. JA20-21. That exception applies to a limited category of cases that "historically could have been determined exclusively by [the executive and legislative] branches," such as cases involving the collection of revenue, immigration, or "relations with Indian tribes." *Jarkesy*, 603 U.S. at 128, 130 (quotation omitted). Watts's and Howell's retaliation claims do not fall within one of those limited categories. Rather, these claims were brought by private litigants against a private company, and the government is not a party to the underlying administrative proceedings. Watts's and Howell's claims are "made of the stuff of the traditional actions at common law" and must be heard in an Article III court where a jury trial is available.

21

*Id.* at 127-28 (quotation omitted). The district court concluded otherwise on the theory that these claims are "closely integrated into a public regulatory scheme" and serve "a weighty public purpose." JA21. But Supreme Court precedent forecloses that broad reasoning, which stretches the public rights exception beyond recognition.

**II.** Perdue is also entitled to relief from the administrative proceedings because the ALJ presiding over those proceedings is unconstitutionally insulated from Presidential removal by two layers of removal protection. *See Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 483-84 (2010). That separation-of-powers violation inflicts a "here-and-now injury" on Perdue that must be remedied before the proceedings "ha[ve] already happened" and "cannot be undone." *Axon Enter., Inc.*, 598 U.S. at 191 (cleaned up).

The district court acknowledged that the ALJ's removal protections "appear[] to violate Article II," but mistakenly reasoned that under *Collins v. Yellen*, 594 U.S. 220, 257 (2021), Perdue's claim is not "actionable" because Perdue failed to establish additional "harm" from the ALJ's removal protections. JA24-25. But *Collins* addressed only retrospective relief, not a party presently facing an unconstitutional administrative

22

proceeding. Perdue's removal claim is "not about" the outcome of the proceedings, but rather "about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." *Axon*, 598 U.S. at 191. Because "the proceeding *is* the injury," no further showing of harm is required. *Space Expl. Tech. Co. v. NLRB*, 151 F.4th 761, 780 & n.114 (5th Cir. 2025).

**III.** The administrative proceedings also violate due process. Perdue sought third-party subpoenas in the administrative proceedings for documents and testimony, but the ALJ denied those subpoenas, reasoning that ALJs have no authority to issue subpoenas to third parties. That categorical holding deprives Perdue of the ability to fully investigate and defend itself against the allegations in the administrative complaints. That due-process violation is compounded by the fact that the statute grants claimants—but not Perdue—the option to bring their claims in federal district court, where the Federal Rules of Evidence apply, a life-tenured judge will preside, and a jury trial is available. Basic principles of fundamental fairness, as well as non-delegation principles, do not permit Congress to grant only claimants the open-ended choice to elect between an Article I or Article III tribunal at their discretion.

23

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 236 (4th Cir. 1995). The district court's grant of a motion to dismiss is also reviewed de novo. *See Rockville Cars, LLC v. City of Rockville, Md.*, 891 F.3d 141, 145 (4th Cir. 2018).

## ARGUMENT

### I.    Perdue Is Entitled to a Jury Trial in Federal Court Under the Seventh Amendment and Article III.

The Seventh Amendment guarantees that in "[s]uits at common law . . . the right of trial by jury shall be preserved." U.S. Const. amend. VII. The Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Jarkesy*, 603 U.S. at 122 (quoting *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 447 (1830)). The jury-trial right thus "extends to a particular statutory claim if the claim is 'legal in nature,'" an inquiry that turns on "the cause of action and the remedy it provides," with the remedy being the "more important consideration." *Id.* at 122-23 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)) (cleaned up). In this case, as in *Jarkesy*, the remedy sought "is all but dispositive." *Id.* at

24

123. For Perdue's alleged retaliatory termination of their contracts, Watts and Howell seek monetary damages, "the prototypical common law remedy." *Id.*

### A. Retaliation Claims Seeking Compensatory Damages are Legal in Nature.

Both the damages remedy that Watts and Howell seek against Perdue and the nature of their cause of action establish that the retaliation claims here are legal in nature. Watts and Howell ask the agency to award compensatory damages for Perdue's alleged wrongful termination of their contracts with the company. Those claims seek a classic legal remedy and are closely analogous to common-law causes of action.

**1.** The Supreme Court has stressed that the remedy sought is the "more important" factor in determining whether a claim is legal in nature, and that factor is straightforward in this case: Watts and Howell seek compensatory damages, a classic legal remedy. *Jarkesy*, 603 U.S. at 123 (quotation omitted).

The FSMA specifically authorizes the agency to award "compensatory damages" to a claimant. 21 U.S.C. § 399d(b)(3)(B). "Money damages," including "compensatory damages," are "the classic form of *legal* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993). Compensatory

25

damages seek to "redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003), and to place the victim "in a position substantially equivalent in a pecuniary way to that which he would have occupied" had the wrong not occurred, *Harvard Maintenance, Inc. v. NLRB*, 165 F.4th 886, 900 n.25 (5th Cir. 2026) (quoting Restatement (Second) Torts § 903, cmt. A).

Both Watts and Howell demand compensatory damages in their administrative complaints. Watts requests "compensatory damages" for:

- "[L]ost earnings, compensation and capital resulting from the loss of his employment. . . contract with Perdue." JA211.

- Lost earnings and expenses allegedly caused by Perdue's "delayed placement[]" of a new flock on his farm. JA212; *see* JA203 (estimating "$4,500 in [lost] earnings" from a delayed flock placement).

- "[W]ages paid" to his employee for the employee's attendance at a mandatory training session. JA212.

- "[E]motional and mental distress, anxiety and loss of enjoyment of life," and "damage to his reputation." JA212.

26

Similarly, Howell requests "compensation" and "damages" for:

- Lost farm and equipment value allegedly caused by Perdue, JA629,

- Lost earnings that he would have received under his contract with Perdue, JA629, and

- "[P]ain, suffering, mental anguish, and injury to [his] career and reputation," JA629.

*See* JA629 (further requesting "prejudgment interest on all compensatory damages").

Monetary damages measured by a victim's loss and aimed at compensating for that loss are classic legal relief. *See* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies* 3, 9, 215 (3d ed. 2018) (explaining that "[t]he damages remedy is a money remedy aimed at making good plaintiff's losses" and "[d]amages was historically a legal remedy"). This well-established principle is reflected in a long line of authority. The Supreme Court has described "actual" or "compensatory" damages as "the traditional form of relief offered in the courts of law." *Curtis*, 415 U.S. at 196-97; *Great-West*, 534 U.S. at 210 (recognizing that claims seeing "compensation for loss resulting from [a] defendant's breach" are traditional actions

27

at law (quotation omitted)); *see also Sripetch v. SEC*, 608 U.S. \_\_, 2026 WL 1593329, at *5 (2026) (discussing the "legal remedy of damages" where a court of law "will order the wrongdoer to pay damages measured by the plaintiff's loss" (quotation mark omitted)).

This Court has likewise recognized that "compensatory damages"— "money 'ordered to be paid to . . . a person as compensation for loss or injury'"—is "the quintessential legal remedy." *Rose*, 80 F.4th at 498 (quoting *Damages*, Black's Law Dictionary (11th ed. 2019)); *see In re Express Scripts, Inc.*, \_\_ F.4th \_\_, 2026 WL 1355370, at *9 (4th Cir. 2026) (explaining that "compensation for the downstream harm" caused by a nuisance is "textbook legal damages"). Other courts of appeals are in accord. *See, e.g.*, *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 866 (9th Cir. 2017) ("[A]n award of money damages to compensate for reputational injury, mental anguish, emotional distress, or loss of job responsibilities constitutes a legal remedy."); *Overwell Harvest, Ltd. v. Trading Techs. Int'l, Inc.*, 114 F.4th 852, 861 (7th Cir. 2024) (recognizing that

"compensatory damages . . . intended to make [the plaintiff] whole . . . are the traditional forms of legal relief").[2]

The district court acknowledged that Watts and Howell each request monetary damages and that damages "are the prototypical common law remedy." JA15-16 (quoting *Jarkesy*, 603 U.S. at 123). The court nonetheless held that the damages sought by Watts and Howell are "equitable" in nature, broadly reasoning that the damages seek to make claimants "whole" and "restore the status quo," rather than to punish. JA16-17, JA19. That reasoning fundamentally misunderstands the distinctions between legal and equitable relief.

The district court appeared to believe that *only* "punitive" or "retributive" remedies are legal in nature. JA16-17, JA19. But punitive remedies are "merely a subset of the broader range of legal remedies"—the two categories are not coextensive. *Starbucks*, 159 F.4th at 480. Thus, the Supreme Court has recognized that "compensation *and* punishment"

---

[2] The list continues. *See, e.g., Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 725 (5th Cir. 2025) ("Compensatory damages . . . were a typical legal remedy, which only courts of law could award."); *Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 156 (11th Cir. 1994) ("Compensatory damages are the classic form of legal relief."); *Pereira v. Farace*, 413 F.3d 330, 340-41 (2d Cir. 2005) ("Plaintiff's claim is for compensatory damages—a legal claim.").

are both "purposes traditionally associated with legal relief." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998) (emphasis added); *see City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710-11 (1999) ("[C]ompensation is a purpose traditionally associated with legal relief." (quotation omitted)). And the Court has described both "actual" and "punitive" damages as "the traditional form of relief offered in the courts of law." *Curtis*, 415 U.S. at 196.

By the same token, the district court was incorrect to suggest that any relief that may be described as making a claimant "whole" or "restor[ing] the status quo" is equitable. JA16-17. Compensatory damages, by definition, aim to "mak[e] good" a victim's losses. Dobbs, *supra*, at 3, 215; *see Sripetch*, 2026 WL 1593329, at *5 (explaining "[t]he primary goal" of damages is "'to put the plaintiff in as good a position as he would have been in' absent the wrongdoer's actions" (quoting 3 S. Williston, Law of Contracts § 1338, p. 2392 (1920)). But again, an award of money damages to compensate a victim is classic *legal* relief. Although equity courts could issue certain remedies involving the payment of money, such as equitable restitution or disgorgement, those remedies are meaningfully distinct from damages. Dobbs, *supra*, at 4, 215, 374. Among other

30

differences, those equitable remedies are aimed at removing improper gains from an unjustly enriched defendant and are measured by the defendant's gain rather than the victim's loss. *Id.* at 215; *see also, e.g.*, *Sripetch*, 2026 WL 1593329, at *6 (explaining a "common feature" of equitable remedies that "the final award to the plaintiff is not measured by his loss but by the defendant's gain attributable to his wrongdoing against the plaintiff"); *Great-West*, 534 U.S. at 213-14 (recognizing that for restitution to lie in equity, the action must seek "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession"); *Liu v. SEC*, 591 U.S. 71, 79-83 (2020) (recognizing as a "mainstay of equity courts" a disgorgement remedy "tethered to a wrongdoer's net unlawful profits"); *Rose*, 80 F.4th at 499, 501-02 & n.13 (discussing traditional limitations on equitable remedies).

The district court's contrary understanding rests on a single sentence from *Jarkesy*, which the district court misread. *Jarkesy* stated that "[w]hat determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to restore the status quo." 603 U.S. at 123 (quotation omitted). From that

31

statement, the district court gleaned a "test" that it understood to distinguish between "punitive" remedies that are legal and "restorative" remedies that are equitable. JA19-20. But there is no such test, and *Jarkesy* did not establish one.

*Jarkesy* addressed a civil monetary sanction sought by the Securities and Exchange Commission for securities fraud. In that context, the Court emphasized the punitive nature of the sanction and observed that "while courts of equity could order a defendant to return unjustly obtained funds, only courts of law issued monetary penalties to 'punish culpable individuals.'" *Id.* at 123 (quoting *Tull v. U.S.*, 481 U.S. 412, 422 (1987)). The Court contrasted the punitive sanction sought by the agency in that case with traditional equitable remedies such as "restitution" and "disgorgement." *Harvard Maintenance, Inc.*, 165 F.4th at 901; *see Jarkesy*, 603 U.S. at 123. In the passage relied on by the district court here, the Court was not purporting to exhaustively define the distinctions between legal and equitable remedies, let alone suggest that compensatory damages are equitable in nature. Nor did it need to undertake any such analysis, since the remedies in *Jarkesy* itself were punitive. But the

Court also made clear that "money damages are the prototypical common law remedy." 603 U.S. at 123 (citing *Mertens*, 508 U.S. at 255).

For these reasons, courts of appeals have rejected the "sweeping" interpretation of *Jarkesy* relied upon by the district court here. *Starbucks*, 159 F.4th at 480. The Sixth Circuit, for example, has rejected the argument that compensatory damages are "equitable" because they "restore the status quo," explaining that argument is based on a "flawed understanding of *Jarkesy*" and misunderstands legal and equitable remedies. *Id.* at 475, 480. The Sixth Circuit reiterated that while an award of compensatory damages may "help restore the status quo," that relief is "legal" in nature because it is measured "from the standpoint of the employee's loss," not the employer's gain. *Id.* The Fifth Circuit has similarly rejected the argument that a damages award may be categorized as equitable because it "restore[s] the status quo," explaining that argument "stems from a fundamental misunderstanding of" *Jarkesy*, which referred to the "status quo" in the context of describing traditional equitable remedies that are "concerned with the return of money unjustly taken," not making a victim whole. *Harvard Maintenance*, 165 F.4th at 901; *see Hiran Mgmt.*, 157 F.4th at 728 (rejecting similar argument as

33

ignoring the "established distinctions" between legal and equitable re-lief).

The district court's error is underscored by its characterization of Watts's and Howell's requests for compensatory damages as "essentially" for "back and/or front pay." JA17-18. That description misunderstands both those remedies and the administrative complaints. Front pay is a prospective remedy "awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). An award of front pay reflects the fact that, although reinstatement is "the much preferred remedy" for wrongful discharge, reinstatement may not be possible or immediately feasible in all cases, and front pay can "bridge" the time between judgment and new employment or "complement" a "deferred order of reinstatement." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). Because of its close relationship with the equitable remedy of reinstatement, this Court has characterized front pay as equitable in nature. *Id.* at 1424. Backpay, by contrast, is typically a legal remedy, though in certain contexts such as Title VII, courts have viewed backpay as equitable where Congress authorized it "as an integral part of"

34

reinstatement and its award is committed to the discretion of the trial judge. *Curtis*, 415 U.S. at 197.

Watts's and Howell's requests for compensatory damages cannot be recharacterized as equitable "back and/or front pay." JA18. As an initial matter, backpay under the FSMA is legal in nature. *See* 21 U.S.C. § 399d(b)(3)(B)(ii) (providing that upon finding a statutory violation, the agency "shall" order reinstatement "together with compensation (including back pay)"); *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1525 (11th Cir. 1991) ("[A] mandatory award of back wages is legal."). Regardless, even assuming an award of front or back pay under the FSMA would be equitable, the FSMA separately and explicitly directs the agency to award "compensatory damages" to a successful claimant, 21 U.S.C. § 399d(b)(3)(B)(iii), and as discussed above, both Watts and Howell requested such damages in their administrative complaints. *See supra* pp. 26-27.

Watts's requests for "compensatory damages," including for mental and emotional distress, lost earnings allegedly caused by the "delayed" placement of a new flock on his farm, and "wages [Watts] paid" to have an employee attend a training session, cannot be described as a forward-

35

looking substitute for reinstatement or an integral part of reinstatement. JA211-212. Indeed, Watts's administrative complaint does not ask for reinstatement. His demands for monetary relief are plainly for "nothing other than compensatory *damages*," as Watts himself describes his requested relief. *See Mertens*, 508 U.S. at 255.

Similarly, while Howell's administrative complaint requests "reinstatement" or "front pay in lieu of reinstatement," that requested relief is *in addition to* Howell's explicit demand for "compensatory damages," including damages for mental and emotional distress, harm to his career and reputation, and lost farm and equipment value. JA629. Such damages clearly "extend[] beyond" any demand for reinstatement with back and/or front pay. *Tamosaitis v. URS, Inc.*, 781 F.3d 468, 487 (9th Cir. 2015) (recognizing that whistleblower plaintiff's requests for "reputational damages and mental and emotional damages" sought compensatory damages and were not integral to reinstatement).

That Watts and Howell may seek equitable remedies in addition to compensatory damages does not change the Seventh Amendment analysis. "When both legal and equitable remedies are demanded," "[t]he right to trial by jury" on the legal issues must be "preserved." *Duke*, 928 F.2d

36

at 1422; *see Ross v. Bernhard*, 396 U.S. 531, 537-38 (1970) ("[W]here equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed[.]"); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 n.2 (4th Cir. 2021) (similar). For purposes of the Seventh Amendment, it is thus "irrelevant" whether Watts's and Howell's claims are "properly characterized 'as one for damages and injunctive relief, or as one for damages alone.'" *Tamosaitis*, 781 F.3d at 487 (quoting *Curtis*, 415 U.S. at 196 n.11). Watts and Howell seek compensatory damages from Perdue, and that is "all but dispositive" as to Perdue's right to a jury trial. *Jarkesy*, 603 U.S. at 123; *see In re Express Scripts, Inc.*, 2026 WL 1355370, at *5 ("[T]he Court's recent decision in *Jarkesy* suggests that a remedy's legal nature can be virtually determinative in entitling the defendant to a jury trial.").

**2.** The nature of the cause of action "confirms" that these claims implicate the Seventh Amendment. *See Jarkesy*, 603 U.S. at 125. Indeed, the district court recognized that Watts and Howell's claims are "analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century." *City of Monterey*, 526 U.S. at 708-09; *see* JA14.

37

Watts and Howell each allege that they raised chicks for Perdue under a written contract with the company, that Perdue wrongfully terminated or constructively terminated those contracts in retaliation for protected activity under the FSMA, and that claimants are damaged by that wrongful termination and owed compensation. *See* JA193-194, JA203, JA204-205, JA208, JA211-212, JA614-615, JA625, JA629. Those claims are analogous to a common-law claim for "breach of contract," JA14, "where the terms of [the FSMA] are considered to be incorporated into the" parties' written agreement, *Hill*, 934 F.2d at 1524. That the claims arise under a statute does not change their essential character. *See id.* Courts of appeals have therefore recognized that similar statutory retaliation claims are analogous to common-law breach-of-contract claims and implicate the Seventh Amendment where the plaintiffs sought legal relief. *Id.* at 1524, 1525-26 (recognizing that statutory retaliation claim for protected jury service was analogous to "an action for special assumpsit or breach of contract" and that a jury was required where plaintiff sought "back wages and civil penalty"); *Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 668, 673 (7th Cir. 1996) (similar with respect to statutory retaliation claim for protected union activities);

38

*Waldrop*, 24 F.3d at 156, 159 (finding statutory discrimination claim under Rehabilitation Act analogous to "an action for breach of an employment contract" and finding a jury trial was available where plaintiff sought "a back pay award" that was "clearly compensatory").

These claims are also analogous to a common-law tort action: the FSMA in effect imposes a "legal duty" on covered employers not to retaliate for protected activity and authorizes compensation "for the injury caused by [an employer's] wrongful breach." *Curtis*, 415 U.S. at 195; *see Hill*, 934 F.2d at 1524 (analogizing retaliation claim for protected jury service to "an action in tort"); *Lebow*, 86 F.3d at 669 (analogizing retaliation claim for union activity to common-law tort). Indeed, this Court has recognized that a statutory discrimination claim was "essentially a form of statutory tort" and analogous to a common-law action. *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 829 (4th Cir. 1994). Under either analogy, Perdue is entitled to a jury trial on Watts's and Howell's retaliation claims for compensatory damages.

## B.   The Public Rights Exception Does Not Apply.

The district court further erred in concluding that Watts's and Howell's retaliation claims may be adjudicated before the agency and without

39

a jury because the "public rights exception" applies. JA20-21. That exception recognizes that for a narrow class of cases involving "public rights," Congress may assign the matter for adjudication without a jury and outside of an Article III court. *Jarkesy*, 603 U.S. at 127-28. The retaliation claims against Perdue do not fall within this limited exception and must be heard in federal court where a jury trial is available.

**1.** The Constitution assigns Article III courts "the judicial Power of the United States," and that power cannot "be shared with another branch." *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (cleaned up). The Constitution thus prohibits Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856). "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory," with a jury where the Seventh Amendment applies. *Jarkesy*, 603 U.S. at 127-28 (citing *Stern*, 564 U.S. at 484).

The Supreme Court has recognized a limited class of cases concerning "public rights" that, "[i]n contrast to common law claims," may be

40

initially adjudicated outside of an Article III court. *Jarkesy*, 603 U.S. at 128. The Court has explained that matters involving public rights are those that "historically could have been determined exclusively by [the executive and legislative] branches." 603 U.S. at 128 (quotation omitted). The Court has thus found the exception to apply in cases involving the collection of revenue, "immigration," tariffs, "relations with Indian tribes," "the administration of public lands," and "the granting of public benefits." *Id.* at 129-30; *see also Sligo Creek Ctr. v. United States Dep't of Health & Hum. Servs.*, __ F.4th __, 2026 WL 1615174, at *3-4 (4th Cir. 2026) (applying public rights exception to "participat[ion] in a voluntary government program (Medicare) where public funds are spent to achieve public benefits" and obligations are "untethered to any injury"). But the Supreme Court has stressed that the public rights "exception is, after all, an *exception*," and one that "has no textual basis in the Constitution." *Jarkesy*, 603 U.S. at 131. The exception's applications must therefore be evaluated "with care," and the "presumption is in favor of Article III courts." *Id.* at 131-32.

Applying these principles, the Court in *Jarkesy* held that the public rights exception did not cover a statutory claim for securities fraud. 603

41

U.S. at 140. The Court rejected the government's arguments that the matter involved public rights because Congress had "created new statutory obligations" and assigned the agency "the function of deciding whether" a violation had occurred. *Id.* at 135 (cleaned up). Relying on its earlier decision in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), which held that claims for fraudulent conveyance could not be assigned for adjudication by bankruptcy courts outside of Article III, the Court explained that the public rights exception does not turn on whether a claim "originate[s] in a newly fashioned regulatory scheme" or whether there are public "advantage[s]" to agency adjudication. 603 U.S. at 135, 140 (quoting *Granfinanciera*, 492 U.S. at 52). Rather, what matters is the "substance" of the claim, and where an action resembles a traditional legal claim, it involves private rights. *Id.* at 135.

**2.** Watts's and Howell's retaliation claims do "not fall within any of the distinctive areas involving governmental prerogatives where the Court has concluded that a matter" involves public rights. *Jarkesy*, 603 U.S. at 120. To the contrary, the claims at issue were brought by private individuals against a private company and the government is not a party to the underlying administrative proceedings. And as explained above,

42

the claims are analogous to a common-law claim for breach of contract or tort and involve classic legal relief. Because these claims are "made of the stuff of the traditional actions at common law," they must be heard in an Article III tribunal where a jury trial is available. *Id.* at 127-28 (quotation omitted).

The district court's contrary holding stretches the public rights exception beyond recognition. Setting aside the clear teachings of *Jarkesy* and *Granfinanciera*, the district court reasoned that the public rights exception applies to these retaliation claims brought by private individuals because the claims are "closely integrated into a public regulatory scheme" and serve "a weighty public purpose." JA21 (citing *Granfinanciera*, 492 U.S. at 54). But *Jarkesy* and *Granfinanciera* foreclose that reasoning. As discussed above, those cases make clear that it is the "substance" of the claim that matters, not whether it arises in a public regulatory scheme or whether agency adjudication serves the public interest. 603 U.S. at 135, 140. Thus, the public rights exception did not apply to the securities-fraud claim at issue in *Jarkesy*, even though the claim arose under the securities scheme, was brought by the agency to "regulate transactions" in the securities markets, and implicated important

43

public purposes. *Id.* at 135-40. If anything, the private nature of these actions is even clearer, where the claims were brought not by the government but by private individuals seeking damages against a private company with which they had contracted.

*Granfinanciera* also refutes the district court's reasoning that the retaliation claims at issue are "closely integrated" with the FSMA's regulatory scheme. JA21-22. In addressing whether fraudulent conveyance claims could be assigned for adjudication by bankruptcy courts, the Court in *Granfinanciera* considered whether such claims were so "closely intertwined" with the bankruptcy process that holding trials for such claims would be "incompatible" with the bankruptcy scheme, given that certain bankruptcy claims are "highly interdependent and require coordination" for fair adjudication. *Jarkesy*, 603 U.S. at 133-34 (discussing and quoting *Granfinanciera*). The Court held that fraudulent conveyance claims were not so closely intertwined, noting that Congress had expressly provided "for jury trials in certain actions arising out of bankruptcy litigation," which demonstrated that jury trials were generally not "incompatible" with the scheme. *Granfinanciera*, 492 U.S. at 62.

Here, too, Congress expressly contemplated jury trials for FSMA whistleblower claims: under the FSMA, if the agency has not issued a final decision on the administrative complaint within a particular time, whistleblower claimants may bring an action "at law or equity" in federal court, which shall "be tried by the court with a jury" at either party's request. 21 U.S.C. § 399d(b)(4)(A); *see, e.g.*, *Finley v. Kraft Heinz Inc.*, 146 F.4th 382, 392-94 (4th Cir. 2025) (vacating grant of summary judgment in FSMA whistleblower claim brought in federal district court because the "record g[ave] rise to genuine issues of material fact for a jury"). Because Congress "already authorized jury trials" for FSMA claims under certain conditions, jury trials for such claims are plainly not "incompatible" with the regulatory scheme. *Jarkesy*, 603 U.S. at 134 (quoting *Granfinanciera*, 492 U.S. at 61-62). Contrary to the district court's reasoning, *Granfinanciera* thus makes clear that these retaliation claims do not involve public rights.

## II. Perdue is Entitled to Relief from Administrative Proceedings Presided Over by an ALJ Who is Unconstitutionally Insulated from Removal by the President.

Perdue is entitled to relief from the administrative proceedings for the additional reason that the ALJ adjudicating these disputes is

unconstitutionally insulated from Presidential removal by two layers of removal protection. The district court correctly acknowledged that the two layers of removal protection "appears to violate Article II." JA24. But the court nonetheless concluded Perdue's claim is not "actionable" because Perdue failed to identify "harm caused by the removal limitations." JA24-25. That was error. Being forced to proceed before an unconstitutional adjudicator *is* the harm, and that harm "can be remedied by a court." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020).

### A. Perdue Is Suffering a Here-and-Now Injury from Being Forced to Proceed Before an Unaccountable ALJ.

Article II vests "[t]he executive Power" in the President, requiring him to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. To that end, the President must be able to hold executive "officers accountable—by removing them from office, if necessary." *Free Enterprise Fund*, 561 U.S. at 483. The Supreme Court has therefore held that Congress may not limit the President's removal authority by insulating executive officers with "two levels of protection from removal." *Id.* at 514.

Yet as the district court recognized, Department of Labor ALJs are inferior officers who "enjoy two layers of removal protection." JA24. This Court has held that Department of Labor ALJs are "inferior officers" of the United States. *See K & R Contractors, LLC v. Keene*, 86 F.4th 135, 143, 147 (4th Cir. 2023) (citing *Lucia v. SEC*, 585 U.S. 237, 247-49 (2018)). The ALJs are removable by the Merit Systems Protection Board (MSPB) only for cause. 5 U.S.C. § 7521(a). And MSPB members, in turn, may be removed by the President only for cause. *Id.* § 1202(d). This "multilevel protection" violates Article II and "contravenes the President's constitutional obligation to ensure the faithful execution of the laws." *Free Enterprise Fund*, 561 U.S. at 484 (quotation omitted). The federal government appears to agree. *See* Letter from Acting Solicitor Gen., Dep't of Just., to Mike Johnson, Speaker, U.S. House of Representatives (Feb. 20, 2025), https://www.justice.gov/oip/media/1390336/dl (advising Congress that the Department "has concluded that the multiple layers of removal restrictions for administrative law judges . . . violate the Constitution").[3]

---

[3] The D.C. Circuit recently held that the MSPB's statutory removal protections violate Article II. *Harris v. Bessent*, 160 F.4th 1235, 1256 (D.C. Cir. 2025). The Department of Justice agrees and has asked the

47

The Supreme Court has recognized that where removal restrictions violate the separation of powers, that violation "inflicts a here-and-now injury on affected third parties that can be remedied by a court." *Seila Law*, 591 U.S. at 212 (quotation omitted); *see Free Enterprise Fund*, 561 U.S. at 513 (recognizing that petitioners were "entitled to declaratory relief sufficient to ensure that the [standards] to which they are subject will be enforced only by a constitutional agency accountable to the Executive"). The Court has recognized, moreover, that parties presently facing administrative proceedings before an unaccountable official must be able to seek relief from those proceedings before they "ha[ve] already happened" and "cannot be undone." *Axon*, 598 U.S. at 191.

Thus, in *Axon*, the Supreme Court held that plaintiffs facing administrative proceedings led by ALJs who were allegedly insulated from removal by the President could bring their removal claims directly in district court at the outset of the proceedings, rather than having to await the conclusion of the proceeding to petition for review in the court of

---

Supreme Court to hold Board Member Harris's petition for a writ of certiorari in abeyance pending the Court's resolution of the Federal Trade Commission's statutory removal protections in *Trump v. Slaughter*, No. 25-332 (argued Dec. 8, 2025). Brief for Respondents at 5, Harris v. Bessent, No. 25-1110 (Apr. 22, 2026).

48

appeals under the applicable statutory review schemes. *Id.* at 188-92. The Court reasoned that the alleged harm of having to appear in an "illegitimate proceeding, led by an illegitimate decisionmaker" is a "here-and-now injury" that does not turn on the ultimate "outcome" of the proceeding or "of other decisions made within it." *Id.* at 191-92 (quoting *Seila Law*, 591 U.S. at 212). And the Court emphasized that that harm is "impossible to remedy once the proceeding is over." *Id.* at 191.

Perdue is facing precisely such a "here-and-now injury": "being subjected to unconstitutional agency authority—a proceeding by an unaccountable ALJ." *Axon*, 598 U.S. at 191 (cleaned up). That injury can and must be addressed before "the proceedings are over," when the harm has already occurred and Perdue's rights "are effectively lost." *Id.* at 192 (quotation omitted).

### B.    The District Court Erred in Requiring Perdue to Show Additional Harm.

The district court acknowledged the presiding ALJ "enjoy[s] two layers of removal protection" and that this "structure appears to violate Article II." JA24. But the district court mistakenly reasoned that under *Collins v. Yellen*, 594 U.S. 220 (2021), Perdue's valid constitutional claim is not "actionable" because Perdue failed to establish additional "harm"

49

from the ALJ's removal protections. JA24-25 (citing *Collins*, 594 U.S. at 259-60). *Collins* addressed only retrospective relief—it does not stand in the way of a party seeking prospective relief from the here-and-now injury of appearing before an unconstitutional adjudicator.

In *Collins*, the Supreme Court held that the Director of the Federal Housing Finance Agency was unconstitutionally insulated from removal by the President. 594 U.S. at 256. Because the plaintiffs "no longer [had] a live claim for prospective relief," the Court addressed whether they could obtain "retrospective relief," namely, undoing an agreement and billions of dollars of transactions under it. *Id.* at 233-36, 257. Addressing that request, the Court explained that the unlawful removal restriction did not mean that all the agency's prior actions were "void *ab initio*" such that they must be "completely undone." *Id.* at 257-60. Instead, the Court explained that the plaintiffs would be entitled to "retrospective relief" only if they could establish the removal protections inflicted "compensable harm," such as if "the President had attempted to remove [the officer] but was prevented from doing so," or the President "made a public statement expressing displeasure with actions" taken by the officer and that

50

he would remove the officer but for the removal restrictions. *Id.* at 259-60.

Applying *Collins*, this Court has similarly recognized that plaintiffs seeking "vacatur" of an already-issued decision based on unconstitutional removal restrictions must show "compensable harm" to obtain relief. *Keene*, 86 F.4th at 149-50 (quoting *Collins*, 594 U.S. at 259); *see also, e.g.*, *Dominion Coal Corp. v. Dir., Off. of Workers' Comp. Programs*, 164 F.4th 353, 361-62 (4th Cir. 2026) (similar).[4]

Neither *Collins* nor *Keene*, however, addressed the circumstance presented here, where Perdue seeks prospective relief from ongoing administrative proceedings before an unconstitutional ALJ. A party seeking to have completed agency action retroactively undone based on an unconstitutional removal provision must show "reason to believe that the

---

[4] In discussing the holdings of *Collins* and *Keene*, the district court stated that those cases establish "only two situations" in which a plaintiff can show that a removal provision inflicted "compensable harm": (1) if the President had attempted to remove the officer but was prevented from doing so, or (2) if the President had publicly expressed that he would remove the officer if not prevented by statute. JA25. But neither *Collins* nor *Keene* state that those two circumstances are the "only" ones in which compensable harm can be shown where such harm is required. *See Keene*, 86 F.4th at 149 (noting that *Collins* provided two "'clear-cut' examples" of harm (quoting *Collins*, 594 U.S. at 260)).

51

unconstitutional removal provision" impacted the outcome of the proceedings. *Keene*, 86 F.4th at 149. But as *Axon* recognizes, a removal challenge to *ongoing* administrative proceedings is "not about" the outcome of the proceedings, but rather "about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." *Axon*, 598 U.S. at 191. Because "the proceeding *is* the injury," "[n]o further showing—such as how the outcome might differ under a valid structure—is required." *Space Expl. Tech. Co.*, 151 F.4th at 780 & n.114. For these reasons, the Fifth Circuit has refused to "[g]raft[] *Collins*'s causal-showing rule . . . onto challenges to an ongoing invalid process," emphasizing that doing so would effectively "nullify" the here-and-now injury that *Axon* recognized. *Id.*

The district court dismissed *Axon*'s relevance, reasoning that *Axon* concerned "only subject matter jurisdiction." JA25. But Axon's reasoning for *why* the district courts had subject-matter jurisdiction is fully relevant here. As set forth above, *Axon* focused on the "nature of" the plaintiffs' structural removal claims and the "accompanying harms" the plaintiffs asserted. *Axon*, 598 U.S. at 192. Similarly here, the "nature" of Perdue's removal claim and the "accompanying harm[]" of having to proceed

before an unconstitutionally insulated ALJ establish why Perdue does not need to show *additional* harm beyond the unconstitutional proceedings themselves. *Axon*'s relevance therefore cannot be "cabin[ed] . . . to jurisdiction." *Space Expl. Tech. Co.*, 151 F.4th at 780 & n.114.

The district court cited cases applying *Collins*'s harm analysis to requests for prospective relief, but those out-of-Circuit cases are distinguishable. JA26. Most of the cited cases involved parties seeking prospective relief from completed agency action, not parties seeking relief from pending administrative proceedings presided over by an unconstitutional adjudicator. *See Consumer Fin. Prot. Bureau v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 180-81 (2d Cir. 2023) (claim arguing that an agency's civil investigative demand for documents could not be enforced); *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022) (petition seeking review of order where the "adjudication . . . ha[d] already ended").[5] Those cases therefore did not involve the here-and-now injury recognized by *Axon*.

---

[5] *See also Starbucks*, 125 F.4th at 87-88 (noting that the plaintiff had "already" been "before the ALJ" and only a future "compliance proceeding" remained and thus the plaintiff's "prospective-injury argument ha[d] less force," but not "definitively decid[ing]" whether *Collins* harm requirement applied).

Other cases cited by the district court addressed *Collins* and *Axon* in the context of holding that plaintiffs had failed to establish "irreparable harm" for purposes of a preliminary injunction. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 757-58 (10th Cir. 2024); *see Care One, LLC v. NLRB*, 166 F.4th 335, 345 (2d Cir. 2026). Whether the "here-and-now injury" of having to appear in illegitimate proceedings is sufficient, by itself, to establish irreparable injury warranting the "extraordinary" remedy of a preliminary injunction is not at issue here. *Leachco, Inc.*, 103 F.4th at 752, 758. The district court ruled at summary judgment that Perdue's removal claim is not "actionable" at all; the court did not purport to resolve any question about irreparable harm. JA25. In any event, the cited cases committed the same error as the district court here in erroneously limiting *Axon*'s relevance to only subject-matter jurisdiction, which is wrong for the reasons already explained. *E.g.*, *Leachco, Inc.*, 103 F.4th at 759. Neither "precedent, first principles," nor "common sense" support requiring parties before an unlawful adjudicator to establish additional harm beyond having to appear in the unconstitutionally structured proceedings. *Space Expl. Tech. Co.*, 151 F.4th at 780.

54

## III.   The Administrative Proceedings Violate Due Process.

Perdue is entitled to relief for the additional reason that the administrative proceedings are fundamentally unfair, in violation of due process. The ALJ has made clear that she will not grant Perdue access to key evidence needed to test complainants' allegations, and Perdue has no option to proceed in district court where it could fully investigate and defend itself through discovery. The complainants, by contrast, may at any time unilaterally choose to file suit in federal court, where the case would be adjudicated by an Article III judge with life tenure, a jury trial would be available, and the Federal Rules of Evidence would apply. Granting claimants, but not Perdue, that unilateral choice violates basic principles of fairness and further presents a non-delegation concern.

**1.** "A fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (cleaned up). This principle "applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). To protect the due process right, courts have long held that "discovery must be granted" in an agency proceeding if "a refusal to do so would so prejudice a party as to deny him due process." *McClelland v. Andrus*, 606

55

F.2d 1278, 1286 (D.C. Cir. 1979); *see Souch v. Califano*, 599 F.2d 577, 580 (4th Cir. 1979) (holding that ALJ's denial of subpoena for "relevant evidence" to defend benefits claim violated due process). Here, Perdue sought to subpoena key evidence, but the ALJ refused to issue the subpoenas, reasoning that it had no "power to issue subpoenas to third-party witnesses." JA390. That conclusion prejudices Perdue's ability to adequately investigate and defend itself against the administrative complaints.

The gravamen of Watts's complaint is that Perdue unlawfully retaliated against him for engaging in protected activity—namely, inviting an animal welfare organization to visit his farm, record video, and publish the footage. JA200-201. Watts relies on that video to support his claim that Perdue failed to "Humanely Raise[]" its chickens as advertised. JA200-201. Perdue denies those allegations and has asserted in the administrative proceedings that the video footage demonstrates that Watts—not Perdue—was failing to comply with animal welfare and biosecurity responsibilities, and Perdue required Watts to complete supplemental training as a result. JA501-502.

To adequately investigate the allegations and defend itself in the administrative proceedings, Perdue sought to subpoena documents and testimony from the animal-welfare organization, including for any unedited video footage taken from Watts's farm. The ALJ ruled that she lacked authority to issue Perdue's third-party subpoenas. JA390. The ALJ reasoned that she did "not have the power to issue subpoenas to third-party witnesses in the absence of explicit statutory authority" and because "the FSMA does not confer" such authority, she lacked the authority to compel third parties to "provide documents or give deposition testimony." JA390-391.

If Perdue must proceed administratively, it will therefore be forced to defend against Watts's whistleblower complaint without key evidence needed to test Watts's allegations. The same is true with respect to Howell's whistleblower complaint, which likewise turns on third parties' visits to Howell's farms. JA652-653. Perdue could seek discovery from third parties in federal district court. But the ALJ has made clear that such discovery is off the table in the administrative proceedings. Indeed, the ALJ left no room for a case-specific determination on whether due process would require third-party subpoenas and instead embraced a categorical

rule foreclosing all such subpoenas. Under this Court's precedent, "[s]uch a result surely offends standards of fundamental fair play." *Souch*, 599 F.2d at 580.

Perdue may lose any opportunity to develop that evidence if it cannot subpoena documents and testimony before the ALJ. If the ALJ's decision is adverse to Perdue, Perdue can seek review of the decision before the Department of Labor's Administrative Review Board, which "review[s] the factual determinations of the ALJ under the substantial evidence standard." 29 C.F.R. § 1987.110. Similarly, Perdue may challenge a final adverse decision of the agency only on petition for review in the court of appeals, whose review "shall conform to chapter 7 of title 5." 21 U.S.C. § 399d(b)(5); *see* 5 U.S.C. § 706(2)(E) (providing for substantial-evidence review on the agency record).

Watts and Howell, by contrast, can elect to leave the administrative proceeding for district court. Complainants have the unilateral right to jettison administrative proceedings and initiate "de novo review" in district court if the Secretary does not issue a final decision within the time

58

periods specified in the statute. 21 U.S.C. § 399d(b)(4)(A).[6] That means complainants—but only the complainants—can elect to proceed in a forum where the Federal Rules of Evidence apply, the case will be heard by an Article III judge with life tenure, and the case "shall . . . be tried by the court with a jury" at the request of either party. *Id.*; *compare* 29 C.F.R. § 1987.107 (b), (d) (providing that the "[f]ormal rules of evidence will not apply" in administrative proceedings). Claimants also have the unfair advantage of seeing how the administrative proceedings progress and then determining whether they prefer a do-over in federal court. If claimants, for example, determined that *they* needed third-party evidence to establish their case and sought to subpoena that evidence, but the ALJ denied the request, they could choose to leave the administrative forum and file suit in district court. Perdue has no such option.

---

[6] In interpreting the Sarbanes-Oxley whistleblower provision, this Court held that "a complainant has the *statutory right* not merely to undefined relief in another forum, but to '*de novo* review' in federal district court." *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 245-46 (4th Cir. 2009) (quotation omitted); *see also Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 135 (3d Cir. 2019) (explaining that the Federal Railway Safety Act whistleblower provision "effectively allows an employee to start her case over from scratch in a federal district court").

This due process concern is compounded by the fact that the one-sided do-over provision also violates non-delegation principles. The Fifth Circuit has recognized that "the power to decide which defendants should receive *certain legal processes* (those accompanying Article III proceedings) and which should not" is a legislative power that "Congress uniquely possesses." *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *adhered to on remand*, 132 F.4th 745 (5th Cir. 2024). The Fifth Circuit has therefore held that it violates the nondelegation doctrine for Congress to grant an agency the "exclusive authority and absolute discretion to decide whether to bring" an enforcement proceeding in an Article I or Article III tribunal. *Id.* Congress surely cannot grant that exclusive and unilateral choice to private claimants. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (recognizing that legislative delegation to self-interested private parties is "delegation in its most obnoxious form"). Congress may not require Perdue to defend itself in a forum that lacks basic procedural safeguards and access to evidence, while giving complainants the unilateral right to decide whether they would prefer the protections of an Article III forum over the administrative proceedings already underway.

60

**2.** The district court's reasons for rejecting these arguments do not withstand scrutiny.

The district court reasoned that an ALJ's "inability (or refusal) to issue subpoenas" does not violate due process unless the ALJ also relies "on the withheld evidence for its decision." JA30. But that misunderstands the nature of the due process violation, which occurred when the ALJ *prevented* Perdue from obtaining and testing relevant evidence needed to present its case. The district court cited this Court's decision in *Souch* in support of its reasoning, but that case only confirms the district court's error. In *Souch*, a claimant sought black lung disability benefits, relying on X-ray evidence that the Secretary challenged. 599 F.2d at 578-79. The ALJ refused the claimant's requests to subpoena the Secretary's medical experts and their negative X-rays but then relied on the X-ray evidence in denying benefits. *Id.* This Court held that the claimant was denied due process, reasoning that the ALJ deprived him of the opportunity to test the "disputed X-rays," which were not "made available to him for inspection." *Id.* at 580. The due-process concern was thus that the claimant could not "adequately prepare his case" because he could not "access . . . the relevant evidence." *Id.* The same is true here. *Souch* does

not support the district court's erroneous holding that due process is satisfied unless the ALJ "has relied upon" the information Perdue "would like to subpoena." JA30.

The district court further erred in holding that Perdue lacks standing to pursue its argument that the statute unfairly grants claimants the unilateral right to withdraw their claims from an administrative forum and proceed de novo in district court. JA28, JA32. The district court reasoned that because "neither Watts nor Howell has invoked" the provision, Perdue "has suffered no injury from it." JA28. But that misunderstands the constitutional injury. As explained above, Perdue is injured because the statute grants claimants—and only claimants—the one-sided choice to leave the ongoing administrative proceedings and begin anew in an Article III court at their discretion. Perdue has standing to raise that "here-and-now injury" for the same reason it has standing to challenge other aspects of the unconstitutionally structured proceedings: Perdue's present injury is being subject to a proceeding that violates the Constitution. *See Seila Law*, 591 U.S. at 212 (rejecting argument that challenge to removal provision was not "ripe until that provision is actually used"

because the provision "inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court" (quotation omitted)).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Date: June 11, 2026                           Respectfully submitted,


                                              */s/ Megan Barbero*
                                              Megan Barbero
                                              Courtney L. Dixon
                                              Elizabeth M. Wilson
                                              VENABLE LLP
                                              600 Massachusetts Avenue, NW
                                              Washington, DC 20001
                                              (202) 344-4540
                                              mbarbero@venable.com


                                              *Attorneys for Plaintiff-Appellant*

63

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains exactly 12,166 words. It also complies with the typeface requirements of Fed. R. App. P. 32(a)(5), 32(a)(6) because it was prepared in Microsoft Word in 14-point Century Schoolbook font, a proportionally spaced typeface.

Dated: June 11, 2026                    By: _/s/ Megan Barbero_
                                                        Megan Barbero

## CERTIFICATE OF SERVICE

I certify that on June 11, 2026, I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit via CM/ECF. I further certify that all participants in this case are registered CM/ECF users, and that service will be accomplished through the CM/ECF system.


Dated: June 11, 2026            By: _ /s/ Megan Barbero_
                                    Megan Barbero